**RICHARD M. MARTINEZ, SBA No. 7763**
307 South Convent Avenue
Tucson, Arizona 85701
(520) 327-4797 phone
(520) 320-9090 fax
richard@richardmartinezlaw.com
**Counsel for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF ARIZONA

| | |
|---|---|
| CURTIS ACOSTA, SEAN ARCE, MAYA ARCE, MARIA FEDERICO BRUMMER, DOLORES  CARRION, ALEXANDRO ESCAMILLA, JOSE GONZALEZ,  NORMA GONZALEZ, LORENZO LOPEZ, JR., KORINA ELIZA LOPEZ, RENE F. MARTINEZ, SARA "SALLY" RUSK, and YOLANDA SOTELO,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN HUPPENTHAL, Superintendent of Public Instruction and Executive Director of the Arizona State Board of Education, in his Official Capacity, and the Arizona State Board of Education, including all members in their Official Capacity; VICKI BALANTINE, JACOB MOORE, JOHN HAEGER, JAIME MOLERA, AMY HAMILTON, EILEEN KLEIN, GREGORY MILLER, JAMES HORTON, DIANNE ORTIZ-PARSONS, and THOMAS TYREE,<br><br>Defendants. | No. CV 10 - 623 TUC AWT<br><br>**<u>FIRST AMENDED</u> COMPLAINT**<br><br>(Action for Declaratory and Injunctive Relief) |

Plaintiffs alleges:

## I. JURISDICTION

1.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331.

## II.  VENUE

2.  Venue is proper in the United States District Court for the District of Arizona under 28 U.S.C. §1391(b).

## III.  PARTIES

3.  Plaintiff Curtis Acosta is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No. 1 in a teaching position for the Mexican-American Studies Department.

4.  Plaintiff Sean Arce is a citizen of the United States, a resident of the State of Arizona residing in Pima County, [and] employed by the Tucson Unified School District No. 1 as the Director of the Mexican-American Studies Department, and the natural parent and next best friend of Maya Arce, a minor who attends Tucson Unified School District No. 1 as a full time Middle School student.

5.  Maya Arce is a citizen of the United States, a resident of the State of Arizona residing in Pima County, and the natural daughter of Plaintiff Sean Arce, her next best friend; Maya Arce is Latina, and a minor who attends Tucson Unified School District No. 1 as a full time seventh grade student at Safford K-8 Magnet School and will attend Tucson High Magnet School starting in the ninth grade. She attended Davis Bilingual for grades kindergarten through fifth grade, an immersion Spanish-English school that with a curriculum that includes as an integral component the language, culture, history and literature of Hispanics operated by Tucson Unified School District No. 1; Maya Arce and her parent/next best friend intend for her to matriculate to Tucson High Magnet School and register for all Mexican American Studies course offerings in English-Latino Literature, American History-Mexican American Perspectives and American Government - Social Justice Education Project.  These course offerings are currently available to Junior and Senior students by the Mexican American Studies Department and are intended to be banned as a violation of

HB 2282 (A.R.S. § 15-112) and thus would not be available for Maya Arce to enroll in, or benefit from in furtherance of her education.

6.   Plaintiff Maria Federico Brummer is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No. 1 in a teaching position for the Mexican-American Studies Department.

7.   Plaintiff Dolores Carrion is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No. 1 in a teaching position for the Mexican-American Studies Department.

8.   Plaintiff Alexandro Escamilla is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No.1 in a teaching position for the Mexican-American Studies Department.

9.   Plaintiff Jose Gonzalez is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No.1 in a teaching position for the Mexican-American Studies Department.

10.   Plaintiff Norma Gonzalez is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No. 1 in a teaching position for the Mexican-American Studies Department.

11.   Plaintiff Lorenzo Lopez is a citizen of the United States, a resident of the State of Arizona residing in Pima County [and] employed by the Tucson Unified School District No.1 in a teaching position for the Mexican-American Studies Department, and the natural parent and next best friend of Korina Eliza Lopez, a minor who attends Tucson Unified School District No. 1 as a full time High School student.

12. Korina Eliza Lopez is a citizen of the United States, a resident of the State of Arizona residing in Pima County, and the natural daughter of Plaintiff Lorenzo Lopez, Jr., her next best friend; Korina Eliza Lopez is Latina, and a minor who attends Tucson Unified School District No. 1 as a full time ninth grade student at Tucson High Magnet School and will graduate in the class of 2014. She attended Pistor Middle School for grades five through eight, where her course offerings included Mexican American Studies Program classes, a curriculum that includes as an integral component the language, culture, history and literature of Hispanics; Korina Eliza Lopez and her parent/next best friend intend for her to register and attend all Tucson High Magnet School course offerings in English-Latino Literature, American History-Mexican American Perspectives and American Government - Social Justice Education Project. These course offerings are currently available to Junior and Senior students by the Mexican American Studies Department and are intended to be banned as a violation of HB 2282 (A.R.S § 15-112) and thus would not be available for Korina Eliza Lopez to enroll in, or benefit from in furtherance of her education.

13. Plaintiff Rene F. Martinez is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No. 1 in a teaching position for the Mexican-American Studies Department.

14. Plaintiff Sara "Sally" Rusk is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No. 1 in a teaching position for the Mexican-American Studies Department.

15. Plaintiff Yolanda Sotelo is a citizen of the United States, a resident of the State of Arizona residing in Pima County and employed by the Tucson Unified School District No. 1 in a teaching position for the Mexican-American Studies Department.

16.  [Defendant] Tom Horne <u>was</u> [is] the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, and as such is the highest ranking state officer for K-12 Public Instruction and whose powers include making a determination that the Tucson Unified School District No. 1 Mexican-American Studies Department is in violation of ARS § 15-112(A), and 60 days thereafter directing the Arizona Department of Education to withhold 10% of the monthly apportionment of State aid that would otherwise be due to Tucson Unified School District No. 1, an amount that is estimated to be or exceed <u>one to</u> three million dollars a month. ARS § 15-112(B). *See*, the House Bill 2281, Exhibit A hereto <u>and incorporated in whole by reference</u>.

17.  <u>[Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, issued Findings dated December 30, 2010, one day before HB 2281 became effective, that the Tucson Unified School District No. 1 Mexican-American Studies Department was in violation of ARS § 15-112(A), thus subjecting the Tucson Unified School District to a sanction commencing 60 days thereafter by directing the Arizona Department of Education to withhold 10% of the monthly apportionment of State aid that would otherwise be due to Tucson Unified School District No. 1, an amount that is estimated to be or exceed one to three million dollars a month. ARS § 15-112(B). *See*, Findings, Exhibit B hereto and incorporated in whole by reference.</u>

18.  <u>Defendant John Huppenthal is the current Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, and as such is the highest ranking state officer for K-12 Public Instruction and whose powers include making a determination that the Tucson Unified School District No. 1 Mexican-American Studies Department is in violation of ARS § 15-112(A), and 60 days thereafter directing the Arizona Department of Education to withhold 10% of the monthly apportionment of State aid that would otherwise be due to</u>

1     Tucson Unified School District No. 1, an amount that is estimated to be or
2     exceed one to three million dollars a month. ARS § 15-112(B).

3  19.  The Arizona State Board of Education exists pursuant to statutory authority
4      provided by the Legislature of the State of Arizona.

5  20.  Vicki Balentine is a Member of the Arizona State Board of Education.

6  21.  Jacob Moore is a Member of the Arizona State Board of Education.

7  22.  John Haeger is a Member of the Arizona State Board of Education.

8  23.  Jaime Molera is a Member of the Arizona State Board of Education.

9  24.  Amy Hamilton is a Member of the Arizona State Board of Education.

10  25.  Eileen Klein is a Member of the Arizona State Board of Education.

11  26.  Gregory Miller is a Member of the Arizona State Board of Education.

12  27.  James Horton is a Member of the Arizona State Board of Education.

13  28.  Diane Ortiz-Parsons is a Member of the Arizona State Board of Education.

14  29.  Thomas Tyree is a Member of the Arizona State Board of Education.

## IV. PLAINTIFF'S ACTION

16  30.  This is an action seeking equitable relief against House Bill 2281 (the "Act"),
17      because its enforcement would violate Plaintiffs rights under the *First* and
18      *Fourteenth* Amendments to the Constitution of the United States, [and] the Act
19      is also void for vagueness and denies Plaintiffs and all Hispanics equal
20      protection.

21  31.  Plaintiff asserts this action pursuant to the Civil Rights Act of 1871, 42 U.S.C.
22      §1983, and the Declaratory Judgment Act of 1934, 28 U.S.C. §2201.

## V. GENERAL ALLEGATIONS

24  32.  All adult Plaintiffs are college graduates and at all times relevant to this action
25      have met the qualifications and possessed the credentials required for their
26      respective positions as educators employed by the Tucson Unified School
27      District No. 1.

28  33.  At all times relevant to this action, all Plaintiffs have possessed all qualifications

1    and certifications required by the State of Arizona for their respective positions
2    as educators employed by the Tucson Unified School District No. 1.

3    34.   At all times relevant to this action, all Plaintiffs have complied with all lawful
4          guidelines and requirements of the State of Arizona in teaching their respective
5          courses as educators employed by the Tucson Unified School District No. 1.

6                                        Curtis Acosta

7    35.   Plaintiff Curtis Acosta is Hispanic, and bilingual in English and Spanish.

8    36.   Plaintiff Curtis Acosta is employed in a teaching position with the Tucson
9          Unified School District for the Mexican-American Studies Department and is
10         assigned to Tucson High School teaching courses offered  by the Mexican-
11         American Studies Department for Junior and Senior students.

12   37.   Tucson High School has a student population that is 67% Hispanic.

13                                        Sean Arce

14   38.   Plaintiff Sean Arce is Hispanic, and bilingual in English and Spanish.

15   39.   Plaintiff Sean Arce is employed in an administrator's position with the Tucson
16         Unified School District as Director for the Mexican-American Studies
17         Department with responsibility for the oversight, management and supervision
18         of the Mexican-American Studies Department throughout the Tucson Unified
19         School District.

20   40.   The Tucson Unified School District currently has a student population that is
21         61% Hispanic serving a community that has a Hispanic population of
22         approximately 36%,

23                               Maria Federico Brummer

24   41.   Plaintiff Maria Federico Brummer is Hispanic, and bilingual in English and
25         Spanish.

26   42.   Plaintiff Maria Federico Brummer is employed in a teaching position with the
27         Tucson Unified School District for the Mexican-American Studies Department
28         and is assigned to Tucson High School teaching courses offered  by the

Mexican-American Studies Department for Junior and Senior students.

<u>Dolores Carrion</u>

43. Plaintiff Dolores Carrion is Hispanic, and bilingual in English and Spanish.

44. Plaintiff Dolores Carrion is employed in a teaching position with the Tucson Unified School District for the Mexican-American Studies Department and is assigned to Pueblo High School teaching art courses offered by the Mexican-American Studies Department for Freshmen to Senior students.

45. Pueblo High School has a student population that is 89% Hispanic.

<u>Alexandro Escamilla</u>

46. Plaintiff Alexandro Escamilla is Hispanic, and bilingual in English and Spanish.

47. Plaintiff Alexandro Escamilla is employed in a teaching position with the Tucson Unified School District for the Mexican-American Studies Department and is assigned to Wakefield Middle School teaching courses offered by the Mexican-American Studies Department for Middle School students.

48. Wakefield Middle School has a student population that is 92% Hispanic.

<u>Jose Gonzalez</u>

49. Plaintiff Jose Gonzalez is Hispanic, and bilingual in English and Spanish.

50. Plaintiff Jose Gonzalez is employed in a teaching position with the Tucson Unified School District for the Mexican-American Studies Department and is assigned to Rincon High School teaching courses offered by the Mexican-American Studies Department for Junior and Senior students.

51. Rincon High School has a student population that is 49% Hispanic.

<u>Norma Gonzalez</u>

52. Plaintiff Norma Gonzalez is Hispanic, and bilingual in English and Spanish.

53. Plaintiff Norma Gonzalez is employed in a teaching position with the Tucson Unified School District for the Mexican-American Studies Department and is assigned to Ochoa and Van Buskirk Elementary Schools and School teaching courses offered by the Mexican-American Studies Department for elementary

1   students and also Rincon High School.

2   54.   Ochoa Elementary and Van Buskirk have student populations that are
3         predominately Hispanic.

4                                  Lorenzo Lopez

5   55.   Plaintiff Lorenzo Lopez is Hispanic, and bilingual in English and Spanish.

6   56.   Plaintiff Lorenzo Lopez is employed in a teaching position with the Tucson
7         Unified School District for the Mexican-American Studies Department and is
8         assigned to Cholla High School teaching courses offered  by the Mexican-
9         American Studies Department for Junior and Senior students.

10  57.   Cholla High School has a student population that is 71% Hispanic.

11                                Rene F. Martinez

12  58.   Plaintiff Rene F. Martinez is Hispanic, and bilingual in English and Spanish.

13  59.   Plaintiff Rene F. Martinez is employed in a teaching position with the Tucson
14        Unified School District for the Mexican-American Studies Department and is
15        assigned to Cholla High School teaching courses offered  by the Mexican-
16        American Studies Department for Junior students.

17                                Sara "Sally" Rusk

18  60.   Plaintiff Sara "Sally" Rusk is an Anglo non-Hispanic, and bilingual in English
19        and Spanish.

20  61.   Plaintiff Sara "Sally" Rusk is employed in a teaching position with the Tucson
21        Unified School District for the Mexican-American Studies Department and is
22        assigned to Pueblo High School teaching courses offered  by the Mexican-
23        American Studies Department for Junior and Senior students.

24                                Yolanda Sotelo

25  62.   Plaintiff Yolanda Sotelo is Hispanic, and bilingual in English and Spanish.

26  63.   Plaintiff Yolanda Sotelo is employed in a teaching position with the Tucson
27        Unified School District for the Mexican-American Studies Department and is
28        assigned to Pueblo High School teaching courses offered  by the Mexican-

American Studies Department for all students.

### Maya Arce

64. Maya Arce is Hispanic, and bilingual in English and Spanish.

65. Maya Arce desires to register for and attend all Mexican American Studies course offerings in English-Latino Literature, American History-Mexican American Perspectives and American Government - Social Justice Education Project Tucson High Magnet School; course offerings that are currently available to Junior and Senior students by the Mexican American Studies Department and are intended to be banned as a violation of HB 2282 by the Findings issued by Tom Horne and thus would not be available for Maya Arce to enroll in, or benefit from in furtherance of her education.

### Korina Eliza Lopez

66. Korina Eliza Lopez is Hispanic, and bilingual in English and Spanish.

67. Korina Eliza Lopez desires to register for and attend all Mexican American Studies course offerings in English-Latino Literature, American History-Mexican American Perspectives and American Government - Social Justice Education Project Tucson High Magnet School; course offerings that are currently available to Junior and Senior students by the Mexican American Studies Department and are intended to be banned as a violation of HB 2282 by the Findings issued by Tom Horne and thus would not be available for Korina Eliza Lopez to enroll in, or benefit from in furtherance of her education.

### Mexican-American Studies Department

68. The Tucson Unified School District No. 1 Mexican-American Studies Department was created in 1998 and has operated as a District approved, Governing Board sanctioned, entity for the past 12 consecutive school years.

69. The Mexican-American Studies Department was created to develop and provide course offerings for students that focused on the history, culture , literature and art of Hispanics as a means of directly addressing and combating

the consistent and persistent failure of Hispanic students in the Tucson Unified School District No.1, which included excessive drop out/push out rates, excessive grade failure rates, excessive discipline, poor attendance, poor graduation rates and extremely poor matriculation to post high school educational institutions, especially four year colleges/universities.

70.   Since the inception of the Mexican-American Studies Department all course offerings and assistance has been open to all students and their families with out consideration of race, national origin, gender, religion, language or economic status.

71.   Since the inception of the Mexican-American Studies Department all course offerings have been provided in conformity with applicable State adopted standards and/or guidelines.

72.   Since the inception of the Mexican-American Studies Department all course offerings have included a diverse student population reflective the specific school site's population.

73.   Since the inception of the Mexican-American Studies Department, Hispanics have comprised the largest and most significant portion of the student population enrolling and completing the Department's course offerings; enrollment that reflects the de facto segregation present throughout the Tucson Unified School District No.1, which has been exacerbated since the advent of Charter Schools.

74.   Since the inception of the Mexican-American Studies Department all course offerings have been subjected to annual scrutiny and as appropriate modification to determine and improve the educational efficacy of the course offerings; these evaluations have consistently shown that students who take and complete Mexican-American Studies course offerings pass the State required AIMS test at higher rates, graduate from High School are higher rates, have improved grades and matriculate to college at high rates while

1   decreasing in the areas of discipline, poor attendance or dropping out of
2   High School. These results have occurred for all students, irrespective of
3   race or national origin.

4   Mexican-American Studies Department: Topic & Materials Utilized

5   75.   The Tucson Unified School District No. 1 Mexican-American Studies
6         Department utilizes text books and materials that are specific to the
7         curriculum; this includes Occupied America, A History of Chicanos by
8         Rodolfo F. Acuna. This text, published by Longman and Charlyce Jones
9         Owens is currently in its seventh edition and is a standard High School and
10        College level course book.

11  76.   Mexican-American Studies offers courses that focus on Hispanic history,
12        culture, literature, art and persons who have contributed in some manner to
13        those subject matter areas; all topics are addressed through the utilization of
14        critical thinking.

15  77.   In October of 2009 the Tucson Unified School District No. 1 central
16        administration imposed a unilateral name change on the Mexican-American
17        Studies Program, which had been since 1998 the "Mexican American/Raza
18        Studies"; a name change that was the result of [Defendant] Tom Horne's
19        constant criticism and disparaging comments about the word "Raza" a term
20        in Spanish that he did not understand, took offense to and insisted it be
21        eliminated.

22  78.   [Defendant] Tom Horne has also made known his objection to text books
23        utilized in the Mexican-American Studies Program, such as "Occupied
24        America", making known his objection to the book, and insisting that it no
25        longer be utilized, relied upon or referenced in the Public Schools.

26  79.   [Defendant] Tom Horne as the Superintendent of Public Instruction and the
27        Executive Officer of the Arizona State Board of Education, and as such is the
28        highest ranking state officer for K-12 Public Instruction and whose powers

include making a determination that the Tucson Unified School District No. 1 Mexican-American Studies Department is in violation of ARS § 15-112(A), and 60 days thereafter directing the Arizona Department of Education to withhold 10% of the monthly apportionment of State aid that would otherwise be due to Tucson Unified School District No. 1, has engaged in a consistent pattern of conduct that has chilled the use of text books, material, posters, content, and the name of the Mexican-American Studies Department by all Plaintiffs, thus impermissibly infringing on their Free Speech which is permitted by the Tucson Unified School District No. 1 but subject to an imminent adverse sanction and irreparable harm by Defendants.

80. Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, issued Findings dated December 30, 2010, Exhibit B, that the Tucson Unified School District No. 1 Mexican-American Studies Department is in violation of ARS § 15-112(A), thus exposing Tucson Unified School District No. 1 to a sanction commencing 60 days thereafter of directing the Arizona Department of Education to withhold 10% of the monthly apportionment of State aid that would otherwise be due to; this sanction would result in the immediate termination of the Mexican-American Studies Department and the employment of the adult Plaintiffs, and thus impermissibly infringing on the Free Speech of all Plaintiffs which is permitted by the Tucson Unified School District No. 1 but subject to an imminent adverse sanction and irreparable harm by Defendants.

House Bill 2281

81. [Defendant] Tom Horne is the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, was the principal advocate for the passage of House Bill 2281, legislation that he sought for the purpose of having a mechanism that would allow him to "shut down" the

Mexican-American Studies Department in the Tucson Unified School District No. 1.

82.  On April 29, 2010 final passage of House Bill 2281occurred; the Act was then transmitted to the Governor on April 30, 2010.

83.  [Defendant] Jan Brewer is the Governor of Arizona.

84.  Acting in her official capacity as the Governor of Arizona, on May 11, 2010, Governor Brewer elected to sign into law House Bill 2281.

85.  A true and correct copy of the Act is attached hereto as Exhibit A.

86.  Had Governor Brewer exercised her authority to veto the Act, it would not have become law.

87.  House Bill 2281 becomes effective on December 31, 2010.

88.  Since House Bill 2281 was signed into law, [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, as stated repeatedly and publicly that he intends to find the Tucson Unified School District No.1 Mexican-American Studies Department to be in violation of ARS § 15-112(A), a determination that 60 days thereafter would result in directing the Arizona Department of Education to withhold 10% of the monthly apportionment of State aid that would otherwise be due to Tucson Unified School District No. 1, signed and issued such a Finding, Exhibit B hereto.

89.  Since House Bill 2281 was signed into law, [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, has determined that the Tucson Unified School District No.1 Mexican-American Studies Department to be in violation of ARS § 15-112(A), thus "[p]romotes the overthrow of the United States Government."

90.  Since House Bill 2281 was signed into law, [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona

State Board of Education, has determined that the Tucson Unified School District No.1 Mexican-American Studies Department to be in violation of ARS § 15-112(A), thus "[p]romotes resentment toward a race or a class of people."

91. Since House Bill 2281 was signed into law, [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, has determined that the Tucson Unified School District No.1 Mexican-American Studies Department to be in violation of ARS § 15-112(A), thus "[a]re designed primarily for pupils of a particular race."

92. Since House Bill 2281 was signed into law, [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, has determined that the Tucson Unified School District No.1 Mexican-American Studies Department to be in violation of ARS § 15-112(A), thus "[a]dvocates ethnic solidarity instead of the treatment of pupils as individuals."

93. [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, has never visited or observed any class offered by the Tucson Unified School District No.1 Mexican-American Studies Department.

94. [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, has no lawful non-discriminatory facts to support or establish that the Tucson Unified School District No.1 Mexican-American Studies Department has violated ARS § 15-112(A).

95. [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education, has singled out the Tucson Unified School District No.1 Mexican-American Studies Department to be in violation of ARS § 15-112(A) while allowing all other

programs, racial, ethnic, national origin and religious groups to offer courses which teach the history, culture, literature and art of such groups; a distinction in classification and treatment that is suspect and for which the State of Arizona has no legal justification or any compelling state interest.

96. The determination, <u>Findings</u>, by [Defendant] Tom Horne as the Superintendent of Public Instruction and the Executive Officer of the Arizona State Board of Education  that Tucson Unified School District No.1 Mexican-American Studies Department is in violation of ARS § 15-112(A), will cause immediate and irreparable harm to the Plaintiffs including elimination of the Mexican-American Studies Department and the loss of employment.

97. At all times relevant to this Complaint, [Defendant] Tom Horne has announced and made clear his intent to implement and enforce the Act, enacted legislation of the State of Arizona, a session law that places every Hispanic educator and student within the Tucson Unified School District No. 1 and the State of Arizona, at substantial risk of the immediate loss of rights guaranteed by the United States Constitution, including unlawful infringement of Free Speech, <u>including freedom of association</u>, denial of due process and denial of equal protection based solely on their race, Hispanic or association with Hispanics.

98. The Act was enacted by the Legislature of the State of Arizona and signed into law by [Defendant] <u>Governor</u> Brewer as a result of racial bias and anti-Hispanic beliefs and sentiments.

99. Plaintiffs believe that the Act is the product of racial bias aimed specifically at Hispanics, is unlawful, results in impermissible deprivations of rights guaranteed by the United States Constitution, have voiced their opinions of such in the work place and been confronted by for expressing such beliefs.

100. But for [Defendant] Tom Horne's Legislative lobbying and Governor Brewer's signing the Act into law, Plaintiffs would <u>not</u> be chilled from exercising their

-16-

First Amendment rights and subject to the enforcement actions created by the Act, resulting in the loss of their positions and employment.

101. John Huppenthal, the current Superintendent of Public Instruction, successor to Tom Horne, openly and publicly campaigned on "Stop La Raza" a racial message that reflected bias, prejudice and resentment towards Hispanics and the Mexican American Studies Department.

**COUNT ONE**

**FOURTEENTH AMENDMENT: EQUAL PROTECTION**

**(42 U.S.C. §1983)**

102. Plaintiffs hereby re-alleges and incorporates all allegations contained in paragraphs 1 through 100 as if fully set forth herein.

103. Defendants' actions against Plaintiff constitutes a violation of equal protection and 42 U.S.C. §1983.

104. As a direct and proximate result of the conduct of Defendants, Plaintiffs have suffered injury.

**COUNT TWO**

**FIRST AMENDMENT: FREE SPEECH**

105. Plaintiffs hereby re-alleges and incorporates all allegations contained in paragraphs 1 through 103 as if fully set forth herein.

106. Defendants' actions against Plaintiffs constitutes a violation of free speech and 42 U.S.C. §1983.

107. As a direct and proximate result of the conduct of Defendants, Plaintiffs have suffered injury.

**COUNT THREE**

**FIRST AMENDMENT: FREEDOM OF ASSOCIATION**

108. Plaintiffs hereby re-alleges and incorporates all allegations contained in paragraphs 1 through 106 as if fully set forth herein.

109. Defendants' actions against Plaintiffs constitutes a violation of free speech

-17-

and 42 U.S.C. §1983.

110. As a direct and proximate result of the conduct of Defendants, Plaintiffs have suffered injury.

## COUNT [THREE] FOUR

## FOURTEENTH AMENDMENT: DUE PROCESS

## (42 U.S.C. §1983)

111. Plaintiffs hereby re-alleges and incorporates all allegations contained in paragraphs 1 through 109 as if fully set forth herein.

112. Defendants' actions constitute violations of due process and 42 U.S.C. §1983.

113. As a direct and proximate result of the conduct of Defendants, Plaintiffs have suffered injury.

## DECLARATORY JUDGMENT

## (28 U.S.C. §2201)

114. Plaintiffs hereby re-alleges and incorporates all allegations contained in paragraphs 1 through 112 as if fully set forth herein.

115. Plaintiffs seeks a declaratory judgment as provided in 28 U.S.C. § 2201 et. seq.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays:

1. That this court declare the actions complained of herein to be in violation of 42 U.S.C. §1983, the *First* and *Fourteenth* Amendments to the United States Constitution.

2. That Defendants be ordered to take appropriate injunctive and affirmative acts to insure that the actions complained of herein are not engaged in again by them or any of their agents.

3. That Defendants, including their officers, directors, agents, employees and successors, be permanently enjoined from engaging in any action

that harms the Tucson Unified School District No. 1 Mexican-American Studies Department, administrator, educators or staff.

4.   That Plaintiffs be awarded their attorneys' fees;

5.   That Plaintiffs be awarded their costs; and

6.   That Plaintiffs be awarded all other relief that this court deems just and proper under the circumstances.

DATED this 12th day of April 2011.

s/*Richard M. Martinez*, Esq.
Richard M. Martinez, Esq.
Counsel for Plaintiffs

COPY sent via ECF
this 12th day of April
2011 to all ECF registrants
in the instant matter.

s/*Richard M. Martinez*, Esq.

First Amended Complaint

Exhibit A

.

Senate Engrossed House Bill

State of Arizona
House of Representatives
Forty-ninth Legislature
Second Regular Session
2010

# HOUSE BILL 2281

AN ACT

AMENDING TITLE 15, CHAPTER 1, ARTICLE 1, ARIZONA REVISED STATUTES, BY ADDING
SECTIONS 15-111 AND 15-112; AMENDING SECTION 15-843, ARIZONA REVISED
STATUTES; RELATING TO SCHOOL CURRICULUM.

(TEXT OF BILL BEGINS ON NEXT PAGE)

H.B. 2281

1   Be it enacted by the Legislature of the State of Arizona:
2       Section 1.  Title 15, chapter 1, article 1, Arizona Revised Statutes,
3   is amended by adding sections 15-111 and 15-112, to read:
4       15-111.  Declaration of policy
5       THE LEGISLATURE FINDS AND DECLARES THAT PUBLIC SCHOOL PUPILS SHOULD BE
6   TAUGHT TO TREAT AND VALUE EACH OTHER AS INDIVIDUALS AND NOT BE TAUGHT TO
7   RESENT OR HATE OTHER RACES OR CLASSES OF PEOPLE.
8       15-112.  Prohibited courses and classes; enforcement
9       A.  A SCHOOL DISTRICT OR CHARTER SCHOOL IN THIS STATE SHALL NOT INCLUDE
10  IN ITS PROGRAM OF INSTRUCTION ANY COURSES OR CLASSES THAT INCLUDE ANY OF THE
11  FOLLOWING:
12      1.  PROMOTE THE OVERTHROW OF THE UNITED STATES GOVERNMENT.
13      2.  PROMOTE RESENTMENT TOWARD A RACE OR CLASS OF PEOPLE.
14      3.  ARE DESIGNED PRIMARILY FOR PUPILS OF A PARTICULAR ETHNIC GROUP.
15      4.  ADVOCATE ETHNIC SOLIDARITY INSTEAD OF THE TREATMENT OF PUPILS AS
16  INDIVIDUALS.
17      B.  IF THE STATE BOARD OF EDUCATION OR THE SUPERINTENDENT OF PUBLIC
18  INSTRUCTION DETERMINES THAT A SCHOOL DISTRICT OR CHARTER SCHOOL IS IN
19  VIOLATION OF SUBSECTION A, THE STATE BOARD OF EDUCATION OR THE SUPERINTENDENT
20  OF PUBLIC INSTRUCTION SHALL NOTIFY THE SCHOOL DISTRICT OR CHARTER SCHOOL THAT
21  IT IS IN VIOLATION OF SUBSECTION A.  IF THE STATE BOARD OF EDUCATION OR THE
22  SUPERINTENDENT OF PUBLIC INSTRUCTION DETERMINES THAT THE SCHOOL DISTRICT OR
23  CHARTER SCHOOL HAS FAILED TO COMPLY WITH SUBSECTION A WITHIN SIXTY DAYS AFTER
24  A NOTICE HAS BEEN ISSUED PURSUANT TO THIS SUBSECTION, THE STATE BOARD OF
25  EDUCATION OR THE SUPERINTENDENT OF PUBLIC INSTRUCTION MAY DIRECT THE
26  DEPARTMENT OF EDUCATION TO WITHHOLD UP TO TEN PER CENT OF THE MONTHLY
27  APPORTIONMENT OF STATE AID THAT WOULD OTHERWISE BE DUE THE SCHOOL DISTRICT OR
28  CHARTER SCHOOL. THE DEPARTMENT OF EDUCATION SHALL ADJUST THE SCHOOL DISTRICT
29  OR CHARTER SCHOOL'S APPORTIONMENT ACCORDINGLY.  WHEN THE STATE BOARD OF
30  EDUCATION OR THE SUPERINTENDENT OF PUBLIC INSTRUCTION DETERMINES THAT THE
31  SCHOOL DISTRICT OR CHARTER SCHOOL IS IN COMPLIANCE WITH SUBSECTION A, THE
32  DEPARTMENT OF EDUCATION SHALL RESTORE THE FULL AMOUNT OF STATE AID PAYMENTS
33  TO THE SCHOOL DISTRICT OR CHARTER SCHOOL.
34      C.  THE DEPARTMENT OF EDUCATION SHALL PAY FOR ALL EXPENSES OF A HEARING
35  CONDUCTED PURSUANT TO THIS SECTION.
36      D.  ACTIONS TAKEN UNDER THIS SECTION ARE SUBJECT TO APPEAL PURSUANT TO
37  TITLE 41, CHAPTER 6, ARTICLE 10.
38      E.  THIS SECTION SHALL NOT BE CONSTRUED TO RESTRICT OR PROHIBIT:
39      1.  COURSES OR CLASSES FOR NATIVE AMERICAN PUPILS THAT ARE REQUIRED TO
40  COMPLY WITH FEDERAL LAW.
41      2.  THE GROUPING OF PUPILS ACCORDING TO ACADEMIC PERFORMANCE, INCLUDING
42  CAPABILITY IN THE ENGLISH LANGUAGE, THAT MAY RESULT IN A DISPARATE IMPACT BY
43  ETHNICITY.

H.B. 2281

1    3.  COURSES OR CLASSES THAT INCLUDE THE HISTORY OF ANY ETHNIC GROUP AND
2  THAT ARE OPEN TO ALL STUDENTS, UNLESS THE COURSE OR CLASS VIOLATES
3  SUBSECTION A.
4    4.  COURSES OR CLASSES THAT INCLUDE THE DISCUSSION OF CONTROVERSIAL
5  ASPECTS OF HISTORY.
6    F.  NOTHING IN THIS SECTION SHALL BE CONSTRUED TO RESTRICT OR PROHIBIT
7  THE INSTRUCTION OF THE HOLOCAUST, ANY OTHER INSTANCE OF GENOCIDE, OR THE
8  HISTORICAL OPPRESSION OF A PARTICULAR GROUP OF PEOPLE BASED ON ETHNICITY,
9  RACE, OR CLASS.
10   Sec. 2.  Section 15-843, Arizona Revised Statutes, is amended to read:
11   15-843.  Pupil disciplinary proceedings
12   A.  An action concerning discipline, suspension or expulsion of a pupil
13  is not subject to title 38, chapter 3, article 3.1, except that the governing
14  board of a school district shall post regular notice and shall take minutes
15  of any hearing held by the governing board concerning the discipline,
16  suspension or expulsion of a pupil.
17   B.  The governing board of any school district, in consultation with
18  the teachers and parents of the school district, shall prescribe rules for
19  the discipline, suspension and expulsion of pupils. The rules shall be
20  consistent with the constitutional rights of pupils and shall include at
21  least the following:
22   1.  Penalties for excessive pupil absenteeism pursuant to section
23  15-803, including failure in a subject, failure to pass a grade, suspension
24  or expulsion.
25   2.  Procedures for the use of corporal punishment if allowed by the
26  governing board.
27   3.  Procedures for the reasonable use of physical force by certificated
28  or classified personnel in self-defense, defense of others and defense of
29  property.
30   4.  Procedures for dealing with pupils who have committed or who are
31  believed to have committed a crime.
32   5.  A notice and hearing procedure for cases concerning the suspension
33  of a pupil for more than ten days.
34   6.  Procedures and conditions for readmission of a pupil who has been
35  expelled or suspended for more than ten days.
36   7.  Procedures for appeal to the governing board of the suspension of a
37  pupil for more than ten days, if the decision to suspend the pupil was not
38  made by the governing board.
39   8.  Procedures for appeal of the recommendation of the hearing officer
40  or officers designated by the board as provided in subsection F of this
41  section at the time the board considers the recommendation.
42   C.  Penalties adopted pursuant to subsection B, paragraph 1 of this
43  section for excessive absenteeism shall not be applied to pupils who have
44  completed the course requirements and whose absence from school is due solely

H.B. 2281

1  to illness, disease or accident as certified by a person who is licensed
2  pursuant to title 32, chapter 7, 13, 15 or 17.
3     D.  The governing board shall:
4     1.  Support and assist teachers in the implementation and enforcement
5  of the rules prescribed pursuant to subsection B of this section.
6     2.  Develop procedures allowing teachers and principals to recommend
7  the suspension or expulsion of pupils.
8     3.  Develop procedures allowing teachers and principals to temporarily
9  remove disruptive pupils from a class.
10    4.  Delegate to the principal the authority to remove a disruptive
11 pupil from the classroom.
12    E.  If a pupil withdraws from school after receiving notice of possible
13 action concerning discipline, expulsion or suspension, the governing board
14 may continue with the action after the withdrawal and may record the results
15 of such action in the pupil's permanent file.
16    F.  In all action concerning the expulsion of a pupil, the governing
17 board of a school district shall:
18    1.  Be notified of the intended action.
19    2.  Either:
20    (a)  Decide, in executive session, whether to hold a hearing or to
21 designate one or more hearing officers to hold a hearing to hear the
22 evidence, prepare a record and bring a recommendation to the board for action
23 and whether the hearing shall be held in executive session.
24    (b)  Provide by policy or vote at its annual organizational meeting
25 that all hearings concerning the expulsion of a pupil conducted pursuant to
26 this section will be conducted before a hearing officer selected from a list
27 of hearing officers approved by the governing board.
28    3.  Give written notice, at least five working days before the hearing
29 by the governing board or the hearing officer or officers designated by the
30 governing board, to all pupils subject to expulsion and their parents or
31 guardians of the date, time and place of the hearing.  If the governing board
32 decides that the hearing is to be held in executive session, the written
33 notice shall include a statement of the right of the parents or guardians or
34 an emancipated pupil who is subject to expulsion to object to the governing
35 board's decision to have the hearing held in executive session. Objections
36 shall be made in writing to the governing board.
37    G.  If a parent or guardian or an emancipated pupil who is subject to
38 expulsion disagrees that the hearing should be held in executive session, it
39 shall be held in an open meeting unless:
40    1.  If only one pupil is subject to expulsion and disagreement exists
41 between that pupil's parents or guardians, the governing board, after
42 consultations with the pupil's parents or guardians or the emancipated pupil,
43 shall decide in executive session whether the hearing will be in executive
44 session.

H.B. 2281

1    2.  If more than one pupil is subject to expulsion and disagreement
2  exists between the parents or guardians of different pupils, separate
3  hearings shall be held subject to this section.
4    H.  This section does not prevent the pupil who is subject to expulsion
5  or suspension, and the pupil's parents or guardians and legal counsel, from
6  attending any executive session pertaining to the proposed disciplinary
7  action, from having access to the minutes and testimony of the executive
8  session or from recording the session at the parent's or guardian's expense.
9    I.  In schools employing a superintendent or a principal, the authority
10  to suspend a pupil from school is vested in the superintendent, principal or
11  other school officials granted this power by the governing board of the
12  school district.
13    J.  In schools that do not have a superintendent or principal, a
14  teacher may suspend a pupil from school.
15    K.  In all cases of suspension, it shall be for good cause and shall be
16  reported within five days to the governing board by the superintendent or the
17  person imposing the suspension.
18    L.  RULES PERTAINING TO THE DISCIPLINE, SUSPENSION AND EXPULSION OF
19  PUPILS SHALL NOT BE BASED ON RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN OR
20  ANCESTRY.  IF THE DEPARTMENT OF EDUCATION, THE AUDITOR GENERAL OR THE
21  ATTORNEY GENERAL DETERMINES THAT A SCHOOL DISTRICT IS SUBSTANTIALLY AND
22  DELIBERATELY NOT IN COMPLIANCE WITH THIS SUBSECTION AND IF THE SCHOOL
23  DISTRICT HAS FAILED TO CORRECT THE DEFICIENCY WITHIN NINETY DAYS AFTER
24  RECEIVING NOTICE FROM THE DEPARTMENT OF EDUCATION, THE SUPERINTENDENT OF
25  PUBLIC INSTRUCTION MAY WITHHOLD THE MONIES THE SCHOOL DISTRICT WOULD
26  OTHERWISE BE ENTITLED TO RECEIVE FROM THE DATE OF THE DETERMINATION OF
27  NONCOMPLIANCE UNTIL THE DEPARTMENT OF EDUCATION DETERMINES THAT THE SCHOOL
28  DISTRICT IS IN COMPLIANCE WITH THIS SUBSECTION.
29    L.  M.  The principal of each school shall ensure that a copy of all
30  rules pertaining to discipline, suspension and expulsion of pupils is
31  distributed to the parents of each pupil at the time the pupil is enrolled in
32  school.
33    M.  N.  The principal of each school shall ensure that all rules
34  pertaining to the discipline, suspension and expulsion of pupils are
35  communicated to students at the beginning of each school year, and to
36  transfer students at the time of their enrollment in the school.
37    Sec. 3.  Effective date
38    This act is effective from and after December 31, 2010.

First Amended Complaint

Exhibit B

**FINDING BY THE STATE SUPERINTENDENT OF PUBLIC INSTRUCTION
OF VIOLATION BY TUCSON UNIFIED SCHOOL DISTRICT
PURSUANT TO A.R.S. § 15-112(B)**

I.    <u>Philosophy of the Applicable Statute.</u>

I make the findings contained in this document as the Arizona Superintendent of Public Instruction.  I also was the author of the first draft of the applicable statute, A.R.S. § 15-112(A).  It was amended somewhat in the legislature.  The following is the philosophy which underlay the statute:

People are individuals, not exemplars of racial groups.  What is important about people is what they know, what they can do, their ability to appreciate beauty, their character, and not what race into which they are born.   They are entitled to be treated that way.  It is fundamentally wrong to divide students up according to their racial group, and teach them separately.

In the summer of 1963, having recently graduated from high school, I participated in the civil rights march on Washington, in which Martin Luther King stated that he wanted his children to be judged by the content of their character rather than the color of their skin.  That has been a fundamental principal for me my entire life.  I believe it is a principle adopted by the legislature and the governor when this statute was passed.  The Ethnic Studies courses in the Tucson Unified School District teach the opposite of this principle.

The United States in general, Arizona in particular, are enriched by the contributions of many cultures, very much including Mexican-American culture.   I myself have studied the Spanish language diligently for the past several years, and have learned enough to do my interviews on the Univision and Telemundo television stations in Spanish.  In the process, I have learned about Mexican history and culture.  As a history buff, I have enjoyed very much being able to read Mexican history books in Spanish.

The standards promulgated by this Department of Education, including a number of specific performance objectives, <u>require</u> that students learn about the contributions of different cultures, including Mexican-American culture.  But the point is that all students should be learning together, and they should be learning about the contributions of different cultures.  Students should not be divided by race, with each race learning about only its own contribution.  School is a place to broaden horizons, not narrow them.

II.    <u>The Language of A.R.S. § 15-112(D)</u>

Section 15-112(A) of the Arizona Revised Statutes ("A.R.S.") prohibits a school district or charter school from including in its program any courses or classes that include any of the following:

1. Promote the overthrow of the United States Government.
2. Promote resentment toward a race or class of people.
3. Are designed primarily for pupils of a particular ethnic group.
4. Advocate ethnic solidarity instead of the treatment of pupils as individuals.

Please note that the violation of <u>any one</u> of the above four items constitutes a violation of the statute. A program could be in compliance as to three of the four, and in violation of one of the four, and that would constitute violation under the statue. This finding is that there is a violation of all four criteria, but the focus will be on criteria three and four.

Under paragraph B of A.R.S. § 15-112, either the Superintendent of Public Instruction or the State Board of Education may make a finding. This is a finding of the Superintendent of Public Instruction.

Tucson Unified School District ("District") has four courses under the heading of Ethnic Studies. Three of the four programs could be found in violation under criterion three, courses designed primarily for pupils of a particular ethnic group. However, all of the complaints received by the Superintendent of Public Instruction have been as to one of those programs: Mexican American Studies, previously known as Raza/Mexican American Studies. Therefore, this finding is as to that program alone.

Section 15-112(B) provides that if the State Board or the Superintendent determines that the district has failed to comply within 60 days after a notice has been issued, then 10% of the school district's budget may be withheld. The only way in which compliance can be effective within the next 60 days is by elimination of the Mexican American Studies program. In view of the long history regarding that program, which is set forth below, the violations are deeply rooted in the program itself, and partial adjustments will not constitute compliance. Only the elimination of the program will constitute compliance.

Pursuant to Section 15-112(D), the determination under this statute is subject to appeal pursuant to Title 41, Chapter 6, Article 10, which is a determination by an Administrative Hearing Officer.

III.   <u>Category (3): "Are Designed primarily for Peoples of a Particular Ethnic Group"</u>

The Mexican American Studies program is not populated exclusively by students of Hispanic background. Other students attend the course. However, the percentage of students in the course that are of Hispanic background greatly exceeds their overall percentage in the relevant schools. As noted, I wrote the first draft of Section 15-112(B). The language in

subsection 3 was deliberately <u>not</u> "are designed <u>exclusively</u> for pupils of a particular ethnic group," but rather was "are designed <u>primarily</u> for pupils of a particular ethnic group." (Emphasis added.)  The evidence shows this to be true.

For example, Augustine Romero was the Chairman of the Ethnic Studies Department at TUSD for many years, and is still involved.  In a debate against the undersigned on CNN, he was asked the following question and gave the following answer:

Q [by the reporter]: And, Mr. Romero, I want to begin with you.  <u>Why not just call the class Mexican studies or – like you would have – Mexican-American studies?  Why did you put the word la raza in there</u>, which as you know, too many people connotes a political movement, as opposed to an educational course?

ROMERO: ...<u>so that our students could recognize and connect to their indigenous side</u>, just like the word "dine" for the Navajo translates to 'the people,' like the word 'o'odham' for the Tohono O'odham translates to 'the people.'  The word 'yoeme' for the Yoeme people translates to 'the people.'

<u>It was an attempt to connect to our indigenous sides, as well as our Mexican side</u>. (Emphasis added.)

If one of the purposes of this course is "an attempt to connect with our indigenous sides, as well as out Mexican side," then obviously the course is designed primarily for pupils of a particular ethnic group."

Furthermore, the page of the District's website describing the program states that the components of the model under which the program was developed is specifically designed for Hispanic students:  "For Latino students, each of [the model's] components creates both a Latino academic identity and an enhanced level of academic proficiency.  The end result is an elevated state of Latino academic achievement."  And, "The Mexican American Studies Department has found that its curriculum, because of its inclusiveness and its critical nature, offers Latino students the opportunity to engage in a learning process which transcends the depth of any previous experience."  Finally, the page includes a graphic indicating that the purpose of the Mexican American Studies Model is "Increased Academic Achievement for Latino Students," "Academic Proficiency for Latino Students," and "Academic Identify for Latino Students."  The District's official description on its website leaves no room for doubt that the Mexican American Studies program is "designed primarily" for Hispanic students.

Additional evidence set forth below will support the satisfaction of this criterion, as well as the other three criteria in the statute.

IV.    Testimony by Witnesses

A.    Teacher Number 1

Doug MacEachern, a columnist for *The Arizona Republic*, ran a series of investigative reports on ethnic studies.  One of his sources was a former TUSD teacher named John Ward, who despite his name, is Hispanic.  Ward reports:

> But the whole inference and tone was anger.  (They taught students) that the United States was and still is a fundamentally racist country to those of Mexican-American kids.
>
> Individuals in this (Ethnic Studies) department are vehemently anti-Western culture.  They are vehemently opposed to the United States and its power.  They are telling students they are victims and that they should be angry and rise up.
>
> . . .
>
> By the time I left that class, I saw a change (in the students), he said.  An angry tone.  They taught them not to trust their teachers, not to trust the system.  They taught them the system wasn't worth trusting.

MacEachern further found:

> In the past several weeks, messages have filtered out from teachers and other TUSD employees (some directed to Horne; others who have contacted me, following two previous columns on this subject) about what an officially recognized resentment-based program does to a high school.
>
> In a word, it creates fear.
>
> Teachers and counselors are being called before their school principals and even the district school board and accused of being racists.  And with a cadre of self-acknowledged 'progressive' political activists in the ethnic-studies department on the hunt, the race transgressors are multiplying.
>
> The director of the TUSD Ethnic Studies Department, who keeps a portrait of Ché Guevara on the wall of his classroom, spoke to MacEachern: 'Our teachers are left-leaning.  They are progressives.  They're going to have things (in their courses) that conservatives are not going to like,' he told me.

Ward eventually wrote his own column.  He describes how the TUSD administration intimidated him by removing him from his class, and calling him a "racist," even though he himself is Hispanic.  This tactic, he writes:

> …is fundamentally anti-intellectual because it immediately stops debate by threatening to destroy the reputation of those who would provide counter arguments.

> Unfortunately, I am not the only one to have been intimidated by the Raza studies department in this way.

> Ward has written further on this subject:

> Condition: TUSD uses tax payer funded programs to indoctrinate students, based primarily on ethnic divisions, in the belief that there is a war against Latino culture perpetrated by a white, racist, capitalist system.

> Cause: TUSD has hired a group of radical socialist activists who promote an anti-capitalist and anti-Western Civilization ideology.  They use ethnic solidarity as their vehicle of delivery.  A climate of outright intimidation has stopped many from standing up to this group for fear of being labeled racists.  Further, there is a collective action problem on the part of concerned Arizonans to make TUSD feel the financial pain of continuing these programs.

> Effect: Impressionable youth in TUSD have literally been reprogrammed to believe that there is a concerted effort on the part of a white power structure to suppress them and relegate them to a second-class existence.  This fomented resentment further encourages them to express their dissatisfaction through the iconoclastic behavior we see—the contempt for all authority outside of their ethnic community and their total lack of identification with a political heritage of this country.

B.     Teacher Number 2

Teacher Number 2 wrote as follows:

I heard him [an ethnic studies teacher] tell his students that the U of A is a racist organization because only 12% of students are Latino and they do not support the Latin students there.  I heard him tell students that they need to go to college so they can gain the power to take back the stolen land and give it back to Mexico.  He personally told me that he teaches his students that republicans

hate Latinos and he has the legislation to prove it.  When I asked him about Mexican American Republicans who are against illegal immigration, he said this is an example of 'self-racism.'

C.     Teacher Number 3

Teacher Number 3 wrote as follows:

I have, during the last two years, been attacked repeatedly here at Tucson High by members of the Ethnic Studies department because I question the substance and veracity of their American History and Social Justice Government classes.  I have been called racist by fellow Tucson High teachers, members of the Ethnic Studies department, and students enrolled in the departments' classes.  These charges come simply because I ask the department to provide the primary source material for the perspective they preach.  The teachers of these classes not only refuse to stop the name-calling but openly encourage the students' behavior.

D.     Teacher Number 4

Teacher Number 4 wrote, as recently as October 21, 2010, as follows:

I applaud your keen and daring actions against La Raza studies at TUSD.  Over the years I began noticing an "open" resentfulness by the Hispanic students.  I clearly have been accused by Hispanic students of "not liking Mexicans".  That is a quote.  I have had Hispanic students tell me that this is NOT the United States of America . . . it is "occupied Mexico". . . I have made simple comments as a substitute such as "please pick up the paper under your desk" only to receive an immediate response of "You don't like Mexicans?"  My response was to repeat my request of picking up the papers and calmly add that they must be REALLY confused . . . because I am also of Mexican descent.

E.     Teacher Number 5

Hector Ayala was born in Mexico, and is an excellent English teacher at Cholla High School in TUSD.  He reports that the director of Raza Studies accused him of being the "white man's agent," and that when this director was a teacher, he taught a separatist political agenda, and his students told Hector that they were taught in Raza Studies to "not fall for the white man's traps."

V.    Written Materials

As noted earlier, the name of this course has been Raza Studies or Raza/Mexican American Studies. The very name "Raza" is translated as "the race." On the TUSD website, it said that the basic text for this program is "the Pedagogy of The Oppressed." The author is Paulo Frere, a Brazilian Marxist. Most of these students' parents and grandparents came to this country, legally, because this is the land of opportunity. They trust the public schools with their children. Those students should be taught that this is the land of opportunity, and that if they work hard they can achieve their goals. They should not be taught that they are oppressed.

During the hearings of the Senate Judiciary Committee on the Ethnic Studies bill, the school sent a number of students to testify how much they loved Ethnic Studies. A senator asked a girl whether she could have learned the things she spoke about in other courses. She responded: "No, before I took this course, I didn't realize that I was oppressed. Now that took this course, I realize that I am oppressed."

One of the textbooks is *Occupied America* (5th ed.). One of the leaders it talks about is described as follows: "José Angel Gutiérrez was one of the leaders, and he expressed the frustrations of the MAYO generation. His contribution was indispensable; it influenced Chicanos throughout the country."

One of Gutiérrez's speeches is described as follows:

We are fed up. We are going to move to do away with the injustices to the Chicano and if the 'gringo' doesn't get out of our way, we will stampede over him." Gutiérrez attacked the gringo establishment angrily at a press conference and called upon Chicanos to 'kill the gringo,' which meant to end white control over Mexicans.

The textbook's translation of what Gutiérrez meant contradicts his clear language. In describing the atmosphere in Texas where Gutiérrez spoke, the textbook states: "Texans had never come to grips with the fact that Mexicans had won at the Alamo." (P. 323.) It is certainly strange to find a textbook in an American public school taking the Mexican side of the battle at the Alamo.

Another textbook is the *Mexican American Heritage* (2nd ed.).

One of the chapters is "The Loss of Aztlan." Aztlan refers to the states taken from Mexico in 1848: Arizona, California, New Mexico and Colorado. This chapter states: "Apparently the U.S. is having as little success in keeping the Mexicans out of Aztlan as Mexico had when they tried to keep the North Americans out of Texas in 1830." (P. 107.) In other

words, books paid for by American taxpayers used in American public schools are gloating over the difficulty we are having in controlling the border.  This page goes on to state: "…the Latinos are now realizing that the power to control Aztlan may once again be in their hands."

Materials for the course include a sheet titled "Chicano Resistance Vocabulary Squares."

The students are given an example of student writing including the sentence "we are slowly taking back Aztlan as our numbers multiply."  The students are taught poems illustrated by the following:

"Going Back" – Victor E "El Vhu"
We're going back, back to where we came from, back to where the truth dwells, AZTLAN…,We suffer colonial incarceration so we foster resistance of our own occupation.
"Decolonize" – "Aztlan Underground"

Some feel this oppression no longer exists  Well here's something they missed – Self  D means self determination…Stranger in your own land under exploitation…This is the state of the indigena today…**WE DIDN'T CROSS THE BORDERS, THE BORDERS CROSSED US! YET THE SETTLER NATION LIVES IN DISGUST!**  The American dream only for some WASP – White Anglo Saxon Protestant…the frame of mind that keeps our oppression constant…Cihuatl is reclaiming…We have returned to Aztlan!!!  We have returned to Aztlan!!!

They are taught an essay called AZTLAN The Lost Land, "The Chicano Homeland" by John R. Chavéz which includes the following:

But to Chicanos the Southwest is more than just their place of residence; it is their homeland, their lost homeland to be precise, the conquered northern half of the Mexican nation…In the mind of the Chicanos, this immense territory remains their patrimony…Mexicans are indigenous to and dispossessed of the region…Chicanos view Southwest as an extension of Mexico and Latin America, a Mexican region spreading beyond what is regarded as an artificial boundary.

A worksheet in association with this essay has a map at the top showing Aztlan as all of Mexico, and some American States, including Texas, Arizona, New Mexico, Utah, Colorado, California and Nevada.  Among the questions asked on this worksheet are: "What are the four areas in the southwest that have had a Mexican cultural and demographic influence since the United States imposed its present boundary on Mexico?...In order for Chicanos to have cultural, political, and economic self-determination, what must Chicanos have control of in order to do so?"

In a section of materials called "Conquest and Colonización", the students are taught "We will see how half of Mexico was ripped off by trickery and violence. We will see how Chicanos became a colonized people. In the process of being colonized, we were robbed of land and other resources."

The students are taught "Critical Race Theory." A part of the "Critical Race Theory" is defined by the materials taught to the students as follows: "Unlike traditional civil rights, which embraces incrementalism and step-by-step progress, critical race theory <u>questions the very foundation of the liberal order,</u> including equality theory, legal reasoning, <u>Enlightenment rationalism,</u> and neutral principles of constitutional law." (Emphasis added.)

The materials for this class include "A Field Guide for Achieving Equity in School." These materials include: "We often hear people referred to as being privileged, which usually is a comment pertaining to the individual's financial or economic status...In Courageous Conversation, however, privilege takes on a different meaning: it refers to the amount of melanin in a person's skin, hair, and eyes. (This is followed by a table which promulgates racial stereotypes by detailing the differences between "white individualism" "colored group collectivism.") "White people tend to dominate the conversation by setting the tone for how everyone must talk and which words should be used. All of these "White ways" must be recognized, internalized, and then silently acted on by people of color". (This is an example, referring to the statute, of subsection 2, "promote resentment toward a race or class of people")...The aforementioned White cultural characteristics, such as individualism, blur into the consciousness of Whiteness, which becomes not only a way of behaving but also a way of thinking....White people depend on the overwhelming presence of other White people in positions of power and influence to maintain a system of racial advantage. At the same time, many White educators believe that gains in school, as in their own lives, come from individual effort and accomplishment."

At page 200 of these materials, there is a table setting forth in detail the difference between "White Talk" and "Color Commentary." These materials go on to state: "Anger, guilt, and shame are just a few of the emotions experienced by participants as they move toward greater understanding of Whiteness". [If one were to substitute any other race for "Whiteness," it would be obvious how this promotes resentment toward a race or a people.

The materials go on to state: "White Americans often feel a unique sense of entitlement to Americanism, partly because many never travel beyond the borders of the United States." All of these kinds of racist propaganda are fed to young and impressionable students, who swallow them whole, as illustrated by the rude behavior of some students during an address by Margaret Garcia Dugan and subsequent demonstrations. The education they are receiving, to deal with disagreements in an uncivil manner, will be dysfunctional for them as adults. It becomes the duty of the people of Arizona, through their elected leaders, as

authorized by A.R.S. § 15-112, to put a stop to this, and to be sure that taxpayer-funded public schools teach students to treat each other as individuals, and not on the basis of the race they happen to have been born into.

These are some examples, that and are not an exhaustive list of the ways in which this course violates ARS § 15-111.

VI.     Conclusion

The Superintendent of Schools finds that the Tucson Unified School District is in violation of A.R.S. § 15-112 and A.R.S. § 15-843, and, pursuant to those statutes, the school district has 60 days to eliminate the Mexican American Studies courses, however they are named, and has 90 days to eliminate the race-based discipline rules.  Failure to comply within those time periods will subject the Tucson Unified School District to having 10 percent of its budget withheld.


Tom Horne
Superintendent of Public Instruction

Date:  December 30, 2010