1  **RICHARD M. MARTINEZ, SBA No. 7763**
   307 South Convent Avenue
2  Tucson, Arizona 85701
   (520) 327-4797 phone
3  (520) 320-9090 fax
   richard@richardmartinezlaw.com
4  **Counsel for Plaintiffs**

5              IN THE UNITED STATES DISTRICT COURT

6                 FOR THE STATE OF ARIZONA

7  CURTIS ACOSTA, SEAN          )
   ARCE, MAYA ARCE, MARIA       )
8  FEDERICO BRUMMER,            )
   DOLORES  CARRION,            )   No. CV 10 - 623 TUC AWT
9  ALEXANDRO ESCAMILLA,         )
   JOSE GONZALEZ,  NORMA        )
10 GONZALEZ, LORENZO            )   **MOTION FOR SUMMARY JUDGMENT**
   LOPEZ, JR., KORINA ELIZA     )
11 LOPEZ, RENE F. MARTINEZ,     )
   SARA "SALLY" RUSK,           )
12 and YOLANDA SOTELO,          )   (Oral Argument Requested)
                                )
13            Plaintiffs,        )
                                )
14 v.                           )
                                )
15 JOHN HUPPENTHAL,             )
   Superintendent of Public     )
16 Instruction and Executive    )
   Director of the Arizona State )
17 Board of Education, in his    )
   Official Capacity, and the    )
18 Arizona State Board of        )
   Education, including all      )
19 members in their Official     )
   Capacity; VICKI BALANTINE,   )
20 JACOB MOORE, JOHN            )
   HAEGER, JAIME MOLERA,        )
21 AMY HAMILTON, EILEEN         )
   KLEIN, GREGORY MILLER,       )
22 JAMES HORTON, DIANNE         )
   ORTIZ-PARSONS, and           )
23 THOMAS TYREE,                )
                                )
24            Defendants.        )
                                )
25

26        Plaintiffs, through their undersigned counsel, hereby submit their motion for

27 summary judgment pursuant to Rule 56, F.R.C.P. There are no contested genuine

28 issues of material fact concerning the Fourteenth Amendment due process claim

1   asserted here. This motion is supported by a separate statement of facts.

2       At issue are the prohibitions of A.R.S. §15-112(A) against courses or classes

3   that: (1) promote the overthrow of the United States government, (2) promote

4   resentment toward a race or class of people, (3) are designed primarily for pupils of

5   a particular ethnic group, and (4) advocate ethnic solidarity instead of the treatment

6   of pupils as individuals. They are all designed to limit the material and ideas allowed

7   in the classroom. By doing so, the statute restricts the First Amendment freedoms of

8   teachers to teach and of students to learn. None of the four subsections contains the

9   requisite specificity and clarity demanded for due process when a statute infringes on

10   First Amendment freedoms. The "exceptions" provided by §15-112(E)(3), (4), and (F)

11   make it even more difficult to determine what speech is prohibited and serve to

12   increase the ambiguity of the enforcing subsections at §15-112(A) and of the statute

13   as a whole. As a result, they do not provide a reasonable opportunity to know what is

14   prohibited and the Court should invalidate them as unconstitutionally vague.

15       Similarly, §§15-112(A)(1) through (4) prohibit a substantial amount of protected

16   expression. Because the substantial amount of material that school districts and

17   teachers will be prohibited from teaching is protected by the First Amendment, the

18   State may regulate only with narrow specificity. §§15-112(A)(1) through (4) fail to

19   provide that specificity. The four subsections are overbroad and the Court should

20   invalidate them all.  Because the Declaration of policy contained in §15-111 cannot

21   be extricated from the enforcement provisions of §15-112, §15-111 must be

22   invalidated, as well.

23       In light of the absence of any material factual questions, as reflected in the

24   record submitted and addressed in the accompanying memorandum of points and

25   authorities, plaintiffs respectfully requests that the instant motion be granted.

26       Respectfully submitted this 25th day of May 2011.

27                   s/ *Richard M. Martinez*, Esq.
                RICHARD M. MARTINEZ, ESQ.

28                   Counsel for Plaintiff

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    Standard of Review.**

3      Summary judgment is appropriate when no genuine issue exists as to any

4 material fact and the moving party is entitled to judgment as a matter of law. Rule 56c,

5 F.R.C.P. In reviewing a motion for summary judgment, the court examines the

6 evidence in the light most favorable to the non-moving party. *United States v. Diebold,*

7 *Inc.*, 369 U.S. 654, 655 (1962); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,*

8 475 U.S. 574, 577 (1986); *Porter v. California Department of Corrections*, 419 F.3d

9 885, 887 (9th Cir. 2005).

10      In this Motion for Summary Judgment, Plaintiffs ask the Court to strike down

11 A.R.S. §§15-111 and 15-112, also referred to as "HB 2281," as vague and overbroad.

12 This facial challenge is ripe for resolution at this time and does not require any facts

13 beyond those in the pleadings; the statement of facts, numbers 1-96 and 1 exhibit.

14

**II.    Overview.**

15      Plaintiffs are eleven career educators who work in certified positions

16 in the Tucson Unified School District ("TUSD"), a K-12 public school system, and

17 two TUSD students. PSOF 1-13, 29-64. TUSD operates within Arizona, a state that

18 finds itself in the midst of a firestorm over immigration that has engulfed public

19 debate and consumed the State's office holders. Racial tensions in Arizona have

20 risen while the state's residents have fractured into ideological positions. Latinos

21 throughout the state feel they are under attack. Concerns and criticisms about the

22 State's rapid demographic shift are common.

23      In this climate, the Arizona Legislature passed HB 2281 along party lines at

24 the urging of Tom Horne, then State Superintendent of Public Instruction. In

25 seeking election to the State Superintendent's position, the current incumbent,

26 defendant John Huppenthal, publicly campaigned on a pledge to "Stop La Raza".[1]

27

28      [1] Advocates of HB 2281 have consistently demonized the Mexican American
Studies program, formerly known as Raza/Mexican American Studies, alleging that
Raza, was a term signifying racial superiority. Due to this repeated public attack by Mr.

HB 2281 was enacted to impose a one dimensional curriculum in the public schools that seeks to eliminate TUSD's Mexican American Studies program. PSOF 78, 85-94.  The principal proponent of HB 2281, Tom Horne, openly and vigorously lobbied for the law with the intent to shut down TUSD's Mexican American Studies program. *Id.*

This law represents what Mr. Horne describes as a shield against a curriculum that he believes is not a legitimate part of the American story. Central to the instant action is the constitutional viability of HB 2281, legislation enacted for the sole purpose of placing a vague but extremely narrow and potent orthodoxy on Mexican American studies in the public schools of Arizona. As a group of educators who teach Mexican American Studies classes at five high schools, a middle school and several elementary schools, plaintiffs challenge the muzzle that has been placed upon their ability to teach students about Latino[2] history, literature and art. In their reciprocal role as students, Ms. Arce and Ms. Lopez seek to remove the unconstitutional limitation that HB 2281 places upon them to learn the same.[3]

//

//

//

---

Horne as Superintendent of Public Instruction, TUSD changed the name of the Mexican American Studies program, dropping the word "Raza". PSOF 75. This name change exemplifies the chilling climate that has limited the speech of Latinos within TUSD.

[2] Latino as used in this motion refers to all Hispanics irrespective of country of origin or race. The Mexican American Studies program classes are not limited to the Mexican or Mexican American experience but include the broader Latino and indigenous experiences that make up the history, cultures, languages, literature and art of all of the Americas.

[3] Mexican American Studies classes are open to all students. The curriculum is not limited to the Latino experience but incorporates a comprehensive perspective. For example the life, words and contributions of Cesar Chavez are taught as our those of Dr. Martin Luther King and many other important voices and figures in our history.

III.   **Facial Challenge to HB 2281.**

A.   **Statutory Construction of A.R.S. §§ 15-111 15-112(A)(1) to (4).[4]**

"A federal court's duty, when faced with a constitutional challenge such as this one, is to employ traditional tools of statutory construction to determine the statute's 'allowable meaning.'" *California Teachers Assoc. v. St. Bd. of Educ.*, 271 F.2d 1141, 1147 (9th Cir. 2001(citations omitted)). Thus, the court looks "to the words of the statute itself as well as the state court interpretations of the same or similar statutes." *Id.* Before invalidating a state statute on its face, a federal court must determine whether the statute is "readily susceptible" to a narrowing construction by a state court. *Id.* In this case, no Arizona state court has interpreted A.R.S. §§15-111 or 15-112.[5]

A.R.S. §§15-111 provides:

> The legislature finds and declares that public school pupils should be taught to treat and value each other as individuals and not be taught to resent or hate other races or classes of people.

A.R.S. §15-112(A)(1) to (4) states:

> A.  A school district or charter school in this state shall not include in its program of instruction any courses or classes that include any of the following:
>
> > 1.  Promote the overthrow of the government.
> > 2.  Promote resentment towards a race or class of people.
> > 3.  Are designed primarily for pupils of a particular race
> > 4.  Advocate ethnic solidarity instead of the treatment of pupils as individuals.

Subsection (B) provides that if the state board of education or the superintendent of public instruction determines that a school district is in violation of subsection (A), the penalty shall be a withholding of up to 10% of the monthly apportionment of state aid to the district. A.R.S. §15-112(B).

---

[4] HB 2281 is codified as A.R.S. §§15-111 and 112.

[5] Should the Court choose to treat the Horne Findings as an  interpretive decision of the enforcing agency, it will not find a narrowing construction.  To the contrary, the broad nature of Superintendent Horne's comments and the lack of specificity render the Findings strong evidence of the statute's ambiguity.

1    **B.    Facial Challenge to HB 2281.**

2        A statute may be facially unconstitutional in one of two ways: either it is

3    unconstitutional in every conceivable application, or it seeks to prohibit such a

4    broad range of protected conduct that it is unconstitutionally overbroad. *Foti v. City*

5    *of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)(citations omitted). In the first type

6    of facial challenge, the plaintiff argues that the statute could never be applied in a

7    valid manner because it is unconstitutionally vague or that it impermissibly restricts

8    protected activity. *See NAACP v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir.

9    1984). The second type of facial challenge is an exception to the general standing

10   requirements: the plaintiff argues that the statute is written so broadly that it may

11   inhibit the constitutionally protected speech of third parties, even if her own speech

12   may be prohibited. *Foti*, 146 F.3d at 635 (citations omitted). "A successful

13   challenge to the facial constitutionality of a law invalidates the law itself." *Id.*

14   **C.    Vagueness Doctrine**.

15       "A fundamental requirement of due process is that a statute must clearly

16   delineate the conduct it proscribes." *Kev, Inc. V. Kitsap County*, 793 F.2d 1053,

17   1057 (9th Cir. 1986), citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

18   A statute must be sufficiently clear so as to allow persons of "ordinary intelligence a

19   reasonable opportunity to know what is prohibited." *Id.*; *see U.S. v. Wunsch*, 84

20   F.3d 1110, 1119 (9th Cir. 1996). "Statutes that are insufficiently clear are void for

21   three reasons: (1) to avoid punishing people for behavior they could not have

22   known was illegal; (2) to avoid subjective enforcement of the laws based on

23   "arbitrary and discriminatory enforcement" by government officers; and (3) to avoid

24   any chilling effect on the exercise of First Amendment freedoms." *Foti*, 146 F.3d at

25   638 citing *Grayned*, 408 U.S. at 108; *see also Wunsch*, 84 F.3d at 1119; *Hunt v.*

26   *City of Los Angeles*, 20011 WL 982475, 2011 U.S. App. LEXIS 5721 (9th Cir.

27   2011).

28       When a statute interferes with rights protected by the First Amendment,

1  courts apply a vagueness analysis more strictly, requiring statutes to provide a

2  greater degree of specificity and clarity than would be necessary under ordinary

3  due process principles. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455

4  U.S. 489, 495 (1982); *California Teachers Assoc.*, 271 F.3d at 1150; *see also*

5  *Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005).

6  **D.   Overbreadth Doctrine.**

7  The First Amendment overbreadth doctrine allows "a person to challenge a

8  statute or policy, even though it is not unconstitutional as applied to that particular

9  person, because '[its] very existence may cause others not before the court to

10  refrain from constitutionally protected speech or expression.'" *U.S. v. Borden*, 523

11  F.3d 153, 165 (3rd Cir. 2008) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612

12  (1973)). "[T]he proper inquiry is whether a statute or policy 'prohibits a substantial

13  amount of protected expression.'" *Borden*, 523 F.3d at 165 (citing *Ashcroft v. Free*

14  *Speech Coalition*, 535 U.S. 234, 244 (2002)). "[A] law may be invalidated as

15  overbroad if a substantial number of its applications are unconstitutional, judged in

16  relation to the statute's plainly legitimate sweep." *Comite de Jornaleros de*

17  *Redondo Beach v. City of Redondo Beach*, 607 F.3d 1178, 1196 (9th Cir. 2010)

18  (citing *U.S. v. Stevens*, 130 S.Ct. 1577, 1587 (2010)).

19  The overbreadth doctrine is applied "quite rigorously" when a statute is

20  directed at speech. *Adamian v. Jacobsen*, 523 F.2d 929, (9th Cir. 1975). The state

21  cannot regulate any protected speech on the basis of content." *Id.* (citing *Police*

22  *Dept. of the City of Chicago v. Mosley,* 408 U.S. 92 (1972). Furthermore, "[e]ven in

23  the case of 'pure speech,'...the deference which must be accorded *first*

24  *amendment* interests attenuates when the state attempts to regulate not the

25  expressive content of the speech, but its *external effects,* such as noise." *Adamian*,

26  523 F.2d at 933 (emphasis added)(citations omitted). Significantly, the court in

27  *Adamian* recognized that "[t]he desire to maintain a sedate academic environment,

28  'to avoid the discomfort and unpleasantness that always accompany an unpopular

viewpoint,' is not an interest sufficiently compelling, however, to justify limitations

on a teacher's freedom to express himself on political issues in vigorous,

argumentative, unmeasured, and even distinctly unpleasant terms." 523 F.2d at

934 (citing *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 502,

509 (1969).

### E.    First Amendment Rights of Teachers and Students.

"First Amendment rights, applied in light of the special characteristics of the

school environment, are available to teachers and students. It can hardly be

argued that either students or teachers shed their constitutional rights to freedom

of speech or expression at the schoolhouse gate." *Tinker,* 393 U.S. at 506. The

Supreme Court "ha[s] not failed to apply the First Amendment's mandate in our

educational system where essential to safeguard the fundamental values of

freedom of speech and inquiry and of belief." *Epperson v. Arkansas*, 393 U.S. 97,

104 (1968). "The discretion of the States and local school boards in matters of

education must be exercised in a manner that comports with the transcendent

imperatives of the First Amendment." *Bd. of Ed, Island Tress Union Free Sch. Dist.*

*v. Pico*, 457 U.S. 853, 864 (1982). Although states and local school boards may

enforce regulations "reasonably related to pedagogical concerns," *Hazelwood Sch.*

*Dist. v. Kuhlmeier*, 434 U.S. 260, 273 (1988), they must discharge their "important,

delicate, and highly discretionary functions" within the limits and constraints of the

First Amendment. *Pico*, 457 U.S. at 865. "Because First Amendment freedoms

need breathing space to survive, [the] government may regulate in the area only

with narrow specificity." *Keyishian v. Bd. of Regents of the Univ. of the St. of N.Y.,*

385 U.S. 589, 605 (1967)(citing *N.A.A.C.P v. Button*, 371 U.S. 432-433 (1963).

Beyond protecting the rights of teacher to express ideas, the First

Amendment also protects the students' right to receive information and ideas. *Pico*,

457 U.S. at 867, *citing Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

This right is an inherent corollary of the rights to free speech and press that

are explicitly guaranteed by the Constitution, in two senses. First the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them: "The right of freedom of speech and press...embraces the right to distribute literature, and necessarily protects the right to receive it." [citation omitted.] The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only the sellers, and no buyers. [citation omitted.] More importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and to political freedom. Madison admonished us:

> A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or perhaps both. Knowledge will forever govern ignorance, and a people who mean to be their own Governors must arm themselves with the power which knowledge gives.

9 Writings of James Madison 103 (G. Hunt ed. 1901).

*Pico*, 457 U.S. at 867 (emphasis in original). It is axiomatic that "[i]n our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate....[S]chool officials cannot suppress 'expressions of feeling with which they do not wish to contend." *Pico*, 457 U.S. at 868.

While "public education is committed to the control of state and local authorities,...'[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Epperson*, 393 U.S. at 104 (citing *Shelton v. Tucker*, 364 U.S. 479, 481 (1960)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Keyishian*, 385 U.S. at 603, citing *Sweezy v. State v. State of New Hampshire*, 354 U.S. 234, 250 (1957); *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) ("minors are entitled to a significant measure of First Amendment protection," citing *Tinker*, 393 U.S. 503, "and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them.")

In light of the Plaintiffs' undeniable First Amendment rights, the Court must closely scrutinize the statutes at issue and those statutes must provide a high degree of specificity and clarity. *Erznoznik*, 422 U.S. at 217-218.

**IV.    HB 2281 Is Impermissibly Vague And Burdens First Amendment Rights.**

This statutory challenge premised on vagueness demands close examination of the actual language of A.R.S. §§15-111 & 112. When a statute requires the application of "wholly subjective judgments without statutory definitions, narrowing context or settled legal meanings" it is invalidated for facial vagueness. *U.S. v. Williams*, 553 U.S. 285, 306 (2008). The subjective and unsettled meaning of words creates an impermissible risk of differing interpretations. *See, Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) ("conduct that annoys some people does not annoy others"); *Connally v. General Construction Co.*, 269 U.S. 385, 394 (1926)("For the vice of the statute here lies in the impossibility of ascertaining, by any reasonable test, that the Legislature meant one thing rather than another.").

The vagueness of each of the four enumerated prohibitions in A.R.S. §15-112 results in impermissible infringements upon speech protected by the First Amendment. They do not provide the required reasonable notice as to what ideas, phrases or words are prohibited. This infirmity is not limited to A.R.S. §§15-112(A)(1),(2),(3) and (4). The same is true of A.R.S. §15-111, (preamble to HB 2281) and A.R.S. §§15-112(E)(3),(4) and (F)("exceptions"), which are also impermissibly vague in violation of the due process clause of the Fourteenth Amendment.

The Supreme Court has consistently struck down statutes that provide no clear line of demarcation between what is permitted and that which is prohibited. Statutes that suffer this infirmity punish those at risk for conduct "they could not have known was illegal" and invite subjective enforcement "based on arbitrary and discriminatory interpretations." *Wunsch*, 84 F.3d at 1119.

**A.    Prohibition of Courses or Classes That Promote the Overthrow of the United States Government.**

A.R.S. §15-112(A)(1) must fall to this facial challenge because it does not

"clearly delineate the conduct it proscribes," *Kev, Inc.*, 793 F.2d at 1057, and because it is not sufficiently clear so as to allow persons of "ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108. Specifically, the statute provides no guidance to teachers or to any other governmental actor to determine what speech or conduct might be considered to "promote the overthrow of the United States government." Because A.R.S. §15-112(A)(1) interferes with the plaintiffs' First Amendment "freedom[s] of teachers to teach and of students to learn," *Epperson v. Arkansas*, 393 U.S. 97, 105 (1968), this court must "apply the vagueness analysis more strictly, requiring [this statutory provision] to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles." *California Teachers Association*, 271 F.3d at 1150 (internal citations omitted).

The Supreme Court has already examined the ambiguities inherent in the idea of attempting to determine what constitutes advocating the overthrow of the government. In *Keyishian*, the Court struck down a statute that required state employees to attest that they had never been a member of a group that "taught or advocated the doctrine that the Government of the United States...should be overthrown or overturned by force, violence or any unlawful means." 385 U.S. at 592; *see also Baggett v. Bullitt*, 377 U.S. 360, 362 (1964) (invalidating a statute precluding public employment of a person who advocates any person to commit or aids in the commission of any act intended to overthrow the United States government.) Under that vague statute, a teacher could not know "the extent, *if any*, to which [an offending] utterance must transcend mere statement about abstract doctrine" or "the extent to which it must be intended to *and* tend to indoctrinate or incite to action in furtherance of the defined doctrine." *Id.* 385 U.S. at 599 (emphasis added). The Court famously illustrated the absurdity of the task by asking, "Does the teacher who carries a copy of the Communist Manifesto on a public street thereby advocate criminal anarchy?" *Id.*, 385 U.S. at 599.

- 11 -

1    Superintendent Horne's Findings prove the dilemma faced by the teachers.
2  At page seven, he discusses the 1836 Battle of the Alamo between Texan
3  insurgents and the Mexican army.  In a classroom, a Mexican American Studies
4  teacher may ask, who are the rebels and who are the patriots? Are the historical
5  figures who died there martyrs? Did the insurgents instigate a war against a
6  sovereign nation?  In this setting, does the discussion of the Mexican-American
7  War in a context that is critical of the United States constitute "promot[ing] the
8  overthrow of the United States government" in violation of subsection (A)(1)?
9  Superintendent Horne suggests that it does.  *See* Finding, p. 7, (Superintendent
10  Horne finds it "strange to find a textbook in an American public school taking the
11  Mexican side of the battle at the Alamo."). However, the First Amendment dictates
12  the opposite conclusion.

13    In order to protect the classroom's vital "marketplace of ideas," the First
14  Amendment "does not tolerate laws that cast a pall of orthodoxy over the
15  classroom." *Keyishian*, 385 U.S. at 603.  Further, "[o]ur Constitution does not
16  permit the official suppression of *ideas*." *Pico*, 457 U.S. at 871 (original emphasis).
17  Therefore, the State of Arizona cannot prohibit teachers from teaching about the
18  Battle of the Alamo from the historical perspective of the Mexican American
19  people.

20    But no teacher or school district can know whether such a classroom lesson
21  criticizing the United States would constitute a course which "promotes the
22  overthrow of the United States government" in violation of subsection (A)(1) and
23  therefore would invoke the penalty of withholding ten percent of the state funding
24  for the entire district. This uncertainty will chill First Amendment rights by forcing
25  teachers and school districts to "restrict their conduct to that which is
26  unquestionably safe." *Baggett*, 377 U.S. at 372; *see also Hunt*, 2011 WL 982475.
27  Subsection (A)(1) lacks the clarity and specificity required to notify educators when
28  their courses could be construed as promoting the overthrow of the government

and must be invalidated as unconstitutionally vague.[6]

### B.     Prohibition of Courses or Classes That Promote Resentment Toward a Race of Class of People.

Determining what "promote[s] resentment" is entirely subjective. It is impossible for any teacher, school board, or official vested with enforcement authority to objectively know when the statute is applicable or violated, since "promoting resentment" could refer to any number of behaviors, historical facts or writing in literature.  Most of these are protected by the First Amendment and are essential for the purposes of classroom discussion and debate.  A classroom is a place revered for the vital exchange of ideas, values and perspectives. *Keyishian*, 385 U.S. at 603. Regardless whether a topic touches on a controversial political, legal or ideological concept, such exchanges have the inherent potential to open minds and conceivably to promote resentment.

The constitutional infirmity of subsection (A)(2) is also demonstrated by the fact that whether a class "promotes resentment" is not based on a teacher's own objective behavior, but on the subjective viewpoints of others.  *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir 2004), *citing Women's Med. Ctr. of N.W. Houston*, 248 F.3d 411, 422 (5th Cir. 2001) (striking down a statute that subjected "physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others."); *see also Wunsch*, 84 F.3d at 1119 (a statute prohibiting attorneys from displaying an "offensive personality" could "refer to any number of behaviors" and "it would be impossible to know when such behaviors would be offensive enough to invoke the statute.") "This provision is too vague and subjective for [teachers] to know how they should behave in order to comply, as well as too vague to limit arbitrary enforcement." *Tucson Woman's Clinic*, 379 F.3d at 555.  What is respectful to one may be discourteous to another.

---

[6] Teachers would face the same dilemma in delivering a lesson about the Declaration of Independence's exhortation to "throw off such Government." *See* Part V., *supra* at page 20.

1   What causes one student to resent another race or class of people may cause

2   another to comprehend or appreciate the perspective of that same race or class.

3   *Cf. Smith v. Goguen*, 415 U.S. 566, 573 (1974).

4        A.R.S. §15-112 presumably prohibits a classroom discussion of *jihad* and

5   the attacks of September 11, 2001, because it could very possibly result in some

6   students fostering a bitterness towards Muslims. The same is equally true of the

7   recent killing of Osama Bin Laden that has spurned a debate concerning the

8   circumstances under which a government may kill a person. And a class debate

9   over Arizona policies regarding undocumented immigration, such as SB 1070,

10  could cause some students to resent State policymakers or the undocumented.

11  The Court feared exactly such a stifling of expression in *Baggett*, stating that "[i]t

12  would not be unreasonable for the serious-minded oath-taker to conclude that he

13  should dispense with lectures voicing far reaching criticism of any old or new policy

14  followed by the Government of the United States." 377 U.S. at 371.

15       In this case it is impossible for any person of reasonable intelligence to know

16  where the line is drawn. Thus, those governed by the statute are subject to the

17  subjective interpretation imposed by the State Superintendent of Public Instruction

18  or the State Board of Education who can draw the line where ever they like. That is

19  the danger of a vague law and that is what renders it fatally flawed. *See e.g.*,

20  *Smith*, 415 U.S. at 577. ("This absence of any ascertainable standard for inclusion

21  and exclusion is precisely what offends the due process clause. The deficiency is

22  particularly objectionable in view of the unfettered latitude thereby accorded law

23  enforcement officials and triers of fact").

24       No teacher should work in fear of the heavy hand of the law when teaching

25  about events that have the potential to stir passions.  Further, the First Amendment

26  prohibits the State of Arizona's attempt to impose a single viewpoint upon students.

27  "The Nation's future depends upon leaders trained through wide exposure to that

28  robust exchange of ideas which discovers truth out of a multitude of tongues,

- 14 -

[rather] than through any kind of authoritative selection." *Keyishian* 385 U.S. at

603. Subsection (A)(2)'s prohibition of classes that "promote resentment" violates

the First Amendment rights of all teachers and students and cannot be enforced.

### C. Prohibition of Courses or Classes That Are Designed Primarily for Pupils of a Particular Ethnic Group.

By banning courses that "are designed primarily for pupils of a particular

ethnic group," subsection (A)(3) creates yet another subjective standard that

provides no guidance to determine the circumstances under which a program may

be found in violation. The subjective nature of the inquiry as to whether a course or

program violates this provision within the statute chills development and

implementation of innovative curricula that expand upon traditional courses, and

inescapably invites discriminatory enforcement. *See Grayned*, 408 U.S. at 108;

*Hunt*, 2011 WL 982475.

Subsection (A)(3) could be reasonably interpreted as prohibiting courses

designed primarily *to be attended by* pupils of a particular ethnic group.  For

example, would authorities declare that a course on Asian literature is inherently

one designed primarily for Asian pupils? If the majority of students in a class

devoted to African American history are indeed African Americans, could the class

be banned?  What if a class on Latin American history is offered in the interest of

providing a broader range of the study of world history, but is taken by mostly

Latino students?  Is the large proportion of Latino students sufficient grounds to

ban the class?  Could any class with a large proportion of Latino students be

banned?  Would it matter that the school itself has a large number of Latino

students?

"Standards of permissible statutory vagueness are strict in the area of free

expression." *Keyishian*, 385 U.S. at 604 (internal citation omitted). "Because *First*

*Amendment* freedoms need breathing space to survive, government may regulate

in the area only with narrow specificity." *Id.*, (emphasis in original). Subsection

1    (A)(3) provides none of the necessary specificity that would prevent school districts

2    from steering away from such classes in order to avoid any possible risk of

3    violation.

4         As for the risk of discriminatory enforcement, it has already occurred.

5    Superintendent Horne has singled out TUSD's Mexican American Studies program

6    for prosecution, despite his opinion that two other Ethnic Studies programs "could

7    be found in violation under [subsection (A)(3)]. PSOF, Exhibit 1, p.2. Mr. Horne

8    based his decision to take action in this case on the fact that he had received

9    complaints about the Mexican American Studies program, but not about the others.

10    *Id.* Mr. Horne admits that he has engaged in subjective enforcement, dictated by

11    the subjective complaints made to him.

12         The statute's requirement that the school district be notified of an alleged

13    violation and given sixty days to cure the defect before imposition of the ten

14    percent sanction does not eliminate the vagueness concern of chilling of First

15    Amendment rights.  *See City of Chicago*, 527 U.S. at 59 (construing an anti-

16    loitering statute: "[an order to disperse] cannot retroactively give adequate warning

17    of the boundary between the permissible and the impermissible applicants of the

18    law"); *Baggett*, 377 U.S. at 373 ("Well-intentioned prosecutors and judicial

19    safeguards do not neutralize the vice of a vague law."). This statute forces

20    educators to choose between fulfilling their obligation to impart knowledge to their

21    students or alternatively, foregoing that duty and with it, the "wide exposure to that

22    robust exchange of ideas which discovers truth out of a multitude of tongues,

23    [rather] than through any kind of authoritative selection." *Keyishian*, 385 U.S. at

24    603 (internal citation omitted); *see also California Teachers' Assoc. v. St. Bd. of

25    Ed.*, 271 F.3d 1141, 1158 (Tashima, J., dissenting). Superintendent Horne's

26    Findings do not eliminate concerns over the statute's vagueness. First Amendment

27    freedoms are still chilled and his issuance of a finding does not cure this vague

28    law.

**D.      Prohibition of Courses or Classes That Advocate Ethnic Solidarity Instead of Treatment of Pupils as Individuals.**

Under subsection (A)(4), no teacher can know what classroom material or discussions might constitute "advocat[ing] ethnic solidarity." *See Hunt*, 2011 WL 982475 ("terms have such amorphous meanings that it makes it difficult, if not impossible, for an individual to determine whether his conduct is proscribed by the ordinance.") Consequently, all teaching, class discussions, texts and materials about identifiable groups, policies, or ideologies that appear to support cultural or national cohesiveness or identity will place school districts in potential jeopardy.[7] A discussion of Black History Month or Hispanic Heritage Month could be construed as advocating ethnic solidarity, as could studying the history and meaning of holidays such as Juneteenth or Cinco de Mayo.  Also off-limits could be the study of social movements, such as the American Indian Movement, the NAACP or the Klu Klux Klan.

In *Keyishian*, the Supreme Court invalidated a statute that prohibited public employment of any person who advocated the doctrine of forceful overthrow of the government, recognizing that the statute was "plainly susceptible of sweeping and improper application." 385 U.S. at 599 (internal citations omitted).  There the Court also found that such a vague provision "may well prohibit the employment of one who merely advocates the doctrine in the abstract without any attempt to indoctrinate others, or incite others to action in furtherance of unlawful aims." *Id.* As an example in the classroom context, an examination of the Civil Rights movement of the 1960's might include the tension between the roles played by Martin Luther King, Jr., who struggled for integration, and Malcolm X, who advocated separation of blacks and whites.  A history teacher could reasonably fear an accusation of advocating "ethnic solidarity" within the meaning of

---

[7]The Horne Findings specifically identify *Occupied America* and *Mexican American Heritage* as two text books that are unacceptable and evidence of statutory violations.  See PSOF Exhibit 1, p.7.

- 17 -

1    subsection (A)(4), without any exhortation to actively embrace Malcom X's ideology

2    of racial segregation.

3         Similarly, a teacher might present material about historical events such as

4    the 1942 Zoot Suit Riots in Los Angeles, Cesar Chavez and the Farm Worker

5    movement, or the symbolism of the Virgin de Guadalupe and be accused of

6    crossing the line. Subsection (A)(4) is unclear as to the whether, under these

7    circumstances, the teacher advocated "ethnic solidarity" in violation of the statute.

8         Subsection (A)(4) is further confusing by its presupposition that "ethnic

9    solidarity" and the "treatment as an individual" are mutually exclusive.  This fallacy

10   ignores that fact that students who understand and take pride in their ethnicity,

11   culture, history, literature and language have the capacity to possess a broad

12   perspective that is the foundation of the development of a strong sense of

13   individual identity and confidence upon which success in academics and social

14   interactions thrive.  Contrary to the implication of the statute, group and individual

15   identity are mutually dependent.  Further, these statutory terms lack a common

16   interpretation or application, and in the public school setting are subject to an

17   infinite number of applications.  As a result, they will invariably be applied

18   inconsistently, subjecting teachers and school districts to scrutiny and sanctions for

19   doing what is allowed and proscribed, but never knowing where are the boundaries

20   between the two.

21   **E.    A.R.S. §15-112(E) and (F) Do Not Provide A Narrowing
         Construction and Render the Statute More Vague.**

22

23        Other subsections of the statute do not provide a narrowing construction of

24   subsection (A).  To the contrary, the circuitous exceptions to subsection (A) provide

25   further ambiguity to a statute devoid of clarity, common understanding or any

26   possibility of uniform enforcement and demonstrate the lack of fair notice and

27   chilling effect.  The "exceptions" provide:

         E.    This section shall not be construed to restrict or prohibit:...
28             3. Courses or classes that include the history of any ethnic group and

that are open to all students, unless the course or class violates
subsection A.
4. Courses or classes that include the discussion of controversial
aspects of history.
F. Nothing in this section shall be construed to restrict or prohibit the
instruction of the holocaust, any other instance of genocide, or the
historical oppression of a particular group of people based on
ethnicity, race, or class.

Subsection (E)(3) does nothing more than provide additional vagueness that

further dims the murky language that plagues subsection (A).  Thus, an instructor

who teaches U.S. history from a Mexican American perspective finds absolutely no

guidance in a statement that the statute does not restrict or prohibit classes that

include the history of any ethnic group, unless the class violates subsection (A).

The statute's vagueness is also increased by introducing terms like "history"

or "historical oppression".  The conflict between the victor's version of history and

that of the oppressed is undeniable. In a domestic context, how is the Mexican

American perspective of history different or similar to a WASP's perspective?  And

who decides which group has been the subject of "historical oppression"?  The

history of South Africa over the past 100 years illustrates this inherent conflict of

viewpoints.  Another example is our country's debate and struggle with racial,

ethnic and religious segregation in housing, employment, public accommodations

and certainly schools.  Is the intentional infection of African Americans with syphilis

at Tuskegee Institute permitted but the same atrocity inflicted by the same

perpetrators in Guatemala off limits?  Why?  And utilizing what criteria?

A teacher of United States history is presented with a similar dilemma when

she examines with her students the role of immigration in shaping the demographic

composition of our country at different points in our history.  Does the fact that the

immigration debate still rages, saturates the media and is a contemporary topic

mean that the historical topic is allowed but the current topic is not?  Does the

controversial nature of the current debate over immigration policy make it more or

less likely that section (E)(4) would allow the topic to be addressed as a part of

1    discourse important to students and their educational development?  There is no

2    predictable answer.

3            Even Mr. Horne ignored the statute's exception at subsection (E)(4) when he

4    cited text from *Occupied America*, taking issue with a more than a 50 year-old

5    speech by Josè Angel Gutíerrez.  *See* PSOF Exhibit 3, p. 7.  (Mr. Gutierrez is an

6    important figure in Chicano history who stood up to the historical oppression of

7    Mexican Americans in Texas.)  Why does Mr. Horne believe that the words of Mr.

8    Gutíerrez are any different than those spoken by figures of the American

9    Revolution?  Or those of Texans in the 1800's?  Certainly everyone would agree

10   that the race or ethnicity of the speaker cannot be a factor.

11           Likewise, when a teacher presents texts detailing the historical aspects of

12   the Chicano movement and the ideas of Chicano leaders who fought against

13   government-imposed discrimination, he would have no idea whether he could be

14   "promoting resentment" in violation of subsection (A)(2) or within the exception for

15   "classes that include the discussion of controversial aspects of history" in

16   subsection (E)(4).

17           The exceptions only multiply the vagueness of the prohibitions in subsection

18   (A), as every teacher will be unsure whether certain class content is permitted,

19   prohibited or excepted. This doubt will undeniably chill the topics covered and

20   material utilized.

21   **V.     HB 2281 Is Overbroad and Burdens First Amendment Rights.**

22           The provisions of A.R.S. §15-111 and 112 lack the specificity required to

23   comply with the First Amendment and would result in prohibiting a substantial

24   amount of protected speech in the classrooms. The prohibition on classes

25   "promot[ing] the overthrow of the United States government" would prohibit a

26   discussion of the provision of the Declaration of Independence stating that it is the

27   "Right of the people to alter, or abolish [that form of government], and to institute

28   new Government," and "it is their Right, it is their Duty, to throw off such

- 20 -

Government." *Declaration of Independence*, ¶ 2 (1776); A.R.S. §15-112(A)(1).  It would also prohibit a discussion of the South's secession and formation of the Confederate States of America.  Classes discussing slavery, the history of lynching of African Americans and the deaths of thousands of Cherokee people forced to march on the "Trail of Tears" will most certainly create "resentment toward a race or class of people" in some students.  As would classes where the experiences of white settlers in Arizona, in which the violent and deadly raids by Apaches on the white settlers are studied.  A.R.S. §15-112(A)(2).  A discussion of the Black Panther party and the American Indian Movement would be prohibited as "advocat[ing] ethnic solidarity".  A.R.S. §15-112(A)(4).  In sum, the astonishing overbreadth of A.R.S. §12-115(A)(1), (2) and (4) would prohibit teaching major portions of every United States history class in Arizona.

As for the provisions of A.R.S. §15-112(A)(3), its ban on courses "designed primarily for pupils of a particular ethnic group" would prohibit courses that contribute to the vital "marketplace of ideas," *Keyishian*, 385 U.S. at 603.  This ban would encompass courses studying Asian Americans, including the Chinese Exclusion Act, classes studying the role of Scandinavians in settling the upper Midwest, programs studying African Americans and the writings of Dr. Martin Luther King, as well as classes devoted to Latino literature, such as the works of Rodolfo "Corky" Gonzales, Luis Rodriguez and Rudolfo Anaya. This statute attempts to "cast a pall of orthodoxy over the classroom," *Keyishian*, 385 U.S. at 603, and in its application would stand to violate the First Amendment rights of all Arizona teachers and students.

//

//

IV.   *Severability*[8]

If a piece of legislation is incapable of standing on its own after excision of

disputed provisions, the legislation will not be construed as salvageable or viable.

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 678 (1987).  In *Alaska Airlines*, the

contested provision involved a legislative veto which the Court held that by its

discretionary nature could successfully be excised from the statute's remaining

substantive provisions. *Id.*  On the other hand, in *Hill v. Wallace*, the Court held that

the valid and invalid provisions of the Future Trading Act were so intertwined as to

render the Act non-severable.  259 U.S. 44 (1922).

Thus, if, after excision of disputed statutory provisions, the remaining

provisions do not fully reflect congressional intent or would not have been created

by a legislature, the statute as a whole must fail.  *Alaska Airlines*, 480 U.S. 678.  As

expressed in *Tilton v. Richardson*, "the absence of an express severability

provision in the Act [does not] dictate the demise of the entire statute." 403 U.S.

672, 684 (1971).  In an earlier case, the Court expressed this rule and its

---

[8] A reviewing judicial body must interpret this Arizona law in accordance with Arizona rules of statutory interpretation. (This is true for Federal Courts as well as Arizona courts; when interpreting state statutes, a Federal Court's role is to "interpret the law as would the [state's] Supreme Court.") *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004). The primary goal of a court interpreting an Arizona statute is to ascertain and give effect to the legislature's intent. *In re Estate of Winn*, 214 Ariz. 149, 150 (2007). To do this, a court begins with the statute's plain meaning avoiding any tools of statutory construction or analysis of legislative history. *Janson ex rel. Janson v. Christensen*, 167 Ariz. 470, 471 (1991).  *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268 (1994). If the meaning of a statute is unresolved after analysis of plain meaning and legislative history, courts consider canons of statutory construction. *Kyle v. Daniels*, 198 Ariz. 304, 306 (2000) ("When faced with ambiguous statutes we apply our canons of statutory construction, considering background and context in an attempt to discover true legislative intent."). These include comparisons of the challenged statute to other statutes, reading the statute to give every word meaning, and interpreting statutes to be constitutional wherever possible. *State ex rel. Larson v. Farley*, 106 Ariz. 119 ,122 (1970); *Simpson v. Simpson*, 224 Ariz. 224 (App. 2010); *Schecter v. Killingsworth*, 380 P.2d 136, 142 (Ariz. 1963) ("Where differing constructions of a statute are possible, it is our duty to construe it in such a manner that it will be constitutional. *State v. Kaiser*, 204 Ariz. 514, 517, (App. 2003) (noting that party challenging statute's constitutionality has the burden of proving statute unconstitutional. Lundholm, Nicholas B., "Cutting Class: Why Arizona's Ethnic Studies Ban Won't Ban Ethnic Studies," Arizona Legal Studies, Discussion Paper No. 11-15, April 2011 at pp.16-17.

1   requirements in greater detail, remarking that, "The unconstitutionality of a part of

2   an Act does not necessarily defeat the validity of its remaining provisions.  Unless it

3   is evident that the legislature would not have enacted those provisions which are

4   within its power, independently of that which is not, the invalid part may be dropped

5   if what is left is fully operative as a law." *U.S. v. Jackson*, 390 U.S. 570, 585

6   (1968).

7        Additionally, Arizona state courts have essentially adopted these general

8   tests for determining severability. *State v. Watson*, 586 P.2d 1253 (1978); *Millett v.*

9   *Frohmiller*, 66 Ariz. 339, 342-43 (1948).  In the context of analyzing Arizona's death

10  penalty statute, the Arizona Supreme Court wrote that, "Severability  is a question

11  of legislative intent.  The court has stated: "'...the valid part of a statute will be

12  sustained where the valid and invalid parts are so separate and distinct that it is

13  clear or may be presumed that the legislature would have enacted the former

14  without the latter, if it had known of the invalidity, or, as otherwise stated if the valid

15  or invalid parts are not intimately connected as to raise the presumption that the

16  legislature would not have enacted the one without the other, the act will be upheld

17  so far as valid. *Watson*, 586 P.2d at 1257 (citation omitted).

18        In the case of A.R.S. §15-112, which lacks an express severability clause, it

19  seems improbable that any of the four subsections of §15-112(A) could be

20  eliminated without impairing the viability of §15-112's general scheme. Because the

21  subsections represent §15-112's central criteria for enforcement, invalidation of any

22  of the subsections would likely yield an invalidation of all other related statutory

23  provisions in both §15-112 and the Declaration of policy in §15-111. Both the

24  Declaration of the policy and the legislative record shed light on the relative

25  importance of the four subsections.  The Declaration of policy states that, "The

26  legislature finds and declares that public school pupils should be taught to treat

27  and value each other as individuals and not be taught to resent or hate other races

28  or classes of people." A.R.S. §15-111.  This language strongly underscores the

importance of subsections (A)(2), (3) and (4) to the Legislature, which respectively

make the teaching of classes unlawful which, "(2.) Promote resentment toward a

race or class of people," "(3.) Are designed primarily for pupils of a particular ethnic

group," and "(4.) Advocate ethnic solidarity instead of the treatment of pupils as

individuals." A.R.S. §15-112(A), (2)-(4).

   The Declaration of policy, as broad statement of purpose, represents a

persuasive indicator of legislative intent and itself points to the extreme importance

of subsections (A)(2), (3) and (4) to the Legislature.  The ideas embodied in these

interconnected provisions cannot be coherently extricated from the general

statutory scheme of §§15-111 and 15-112. Thus, the invalidation of any one of

these subsections or a subset of them would appear to leave any relevant

remainder of §15-112 unrepresentative of the legislative intent.  For the same

reason, invalidation of the exceptions in §§15-112(E)(3), (4) and (F) would also

result in a statutory framework the Legislature would have been unlikely to

approve, and again lead to concurrent invalidation §15-111 and any remainder of

§15-112. In such a case, the failure of any of the aforementioned provisions would

substantially deviate the meaning of §§15-111 and 15-112 from the legislative

intent which made their enactment possible, and consequently render any other

related provisions non-severable.

   While the presence or absence of a severability clause may hold some

relevance for analyzing congressional intent, it is not totally dispositive of a

statute's overall viability. If the statutory scheme cannot remain intact after excision

of disputed provisions, any crucially related provisions of the law also will probably

be invalidated too due to an absence of severability. In the case at bar, invalidation

of either §15-111's Declaration, any of the subsections in §15-112(A)(2)-(4), the

exceptions in §§15-112(E)(3), (4) and (F), or any combination thereof would likely

result in the failure of any other related provisions that still remain.

//

## VI.   Conclusion.

HB 2281 is a misguided effort that fails in every respect to fall within the four corners of the document that binds us all together as a country–the Constitution. Due to the efforts of a single State official--one who made it his mission to eliminate a successful TUSD program designed to close the achievement gap that has historically plagued Latinos, the First Amendment freedoms of every Arizonan are at risk.

Remarkably, since the inception of the Mexican American Studies program, the courses have been open to all and have proven to be highly effective across the board in improving student achievement. Yet, the gains made as a result of the courses developed by Mexican American Studies are in danger of being lost as a result of HB 2281, a statute that represents a direct threat to the American value of free speech in the classroom.

In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Supreme Court turned back the State of Nebraska's equally misguided effort to "foster a homogenous people with American ideals" by prohibiting the teaching of languages other than English to students younger than the eighth grade. Mr. Horne's mission to deny a substantial spectrum of knowledge to all of Arizona's students must also fail. Latinos cannot simply be written out of classroom textbooks or treated as an invisible segment of the community.

HB 2281 represents a classic example of Alexis de Tocqueville's "tyranny of the majority." It is a law promulgated by the majority of legislators that violates the First Amendment rights of teachers to teach and of students to learn.  The only viable avenue to vindicate plaintiffs' First Amendment rights is here, as it has always been, in this Court.

Among the many flaws contained in HB 2281 is the unmistakable message to our youth that the promise of the Constitution to protect them all equally is a myth; that the history, literature and culture of at least one group is not worthy of

being taught in school. If the State of Arizona can take away the right of students to learn about the historical, literary and artistic contributions of Mexican Americans to the American experience, then the Constitution is a hollow document.  The fact that the teachers "are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia St. Bd. of Ed. v. Barnette*, 139 U.S. 624, 637 (1943).  Whatever legitimate role the State may have in setting curriculum standards in Arizona, it must be "within the limits of the Bill of Rights" *Id.*  This is the fundamental requirement that HB 2281 fails to meet.

For all of the reasons stated in the instant motion, the separate statement of facts and accompanying exhibit, it is respectfully requested that plaintiffs motion be granted.

Dated this 25th day of April 2011.

s/*Richard M. Martinez*, Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs

**Certificate of Service**

I hereby certify that on May 25, 2011, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of the instant motion via the Notice of Electronic Filing to the CM/ECF registrants of record.

s/*Richard M. Martinez*, Esq
Counsel for Plaintiffs