BURCH & CRACCHIOLO, P.A.
702 East Osborn, Suite 200
P.O. Box 16882
Phoenix, Arizona 85011-6882
(602) 274-7611

Bryan Murphy (006414)
bmurphy@bcattorneys.com
Daryl Manhart (005471)
dmanhart@bcattorneys.com
Melissa G. Iyer (024844)
miyer@bcattorneys.com
Jessica Conaway (025401)
jconaway@bcattorneys.com

Attorneys for Defendant John Huppenthal, Superintendent
of Public Instruction of the State of Arizona

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CURTIS ACOSTA, et. al., | Case No. CIV 10-000623-AWT |
| Plaintiffs, | |
| v. | **DEFENDANT SUPERINTENDENT'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| JOHN HUPPENTHAL, Superintendent of Public Instruction and Executive Director of the Arizona State Board of Education, et. al., | |
| Defendants. | |

## **INTRODUCTION**

Plaintiffs' motion marches through a parade of hypothetical horribles as the sole

support for their claim that HB 2281 is facially unconstitutional.  Plaintiffs' analysis of

the statute, however, is fatally flawed for two reasons.

(1)     First, plaintiffs gloss over the most critical inquiry into mounting a

successful facial challenge of any kind – does the statute at issue infringe upon a

substantial amount of constitutionally protected speech?  Here, the answer is no.  By its

plain terms, HB 2281 does not prevent an individual teacher or student from discussing

anything, inside or outside the classroom.  Rather, the statute is directed to "districts or charter schools" who implement certain prohibited "programs of instruction."

(2)     Second, plaintiffs do not conduct any textual analysis of the statute, but merely re-state the text they oppose and then speculate regarding how it might be applied. Plaintiffs' argument is, therefore, devoid of any analysis of the statute's plain language. The most important step in the process of evaluating a statute for constitutional infirmity is a textual analysis of its "allowable meaning."  Obviously, every statute might be construed as "vague" if its actual language is ignored, as plaintiffs do here.

Accordingly, plaintiffs' motion for summary judgment should be denied and defendant's motion to dismiss filed contemporaneously with this response and incorporated herein by reference should be granted.

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.     Plaintiffs Have No First Amendment Right to Determine Their Curriculum or to Teach a Particular Course of Study.

Plaintiffs piece together a series of quotes from several inapposite cases, which stand for the general proposition that teachers and students do not "shed their First Amendment rights "at the schoolhouse gates," to support their specific and unfounded position that they have an "undeniable" First Amendment right to teach Mexican American Studies and select their own texts.[1]  (*See* Plaintiffs' Motion for Summary Judgment, Dkt. # 42, at 8-9); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393

---

[1] These plaintiff teachers and students appear to be claiming to have a First Amendment right to "teach students about Latino history, literature and art"[1] through the "use" of their self-selected "textbooks, material, posters, content, and the name of the Mexican-American Studies Department by all Plaintiffs."  (Dkt. # 42 (Plaintiffs' MSJ) at 4; SAC at ¶ 79.)  Thus, these teachers are claiming a First Amendment right to "teach" Mexican American studies and to "use" self-selected texts in so doing.

U.S. 503, 506 (1969).  While teachers do not necessarily "shed" their First Amendment rights at "the schoolhouse gates," teachers have no constitutionally protected interest in selecting the curriculum or pedagogical method used in any program or in choosing what texts or materials are used in the classroom.  The Supreme Court emphasized this distinction in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988) (emphasis added):

> The question whether the First Amendment requires a school to tolerate particular student speech - the question that we addressed in Tinker - is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.

### 1.   Every circuit that has ruled on the issue has held that a teacher's curricular and pedagogical choices are categorically unprotected.

Teachers have no constitutional right to determine the subject matters taught in the classroom nor do they have a constitutional right to determine the instructive strategies used in the classroom: "A teacher's curricular and pedagogical choices are categorically unprotected."  *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Village Sch. Dist.*, 624 F.3d 332, 342 (6th Cir. 2010) (emphasis added); *see also Downs v. Los Angelos Sch. Dist.*, 228 F.3d 1003, 1014 (9th Cir. 2000) ("We conclude that when a public high school is the speaker, its control of its own speech is not subject to the constraints of constitutional safeguards and forum analysis.").  This rule is not limited to the 9th and 6th Circuits, but extends to every Circuit that has ruled on the issue.[2]

---

[2] *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir. 1990) ("[N]o court has found that teachers' First Amendment rights extend to choosing their own curriculum or classroom management techniques in contravention of school policy or

1    The rationale supporting this rule is readily apparent.  "Government employers,

2    like private employers, need a significant degree of control over their employees' words

3    and actions; without it, there would be little chance for the efficient provision of public

4    services."  *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

5           **2.**     **Plaintiffs have identified the wrong actor: when the speech at**
           **issue is curriculum and pedagogy, the state is the speaker – not**

6               **the teacher and not the student.**

7         "[W]hen the state is the speaker it can decide the content of its message," and the

8    Supreme Court "has stated that the curriculum of public schools is a fully protected

9

10   _____

11   dictates."); *Ward v. Hickey*, 996 F.2d 448 (1st Cir. 1993) ("a teacher's principal
classroom role is to teach students the school curriculum.  Thus schools may reasonably

12   limit teachers' speech in that setting."); *Boring v. Buncombe County Bd. of Educ.*, 136
F.3d 364, 371 (4th Cir. 1998) ("In the case of a public school, in our opinion, it is far

13   better public policy, absent a valid statutory directive on the subject, that the makeup of
curriculum be entrusted to the local school authorities."); *Kirkland v. Northside Ind.*

14   *Sch. Dist.*, 890 F.2d 794, 795 (5th Cir. 1989) ("The first amendment has never required
school districts to abdicate control over public school curricula to the unfettered

15   discretion of individual teachers."); *Evans-Marshall v. Bd. of Educ. of the Tipp City*
*Exempted Village Sch. Dist.*, 624 F.3d 332, 334 (6th Cir. 2010) ("[T]he right to free

16   speech protected by the First Amendment does not extend to in-class curricular speech
of teachers in primary and secondary schools made 'pursuant to' their official duties.");

17   *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1007 (7th Cir. 1990) ("[W]e
have already confirmed the right of those authorities charged by state law with

18   curriculum development to require the obedience of subordinate employees, including
the classroom teacher."); *Clark v. Holmes*, 474 F.2d 928 (7th Cir.) (holding that

19   individual teacher has no constitutional prerogative to override the judgment of his
superiors as to proper course content), *cert. denied*, 411 U.S. 972 (1973); *Mayer v.*

20   *Monroe County Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) ("The Constitution does
not entitle teachers to present personal views to captive audiences against the

21   instructions of elected officials."); *Lacks v. Ferguson Reorganized Sch. Dist.*, 147 F.3d
718 (8th Cir. 1998) (holding teacher had no First Amendment right to choose play with

22   profane content as a part of drama class curriculum); *Hetrick v. Martin*, 480 F.2d 705
(9th Cir.) (Pedagogical methods in classroom are not a protected form of speech), *cert.*

23   *denied*, 414 U.S. 1075 (1973); *Griswold v. Driscoll*, 625 F. Supp. 2d 49 (D. Mass.
2009) ("Public officials have the right to recommend, or even require, the curriculum

24   that will be taught in public school classrooms.  Doing so is a form of government

25   speech, which is not generally subject to First Amendment scrutiny.").

26

form of <u>state speech</u>." *Griswold v. Driscoll*, 625 F. Supp. 2d 49, 54 (D. Mass. 2009)

(citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995))

(emphasis added).  Indeed, as the Ninth Circuit recognized in *Downs v. Los Angeles*

*Sch. Dist.*, 228 F.3d 1003, 1015 (9th Cir. 2000), if teachers were permitted to compel

government speech by dictating the form and content of classroom curriculum and

materials, they "would be able to do to the government what the government could not

do to [the teacher]: compel it to embrace a viewpoint."

> [T]he school system does not 'regulate' teachers' speech as much as it
> *hires* that speech.  Expression is a teacher's stock in trade, the commodity
> she sells to her employer in exchange for a salary.  A teacher hired to lead
> a social-studies class can't use it as a platform for a revisionist perspective
> that Benedict Arnold wasn't really a traitor, when the approved program
> calls him one.

*Mayer v. Monroe County Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007)

(emphasis added).

### 3.   <u>Vesting the constitutional right to determine curriculum and pedagogical choices with the state over individual teachers, protects the integrity of the educational system.</u>

Under Arizona law, the power to determine the curriculum taught in public

schools is generally shared by the Arizona State Board of Education and local

governing boards.  *See* Ariz. Rev. Stat. §§ 15-203(12), 15-701, 15-701.01, 15-341(5).

Local governing boards are also empowered to choose specific courses of study and to

approve all textbooks and other materials used in the classroom.  *See* Ariz. Rev. Stat. §§

15-721(A), 15-722.  Unlike teachers, legislators and local governing board officials are

duly elected representatives answerable to their constituents (parents, students, and

community members) for any decisions they make regarding curriculum.  *See* Ariz.

Rev. Stat. § 15-421.  "This is an accountability measure, pure and simple, one that

ensures the citizens of a community have a say over a matter of considerable

importance to many of them – their children's education – by giving them control over

membership on the board." *Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Village Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010).  Therefore, "it is far better public policy, absent a valid statutory directive on the subject, that the makeup of curriculum be entrusted to the local school authorities who are in some sense responsible rather than to teachers, who would be responsible only to judges, had they a first amendment right to participate in the makeup of the curriculum." *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 371 (4th Cir. 1998).

Any other rule would result in chaos, particularly the rule propounded by plaintiffs.  If plaintiffs were correct (which they are not) that individual teachers have a protected right to determine curriculum and choose texts, then theoretically, students in the same grade, at the same school, but with different instructors, could advance to the next grade without sharing a common knowledge base.  Each class of students from kindergarten through twelfth grade would be educated based upon the preferences of their particular teacher rather than based upon the decisions of elected officials, who must justify their curricular and pedagogical choices to the public at large.

### 4.  Students, like their teachers, have no right to control their curriculum or to choose their texts.

Though plaintiffs argue that students have a First Amendment right "to receive information and ideas," they have cited no case (because there is none) holding that students' "right to receive information" bestows upon them the power to control the content of curriculum and pedagogy or to select their own texts.  (Dkt. # 42 (Plaintiffs' MSJ) at 8.)  In fact, the opposite is true.

In *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988), the United States Supreme Court held that, while students, like their teachers, have limited free speech rights in the classroom, they have no right to control the content of curriculum pursuant to their "right to receive information."  The school, state, or district's choice to

include or exclude a particular text, play, or subject from study in its schools does not implicate a student's First Amendment rights.  *See Seyfried v. Walton*, 668 F.2d 214, 216 (3d Cir. 1981).  Rather, "[t]he selection of course curriculum [is] a process which courts have traditionally left to the expertise of educators."  *Id.*  Thus, "a student has no First Amendment right to study a particular aspect or period of history in his or her senior history course."  *Id.*  In other words, the Constitution does not compel "teachers, parents, and elected school officials to surrender control of the American public school system to public school students." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 526 (1969) (J. Blackmun, dissenting).

In sum, based on the overwhelming precedent from the Supreme Court and almost every circuit in the country, it is clear that these plaintiff teachers and students have not articulated a protected First Amendment right to teach a Mexican American studies course or to control  the selection of curriculum and texts used in any such course.  Moreover, plaintiffs still could not allege that the statute reaches a "substantial" amount of their protected speech, even if they could assert such a right.  This is because § 15-112 does not apply to either teacher or student speech <u>at all</u>.  Rather, the statute prohibits a <u>district</u> from implementing a <u>program of instruction</u>, which includes "<u>any courses or classes</u>" that violate the provisions of subsection A.  Because the plain language of the statute does not restrict teacher or student speech, either inside or outside of the classroom, it does not reach any constitutionally protected speech.  Similarly, § 15-111 is merely a statement of legislative purpose and, likewise, does not restrict or regulate any teacher or student speech.  Accordingly, plaintiffs have not satisfied the first and most critical inquiry in the analysis needed to sustain their burden of demonstrating that HB 2281 is facially unconstitutional.

5.   **Despite overwhelming authority to the contrary, plaintiffs claim to have a constitutional right to determine curriculum and pedagogy; a claim unsupported by the case law they cite.**

Plaintiffs misplace their reliance[3] on *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), which upheld a restriction on student speech when the school principal removed two student articles from publication in a school-sponsored newspaper.  Far from claiming any affirmative First Amendment right to study a certain subject or to use certain textbooks as part of an approved curriculum or course, the plaintiffs in *Hazelwood* merely opposed a restriction on their speech as expressed in a school-sponsored newspaper.  The *Hazelwood* court did not uphold a student or teacher's First Amendment right to self-select curriculum or texts.  Rather, the Court held that state actors could not unreasonably restrict student speech, even if it occurs inside the classroom or as a part of "school sponsored expressive activities" unless the restriction is "reasonably related to legitimate pedagogical concerns."  *Id.* at 272-73. Accordingly, *Hazelwood* does not support plaintiffs' broad claim to have a First Amendment right to "teach" Mexican American Studies and to "use" self-selected materials in doing so.   Put another way, a school's right to select its curriculum and texts is "by definition a legitimate pedagogical concern."  *Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998) (emphasis added).

Plaintiffs' citation to other First Amendment cases which incidentally involve teachers or students is similarly misleading.  For example, plaintiffs rely on *Adamian v. Jacobsen*, 523 F.2d 929 (9th Cir. 1975), for the proposition that the "desire to maintain a sedate academic environment, 'to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint,' is not an interest sufficiently compelling, however, to justify limitations on a teacher's freedom to express himself on political

---

[3] *See* Dkt. # 42 (Plaintiffs' MSJ) at 8.

issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Adamian*, however, involved the right of a professor at a public university to participate in a demonstration on campus (but not in class) protesting the Cambodian invasion. Thus, *Adamian* is inapposite in three respects: (1) it involved a college professor and not a public high school teacher;[4] (2) his political speech was affirmatively and directly restricted; and (3) his speech was restricted on campus, but outside of the classroom. Thus, despite making a generalized statement about academic freedom in the distinct context of a public university, *Adamian* is not useful in evaluating plaintiffs' First Amendment claim as alleged here.[5]

    **B.**    **As Discussed, HB 2281 Does Not Infringe Upon Any Protected Speech; Thus Plaintiffs' Overbreadth Challenge Must Fail.**

As the Supreme Court held in *Village of Hoffman Estates v. Flipside*, if a challenged law does not reach a substantial amount of constitutionally protected speech, "then the overbreadth challenge must fail." 455 U.S. 489, 494-95 (1982). Because

---

[4] "[S]econdary school teachers occupy a unique position for influencing secondary school students, thus creating a concomitant power in school authorities to choose the teachers and regulate their pedagogical methods." *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1007 (7th Cir. 1990) citing *Zykan v. Cmty. Sch. Corp.*, 631 F.2d 1300, 1304 (7th Cir. 1980).

[5] Plaintiff also relies on *Epperson v. Arkansas*, 393 U.S. 97 (1968). *Epperson* involved a challenge to a state law prohibiting "teachers" from "teaching" the theory of evolution. The Court struck down the law on the basis of the establishment clause and not purporting to give teachers an affirmative right to choose curriculum. Likewise in *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Supreme Court struck down a state law prohibiting  any "teacher" "in any private, denominational, parochial or public school, [from] teach[ing] any subject to any person in any language other than the English language."  Notably, the law at issue in *Meyers* broadly applied to both <u>public</u> and <u>private</u> institutions thereby obviously implicating First Amendment speech.  Moreover, unlike § 15-111 and § 15-112 at issue here, the law in *Meyers* applied directly to teachers by its terms and imposed criminal liability on them for violating the statute.

1    plaintiffs here have not, and cannot, demonstrate that HB 2281 reaches a substantial

2    amount of protected speech, their overbreadth challenge should be rejected.

3        **C.    HB 2281 Is Not Unconstitutionally Vague.**

4            **1.    <u>Vagueness analysis when no protected speech is implicated</u>.**

5        Once an overbreadth challenge has been considered and rejected, as it should be

6    here, "[t]he court should then examine the facial vagueness challenge and, assuming the

7    enactment implicates no constitutionally protected conduct, should uphold the

8    challenge only if the enactment is impermissibly vague in all of its applications."

9    *Hoffman Estates*, 455 U.S. at 494-95.

10       A statute is void for vagueness if it does one of two things: (1) "fails to give

11   adequate notice to people of ordinary intelligence concerning the conduct it prescribes,"

12   or (2) "invites arbitrary and discriminatory enforcement."  *Schwartzmiller v. Gardner*,

13   752 F./2d 1341, 1345 (9th Cir. 1984).  A statute need not be perfectly clear to pass

14   constitutional muster.  *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150

15   (9th Cir. 2001).  As the Supreme Court observed in G*rayned v. City of Rockford* ,

16   "[c]ondemned to the use of words, we can never expect mathematical certainty from

17   our language."  408 U.S. 104, 110 (1972).  Thus, in testing a challenged statute for

18   unconstitutional vagueness, "[a] federal court's duty . . . is to employ <u>traditional tools</u> of

19   statutory construction to determine the statute's '<u>allowable meaning</u>.'" *Cal. Teachers

20   Ass'n*, 271 F.3d at 1147 quoting G*rayned*, 408 U.S. at 110 (emphasis added).  In

21   evaluating the "allowable meaning" of the challenged law, the Court should "look to

22   the words of the statute itself as well as state court interpretations of the same or similar

23   statutes."  *Id.*

24       Notably, "[t]he degree of vagueness that the Constitution tolerates –  as well as

25   the relative importance of fair notice and fair enforcement – depends in part on the

26

1    nature of the enactment." *Hoffman*, 455 U.S. at 498.  "The Court has . . . expressed

2    greater tolerance of enactments with civil rather than criminal penalties because the

3    consequences of imprecision are qualitatively less severe."  *Id.* at 498-99.

4           Based upon the standard of review articulated above, the Ninth Circuit

5    "presume[s] statutes are constitutional."  *SeaRiver Maritime Fin. Holdings, Inc. v.*

6    *Mineta*, 309 F.3d 662, 669 (9th Cir. 2002).  Thus, this court must construe the statutes

7    challenged here to uphold their validity if possible. *Robertson v. Seattle Audubon*

8    *Society*, 503 U.S. 429 (1992).

9                   **2.      Section 15-112(A) is not unconstitutionally vague.**

10          Plaintiffs' motion purports to analyze the statute, concluding that it is

11   unconstitutionally vague.  But plaintiffs do no such thing.  Instead, plaintiffs recite a

12   series of hypotheticals to the court implying that the statute might be broadly enforced

13   to encompass those scenarios.  They do not, however, critically analyze the statute's

14   text or explain how that text might reasonably be construed to apply as broadly as they

15   fear.  Thus, plaintiffs' hypotheticals do not exemplify the vagueness of the statute; they

16   are red herrings.

17          Indeed, <u>all</u> of the hypotheticals plaintiffs pose to the court rely upon the same

18   false premise: they presume that the statute restricts teacher and student speech.  It does

19   not.  Section 15-112(A) only restricts a "district or charter school" from implementing

20   certain "program[s] of instruction."  Ariz. Rev. Stat. § 15-112(A).[6]  Plaintiffs are

21   teachers and students.  To state the obvious, they are not a district or a charter school.

22

23          [6] Plaintiffs' motion emphasizes an attack on the constitutionality of § 15-112.
     Nevertheless, plaintiffs' motion also occasionally refers to § 15-111 together with § 15-
24   112 as being "unconstitutionally overbroad."  (Dkt. # 42 at 20, ln. 22.)  Section 15-111
     does not impose any restraint on speech or conduct whatsoever and is merely a
25   statement of legislative purpose prefatory to the enactment of § 15-112.   This is
     presumably why plaintiffs' vagueness analysis is limited to § 15-112.

Consequently, the statute does not restrict their speech in any way.  It does not prevent the discussion of any topic: it does not prevent the discussion of the Declaration of Independence.  It does not prevent the discussion of the 9/11 attacks on the World Trade Center or the Pentagon.  It does not prevent the discussion of <u>anything</u>.  To properly, and narrowly, construe the plain language of § 15-112, the court must start from the plain terms of the statute and those terms simply do not impact teacher or student speech <u>at all</u>.

(a)     <u>The phrase "promote the overthrow of the United States Government" is not unconstitutionally vague</u>.

Section 15-112(A)(1) prohibits a district or charter school from including within its "program of instruction" any courses or classes that "promote the overthrow of the United States government."  Plaintiffs first challenge the legislature's use of the phrase "promote the overthrow of the United States government" as unconstitutionally vague. In so doing, plaintiffs claim that "no teacher <u>or school district</u> can know whether such a classroom lesson criticizing the United States would constitute a course which "promotes the overthrow of the United States government" in violation of (A)(1). Again, this provision of the statute does not prohibit teachers from speaking about anything.  And upon review of the plain language, it is clear that none of the claimed vagueness actually exists.

*(i)     The United States statute criminalizing treason contains the same language challenged here and has been upheld as constitutional since 1951.*

There is nothing vague about the phrase "promote the overthrow of the United States government," a fact that has been recognized by the United States Supreme Court for sixty years.  18 U.S.C. § 2385 (emphasis added), criminalizes the act of treason and provides the following:

> Whoever knowingly or willfully advocates,[7] abets, advises, or <u>teaches</u> the duty, necessity, desirability, or propriety of <u>overthrowing</u> or destroying <u>the United States Government</u> . . . shall be fined under this title or imprisoned not more than twenty years, or both.

In 1951, this statute was challenged on vagueness grounds and upheld as constitutional by the United States Supreme Court.  In *Dennis v. United States*, the Court stated, in no uncertain terms, that "[n]o one could conceive that it is not within the power of Congress to prohibit acts intended to overthrow the Government by force and violence."  341 U.S. 494, 501 (1951).

As noted above, "[t]he court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  *Hoffman*, 455 U.S. at 498-99.  The language at issue has already survived a vagueness challenge and that ruling has survived for sixty years.  It should go without saying then that the civil statute at issue in this case, which incidentally imposes no <u>individual</u> civil penalty but merely a reduction in state aid, is not unconstitutionally vague.

If that were not sufficient, other cases support the holding in *Dennis* in considering vagueness challenges to laws with a similar prohibition.  In *Cole v. Richardson*, 405 U.S. 676 (1972), the Supreme Court upheld a state statute requiring public employees to take an oath swearing or affirming that they would "oppose the overthrow of the government of the United States."   The Court explained that "[a]lmost

---

[7] As used in § 15-112, the word "promote" is similar in its common usage as the word "advocate" used in the federal treason statute.  To "promote" means "to further or encourage the progress or existence of" or "to urge the adoption of."  *See* Definition from Merriam Webster available at http://www.merriam-webster.com/dictionary/promote (last visited Jun. 22, 2011).  Thus, it is not surprising that courts called up to construe the word "promote" have concluded that the word has "a general meaning" and that "no serious argument can be presented by which it may be successfully contended" that the word "promote" is "either vague or ambiguous or [has] some obscure meaning."  *United States v. Smith*, 209 F. Supp. 907, 918 (D.C. Ill. 1962).

1    any word or phrase may be rendered vague and ambiguous by dissection with a

2    semantic scalpel" but that the Court has "rejected such rigidly literal notions." *Id.* 683-

3    84. The Court, thus, rejected the argument that the phrase became void for vagueness

4    merely because the term "oppose" could be literally construed to require the oath taker

5    to "actively oppose" the overthrow of the government, but did not define what

6    affirmative acts of opposition would satisfy the oath. *Id.* at 683.

7              (ii)    *The cases plaintiffs rely upon are distinguishable and do not*
                      *support their conclusion that § 15-112(A)(1) is void for vagueness.*
8

9          The cases plaintiffs rely upon, such as *Keyishian*, are distinguishable for the

10   same reason explained in *Cole*. *See Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)

11   (cited in Plaintiffs' Motion at p. 11-12.)   The Court in *Keyishian* was not concerned

12   with the phrase "overthrow the United States government" so much as it was concerned

13   at the breadth and vagueness of the subject statutes and oaths/certificates public

14   employees were required to sign.

15         In *Keyishian*, a New York law called the "Feinberg law" was challenged as

16   facially unconstitutional along with its implementing regulations by members of the

17   faculty at the University of Buffalo. The Feinberg law was enacted by the New York

18   legislature to enforce and implement two earlier state statutes passed in 1917 and 1939

19   respectively. The 1917 Act provided that a public school teacher could be dismissed

20   for the "utterance of any treasonable or seditious word or words or the doing of any

21   treasonable or seditious act." *Id.* at 593. The 1939 law similarly disqualified a person

22   from civil service and employment in the educational system if that person personally

23   "advocate[d] the overthrow of government by force, violence, or any unlawful means,

24   or publishes material advocating such overthrow or organizes or joins any society or

25   group of persons advocating such doctrine." *Id.*

26

1     Pursuant to the Feinberg law, the State Board of Regents promulgated rules and

2  regulations designed to ferret out persons ineligible for public employment pursuant to

3  the 1917 and 1939 laws.  Included within those rules and regulations were definitions of

4  "subversive persons" and "subversive organizations."  The regulations provided that

5  membership in a "subversive organization" would be treated as prima facie evidence of

6  disqualification for public employment.  *Id.* at 594.

7     The Court ruled that the 1917 act was void for vagueness because it broadly

8  prohibited any "utterances" or "acts" of a "seditious" or "treasonable" nature and did

9  not define the terms "seditious" or "treasonable."  Thus, in "famously illustrating" the

10  vagueness of the law by asking "Does the teacher who carries a copy of the Communist

11  Manifesto on a public street thereby advocate criminal anarchy?" the Court was

12  pointing out the broad application of the statute to all "utterances" and "acts" and the

13  vague nature of the words "seditious" and "treasonable."

14     A.R.S. § 15-112 contains none of those terms. Unlike the statutes and

15  regulations at issue in *Keyishian*, the statute at issue here does not impose any civil or

16  criminal penalty on any public teacher and does not disqualify any teacher or other

17  person from being publicly employed in the Arizona public school system.  For those

18  reasons, plaintiffs' reliance on *Keyishian* is misplaced.[8]

19  ////

20  ////

21

---

22

23  [8] Plaintiff also relies on *Baggett v. Bullitt*, 377 U.S. 360, 362 (1964), another oath case similar to *Keyishian* involving a statute prohibiting "subversive persons" from being employed by the government.  *Baggett* is distinguishable for the same reasons as *Keyishian*.   Plaintiff also cites *Hunt v. City of Los Angeles*, 638 F.3d 703 (9th Cir. 2011), but *Hunt* involved a challenge to city ordinances regulating speech on the boardwalk in Venice Beach and so is entirely distinguishable as well.

24

25

26

   (b)   The phrase "promote resentment toward a race or class of people" is not unconstitutionally vague.

Just as the phrase "promote the overthrow of the United States government" is not unconstitutionally vague, the phrase under subsection (A)(2) prohibiting a program of instruction that "promotes resentment towards a race or class of people" is equally clear of any constitutionally infirmity.  Section 15-112(A)(2) prohibits a district from offering a "course or class" that "furthers" or "encourages" students to resent a race or class of people.[9]

Plaintiffs' only argument supporting their conclusion that § 15-112(A)(2) is void for vagueness is the ludicrous speculation that its language "prohibits a classroom discussion of jihad and the attacks of September 11, 2001."  (Dkt. #42 (Plaintiffs' MSJ) at 14.)  As noted, discussions of any kind are not prohibited by § 15-112(A)(2).  The court need go no further than the plain language of the statute to reach this conclusion.

Because the statute plainly does not prohibit "discussions," plaintiffs' presumption that a course could be construed as "promoting resentment" so long as a discussion of a subject "could . . . result in some students fostering a bitterness" toward a race or class of people, also fails.  By its plain language, the statute does not prohibit "discussions" even if those discussions might result in "fostering bitterness."  Rather, the statute prohibits a course from "promoting" such resentment by encouraging it through the official program of instruction it employs.

/ / / /

/ / / /

/ / / /

---

[9] *See* Definition from Merriam Webster available at http://www.merriam-webster.com/dictionary/promote (last visited Jun. 22, 2011).

1

2

      (c)    <u>The phrase "designed primarily for pupils of a particular ethnic group" is not vague.</u>

3

Next, plaintiffs challenge subsection (A)(3), which contains the prohibition

4

against "courses or classes" that are "designed primarily for pupils of a particular ethnic

5

group."[10]  This challenge is also unsuccessful.

6

Courts have already concluded that statutes containing the term "primarily" are

7

not indecipherable to the point of being void.  Courts have defined the term "primarily"

8

as "meaning more than fifty percent."  *In re Stewart*, 175 F.3d 796, 808 (10th Cir.

9

1999) (citing *Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996))

10

(recognizing the Department of Labor, as a "good rule of thumb," defines "primary

11

duty" to mean the major part, or over fifty percent, of the employee's time).  This is

12

consistent with the term's ordinary meaning.  The dictionary consistently defines

13

"primarily" as "for the most part."  *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988)

14

(quoting Webster's Ninth New Collegiate Dictionary 934 (1984)).  Thus, it is not a

15

surprise that the Tenth Circuit has concluded that "the word 'primarily' is not an

16

ambiguous or difficult word to understand."  *In re Stewart*, 175 F.3d at 808.

17

Though not with any specific reference to an ambiguity in the text itself,

18

plaintiffs reiterate the argument that § 15-112(A)(3) creates "another subjective

19

standard" and again pose a series of hypothetical applications of the statute to support

20

their claim.  For example, plaintiffs ask whether "a course on Asian literature is

21

------------------------

22

    [10] Notably, a state may have compelling interests in discouraging racial or ethnic resentment when it interferes with the function of an important public service.  *See, e.g.*

23

*McMullen v. Carson*, 568 F. Supp. 937, 945 (D.C. Fla.1983) (dismissal of public employee for affiliation with Klu Klux Klan was narrowly tailored to compelling state

24

interests).  Certainly, public education is an important function that might be seriously disrupted by racial resentment, which may also lead to violence.  Thus, even if this

25

statute were subject to a heightened level of scrutiny, it would still pass constitutional

26

muster.

1  inherently one designed primarily for Asian pupils."  (Dkt. # 42 (Plaintiffs' MSJ) at 14.)

2  Plaintiffs assume that such a course must be prohibited by the statute, but do so without

3  any reference to the text.

4         The plain language of this provision does not prohibit a course or class "about"

5  or even "primarily discussing" works by any particular ethnic group.  So courses <u>about</u>

6  "Asian literature" by Asian authors are not "banned" by the statute so long as they are

7  not "designed primarily" <u>for</u> Asian students to the exclusion of students from other

8  ethnic groups.   There is a clear and understandable demarcation between courses

9  "designed primarily to study" a certain ethnic group and courses "designed primarily

10  for" students belonging to that group.   Plaintiffs' counsel conducts no direct

11  construction of the statutory language to demonstrate how the courses or discussion

12  topics he suggests might be prohibited.  Simply stated, plaintiffs ignore the language of

13  the statute because it does not suffer from any unconstitutional vagueness.

14  Accordingly, plaintiffs' rhetorical concerns as expressed in the motion do not emerge as

15  the result of unclear statutory text.  Plaintiffs' unsupported conclusion that § 15-

16  112(A)(3) is unconstitutionally vague should be rejected.

17              (d)    <u>The phrase "advocate ethnic solidarity instead of the treatment of
               pupils as individuals" contained in section 15-112(A)(4) is not
18             unconstitutionally vague.</u>

19         Plaintiffs also challenge the final subsection of § 15-112(A)(4), which prohibits

20  classes or courses that "advocate ethnic solidarity instead of the treatment of pupils as

21  individuals."  Again, plaintiffs do not directly assess the text of this provision.  In

22  similar fashion to every other provision they have challenged, plaintiffs merely pose a

23  series of hypotheticals that clearly do not fall within the plain textual prohibition.  As

24  with the other provisions challenged, plaintiffs' unsupported speculation does not

25  support a conclusion that § 15-112(A)(4) is unconstitutionally vague.

26

1          Again, this provision, like all the others, does not prohibit <u>discussion</u> of

2   <u>anything</u>.  It simply prohibits a "course of study" and does not prevent "discussion" of

3   nationalism, ethnic solidarity, or movements dedicated to either.

4          Analyzing the plain language of the statute, the word "advocate" is an "ordinary

5   everyday term[] with generally understood meaning" and is not vague. *Dunne v. United*

6   *States*, 138 F.2d 137, 142 (8th Cir. 1943).  When used as a verb, as it is here, the word

7   "advocate" means "to plead in favor of."[11]  The term "solidarity" is defined as "unity

8   (as of a group or class) that produces or is based on community of interests, objectives,

9   and standards."  *Id.*  By contrast, "individual" when used as a noun (as it is here) is

10  defined as "a particular being or thing as distinguished from a class, species, or

11  collection."  *Id.*  So the statute clearly distinguishes "advocating ethnic solidarity" (*i.e.*,

12  "pleading in favor of ethnic unity") from treating students as "individuals" (*i.e.*, treating

13  students as beings which are distinguishable in their own right from any class or ethnic

14  category to which they might also belong).   Thus, the statute's "allowable meaning" is

15  sufficiently clear.

16         Nevertheless, plaintiffs presume that the term "advocate" could reasonably be

17  construed as a prohibition on any "presentation" about historical events or figures

18  including Malcolm X, the 1942 Zoot Suit riots, and Cesar Chavez.  (Plaintiffs' Motion

19  at 17-18.)   But nothing in the plain definition of the word "advocate" supports an

20  interpretation that would give rise to this "parade of horribles," where any discussion or

21  "presentation" of historical figures or events would be prohibited.  Accordingly,

22  plaintiffs' vagueness challenge to this provision also fails.

23  / / / /

24

25  _____

26         [11] *See* Merriam Webster On-Line Dictionary available at http://www.merriam-
    webster.com/dictionary/advocate?show=1&t=1308792449 (last visited Jun. 22, 2011).

19

1

2

**2.      Subsections E and F limit the scope of subsection A and are not unconstitutionally vague.**

3      A key factor in analyzing whether a law is unconstitutionally vague is to

4  determine the breadth of the statute's proscription in light of the enumerated exceptions.

5  *Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997)).   Section 15-112(E) and

6  (F) were included in the statute to clarify and narrow how broadly the statute can be

7  applied.  Many of plaintiffs' concerns and hypothetical applications are wholly

8  undermined by the narrowing provisions of subsections (E) and (F).

9      For example, while plaintiffs opine that teachers reading subparts of subsection

10  (A) might "fear" speaking about controversial figures or events in history, these

11  narrowing provisions were designed to alleviate any such concern.  Subsection (E)

12  makes clear that no district can be penalized for implementing "Courses or classes that

13  include the history of any ethnic group and that are open to all students" or "courses or

14  classes that include the discussion of controversial aspects of history."  This is

15  consistent with the plain meaning of subsection (A) discussed above, which prohibits a

16  district from implementing certain "program[s] of instruction," but which does not

17  prohibit "discussion" of any topic.

18      Similarly, subsection (F) makes clear that the statute should be construed

19  narrowly so that "instruction of the holocaust, any other instance of genocide, or the

20  historical oppression of a particular group of people based on ethnicity, race, or class"

21  is not prohibited by the restrictive language of subsection (A).  Thus, these subsections

22  do indeed provide narrowing and clarification of the prohibitions outlined in subsection

23  (A) and support the conclusion that the statute is not unconstitutionally vague.

24  ////

25  ////

26

**D.      The Provisions of Subsections A, E, and F Are Severable And Should Be Severed If Some But Not All Provisions Are Declared Unconstitutional.**

Plaintiffs acknowledge, as they must, that "the absence of an express severability provision in the Act [does not] dictate the demise of the entire statute." (Plaintiffs' Motion at 22 quoting *Alaska Airlines v. Brock*, 480 U.S. 678, 678 (1987). They nevertheless argue that even if this Court finds only a portion of the statute unconstitutional it must be treated as non-severable. Consistent with their analysis of the specific provisions at issue, plaintiffs' argument regarding severability is devoid of any textual support.

Severability is determined by "legislative intent." The test is whether a statute's provisions are "so intimately connected as to raise the presumption that the legislature would not have enacted the one without the other." *State v. Pandeli*, 215 Ariz. 514, 530, 161 P.3d 557, 573 (2007). "Additionally, 'if part of an act is unconstitutional and by eliminating the unconstitutional portion the balance of the act is workable, only that part which is objectionable will be eliminated and the balance left intact.'" *State v. Rios*, 225 Ariz. 292, 296, 237 P.3d 1052, 1056 (App. 2010).

In light of this well-established standard, it is obvious that the various subsections of 15-112 are severable from one another and are not so "intimately connected" that a prohibition on a course that "promotes the overthrow of the United States government" cannot stand independently from a separate section prohibiting a course which "advocates ethnic solidarity." For this reason, plaintiffs' severability arguments should be rejected. If this Court upholds their constitutional challenge to some, but not all of the provisions of subsection A, E, or F of § 15-112, then its unconstitutional portions may be easily excised and the remainder left "intact."

1

## CONCLUSION

2        For all the foregoing reasons, plaintiffs' motion for summary judgment should

3   be denied.

4
5        DATED this 27th day of June, 2011.

6                                        BURCH & CRACCHIOLO, P.A.

7
                                  By:   /s/Melissa G. Iyer
8                                        Bryan Murphy, Esq.
                                         Daryl Manhart, Esq.
9                                        Melissa G. Iyer, Esq.
                                         Jessica Conaway, Esq.
10                                       Burch & Cracchiolo, P.A.
                                         702 East Osborn, Suite 200
11                                       Phoenix, Arizona 85014
                                          Attorneys for Defendant
12                                       John Huppenthal, Superintendent
                                         of Public Instruction and
13                                       Executive Director of the
                                         Arizona State Board of Education

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 27th, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Richard M. Martinez, Esq.                    Richard@richardmartinezlaw.com
*Attorney for Plaintiffs*

Kevin D. Ray, Esq.                           Kevin.Ray@azag.gov
Assistant Attorney General
Office of the Attorney General
State of Arizona
*Attorney for Defendants Arizona State Board of Education,*
*including members named in their Official Capacity*

With a copy mailed this same date to:

Jinju Park Hurtado, Esq.
Assistant Attorney General
Office of the Attorney General
State of Arizona
1275 West Washington Street
Phoenix, AZ 85007
*Attorney for Defendants Arizona State Board of Education,*
*including members named in their Official Capacity*

s/Leslie Chatburn