**RICHARD M. MARTINEZ, SBA No. 7763**
307 South Convent Avenue
Tucson, Arizona 85701
(520) 327-4797 phone
(520) 320-9090 fax
richard@richardmartinezlaw.com
**Counsel for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF ARIZONA

CURTIS ACOSTA, SEAN ARCE, MAYA ARCE, MARIA FEDERICO BRUMMER, DOLORES  CARRION, ALEXANDRO ESCAMILLA, JOSE GONZALEZ,  NORMA GONZALEZ, LORENZO LOPEZ, JR., KORINA ELIZA LOPEZ, RENE F. MARTINEZ, SARA "SALLY" RUSK, and YOLANDA SOTELO,

        Plaintiffs,

v.

JOHN HUPPENTHAL, Superintendent of Public Instruction, et. al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV 10 - 623 TUC AWT

**REPLY TO DEFENDANT'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

    Plaintiffs, through their undersigned counsel, hereby reply to the response submitted by Mr. Huppenthal to the pending motion for summary judgment.

    At issue is the constitutional propriety of A.R.S. §15-112, a statute intended to limit the dialogue and materials allowed in a public classroom. This statute impermissibly restricts First Amendment freedoms of teachers and students. Nor does it provide reasonable opportunity to know what is prohibited while imposing severe career ending sanctions.

    Plaintiffs respectfully request that their motion be granted.

    Submitted this 8th day of July 2011.

                *s/ Richard M. Martinez*, Esq.
                RICHARD M. MARTINEZ, ESQ.
                Counsel for Plaintiffs

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    Overview.**

3         Plaintiffs' motion for summary judgment seeks redress to preserve the

4    constitutional protections that are essential to the operation of public schools, and

5    to the speech that is required by teachers and students to engage in classroom

6    learning. Contrary to the  assertion of Mr. Huppenthal, HB 2281 was written,

7    passed and signed into law to silence all discussion about the history, culture and

8    languages of Latinos. Defendant's response presumes that HB 2281 can be

9    divorced from that critical element present in every classroom: dialogue that is at

10   the core of teaching and communication between a teacher and her students in

11   the classroom. Plaintiffs, as teachers and students, ask this Court to uphold and

12   enforce their right to know what cannot be taught, or even spoken about, in the

13   classroom. They also seek to remove the yoke of a vague and arbitrary statute,

14   selectively enforced, and designed to stifle learning about Mexican Americans

15   from a curriculum and underlying pedagogy approved by the Governing Board.

16        Plaintiffs do not seek the intervention of this Court to controvert or

17   supersede the  legitimate role of the local Governing Board to make curricular

18   decisions. To the contrary, plaintiffs seek to preserve the role of the elected

19   officials of the Tucson Unified School District ("TUSD") to decide what curriculum

20   is appropriate and necessary for its student population. *See Hazelwood Sch. Dist.*

21   *v. Kuhlmeier*, 484 U.S. 260, 273 (1988)("education of the Nation's youth is

22   primarily the responsibility of parents, teachers, and state and local officials, and

23   not federal judges.")(citations omitted), *see also, Bd. of Ed. v. Pico*, 457 U.S. 853,

24   864 (1982)("At the same time, however, we have necessarily recognized that the

25   discretion of the States and local school boards in matters of education must be

26   exercised in a manner that comports with the transcendent imperatives of the

27   First Amendment.").

28        Mr. Huppenthal's response distorts plaintiffs claims, the applicable law and

1  the relief sought by his contention that they seek a constitutional right to dictate

2  their curriculum, text books and materials. Defendant's Response, CD No. 57, pp.

3  2-9. Nor do plaintiffs argue that public school teachers' or students' instructional

4  speech requires boundless free speech protection. Rather, they seek that

5  constitutional protection necessary to preserve their right to use the words and

6  content needed to teach and learn about the history, culture and languages of

7  Latinos.[1]

8       The fact that HB 2281 has an "unusual character [that] especially suggest[s]

9  careful consideration to determine whether [it is ] obnoxious to the constitutional

10 provisions", *Romer v. Evans*, 517 U.S. 620, 633 (1996) (citations omitted), is not

11 to be conflated with asking this Court to act as a "super school board" to overturn

12 a legitimate curriculum established by the State.[2]  Here, plaintiffs ask the Court to

13 exercise its most crucial function, to check the representative branch where it

14 exceeds its legitimate exercise of power.

15      When, as has occurred here, the boundaries of sound discretion have been

16 breached, and the role of public education "to prepare pupils for citizenship in the

17 Republic" and to inculcate the civic values that are "indispensable to the practice

18 of self government in the community and the nation" is ignored, judicial

19 intervention is necessary and appropriate. *See*, *Bethel Sch. Dist. v. Fraser*, 478

20 U.S. 675, 681 (1986)(citations omitted). The fact that the government may

---

22  [1]  Upon passage of HB 2281, then Superintendent Horne stated, "I think it's
23  overdue.  The Department of Education will now have the authority to put a stop to the
    extremely dysfunctional practices in Tucson Unified School District." KVOA.com, "Bill
    Passed That Would Ban Ethnic Studies for TUSD," April 30, 2010,
24  http://www.kvoa.com/news/bill-passed-that-would-ban-ethnic-studies-for-tusd/.  Mr.
25  Horne targeted the TUSD program because he "believes that the ethnic studies
    program teaches Latino students that they are oppressed by white people and promotes
26  racial hatred."  The Washington Post, The Answer Sheet, "Arizona Strikes Again: Now
    It's Ethnic Studies," http://voices.washingtonpost.com/answer-sheet/history/arizona-
27  strikes-again-now-it-I-.html. Fed. R. Evid. 201(b)provides for judicial notice of Mr.
28  Horne's public comments.

    [2] HB 2281 is not a curriculum nor does it represent a pedagogy. It is a statute
    enacted by the legislature that is representative of a specific viewpoint.

1  determine the content of its own speech, does not provide a license to trample the
2  First Amendment rights of individuals, including those who work and study in the
3  classrooms of our public schools. It is in our schools that we as a nation impart our
4  fundamental notions of liberal democracy. It is here, in these classrooms, that we
5  invite and are open to debate and the free exchange of ideas.

6  **II.    Defendant Huppenthal Fails To Recognize That The First**
       **Amendment Shields The Words Spoken And Concepts Taught In**
7      **The Classroom That Are Part Of An Adopted Curriculum.**

8       Neither the Supreme Court nor the Ninth Circuit have "definitively resolved
9  whether and to what extent a teacher's instructional speech is protected by the
10  First Amendment," and this Court need not determine the extent of such
11  protection, but merely recognize that such exists in finding HB 2281
12  unconstitutionally void for vagueness. *California Teachers Assoc. v. State Board*
13  *of Ed.*, 271 F.3d, 1141, 1148 (9th Cir. 2001). Rather than engage in this type of
14  prescient exercise, it suffices to recognize that, at a minimum, teachers and
15  students have a right to engage in classroom and school speech that is allowed
16  within the boundaries of the adopted curriculum.

17      Speech inheres in the function of teaching. Words, whether spoken or
18  written are the stock-in-trade of the educational setting. Curriculum standards are
19  written broadly to define the basic content of the course. Lessons are not scripted
20  word-by-word for teachers or students but left open for each to choose their own
21  words. Regardless where the outer limits of a teacher's or student's First
22  Amendment rights lay, both must be free to use that most basic speech to teach
23  and learn the required material. *Cf. Morse v. Frederick*, 551 U.S. 393, 403
24  (2007)("*First Amendment* rights, applied in light of the special characteristics of the
25  school environment, are available to teacher's and students," citing *Tinker v. Des*
26  *Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969)).

27      The Ninth Circuit has noted that *Hazelwood Sch. Dist. v. Kuhlmeir*, 484
28  U.S. 260 (1988), supports the limited right to classroom speech in furtherance of

1    the course curriculum. In *Downs v. LAUSD*, the court recognized that where

2    "activities may fairly be characterized as a part of the school curriculum, whether

3    or not they occur in a traditional classroom setting," the "educators' authority in

4    this area enable[s] them to 'assure that the participants learn whatever lessons the

5    activity is designed to teach, that readers or listeners are not exposed to

6    material that may be inappropriate for their level of maturity, and that the views of

7    the individual speaker are not erroneously attributed to the school." 228 F.3d

8    1003, 1010 (9th Cir. 2000), quoting *Hazelwood*, 484 U.S. at 271. Thus, within the

9    educational setting, teachers and students have the right to communicate within

10   the curriculum in a manner that facilitates learning the intended lesson. However

11   limited this protection may be, it applies to the all public educational settings,

12   including the teaching of Mexican American studies.

13         Mr. Huppenthal's contention that " [w]hen the state is the speaker it can

14   decide the content of the message," confuses state speech with teacher and

15   student speech and ignores the legitimate and necessary role of the First

16   Amendment in the public schools. State and local officials have the authority to

17   determine curriculum[3] and in this instance the TUSD Governing Board exercised

18   that power.

19         There is no contention that Mexican American studies was created,

20   implemented or exists absent the consent of the Governing Board. To the

21   contrary, Mexican American studies was included in the school district's Post-

22   Unitary Plan.[4] Mexican American studies was approved by the Governing Board

23

24   _____

25         [3] *But see, Epperson v. Arkansas*, 393 U.S. 97, 107 (1968), Stewart, J.,
     concurring("The State's undoubted right to prescribe the curriculum for its public schools
26   does not carry the right to prohibit, on pain of criminal penalty, the teaching of a
     scientific theory or doctrine where that prohibition is based upon reasons that violate the
27   *First Amendment.* It is much too late to argue that the State may impose upon the
     teacher in its schools any conditions that it chooses, however restrictive they may be of
28   constitutional guarantees.")

         [4] *See* Tucson Unified School District Post Unitary Plan, Ex. 2. pp. 31-33.

1  as authorized by A.R.S. § 15-341(A)(5).[5]

2       Plaintiffs do not dispute that the Governing Board engaged in state speech

3  by adopting the Mexican American studies program. Nor is there a dispute that HB

4  2281 represents state speech. But in this latter instance, HB 2281 does not

5  represent a curriculum or a modification of an adopted curriculum. This statute

6  applies to all "classes and courses" from kindergarten to the twelfth grade in every

7  school district and charter school and prohibits across the board the four items

8  specified. Where HB 2281 prohibits or restricts instructional communications by

9  teachers and students that actualize an approved curriculum, it must comport with

10  the mandates of the First Amendment and Due Process. *See Citizens United v.*

11  *F.E.C.*, 130 S. Ct. 876, 911 (2010) ("Where Congress finds that a problem exists,

12  we must give that finding due deference; but Congress may not choose an

13  unconstitutional remedy.") A limitation to which HB 2281 fails to adhere.[6]

14  **III.    The Prohibitions Included In A.R.S. § 15-112 Apply To The Classroom Speech Of Teachers And Students.**

15       Mr. Huppenthal erroneously asserts, "the plain language of the statute does

16  not restrict teacher or student speech, either inside or outside of the classroom..."

17  CD No. 57, p. 7. To the contrary, the statute explicitly states that the prohibitions

18  listed in subsections 15-112(A)(1) through (4) apply to "classes" and thus

19  necessarily  to teachers' and students' instructional speech.  "A school

20

21  ————————————

22       [5]  The relevant portion of section 341 provides: "A. The governing board shall:...5.

23  Provide the curricula...as provided in sections 15-701 and 15-701.01."  A.R.S. § 15-701 and 15-701.01 require the State Board of Education to "[p]rescribe a minimum course of

24  study, as defined in section 15-101 and incorporating the academic standards adopted by the State Board of Education..." "Course of study' means a list of required and

25  optional subjects to be taught in the schools." A.R.S. § 15-101(10). Thus, the statutory scheme requires the local governing board to determine the curricula, which must

26  include the general academic standards and minimum list of required and optional courses provided by the State Board of Education.

27

28       [6]  The defendant has not responded to the plaintiffs' assertion that students' classroom speech has First Amendment protection. CD No. 42, pp.8-9. Plaintiffs do not contend that students' First Amendment rights grant them the "right to control their curriculum or to choose their texts." CD No. 57, p.6.

1   district...shall not include in its program of instruction any courses or classes that

2   include any of the following:...." A.R.S.§15-112(A) (emphasis added). This statute

3   is not directed solely to the curricular decisions made by local governing boards.

4   It is also directed to the speech activities in the classroom.

5        Because this statute applies to all Arizona school districts and charter

6   schools, they must now attempt to educate teachers about the new restrictions

7   imposed by HB 2281. If a teacher is accused of "promot[ing] resentment toward a

8   race or class of people" by virtue of what he said during a classroom lesson, then

9   a violation of A.R.S. §15-112(A)(2) may be alleged. It makes no difference that the

10  finding of a violation would be entered against the school district and not against

11  the teacher individually. By its plain wording, HB 2281 effectively requires

12  teachers to discern what classroom speech might violate the statute, thus

13  undeniably chills teachers' and students' classroom speech. The prohibitions

14  contained in the statute can only be construed as applying to classroom speech.

15       It is also apparent that A.R.S. §15-112 does not operate like the usual

16  "curricular" decision made by school boards because it is not a curriculum, and

17  was not developed according to educational standards or adopted by a school

18  board. HB 2281 is the result of a successful legislative effort to eliminate one

19  program. Under normal circumstances, when a teachers acts beyond the district's

20  prescribed curriculum, the teacher risks discipline or termination of employment.

21  *See e.g. Mayer v. Monroe Co. Comm. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir.

22  2007) (teacher terminated for stating personal opinion in classroom discussion of

23  current events.) In this case, the statute directs the punishment for prohibited

24  classroom speech at the school district. The punishment is a draconian 10% cut to

25  the district's state funds and is intended to give the State Superintendent the

26  power to compel TUSD into shutting down the Mexican American Studies

27  program. Further, the punishment is nominally to the district, but the effect is to

28  reduce the quality of education provided to students, a harm that most other states

1  would not attempt to visit upon their citizens.[7] Under these circumstances, the

2  Court should look beyond the fact that the statute formally directs punishment to

3  the school district and recognize the reality that the coercion is directed squarely

4  at teachers and students.

5    The efforts of Mr. Horne and Mr. Huppenthal to shut down the Mexican

6  American Studies program extended over a period of years. Their focus has

7  always been on the these classes and this group of teachers. In Mr. Horne's June

8  11, 2007, Open letter to the Citizens of Tucson, delivered in his official capacity as

9  Superintendent of Public Instruction, he urged the citizens of Tucson to close

10 down the Mexican American Studies program by pointing to allegations of

11 classroom conduct by teachers and students. Horne's Open Letter to the Citizens

12 of Tucson, Ex. 3, pursuant to Fed. R. Evid. 201(b), judicial notice is urged. In Mr.

13 Horne's finding, the allegations go beyond mere curricular materials and allege

14 very specific messages communicated by teachers. Ex. 1, pp. 4-10. Earlier this

15 year, Mr. Huppenthal commissioned an audit of TUSD's Mexican American

16 Studies program, which included numerous classroom visits. Classroom

17 observations made by the members of the audit team included observations of

18 teachers, students, as well as materials found on the shelves and walls.

19 Cambium Audit Report, issued by the Arizona Dept. of Education, June 15, 2011,

20 Ex. 4, Judicial notice pursuant to Fed. R. Evid 201(b) is requested.

21   In legislative history, Rep. Steve Montenegro, as a sponsor of HB 2281,

22 specifically referenced classroom speech in support of the bill:

23   You asked me, Rep. Youngwright, if they have the, if the school boards
   have the ability to choose the curriculum and yes they do. But in this case,
24 there is evidence that has been recorded and we can see from textbooks,
   from testimonies, from actual speeches or <u>even lectures given inside</u>
25

26

27   [7] Mr. Huppenthal states that A.R.S. § 15-112 "imposes no individual civil penalty
   but <u>merely</u> a reduction in state aid." CD No. 57, p. 13 (emphasis added). Regardless of
28 whether the Arizona Superintendent of Public Instruction comprehends that withholding
   10% of state aid is extremely detrimental to students, teachers and staff, the "mere"
   reduction in state aid will do grave harm to TUSD and all who depend on it.

1  <u>classrooms</u> that show us that the due prudence is not being employed.

2  Floor comments from Rep. Steve Montenegro, Arizona House of Representatives

3  Forty-Ninth Legislature-Second Regular Session Active Calendar Committee of

4  the Whole #2, Thursday, March, 18, 2010,

5  https://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=7138. Judicial

6  notice of the cited record pursuant to Fed. R. Evid. 201(b) is requested. The focus

7  of efforts by Mr. Horne, Mr. Huppenthal and legislators to shut down Mexican

8  American Studies has always been on the classrooms and the teachers. Mr.

9  Huppenthal's claim that HB 2281 does not restrict classroom speech rings hollow.

10 **IV.   HB 2281 Is Not Sufficiently Clear To Allow A Person Of Ordinary Intelligence A Reasonable Opportunity To Know What Is Prohibited.**

11

12      Because the statute encroaches upon First Amendment rights, the Court

13 must apply the vagueness analysis more strictly, requiring a greater degree of

14 specificity and clarity than would be necessary under ordinary due process

15 principles. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.

16 489, 495 (1982). However, even if the statute does not affect plaintiffs' First

17 Amendment rights, the Court still must apply a stricter scrutiny because of the

18 significant effect on the plaintiffs of the ten per cent penalty to TUSD's budget

19 threatened by Supt. Huppenthal. CD No. 58-3, p.3. Where a challenged civil

20 statute allows imposition of penalties for prohibited conduct, courts apply the

21 stricter standard standard. *See Thompson v. Southwest Sch. Dist.*, 483 F.Supp.

22 1170, 1179 (W.D. Mo. 1980).

23      **A.   Promoting the Overthrow of the United States Government.**

24      Mr. Huppenthal incorrectly argues that "[t]he Court in *Keyishian* was not

25 concerned with the phrase 'overthrow of the United States government.' CD No.

26 57, p.14, ll. 11-12. To the contrary, the Supreme Court invalidated for vagueness

27 where the statute at issue required termination of an employee "involved with the

28 distribution of written material 'containing or advocating, advising or teaching the

1   doctrine' of forceful overthrow, and who himself 'advocates, advises, teaches, or
2   embraces the duty, necessity or propriety of adopting the doctrine contained
3   therein.'" 385 U.S. 589, 600 (1967). There the Court did not need to look to the
4   dictionary definitions to strike down the enactment for vagueness. It was enough
5   that the law was uncertain as to whether, for example, a university librarian who
6   recommends the reading of materials such as the "histories of Marxist doctrine" or
7   "the background of the French, American, or Russian revolutions" might engage in
8   prohibited conduct. Id., at 601. Although the law at issue in *Keyishian* added the
9   concept of advocating "the doctrine" of forceful overthow, and HB 2281 does not
10  use the word "doctrine," the same vagueness concerns apply. A teacher may
11  reasonably fear that an official with the Department of Education could find that
12  the study of armed conflict in American history and of revolutionary doctrines
13  crosses an imperceptible line into "advocating the overthrow of the United States
14  government.

15          **B.     Promote Resentment Toward a Race or  Class of People.**

16          In this case, it is inevitable that many of Arizona's teachers will be required
17  to venture into some area of instruction that could be construed as "promoting"
18  feelings of "resentment" in students.[8] "Resentment" is defined as "the feeling of
19  displeasure or indignation at some act, remark, person, etc., regarded as causing
20  injury or insult." (See definition from dictionary.com available at
21  http://dictionary.reference.com/browse/resentment (Last vistited 6/30/11)). In the
22  context of the classroom, when does a teacher "encourage" "feelings of
23  displeasure" toward a race or class of people? If a teacher is particularly good at
24  bringing history alive for her students, is she more likely to be "encouraging"
25  subjective feelings of displeasure? By what standards, objective or subjective,
26  would such a  determination be made?

27

28
_____

        [8] As noted by the defendant, to "promote" means "to further or encourage the
progress or existence of" or "to urge the adoption of." CD No. 57, p.13, fn. 7(citation
omitted).

1    There are countless lessons that take place every day that result in students
2  feeling displeasure or indignation at some act, remark, or person, as there should
3  be. It is a natural response to feel "displeasure" or "indignation" when learning
4  much of American history.  Slavery, brutality against Native Americans, Jim Crow
5  laws, lynching, separate but equal are all topics that should give rise to such
6  emotions. At what point would the Superintendent of Public Instruction, with the
7  unrestrained power of enforcement granted by HB 2281, decide that a teacher has
8  "encouraged," and therefore "promoted" "displeasure" in students? The statute
9  offers no assistance.

10    **C.    Designed Primarily for Pupils of a Particular Ethnic Group.**

11    Mr. Huppenthal does not address the plaintiffs' argument that subsection
12  15-112(A)(3) does not make it clear whether "designed primarily for" pupils of a
13  particular race might mean "attended primarily by" students of a particular race.
14  However Mr. Huppenthal's Finding expressly notes that the enrollment of more
15  than 90% Latino students supports the charge that the classes are designed
16  primarily for Latinos. Huppenthal Finding, p.2. Yet, in his Response, he states that
17  there is a "clear and understandable demarcation between courses "designed
18  primarily to study" a certain ethnic group and courses "designed primarily for"
19  students belonging to that group. CD No. 57, p18. Is the high percentage of Latino
20  students in Mexican American Studies classes because the classes are "designed
21  primarily to study" Mexican Americans? Or is it because they are "designed
22  primarily for" Mexican Americans? There is no "clear and understandable
23  demarcation" between the two.

24    **D.    Advocate Ethnic Solidarity Instead of the Treatment of Pupils as**
       **Individuals.**

25
26    According to Mr. Huppenthal, evidence that materials from Mexican
     American Studies classes touch on "oppression" against Mexican Americans is
27   evidence that the classes violate subsection 15-112(A)(4). Huppenthal Finding,
28

1  p.2. Mr. Huppenthal's interpretation of subsection (A)(4) means that learning about
2  oppression necessarily precludes treating a student as an individual, or as "a
3  single human being, as distinguished from a group."  See
4  http://dictionary.reference.com/browse/individual (last visited July 7, 2011). The
5  inherent ambiguity in the provision is demonstrated by Mr. Huppenthal's own
6  interpretation. The fact that students learn about oppression has nothing to do with
7  whether their teachers treat them "as a single human being."

8  **V.    A.R.S. § 15-112 Is Vague And Invites Subjective And Arbitrary
       Enforcement Of The Law.**

9      "Facial challenges to legislation have been permitted in the context of the
10 *First Amendment* when the legislation allegedly vests government officials with
11 unbridled discretion. The rationale is that 'every application of the statute creates
12 an impermissible risk of suppression of ideas.'" *Baby Tam v. City of Las Vegas*,
13 154 F.3d 1097, 1100 (9th Cir. 1998), citing *City Council of Los Angeles v.*
14 *Taxpayers for Vincent*, 466 U.S. 789, 798 n.15 (1984)(emphasis added); *see also*
15 *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (Courts invalidate
16 ambiguous statutes to avoid subjective enforcement of the laws based on
17 "arbitrary and discriminatory enforcement" by government officers.)(citations
18 omitted.)  Here it is clear, not only that HB 2281 invites discriminatory
19 enforcement, but that selective enforcement was the driving force behind HB 2281
20 and that it has already been discriminatorily enforced.[9]

21     The enforcement provisions of the statute grant unchecked discretion to the
22 Superintendent of Public Instruction. The relevant portion of subsection 112(B)
23 provides:

24

25     [9] As pointed out in Plaintiff's Motion for Summary Judgement, CD No. 47, p. 16,
26 former Superintendent of Public Instruction Horne has already engaged in
   discriminatory enforcement by finding TUSD's Mexican American Studies program to be
27 in violation of the statute, while explicitly declining to prosecute alleged violations of two
   other TUSD Ethnic Studies programs. His stated rationale, that the different treatment
28 rests on nothing more than the subjective complaints received by him, is further
   evidence of discriminatory enforcement. *See* Plaintiffs Statement of Facts, CD No. 43-1,
   p.2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

If the state board of education[10] or the superintendent of public instruction determines that a school district...is in violation of subsection A, the state board of education or the superintendent of public instruction shall notify the school district...that it is in violation of subsection A.

The Statute gives no criteria for the Superintendent's decision. Nor does it require him to specify alleged violations or to provide the school district with any type of notice at all, beyond a conclusory allegation of violation. Sixty days after providing the notice, the Superintendent may "determine[ ] that the school district...has failed to comply with subsection A" A.R.S. § 15-112(B). Again, the statute provides no guidance and this determination is left wholly up to the Superintendent's discretion. After directing the withholding of ten percent of the school district's budget, only "[w]hen...the Superintendent...determines that the school district...is in compliance with subsection A, the department of education shall restore" the school district's funding. Id.

The arbitrary enforcement powers granted by the statute come to life in Mr. Huppenthal's Findings against the MAS program. Not only does he fail to identify any course or class in violation of subsection 112(A), but also, according to TUSD, his lack of specificity makes "it impossible for TUSD to identify and remedy any alleged violation." TUSD's June 22, 2011, Notice of Appeal, Defendant's Statement of Facts, Ex. D., CD No. 58-4.

Mr. Huppenthal's arbitrary conduct in the face of an audit report finding the Mexican American Studies program fully compliant with A.R.S. § 15-112(A) provides compelling evidence of the unchecked and discriminatory nature of the enforcement power granted by the statute. Mr. Huppenthal contracted with Cambium Learning Group, Inc., an educational consulting firm, to perform a comprehensive and independent audit of the Mexican American Studies program. Cambium Report.[11] In its 120-page report, Cambium found, "[d]uring the

---

[10] In this case, the State Board of Education is a nominal party. CD No. 48.

[11] Although the Audit Report is dated May 2, 2011, presumably the date it was issued to the Superintendent of Public Instruction, the Superintendent did not release it

1  curriculum audit period, no observable evidence was present to indicate that any
2  classroom within [TUSD] is in direct violation of the law, A.R.S. 15-112(A). In most
3  cases, quite the opposite is true." Cambium Report, p.50. It also confirmed that
4  Mexican American Studies students outperform their peers on standardized tests
5  and graduate at higher rates, as well as recommended that the classes be
6  retained as part of the core curriculum. Id., pp. 43, 47, 49-50,66-67. Mr.
7  Huppenthal ignored his expert firm's audit findings and issued his own conclusion
8  that the Mexican American Studies program violates subsection 15-112(A).

9      The fact that HB 2281 was passed for the purposes of selectively enforcing
10  it as a means to silence the Mexican American Studies program, shines a glaring
11  spotlight on the invidious nature of HB 2281. Precisely because the First
12  Amendment is "premised on mistrust of governmental power," it exists to stand
13  "against attempts to disfavor certain subjects or viewpoints." *Citizens United*, 130
14  S.Ct. at 898. In this case, the statute encourages discriminatory enforcement by
15  its ambiguous wording, as well as by its limitless discretion vested in the
16  Superintendent to declare violations, with no discernible guidelines. The result is
17  an attempt to control content by selective enforcement against disfavored
18  speakers. "By taking the right to speak from some and giving it to others, the
19  Government deprives the disadvantaged person or class of the right to use
20  speech to strive to establish worth, standing, and respect for the speaker's voice."
21  Id., at 899.

22      In this case, the State goes far beyond merely promoting the idea that
23  "pupils should be taught to treat and value each other as individuals." A.R.S. § 15-
24  111. Rather, it seeks to suppress a viewpoint that is not even counter to "valu[ing]
25  each other as individuals." Id. There is nothing inherent in learning about Mexican
26  Americans, or about any other ethnic group, that is inimical to treating pupils as

27

28

to the public until he issued his Finding against TUSD on June 15, 2011. For that
reason, the Cambium Audit Report was not attached to the plaintiffs' motion for
summary judgement, filed on June 2, 2011.

1  individuals. Since closing down the Mexican American Studies program would do
2  nothing to improve the treatment of students as individuals, the remedy is not
3  tailored to promote the stated goal of the statute. *Cf. Brown v. Entertainment*
4  *Merchants Assoc.*, 2011 Lexis 4802, 22 (2011) ("The State must identify an 'actual
5  problem' in need of solving,...and the curtailment of free speech must be actually
6  necessary to the solution.")(citation omitted.)

7  　　By attempting to shut down the Mexican American Studies program and to
8  prohibit students from learning about literature, history, government and art from
9  the perspective of Mexican Americans, Arizona goes too far. *See e.g. Pico*, 457
10 U.S. at 872 (the local school board goes too far by removing books from the
11 school library "simply because they dislike the ideas contained in those books and
12 seek by their removal to 'prescribe what shall be orthodox in politics, nationalism,
13 religion, or other matters of opinion.'"); *Epperson v. Arkansas*, 393 U.S. 97, 116,
14 Stewart, J., concurring, ("It is one thing for a State to determine that 'the subject of
15 higher mathematics, or astronomy, or biology' shall or shall not be included in its
16 public school curriculum. It is quite another thing for a State to make it a criminal
17 offense for a public school teacher so much as to mention the very existence of an
18 entire system of respected human thought.") In this case, the unrestrained
19 discretion vested in the Superintendent creates an unconstitutional
20 level of vagueness with an impermissible risk of discriminatory and arbitrary
21 enforcement each time the Superintendent chooses to exercise his authority. For
22 that reason the Court should invalidate the statute.

23 **VI.　　HB 2281's Vagueness Chills Protected Speech.**

24 　　Statutes that are insufficiently clear will be struck down for vagueness to
25 avoid unnecessary chilling of protected First Amendment rights. *Foti*, 146 F.3d at
26 638, citing *Grayned v. City of Rockford*, 408 U.S. 104, 108(1972). "A statute that
27 chills speech can and must be invalidated where its facial invalidity has been
28 demonstrated." *Citizens United v. FEC,* 130 S.Ct. 876, 896 (2010).

1   *"When one must guess what conduct or utterance may lose him his
2   position, one necessarily will 'steer far wider of the unlawful zone....'" *Keyishian*,
3   385 U.*S. at 604 (*citation omitted). "For 'the threat of sanctions may deter...almost
4   as potently as the actual application of sanctions.'" *Id.,* (citation omitted). "The
5   danger of that chilling effect upon the exercise of vital *First Amendment* rights
6   must be guarded against by sensitive tools which clearly inform teachers what is
7   being proscribed." *Id.* (citations omitted).

8   *Citizens United*, although not a case involving teacher speech, is instructive
9   for considering the facial invalidity of the election law at issue because "any other
10  course of decision would prolong the substantial, nationwide chilling effect" of the
11  statute. *Id.*, at 894. An important factor was the immediacy of the need for relief in
12  light of the short window available for political speech during a campaign. The
13  statute was used to ban speech and the election went on, without Citizens United
14  being allowed to engage in the desired political speech. *Id.* Similarly, this case
15  deals with the educational needs and rights of students to benefit from the best
16  that their teachers have to offer them. While adults argue the merits of this case in
17  court, the students' education continues. If their teachers' speech is chilled during
18  the pendency of this lawsuit, the students' opportunity to benefit from the speech
19  is forever lost.

20  HB 2281 also chills students' speech and their "undoubted freedom to
21  advocate unpopular and controversial views in schools and classrooms...." *Fraser*,
22  478 U.S. at 681; *see also Brown*, 2011 LEXIS 4802, 14 (the state does not have a
23  "free-floating power to restrict the ideas to which children may be exposed.")
24  Under the statute, a teacher is obliged to silence students when they fear
25  something the student may say will cross the murky statutory line and "encourage"
26  "feelings of displeasure" toward a race or class of people. Here the chilling effects
27  of HB 2281 are ominous. The right of the state to determine a legitimate
28  curriculum does not mean that the state may declare an "educational mission" to

1  "suppress speech on political and social issues based on disagreement with the
2  viewpoint expressed." *Morse*, 551 U.S. at 423, Alito, J., concurring. Such a
3  "mission" "strikes at the very heart of the First Amendment." *Id.*

4  **VII.  Subsections (E) And (F) Of A.R.S. § 15-112 Do Not Provide A**
   **Narrowing Interpretation, And Render The Entire Statute More**
5  **Vague.**

6  Despite Mr. Huppenthal's claim that the exceptions contained in §§15-
7  112(E) and (F) "clarify and narrow how broadly the statute can be applied," those
8  subsections only serve to increase the statute's ambiguity, and therefore, its
9  overbreadth and vagueness. *See Berger v. City of Seattle*, 569 F.3d 1029, 1047-
10  48 (9th Cir. 2009) (city's proposed limiting interpretation would render the
11  ordinance vague.); CD No. 57, p. 20. Subsection F states,

12        Nothing in this section shall be construed to restrict or prohibit the
          instruction of the holocaust, any other instance of genocide, or the
13        <u>historical oppression</u> of a particular group of people based on ethnicity,
          race or class.
14
15  (emphasis added.) Although subsection (F) correctly recognizes that one cannot
16  teach American History without teaching about oppression, this exception further
17  clouds the issue of when it is allowable to teach about "oppression."

18  Teaching about "oppression" is a favorite theme of Mr. Huppenthal and Mr.
19  Horne when castigating Mexican American Studies.[12] Mr. Huppenthal declared the
20  program to be in violation of subsection (A)(2), allegedly promoting resentment
21  toward a race or class of people, by having "materials repeatedly reference White
22  people as being 'oppressors' and 'oppressing' the Latino people." Huppenthal
23  Finding, p.2. Mr. Horne is equally concerned with "oppression" in his Finding,
24  where he cites the textbook, "Pedagogy of the Oppressed," by Paolo Freire as in
25  violation of the statute and opines that students "should not be taught that they are
26  oppressed." Horne Finding, p.7.

27        [12] Although the plaintiffs will later advance their claim that the statute is vague as
28  applied, after the opportunity to conduct discovery, Mr. Huppenthal and Mr. Horne's
      Findings against TUSD are illustrative of the facial overbreadth and vagueness of HB
      2281 and serve as two separate agency findings both of which are contradicted by their
      own retained experts.

1    In examining his Finding, we do not know why Mr. Huppenthal finds the

2 topic of "oppression" to be in violation of subsection (A)(2), despite the existence

3 of the "exception" for teaching about "historical oppression" contained in

4 subsection (F). If he argues that teaching about "historical oppression" is

5 permitted, but teaching about "oppression" in general is prohibited, then he further

6 demonstrates the overbreadth and vagueness of the statute. Justice Black

7 recognized a similar dilemma where he observed, "Under this statute, as

8 construed by the Arkansas Supreme Court, a teacher cannot know whether he is

9 forbidden to mention Darwin's theory at all or only free to discuss it as long as he

10 refrains from contending that is it true." *Epperson v. Arkansas*, 393 U.S. 97, 112

11 (1968), Black, J., concurring. Teaching about history is inextricably bound with the

12 present and any attempt to distinguish between "oppression" as an historical

13 concept and the modern day consequences of that "oppression" must fail.[13]

14    The Supreme Court has cautioned against rewriting statutes to "conform to

15 constitutional requirements," not only to avoid "a serious invasion of the legislative

16 domain," but to not diminish the legislature's "incentive to draft narrowly tailored

17 law in the first place." *Stevens*, 130 S. Ct. 1592, (citation omitted.)  In passing HB

18 2281, the Arizona Legislature showed little concern for drafting a narrowly tailored

19 law. This court should not encourage further irresponsible legislation by attempting

20 to rescue the statute from its constitutional infirmities. The "exceptions" of

21 subsections 112(E) and (F) render the statute more vague and the Court should

22 invalidate it.

23 **VIII.  A.R.S. § 15-112 Prohibits A Substantial Amount Of Protected**
       **Speech.**
24

25    In order to determine whether the prohibitions contained in HB 2281 would

26 reach a substantial amount of protected speech, the Court must first construe the

27    [13] The same argument renders the "exception" for "[c]ourses or classes that

28 include the discussion of controversial aspects of history" overbroad and vague. A.R.S.
§ 15-112 (E)(4). We do not know why Mr. Huppenthal alleges teaching about
"oppression" is prohibited, rather than permitted as a "discussion of controversial
aspects of history."

1  statute. *U.S. v. Stevens*, 130 S. Ct. 1577, 1587 (2010). "[I]t is impossible to

2  determine whether a statute reaches too far without first knowing what a statute

3  covers." *Id.*, (citation omitted.) Like the statute at issue in *Stevens,* HB 2281

4  creates prohibitions of "an alarming breadth." *Id.*, 130 S. Ct. at 1588. In *Stevens*,

5  the Supreme Court construed a statute that purported to ban depictions of "animal

6  cruelty." Id. However, the statute went far beyond merely banning depictions of

7  animal cruelty. It banned videos showing all types of animal deaths, whether cruel

8  or not. *Id.* In concluding that the statue was unconstitutionally overbroad, the Court

9  found that the presumptively impermissible applications of the statute far

10  outnumbered the few permissible ones. Id. at 1592.

11      To determine whether a statute reaches a substantial amount of protected

12  conduct,

13      a court shall evaluate the ambiguous, as well as the unambiguous scope of
        the enactment. To this extent, the vagueness of a law affects overbreadth

14      analysis. The Supreme Court has long recognized that ambiguous
        meanings cause citizens to 'steer far wider' of the unlawful zone...than if

15      the boundaries of the forbidden areas were clearly marked.

16  *Village of Hoffman Estates*, 455 U.S. at 495. (citations omitted).[14]

17  Although HB 2281 has always targeted TUSD's Mexican American Studies

18  program, the ambiguous wording of the statute reaches far beyond. Many topics

19  of history and literature may "encourage" feelings of "displeasure" toward a

20  particular race or ethnic group. Racial and religious groups are disparaged in

21  many books commonly read by high school students, such as: To Kill A

22  Mockingbird, The Bluest Eyes, The Canterbury Tales, Huck Finn, The Great

23  Gatsby, Othello, and The Scarlett Letter.  Other common books detail the evil of

24  discrimination and oppression: The Diary of Anne Frank, Their Eyes Were

25  Watching God, Black Boy, Native Son, Farewell to Manzanar, Black Like Me, and

26  The Invisible Man. Social studies classes teach many historical and current events

27

28

---

[14] Since ambiguities contained in the statute affect both the vagueness and
overbreadth arguments, plaintiffs will not repeat here those arguments asserted under
the vagueness analysis, but incorporate them by reference.

1   that may encourage feelings of displeasure toward a particular race or ethnic
2   group: The Spanish conquistadors in the New World, the Civil War, the Mexican-
3   American War, World Wars I and II, the Korean War, the Vietnam War, the wars in
4   Iraq and Afghanistan, colonization, the labor union movement, the civil rights
5   movement, slavery, Jim Crow, Brown v. Board of Education, Manifest Destiny,
6   immigration, the TEA party, and the Freedom Riders.[15]

7          Not only does HB 2281 reach a substantial amount of protected speech, but
8   the nature of the speech is also substantial. When our children's education is at
9   stake, overbroad laws that cause teachers to "steer far wider" of the unlawful zone
10  cannot be tolerated. *See Keyishian*, 385 U.S. at 604.

11  **IX.    Subsections A, E, And F Are Not Severable.**

12         The parties agree that  if the Court finds that part of A.R.S. s15-112 is
13  unconstitutional, it must look to legislative intent to determine whether those
14  subsections may be severed, or whether the entire statute must be struck. CD No.
15  57, p.21. Only where the valid and invalid parts are not "intimately connected" will
16  the act be upheld so far as valid.  *State v. Watson,* 586 P.2d 1253, 1257 (1978).

17         Of the four subsections of 15-112(A), subsections (2), (3) and (4) all
18  express the legislature's intent to prohibit teaching about race and ethnicity. The
19  exclusions contained in subsections (E) and (F) also deal solely with teaching
20  about race and ethnicity. Those exclusions would not exist, but for the racial
21  context of subsections (A)(2), (3) and (4). Invalidating any one of them strikes a
22  blow to the legislature's intent to prohibit teaching about race and they cannot be
23  severed.

24  _____

25         [15] It appears that the purported exclusions contained in subsections 112(E) for
26  classes teaching the history of any ethnic group or that include the discussion of
    controversial aspects of history and (F) for instruction on the historical oppression of a
27  particular ethnic group are insufficient to rescue any of the above from being prohibited
    by the statute.  Mr. Huppenthal and Mr. Horne examined the texts used by Mexican
28  American Studies and indicted them as teaching about Mexicans being oppressed by
    white people and historical events, such as the Battle of the Alamo and the Mexican
    American War, without ever mentioning the "exclusions." Horne Finding, pp.7-9;
    Huppenthal Finding, p.2.

1  **X.    Conclusion.**

2          Plaintiffs seek only that which the Constitution provides with respect to the

3  First Amendment and Due Process; the right to engage in speech within their

4  approved curriculum and to be free of the fear of the unknown, undisclosed

5  boundaries of what can and cannot be said in the public school setting by

6  educators or students. The challenges confronting public education demand the

7  ability to adopt new and innovative curriculums that can effectively reach students

8  and enhance their performance. Mexican American Studies is such a program.

9          Ours is a history filled with removing the shackles of orthodoxy that seeks to

10 deny fundamental rights to all who have the privilege to reside in our country.

11 Plaintiffs motion seeks limited but critical relief; a finding that HB 2281 fails to

12 comport with fundamental constitutional mandates.

13         Respectfully submitted this 8th day of July 2011.

14                                     s/*Richard M. Martinez,* Esg.
                                     RICHARD M. MARTINEZ, ESQ.
15                                   Counsel for Plaintiffs

16

17

18

19

20

21                          **Certificate of Service**

22         I hereby certify that on July 8th 2011, I electronically transmitted the

23 foregoing document to the Clerk's Office using the CM/ECF System for filing and

24 transmittal of the instant motion via the Notice of Electronic Filing to the CM/ECF

25 registrants of record.

26                                   s/*Richard M. Martinez,* Esq
                                     Counsel for Plaintiffs
27

28