**RICHARD M. MARTINEZ, SBA No. 7763**
307 South Convent Avenue
Tucson, Arizona 85701
(520) 327-4797 phone
(520) 320-9090 fax
richard@richardmartinezlaw.com
**Counsel for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CURTIS ACOSTA, *et. al.*,          )
                                   )     No. CV 10 - 623 TUC AWT
            Plaintiffs,            )
                                   )
v.                                 )     **RESPONSE IN OPPOSITION TO**
                                   )     **MOTION TO DISMISS, Ct. Doc. No. 88**
JOHN HUPPENTHAL,                   )
Superintendent of Public           )
Instruction, in his Official       )
Capacity, et. al.,                 )
                                   )
            Defendants.            )
_____)

Plaintiffs, by and through their counsel undersigned, hereby respond in opposition to the pending motion to dismiss.[1] Superintendent Huppenthal seeks dismissal pursuant to the provisions of Rule 12(b)(1) and (6), F.R.C.P. Neither Rule provides a basis for dismissal of this case.

The plaintiffs are all proper individuals to assert the constitutional claims identified in their third amended complaint.[2] They are two students and eleven public school educators. Both students attend Tucson Unified School District ("TUSD") schools. Ten of the educators teach classes for the Mexican American Studies Department ("MAS"), a TUSD-adopted curriculum. Sean Arce is the MAS director. All of the educator plaintiffs are certified, meet the requirements of the Arizona Department of Education ("ADE"), and are subject to ADE scrutiny.

Plaintiffs as a group have been forced to live under the limitations and scrutiny created by HB 2281.[3] Their rights as citizens of the United States of America have

---

[1] Ct. Doc. No. 88.
[2] Ct. Doc. No. 84, hereinafter, "TAC."
[3] A.R.S. §§ 15-111 & 112.

been diminished. They no longer enjoy the same rights under the First and the Fourteenth Amendments that other similarly situated individuals do. Their ability to teach or learn about the history, culture, and language of Latinos has been circumscribed by State-imposed limitations; what they teach or learn about Latinos must not offend the State of Arizona. Arizona does not subject any other racial, ethnic or religious group to this type of State-imposed scrutiny. The line between what is permissible and that which offends is unknown. HB 2281 is devoid of any definitions. Enforcement is left to the subjective interpretation of State officials who have either been elected or appointed to their position.

HB 2281 is a statute that provides for differential treatment on the basis of race, ethnicity and religion. It expressly provides for the teaching of the Holocaust while implicitly denying Latinos the opportunity to read, hear, discuss, or debate the atrocities Latinos have suffered as a group.[4] This law also denies Latinos, and all students of TUSD, the opportunity to learn about Latinos' contributions to our nation, the struggles endured and the price that has been paid to enjoy the promises of our nation.

HB 2281 is a muzzle placed firmly on the mouths and minds of classroom teachers that deafens students and places State-imposed blinders on the public schools of Arizona. The history of HB 2281 and subsequent enforcement diminishes the rights of every Latino. It is a Latino-specific law aimed at one target–TUSD's MAS program.

Accordingly, for the reasons more fully set forth in the accompanying memorandum of points and authorities, the plaintiffs respectfully urge denial of defendant's motion to dismiss.

Respectfully submitted this 11th day of October 2011.

 s/*Richard M. Martinez*, Esq.

---

[4] See A.R.S §15-112(F).

**Memorandum of Points and Authorities**

**I.    Preliminary Statement**

On December 31, 2010, Latinos in Arizona entered a new era, one that returned them to their prior status as second-class citizens in the United States of America. On that date, HB 2281 became effective.

The events that led to the enactment of HB 2281 are no secret. They are a matter of public record.[5] While Tom Horne was the Superintendent of Public Instruction, he did all he could to impose his will on TUSD to "shut down" the MAS program.[6] Upon passage of HB 2281, then Superintendent Horne stated, "I think it's overdue. The Department of Education will now have the authority to put a stop to the extremely dysfunctional practices in Tucson Unified School District."[7] Superintendent Horne targeted the TUSD program because he "believes that the ethnic studies program teaches Latino students that they are oppressed by white people and promotes racial hatred."[8]

Unwilling to be denied the opportunity to impose the sanction provided in HB 2281 on TUSD's MAS program, Superintendent Horne signed his Finding a day before HB 2281 became effective, a Finding that was based entirely on pre-enactment allegations and drafted during Mr. Horne's final days as Superintendent of Public Instruction.[9] This Finding remains in effect, has not been withdrawn or voided, and represents an enforcement action of HB 2281 by the State of Arizona.

In June of this year, Superintendent Huppenthal released his own Finding concerning TUSD's MAS program, reaching the same conclusion as Superintendent

---

[5] *Intri-Plex Tech Inc. v. Crest Group Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).
[6] See Horne Finding, Ex. B to Third Amended Complaint, ("TAC") Ct. Doc. No. 84; and Superintendent Horne's Open Letter to the Citizens of Tucson, Ct. Doc. No. 53, Ex. 1.
[7] KVOA.com, "Bill Passed That Would Ban Ethnic Studies for TUSD," April 30, 2010, http://www.kvoa.com/news/bill-passed-that-would-ban-ethnic-studies-for-tusd/.
[8] The Washington Post, The Answer Sheet, "Arizona Strikes Again: Now It's Ethnic Studies," http://voices.washingtonpost.com/answer-sheet/history/arizona-strikes-again-now-it-l-.html. See also, Mr. Horne's Attorney General website, http://www.azag.gov/, where he prominently continues to promote his Finding and anti-MAS campaign. Fed. R. Evid. 201(b)provides for judicial notice of Superintendent Horne's public comments.
[9] Mr. Horne is the current Attorney General for the State of Arizona.

1    Horne, that HB 2281 was violated.[10] Superintendent Huppenthal's Finding ignored the

2    on-site audit conducted at his request by his own retained team of experts, Cambium

3    Learning, Inc.[11] The Cambium Audit, which found no evidence of a statutory violation,

4    directly contradicts the Horne and Huppenthal Findings.[12] Additionally, it is noteworthy

5    that, in his Finding, Superintendent Huppenthal does not cite a single classroom

6    incident.

7         Irrespective of the paucity of evidence offered by Superintendent Huppenthal,

8    like Superintendent Horne, he explicitly orders that steps be taken to come into

9    compliance or thereafter 10 per cent of state funding will be withheld. This sanction will

10   cost TUSD one to three million dollars per month.[13] By issuing his own Finding and not

11   identifying what must be changed, Superintendent Huppenthal has inflicted his injury

12   upon the plaintiffs. Their program, teaching, words, and the opportunity to learn has

13   been substantially altered subject to a draconian penalty–sanctions that, irrespective

14   of the final choice, injures each of the plaintiffs. Moreover, the plaintiffs remain under

15   the cloud of HB 2281 to refrain from saying or doing anything that hints of "Hispanic

16   nationalism and unity in the face of assimilation and oppression."[14] The very existence

17   of the MAS program is at risk, endangering plaintiffs employment and educational

18   opportunities.

19        Superintendent Huppenthal's position that HB 2281 does not reach, impact, or

20   limit the Free Speech of plaintiffs is as absurd as his suggestion that HB 2281 and the

21   subsequently issued Findings of violations do not impose cognizable constitutional

22   injuries upon the plaintiffs.[15] HB 2281 is not a State-mandated curriculum, but a

23   limitation on a locally-approved curriculum that fulfills its purpose by effectively

24   reaching students and improving their ability to be successful in school.

25

26        [10] TAC, Exhibit B, Ct. Doc. No. 84.
          [11] Ct. Doc. Nos. 84-01, 85, 86 and 87.
          [12] Ibid.
27        [13] TAC, ¶¶ 16-17.
          [14] TAC, Exhibit C, Huppenthal Finding at p. 3; Ct. Doc. No. 84.
28        [15] Ct. Doc. No. 88; See also, Ct. Doc. No. Xx, p. x.(Contending that HB 2281 does not
     impact or limit teacher or student speech in any way.)

1   The plaintiffs assert that HB 2281 is void for vagueness, both facially and as

2   applied, and that it impermissibly chills First Amendment interests, including impairing

3   the right of students to hear a protected communication. HB 2281 also denies Latinos

4   equal protection and substantive due process.[16]

5   HB 2281 is the law in Arizona. Its requirements and sanctions are real, not

6   speculative. For Latinos, their rights under the Constitution have been impermissibly

7   altered.

8   **II.    Standard of Review**

9   **A.    12(b)(1)**.

10   Plaintiffs have the burden of establishing standing.[17] "For purposes of ruling on

11   a motion to dismiss for want of standing, both the trial and reviewing courts must

12   accept as true all material allegations of the complaint, and must construe the

13   complaint in favor of the complaining party."[18] "Each element [of standing] must be

14   supported in the same way as any other matter on which the plaintiff bears the burden

15   of proof, *i.e.*, with the manner and degree of evidence required at successive stages

16   of the litigation."[19]  At this pleading stage, "general factual allegations of injury resulting

17   from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that

18   general allegations embrace those specific facts that are necessary to support the

19   claim."[20] "The threshold question of whether the plaintiffs [have] standing (and the court

20   has jurisdiction) is distinct from the merits of [their] claim.  Rather 'the jurisdictional

21   question of standing precedes, and does not require, analysis of the merits."[21]

22   **B.    12(b)(6)**.

23   In determining whether the plaintiffs fail to state a claim for which relief may be

24   granted pursuant to Fed. R. Civ. Pro. 12(b)(6), the Court must determine whether,

25

26   [16] See TAC ¶¶ 113-131, Ct. Doc. No. 84.
    [17] See e.g., *Kokkonen v. Guardian of Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).
27   [18] *Takhar v. Kessler*, 76 F.3d 995, 1000 (9th Cir.1996) (internal citations and quotation
    marks omitted).
    [19] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)(citations omitted).
28   [20] *Ibid*.
    [21] *Maya v. Centex Corp.,* 2011 U.S. App. LEXIS 19344, 13 (9th Cir. 2011).

1     "accepting the facts as stated by the nonmoving party from the record and drawing all

2     inferences in its favor," it is "beyond doubt that the plaintiff[s] can prove no set of facts

3     in support of [their] claim."[22]

4 **III.    Plaintiffs' Satisfy The Standing Requirements of Article III**

5     A plaintiff establishes standing when:

6        1.     she has suffered an actual or imminent injury that is
             concrete and particularized;

7

8        2.     the injury is fairly traceable to the challenged action of the
             defendants; and

9        3.     the injury will likely be avoided or redressed by a decision in favor
             of the plaintiff.[23]

10

11 Where one of the plaintiffs satisfies the standing requirements, "the Court need not

consider the standing of the other plaintiffs.[24]

12

13     The equitable jurisdiction of the federal courts is both preventive and corrective.[25]

14 The Supreme Court of the United States has repeatedly held that  "[o]ne does **not**

have to await the consummation of threatened injury to obtain preventive relief. If the

15 injury is certainly impending that is enough."[26]

16

17     Superintendent Huppenthal misconstrues the nature of the plaintiffs' Third

18 Amended Complaint by attacking only the plaintiffs' standing to assert violations of their

First Amendment rights. However, the Complaint also alleges violations of the plaintiffs'

19

20

21          [22] *Everest & Jennings v. Am. Motorists Ins. Co.*, 23 F.3d 226,  228 (9th Cir. 1994).
         [23] See e.g., *Stormans, Inc., v. Selecky*, 586 F. 3d. 1109, 1119 (9th Cir. 2009) (pharmacy

22 and two pharmacists had Article III standing to challenge a state law requiring pharmacists to
dispense all lawful medications, including the "Plan B," pill, although they had **not** been
threatened with enforcement of the law). The Ninth Circuit noted in *Graham v. FEMA*, 149 F.3d

23 997, 1003 (9th  Cir. 1998), that the applicable burden of proof in establishing standing is
"likelihood," **not** certainty: "Plaintiffs need **not** demonstrate that there is a 'guarantee' that their

24 injuries will be redressed by a favorable decision...plaintiffs must show only that a favorable
decision is likely to redress [their injuries], **not** that a favorable decision will inevitably redress

25 [their injuries]") (emphasis added).
         [24] *Carey v. Population Services Int'l*, 431 U.S. 678, 682 (1977); *Planned Parenthood of*

26 *Idaho v. Wasden*, 376 F.3d 908, 918 (9th Cir 2004) (citations omitted); *Leonard v. Clark*, 12
F.3d 885, 888 (9th Cir. 1992).

27          [25] See e.g., *Pierce v. Society of Sisters,* 268 U.S. 510, 536 (1925) ("[p]revention of
impending injury by unlawful action is a well-recognized function of courts of equity").

28          [26] *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979) (emphasis
added), quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923).

1    rights to Equal Protection and Substantive Due Process, as well as that HB 2281 is

2    unconstitutionally vague and overbroad.[27]

3          Furthermore, Superintendent Huppenthal mischaracterizes the plaintiffs' facial

4    claims as "pre-enforcement," and therefore subject to the special standing

5    requirements set out by *Lopez v. Candaele*.[28] This assumption ignores Superintendent

6    Horne's Finding against MAS, setting in motion the enforcement proceedings on

7    December 30, 2010, the ensuing curriculum audit by Cambium Learning, Inc. and

8    Superintendent Huppenthal's own Finding issued on June 15, 2011. Both of these

9    Findings are still pending.[29] The administrative hearing on the enforcement of the

10   Huppenthal Finding commenced on August 19, 2011, with the testimony scheduled to

11   conclude on October 17th. The administrative law judge's recommendation will be

12   essentially meaningless, as Superintendent Huppenthal has complete discretion to

13   accept, deny or modify it.[30]

14         Superintendent Huppenthal's reliance on *Younger v. Harris*[31] and *Johnson v.*

15   *Stuart*[32] is misplaced. *Johnson* involved a statute prohibiting the use of any textbook

16   "which speaks slightingly of the founders of the republic."[33] In that case, the plaintiff

17   teachers had no standing because no teacher had been charged with violation of the

18   statute, denied permission to use any book or even threatened with such

19   enforcement.[34] Similarly, in *Younger*, teachers not under prosecution had no standing

20   to challenge a law that criminalized teaching communism. Prosecution of those

21   particular *Younger* plaintiffs was not even "remotely possible."[35] The imminence of

_____

[27] TAC ¶¶ 113-131.
[28] 630 F.3d 775, 786 (9th Cir 2010). Ct. Doc. No. 88, p.7.
[29] Superintendent Huppenthal now claims, through pleadings filed in this action, that his Finding supersedes the Finding issued by Superintendent Horne. Ct. Doc. No. 88, p.4. Yet, aside from assertions made in this action, he has not officially issued any such statement through the Arizona Department of Education. The Horne Finding is still in force and applicable to the MAS program.
[30] See A.R.S §41-1092.08(B).
[31] 401 U.S. 37 (1971).
[32] 702 F.2d 193 (9th Cir. 1983).
[33] 702 F.2d at 194.
[34] 702 F.2d at 194-95.
[35] 401 U.S. at 41-42.

1   injury shown in this case is in stark contrast to that of *Johnson* and *Younger.* The

2   coercion felt by the plaintiffs as a result of the enforcement of HB 2281 is much more

3   real and substantial than a mere "subjective chill." Their program, livelihoods and

4   constitutional rights are at stake. Further, Superintendent Huppenthal remains silent

5   regarding the fact that he has introduced numerous examples of lessons written and/or

6   used by some of the plaintiffs in the administrative hearing against TUSD. [36]

7   Superintendent Huppenthal's characterization of the plaintiffs' claims as "pre-

8   enforcement" is without foundation, contrary to his own course of conduct and devoid

9   of the candor owed this court.

10   ### A.   The Students Have Standing.

11   The two student plaintiffs, Korina Lopez and Maya Arce, have standing despite

12   the fact that they will not be eligible to enroll in MAS classes until the fall of 2012 and

13   2013, respectively.[37] The Supreme Court has upheld standing for parents challenging

14   a race-based admission policy where they alleged that their elementary and middle

15   school-aged children may be "denied admission to the high school of their choice when

16   they apply to those schools in the future."[38] The Court rejected the defendants'

17   contention that the fact that the students were not yet eligible to apply for high school

18   admission eliminated the imminence of their injuries and rendered them too

19   speculative.[39] The likelihood that they would be subjected to the allegedly

20   discriminatory procedure at some point in the future was sufficient for standing.

21   Similarly, the fact that Ms. Lopez and Ms. Arce are not yet eligible to take MAS

22   classes does not defeat standing. The administrative enforcement action is moving

23   inexorably toward a final decision by Superintendent Huppenthal. He has made clear

24   his determination to eliminate the program. The injury is imminent and particularized

---

26   [36] Superintendent Huppenthal's managing agents have also testified that TUSD's MAS program is not salvageable, that TUSD would have to create an entirely new program.

27   [37] Both have stated their intentions to register for MAS classes as soon as they are eligible. TAC ¶¶ 69, 71.

28   [38] *Parents Involved in Comm. Sch. v. Seattle Sch. Dist.,* 551 U.S. 701, 718 (2007).
   [39] *Ibid.*

1   to the students.[40]

2          As to the requirements that the injury "fairly can be traced to the challenged

3   action" and "is likely to be redressed by a favorable decision," the plaintiffs' burden

4   requires "no more than a showing that there is a 'substantial likelihood' that the relief

5   requested will redress the injury claimed...."[41] In evaluating the pleadings, the Court

6   must "make a judgment as to whether the causal relation is **probable enough** to allow

7   standing."[42] Here there is no doubt that the injury to the MAS program is directly

8   traceable to the passage of HB 2281 and to the enforcement actions by

9   Superintendents Huppenthal and Horne.  Eliminating MAS has always been the stated

10  goal of the legislation and of Superintendents Huppenthal and Horne. This causal

11  relationship is "probable enough" to confer standing.[43] Moreover, it is substantially likely

12  that a ruling by this Court that HB 2281 and/or its application by Superintendent

13  Huppenthal is unconstitutional, will avoid elimination of the MAS program and avoid the

14  injury claimed by the plaintiffs.

15         *Johnson* supports the students' standing in this action.[44] There, the students

16  claimed that a state statute that banned textbooks that "speak... slightingly of the

17  founders of the republic or of those who preserved the union or which belittles or

18  undervalues their work" violated their First Amendment right of free access to

19  information.[45] The Ninth Circuit found that "[a]s persons who would have received the

20  information except for its alleged suppression by the state, the students were directly

21  injured if a constitutional violation occurred."[46] Superintendent Huppenthal's attempt

22  to restrict information provided to the students through MAS classes injures the

23  plaintiffs in the same manner.

24

25         [40] *Cf. Johnson,* 702 F.2d at 196 (students' claim of restricted access to information is
    an injury "peculiar to...a distinct group of which they are a part.")
26         [41] *Ibid.*
           [42] *Ibid.* (emphasis added).
27         [43] *Ibid.*
           [44] *Ibid.*
28         [45] 702 F.2d at 195.
           [46] *Ibid.*

-9-

The student plaintiffs' intent to take MAS classes as soon as they are eligible is also sufficient to confer standing.[47] "It is well established that intent may be relevant to standing in an Equal Protection challenge."[48] **At the pleading stage, the Court must accept this allegation as true.[49]** In *Gratz*, the Supreme Court upheld an individual's standing to challenge a race-based college admissions policy on the basis that he intended to apply for admission as a transfer student.[50] The Court found it immaterial that he did not actually apply, reasoning that "the 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."[51] Likewise, the injury to Ms. Lopez and Ms. Arce is the denial of equal treatment and freedom of speech resulting from HB 2281 and its enforcement by Superintendents Huppenthal and Horne.

## B.    The Plaintiff Teachers And Director Have Standing.

The educator plaintiffs have standing to assert their claim that HB 2281 denies them their rights to Equal Protection under the political process theory.[52] The *Hunter* and *Seattle* cases "yield a simple but central principle:" A state may not "allocate... governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process."[53] HB 2281 violates the Equal Protection Clause because it selectively restructures the political process to lodge "decisionmaking authority over the question at a new and remote level of government."[54] State action of this kind, "places *special* burdens on racial minorities within the governmental process and makes it "more difficult for certain racial and religious minorities [than for other members of the community] to achieve legislation

---

[47] TAC ¶¶ 69, 71.
[48] *Gratz v. Hamacher*, 539 U.S. 244, 260 (2003).
[49] *Takhar,* 76 F.3d at 1000.
[50] 539 U.S. at 260-61.
[51] 539 U.S. at 262.
[52] *See Hunter v. Erickson*, 393 U.S. 385 (1969); *Washington v. Seattle Sch. Dist.*, 458 U.S. 457 (1982).
[53] *Seattle*, 458 U.S. at 469-70.
[54] 458 U.S. at 483. Rather than merely influencing the TUSD Governing Board to create programs considered to be in their interests, members of the Latino community must now **additionally** convince the entire Arizona legislature and Governor to abrogate HB 2281.

-10-

1    that is in their interest."[55]

2       That is precisely the situation here. The MAS program was created at the urging

3    of the community to address and combat declining trends for Latino students with

4    regard to drop out rates, grade failure rates, excessive discipline, poor attendance,

5    poor graduation rates and poor matriculation rates to post-secondary institutions.[56] For

6    the same reasons, the MAS program is required by the Federal District Court pursuant

7    to the Post-Unitary School Desegregation Plan.[57] Data shows that the MAS program

8    has been successful in these efforts.[58] By requiring Latinos to surmount the additional

9    hurdle of legislative repeal of HB 2281 in order to "achieve legislation that is in their

10   interest," HB 2281 creates an actual injury for the plaintiffs and is particularized to them

11   as members of TUSD's Latino community.  The causal relationship between HB 2281

12   and these injuries is self-evident and there is substantial likelihood that a favorable

13   decision by the Court will eliminate the barrier faced by the plaintiffs in the political

14   process.

15        **1. MAS Director Sean Arce Has Standing.**

16      Plaintiff Sean Arce is the director of the MAS program. If MAS is eliminated as

17   a result of Superintendent Huppenthal's enforcement action, his position, and therefore

18   his employment with TUSD, will be eliminated as well. It is well established that a

19   plaintiff "suffers an injury ***in fact*** sufficient for Article III standing purposes from the

20   impact of the statute on his practice of his profession."[59] The imminence of an injury is

21   an "elastic concept" with the objective of ensuring that the injury is not too speculative

22   and that the injury is "***certainly*** impending."[60] Superintendent Huppenthal's pending

23   enforcement of HB 2281 makes the elimination of MAS and Mr. Arce's termination

24

25     [55] 458 U.S. at 470, quoting *Hunter*, 393 U.S. at 395 (Harlan, J., concurring).
  [56] TAC ¶73.
26     [57] TAC ¶79.
  [58] TAC ¶78.
27     [59] *Planned Parenthood of Idaho*, 376 F.3d at 918, fn.5: *see also Carroll v. Nakatani*, 342
F.3d 934, 940 (9th Cir. 2003), citing *Allen v. Wright,* 468 U.S. 737, 755 (1984) (denial of equal
28   treatment in violation of the right to Equal Protection is enough to confer standing.)
  [60] *Lujan*, 504 U.S. at 564, n.2.

1    "certainly impending."

2         Contrary to Superintendent Huppenthal's contention, Mr. Arce's claim does not

3    rely "upon a chain of speculative contingencies."[61] Superintendent Huppenthal's litany

4    of potential outcomes of the enforcement proceeding is counter to the political and

5    practical realities created by HB 2281. Revision of the curriculum "to ensure

6    compliance with the statute" is impossible because the statute does not require the

7    Superintendent to inform TUSD what changes he believes would cure any alleged

8    violations and he has not done so.[62] From his Finding, it appears that Mr. Huppenthal

9    believes the statute requires the elimination of teaching about the concept of

10   "oppression," and therefore of racism.[63] If his view of the statute is correct, then nothing

11   short of elimination would satisfy the requirements of HB 2281. Superintendent

12   Huppenthal's suggestion that TUSD might accept the 10 per cent cut in funding to

13   allow MAS to continue defies reality.[64] The 10 per cent penalty is designed to not only

14   make it practically impossible for TUSD to accept the penalty, but to create an

15   acrimonious climate, eroding support for the MAS program and for efforts to vindicate

16   the Governing Board's right to develop a such a program that it believes to be in the

17   best interests of its students.

18        Likewise, TUSD's failure in its administrative appeal is guaranteed by the

19   procedure created by HB 2281. Despite the proceeding before an administrative law

20   judge, Superintendent Huppenthal is vested with complete discretion to make the final

21   agency decision.[65] If the TUSD Governing Board appeals his decision, the superior

22   court must "affirm the agency action unless...[it] is not supported by substantial

23   evidence, is contrary to the law, is arbitrary and capricious or is an abuse of

24

25

26   ——————————

27   [61] Ct. Doc. No. 88, p.10.
     [62] *Ibid.*
     [63] Ct. Doc. No. 84, Ex. D., p. 2.
28   [64] Ct. Doc. No. 88, p. 10.
     [65] See, A.R.S. §41-1092.08(B).

1    discretion."[66] The legislature predetermined the outcome against TUSD and the injury

2    to Mr. Arce is indeed imminent.

3                    **2.        The Plaintiff Teachers Have Standing.**

4            Superintendents Huppenthal and Horne's Findings and enforcement actions

5    have created doubt about the continued viability of MAS classes. Because MAS

6    classes count as core credits in English, history and government, students are

7    understandably apprehensive about taking classes that could be declared ineligible

8    toward graduation requirements. As a result of this uncertainty, enrollment in MAS

9    classes has dropped 46 per cent from the spring semester of 2011 to the fall semester

10   of 2011, from 1,155 students to 628 students enrolled.[67] The number of course

11   sections offered has dropped 56 percent, from 43 to 24.[68] These reductions, as well as

12   the prospect of elimination of MAS classes creates an imminent threat of harm to the

13   teachers.

14           Superintendent Huppenthal erroneously implies that because the statutory

15   penalty applies only to TUSD, HB 2281 does not restrict the speech or activities of

16   MAS teachers or students."[69] While it is true that the statutory remedy for violations is

17   a reduction of funds to the school district, those violations are found as a result of

18   classroom activity, resulting in a powerful coercive effect. Thus, the statute not only

19   restricts teacher and student speech, but discriminates against the plaintiffs on the

20   basis of race and ethnicity, abridges the students' right to education without a rational

21   basis and violates their First and Fourteenth Amendment rights by being overbroad

22   and vague.

23

24           [66] *Anderson v. Ariz. Game & Fish Dept.*, 226 Ariz. 39 (Ct. App. 2010), citing A.R.S. §12-
25   910(E); *see also Brodesky v, City of Phoenix*, 183 Ariz. 92, 94-95 (Ct. App. 1995) (court would
     decide "only whether [the] administrative action was illegal, arbitrary, capricious, or an abuse
     of discretion.")
26           [67] Declaration of Sean Arce, attached as Ex. A.  See, *Table Bluff Reservation (Wiyot
     Tribe) v. Philip Morris Inc.,* 256 F.3d 879, 882 (9th Cir. 2001)(in assessing standing, the court
27   may consider "the complaint and any other particularized allegations of fact in affidavits or
     amendments to the complaint.")
28           [68] See Arce Declaration ¶¶ 6-8.
             [69] Ct. Doc. No. 88, p.3.

HB 2281 explicitly states that the prohibitions listed in subsections 15-112(A)(1) through (4) apply to "classes" and thus necessarily to teachers' and students' instructional speech. "A school district...shall not include in its program of instruction any courses or classes that include any of the following:...."[70] This statute is not directed solely to the curricular decisions made by local governing boards. It is also directed to the speech activities in the classroom. If a teacher is accused of "promot[ing] resentment toward a race or class of people" by virtue of what she said during a classroom lesson, then a violation of A.R.S. §15-112(A)(2) may be alleged. It makes no difference that the finding of a violation would be entered against the school district and not against the teacher individually. By its plain wording, HB 2281 effectively requires teachers to discern what classroom speech might violate the statute, this undeniably chills teachers' and students' classroom speech.[71]

As an example, at the administrative hearing against TUSD on August 19, 2011, Superintendent Huppenthal introduced an email between the plaintiff Sara Rusk and Salomon Baldenegro, a long-time Tucson civil rights activist.[72] In the email, Ms. Rusk referenced an attached essay by Mr. Baldenegro and stated her intention of using the essay in one of her MAS history classes. Superintendent Huppenthal introduced the email and essay as evidence of a violation of A.R.S. §15-112(A).

Also on August 19, Superintendent Huppenthal introduced into evidence a

---

[70] A.R.S.§15-112(A) (emphasis added).

[71] In legislative history, Rep. Steve Montenegro, as a sponsor of HB 2281, specifically referenced classroom speech in support of the bill:

> You asked me, Rep. Youngwright, if they have the, if the school boards have the ability to choose the curriculum and yes they do. But in this case, there is evidence that has been recorded and we can see from textbooks, from testimonies, from actual speeches or **even lectures given inside classrooms** that show us that the due prudence is not being employed.

Floor comments from Rep. Steve Montenegro, Arizona House of Representatives Forty-Ninth Legislature-Second Regular Session Active Calendar Committee of the Whole #2, Thursday, March, 18, 2010, https://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=7138. Judicial notice of the cited record pursuant to Fed. R. Evid. 201(b) is requested.

[72] A copy of the email admitted as an exhibit in the administrative hearing is attached hereto as a part of Ex. B.

1   photograph of student art work posted by Ms. Rusk on the wall outside of her

2   classroom.[73] The student drew an image representing the Arizona flag with a swastika

3   on it.  In the past Ms. Rusk freely posted examples of student work outside of her

4   classroom as part of the educational process of stimulating student thought, inquiry

5   and conversation.[74] Since learning that Superintendent Huppenthal used a photograph

6   of one of her students' work that she posted for display in order to prove a violation of

7   HB 2281, Ms. Rusk has refrained from posting some student work that she would have

8   posted before the enforcement of HB 2281.[75] Further, Superintendent Huppenthal's

9   use of a teacher e-mail and photograph of student work to prove that the MAS program

10  is in violation of HB 2281 contradicts his contention that the plaintiffs raise "merely an

11  assertion of 'subjective chill.'"[76] To the contrary, Superintendent Huppenthal's

12  enforcement action has created precisely the type of chilling and intimidation that HB

13  2281 was designed to create in the MAS teachers and administrators.  This chilling,

14  as well as targeting, confers standing upon the plaintiffs.[77]

15      Within the context of the plaintiffs' claim for violation of the right to Equal

16  Protection, the requisite "injury in fact" is the denial of equal treatment and it is not

17  necessary to show a monetary loss.[78] Regardless, plaintiffs have sufficiently alleged

18  the imminence of actual injury to the practice of their profession.[79] Although it is

19  possible that in the event that the MAS program is eliminated, the teachers could be

20  reassigned to teach other classes, it is more likely that they would be terminated.  By

21  challenging the State of Arizona in this action and standing up for their constitutional

---

[73] A copy of the photograph admitted int eh administrative hearing is attached hereto as a part of Exhibit C.

[74] Declaration of Sara Rusk, attached hereto as Ex. C.

[75] Ibid.

[76] HB 2281 has become the litmus test that every MAS teacher and student must pass without knowing what words, reading, writing or image offends the State.

[77] See, *Minnesota Concerned Citizens for Life v. FEC*, 113 F.3d 129, 131 (8th Cir. 1997) (when government action is challenged "by a party who is a target or object of the action," there is little question that the action has caused injury.), citing *Lujan*, 504 U.S. at 561-62.

[78] See *Gratz,* 539 U.S. at 262.

[79] See *Lopez*, 630 F.3d at 785 (standing met by "demonstrating a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.")

rights, speaking out on behalf of MAS and criticizing the actions and failures to act of TUSD, the teachers have risked political unpopularity with the TUSD administration and Governing Board. Because Arizona law prohibits "employment retention priority for teachers based on tenure or seniority," they are especially vulnerable to termination as a means of retribution if the MAS program is eliminated.[80]

The fact that the potential termination of the plaintiffs' employment is a decision to be made by TUSD and not directly by Superintendent Huppenthal, does not negate the causal connection to HB 2281 and its enforcement.  Though "it does not suffice if the injury complained of is 'the result of independent action of some third party not before the court,' that does not exclude injury produced by determinative or coercive effect upon the action of someone else."[81] For that reason, pharmacists who were likely to be terminated by their employer because their religious beliefs allegedly prevented them from delivering certain medications, as required by new state regulations, satisfied the causal connection requirement in their action to strike down the regulations.[82] If the new rules had not been passed, the pharmacists' jobs with their present employers would not have been at stake.[83] The injury was actual and imminent despite the possibility of their finding new employers who could accommodate their religious beliefs by having an additional pharmacist on duty to dispense the requested medication.[84]

Similarly, the fact that the teachers might possibly be retained to teach other classes does not negate the injury to them by prohibiting them from teaching MAS classes. Further, any future termination because of the reduction or elimination of MAS classes would be causally connected to Superintendent Huppenthal and Horne's actions and not the result of a purely independent decision by TUSD.  HB 2281 and Superintendents Huppenthal and Horne have produced a determinative or coercive

---

[80] A.R.S. §15-502(H).
[81] *Stormans*, 586 F.3d at 1112.
[82] *Ibid.*
[83] 586 F.3d at 1121-22.
[84] *Ibid.*

-16-

1    effect on TUSD sufficient to confer standing.

2    **IV.    Abstention Is Not Appropriate Or Required**

3           The district court has federal question jurisdiction in this matter as provided by

4    28 U.S.C. § 1331, which provides original jurisdiction of all civil actions rising under the

5    Constitution, laws or treaties of the United States. "Because the federal courts'

6    obligation to adjudicate claims within their jurisdiction is 'virtually unflagging,' abstention

7    is permissible only in a few 'carefully defined' situations with set requirements."[85]

8    Superintendent Huppenthal's contention that the Court should take advantage of the

9    "extraordinary and narrow exception to the duty of the District Court to adjudicate a

10   controversy properly before it" cannot withstand scrutiny.[86] "Given that admonition, it is

11   critical to examine the scope of that 'extraordinary and narrow exception' with care,

12   rather than applying it as a convenient way of avoiding state law questions.[87]

13          *Burford v. Sun Oil,*[88] allows federal district courts to "decline to rule on an

14   essentially local issue arising out of a complicated state regulatory scheme."[89]

15   However, abstention is not required whenever there exists such a complex state

16   process "or even in all cases where there is a 'potential for conflict' with state law or

17   policy."[90] Pursuant to the *Burford* doctrine, abstention may be proper where it is

18   established that (1) the state has chosen to concentrate suits challenging the actions

19   of the agency involved in a particular court, (2) the federal issues cannot be separated

20   easily from complex state law issues with respect to which state courts might have

21   special competence, and (3) federal review might disrupt state efforts to establish a

22   coherent policy.[91]

23

24          [85] *U.S. v. Morros*, 268 F. 3d 695, 703 (9th Cir. 2001) (citations omitted).
             [86] *Hawthorne Savings F.S.B. v. Reliance Ins. Co. of Ill.,* 421 F.3d 835, 845 (9th Cir.
25   2005), citing *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728 (1996), quoting *Colo. River
     Water Conserv. Dist. v. U.S.* 424 U.S. 800, 813 (1976).
26          [87] *Ibid.*
             [88] 319 U.S. 315 (1943).
27          [89] *Morros*, 268 F.3d at 705.
             [90] *City of Tucson v. U.S. West*, 284 F.3d 1128, 1133 (9th Cir 2002), citing *New Orleans
28   Pub. Serv. Inc. v. Council for New Orleans,* 491 U.S. 350, 362 (1989).
             [91] *Morros*, 268 F.3d at 705.

1      In this case, abstention is neither required nor appropriate. The plaintiffs cannot

2  join as parties to TUSD's administrative appeal. Here the plaintiffs assert distinct claims,

3  including violations of their individual rights to Equal Protection, Free Speech and

4  Substantive Due Process.  Governmental entities do not possess such rights, so they

5  cannot be asserted by TUSD in its administrative appeal.

6      Arizona has not created the any type of "complicated state regulatory scheme"

7  for which the state courts have a special competence necessary for *Burford*

8  abstention.[92] In *Burford*, the Supreme Court found abstention appropriate because

9  Texas devised a general regulatory system for the conservation of oil and gas with all

10 appeals required to be taken exclusively in the state district court in Travis County.[93]

11 Texas deemed this scheme necessary to prevent the "interminable confusion" that

12 would result if rulings by the state commission on the vast number of oil and gas wells,

13 "could be collaterally attacked in the various courts and counties of the state."[94]

14 However, HB 2281 provides no complex state regulatory scheme and does not

15 concentrate suits challenging state action in a particular court.[95]

16      The claims asserted by the plaintiffs are complex federal Constitutional law issues

17 for which the state administrative proceeding is ill equipped to adjudicate in a competent

18 manner and which Superintendent Huppenthal is free to disregard.  Nor is there any

19 disruption to any effort to establish a coherent state policy by proceeding with

20 adjudication of the this case. Moreover, the administrative proceeding is ***not*** binding but

21 merely advisory. Mr. Huppenthal is free to enforce HB 2281 and impose the 10 per cent

22 sanction irrespective of the report and recommendation of the administrative law judge.

23 Mr. Huppenthal is also well aware that his action is subject to review under an abuse

24 of discretion standard that heavily favors sustaining his final decision.

25

26      [92] *Ibid.*
        [93] 319 U.S. at 326.
27      [94] 319 U.S. at 327.
        [95] See also, *Morros*, 268 F.3d at 705 (abstention improper where no evidence that
28 "Nevada courts are working partners with the State Engineer in the business of creating a
   regulatory system for the issuance of water permits.").

1    Abstention is the exception and not the rule, and is not appropriate in this case

2    where the state administrative proceeding is not an adequate or comparable vehicle for

3    a complete, prompt and competent resolution of the distinct issues raised here.[96]

4    **V.    The First Amendment Protects The Teachers' Right To Teach And Students' Right To Learn Within The MAS Curriculum Approved By TUSD.**

5

6    When all of the facts alleged by the plaintiffs are taken as true and construed in

7    the light most favorable to them, it is clear that Superintendent Huppenthal fails to carry

8    his burden to prove "beyond doubt" that there are no set of facts that would entitle the

9    plaintiffs to relief for their claims that HB 2281 and the actions of Superintendents

10   Huppethal and Horne have denied them their rights to Freedom of Speech.[97] Contrary

11   to Superintendent Huppenthal's assertion, the plaintiffs do not contend they have a First

12   Amendment right to dictate curriculum and textbooks.[98] Rather, the First Amendment

13   guarantees the students the right to receive information and ideas and the educators

14   the right to speak ***within the curriculum*** approved by the TUSD Governing Board.

15   The MAS curriculum has been adopted by the TUSD Governing Board. Arizona

16   law specifically delegates authority and directs school district governing boards to

17   determine the curricula of its programs.[99] Additionally, the TUSD Governing Board

18   implemented the MAS curriculum in fulfillment of its obligations under the Post-Unitary

19   Status Plan ordered by the District Court in *Fisher v. TUSD*, D.C. No. 4:74-cv-00090-

20   DCB.[100] Thus, the plaintiffs' First Amendment rights in this context are those that further

21   teaching and learning within the prescribed MAS curriculum.

22   "First Amendment rights, applied in light of the special characteristics of the

23

24

25

26   [96] *City of Tucson*, 284 F.3d at 1132.
     [97] *Everest & Jennings*, 23 F.3d at 228.
     [98] Ct. Doc. No. 88, p.13-16.
27   [99] A.R.S. §15-341.
     [100] The Ninth Circuit recently reversed the District Court's finding that unitary status has
28   been achieved and remanded the case for continuing District Court oversight. *Fisher v. TUSD*, 2011 U.S. App. LEXIS 14688.

school environment, are available to teachers and students.[101]  It can hardly be argued

that either students or teachers shed their constitutional rights to freedom of speech or

expression at the schoolhouse gate."[102] The Supreme Court "ha[s] not failed to apply

the First Amendment's mandate in our education system where essential to safeguard

the fundamental values of freedom of speech and inquiry and of belief."[103] Along with

the broad discretion of the States and school boards to manage school affairs comes

the limitation that such discretion "must be exercised in a manner that comports with the

transcendent imperatives of the First Amendment."[104] Although state and local boards

may enforce regulations "reasonably related to pedagogical concerns,"[105] they must

discharge their "important, delicate, and highly discretionary functions" within the limits

and constraints of the First Amendment.[106] "Because First Amendment freedoms need

breathing space to survive, [the] government may regulate in the area only with narrow

specificity."[107]

Public education plays a vital role to "prepare pupils for citizenship in the

Republic. . . [and to] inculcate the habits and manners of civility as values in themselves

conducive to happiness and as indispensable to the practice of self-government in the

---

[101] Neither the Supreme Court nor the Ninth Circuit have applied the restrictions on the Free Speech rights of public employees, recognized by the Supreme Court in *Garcetti v. Ceballos*, to public school teachers' speech within the curriculum.  547 U.S. 410, 425 (2006). (The Court does not decide whether "the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."); cf. *Johnson v. Poway Unified Sch. Dist.,* 2011 U.S. App. LEXIS 18882 (9th Cir. 2011)(no First Amendment violation where teacher ordered not to preach his personal views on God to students in classroom.)

[102] *Tinker v. DesMoines Indep.Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

[103] *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

[104] *Bd. Of Educ. Island Trees v. Pico*, 457 U.S. 853, 864 (1982) (school board may not remove books from school library on the basis of partisan or political disapproval); see also, *Meyer v. Nebraska*, 262 U.S. 390 (1923) (state may not forbid teaching foreign language in public and private schools); *Epperson*, 393 U.S. 97 (1968) (state may not prohibit the teaching of evolution).

[105] *Hazelwood Sch. Dist. v. Kuhlmeier*, 434 U.S. 260, 273 (1988); *see also California Teachers Assoc. v. State Board of Ed.*, 271 F.3d 1141, 1149 (9th Cir. 2001).

[106] *Pico*, 457 U.S. at 865; see also, *Citizens United v. F.E.C.,* 130 S.Ct. 876, 911 (2010)("Where Congress finds that a problem exists, we must give that finding due deference; but Congress may not choose an unconstitutional remedy.")

[107] *Keyishian v. Bd. of Regents of the Univ. of the St. of N.Y.*, 385 U.S. 589, 605 (1967), citing *N.A.A.C.P. v. Button*, 371 U.S. 432-433 (1963).

community and the nation."[108] In pursuit of these goals, students must develop the intellect and the ability to freely question and evaluate the world around them.  For this reason, "[t]he process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order."[109] In this case, Superintendent Huppenthal and the State's political leaders have gone beyond making legitimate curricular decisions, entered into the realm of censorship, book-banning, and stifling of critical thinking which represents the worst possible example of civic democracy for students.

Neither the Supreme Court nor the Ninth Circuit has "definitively resolved whether and to what extent a teacher's instructional speech is protected by the First Amendment."[110] However, the Ninth Circuit has noted that *Hazelwood* supports the limited right to classroom speech in furtherance of the course curriculum.  In *Downs v. LAUSD*, the court recognized that where "activities may fairly be characterized as a part of the school curriculum, whether or not they occur in a traditional classroom setting," the "educators' authority in this area enable[s] them to 'assure that the participants learn whatever lessons the activity is designed to teach....'"[111] Thus, in the educational setting, teachers and students have the right to communicate within the curriculum in a manner that facilitates learning the intended lesson.[112]

Beyond protecting the rights of a teacher to express ideas, the First Amendment

---

[108] *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 681 (1986).
[109] *Ibid.* at 683.
[110] *Cal. Teachers Assoc.*, 271 F.3d at 1148.
[111] 228 F.3d 1003, 1010 (2000), quoting *Hazelwood*, 484 U.S. 260, 271 (1988).
[112] A teacher's instructional speech entitled to First Amendment protection is not to be confused with the governing board's curricular speech. A.R.S. §15-341(A) delegates the authority to develop public school curricula to local governing boards. The curriculum is "a case of the government itself speaking," in this case, TUSD. See, *Downs*, 228 F.3d at 1011.  See also, *Epperson*, 393 U.S. at 105 (1968)(recognizing "the freedom of teachers to teach and of students to learn"); *Pico*, 457 U.S. at 867 ("the Constitution protects the right to receive information and ideas.") HB 2281, on the other hand, is not a curriculum.  A curriculum is "a course of study in one subject at a school or college." Dictionary.com, http://dictionary.reference.com/browse/curriculum (last accessed July 20, 2011.).  HB 2281 does not describe a "course of study." Rather it is an attempt to shut down one program in one school district.

1   also protects the students' right to receive information and ideas.[113]

2   This right is an inherent corollary of the rights to free speech and press that are
    explicitly guaranteed by the Constitution, in two senses. First the right to receive
3   ideas follows ineluctably from the *sender's* First Amendment right to send them:
    "The right of freedom of speech and press. . .embraces the right to distribute
4   literature, and necessarily protects the right to receive it." [citation omitted.] The
    dissemination of ideas can accomplish nothing if otherwise willing addressees
5   are not free to receive and consider them. It would be a barren marketplace of
    ideas that had only the sellers, and no buyers. [citation omitted.] More
6   importantly, the right to receive ideas is a necessary predicate to the *recipient's*
    meaningful exercise of his own rights of speech, press, and to political freedom.
7   Madison admonishes us:

8   A popular Government, without popular information, or the means of
    acquiring it, is but a Prologue to a Farce or a Tragedy, or perhaps both.
9   Knowledge will forever govern ignorance, and a people who mean to be
    their own Governors must arm themselves with the power which
10  knowledge gives.[114]

11  It is axiomatic that "[i]n our system, students may not be regarded as closed-circuit

12  recipients of only that which the State chooses to communicate. . . [S]chool officials

13  cannot suppress 'expressions of feeling' with which they do not wish to contend."[115]

14      The history and context of HB 2281 reveal that it was not motivated by legitimate

15  curricular concerns, but rather by invidious viewpoint discrimination.[116] Superintendents

16  Huppenthal and Horne and other politicians created, passed, and implemented HB

17  2281 solely because they do not like the Mexican-American perspective presented by

18  the curriculum authorized by TUSD.

19      In *Morse v. Frederick,* the Supreme Court rejected the claim that the First

20  Amendment allows the suppression of speech based on this type of viewpoint

21  discrimination.[117]  In that case, both the school district and the United States urged the

22  broad argument "that the First Amendment permits public school officials to censor any

23

24  _____

25  [113] *Pico,* 457 U.S. at 867, citing *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).
    [114] 9 Writings of James Madison 103 (G. Hunt ed. 1901), *Pico*, 457 U.S. at 867
26  (emphasis in original).
    [115] *Tinker*, 393 U.S. at 511.
27  [116] Cf. *City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984) ("[S]ome
    purported interests–such as a desire to suppress support for a minority party or an unpopular
28  cause, or to exclude the expression of certain points of view from the marketplace of
    ideas...are...plainly illegitimate.").
    [117] 551 U.S. 393 (2007).

student speech that interferes with a school's 'educational mission.'"[118] Under that theory, for example, a school that defined its mission as solidarity with soldiers could have tried to ban the black armbands worn in *Tinker*, or a school with an educational mission to promote world peace could have sought to ban buttons expressing support for the troops.[119] Or, in this case, lawmakers with an educational mission to treat and value pupils as individuals could seek to ban discussions of the legacy of oppression in the United States in the context of learning about Mexican-Americans from the perspective of Mexican-Americans.[120] Justice Alito further declared that the "'educational mission'" argument would give public school authorities a license to suppress speech on political and social views based on disagreement with the viewpoint expressed.[121] The argument, therefore, strikes at the very heart of the First Amendment."[122]

HB 2281 ostensibly seeks to value students as individuals. In reality, it gives life to politicians' efforts to drive out a curriculum that teaches about Mexican-Americans. It does not represent a "curriculum."  Rather, it represents an "educational mission" that is beyond the State's authority to set curriculum and impermissibly burdens teachers' and students' speech, speech which is otherwise properly within the district-approved MAS curriculum.

While "public education is committed to the control of state and local authorities,. . .'[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'"[123] "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."[124] These principles affirm the First Amendment

---

[118] 551 U.S. at 423, Alito, J. concurring.
[119] *Ibid.*
[120] See A.R.S. §15-111.
[121] 551 U.S. at 423.
[122] *Ibid.*
[123] *Epperson*, 393 U.S. at 104, citing *Shelton v. Tucker*, 364 U.S. 479, 481 (1960).
[124] *Keyishian*, 385 U.S. at 603, citing *Sweezy v. State of New Hampshire*, 354 U.S. 234, 250 (1957); *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975)("minors are entitled to a significant measure of First Amendment protection," citing

1   rights of teachers to teachers to teach within the prescribed curriculum and of student

2   to receive information. The defendant's motion to dismiss the plaintiffs' First

3   Amendment claims should be denied.

4   **VI.    Conclusion**

5   The United States Supreme Court stated in *Virginia v. American Booksellers*

6   *Ass'n, Inc.*:

7   > To bring a cause of action in federal court requires that
    > plaintiffs establish at an irreducible minimum an injury in fact;
8   > that is, there must be some threatened or actual injury
    > resulting from the putatively illegal action. . . .   That
9   > requirement is met here, **as the law is aimed directly at**
    > **plaintiffs**, who, if their interpretation of the statute is correct,
10  > will have to take significant and costly compliance
    > measures....[125]

11

12  Because HB 2281 prohibits broad undefined conduct, it requires plaintiffs to engage in

13  a never ending guessing game as to what they can teach or reciprocally learn. They

14  have standing to challenge the legality of HB 2281 before they are further injured by

15  it; prevention is preferable to correction.

16  Enforcement of HB 2281 has commenced. Those with the power to do irreparable

17  harm have engaged in a course of conduct that will leave plaintiffs undeniably injured.

18  Superintendent Huppenthal, like Superintendent Horne, has demonstrated a

19  commitment to enforce and defend HB 2281; there exists an undeniable requisite

20  "credible threat" of enforcement.[126] Under these circumstances, plaintiffs are victims of

21  HB 2281 and as the Ninth Circuit concluded in *Bland v. Fessler;*

22  > Bland chose to obey both the civil and utilities statutes and to

23  *Tinker*, 393 U.S. 503, "and only in relatively narrow and well-defined circumstances may
    government bar public dissemination of protected materials to them.")

24  [125] 484 U.S. 383, 392 (1988)(Internal citations and quotation marks omitted; emphasis
    added); See also, *American-Arab Anti-Discrimination Committee v. Thornburgh*, 970 F.2d 501.

25  508 (9th Cir. 1991) ("However, even if [the plaintiffs] had not already been charged with
    violating the challenged provisions, the individual appellees would have standing. The

26  challenged statute . . . is regulatory and proscriptive in nature and the penalty for
    noncompliance is high.  Moreover, the individual appellees fall within the class of persons

27  whose conduct the statute proscribes".

28  [126] See, e.g., *Culinary Workers Union, Local 226 v. Del Papa,* 200 F.3d 614, 618 (9th Cir.
    1999)(plaintiff can establish standing by demonstrating "that the state [defendant] intends
    either to enforce a statute or to encourage local law enforcement agencies to do so").

1
2
3
4

bring a declaratory action challenging their constitutionality, rather than to violate the law, await an enforcement action against him, and raise the statutes' constitutionality as a defense. Bland's decision was altogether reasonable and demonstrates a commendable respect for the rule of law. Under the circumstances of this case, Bland should be allowed to test the law.[127]

5  Based on these facts, plaintiffs have standing to challenge the constitutionality of HB

6  2281.[128] Plaintiffs  have demonstrated that they have standing as the educators who

7  teach MAS and the students desire to enroll in TUSD's MAS course offerings. The

8  claims made are those for which relief can and customarily is provided when the

9  requisite showing is made. Defendant's motion fails to demonstrate any factual

10  circumstance or binding authority that warrants dismissal. Denial is urged and

11  respectfully requested.

12      Respectfully submitted this 11th day of October 2011.

13
        s/*Richard M. Martinez*, Esq.
14
        Richard M. Martinez, Esq.
        Counsel for Plaintiffs

15          **Certification of Service**

16      I hereby certify that on October 11, 2011, I electronically transmitted the foregoing

17  document to the Clerk of Court using the CM/ECF System for filing and transmittal of

18  a Notice of Electronic Filing to the CM/ECF registrants on record.

19
        s/*Richard M. Martinez*, Esq.
        Richard M. Martinez, Esq.

20
21
22
23
24
25

26     [127] 88 F.3d 729, 737 (9th Cir. 1996).

27     [128] See: *Mobil Oil Corp. v. Attorney General of Virginia*, 940 F.2d 73, 75 (4th Cir. 1991) ("Public policy should encourage a person aggrieved by laws he considers unconstitutional to

28  seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution").