**RICHARD M. MARTINEZ, SBA No. 7763**
307 South Convent Avenue
Tucson, Arizona 85701
(520) 327-4797 phone
(520) 320-9090 fax
richard@richardmartinezlaw.com
**Counsel for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CURTIS COSTA, SEAN ARCE,
MAYA ARCE, MARIA
FEDERICO BRUMMER,
DOLORES CARRION,
ALEXANDRO EXCAMILLA,
JOSE GONZALEZ, NORMA
GONZALEZ, LORENZO LOPEZ,
JR., KORINA ELIZA LOPEZ,
RENE F. MARTINEZ, SARA
"SALLY" RUSK, and YOLANDA
SOTELO,

        Plaintiffs,

v.

JOHN HUPPENTHAL,
Superintendent of Public
Instruction, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV 10 - 623 TUC AWT

**PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

(Oral Argument Requested)

    Plaintiffs, through their undersigned counsel, hereby submit their motion for summary judgment pursuant to Rule 56, F.R.C.P. There are no contested issues of material fact concerning the Fourteenth Amendment due process and First Amendment overbreadth claims asserted here. This motion is supported by a separate statement of facts, which includes four exhibits, one of which is a declaration.

    At issue are the prohibitions of A.R.S. §15-112(A) against courses or classes that: (1) promote the overthrow of the United States government, (2) promote resentment toward a race or class of people, (3) are designed primarily for pupils of a particular ethnic group, and (4) advocate ethnic solidarity instead of the treatment

of pupils as individuals, and their application by State Superintendents of Public Instruction Tom Horne and John Huppenthal. These express but incomprehensible prohibitions are all designed to limit the material and ideas allowed in the public classrooms of Arizona. The prohibitions of subsection 112(A) and the exceptions of subsections 112(E) and (F) are vague and restrict the First Amendment freedoms of students to learn and teachers to teach because: 1.) they do not provide notice as to what speech constitutes a violation of subsection 112(A), 2.) they grant the State Superintendent of Public Instruction arbitrary and subjective powers of enforcement, and 3.) they chill the plaintiffs' rights to free speech.

Similarly, §§15-112(A)(1) through (4) prohibit a substantial amount of protected expression. Because the substantial amount of material that school districts and teachers will be prohibited from teaching is protected by the First Amendment, the State may regulate only with narrow specificity; §§15-112(A)(1) through (4) fail to provide that specificity. All four subsections are overbroad and require invalidation by this Court. Because the Declaration of policy contained in §15-111 cannot be extricated from the enforcement provisions of §15-112, §15-111 is equally flawed and requires invalidation.

Enforcement actions have been undertaken and the Mexican American Studies program is close to complete elimination. Cognizable constitutional harm has already been inflicted upon the plaintiffs that will only increase in severity if the enforcement actions undertaken remain unchecked.

In light of the absence of any material factual questions, as reflected in the record submitted and addressed in the accompanying memorandum of points and authorities, plaintiffs respectfully request that the their motion be granted.

Respectfully submitted this 18th day of October, 2011.

s/*Richard M. Martinez*, Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), F.R.C.P. In reviewing a motion for summary judgment, the court examines the evidence in the light most favorable to the non-moving party.[1]

In this motion for summary judgment, plaintiffs ask the court to strike down A.R.S. §§15-111 and 15-112, also referred to as "HB 2281," and the subsequent enforcement actions by then State Superintendent of Public Instruction Tom Horne and by his elected successor, John Huppenthal, as vague and overbroad.[2] The instant facial and as-applied challenge is ripe for resolution at this time and does not require any facts beyond those in the pleadings and accompanying statement of facts, numbers 1 - 102 and four exhibits.

## II.    OVERVIEW

### A.    The Plaintiffs and TUSD'S Mexican American Studies Program.

The plaintiffs include eleven career educators who work in certificated positions in the Tucson Unified School District[3] ("TUSD"), a K-12 public school system, and two TUSD students. The plaintiff teachers provide classroom instruction for the approved Mexican American Studies ("MAS") curriculum at the high school, middle school and elementary school level; plaintiff Sean Arce is the director of

---

[1] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 577 (1986); *Porter v. California Department of Corrections*, 419 F.3d 885, 887 (9th Cir. 2005).

[2] HB 2281 is codified as A.R.S. §§15-111 and 112.

[3] TUSD is the largest public school district in the Tucson metropolitan area. It is comprised of thirteen high schools, seventeen middle schools, four K-8 schools, 62 elementary schools, one K-12 school and fourteen alternative educational programs. The 2010-2011 student population was 52,987, of which 60 per cent were Latino. See Ct. Doc. No. 84-1, p.5, Cambium Learning Group, Inc. Audit Report, hereinafter "Cambium Report." (The entire 120-page Cambium Report is filed in four sections at Ct. Doc. Nos. 84-1, 85, 86 and 87.)

-1-

MAS.[4] More than a decade ago, the TUSD Governing Board approved the MAS program in an effort to remedy the District's historical failure to educate Latino students. This effort to enhance the academic achievement of Latino students has never been limited to Latinos, but is open to all students who elect to take MAS classes.[5] From the 1998 school year to the 2010 school year, the program grew as it established its curriculum and proved its efficacy with consistent unprecedented results.[6] The enactment and enforcement of HB 2281 has halted all growth and caused substantial reductions in the number of classes offered and students enrolled.[7]

**B.   Passage Of HB 2281**

After the inception of the MAS program the State of Arizona devolved into an unstable and divided community that has spurned heated public debate and consumed State office holders over the number of Latinos in the state and their role. Concerns and criticisms about the State's rapid demographic shift are common and openly stated. Racial and ethnic tensions in Arizona have risen dramatically while the State's residents and elected officials have fractured into divergent ideological positions. Latinos throughout the state know they are disfavored and that their rights are under attack.

In this climate, the Arizona Legislature passed HB 2281 along party lines at

---

[4] PSOF 1-13, 22-57.

[5] PSOF Exhibit A, Declaration of Martin Sean Arce.  MAS is currently implemented as part of TUSD's obligations pursuant to the Post-Unitary Plan, adopted as part of a long-running desegregation action.  *See* Post-Unitary Plan, attached hereto as Ex. B, pp. 31-33.  The Ninth Circuit recently remanded the desegregation case, *Fisher v. TUSD*, 2011 U.S. App. LEXIS 14688 (9th Cir. 2011), to the district court with instructions to maintain jurisdiction until TUSD has demonstrated that it is in good faith compliance with the Post-Unitary Plan over a reasonable period of time.

[6] See Cambium Report, Ct. Doc. No. 85, pp. 49-50.

[7] PSOF 99-101.

the urging of Tom Horne, then State Superintendent of Public Instruction.[8] Through HB 2281, Superintendent Horne and his successor, defendant Superintendent John Huppenthal, seek to impose a narrow and restrictive orthodoxy that limits what can be spoken or read about concerning the history, literature and art of the United States; one that is devoid of the role, contributions or sacrifices of Mexican Americans. The end result is banishment of TUSD's MAS program.[9] HB 2281 is the vehicle created to impose this death sentence by State Superintendent Huppenthal.

A.R.S. §§111 and 112 provide, in pertinent part:

111.   The legislature finds and declares that public school pupils should be taught to treat and value each other as individuals and not be taught to resent or hate other races or classes of people.

112.   A.  A school district...shall not include in its program of instruction any courses or classes that include any of the following:

1.  Promote the overthrow of the United States government.
2.  Promote resentment toward a race or class of people.
3.  Are designed primarily for pupils of a particular ethnic group.
4.  Advocate ethnic solidarity instead of the treatment of pupils as individuals.

B.  If...the superintendent of public instruction determines that a school district...is in violation of subsection A,...the superintendent of public instruction shall notify the school district...that it is in violation of subsection A.  If...the superintendent of public instruction determines that the school district...has failed to comply with subsection A within sixty days after a notice has been issued pursuant to this subsection,....the superintendent of public instruction may direct the department of education to withhold up to ten per cent of the monthly apportionment of state aid that would otherwise be due the school district....  The department of education shall adjust the school district or charter school's apportionment accordingly.  When the...superintendent of public instruction determines that the school district...is in compliance with subsection A, the department of education shall restore the full amount of state aid payments to the school district....

...

---

[8] Mr. Horne is currently the Arizona Attorney General.  See, Tom Horne for Attorney General website, http://www.electtomhorne.com/news.htm at link titled, "Tom Horne Championed Bill to Ban Ethnic Studies," http://www.azcentral.com/news/election/azelections/articles/2010/05/01/20100501arizona-bill-bans-ethnic-studies.html

[9] PSOF 14-21, 69-73, 80-94, 100-01.

D.  Actions taken under this section are subject to appeal pursuant to title 41, chapter 6, article 10.

E.  This section shall not be construed to restrict or prohibit:
...
3.  Courses or classes that include the history of any ethnic group and that are open to all students, unless the course or class violates subsection A.
4.  Courses or classes that include the discussion of controversial aspects of history.

F.  Nothing in this section shall be construed to restrict or prohibit the instruction of the holocaust, any other instance of genocide, or the historical oppression of a particular group of people based on ethnicity, race, or class.

The constitutional deficiencies in HB 2281 include the statute's failure to define the terms necessary for the State Superintendent to find a violation or an exception to the statutory prohibitions. Subsection 112(B) grants the State Superintendent draconian enforcement powers and fails to provide standards or guidelines for making  determinations of violations or compliance with the statute.

**C.   Actions of State Superintendents Horne and Huppenthal.**

HB 2281 was passed with the express intent of eliminating the MAS program, a curriculum lawfully adopted by the TUSD Governing Board. Superintendents Horne and Huppenthal believe the MAS program is not a legitimate part of instruction in any public school. Exercising the authority granted to them by HB 2281, first Superintendent Horne, then Superintendent Huppenthal issued Findings of alleged violations against TUSD with the intent of forcing the elimination of the MAS program. In a Finding dated December 30, 2010[10], but released on January 2, 2011, hours before he left office to become the Arizona Attorney General, Superintendent Horne issued his determination that TUSD's MAS program was in

---

[10] HB 2281 did not become effective until December 31, 2011. Thus, the Horne Finding predates the effective date of the statute; it cites and relies upon facts that all occurred before the statute was the enforceable law of the state of Arizona.

violation of HB 2281.[11]

On January 2, 2011, Mr. Huppenthal was sworn into office as the new State Superintendent and the HB 2281 baton was passed from Mr. Horne to Mr. Huppenthal.[12] In seeking election to the State Superintendent's position, defendant Huppenthal continued Superintendent Horne's battle and publicly campaigned on a pledge to "Stop La Raza."[13]

Once in office, State Superintendent Huppenthal commissioned Cambium Learning Group, Inc. to perform a curriculum audit of the MAS program at a cost of $110,000 to determine compliance with HB 2281. After Cambium spent two months observing classrooms, interviewing teachers, students, administrators, parents and members of the community, reviewing curricular materials and compiling the audit report, a 120-page report was issued. Cambium concluded that the MAS program provides the "effective use of curriculum to support student achievement" and recommended that the courses remain as core courses and be "expanded and made available to more students." But most importantly, Cambium found that "[d]uring the curriculum audit period, no observable evidence was present to indicate that any classroom within [TUSD] is in direct violation of the law, A.R.S. §15-112(A). In most cases, quite the opposite is true."[14] Cambium also confirmed that MAS students

---

[11] Ct. Doc. No. 84, Ex. B to Plaintiffs' Third Amended Complaint, hereinafter referred to as "Horne Finding."

[12] Mr. Huppenthal had been a member of the Sate Senate and voted for passage of HB 2281. He also has stated publically his dislike for the MAS program which he believes disparages the county's forefathers.

[13] Advocates of HB 2281 have consistently demonized the MAS program, formerly known as Raza/Mexican American Studies, alleging that Raza was a term signifying racial superiority. Due to this repeated public attack by Mr. Horne as Superintendent of Public Instruction, TUSD changed the name of the MAS program, dropping the word "Raza." PSOF 75. This name change exemplifies the chilling climate that has limited the speech of Latinos within TUSD.

[14] Cambium Audit, pp. 42, 50, 66-67.

outperform their peers on standardized tests and graduate at higher rates.[15]

In response, Superintendent Huppenthal jettisoned the audit and after withholding the Cambium audit report for six weeks, he kept his campaign pledge to "Stop La Raza". On June 15, 2011, Superintendent Huppenthal issued his Finding of violation against TUSD in direct contradiction to the Cambium Audit.[16] Cambium found that the MAS program did not violate any provision within HB 2281, the opposite conclusion reached by Superintendents Huppenthal and Horne in their Findings. These three documents share one thing, in reaching their conclusions, none of them attempt to define the meanings of the statutory terms, "promote resentment," "designed primarily for pupils of a particular group," and "advocate ethnic solidarity instead of the treatment of pupils as individuals."[17]

TUSD appealed Superintendent Huppenthal's Finding to an administrative law judge, as provided by subsection 112(D), and is currently pending.[18]  The efficacy of the administrative proceeding is questionable in that the administrative law judge only issues a recommendation, Superintendent Huppenthal retains full authority to accept, reject or modify it.[19]

The actions of State Superintendents Horne and Huppenthal are having their

---

[15] Cambium Audit, pp. 43, 47, 49-50, 66-67.

[16] Ct. Doc. No. 84, Ex. D, hereinafter referred to as "Huppenthal Finding." Superintendent Huppenthal now claims, through pleadings filed in this action, that his Finding, Ct. Doc. No. 84, Ex. D, supersedes the Finding issued by Superintendent Horne.  See Ct. Doc. No. 88, p. 4. Yet, aside from assertions made in this action, he has not issued any such statement in his capacity as Superintendent of Public Instruction through the Arizona Department of Education. The Horne Finding is still in force and applicable to the MAS program.

[17] A.R.S. §15-112(A). This is not only a case of a violation being "in the eye of the beholder", but revealing of the complete absence of any yardstick by which any person or entity can define, apply or defend their conclusion. Subjectivity not only predominates but overwhelms HB 2281.

[18] That appeal has failed to address the constitutional issues raised here or to provide any definitions for HB 2281.

[19] A.R.S §41-1092.08(B).

intended coercive effect on the MAS program. HB 2281's notoriety, the disinformation propagated by the Horne and Huppenthal Findings and the uncertainty whether students taking MAS courses this year will be able to complete the courses and rely on those credits toward graduation, has adversely effected the number of students enrolled in MAS class at the high school level has dropped by nearly 50% from the spring of 2011 to the fall of 2011.[20]

### D.   Summary of the Applicable Law

#### 1.   Vagueness.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."[21]  Statutes must be sufficiently clear so as to allow persons of "ordinary intelligence a reasonable opportunity to know what is prohibited."[22]  A statute may be void for vagueness if it does any one of the following:

> "because it either (1) fails to give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited;' (2) 'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application;' or (3) 'abut[s] upon sensitive areas of basic *First Amendment* freedoms, operating to inhibit the exercise of [those] freedoms."[23]

The Court should apply the vagueness analysis more strictly in this case as HB 2281 interferes with the plaintiffs' rights protected by the First Amendment.[24]  "The danger of that chilling effect upon the exercise of vital *First Amendment* rights must be guarded against by sensitive tools which **clearly inform** teachers what is being proscribed."[25] Students also have First Amendment rights to speak in the classroom,

---

[20] PSOF 100-01.

[21] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[22] *Ibid.*; see, *U.S. v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996).

[23] *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011), citing *Grayned*, 408 U.S. at 108; *see also*, *Wunsch*, 84 F. 3d at 1119.

[24] *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982); *California Teachers Assoc. v. Board of Education*, 271 F.3d 1141, 1150 (2001); see also, *Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005).

[25] *Village of Hoffman Estates*, 455 U.S. at 495 (emphasis added).

-7-

1   thus independently requiring a heightened vagueness scrutiny.[26] Under these

2   circumstances, courts require statutes to provide a greater degree of specificity and

3   clarity than would be necessary under ordinary due process principles.[27]

4        The vagueness doctrine applies even if HB 2281 does not touch on First

5   Amendment rights.[28] A common thread in all vague statutes is "a sanction, whether

6   it be penal or a refusal to grant a license, for allegedly engaging in certain conduct

7   proscribed by a statute,"[29] and "the exaction of obedience to a rule or standard which

8   [is] so vague and indefinite as really to be no rule or standard at all."[30] These flaws

9   are evident in HB 2281, thus both criteria are satisfied.[31]

10              **2.    Overbreadth**

11        In a facial challenge to an overbroad statute, it is the plaintiff's burden to

12   establish "that no set of circumstances exists under which the statute would be valid,

13   or that the statute lacks any plainly legitimate sweep.[32] When the First Amendment

14   is implicated, the bar is lower, where "a law may be invalidated as overbroad if a

15   substantial number of its applications are unconstitutional, judged in relation to the

---

[26] See *infra* at part V., pp. 41-46.

[27] *Ibid.*

[28] The Supreme Court has considered claims that laws regulating economic and professional activity are vague, even where there is no criminal enforcement and no First Amendment rights affected. See *Village of Hoffman Estates,* 455 U.S. at 497-505; *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 48-49 (1966); *Barsky v. Bd. of Regents*, 347 U.S. 442, 443, 448 (1954); *Neblett v. Carpenter,* 305 U.S. 297, 302-03 (1938); *A.B. Small Co. v. Am. Sugar Refining Co.*, 267 U.S. 233, 239 (1925).

[29] *U.S. v. David H.*, 29 F.3d 489, 491 (9th Cir. 1994), quoting *U.S. v. Jordan*, 747 F.2d 1120, 1130 (7th Cir. 1984).

[30] *A.B. Small Co.*, 267 U.S. at 239.

[31] Neither State Superintendent Horne or Huppenthal or even Cambium offer any definitions to A.R.S. §§111 and 112. The Horne and Huppenthal Findings merely reflect subjective interpretations absent any line of demarcation. State Superintendents Horne and Huppenthal appear to know a violation when they see it, but cannot define how or why such exists.

[32] *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*, 607 F.3d. 1178, 1196 (9th Cir. 2011), citing *U.S. v. Stevens*, 130 S.Ct. 1577, 1587 (2010).

statute's plainly legitimate sweep."[33] The Court's first task "is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."[34] The Court must then "determine whether the enactment reaches a substantial amount of protected conduct."[35] To do so,

> a court shall evaluate the ambiguous, as well as the unambiguous scope of the enactment. To this extent, the vagueness of a law affects overbreadth analysis. The Supreme Court has long recognized that ambiguous meanings cause citizens to 'steer far wider' of the unlawful zone. . . than if the boundaries of the forbidden areas were clearly marked.[36]

## III.    HB 2281 IS UNCONSTITUTIONAL ON ITS FACE.

A statute may be facially unconstitutional in one of two ways: either it is unconstitutional in every conceivable application, or it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad.[37] In the first type of facial challenge, the plaintiff argues that the statute could never be applied in a valid manner because it is unconstitutionally vague or that it impermissibly restricts protected activity.[38] The second type of facial challenge is an exception to the general standing requirements: the plaintiff argues that the statute is written so broadly that it may inhibit the constitutionally protected speech of third parties, even if her own speech may be prohibited.[39] "A successful challenge to the facial constitutionality of a law invalidates the law itself."[40] In this case HB 2281 is both facially vague and overbroad.

//

---

[33] *Ibid.*

[34] *U.S. v. Stevens*, 130 S.Ct. 1577, 1587 (2010).

[35] *Ibid.*

[36] *Village of Hoffman Estates*, 455 U.S. at 495.  (Citations omitted).

[37] *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (citations omitted).

[38] *Ibid.*

[39] *Ibid.*

[40] *Ibid.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## A.   HB 2281 Is Unconstitutionally Vague and Impermissibly Burdens First Amendment Rights.

HB 2281 is fatally flawed for vagueness because: (1) it punishes people for behavior they could not have known was illegal, (2) allows subjective enforcement based on "arbitrary and discriminatory enforcement" by government officers; and (3) has a chilling effect on the exercise of First Amendment freedoms.[41] This statutory challenge premised on vagueness requires close examination of the actual language of A.R.S. §§15-111 and 112. The Court should interpret the law as would the Supreme Court of Arizona.[42] A primary goal is to "discern and give effect to legislative intent."[43] The Court should "construe the statute as a whole, and consider its context, language, subject matter, historical background, effects and consequences, and its spirit and purpose."[44] Before invalidating a state statute on its face, a federal court must determine whether the statute is "readily susceptible" to a narrowing construction by a state court.[45] No Arizona court has construed HB 2281 nor is there any proceeding pending before any judge of the Superior Court of the State of Arizona or any appellate court.

HB 2281 contains no definitions, no terms with settled legal meanings and no narrowing context.[46] The application of the statute depends entirely upon the subjective judgment of the incumbent Superintendent of Public Instruction. When a statute requires the application of "wholly subjective judgments without statutory definitions, narrowing context or settled legal meanings" it is invalidated for facial

---

[41] *Foti,* 146 F.3d at 638, citing *Grayned*, 408 U.S. at 108-09.

[42] *Planned Parenthood of Idaho v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004).

[43] *Arizona Dept. of Revenue v. Action Marine, Inc.*, 218 Ariz. 141, 143 (2008).

[44] *People's Choice TV Corp. v. City of Tucson,* 202 Ariz. 401, 414 (2002) (citation omitted).

[45] *Cal. Teachers Assoc.,* 271 F.3d at 1147.

[46] *Cf. Holder v. Humanitarian Law Project,* 130 S.Ct. 2705, 2728 (2010) (Congress added clarity to the statute by providing narrowing definitions of terms and explaining when a violation of the statute occurs.)

-10-

vagueness.[47] The subjective and unsettled meaning of words creates an impermissible risk of differing interpretations.[48] This infirmity is not limited to A.R.S. §§15-112(A) and (B).  The same is true of A.R.S. §15-111, (preamble to HB 2281) and A.R.S. §§15-112(E)(3),(4) and (F)("exceptions"), which are also impermissibly vague in violation of the Due Process clause.

### 1.   HB 2281 Does Not Provide a Reasonable Opportunity to Know What Constitutes Courses or Classes That Promote the Overthrow of the United States Government and Chills Free Speech.

The Supreme Court has examined the ambiguities inherent in attempting to determine what constitutes advocating the overthrow of the government. In *Keyishian v. Bd. of Regents*, the Court struck down a statute that required state employees to attest that they had never been a member of a group that "taught or advocated the doctrine that the Government of the United States. . .should be overthrown or overturned by force, violence or any unlawful means."[49]  Under that vague statute, a teacher could not know "the extent, *if any*, to which [an offending] utterance must transcend mere statement about abstract doctrine" or "the extent to which it must be intended to *and* tend to indoctrinate or incite to action in furtherance of the defined doctrine."[50] The Court famously illustrated the absurdity of the task by asking, "Does the teacher who carries a copy of the Communist Manifesto on a

---

[47] *U.S. v. Williams*, 553 U.S. 285, 306 (2008), citing *Coates v. City of Cincinnati,* 402 U.S. 611, 614 (1971); *Reno v. ACLU*, 521 U.S. 844, 870-71 (1997).

[48] See *Coates*, 402 U.S. at 614 ("conduct that annoys some people does not annoy others"); *Connally v. General Construction Co.*, 269 U.S. 385, 394 (1926)("For the vice of the statute here lies in the impossibility of ascertaining, by any reasonable test, that the Legislature meant one thing rather than another").

[49] 385 U.S. 589, 592 (1967); *see also Baggett v. Bullitt*, 377 U.S. 360, 362 (1964)(invalidating a statute precluding public employment of a person who advocates any person to commit or aids in the commission of any act intended to overthrow the United States government).

[50] *Keyishian*, 385 U.S. at 599 (emphasis added).

-11-

public street thereby advocate criminal anarchy?"[51]

Superintendent Horne's Finding proves the dilemma faced by the teachers where he faults the MAS program for presenting a Mexican perspective of the 1836 Battle of the Alamo between Texan insurgents and the Mexican army.[52] In a classroom, a MAS teacher may ask, who are the rebels and who are the patriots? Are the historical figures who died there martyrs, thieves or terrorists? Did the insurgents instigate a war against a sovereign nation? In this setting, does the discussion of the Mexican American War in a context that is critical of the United States constitute "promotin[g] the overthrow of the United States government" in violation of subsection 112(A)(1)?  Superintendent Horne suggests that it does.[53] However, the First Amendment dictates the opposite conclusion.

In order to protect the classroom's vital "marketplace of ideas," the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom."[54]  Since, "[o]ur Constitution does not permit the official suppression of *ideas,*" the State of Arizona cannot prohibit teachers from teaching about the Battle of the Alamo from the historical perspective of the Mexican American people.[55]  But HB 2281 does not allow teachers to know whether such a classroom lesson critical of the United States would constitute a course which "promotes the overthrow of the United States government" in violation of subsection 112(A)(1). This uncertainty chills First Amendment rights by forcing teachers and school districts to "restrict their

---

[51] *Ibid.* In this instance, does a teacher who utilizes "Occupied America" "advocate ethnic solidarity" in violation of subsection 112(A)(4)?

[52] Horne Finding, p. 7.  In criticizing the Mexican American perspective presented, Superintendent Horne ignores the fact that MAS students also use the regular district-adopted text books. PSOF 102.

[53] See Horne Finding, p. 7, (Superintendent Horne finds it "strange to find a textbook in an American public school taking the Mexican side of the battle at the Alamo.").

[54] *Keyishian*, 385 U.S. at 603.

[55] See *Bd. of Educ. Island Trees v. Pico*, 457 U.S. 853, 871 (1982)(emphasis in original).

conduct to that which is unquestionably safe."[56] Subsection 112(A)(1) lacks the clarity and specificity required to notify educators when their courses, texts or words could be construed as promoting the overthrow of the government and must be invalidated as unconstitutionally vague.

## 2. HB 2281 Does Not Provide a Reasonable Opportunity to Know What Constitutes Courses or Classes That Promote Resentment Toward a Race of Class of People and Chills Free Speech.

To "promote" means "to help or encourage to exist or flourish."[57] "Resentment" is defined as "the feeling of displeasure or indignation at some act, remark, person, etc., regarded as causing injury or insult."[58] Thus, to "promote resentment" toward a race or class of people is to encourage a feeling of displeasure regarded as causing injury or insult toward a race or class of people.

Determining what promotes the feeling of displeasure regarded as causing injury or insult is entirely subjective. Whether a class, topic, text or words "promotes resentment" is not based upon a teacher's own objective behavior, but on the subjective viewpoints of others.[59] In *Tucson Women's Clinic*, the Ninth Circuit struck down an Arizona regulation requiring that abortion providers treat patients with "consideration, respect, and full recognition of the patient's dignity and individuality."[60] In addition to the problem of subjecting physicians to sanctions based upon the subjective viewpoints of others, the court declared that "understandings of

---

[56] *Baggett*, 377 U.S. at 372; see also, *Hunt v. City of Los Angeles*, 638 F.3d 703, 713 (2011).

[57] See definition from dictionary.com available at http://dictionary.reference.com/browse/promote (last accessed 9/5/11).

[58] See definition from dictionary.com available at http://dictionary.reference.com/browse/resentment (last accessed 6/30/11).

[59] See *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004),citing *Woman's Med. Ctr. of N.W. Houston*, 248 F.3d 441, 422 (5th Cir. 2001); see also, *Wunsch*, 84 F.3d at 1119 (a statute prohibiting attorneys from displaying an "offensive personality" could "refer to any number of behaviors" and "it would be impossible to know when such behaviors would be offensive enough to invoke the statute.")

[60] 379 F.3d at 555.

the words...are widely variable."[61] The regulation was "too vague and subjective for providers to know how they should behave in order to comply, as well as too vague to limit arbitrary enforcement."[62] In this case, the term "promote resentment" is equally subjective and variable, and equally invites subjective discriminatory enforcement.

The guarantee of Due Process requires that statutes "must be intelligible, defining a 'core' of proscribed conduct that allows the common person to understand whether their actions will result in adverse consequences."[63] The prohibition against classes that "promote resentment" does not define any "core" of proscribed conduct to guide educators. It is impossible for any teacher, school board member, or indeed the Superintendent of Public Instruction to objectively know when a course or class promotes resentment. Thus, those governed by the statute are vulnerable to the whim of the subjective interpretation of the State Superintendent of Public Instruction, who can draw the line where ever he likes. That is the danger of a vague law and what renders it fatally flawed.[64]

The ideas that flow from a Mexican American perspective of U.S. history, government, literature and art, and that are presented within the context of the MAS program approved by the TUSD Governing Board, are essential for the purposes of classroom discussion and debate and are within the contours of the Free Speech clause of the First Amendment. A classroom is a place revered for the vital exchange of ideas, values and perspectives.[65] Regardless whether a topic touches

---

[61] *Ibid.*; see also, *Hunt,* 638 F.3d at 711 (Ordinance is unconstitutionally vague where it fails to define or provide any examples of the proscribed behavior.)

[62] *Ibid.*

[63] *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000) (citation omitted).

[64] See e.g*., Smith v. Goguen*, 415 U.S. 566, 577 (1974)("This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the due process clause.  The deficiency is particularly objectionable in view of the unfettered latitude thereby accorded law enforcement officials and triers of fact.").

[65] *Keyishian*, 385 U.S. at 603.

on a controversial political, legal or ideological concept, such exchanges have the inherent potential to open minds and conceivably to promote resentment.[66]

A.R.S. §15-112 presumably prohibits a classroom discussion of *jihad* and the attacks of September 11, 2001, because it could result in some students fostering a bitterness towards Muslims. The same is equally true of the recent killing of Osama Bin Laden that has spurned a debate concerning the circumstances under which a government may kill a person, including a citizen of the United States. And a class debate over Arizona policies regarding undocumented immigration, such as SB 1070, could cause some students to resent some white State policymakers or undocumented Latinos.[67] The Supreme Court feared such a stifling of expression in *Baggett*, stating that "[i]t would not be unreasonable for the serious-minded oath-taker to conclude that he should dispense with lectures voicing far reaching criticism of any old or new policy followed by the Government of the United States."[68]

In this case it is impossible for any person of reasonable intelligence to know where the line is drawn. No teacher should work  in fear of the heavy hand of the law when teaching about events or topics that have the potential to stir passions. This statute forces educators to choose between fulfilling their obligation to impart knowledge to their students or alternatively, foregoing that duty and with it, the "wide exposure to that robust exchange of ideas which discovers truth out of a multitude

---

[66] The murals of David Alfaro Siqueiros are an example of extraordinary art that has been lauded and criticized within the United States. Currently there is a major restoration effort in downtown Los Angeles on Olvera street to restore the Siqueiros mural that was painted over in the 1930's because it was considered to too controversial and un-American.

[67] It is reasonable to conclude that Superintendent Huppenthal would consider use of Randall Kennedy's most recent book "The persistence of the Color Line, *Racial Politics and the Obama Presidency"* Pantheon Books 2011 and "Malcom X, A Life of Reinvention" Manning Marable, Viking 2011,works that violate HB 2281 if used in the MAS history or government classes. Banning these scholarly works because they may make the reader uncomfortable is pernicious and contrary to Due Process.

[68] *Baggett*, 377 U.S. at 371.

of tongues, [rather] than through any kind of authoritative selection."[69] Subsection 112(A)(2)'s prohibition of classes that "promote resentment" violates the Due Process and First Amendment rights of all teachers and students and cannot be objectively enforced.

### 3. HB 2281 Does Not Provide a Reasonable Opportunity to Know What Constitutes Courses or Classes That Are Designed Primarily for Pupils of a Particular Ethnic Group and Chills Free Speech.

By banning courses that "are designed primarily for pupils of a particular ethnic group," subsection 112(A)(3) creates yet another subjective standard that provides no guidance to determine the circumstances under which a program may be found in violation. The subjective nature of the inquiry as to whether a course or program violates this provision within the statute chills development and implementation of innovative curricula that expand upon traditional courses, and inescapably invites discriminatory enforcement.[70]

Subsection 112(A)(3) could reasonably be interpreted as prohibiting courses attended primarily by pupils of a particular ethnic group.[71] If the majority of students in a class devoted to African American history are African Americans, could the class be banned? What if a class on Latin American history is offered in the interest of providing a more in-depth range of the study of world history, but is taken by mostly Latino students? Is the large proportion of Latino students sufficient grounds to ban the class?

Could any class with a large proportion of Latino students be banned? In this

---

[69] *Keyishian*, 385 U.S. at 603 (internal citation omitted); see also, *Cal. Teachers' Assoc.*, 271 F.3d at 1158 (Tashima, J., dissenting)(Statute places teachers in the dilemma of either fulfilling legal and professional duties and exposing themselves to liability, or ignoring teaching obligations in order to steer clear of a vague restriction.)

[70] See *Grayned*, 408 U.S. at 108; *Hunt*, 638 F.3d at 712-13.

[71] Both Superintendents Huppenthal and Horne rely upon this interpretation to support alleged violations of subsection 112(A)(3). See Huppenthal Finding, p. 2 and Horne Finding, p. 2.

case, it is significant that TUSD offers MAS classes at schools having a higher proportion of Latino students than in the district as a whole. Thus, the fact that 90% of students in MAS classes are Latino, as opposed to 61% in all of TUSD, reflects the higher proportion of Latinos in those schools.[72] The undefined term "designed primarily for pupils of a particular ethnic group," does not allow those who design academic courses to know when any course that touches upon a specific ethnicity will be found in violation.

### 4. HB 2281 Does Not Provide a Reasonable Opportunity to Know What Constitutes Courses or Classes That Advocate Ethnic Solidarity Instead of Treatment of Pupils as Individuals and Chills Free Speech.

Subsection 112(A)(4) prohibits classes that "[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals." The Ninth Circuit has already found the word "individuality" to be unconstitutionally vague. In *Tucson Women's Clinic*, the court struck down a regulation requiring physicians to treat patients in recognition of their "individuality" on the basis that the understanding of the meaning of "individuality" varies widely.[73] Treating "pupils as individuals" is likewise vague.

"Solidarity" is defined as, "union or fellowship arising from common responsibilities and interests, as between members of a group or between classes, peoples, etc."[74] Therefore, to promote ethnic solidarity means to promote fellowship arising from common interests between members of an ethnic group. Subsection 112(A)(4) is another prohibition which requires determination of the subjective state of mind of others.[75] Teachers cannot reasonably know what classroom material or discussions about ethnic groups might promote fellowship [76]

---

[72] Ct. Doc. No. 84-1, Cambium Audit, pp.5-6.

[73] 379 F.3d at 555.

[74] See definition from dictionary.com available at http://dictionary.reference.com/browse/solidarity (last accessed 9/8/11).

[75] See *Tucson Women's Clinic,* 379 F.3d at 555.

[76] See *Hunt*, 638 F.3d at 711 ("terms have such amorphous meanings that it makes it difficult, if not impossible, for an individual to determine whether his conduct is

Subsection 112(A)(4)'s vagueness is further heightened by the illogical assumption that anything that might be construed as fellowship arising from common interests between members of an ethnic group necessarily means that the teacher does not treat those students as individuals. This *non sequitur* ignores the fact that students who understand and take pride in their ethnicity, culture, history, literature and language have the capacity to possess a broad perspective that is the foundation of the development of a strong sense of individual identity and confidence upon which success in academics and social interactions thrive. Contrary to the implication of the statute, group and individual identity are not mutually exclusive, but mutually dependent.

Consequently, all teaching, class discussions, texts and materials about identifiable groups, policies, or ideologies that appear to support cultural or national identity will place school districts in potential jeopardy. A discussion of Black History Month or Hispanic Heritage Month might be construed as advocating ethnic solidarity, as could studying the history and meaning of holidays such as Juneteenth or Cinco de Mayo. Also off-limits would be the study of social movements, such as the American Indian Movement or the NAACP. As an example in the classroom context, a teacher might present material about historical events such as the 1942 Zoot Suit Riots in Los Angeles, Cesar Chavez and the Farm Worker movement, or the symbolism of the Virgin de Guadalupe and be accused of promoting fellowship among Mexican Americans.[77]

These statutory terms lack a common interpretation or application, and in the public school setting are subject to an infinite number of applications. As a result,

_____

proscribed by the ordinance.").

[77] If course material focused on the use of the Navajo code-talkers during the second World War and contrasted that with the prohibition of speaking Navajo at the federal Indian Boarding Schools, such as the Phoenix Indian School, the lesson could be contrary to HB 2281 for promoting solidarity and resentment.

they will invariably be applied inconsistently, subjecting teachers and school districts to scrutiny and sanctions for doing what is allowed and proscribed, but never knowing where are the boundaries between the two.

### 5. A.R.S. §15-112(E) and (F) Do Not Provide a Narrowing Construction and Render the Statute More Vague.

"A key factor in analyzing whether a law is unconstitutionally vague is to determine the breadth of the statute's proscription in light of the enumerated exceptions."[78] In HB 2281, the exceptions entirely fail to narrow the  proscriptions. To the contrary, the circuitous exceptions to subsection (A) provide further ambiguity to a statute devoid of clarity, common understanding or any possibility of uniform enforcement. Moreover, Superintendent Huppenthal's failure to apply subsections (E) and (F) further illustrate the facial invalidity of the statute.[79]

Subsections 112(E) and (F) exclude from violations any courses or classes that include "the history of any ethnic group," the "discussion of controversial aspects of history," and "the instruction of the holocaust, any other instance of genocide, or the historical oppression of a particular group of people based on ethnicity, race, or class."[80] Similar to the prohibitions, the meaning of these terms are undefined and left up to the discretion of the State Superintendent.

  For example, HB 2281 presents a teacher of United States history with a profound dilemma when she examines with her students the role of immigration in shaping the demographic composition of our country at different points in our history. Does the fact that the immigration debate still rages, saturates the media and is a contemporary topic mean that the historical topic of immigration is allowed under

---

[78] *Nunez v. City of San Diego,* 114 F.3d 935, 940 (9th Cir. 1997).

[79] See *Comite de Jornaleros v. City of Redondo Beach*, 2011 U.S. App. LEXIS 19212, 19 (9th Cir. 2011), citing *Forsythe County v. Nationalist Movement,* 505 U.S. 123, 131 (1992)(In evaluating a facial challenge, the Court must "consider [an agency's] authoritative constructions of the [statute], including its own implementation and interpretation of it.")

[80] A.R.S. §12-115(E)(3), (4) and (F).

subsection 112(E)(4) as a "controversial aspect of history" but the current topic is not? There is no predictable answer. Likewise, when a teacher presents texts detailing the history of the Chicano movement and the ideas of Chicano leaders who fought against government-imposed discrimination, he would have no idea whether he could be "promoting resentment" in violation of subsection 112(A)(2) or within subsection 112(F)'s exception for instruction on the "historical oppression" of a particular ethnic group. Educators will find no guidance in the Findings issued by Superintendents Huppenthal and Horne, as neither mentions subsections (E) or (F).

The exceptions multiply the vagueness of the prohibitions in subsection (A), as every teacher will be unsure whether certain class content is permitted, prohibited or excepted. This will unavoidably result in chilling and therefore limit what is presented to students.

### 6. HB 2281 Allows the Superintendent to Arbitrarily and Discriminatorily Enforce the Statute.

In this action involving classroom learning, the requirement that the legislature establish minimal guidelines to govern enforcement of the law is "the most meaningful aspect of the vagueness doctrine."[81] Here it is clear, not only that HB 2281 invites discriminatory enforcement, but that selective enforcement was the driving force behind HB 2281 and that it has already twice been discriminatorily enforced. The legislature intended for the Superintendent to arbitrarily enforce the statute by granting him the unchecked power to find violations of an ambiguous and chilling statute. The statute has no definitions, standards, guidelines or examples to restrict or guide the State Superintendent's authority at any of the many junctures of his decision-making authority.

In addition to the power to determine statutory violations, HB 2281 grants the

---

[81] *Smith*, 415 U.S. at 574 (in a noncommercial context where behavior is not mapped out in advance on the basis of statutory language, the most meaningful aspect of the vagueness doctrine is not actual notice, but the requirement that a legislature establish minimal guidelines to govern law enforcement).

State Superintendent the exclusive authority to impose the penalty of a ten percent cut in funding if he concludes that a district has not come into compliance after issuing a Finding of violation.[82] The State Superintendent also has the discretion to determine when a district has come into compliance, so as to restore its right to full funding.[83] However, the statute gives no standards as to how the State Superintendent should make any of these determinations. Finally, even after an administrative hearing, the State Superintendent has the sole authority to accept, reject or modify the ALJ's Findings of Fact or Conclusions of Law.[84] As proved by the unlimited discretion granted to the State Superintendent by HB 2281, the Arizona Legislature failed to fulfill its constitutional obligation to establish minimal guidelines to govern enforcement of the law.

The Supreme Court confronted a similarly standardless statute in *City of Chicago v. Morales*, where police officers were granted absolute discretion to determine what activities constitute loitering.[85] In that case, the principal source of the vast discretion conferred on the police was the fact that the police were in total control of the definition of "loitering".[86] Similarly, HB 2281 grants the State Superintendent absolute discretion to determine what constitutes a violation of the statute.

The Constitution prohibits laws like HB 2281 that impose penalties under a standard so indefinite, that the State Superintendent is free to react to nothing more than his own personal preferences against learning about history, government,

---

[82] A.R.S. §15-112(B).
[83] *Ibid.*
[84] See A.R.S. §41-1092.08(B).
[85] 527 U.S. 41, 61 (1999).
[86] *Ibid.*; *cf. Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997)(striking down a statute as vague for failing to define "loiter.")

1  literature or art from a Mexican American perspective.[87] HB 2281 is so standardless

2  that it "encourages seriously discriminatory enforcement" in violation of the plaintiffs'

3  right to Due Process thus mandating its invalidation.[88]

4  **B.   HB 2281 Is Overbroad And Burdens First Amendment Rights.**

5  "Facial challenges to legislation have been permitted in the context of the *First*

6  *Amendment* when the legislation allegedly vests government officials with unbridled

7  discretion. The rationale is that 'every application of the statute creates an

8  impermissible risk of suppression of ideas.'"[89] In the academic context, the Ninth

9  Circuit in *Adamian v. Jacobsen,* recognized that "[t]he desire to maintain a sedate

10 academic environment, 'to avoid the discomfort and unpleasantness that always

11 accompany an unpopular viewpoint,' is not an interest sufficiently compelling,

12 however, to justify limitations on a teacher's freedom to express himself on political

13 issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant

14 terms."[90]

15 In *U.S. v. Stevens,* the Supreme Court examined whether a statute which

16 prohibited a broad range of depictions of animal cruelty reached a substantial

17 amount of protected activity.[91] While the statute's aim was to eliminate the market

18 for "crush videos," featuring the intentional torture and killing of helpless animals, the

19 text did not require that depictions be "cruel" and encompassed any type of illegal

20

21

22 [87] See *Smith,* 415 U.S. at 568-69, 578, (flag-misuse statute subjects individuals

23 "to criminal liability under a standard so indefinite that police, court and jury were free to react to nothing more than their own preferences for treatment of the flag.")

    [88] *Holder*, 130 S.Ct. at 2718.

24 [89] *Baby Tam v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir. 1998), citing *City*

25 *Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789,798 n.15 (1984) (emphasis added); see also, *Foti*, 146 F.3d at 638 (Courts invalidate ambiguous

26 statutes to avoid subjective enforcement of the laws based on "arbitrary and

27 discriminatory enforcement" by government officers)(citations omitted.)

    [90] 523 F.2d 929, 934 (9th Cir. 1975).

28 [91] 130 S.Ct. at 1582.

-22-

killing of an animal, whether cruel or not.[92] The Court noted that the statute was so overbroad as to prohibit some instructional hunting videos or depictions of livestock slaughter, and that the presumptively impermissible applications of the statute far outnumbered the permissible ones.[93]

HB 2281 similarly ensnares a substantial amount of clearly protected speech. Although it has always targeted TUSD's MAS program, the wording of the statute reaches far beyond, into all Arizona public and charter school classrooms, kindergarten through twelfth grade. The prohibition on classes "promot[ing] the overthrow of the United States government would prohibit a discussion of the provision of the Declaration of Independence stating that it is the "Right of the people to alter, or abolish [that form of government], and to institute new Government," and "it is their Right, it is their Duty, to throw off such Government."[94]

Many topics of history and literature or art images may "encourage" feelings of "displeasure" toward a particular race or ethnic group. Classes discussing slavery, the history of lynching of African Americans and Latinos and the deaths of thousands of Cherokee people forced to march on the "Trail of Tears" will create "resentment toward a race or class of people" in some students.[95] As would classes where the experiences of white settlers in Arizona, in which the violent and deadly raids by Apaches on the settlers are studied. Racial and religious groups are disparaged in many books commonly read by high school students, such as: *To Kill a Mocking Bird, The Bluest Eye, The Canterbury Tales, Huck Finn, The Great Gatsby, Othello,* and *The Scarlet Letter.* Other common books detail the evil of discrimination and oppression: *The Diary of Anne Frank, Their Eyes Were Watching God, Black Boy,*

---

[92] *Stevens*, 130 S.Ct. at 1583, 1588.

[93] *Stevens*, 130 S.Ct. at 1588, 1592.

[94] *Declaration of Independence*, ¶2 (1776); A.R.S. §15-112(A)(1).

[95] In the administrative hearing against TUSD, Superintendent Huppenthal has proved this point by introducing photos of lynchings of Mexican Americans contained in MAS curricular materials as a violation of HB 2281. Copy provided at PSOF Exhibit C.

*Native Son, Farewell to Manzanar, Black Like Me,* and *The Invisible Man.* Social studies classes teach many historical and current events that may encourage feelings of displeasure toward a particular race or ethnic group: The Spanish conquistadors in the New World, the Civil War, the Mexican American War, World Wars I and II, the Korean War, the Vietnam War, the wars in Iraq and Afghanistan, colonization, the labor union movement, the civil rights movement, slavery, Jim Crow, *Brown v. Board of Education*, Manifest Destiny, immigration, the TEA party, and the Freedom Riders. A discussion of the Black Panther party and the American Indian Movement would be prohibited as "advocat[ing] ethnic solidarity."

Finally, the Court must consider whether the statute is "readily susceptible" to a limiting construction."[96] Superintendents Huppenthal and Horne have demonstrated that the exclusions contained in subsections 112(E) and (F) are meaningless and insufficient to rescue any of the above from being prohibited by the statute.[97] Both State Superintendents found numerous violations, none of them saved by the exclusions.

In sum, the undeniable overbreadth of A.R.S. §15-112 prohibits teaching important topis and facts of every United States history class in Arizona. This statute attempts to "cast a pall of orthodoxy over the classroom,"[98] and in its application would stand to violate the First Amendment rights of all Arizona teachers and students.

## C.    HB 2281 Is Not Severable.

Severability is a question of legislative intent.[99] The fact that the legislature did not provide A.R.S. §15-112 with a severability clause is a factor to consider.[100] The

---

[96] *Stevens,* 130 S.Ct. at 1591-92.
[97] See *infra,* at part IV, pp. 26-41.
[98]  *Keyishian*, 385 U.S. at 603.
[99] *State v. Pandeli*, 215 Ariz. 514, 530 (2007); citing State *v. Watson*, 120 Ariz. 441, 445 (1978).
[100] See *Ruiz v. Hull*, 191 Ariz. 441, 459 (1998).

1   Arizona Supreme Court will sever a statutory provision only if it can determine that

2   "(1) the valid portions are effective and enforceable standing alone and (2) the

3   legislature would have enacted the valid portions of the statute absent the invalid

4   provision."[101]

5       If the Court finds that subsection 112(B) provides the Superintendent with

6   enforcement powers so standardless that they encourage arbitrary and

7   discriminatory enforcement, then the remainder of the statute must also be struck

8   down.  The legislature did not intend that subsection 112(A)'s prohibitions be merely

9   aspirational; the remainder of the statute cannot stand alone without enforcement

10  provisions.

11      It seems unlikely that any of the four subsections of 112(A) could be

12  eliminated without impairing the viability of §15-112's general scheme. Because

13  subsection 112(A) represents the central criteria for enforcement, invalidation of any

14  of the subsections would likely yield an invalidation of all other related statutory

15  provisions in both §15-112 and Declaration of policy in §15-111. Both the

16  Declaration of the policy and the legislative record shed light on the relative

17  importance of the four subsections. The Declaration of policy states that, "The

18  legislature finds and declares that public school pupils should be taught to treat and

19  value each other as individuals and not be taught to resent or hate other races or

20  classes of people."[102] This language strongly underscores the importance of

21  subsection 112(A) to the Legislature.

22      The ideas embodied in the interconnected provisions of subsection 112(A)

23  cannot be coherently extricated from the general statutory scheme of §§15-111 and

24  15-112. Thus, the invalidation of any one of these subsections or a subset of them

25  would leave any relevant remainder of §15-112 unrepresentative of the legislative

26

27

28

---

[101] *Hull v. Albrecht,* 192 Ariz. 34, 39-40 (1998) (citation omitted).

[102] A.R.S. §15-111.

intent. To the extent that the legislature sought to ensure that courses or classes that include the concepts described in subsections 112(E) and (F) must not be found in violation of subsection 112(A), the invalidation of those exceptions would also result in a statutory framework the Legislature would have been unlikely to approve. In such a case, the failure of any of the aforementioned provisions would substantially deviate the meaning of §§15-111 and 15-112 from the legislative intent which made their enactment possible, and consequently render any other related provisions non-severable. In the case at bar, invalidation of either §15-111's Declaration, any of the subsections in §15-112(A)(1)-(4), the exceptions in §§15-112(E)(3), (4) and (F), or any combination thereof would likely result in the failure of any other related provisions that still remain.

## IV.   A.R.S. §15-112 IS UNCONSTITUTIONALLY VAGUE AS APPLIED

**The applications of HB 2281 by State Superintendents Huppenthal and Horne are vague in all three respects.**

### A.   The Findings Do Not Provide  A Reasonable Opportunity To Know What Speech Is Prohibited.

The first way in which a statute may be void for vagueness is if it fails to give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited.[103]  Both Findings fail to provide notice sufficient to inform the plaintiffs precisely how MAS is alleged to have violated HB 2281.

#### 1.   The Findings Do Not Provide a Reasonable Opportunity to Know What Constitutes Speech That Promotes Resentment Toward a Race or Class of People.

To sustain his finding of a violation of subsection 112(A)(2), Superintendent Huppenthal claims to rely on materials containing content "which are **clear violations** of subsection A(2)."[104] The Finding further states that "[e]xamples of such content include:

---

[103] *Grayned*, 408 U.S. at 108.
[104] Huppenthal Finding, p. 2 (emphasis added).

1
2
3

"Reviewed materials repeatedly reference white people as being 'oppressors' and 'oppressing' the Latino people.
Reviewed materials present only one perspective of historical events, that of the Latino people being persecuted, oppressed, and subjected by the 'hegemony'-or white America."[105]

4   Superintendent Huppenthal does not identify the materials or books containing the

5   "oppression" language, nor does he identify when, how, or if the materials were used

6   in class. Most importantly, nowhere does Superintendent Huppenthal attempt to

7   describe how the use of materials with references to "oppression" have arguably

8   resulted in the encouragement of displeasure toward a race or class of people, *i.e.*

9   how these materials constitute "clear violations" of the statute.[106]

10          The Finding reveals that State Superintendent Huppenthal makes an *a priori*

11  judgment that teaching about "oppression" necessarily promotes resentment and is

12  therefore prohibited by the statute. If his assumption is correct, then the statute

13  outlaws teaching about racism. Yet, it is impossible to teach a competent class about

14  U.S. history and society without teaching about racism and oppression. The phrase

15  "promote resentment" is so vague as to allow Superintendent Huppenthal to reach

16  an absurd conclusion.

17          Moreover, the precise nature of what State Superintendent Huppenthal finds

18  to be prohibited by subsection 112(A)(2) is further clouded by his silence on the

19  applicability of subsections 112(E) and (F)'s exceptions for "discussion of

20  controversial aspects of history" and for the instruction of "the historical oppression"

21  of a particular ethnic group. By failing to explain why the exceptions do not apply, the

22  Finding fails to provide notice as to specifically what is prohibited and what is

23  allowed.

24          Superintendent Huppenthal's failure to apply subsections 112(E) and (F)

25  directly contradicts his  arguments urged in response to the plaintiffs' first Motion for

26

27          _____

28          [105] *Ibid.*
           [106] *Ibid.*

Summary Judgment, which he filed twelve days after issuing his Finding.[107] There he stated that the exceptions were included in the statute "to clarify and narrow how broadly the statute can be applied" and that many of the plaintiffs' concerns are "wholly undermined by the narrowing provisions of subsections (E) and (F)."[108]  In light of State Superintendent Huppenthal's attack on teaching the concept of oppression and controversial aspects of history without mention of the statutory exceptions, it is clear that subsections (E) and (F) do not "undermine" plaintiffs' concerns at all, but bolster them.

Also in his earlier brief, State Superintendent Huppenthal wrote that subsection (E) "makes clear" that no district can be penalized for implementing courses that include "controversial aspects of history."[109] But he has penalized TUSD precisely for doing so.[110] Additionally, Superintendent Huppenthal claimed that subsection (F) "makes clear" that the statute "should be construed narrowly so that 'instruction of the historical oppression of a particular group of people based on ethnicity, race or class' is *not* prohibited by the restrictive language of subsection (A)."[111] Since Superintendent Huppenthal has penalized TUSD based on materials that present "historical events" in the context of the oppression of Mexican Americans, it is clear that he has ignored his own standard.[112]

From his Finding, we do not know why Superintendent Huppenthal finds the topic of "oppression" to be in violation of subsection 112(A)(2), despite the existence of subsection (F)'s exception for teaching about "historical oppression." If he argues that teaching about "historical oppression" is permitted, but teaching about

---

[107] Ct. Doc. No. 57, p. 20, filed June 27, 2011.
[108] *Ibid.*
[109] *Ibid.*
[110] "Reviewed materials present only one perspective of historical events, that of the Latino people being persecuted, oppressed, and subjected by the 'hegemony'-or white America." Huppenthal Finding, p.2.
[111] Ct. Doc. No. 57, p. 20.
[112] Huppenthal Finding, p. 2.

"oppression in general is prohibited, then he further demonstrates the overbreadth and vagueness of the statute. Teaching about history is inextricably bound with the present and any attempt to distinguish between "oppression" as an historical concept and the modern day consequences of that "oppression" fail. Justice Black recognized a similar dilemma where he observed, "Under this statute, as construed by the Arkansas Supreme Court, a teacher cannot know whether he is forbidden to mention Darwin's theory at all or only free to discuss it as long as he refrains from contending that it is true."[113]

The only thing that is clear from Superintendent Huppenthal's Finding is that the statute's "exceptions" not only do not serve to narrow the statute's application, but that they serve no function at all.  Superintendent Huppenthal's Finding is vague because it fails to provide a reasonable opportunity to understand what speech promotes resentment towards a race or class of people and what speech is allowed by the exceptions.

### 2. The Findings Do Not Provide A Reasonable Opportunity to Know What Speech Advocates Ethnic Solidarity Instead of the Treatment of Pupils As Individuals.

To support the alleged violation of subsection 112(A)(4), Superintendent Huppenthal relies on the same evidence offered to support a violation of subsection 112(A)(2), as well as the following:

"Reviewed curriculum and materials repeatedly emphasize the importance of building Hispanic nationalism and unity in the face of assimilation and oppression."[114]

He does not identify the materials or books reviewed. Nor does Superintendent Huppenthal identify when, how, or if the materials were used in class or in what context. Did the materials discuss the concept of building Hispanic nationalism urged by an historical figure? Did the materials concern the historical roots of the Chicano

---

[113] *Epperson*, 393 U.S. at 112 (Black, J., concurring).
[114] Huppenthal Finding, p. 2.

-29-

movement and its advocacy of pride in one's Mexican American heritage? Is the "unity" that he claims is urged by the materials a call to improve the situation of Mexican Americans? Why did Superintendent Huppenthal fail to apply the exceptions for "historical oppression" or "controversial aspects of history"? Superintendent Huppenthal fails to put the alleged violation in any context to understand how these materials advocate ethnic solidarity instead of the treatment of students as individuals in violation of the statute.

The MAS program is different from many other high school curricula in that it teaches students to think critically. Critical thinking requires students to consider a variety of viewpoints espoused by scholars, historians and activists. Superintendent Huppenthal apparently believes that the mere fact that these viewpoints are presented to students for critical analysis must mean that these viewpoints are all urged upon students to adopt as their own. He presents no evidence that this has occurred in the classrooms. The reason he cannot is because that type of exercise would be antithetical to critical thinking. Yet Superintendent Huppenthal cites to texts that students are asked to examine and comes to the simplistic conclusion that students are asked to adopt all of the beliefs contained in the texts. If he believes this is so, then why has Superintendent Huppenthal not applied A.R.S. §15-112(A)(4) against districts that have courses that teach about the doctrine of Manifest Destiny because they advocate ethnic solidarity of white settlers instead of the treatment of pupils as individuals?

Superintendent Horne's Finding also demonstrates the vagueness of subsection 112(A)(4), as well as 112(E) and (F).[115] In ordering the MAS program to

_____

[115] Although the Huppenthal Finding is the application of the statute directly at issue in the pending administrative action against TUSD, the Horne Finding has been applied, has never been withdrawn and is equally at issue. Mr. Horne's application of the statute is compelling evidence that the statute "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder*, 130 S. Ct. at 2718.

be shut down for violations of subsection 112(A), he ignored the statute's exceptions.  For example, as a violation, he cited text from *Occupied America*, taking issue with a more than 50 year-old speech by Jose Angel Gutierrez.[116]  In Superintendent Horne's opinion, the quotation of Gutierrez' exhortation to end white control over Mexicans violates an unspecified subsection of 112(A). But in his Finding, he fails to explain not only why the passage might "advocate ethnic solidarity," but why he does not apply the exceptions for "controversial aspects of history" or the "historical oppression" of Mexican Americans. Why does Superintendent Horne believe that the words of Mr. Gutierrez are any different than those spoken by figures of the American Revolution?  Or those of Texans in the 1800's?  Certainly everyone would agree that the race or ethnicity of the speaker cannot be a factor.

Subsection 112(A)(4) also is vague by virtue of the false premise that prohibits courses or classes that "[a]dvocate ethnic solidarity *instead* of the treatment of pupils as individuals."  Nowhere do Superintendents Huppenthal or Horne attempt to describe how the use of materials with references to "oppression" and "Hispanic nationalism and unity" have resulted in pupils not being treated as individuals.  There is nothing about studying the concept of "building Hispanic nationalism and unity" that is inimical to treating students as individuals. In fact, the concept is entirely irrelevant to the issue of how teachers treat their pupils. Further, Superintendents Huppenthal and Horne's failure to apply, or even mention, the statutory exceptions gives no narrowing construction to the statue to save it from unconstitutional vagueness.

//

//

---

[116] Horne Finding, p. 7. Mr. Gutierrez is an important figure in Chicano history who stood up to the historical oppression of Mexican Americans in Texas.

-31-

### 3. The Findings Do Not Provide A Reasonable Opportunity to Know What Constitutes Classes or Courses Designed Primarily For Pupils of a Particular Ethnic Group.

The ambiguity of the term "classes or courses designed primarily for" is illustrated by the fact that the Cambium auditors reviewed much of the same material reviewed by Superintendent Huppenthal and came to the opposite conclusion, stating that, "A majority of evidence demonstrates that the Mexican American Studies Department's instruction is NOT designed primarily for pupils of a particular ethnic group."[117] The Cambium auditors found it important that every current course syllabus states,

> "At the core of this course is the idea that ALL people should not be required to give up their ethnic and cultural traditions in order to become part of mainstream American Society. People have the moral and legal right to maintain the knowledge and identification of their own race, ethnicity, culture, traditions, history, and language. Culture is a major indicator in the ways in which individuals communicate, seek assistance, seek recognition, intellectually process and disseminate information and it significantly impacts the way individuals learn."[118]

This statement demonstrates that one of the highest priorities of the MAS program is to value the cultures of all students, not just Latinos. TUSD's website, considered by both the Cambium auditors and Superintendents Huppenthal and Horne, describes the effect of the MAS model:

> "For Latino students, the model serves as a mirror; for non-Latino students, the model serves as a window into cultural, historical, and social understanding."[119]

This passage explicitly describes the value of the MAS model for both Latino and non-Latino students.

In Superintendent Huppenthal's mind, the phrase "designed primarily for" is so broad as to be evidenced by materials that address the reader "as being of Latino

---

[117] Cambium Audit, p. 59.

[118] *Ibid.* at pp. 59-60.

[119] TUSD Mexican American Studies website, http://www.tusd.k12.az.us/contents/depart/mexicanam/model.asp (last accessed September 6, 2011.)

or Hispanic origin."[120] Subsection 112(A)(3) is also sufficiently malleable for him to point to the fact that over 90% of the students enrolled in MAS classes are Hispanic in support of a violation.[121] It makes no difference to his analysis that the enrollment figure mirrors the greater proportion of Latino students in the select schools that offer MAS classes. The subsection is also so vague as to allow him to disregard the fact that an excerpt from the TUSD website that describes MAS as a program to "'enhance the academic success of Latino students,' *although it can benefit all students.'*"[122]

It is undisputed that Mexican Americans are the subject matter of MAS courses, that enhancement of Latino student achievement is one of the goals of the MAS program and that the great majority of students enrolled in MAS classes are Latino. It is also undisputed that MAS classes are open to all students and that students of various ethnicities can and do benefit from the classes. Yet, in Superintendent Huppenthal's mind, the term "designed primarily for pupils of a particular race" is flexible enough to disregard explicit descriptions of the MAS program's focus on students of all races and ethnicities. Under these circumstances, the Huppenthal Finding fails to provide the plaintiffs with a reasonable opportunity to know how the MAS program is designed primarily for pupils of a particular race.

**B.    The Superintendents' Enforcement of HB 2281 Is Arbitrary and Discriminatory.**

The requirement that a statute establish minimal guidelines to govern enforcement of the law is the most important aspect of the vagueness doctrine.[123] Vagueness may invalidate a statute if it "is so standardless that it authorizes or

---

[120] Huppenthal Finding, p. 2; See also Horne Finding p. 2.
[121] *Ibid.*
[122] Huppenthal Finding, p. 2.
[123] *Smith,* 415 U.S. at 574.

encourages seriously discriminatory enforcement."[124] This occurs when "[s]tatutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their **personal predilections.**"[125] HB 2281's lack of standards allows Superintendents Huppenthal and Horne to target a program because it is designed to enhance the academic achievement of Latino students and to "pursue their personal predilections" against learning literature, U.S. history and government from a Mexican American perspective[126]

Neither subsection 112(B) nor any other subsection provide definitions, examples, standards or any criteria at all to direct how the Superintendent should determine whether the MAS program is in violation. Nor does it require him to specify alleged  violations. HB 2281 is so standardless that it allows a finding of violation to be based upon nothing more than:

> "Reviewed materials repeatedly reference white people as being "oppressors" and "oppressing" the Latino people."[127]

On the other hand, in its 120-page report, Cambium concluded that "[d]uring the curriculum audit period, no observable evidence was present to indicate that any classroom within [TUSD] is in direct violation of the law, A.R.S. §15-112(A). In most cases, quite the opposite is true."[128] In response, Superintendent Huppenthal ignored Cambium's conclusions.

The arbitrary enforcement powers created by HB 2281 come to life in Superintendent Huppenthal's Findings and expose the extent to which the statute's lack of standards permit him to conjure up alleged violations in complete contradiction to the evidence and conclusions of the Cambium audit.

---

[124] *Holder*, 130 S. Ct. at 2718; *U.S. v. Williams*, 553 U.S. 285, 304 (2008); see also, *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

[125] *Smith*, 415 U.S. at 575 (emphasis added); *accord Kolender v. Lawson,* 461 U.S. 352, 358 (1983).

[126] *Smith,* 415 U.S. at 575.

[127] Huppenthal Finding, p. 2.

[128] Audit, p. 42, 50, 66-67.

1    Superintendent Huppenthal cites a few random quotes from some "reviewed
2    materials" and a few cites to TUSD's website to support his Finding that the MAS
3    program violates HB 2281, and that in the absence of unidentified changes, millions
4    of dollars will be withheld.[129]

5         The Finding does not identify the "reviewed materials" and does not specify
6    the nature of the offending materials beyond the vague statement that white people
7    are referenced as "oppressors" and that "the importance of building Hispanic
8    nationalism" is emphasized.  Superintendent Huppenthal also fails to specify where,
9    when, how, in which classrooms and courses and in what context these "materials'
10   were used with students or whether these materials were ever used with students
11   at all.  Apparently, he believes that the violations of the statute by the quoted texts
12   are self-evident, because the Finding provides no insight as to **how** the few words
13   violate the statute. According to TUSD, the Finding's lack of specificity makes "it
14   impossible for TUSD to identify and remedy the violation."[130] Because HB 2281
15   allows the State Superintendent to find violations and impose sanctions without
16   providing any of this information and with no criteria, definitions or guidelines for his
17   determinations, Superintendent Huppenthal's Finding aptly illustrates how HB 2281
18   allows him to pursue his own "personal predilections."[131]

19        When asked in a radio interview about his reasons for disregarding the
20   conclusions of the Cambium Audit, Superintendent Huppenthal was candid. He
21   disregarded the Audit because what the auditors reported did not match the
22   "information" that he had about what happens in MAS classrooms.[132]

23

24        [129] See Huppenthal Finding.
25        [130] Ct. Doc. No. 58-4, TUSD's June 22, 2011, Notice of Appeal, Defendant's
26   Statement of Facts, Ex. D,
         [131] *Smith*, 415 U.S. at 575.
27        [132] The relevant portion of the audio transcript provides, "And the nature of the
28   audit is you're supposed to define fact and you–we have–we have a lot of information
     that what was going on in Mexican-American Studies did not match what they observed

1    Superintendent Huppenthal never had any intention of relying on independent

2    auditors to provide an unbiased report of their observations. Rather, he wanted an

3    audit report that would substantiate the complaints received by his office and his

4    version of what goes on in MAS classrooms. When he did not receive what he

5    wanted, Superintendent Huppenthal decided to discredit the audit.

6         Superintendent Huppenthal's arbitrary and subjective application of HB 2281

7    is further demonstrated by his failure, not only to apply, but to even acknowledge the

8    existence of the exceptions to subsection 112(A). In his Findings of violations of

9    each of the three subsections (A)(2), (3) and (4), Mr. Huppenthal expressly notes the

10   concept of oppression. Yet, he is silent with regard to subsections 112(D) and (F),

11   which contain exceptions for courses that include the instruction of "the historical

12   oppression of a particular group of people based on ethnicity, race, or class" and

13   "discussion of controversial aspects of history."

14        This type of arbitrary and subjective discretion served to invalidate the statute

15   at issue in *Smith*, where the defendant was convicted and sentenced to six months

16   of imprisonment for wearing a depiction of a small United States flag on his pants.[133]

17   The statute subjected to criminal liability anyone who publicly "treats contemptuously

18   the flag of the United States." The Supreme Court focused on the fact that the

19   statute imposed liability "under a standard so indefinite that police, court, and jury

20   were free to react to nothing more  than their own preferences for treatment of the

21   flag."[134] The Court illustrated the extent to which individual preferences controlled the

22   application of the statute by this example:

23        "a war protestor who, while attending a rally at which it begins to rain,
         evidences his disrespect for the American flag by contemptuously covering
24

25   _____

26   in that week. So that was what led us to set aside those observations as not being
     reliable for that week." PSOF Exhibit D, Recorded Interview Transcript, Buckmaster
27   Show, June, 21, 2011, p. 5.

              [133] 415 U.S. at 575.
28            [134] 415 U.S. at 568-69, 578.

                                       -36-

1
2
3

himself with it in order to avoid getting wet, would be prosecuted under the...statute. Yet a member of the American Legion who, caught in the same rainstorm while returning from an 'America–Love It or Leave It' rally, similarly uses the flag, but does so regrettably and without a contemptuous attitude, would *not* be prosecuted."[135]

4
5
6
7
8
9
10
11
12
13

The same deficiency applies to the Huppenthal and Horne Findings. HB 2281 is so standardless that Superintendents Huppenthal and Horne are free to react to nothing more than their own preferences for the treatment of diverse perspectives on U.S. history, government and literature. There are other classrooms in Arizona where students learn about racism in the United States and the word "oppression" is used. How does a Superintendent of Public Instruction decide which programs to shut down and which to allow to remain? In Superintendent Horne's case, he decided to shut down the program about which he received complaints.[136] In Superintendent Huppenthal's case, he decided to "stop La Raza" despite the positive conclusions and recommendations of the Cambium Audit.

14

The Supreme Court has held that

15
16
17

"[this absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause. The deficiency is particularly objectionable in view of the unfettered latitude thereby accorded law enforcement officials and triers of fact."[137]

18
19
20

The Huppenthal and Horne Findings are not vague in the sense that MAS must conform to an "imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. Such a provision has no core."[138]

21
22
23

The enforcement powers granted to the Superintendent by HB 2281 are the quintessence of irony. After Superintendent Huppenthal has found violations and

24

25

[135] 415 U.S. at 575-76.

26
27

[136] Horne Finding, p. 2.

[137] *Smith*, 416 U.S. at 578; see also, *City of Chicago v. Morales*, 527 U.S. at 61, (statute that "provides absolute discretion to police officers to determine what activities constitute loitering" is void for vagueness.)

28

[138] *Smith*, 415 U.S. at 575-76, quoting *Coates*, 402 U.S. at 614.

1  exercised his unlimited discretion to determine whether the school district has come
2  into compliance, TUSD has the right to appeal to an administrative law judge. TUSD
3  has done so. When the administrative law judge issues his decision, Superintendent
4  Huppenthal will have full authority to accept, reject or modify it.[139] TUSD is engaged
5  in a proceeding where its adversary will make the final decision. By the powers
6  granted by HB 2281, Superintendent Huppenthal is the judge, jury and executioner.

7       HB 2281 also allowed Superintendent Horne to pursue arbitrary and
8  discriminatory allegations of violations against MAS. Superintendent Horne singled
9  out the MAS program for prosecution, despite his original opinion that two other
10  Ethnic Studies programs "could be found in violation under [subsection
11  112(A)(3)]."[140] Superintendent Horne based his decision to take action in this case
12  on nothing more than the fact that he had received complaints about the MAS
13  program, but not about the others.[141] Also like Superintendent Huppenthal, HB 2281
14  allowed Superintendent Horne to conjure up violations from a few text book quotes
15  without proving when, where, how or whether they were used in the classroom and
16  without explaining how the cited quotes violate the statute.  Superintendent Horne's
17  final demand of his Finding reveals the unlimited nature of his discretion.  He did not
18  give TUSD sixty days to come into compliance as required by subsection 112(B).
19  Rather, he told the district it had "60 days to **eliminate** the Mexican American
20  Studies courses, however they are named...."[142] For Superintendent Horne, HB 2281
21  is "a convenient tool for [his] 'harsh and discriminatory enforcement...against
22  particular groups deemed to merit [his] displeasure.'"[143]

23       The fact that HB 2281 was passed for the purpose of selectively enforcing it

24

25
_____

26  [139] A.R.S. §41-1092.08(B).
   [140] Horne Finding, p.2.
27  [141] *Ibid.*
   [142] Horne Finding, p.10 (emphasis added).
28  [143] *Pappachristou v. City of Jacksonville,* 405 U.S. 156, 170 (1972).

as a means to silence the MAS program, shines a glaring spotlight on the invidious nature of the arbitrary enforcement of HB 2281. Precisely because the First Amendment is "premised on mistrust of government power," it exists to stand "against attempts to disfavor certain subjects or viewpoints."[144] In HB 2281, the limitless discretion vested in the Superintendent to declare violations, with no discernible guidelines is an attempt by the State to control content by selective enforcement against disfavored speakers. "By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice."[145]

The Ninth Circuit recently warned the State of Arizona against "the selective application of legislation to a small group" by quoting Justice Jackson:

> "The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation."[146]

Although Justice Jackson's admonition came in the context of an equal protection claim, his rationale against targeting a small group through selective application of the law applies equally to the due process concern of lack of fairness caused by arbitrary enforcement of the law.

Superintendent Huppenthal and Horne's conduct provides a lesson in why a statute that is "so standardless that it authorizes or encourages seriously

---

[144] *Citizens United*, 130 S.Ct. at 898.

[145] *Ibid.,* 130 S.Ct. at 899.

[146] *Diaz v. Brewer*, 2011 U.S. App. LEXIS 18467, 14-15 (9th Cir. 2011), citing *Eisenstadt v. Baird,* 405 U.S. 438, 454 (1972), (quoting *Ry. Express Agency v. New York*, 336 U.S. 106, 112-113 (1949)(Jackson, J., concurring.))

1    discriminatory enforcement" violates the plaintiffs' rights to due process.[147]   Here,

2    students and their education are held hostage to the orthodoxy of whichever

3    politician is elected to the office of Superintendent of Public Instruction.

4        **C.    The Huppenthal Finding Chills Plaintiffs' Free Speech Rights.**

5        The chilling effect of the Findings on plaintiffs' free speech rights is evident.

6    For students, they are less likely to choose MAS classes given the uncertainty

7    whether the classes will be shut down, leaving them short credits for graduation.  As

8    a result, the number of high school classroom sections has dropped this school year

9    from 44 to 24 and the number of students enrolled from 1,155 to 628.[148]   For the

10   teachers and the director, the threat of withholding ten percent of TUSD's state

11   funding puts their jobs at risk. "When one must guess what conduct or utterance may

12   lose him his position, one necessarily will 'steer far wider of the unlawful zone...'"[149]

13   "For 'the threat of sanctions may deter...almost as potently as the actual application

14   of sanctions.'"[150]

15       The Finding puts the plaintiff teachers in an untenable position. It appears to

16   mandate that they must not teach anything that touches on the issue of oppression,

17   past or present. But the existence of racism is inherent in the history, government

18   and society of the United States and Superintendents Huppenthal and Horne cannot

19   force teachers to sanitize history in order to accommodate their discomfort with the

20   concept. "The danger of that chilling effect upon the exercise of vital *First*

21   *Amendment* rights must be guarded against by sensitive tools which clearly inform

22   teachers what is being proscribed."[151]   But the Findings provide no assistance to

23   know what is being proscribed.

24

25

26   [147] See *Holder*, 130 S. Ct. at 2718.
     [148] PSOF 100-01.
27   [149] *Keyishian*, 385 U.S. at 604.
     [150] *Ibid.*
28   [151] *Ibid.*

-40-

The Findings also chill students' speech and their "undoubted freedom to advocate unpopular and controversial views in schools and classrooms...."[152] In light of the Findings, teachers are now obliged to silence students when they fear something students may say will cross the murky statutory line and "encourage" "feelings of displeasure" toward a race or class of people. Here, the chilling effects of the Findings are ominous. Mr. Huppenthal's Finding casts a pall over the legitimate Free Speech rights of students and teachers in the classroom.[153]

## V. THE FIRST AMENDMENT GUARANTEES TEACHERS AND STUDENTS THE RIGHT OF FREEDOM OF SPEECH NECESSARY TO TEACH AND LEARN THE CURRICULUM APPROVED BY THE GOVERNING BOARD.

To conduct the vagueness analysis with the heightened degree of strictness, the Court need not fully define the limits of teachers' and students' First Amendment rights in the classroom. In this case, the MAS curriculum has been adopted by the TUSD Governing Board. Arizona law specifically delegates authority and directs school district governing boards to determine the curricula of its programs.[154] Additionally, the TUSD Governing Board implemented the Mexican American Studies curriculum in fulfillment of its obligations under the Post-Unitary Status Plan ordered by the District Court in *Fisher v. TUSD*, D.C. No. 4:74-cv-00090-DCB.[155] Thus, the plaintiffs' First Amendment rights in this context are those that further teaching and learning within the prescribed MAS curriculum.[156]

---

[152] *Fraser*, 478 U.S. at 681.

[153] *See Keyishian,* 385 U.S. at 603.

[154] A.R.S. §15-341.

[155] The Ninth Circuit recently reversed the District Court's finding that unitary status has been achieved and remanded the case for continuing District Court oversight. *Fisher v. TUSD*, 2011 U.S. App. LEXIS 14688.

[156] Neither the Supreme Court nor the Ninth Circuit have applied the restrictions on the Free Speech rights of public employees, recognized by the Supreme Court in *Garcetti v. Ceballos*, to public school teachers' speech within the curriculum. 547 U.S. 410, 425 (2006) (The Court does not decide whether "the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."); *cf. Johnson v. Poway Unified Sch. Dist.,* 2011 U.S. App. LEXIS 18882 (9th

-41-

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[157] The Supreme Court "ha[s] not failed to apply the First Amendment's mandate in our education system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief."[158] Along with the broad discretion of the States and school boards to manage school affairs comes the limitation that such discretion "must be exercised in a manner that comports with the transcendent imperatives of the First Amendment."[159]. Although state and local boards may enforce regulations "reasonably related to pedagogical concerns,"[160] they must discharge their "important, delicate, and highly discretionary functions" within the limits and constraints of the First Amendment.[161] "Because First Amendment freedoms need breathing space to survive, [the] government may regulate in the area only with narrow specificity."[162]

Public education plays a vital role to "prepare pupils for citizenship in the Republic. . . [and to] inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-

---

Cir. 2011)(no First Amendment violation where teacher ordered not to preach his personal views on God to students in classroom.)

[157] *Tinker v. Des Moines Indep. School District*, 393 U.S. 503, 506 (1969).

[158] *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

[159] *Pico*, 457 U.S. 853, 864 (1982) (school board may not remove books from school library on the basis of partisan or political disapproval); see also, *Meyer v. Nebraska*, 262 U.S. 390 (1923) (state may not forbid teaching foreign language in public and private schools); *Epperson*, 393 U.S. 97 (state may not prohibit the teaching of evolution).

[160] *Hazelwood Sch. Dist. v. Kuhlmier*, 434 U.S. 260, 273 (1988); see also*, California Teachers Assoc.,* 271 F.3d at 1149.

[161] *Pico*, 457 U.S. at 865; see also, *Citizens United,* 130 S.Ct. at 911 ("Where Congress finds that a problem exists, we must give that finding due deference; but Congress may not choose an unconstitutional remedy.")

[162] *Keyishian*, 385 U.S. at 605, citing *N.A.A.C.P. v. Button*, 371 U.S. 432-433 (1963).

government in the community and the nation."[163]  In pursuit of these goals, students must develop the intellect and the ability to freely question and evaluate the world around them. For this reason, "[t]he process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order."[164]  In this case, Superintendent Huppenthal and the State Legislature have gone beyond making legitimate curricular decisions, entered into the realm of censorship, book-banning, and stifling of critical thinking, and represent the worst possible example of civic democracy for students.

Neither the Supreme Court nor the Ninth Circuit has "definitively resolved whether and to what extent a teacher's instructional speech is protected by the First Amendment."[165]  However, the Ninth Circuit has noted that *Hazelwood* supports the limited right to classroom speech in furtherance of the course curriculum.[166]  In *Downs v. LAUSD*, the court recognized that where "activities may fairly be characterized as a part of the school curriculum, whether or not they occur in a traditional classroom setting," the "educators' authority in this area enable[s] them to 'assure that the participants learn whatever lessons the activity is designed to teach....'"[167] Thus, in the educational setting, teachers and students have the right to communicate within the curriculum in a manner that facilitates learning the intended lesson.[168]

---

[163] *Fraser,* 478 U.S. at 681.

[164] 478 U.S. at 683.

[165] *Cal. Teachers Assoc.*, 271 F.3d at 1148.

[166] 484 U.S. 260 (1988).

[167] 228 F.3d 1003, 1010 (2000), quoting *Hazelwood*, 484 U.S. at 271.

[168] A teacher's instructional speech entitled to First Amendment protection is not to be confused with the governing board's curricular speech. A.R.S. §15-341(A) delegates the authority to develop public school curricula to local governing boards. The curriculum is "a case of the government itself speaking," in this case, TUSD.  See *Downs*, 228 F.3d at 1011. HB 2281, on the other hand, is not a curriculum. A curriculum is "a course of study in one subject at a school or college."  Dictionary.com,

Beyond protecting the rights of a teacher to express ideas, the First Amendment also protects the students' right to receive information and ideas.[169]

> This right is an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution, in two senses. First the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them: "The right of freedom of speech and press. . .embraces the right to distribute literature, and necessarily protects the right to receive it." [citation omitted.] The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them.  It would be a barren marketplace of ideas that had only the sellers, and no buyers. [citation omitted.] More importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and to political freedom. Madison admonishes us:
>
> > A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or perhaps both. Knowledge will forever govern ignorance, and a people who mean to be their own Governors must arm themselves with the power which knowledge gives.[170]

It is axiomatic that "[i]n our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. . . [S]chool officials cannot suppress 'expressions of feeling' with which they do not wish to contend."[171]

The history and context of HB 2281 reveal that it was not motivated by legitimate curricular concerns, but rather by invidious viewpoint discrimination.[172] Superintendents Huppenthal and Horne and other politicians created, passed, and implemented HB 2281 solely because they do not like the Mexican-American perspective presented by the curriculum authorized by TUSD.

---

http://dictionary.reference.com/browse/curriculum (last accessed July 20, 2011.). HB 2281 does not describe a "course of study." Rather it seeks to shut down one program in one school district. See *Epperson*, 393 U.S. at 105 (1968)(recognizing "the freedom of teachers to teach and of students to learn"); *Pico*, 457 U.S. at 867 ("the Constitution protects the right to receive information and ideas.")

[169] *Pico,* 457 U.S. at 867, citing *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

[170] 9 Writings of James Madison 103 (G. Hunt ed. 1901), *Pico*, 457 U.S. at 867 (emphasis in original).

[171] *Pico*, 457 U.S. at 868, quoting *Tinker*, 393 U.S. at 511.

[172] Cf. *City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984) ("[S]ome purported interests–such as a desire to suppress support for a minority party or an unpopular cause, or to exclude the expression of certain points of view from the marketplace of ideas...are...plainly illegitimate.").

In *Morse v. Frederick,* the Supreme Court rejected the claim that the First Amendment allows the suppression of speech based on this type of viewpoint discrimination.[173] In that case, both the school district and the United States urged the broad argument "that the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission.'"[174] Under that theory, for example, a school that defined its mission as solidarity with soldiers could have tried to ban the black armbands worn in *Tinker*, or a school with an educational mission to promote world peace could have sought to ban buttons expressing support for the troops.[175] Or, in this case, lawmakers with an educational mission to treat and value pupils as individuals could seek to ban discussions of the legacy of oppression in the United States in the context of learning about Mexican-Americans from the perspective of Mexican-Americans.[176] Justice Alito further declared that the "'educational mission'" argument would give public school authorities a license to suppress speech on political and social views based on disagreement with the viewpoint expressed.[177] The argument, therefore, strikes at the very heart of the First Amendment."[178]

HB 2281 ostensibly seeks to value students as individuals. In reality, it gives life to politicians' efforts to drive out a curriculum that teaches about Mexican-Americans. It does not represent a "curriculum." Rather, it represents an "educational mission" that is beyond the State's authority to set curriculum and impermissibly burdens teachers' and students' speech, speech which is otherwise properly within the district-approved MAS curriculum.

While "public education is committed to the control of state and local

---

[173] 551 U.S. 393 (2007).
[174] 551 U.S. at 423, Alito, J. concurring.
[175] *Ibid.*
[176] See A.R.S. §15-111.
[177] 551 U.S. at 423.
[178] *Ibid.*

authorities,. . .'[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'"[179] "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."[180] In light of the plaintiffs' First Amendment rights, the Court must closely scrutinize the statute at issue and its application. HB 2281 must provide a high degree of specificity and clarity.[181]

## VI.    CONCLUSION

Among the many flaws contained in HB 2281 is the unmistakable message to our youth that the promise of the Constitution to protect them all equally is a myth; that the history, literature and culture of at least one group is not worthy of being taught in school. If the State of Arizona can take away the right of students to learn about the historical, literary and artistic contributions of Mexican Americans to the American experience, then the Constitution is a hollow document. The fact that the teachers "are educating the young for citizenship is a reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."[182] Whatever legitimate role the State may have in setting curriculum standards in Arizona, it must be "within the limits of the Bill of Rights."[183] This is the fundamental requirement that HB 2281 and its application fails

---

[179] *Epperson*, 393 U.S. at 104, citing *Shelton v. Tucker*, 364 U.S. 479, 481 (1960).
[180] *Keyishian*, 385 U.S. at 603, citing *Sweezy v. State v. State of New Hampshire*, 354 U.S. 234, 250 (1957); see also, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975)("minors are entitled to a significant measure of First Amendment protection," citing *Tinker*, 393 U.S. 503, "and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them.")
[181] *Erznoznik*, 422 U.S. at 217-218.
[182] *West Virginia St. Bd. of Ed. v. Barnette*, 139 U.S. 624, 637 (1943).
[183] *Pico*, 457 U.S. at 864.

to meet.

Plaintiffs do not seek the intervention of this Court to controvert or supersede the legitimate role of the local Governing Board to make curricular decisions. To the contrary, plaintiffs seek to preserve the role of the elected officials of the Tucson Unified School District ("TUSD") to decide what curriculum is appropriate and necessary and beneficial for its student population.[184]

Respectfully submitted this 18th day of October, 2011.

s/*Richard M. Martinez*, Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs

**Certificate of Service**

I hereby certify that on October 18, 2011, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of the instant motion via the Notice of Electronic Filing to the CM/ECF registrants of record.

s/*Richard M. Martinez*, Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs

---

[184] See *Hazelwood*, 484 U.S. at 273 ("education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not federal judges.")(citations omitted); see also, *Pico*, 457 U.S. at 864 ("At the same time, however, we have necessarily recognized that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment.")