**RICHARD M. MARTINEZ, SBA No. 7763**
307 South Convent Avenue
Tucson, Arizona 85701
(520) 327-4797 phone
(520) 320-9090 fax
richard@richardmartinezlaw.com
**Counsel for Plaintiffs**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CURTIS COSTA, SEAN ARCE, MAYA ARCE, MARIA FEDERICO BRUMMER, DOLORES CARRION, ALEXANDRO EXCAMILLA, JOSE GONZALEZ, NORMA GONZALEZ, LORENZO LOPEZ, JR., KORINA ELIZA LOPEZ, RENE F. MARTINEZ, SARA "SALLY" RUSK, and YOLANDA SOTELO,

        Plaintiffs,

v.

JOHN HUPPENTHAL, Superintendent of Public Instruction, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV 10 - 623 TUC AWT

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

(Oral Argument Requested)

Plaintiffs, through their undersigned counsel, hereby submit their motion for preliminary injunction and ask the Court to enter an order enjoining defendant Superintendent Huppenthal from proceeding with his enforcement action pursuant to authority granted by A.R.S. §§15-112 and 41-1092 et seq. At issue are the prohibitions and enforcement of A.R.S. §15-112(A) against courses or classes that: (1) promote the overthrow of the United States government, (2) promote resentment toward a race or class of people, (3) are designed primarily for pupils of a particular ethnic group, and (4) advocate ethnic solidarity instead of the treatment of pupils as individuals. These express but incomprehensible prohibitions are all designed to limit what history, literature or art is allowed in the public classrooms of Arizona.

The vagueness and overbreadth of HB 2281 and its enforcement by Superintendents Huppenthal and Horne violate the plaintiffs' constitutional rights. Further, the statute and its application violate the plaintiffs' rights to Equal Protection, Free Speech and Substantive Due Process.

Enforcement action is underway and nearing to a close. As a direct result, elimination of the Mexican American Studies ("MAS") program is imminent. Cognizable constitutional harm has and continues to be inflicted upon the plaintiffs, which will only increase in severity if the enforcement action undertaken remains unchecked. Plaintiffs herein demonstrate that they are likely to succeed on the merits of their claims, that they will suffer irreparable harm in the absence of injunctive relief, that the balance of hardships tilts sharply in their favor, and that an injunction is in the public interest. Absent an injunction, students who attend the Tucson Unified School District will be foreclosed from completing the MAS classes they are currently enrolled in and the student plaintiffs will be foreclosed from enrolling in any MAS classes. Similarly, the educators who have taught the MAS curriculum at the elementary, middle school and high school levels for the past twelve years will be left without a department. Banishment of MAS includes elimination of the director's position, and the loss of continued employment for plaintiff Sean Arce. Those MAS teachers who are unable to find other positions within the district face unemployment.

MAS has been taught  to Tucson Unified's students for twelve consecutive years; the record of achievement during that period has consistently proven the efficacy of the program. Latino students destined for failure have been redirected to graduate and excel. The state of Arizona is without a single legitimate reason for imposing the immediate termination of the program.

Plaintiffs respectfully request that the their motion be granted.

Submitted this 14th day of November, 2011.

s/*Richard M. Martinez,* Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   NECESSITY FOR A PRELIMINARY INJUNCTION

HB 2281[1] exists for one reason: to give the Arizona Superintendent of Public Instruction the means to end Tucson Unified School District's ("TUSD") MAS program. Superintendent Huppenthal's opportunity to do so is fast approaching. In his 2010 campaign, he promised to end the MAS program with his pledge to "Stop La Raza." There is no reason to doubt that Superintendent Huppenthal will carry out that promise. Unless this Court enjoins him from proceeding with the enforcement action, the MAS program will be terminated within the next few weeks.[2]

TUSD appealed Superintendent Huppenthal's Finding[3] that MAS is in violation of HB 2281. That administrative appeal is now drawing to a close. However, the administrative proceeding is designed to ensure that Superintendent Huppenthal will prevail. Irrespective of how the Administrative Law Judge ("ALJ") rules, Superintendent Huppenthal has full discretion to impose a devastating sanction on TUSD in an amount equal to ten percent of its budget.[4] The timing of Superintendent Huppenthal's action is central to this motion and controlled, at its outer limits, by Arizona's Uniform Administrative Hearing Procedures at A.R.S. §41-1092.08(A) and (B).

The ALJ will soon close the record in the appeal, at an unspecified time within his discretion, after the parties make their final filings, which he has ordered them to do by November 18, 2011.[5] Then, he must issue his recommended decision within

---

[1]  Codified as A.R.S. §§ 15-111 and 112.

[2]  In other pleadings, the plaintiffs have set out the history, background and purpose of the MAS program, including detailed accounts of Superintendents Huppenthal and Horne's efforts to end it. In the interests of economy, the plaintiffs will not repeat all of those facts here, but direct the Court's attention to those documents. See Ct. Doc. Nos. 89 and 91.

[3]  Ct. Doc. No. 84, Exhibit D, hereinafter referred to as "Huppenthal Finding."

[4]  A.R.S. §15-112(B).

[5]  See Order Setting Deadlines For Post-Hearing Submissions, filed by Administrative Law Judge Lewis D. Kowal, Case No. 11F-002-ADE, attached hereto as Exhibit 1.

twenty days of closing the record.[6] Thus, the ALJ could close the record as early as November 19 and issue his recommended decision on that day.[7] Upon receipt of the ALJ's decision, Superintendent Huppenthal may issue his order either accepting, rejecting or modifying the decision, also on November 19 at the earliest. Once November 18 passes, any day could be the end of the MAS program in TUSD.[8]

The urgency with which the plaintiffs seek this preliminary injunction is entirely generated by Superintendent Huppenthal. Since issuing his Finding on June 15, 2011, he has vigorously prosecuted this enforcement action and consistently indicated that he will act to eliminate this program.[9] The plaintiffs recently proposed a stipulation by which Superintendent Huppenthal would agree to stay any enforcement action until such time as the Court rules on the merits of the plaintiffs' claims.[10] Superintendent Huppenthal rejected that offer. Thus, Superintendent Huppenthal's enforcement action is proceeding and the plaintiffs must seek a

_____

[6] A.R.S. §41-1092.08(A).

[7] Although the likelihood that ALJ Kowal would close the record and issue his decision on the first possible day might be small, the plaintiffs have no control over this issue and cannot know when the ALJ will issue his recommended decision. Once the November 18 deadline passes, the ALJ's decision could come at any day.

[8] Superintendent Huppenthal must issue his order within thirty days of transmission of the ALJ's recommended decision to him. See A.R.S. §41-1092.08(B). Thus, the outer limit of when Superintendent Huppenthal's order could come is fifty days after ALJ Kowal closes the record. Plaintiffs have no way of knowing when ALJ Kowal will close the record, when, within his twenty-day time limit he will issue his recommended decision and when, within his thirty-day time limit Superintendent Huppenthal will issue his order. For the purposes of informing the Court in order to rule on this motion for preliminary injunction, the plaintiffs must advise the Court of the earliest possible date when Superintendent Huppenthal could enforce the penalty against TUSD.

[9] In light of this conduct, his recent statement to the Court that "the Superintendent has not determined whether the Tucson Unified School District's ("TUSD") Mexican-American Studies program violates the state law at issue" strains credulity. Ct. Doc. No. 104, p.2. This Court recognized that Superintendent Huppenthal already made this determination through his Finding, calling it a "significant development–an action taken by Defendants relating to the heart of the case..." Ct. Doc No. 83, p.1.

[10] See letter dated November 2, 2011, from Richard M. Martinez to Bryan Murphy, attached as Exhibit 2.

preliminary injunction now to avoid the prejudice they would suffer by the elimination of the MAS program.

## II.   MEXICAN AMERICAN STUDIES AND HB 2281.

### A.   The Plaintiffs and TUSD'S Mexican American Studies Program.

The plaintiffs include eleven career educators who work in certificated positions in TUSD[11] and two TUSD students. The plaintiff teachers provide classroom instruction for the approved MAS curriculum at the high school, middle school and elementary school level; plaintiff Sean Arce is the director of the MAS program.[12] More than a decade ago, the TUSD Governing Board approved the MAS program in an effort to remedy the District's historical failure to educate Latino students. This effort to enhance the academic achievement of Latino students has never been limited to Latinos, but open to all students who choose to take MAS classes.[13] From the 1998 school year to the 2010 school year, the program grew as it established its curriculum and proved its efficacy with consistent unprecedented results.[14] The enactment and enforcement of HB 2281 has halted all growth and caused substantial reductions in the number of classes offered and students enrolled.[15] Absent an injunction, the 804 students who currently are enrolled in MAS

[11] TUSD is the largest public school district in the Tucson metropolitan area. It is comprised of thirteen high schools, seventeen middle schools, four K-8 schools, 62 elementary schools, one K-12 school and fourteen alternative educational programs. The 2010-2011 student population was 52,987, of which 60 per cent were Latino. See Ct. Doc. No. 84-1, p.5, Cambium Learning Group, Inc. Audit Report, hereinafter "Cambium Report." (The entire 120-page Cambium Report is filed in four sections at Ct. Doc. Nos. 84-1, 85, 86 and 87.)

[12] Plaintiffs' Third Amended Complaint (TAC), Ct. Doc. No. 84, ¶¶3-15, 36-71.

[13] Declaration of Martin Sean Arce, attached hereto as Exhibit 3. MAS is currently implemented as part of TUSD's obligations pursuant to the Post-Unitary Plan, adopted as part of a long-running desegregation action. *See* Ct. Doc No. 92-2, TUSD Post-Unitary Plan, pp. 31-33. The Ninth Circuit recently remanded the desegregation case, *Fisher v. TUSD*, 2011 U.S. App. LEXIS 14688 (9th Cir. 2011), to the district court with instructions to maintain jurisdiction until TUSD has demonstrated that it is in good faith compliance with the Post-Unitary Plan over a reasonable period of time.

[14] See Cambium Report, pp. 49-50.

[15] Exhibit 3, Arce Declaration ¶ ¶ 10-15.

classes will be denied the opportunity to complete those classes.[16] Similarly, the educators who currently teach the MAS curriculum at the elementary, middle school and high school levels will be left without a department and face the loss of continued employment.[17] Banishment of MAS includes elimination of the director's position, and the loss of continued employment for plaintiff Sean Arce.[18]

## B.   Origin and Applications of HB 2281

HB 2281 was drafted and championed by Superintendent Horne for the expressed purpose of ending the MAS program.[19]  On December 30, 2010, the day before the effective date of HB 2281, Superintendent Horne issued his Finding that the MAS program was in violation of the statute.[20]  After taking office on January 2, 2011, Superintendent Huppenthal initiated his own investigation as to whether MAS classes violated the new statute due to the premature nature of the Horne Finding.[21]

To accomplish this, he commissioned Cambium Learning, Inc. to perform a curriculum audit. Cambium spent several months reviewing texts and materials, conducting classroom observations and numerous interviews of teachers, students, administrators, parents and community  members. Cambium's audit report found, not only that MAS classes do not violate HB 2281, but that MAS effectively promotes student achievement and recommended the expansion of course offerings.[22] Instead of immediately releasing the Cambium Report, Superintendent Huppenthal waited six weeks to release it, along with his own contradictory Finding that the MAS program violates HB 2281. Since then, Superintendent Huppenthal's enforcement of HB 2281 against TUSD's MAS program has proceeded without delay or interruption.

---

[16] *Ibid.*, ¶¶ 11-16.
[17] *Ibid.*, ¶¶ 16-17.
[18] *Ibid.*, ¶ 18.
[19] Ct. Doc. No. 84, Exhibit B, hereinafter referred to as "Horne Finding."
[20] *Ibid.*
[21] Huppenthal Finding, p.1.
[22] See Cambium Report, pp. 66-67.

## III.   PRELIMINARY INJUNCTION STANDARDS.

"The basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits."[23] To merit the Court's grant of a preliminary injunction, the plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."[24] The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[25] The Ninth Circuit includes the "serious questions" test when applying the requirements of *Winter*. Thus, the Court must balance the elements of the preliminary injunction test "so that a stronger showing of one element may offset a weaker showing of another."[26]  This insures that "[f]lexibility is the hallmark of equity jurisdiction."[27]

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[28]  Here, the plaintiffs establish that clear showing. State Superintendents Huppenthal and Horne have engaged in a course of conduct to enforce HB 2281 by  imposing the severe statutory sanction for the purpose of shutting down TUSD's MAS program. Superintendent Horne initiated this enforcement action before HB 2281 went into effect and Superintendent Huppenthal has continued without interruption since. Absent immediate  relief, MAS in TUSD will cease to exist.

//

//

---

[23]  *Chalk v. U.S. Dist. Ct.*, 840 F.2d 701, 710 (9th Cir. 1988).
[24]  *Winter v. NRDC*, 129 S.Ct. 365, 374 (2008).
[25]  *Winter*, 129 S.Ct. at 376-77.
[26]  *Alliance for the Wild Rockies v. Cottrell* 632 F.3d 1127, 1131 (9th Cir. 2011).
[27]  *Ibid.*, *citing Winter*, 129 S.Ct. at 391 (Ginsberg, J., dissenting).
[28]  *Winter*, 129 S.Ct. at 376.

## IV. HB 2281 AND ITS APPLICATION BY SUPERINTENDENTS HUPPENTHAL AND HORNE ARE UNCONSTITUTIONALLY VAGUE AND OVERBROAD

The plaintiffs' claims that HB 2281 and its application by Superintendents Huppenthal and Horne are impermissibly vague and overbroad have been briefed in the plaintiffs' Motion for Summary Judgment and supporting documents.[29] They are core claims which demonstrate the plaintiffs' likelihood of success on the merits. In the interest of efficiency, the plaintiffs incorporate those claims and arguments in support herein in their entirety.

## V. THE STATE OF ARIZONA HAS DENIED THE PLAINTIFFS' RIGHTS TO EQUAL PROTECTION OF THE LAWS

The Equal Protection Clause of the Fourteenth Amendment states: "No State shall. . .deny to any person within this jurisdiction the equal protection of the laws." In this case, the actions taken by the two successive Superintendents of Public Instruction discriminate against Mexican Americans in violation of the Equal Protection clause.

"The first step in Equal Protection analysis is to identify the [defendant's] classification of groups."[30] To accomplish this, the plaintiffs may show a classification by one of three ways: "by showing that the law, on its face, employs a classification; by showing that the law is applied in a discriminatory fashion; or by showing that the law is 'in reality. . .a device designed to impose different burdens on different classes of persons.'"[31] Where a law is facially neutral, the plaintiff must also prove that the law has a discriminatory purpose.[32] In this case, a classification is shown because HB 2281 discriminates against Latinos on its face and because Superintendents Huppenthal and Horne have applied HB 2281 against Latino students and educators

---

[29] See Ct. Doc. Nos. 97-8.

[30] *Country Classics Dairy, Inc. v. St. of Mont., Dep't. Of Commerce Milk Control Bur.,* 847 F.2d 593, 596 (9th Cir. 1988).

[31] C*hristy v. Hodel*, 857 F.2d 1324, 1331 (9th Cir 1988).

[32] *Personnel Admin. Of Mass. v. Feeney*, 442 U.S. 256 (1979) (discriminatory impact alone insufficient for Equal Protection violation; proof of discriminatory intent required.)

in a discriminatory manner.

**A.    Superintendents Hupppenthal And Horne Have Specifically Targeted And Discriminated Against Latinos Who Choose To Study And Teach Mexican American History, Literature, Culture And Art.**

A classification is found here where Superintendents Huppenthal and Horne have taken steps to shut down **only** the MAS program; thus they discriminate on the basis of the choice made by Latino students and educators to enroll and work in a program that is designed to improve the academic success of Latinos through the study of the Mexican American perspective of history, literature and art.[33] Superintendents Huppenthal and Horne's discriminatory application of HB 2281 provides ample and undeniable proof of the discriminatory purpose behind their enforcement action.

To determine whether an "invidious discriminatory purpose" is a motivating factor behind official action, the Court must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[34] Sources of evidence surrounding the action include: (1) "a clear pattern, unexplainable on grounds other than [race and ethnicity]", (2) the historical background of the decision, (3) departures from the normal procedural sequence, (4) substantive departures and (5) the legislative and administrative history.[35]

**1.    Superintendents Huppenthal and Horne Have Applied HB 2281 Exclusively Against the MAS Program Designed to Improve the Academic Success of Latino Students.**

It is undisputed that Superintendents Huppenthal and Horne have applied HB 2281 exclusively against the MAS program. Moreover, with the unchecked discretion

---

[33] *Cf. Lazy Y Ranch, Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008) (classification shown where state officials made the bidding process for grazing leases more cumbersome and denied leases "because they discriminated on the basis of whether a bidder was a conservationist (or perceived to be a conservationist) and new to the Idaho grazing market.")

[34] *Village of Arlington Hts. v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

[35] *Arlington Hts.*, 429 U.S. at 266-67.

vested in the Superintendent of Public Instruction by HB 2281,[36] they have shown no intention of pursuing any other program, even when presented with the opportunity. In his Finding, Superintendent Horne stated his belief that three of TUSD's Ethnic Studies Department programs are in violation of A.R.S. §15-112(A), but that he chose to enforce the statute only against MAS.[37] Subsequently, Superintendent Huppenthal ignored Superintendent Horne's conclusion that other programs also violate HB 2281. Neither Superintendent has indicated any intent to enforce the statute against TUSD's African American, Native American or Pan-Asian Studies programs. This is a clear case of a law administered "so exclusively against a particular class of persons as to warrant and require the conclusion, that. . .they are applied. . .with a mind so unequal and oppressive as to amount to a practical denial" of Equal Protection.[38]

Although the legislature and State Superintendents have exclusively targeted the MAS program with HB 2281, the prohibitions of the statute apply to every public and charter school K-12 classroom in Arizona. There are numerous other classrooms where students are taught about racism and oppression. In Arizona schools, students learn about the legacy of discrimination and hate through learning about subjects such as Jim Crow laws and *Brown v. Bd. of Education*, and by reading books like *To Kill a Mockingbird* and *The Diary of Anne Frank*. Yet Superintendents Huppenthal and Horne have not accused any other teachers or school districts of conducting courses or classes that "promote resentment toward

_____

[36] See A.R.S. §112(B), the enforcement provision of HB 2281, which gives no definitions, examples or guidelines for the Superintendent's determination of violation and provides for an administrative appeal with the final decision to be made by the Superintendent.  The total discretion given to the Superintendent by subsection 112(B) allows for the subjective and discriminatory enforcement seen here against MAS and renders the statute unconstitutionally vague. See Ct. Doc. No. 91, Plaintiffs' Motion for Summary Judgment, parts III, A, 6, pp.20-22 and IV, B, pp.33-40.

[37]  Horne Finding, p.1.

[38]  *Yick Wo v. Hopkins*, 118 U.S. 356, 372 (1886).

a race or class of people."[39] Rather, they have solely targeted their efforts against Latino students to deny them the opportunity to enhance their academic success through learning about the Mexican American perspective of U.S. history and government, literature and art.

Both State Superintendents campaigned specifically to ban the MAS program. On his attorney general election website, Tom Horne admits that he has singled out MAS with the following explanation:

> "In the Tucson Ethnic Studies programs they divided the kids by race. African American Studies for African Americans. Raza Studies for the Latino kids. "Raza" means race in Spanish. Indian Studies for the Native American kids. Asian Studies for the Asian kids. It just sounds like the Old South. And particularly in Raza Studies they taught the kids that the country is dominated by a white racist, imperialist power structure that is out to oppress them.... And these kids are being taught not to deal with civil disagreements in a civil way, but to deal with everybody by getting into people's faces and being rude and that means they are going to be unsuccessful adults. So it's a dysfunctional education and I fought hard to get the legislature to put a – to pass a law so that I can put a stop to it. And as the attorney general, I will give the legal aid to the Department of Education to be sure that we do put a stop to it."[40]

Significantly, Superintendents Huppenthal and Horne have made no effort to eradicate learning about European perspectives. Many Arizona high schools offer classes such as Advanced Placement European History and classes that feature learning about British and European literature and art. The State Superintendents target Latino students who choose to learn about Mexican American culture, but do not similarly target European American students who choose to learn about their

---

[39]  A.R.S. §15-112(A)(2).

[40]  Tom Horne election website http://www.electtomhorne.com with link to video at http://www.youtube.com/user/TomHorneforAG#p/u/22/nA3HfVBRz0o titled "Tom Horne – Ended Ethnic Studies (Already performing Attorney General duties!)" at minutes 0:31 to 1:00 and 2:07 to 2:30.  In this video clip, Mr. Horne also presents compelling evidence of how the traditional perspective of U.S. history excludes the Mexican American perspective. In reference to Latino students in the MAS program, he states, "I'll tell you, these kids' parents and grandparents *came to this country, most of them legally,* because this is the land of opportunity." *Ibid.* at minute 1:07 to 1:13. Mr. Horne fails to recognize that the ancestors of many of the Latino students in the MAS program, like so many other Mexican Americans, have resided in what is now Arizona and the United States for centuries.

1  heritage.[41] The educators who teach MAS are similarly targeted.

2      That MAS is the first and only victim of HB 2281 provides no defense. The
3  program and the majority-Latino students enrolled in MAS, along with the educators,
4  were always intended to be the targets. The lack of a "consistent pattern of official
5  race discrimination" is not a barrier to an Equal Protection claim.[42] "A single
6  invidiously discriminatory governmental act. . .would not necessarily be immunized
7  by the absence of such discrimination in the making of other comparable decisions.[43]
8  Superintendents Huppenthal and Horne's actions taken exclusively against a
9  program designed to advance the academic performance of Latino students and
10 their desire to unravel the substantial gains made by those students is
11 "unexplainable on grounds other than [race and ethnicity]."[44]

12     This is one of the "rare" cases where the starkness of the exclusivity of
13 enforcement allows a finding of purposeful discrimination.[45] Just as an ordinance
14 which effectively prohibited the operation of laundries in buildings made from wood,
15 where all laundries owned by Chinese operators were housed in wooden buildings,

---

17  [41]  The fact that non-Latinos also would be shut out of MAS classes does not
18  negate the States' discrimination against Latino students. In *Griffin v. Co. Sch. Bd. of*
19  *Prince Edward Co.,* 377 U.S. 218 (1964), the school board's decision to close all of its
20  schools, rather than to integrate them, discriminated against African American students,
    despite that fact that the schools were closed to white students, as well. The closing of
    the schools "[bore] more heavily on Negro children in Prince Edward County" and was
21  done specifically with the intent to discriminate against them. *Ibid.,* 377 U.S. at 230.
22  Whatever nonracial grounds might support closing public schools, "the object must be a
    constitutional one, and grounds of race and opposition to desegregation do not qualify
23  as constitutional." *Ibid.,* 377 U.S. at 231. Superintendents Huppenthal and Horne's
    desire to eliminate MAS out of a desire to deny Latino students the opportunity to
24  improve their education through learning about Mexican Americans is a violation of their
    right to Equal Protection.
25     [42]  See *Arlington Hts.,* 429 U.S. at 266, fn. 14.

26     [43]  *Ibid.,* citing *City of Richmond v. United States,* 422 U.S. 358, 378 (1975)
    (annexation taken for the purpose of discriminating against African Americans has no
27  legitimacy under the Constitution).

28     [44]  *Ibid.,* 429 U.S. at 266.

       [45]  *Ibid.,* citing *Yick Wo,* 118 U.S. 356; *Gomillion v. Lightfoot,* 364 U.S. 339
    (1960).

-10-

is unexplainable on grounds other than race,[46] so too is HB 2281, which was drafted specifically to eliminate the MAS program and applied exclusively against it. Superintendents Huppenthal and Horne's actions targeting MAS to the exclusion of any other program, proves that they acted with the requisite discriminatory purpose.

### 2. The Historical Background of the Huppenthal and Horne Findings Reveals Their Intent to Discriminate Against Latinos.

The historical background of the decision is relevant, "particularly if it reveals a series of official actions taken for invidious purposes."[47] Superintendents Huppenthal and Horne's efforts to eliminate MAS over several years, culminating in their respective Findings of violations of HB 2281, reveal this type of invidious intent and prove a discriminatory purpose. They have specifically attacked and questioned the very idea of teaching Mexican American history, heritage, and culture, and **explicitly condemned** the goal of creating a curriculum designed to enhance the academic success of Latino students, who represent ninety percent (90%) of MAS students.[48] In 2007, in his official capacity as Superintendent of Public Instruction, Superintendent Horne issued a call to citizens of Tucson to end the MAS program.[49] In support, he accused MAS of advocating "a kind of destructive ethnic chauvinism" and pointed to the fact that "[t]he very name 'Raza' is translated as 'the race,'" to him, a negative connotation of the term.[50] He complained that Tucson High School students participate in MEChA, a Chicano youth organization, as an extracurricular activity and disapprovingly noted that he observed a Tucson High School librarian wearing a shirt with the MEChA insignia.[51] Also in the letter, Superintendent Horne claimed that the Mexican American history textbooks "Occupied America" and "The

---

[46]  *Yick Wo*, 118 U.S. 356.
[47]  *Arlington Hts.*, 429 U.S. at 267.
[48]  Cambium Report, p.6.
[49]  Ct. Doc. No. 64-2, Horne's Open Letter to the Citizens of Tucson, hereinafter, "Open Letter."
[50]  *Ibid.*, p. 2.
[51]  *Ibid.*, p. 3.

Mexican American Heritage" are inappropriate for students in MAS classes.[52]

When the citizens of Tucson chose not to take up Superintendent Horne's call to eliminate MAS, he drafted the legislation that was eventually introduced and passed as HB 2281.[53] In their 2010 campaigns, both Superintendents Huppenthal and Horne pandered to anti-Mexican American sentiment in Arizona to their advantage by making the eradication of MAS central to their campaign platforms. In an obvious display of racial and ethnic bias, Superintendent Huppenthal ran television and radio advertisements in which an announcer stated that, "He is one of us," followed by a pledge that he will "Stop La Raza."  Superintendent Horne also seized the opportunity to cast the Mexican American experience as outside of the American experience in a campaign video that opened with the statement, "On May 11, Tom Horne's bill to end Tucson's **anti-American** Ethnic Studies program in Arizona was signed into law."[54]

### 3. Superintendent Horne's Departure From the Normal Procedural Sequence Reveals His Intent to Discriminate Against Latinos.

This method of proving discriminatory intent involves scrutiny of the "specific sequence of events leading up to the challenged decision" to shed light on the decisionmaker's purpose.[55] A departure from the "normal procedural sequence" may provide evidence that an improper purpose motivated the action.[56] In issuing his Finding against MAS, Superintendent Horne's departure from the normal procedural sequence of events is significant evidence that he was motivated by an intent to

---

[52]  *Ibid.*, pp.2-3

[53]  Horne Finding, p. 1; see also video clip on Tom Horne attorney general election website referenced, *supra*, at fn.40.

[54]  This video was previously found on Tom Horne's Attorney General campaign website at http://www.electtomhorne.com/tom_tv.htm titled "The U.N. and Liberals Want to Stop Tom Horne's Fight Against Taxpayer Funded Ethnic Studies."  (Last accessed July 14, 2011.)  This video, along with Tom Horne's numerous other videos and statements regarding the MAS program, has recently been removed from his web site and replaced with the one video cited, *supra*, at fn.40.

[55]  *Arlington Hts.*, 429 U.S. at 267.

[56]  *Ibid.*

discriminate against Latinos.

HB 2281 did not become effective until December 31, 2010, when MAS classes were adjourned for the winter break.[57] However, Superintendent Horne prematurely declared that TUSD's MAS program was in violation of HB 2281 in his Finding dated December 30, 2010, and released on January 2, 2011, hours before he left office to become the Arizona Attorney General.[58] Thus, the Horne Finding not only predates the effective date of the statute, but it cites and relies upon facts that all occurred *before* the statute was the enforceable law of the state of Arizona.

Superintendent Horne offered no explanation for completing his Finding before HB 2281's effective date. Nor did he explain his decision to issue his Finding mere hours before leaving office, rather than allow his successor the opportunity to properly investigate whether any violation occurred after classes resumed for the spring semester and after the statute came into force. Nor has he ever explained how the MAS program could have violated the statute when MAS classes had not yet been conducted after the statute's effective date. Instead, Superintendent Horne engaged in an unusual last-minute rush to find MAS in violation. Unable to deny Superintendent Horne's irregularities, Superintendent Huppenthal consequently conceded that those flaws required him to "determine if, in fact, TUSD was in violation of the statue post January 1, 2011."[59]

### 4.   Superintendents Huppenthal and Horne's Rejection of Factors Usually Considered Important By An Educational Decision Maker Reveals Their Intent To Discriminate Against Latinos.

A substantive departure from the normal sequence of events may also be relevant, "particularly if the factors usually considered important by the

---

[57]  Ct. Doc. No. 84, Exhibit A (HB 2281) to TAC, p. 4.
[58]  Horne Finding, p.1.
[59]  Huppenthal Finding, p. 1. (In his Finding, Superintendent Huppenthal erroneously describes the Horne Finding as issued on January 1, 2011 and the effective date of the statute as January 1, 2011.)

decisionmaker ***strongly favor a decision contrary to the one reached.***"[60] For example, where re-zoning for a low-income housing development in a white neighborhood was denied, yet the city planning directors testified that there was no reason "from a zoning standpoint" why the parcel should not be re-zoned to match the surrounding zoning classification, the court found that the lack of rational decision making proved invidious racial discrimination.[61] In this case, Superintendent Huppenthal continued the biased enforcement action commenced by Superintendent Horne despite convincing evidence that the MAS program does not violate HB 2281 and actually helps at-risk students to succeed in school.

> **a.   Superintendent Huppenthal's Rejection of the Cambium Audit Report Reveals His Intent to Discriminate Against Latinos.**

Shortly after taking office, Superintendent Huppenthal contracted with Cambium Learning Group, Inc., to perform an independent audit of the MAS program.[62]  The audit had three declared purposes:

> [T]o determine: (1) how or if the Tucson Unified School District Mexican American Studies Department programs are designed to improve student achievement; (2) if statistically valid measures indicated student achievement occurred; and (3) whether the Mexican American Studies Department's curriculum is in compliance with A.R.S. §15-112(A).[63]

The audit included an extensive review of the curriculum and materials, many hours of classroom observations and site visits, and a multitude of personal interviews with administrators, teachers, parents, students, and community members.[64] On May 2, 2011, after nearly two months of work, Cambium issued its 120-page comprehensive audit report to Superintendent Huppenthal.[65] Rather than immediately release the audit report to the public, he held on to the report for six weeks.

Superintendent Huppenthal's next action provides some of the starkest

---

[60]  *Arlington Hts.*, 429 U.S. at 267 (emphasis added).

[61]  *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970).

[62]  It has been reported that this study cost $110,000.00.

[63]  Cambium Report, p. 4.

[64]  *Ibid.*, pp.12-18.

[65]  Cambium Report, p.1.

-14-

1  evidence of his intent to discriminate against Latinos. After receiving the audit report

2  that he commissioned, Superintendent Huppenthal waited until June 15, 2011, to

3  reject the Cambium Report and issue his own three-page Finding declaring MAS to

4  be in violation of HB 2281. On that date, the reason for Superintendent Huppenthal's

5  reticence became obvious: The Cambium Report confirms the success of MAS in

6  all three aspects of its evaluation.[66]

7        First, the "programs are designed to improve student achievement based on

8  the audit team's findings of valuable unit and lesson design, engaging instructional

9  practices, and collection inquiry strategies through values of diversity and inter-

10  cultural proficiency."[67] Second, statistically valid measurements demonstrate

11  improved student achievement and "closing the achievement gap."[68] Third, the audit

12  team observed no evidence that MAS violated A.R.S. §15-112(A)(1) through (4).[69]

13  In summary:

14        During the curriculum audit period, no observable evidence was
      present to suggest that any classroom within Tucson Unified School
15        District is in direct violation of the law A.R.S. §15-112(A).  Schools
      associated with [the Mexican American Studies Department] courses
16        promote a culture of excellence and support a safe and orderly
      environment conducive to learning.  Teachers collectively are building
17        nurturing relationships with students and work to improve student
      achievement and attendance as identified in numerous focus group
18        interview sessions. A culture of respect exists and students receive
      additional assistance beyond the regular classroom instruction to
19        support their academic learning. As a result, students from many
      ethnicities are physically sitting in Mexican American Studies
20        Department classes and are learning that different perspectives are
      valuable, that Americans come from many backgrounds, and that being
21        an American means that all people are accepted.[70]

22  Cambium also recommended that TUSD "[m]aintain Mexican American Studies

23  courses as part of a core curriculum for high school courses" in "U.S. History,

24  American Government and Literature."[71]

25

26  [66] *Ibid.*, pp. 18-63.

   [67] *Ibid.*, p.68.

27  [68] *Ibid.*

   [69] *Ibid.*

28  [70] *Ibid.*, p.63.

   [71] *Ibid.*, pp.66-67.

Remarkably, in his Finding, Superintendent Huppenthal barely acknowledged the existence of the Cambium Report and **never mentioned** its lengthy and overall positive conclusions. Rather, in an obvious effort to obfuscate, he accused TUSD of failing to properly approve textbooks used in MAS classes in violation of board policies and state statutes, allegations which are entirely irrelevant to alleged violations of A.R.S. §15-112(A) and the ensuing enforcement action.[72]

Superintendent Huppenthal's decision to ignore the Cambium Report, which was designed to provide him with the facts necessary to make his determination, exposes the reality that nothing would prevent him from carrying out his campaign pledge to "Stop La Raza." On June 21, 2011, he publicly declared that the observations of the Cambium audit team were unreliable because they did not match the "information" as to what takes place in MAS classrooms that had been reported to him.[73] Superintendent Huppenthal's failure to account for the possibility that the reported information might be biased and flawed and that what took place in the classrooms during the auditors' many hours of observation is what genuinely takes place in MAS classrooms is strong evidence of his intent to discriminate. He

_____

[72] *See* Huppenthal Finding, pp.2-3.

[73] On the Buckmaster Radio show broadcast on June 21, 2011, the following exchange took place between host Bill Buckmaster and Superintendent Huppenthal: BILL BUCKMASTER: But do you – what about the audit, stating on page 50, "During the curriculum audit period, no observable evidence was present to indicate that any classroom within TUSD is in direct violation of the law.  In most cases, quite the opposite is true." and – "quite the opposite is true," and I think this is what has people here in Tucson confused.  They read that sentence in the audit report but then what you're ruling is in, really, a contradictory – there's a disconnect between the two. JOHN HUPPENTHAL: Absolutely.  And the thing that weighed heavily on our mind to set aside that observation of what they observed in the classroom, two things.  One, the – the Mexican American Studies knew that the audit would be taking place that week.  And the nature of an audit is you're supposed to define facts and you – we have – **we have a lot of information that what was going on in Mexican American Studies did not match what they observed in that week. So that was what led us to set aside those observations as not being reliable for that week.**

Ct. Doc. No. 98-4, transcript of recorded interview of The Buckmaster Show, June 21, 2011, p.5 (emphasis added).

1   predetermined his narrative of what goes on in MAS classrooms.  When the auditors
2   saw something different, Superintendent Huppenthal rejected both the Cambium
3   Report's observations, as well as its conclusions.

4   Another important factor to an educational decision maker that would strongly
5   favor a decision contrary to Superintendent Huppenthal's is the data indicating the
6   MAS program's effectiveness in student achievement and graduation.[74] In this
7   regard, the evidence proves the overwhelming success of the program. Over a four-
8   year period, the primarily at-risk Latino students who participate in MAS consistently
9   closed the achievement gap with non-MAS students in standardized test scores in
10  each of the four years and in each of the three sections: reading, writing and
11  mathematics.[75] As the highest-ranking education official in Arizona, Superintendent
12  Huppenthal's persistence in denigrating the MAS program without ever
13  acknowledging its data-proven successes demonstrates an invidious motive.

14                    **b.    The Lack of Evidence To Support the Findings
                      Reveals Superintendents Huppenthal and Horne's
15                    Intent to Discriminate Against Latinos.**

16  Equally damning of Superintendent Huppenthal's decision to ignore the
17  voluminous data and conclusions of the Cambium Report is the dearth of evidence
18  he musters to purportedly support his fundamentally flawed finding that MAS violates
19  HB 2281.  With regard to subsection 112(A)(2), which prohibits classes or courses
20  that promote resentment toward a race or class of people, the Finding merely cites
21  to "materials" that "reference white people as being 'oppressors' and 'oppressing'
22  Latino people and "materials" that "present only one perspective of historical events,
23  that of Latino people being persecuted, oppressed and subjugated by the
24  'hegemony'-or white America."[76] Superintendent Huppenthal fails to identify the
25  specific materials from which he takes these quotes, the context in which the texts

26

27         [74]  See Cambium Report, pp.43-50; Arce Declaration ¶ 19.
28         [75]  See "Final AIMS Data," attached to Arce Declaration as Exhibit A; Cambium
       Report, pp.43-50.
           [76]  Huppenthal Finding, p. 2.

-17-

use them, or when, where, how, and if the materials were used in class.

The surreality culminates in Superintendent Huppenthal's conclusion that with the few words quoted above, found in unidentified "materials," without any evidence as to their use, Arizona law gives him the unilateral and wholly unrestricted discretion to withhold $1 to $3 million per month in school district funding from the more than 50,000 students in TUSD.[77]

The following section, finding an alleged violation of subsection 112(A)(3) for having classes that "are designed primarily for pupils of a particular ethnic race," demonstrates explicit ethnic discrimination. Applying this twisted logic, Superintendent Huppenthal contends the following goals for TUSD students cross the line drawn by the Arizona Legislature and render the entire MAS program illegal: "The [Mexican American Studies] Model shows the focus to be academic achievement for Latino Students" and the "[TUSD] [w]ebsite clearly states the Department was formed to specifically enhance the academic success of Latino students although it can benefit all students. . . ."[78]

In any state but Arizona, the enhanced "academic success of Latino students" would be seen, not only as a crucial educational goal, but as a federal mandate.[79] Yet, Superintendent Huppenthal pounces on the language to justify withholding more than $1 million per month in order to bully TUSD into eliminating MAS.  Accordingly, these aspirations for Latino students cannot be tolerated and HB 2281 stands to prevent TUSD from promoting the achievement of Latino students through the vehicle of learning about Mexican Americans. Superintendent Huppenthal's unapologetic actions to prevent TUSD from addressing the educational needs of its

---

[77]  Ct. Doc. No. 84, TAC ¶17; Huppenthal Finding, p.3.

[78]  Huppenthal Finding, p. 2.

[79]  See e.g. Elementary and Secondary Education Act ("No Child Left Behind"), Title I, Sec. 1001(3) Statement of Purpose, (purpose to ensure that all children have a fair, equal and significant opportunity to obtain a high-quality education can be accomplished by "closing the achievement gap between high- and low-performing children, ***especially the achievement gaps between minority and nonminority students.***")

Latino students prove his desire and intent to discriminate against Latinos.

        **c.**    **Superintendents Huppenthal and Horne's Failure to Apply the Statutory Exceptions to A.R.S. §15-112(A) Reveal Their Intent to Discriminate Against Mexican Americans.**

The exceptions contained in subsections 112(E) and (F) are critical factors that would strongly favor a decision contrary to that of Superintendents Huppenthal and Horne. Inexplicable by any legitimate explanation in their Findings, neither State Superintendent mentions the exceptions at all.

Those subsections provide that HB 2281 does not prohibit or restrict "[c]ourses or classes that include the history of any ethnic group,"[80] "the discussion of controversial aspects of history,"[81] or "the instruction of the holocaust, any other instance of genocide, or the historical oppression of a particular group of people based on ethnicity, race, or class."[82] And yet, Superintendents Huppenthal and Horne have based their allegations of violations on materials that fall well within the exceptions, and proceed as if the exceptions did not exist at all.

The Horne Finding is rife with examples of alleged violations, taken out of context, that should come within the exceptions of subsections 112(E) and (F). Foremost is Superintendent Horne's inescapable conclusion that books that present history from a Mexican American perspective should be banned.[83] As evidence of

---

[80]  A.R.S. §15-112(E)(3).

[81]  A.R.S. §15-112(E)(4).

[82]  A.R.S. §15-112(F).

[83]  Superintendent Horne's Finding reveals an element of duplicity where he states his oft-repeated (see e.g. Open Letter, p. 1) interpretation of the "philosophy which underlay the statute: People are individuals, not exemplars of racial groups. What is important about people is what they know, what they can do, their ability to appreciate beauty, their character, and not what race into which they are born."  Horne Finding, p. 1. However, when describing his own heritage, Superintendent Horne writes that, as a Jew, the "long cultural tradition in Judaism of valuing scholarship" directly benefitted his family, in that his "father's knowledge of history" enabled his family to escape the Holocaust. Jewish News of Greater Phoenix, 6/9/06, Vol. 58, No. 37, http://www.jewishaz.com/issues/printstory.my?060609+elected. Superintendent Horne's sincere understanding of the value of his own culture and the importance of that culture to successive generations contrasts with the invidious nature of his attempts to prevent

a violation of §15-112, Superintendent Horne finds it is "certainly strange to find a textbook in an American public school taking the Mexican side of the battle at the Alamo."[84] In a display of hubris, Superintendent Horne disputes a textbook's contexualization of an early Chicano leader's statement, "kill the gringo," as meaning "to end white control over Mexicans," with the naked assertion that the book's interpretation "contradicts [the speaker's] clear language."[85] Superintendent Horne also quotes the following statement from another textbook that refers to the more current phenomenon of Mexican migration to the American Southwest: "Apparently the U.S. is having as little success as Mexico had when they tried to keep the North Americans out of Texas in 1830."[86] Rather than ponder a thought-provoking observation, as intended by the author, Superintendent Horne laments the fact that "books paid for by the American taxpayers used in American public schools are gloating over the difficulty we are having in controlling the border."[87] Superintendent Horne ignores the issue of whether these passages qualify pursuant to the statutory exceptions as "controversial aspects of history" or "historical oppression of a particular group of people based on ethnicity."

Likewise, Superintendent Huppenthal points to unnamed "[r]eviewed materials" which "present only one perspective of historical events, that of Latino people being persecuted oppressed and subjugated by the 'hegemony'–or white America."[88] He never explains why this material is not allowed under subsection 112(F) as "the historical oppression of a particular group of people based on ethnicity."

The fact that both Superintendents Huppenthal and Horne proceeded to

---

Latino students from learning about the same types of values and significance of their culture.

[84] Horne Finding, p. 7.
[85] *Ibid.*
[86] *Ibid.*
[87] *Ibid.*, pp.7-8.
[88] Huppenthal Finding, p.2.

enforce HB 2281 against MAS as if the exceptions did not exist is strong evidence that they never intended to fairly apply the statute and that their motivation was an intent to discriminate against Latino students.

### 5. The Administrative History of the Huppenthal and Horne Findings Reveal Their Intent To Discriminate Against Latinos.

The legislative or administrative history may be "highly relevant" to the issue of discriminatory intent, especially the "contemporary statements" of the decisionmakers or reports.[89] In this case, Superintendents Huppenthal and Horne's official conduct as the relevant administrative decisionmakers in pursuit of their mission to eliminate the MAS program and classes designed to enhance the academic success of Latino students displays their invidious intent to discriminate against Latinos. Superintendent Huppenthal declared MAS to be in violation of HB 2281 without specifying what changes are necessary to bring the program into compliance. His lack of direction prompted TUSD, in its Notice of Appeal, to complain that the Finding's "lack of specificity makes it impossible for TUSD to identify and remedy any alleged violation."[90]

Superintendent Horne did not even suggest that MAS could come into compliance. Rather, he exceeded his statutory authority by issuing an edict that TUSD had sixty days to "***eliminate*** the Mexican American Studies courses...."[91] However, A.R.S. §15-112(B) does not contain any provision authorizing the Superintendent to order the elimination of a program in his Finding. Rather, it requires him to give the school district sixty days to come into compliance and then make a determination whether the district has complied. Moreover, Superintendent Horne's Finding provided TUSD with no information as to how to bring the program into compliance. He had no interest in assisting TUSD to alter the classes. His mission was to fulfill his promise to "end Tucson's anti-American Ethnic Studies

---

[89] *Arlington Hts.,* 429 U.S. at 268.
[90] TUSD Notice of Appeal, Ct. Doc. No. 88-1, Exhibit A, p.4.
[91] Horne Finding, p.10 (emphasis added).

-21-

program."

Both Superintendents' Findings describe in racial/ethnic terms what they do not like about MAS classes. They object to students learning that Mexican Americans have suffered oppression.[92] They explicitly target Latino students by objecting to the program's goal of "increas[ing] academic achievement for Latino students."[93] These actions explicitly based on racial/ethnic criteria constitute a racial/ethnic classification.[94]

Under Superintendents Huppenthal and Horne's leadership, the Arizona Department of Education ("ADE") has engaged in other administrative actions that discriminate against Latinos. Most recently, the U.S. Department of Justice, Civil Rights Division ("CRD") and the U.S. Department of Education, Office of Civil Rights ("OCR") concluded a joint investigation of the ADE's policy of monitoring the fluency in English of teachers of English language learners by using subjective evaluations.[95] The ADE conducted these subjective on-site fluency monitoring practices despite the fact that the school districts had already assessed the teachers' English fluency using objective measures and had **no concerns** about the teachers' fluency.  As a result of its subjective evaluations, the ADE accused teachers who pronounce "the" as "da", "another" as "anuder," and "lives here" as "leeves here" of lacking sufficient fluency in English.[96] The CRD and OCR were concerned that the ADE's subjective evaluations "discriminat[e] against Hispanics. . .who work as or wish to work as public school teachers in Arizona, and that **such discrimination could deny public school students in Arizona equal educational opportunities on the basis of**

---

[92]  Huppenthal Finding, p. 2; Horne Finding, p. 7.

[93]  Huppenthal Finding, p. 2; Horne Finding, p. 3.

[94]  See *Palmore v. Sidoti,* 466 U.S. 429 (1984) (racial classification found where judge denied custody to mother because of her interracial marriage.)

[95]  See August 26, 2011 letter from CRD and OCR attorneys to State Superintendent Huppenthal notifying him of the determination of the statewide discrimination complaint, attached hereto as Exhibit 4.

[96]  *Ibid.*, p.2.

1    ***national origin in violation of Title VI and the EEOA."***[97] The ADE initially

2    defended its actions, but later "confirm[ed] its commitment to change its on-site

3    teacher English fluency monitoring practices" and limit its inquiry to whether school

4    districts "have certified that their teachers are fluent in English."[98]

5         In this case, the same government actors take exception to teaching primarily

6    Latino students about Latinos in a meaningful way. More importantly, these two non-

7    Latino officeholders take exception to teaching Latino students about Mexican

8    Americans from the perspective of Mexican Americans.  The inescapable implication

9    is that Superintendents Huppenthal and Horne believe that learning about Mexican

10   Americans from the perspective of Mexican Americans is harmful to Latino students

11   due to both Superintendents' biased perception of the need to impose a cultural

12   genocide on Latino students.[99] "The Constitution cannot control such prejudices but

13   neither can it tolerate them.  Private biases may be outside the reach of the law, but

14   the law cannot, directly or indirectly, give them effect."[100]

15
16
**B.    The Elimination of MAS Is Not Narrowly Tailored to Further the State's Interest in Treating Pupils as Individuals and Not Teaching Them to Hate Other Races or Classes of People.**

17        The result of finding an race/ethnic classification is that Superintendent

18   Huppenthal must prove that his action is narrowly tailored to further a compelling

19   governmental interest.[101]  "Absent searching judicial inquiry into the justification for

20   such [race/ethnic]-based measures, there is simply no way of determining what

21   classifications are 'benign' or 'remedial' and what classifications are in fact motivated

22   by illegitimate notions of [racial/ethnic] inferiority or simple [racial/ethnic] politics."[102]

23   In this regard, "[c]ontext matters when reviewing [race/ethnic]-based governmental

24
25
_____

26   [97]  *Ibid.*
     [98]  *Ibid.,* pp.2-3.
27   [99]  See text accompanying fn.40.
     [100]  *Palmore,* 466 U.S. at 433.
28   [101]  *Grutter v. Bollinger*, 539 U.S. 306 (2003).
     [102]  *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493 (1989).

action under the Equal Protection Clause."[103] Courts use this type of strict scrutiny to "'smoke out' illegitimate uses of [race/ethnicity] by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool."[104] Strict scrutiny provides the "framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of [race/ethnicity] in that particular context."[105]  And finally, strict scrutiny also ensures that "the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate [racial/ethnic] prejudice or stereotype."[106]  In this case, Superintendent Huppenthal cannot meet this strict scrutiny test.

The stated purpose behind the statute drafted by Superintendent Horne is "that public schools pupils should be taught to treat and value each other as individuals and not be taught to hate other races or classes of people."[107] Although the interests identified are logical, it has not been demonstrated that Arizona schools have problems with treating pupils as individuals or with teaching them to hate other races or classes of people. Even assuming that these interests rise to the level of compelling, the elimination of MAS does nothing to advance them.

Superintendent Huppenthal has visited a MAS classroom and never reported observing that students were taught to hate or that they were not treated as individuals. There is no credible, relevant evidence that MAS students are not treated as individuals and are taught to hate other people. In fact, as reported in the Cambium Report:

"No observable evidence exists that instruction within the Mexican American Studies Department promotes resentment towards a race or class of people.  The auditors observed the opposite, as students are

---

[103]  *Grutter,* 539 U.S. at 327.

[104]  *Richmond,* 488 U.S. at 493.

[105]  *Grutter*, 539 U.S. at 327; *Smith v. Univ. of Washington,* 392 F.3d 367, 372 (9th Cir. 2004), *cert. denied* 546 U.S. 813 (2005).

[106]  *Richmond,* 488 U.S. at 493.

[107]  A.R.S. §15-111.

-24-

1
2
3
4
5

taught to be accepting of multiple ethnicities of people. [Mexican American Studies Department] teachers are teaching Cesar Chavez alongside Martin Luther King, Jr. and Gandhi, all as peaceful protesters who sacrificed for people and ideas they believed in.  Additionally, all ethnicities are welcomed into the program and these very students of multiple backgrounds are being inspired and taught in the same manner as Mexican American students. ***All evidence points to peace as the essence for program teachings.  Resentment does not exist in the context of these courses.***[108]

6   The Cambium Report provides compelling evidence that MAS classes actually

7   ***further*** the State's interest in treating pupils as individuals and not teaching them to

8   hate others. In this respect, Superintendents Huppenthal and Horne's mission to

9   shut down MAS is a paradox. The program they so revile actually supports the same

10  interests that HB 2281 claims to promote.

11  This contradiction reveals the insincerity of the purported governmental

12  interest of teaching pupils not to hate other races or classes of people as applied in

13  the context of the propriety of teaching students from the perspective of Mexican

14  Americans. It also establishes that the means chosen to pursue this interest does

15  not fit "so closely that there is little or no possibility that the motive for the

16  classification was illegitimate [ethnic] prejudice or stereotype."[109] To the contrary, it

17  does not fit it at all.

18  The reason for this disconnect is clear. Superintendents Huppenthal and

19  Horne have drawn the MAS students into their scheme to garner votes in Arizona's

20  current racially-charged atmosphere. Strict scrutiny of their official conduct reveals

21  that their conduct is motivated in fact by "simple [race/ethnic] politics."[110]

22  Superintendent Huppenthal cannot prove that the elimination of MAS is narrowly

23  tailored to promote treating pupils as individuals and not teaching them to hate

24  others and his application of HB 2281 must be struck down as in violation of the

25  Equal Protection Clause.

26  //

27

28

---

[108]  Cambium Report, p. 55 (emphasis added).
[109]  *Richmond,* 488 U.S. at 493.
[110]  *Ibid.*

**VI.   A.R.S. §15-112 ON ITS FACE VIOLATES THE PLAINTIFFS' RIGHTS TO EQUAL PROTECTION**.

**A.   A.R.S. §15-112 Constitutes a Facial Race/Ethnic Classification.**

HB 2281 prohibits classes "designed primarily for pupils of a particular ethnic group."[111] TUSD's Ethnic Studies programs, including MAS, are designed to effectively target the persistent achievement gaps generally suffered by ethnic and racial minority students.[112] Therefore, as an attack on efforts to improve the performance of racial and ethnic minority students, but not on any other groups of students, the statute creates an racial/ethnic classification. Subsection (A)(4) prohibits classes that "[a]dovcate ethnic solidarity instead of the treatment of pupils as individuals" in the misguided belief that learning about ethnicity negates one's ability to interact with others on an individual level. This subsection, too, creates a racial/ethnic classification.

Classifications based on race/ethnicity "carry a danger of stigmatic harm."[113] For that reason, they must be "strictly reserved for remedial settings" in order to avoid promoting "notions of racial inferiority. . .lead[ing] to a politics of racial hostility."[114] In this case, the race/ethnic classifications and targeting of HB 2281 solely against the MAS program have stigmatized Latinos in Arizona and caused racial/ethnic hostility to be directed toward them.

HB 2281's racial/ethnic classification is not facially neutral despite the fact that the law does not explicitly single out learning about Mexican Americans.[115] The impact of the law falls primarily on Latinos, who comprise 90 percent of MAS

---

[111]   A.R.S. §15-112(A)(3).

[112]   Arce Declaration, ¶ 20.

[113]   *See Richmond*, 488 U.S. at 493.

[114]   *Ibid.*

[115]   *See Hunter v. Erickson*, 393 U.S. 385, 391 (1969) (Even though a "law on its face treats Negro and white, Jew and gentile in an identical manner, [where] the reality is that the law's impact falls on the minority," an ethnic classification is found."); *see also Ho by Ho*, 147 F.3d 854, 863 (9th Cir. 1998) ("Misuse of race by government for over three centuries in America must make any new governmental use of race stand suspect and in pressing need of justification.")

students and teachers. The ethnic classification scheme is further exposed by an exception to the prohibitions contained in §15-112(A).  §15-112(F) provides:

> F.  Nothing in this section shall be construed to restrict or prohibit the instruction of the Holocaust, any other instance of genocide, or the historical oppression of a particular group of people based in ethnicity, race, or class.

In subsection F, the legislature creates a racial/ethnic and religious classification that permits teaching about the particular religious, racial or ethnic groups targeted by Nazis in the Holocaust, thus making them favored by the statute. The explicit determination that the experiences of some racial/ethnic and religious groups may be validly taught, while others may not, creates a constitutionally impermissible classification.

**B.    HB 2281 Is Not Narrowly Tailored to Further the State's Interest in Treating Pupils as Individuals and Not Teaching Them to Hate Other Races or Classes of People.**

Superintendent Huppenthal cannot meet the strict scrutiny test by proving that HB 2281 is narrowly tailored to further a compelling governmental interest. The statute describes its purpose as teaching public school students to "treat and value each other as individuals and not be taught to hate other races or classes of people."[116] Assuming that this is a compelling state interest, the provisions of the statue are not narrowly tailored to achieve it.

Subsection 112(A)(3), which prohibits courses or classes designed primarily for pupils of a particular ethnic group, is not only not narrowly tailored, but has no relationship to treating pupils as individuals. Courses designed for pupils of a particular ethnic group are designed to remedy problems in student achievement. In fact, the No Child Left Behind Act ("NCLB") requires that states be held accountable for student achievement and report required data for ethnic and racial subgroups.[117] In the case of MAS, issues of race and ethnicity and their role in history and society is the vehicle by which the curriculum brings cultural relevancy

---

[116]  A.R.S. §15-111.
[117]  See, *infra,* fn. 79.

to its academic subjects.[118] But learning about and discussing race and ethnicity does not mean that students are not treated as individuals. Discussions about race and ethnicity occur every day and those who engage in those discussions do not *ipso facto* fail to treat others as individuals. The statute prohibiting courses designed primarily for pupils of a particular race/ethnic group is not narrowly tailored to promote treating students as individuals and must be struck down.

## C.   HB 2281 Is Not Rationally Related to the Purpose of Treating Students as Individuals.

Even if judged by the most deferential constitutional standard, the classification contained in HB 2281 must fail. Where a law "neither burdens a fundamental right nor targets a suspect class, [courts] will uphold the legislative classification so long as it bears a rational relation to some legitimate end."[119] Although judges "may not substitute [their] personal notions of good public policy for those of the legislature, the rational-basis standard is 'not a toothless one.'"[120] The link between the classification and objective is necessary to "provide guidance and discipline for the legislature," so that it may "know what sort of laws it can pass."[121] The requirement of "a rational relationship to an independent and legitimate legislative end. . .ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."[122]

Much like the statute at issue in *Romer*, which attempted to deny homosexuals equality under the laws of Colorado, HB 2281 is "born out of animosity toward the class of persons affected," in this case, Latinos.[123]  The Ninth Circuit recently warned the State of Arizona against "the selective application of legislation to a small group" by quoting Justice Jackson:

---

[118]  Arce Declaration, ¶ 21.
[119]  *Romer v. Evans,* 517 U.S. 620, 631 (1996).
[120]  *Navarro v. Block*, 72 F.3d 712, 717 (9th Cir. 1995) (citations omitted).
[121]  *Romer*, 517 U.S. at 632.
[122]  *Ibid.*, 517 U.S. at 633.
[123]  *Ibid.,* 517 U.S. at 634.

1
2
3
4
5
6

"The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation."[124]

7
8
9
10
11
12
13

By denying school districts the opportunity to develop programs to enhance the academic success of Latino students, subsection 112(A)(3) singles out race/ethnicity as a prohibited basis, while districts are free to strive to improve academic performance based on other criteria. School districts have a myriad of programs, such as those funded by Title I, which target students of low socio-economic status. Also, NCLB specifically allows the development of single-sex schools and programs to target student achievement.[125] Arizona cannot prohibit its school districts from similarly promoting the achievement of Latinos.

14
15
16
17
18
19
20
21
22
23

The National Governors Association has identified the achievement gap between "minority and disadvantaged students and their white counterparts" as "one of the most pressing education-policy challenges that states currently face."[126] On the other hand, Arizona is unique in its prohibition of programs designed to close the achievement gap for Latino students. "If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality [is] suspect."[127] In passing HB 2281, the Legislature's impartiality is clearly suspect because its expressed aim is to eliminate MAS, and thereby deny to Latino students a successful avenue for improving their educational outcomes and for closing the achievement gap. Further,

24
25
26
27
28

---

[124] *Diaz v. Brewer*, 2011 U.S. App. LEXIS 18467, 14-15 (9th Cir. 2011), citing *Eisenstadt v. Baird,* 405 U.S. 438, 454 (1972), (quoting *Ry. Express Agency v. New York*, 336 U.S. 106, 112-113 (1949)(Jackson, J., concurring.))

[125] See 20 U.S.C. §7215(a)(23).

[126] See policy primer on "Closing the Achievement Gap," published by the National Governors Association at http://www.subnet.nga.org/educlear/achievement (last accessed November 6, 2011).

[127] *R.Rd. Ret. Bd. v. Fritz*, 449 U.S. 166, 181 (1980), Stevens, J., (concurring).

HB 2281 appears to be a one of a kind statute in its objective of eliminating a program designed to improve the academic performance of Latino students purportedly in order to treat them as individuals. This absence of precedence is itself instructive, since "discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision."[128] Here it is clear that eliminating a program designed to enhance the academic achievement of Latino students has no affect on whether teachers treat their students as individuals and HB 2281 fails the rational relationship test.

## VII.   A.R.S. §15-112 DISCRIMINATES ON A RACE/ETHNIC BASIS AGAINST THE PLAINTIFFS' RIGHT TO ENGAGE IN THE POLITICAL PROCESS

HB 2281 violates the Equal Protection Clause because it targets a program that focuses on a racial or ethnic issue, in this case the persistent achievement gap affecting Latino students, and removes the school districts' authority to address **only** this racial or ethnic issue to a more remote level of government in a manner that puts "special burdens" on Latinos' ability to benefit from the program.[129] The *Hunter* and *Seattle* cases "yield a simple but central principle:" A state may not "allocate[ ] governmental power nonneutrally, by explicitly using the **racial** nature of a decision to determine the decisionmaking process."[130]

A program has this type of racial focus if it "inures primarily to the benefit of the minority, and is designed for that purpose."[131] Second, the law must work a reallocation of political power or reordering of the decisionmaking process that places special burdens on a minority group's ability to achieve its goals through that process.[132] State action of this kind, "places **special** burdens on racial minorities within the governmental process" and makes it "**more** difficult for certain racial and

---

[128]   *Romer*, 517 U.S. at 633.
[129]   See *Hunter v. Erickson*, 393 U.S. 385 (1969); *Washington v. Seattle Sch. Dist.*, 458 U.S. 457 (1982).
[130]   *Seattle*, 458 U.S. at 469-70.
[131]   *Ibid.,* 458 U.S. at 472.
[132]   *Ibid.,* 458 U.S. at 460.

religious minorities than for other members of the community to achieve legislation that is in their interest."[133]

In passing HB 2281, the Arizona Legislature restricted the TUSD Governing Board's authority to address the educational inequities affecting Latino and other racial and ethnic minority students by prohibiting the Governing Board from implementing programs that "are designed primarily for pupils of a particular ethnic group."[134] This impermissible reallocation of decision making is much like that in *Seattle*, where the school district devised a magnet school program with busing to integrate the schools. After opponents failed to convince the school board to reverse the program, they successfully promoted a state-wide initiative that prohibited assigning students to schools other than to their closest neighborhood schools. Under the new scheme, minority groups that wished to implement the busing plan would no longer be able to do so by convincing the local school board, but would be compelled to mount a state-wide campaign to overturn the initiative. The Supreme Court found the unconstitutional vice of the initiative was that it "placed **burdens** on the implementation of educational policies designed to deal with race on the local level" by "treating educational matters involving racial criteria differently from other educational matters."[135]

HB 2281 is equally flawed. The MAS program, like the busing program in *Seattle*, "at bottom inures primarily to the benefit of the minority, and is designed for that purpose. Education has come to be a 'principle instrument in awakening the child to cultural values, in preparing him to adust normally to his environment'"[136]

---

[133] *Ibid.*, 458 U.S. at 470.
[134] A.R.S. §15-112(A)(3).
[135] *Seattle*, at 469, quoting *Hunter*, at 719 (emphasis in original).
[136] *Seattle*, at 472; quoting *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954). Superintendent Huppenthal concedes that HB 2281 targets a program that "inures primarily to the benefit of the minority" by alleging that TUSD's MAS program was "formed to specifically enhance the academic success of Latino students."  See Huppenthal Finding, p.2.

The MAS program was borne out of the community's long-standing desire to provide TUSD's Latino students with a curriculum that would engage them with the material, resulting in the reversal of many negative educational trends that affect Latinos.[137] Data from four years of standardized AIMS testing has proven the success of the MAS program in making academic gains with primarily Latino students, a group that has had limited achievement in general academic programs.[138]

In response to community pressure, the TUSD Governing Board created MAS pursuant to its statutory responsibility for the function of its schools and to set curricula.[139] When Superintendent Horne failed in his efforts to convince Tucson citizens to lobby the Governing Board to shut down the program,[140] he drafted and successfully promoted the passage of HB 2281.[141] The statute removed the Governing Board's authority to act affirmatively in a curricular matter involving racial or ethnic criteria, but left intact the Board's authority to deal with all other types of curricular matters. Like supporters of the Seattle integration plan, supporters of MAS now must not only convince the TUSD Governing Board to implement the program, as supporters of any *other* type of educational program must do.  Rather, HB 2281 puts an *additional* burden on those who seek programs to address the achievement gap generally suffered by Latino and other minority students by "lodging decisionmaking authority over the question at a new and remote level of government."[142] They now must clear a much higher hurdle and also convince the Arizona Legislature, a body well-known for passing legislation hostile to Latinos, to

---

[137]  Arce Declaration, ¶ 7.

[138]  Arce Declaration, Exhibit A.

[139]  A.R.S. §15-341(A)(5); *see Savage v. Glendale H.S. Union Sch. Dist.*, 343 F.3d 1036, 1044-48 (9th Cir. 2003) (discussing the decentralized nature of Arizona public schools, placing primary responsibility with the local governing boards.)

[140]  Open Letter.

[141]  Horne Finding, p.1.

[142]  *Seattle*, 458 U.S. at 483.

overturn HB 2281.[143]

It makes no difference that the State has the power to set curricula. The State has delegated that power to the local governing boards.[144] Just as the Supreme Court confronted in *Seattle*, the issue here is not whether the State has the "authority to intervene in the affairs of local school boards; it is, rather, whether the State has exercised that authority in a manner consistent with the *Equal Protection Clause*."[145] "In a most direct sense, this implicates the judiciary's special role in safeguarding the interests of those groups that are 'relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'"[146] Here, the Arizona Legislature has exercised its considerable power to impermissibly deny Latinos the ability to advocate for an educational program that benefits their community. This Court should require that Arizona extend Equal Protection of the laws to all of its citizens and strike down HB 2281.

//

//

---

[143]   The reasoning of the Ninth Circuit ruling in *Coalition for Economic Equity v. Wilson,* rejecting a constitutional challenge on the basis of the Equal Protection clause's political process theory, does not apply to the facts at issue here. 122 F.3d 692, 696 (9th Cir. 1997). *Wilson* involved an amendment to the California constitution prohibiting public race and gender **preferences**. The constitutional challenge was only to the prohibition of government affirmative action programs. *Ibid.,* 122 F.3d at 697-98.  The Ninth Circuit distinguished *Seattle* on the basis that the California prohibition on racial and gender preferences "prohibits all its instruments from discriminating against or granting preferential treatment to anyone on the basis of race or gender" and that its law "addresses in a neutral-fashion race-related and gender-related matters. *Ibid.,* 122 F.3d at 707. Critical to the court's decision was the fact that the amendment at issue did not present an obstruction to equal treatment, but rather to preferential treatment that creates a situation where there are winners and losers. *Ibid.*, 122 F.3d at 708.  On the other hand, like the law at issue in *Seattle,* HB 2281 grants no preferences that benefit one group while disadvantaging another and does not address ethnic-related matters in a neutral fashion. Rather, it singles them out for different treatment and thus presents an obstruction to equal treatment.

[144]   A.R.S. §15-341(A)(5)
[145]   458 U.S. at 476.
[146]   *Ibid.,* 458 U.S. at 486 (citation omitted).

## VIII.  SUPERINTENDENT HUPPENTHAL'S FINDING AND HB 2281 VIOLATE PLAINTIFFS' RIGHT TO FREE SPEECH

HB 2281 represents an illegitimate attempt to stifle the voices of teachers and students speaking within an approved curriculum in Arizona classrooms. "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[147] The Supreme Court "ha[s] not failed to apply the First Amendment's mandate in our education system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief."[148] Along with the broad discretion of the States and school boards to manage school affairs comes the limitation that such discretion "must be exercised in a manner that comports with the transcendent imperatives of the First Amendment."[149] Although state and local boards may enforce regulations "reasonably related to pedagogical concerns,"[150] they must discharge their "important, delicate, and highly discretionary functions" within the limits and constraints of the First Amendment.[151] "Because First Amendment freedoms need breathing space to survive, [the] government may regulate in the area only with narrow specificity."[152]

Neither the Supreme Court nor the Ninth Circuit has "definitively resolved

---

[147] *Tinker v. Des Moines Indep. School District*, 393 U.S. 503, 506 (1969).

[148] *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

[149] *Pico*, 457 U.S. 853, 864 (1982) (school board may not remove books from school library on the basis of partisan or political disapproval); see also, *Meyer v. Nebraska*, 262 U.S. 390 (1923) (state may not forbid teaching foreign language in public and private schools); *Epperson*, 393 U.S. 97 (state may not prohibit the teaching of evolution).

[150] *Hazelwood Sch. Dist. v. Kuhlmier*, 434 U.S. 260, 273 (1988); see also, *California Teachers Assoc.,* 271 F.3d at 1149.

[151] *Pico*, 457 U.S. at 865; see also *Citizens United,* 130 S.Ct. at 911 ("Where Congress finds that a problem exists, we must give that finding due deference; but Congress may not choose an unconstitutional remedy.")

[152] *Keyishian*, 385 U.S. at 605, citing *N.A.A.C.P. v. Button*, 371 U.S. 432-433 (1963).

whether and to what extent a teacher's instructional speech is protected by the First Amendment."[153]  However, the Ninth Circuit has noted that *Hazelwood* supports the limited right to classroom speech in furtherance of the course curriculum.[154]  In *Downs v. LAUSD*, the court recognized that where "activities may fairly be characterized as a part of the school curriculum, whether or not they occur in a traditional classroom setting," the "educators' authority in this area enable[s] them to 'assure that the participants learn whatever lessons the activity is designed to teach....'"[155] Thus, in the educational setting, teachers and students have the right to communicate within the curriculum in a manner that facilitates learning the intended lesson.[156]

Beyond protecting the rights of a teacher to express ideas, the First Amendment also protects the students' right to receive information and ideas.[157]

---

[153] *Cal. Teachers Assoc.*, 271 F.3d at 1148.  Nor have the Supreme Court or the Ninth Circuit applied the restrictions on the Free Speech rights of public employees, recognized by the Supreme Court in *Garcetti v. Ceballos*, to public school teachers' speech within the curriculum. 547 U.S. 410, 425 (2006) (The Court does not decide whether "the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."); *cf. Johnson v. Poway Unified Sch. Dist.,* 2011 U.S. App. LEXIS 18882 (9th Cir. 2011)(no First Amendment violation where teacher ordered not to preach his personal religious views to students in classroom.)

[154] 484 U.S. 260 (1988).

[155] 228 F.3d 1003, 1010 (2000), quoting *Hazelwood*, 484 U.S. at 271.

[156] A teacher's instructional speech entitled to First Amendment protection is not to be confused with the governing board's curricular speech. A.R.S. §15-341(A) delegates the authority to develop public school curricula to local governing boards. The curriculum is "a case of the government itself speaking," in this case, TUSD. See *Downs*, 228 F.3d at 1011. HB 2281, on the other hand, is not a curriculum. A curriculum is "a course of study in one subject at a school or college." Dictionary.com, http://dictionary.reference.com/browse/curriculum (last accessed July 20, 2011.). HB 2281 does not describe a "course of study." Rather it seeks to shut down one program in one school district. See *Epperson*, 393 U.S. at 105 (1968)(recognizing "the freedom of teachers to teach and of students to learn"); *Pico*, 457 U.S. at 867 ("the Constitution protects the right to receive information and ideas.")

[157] *Pico,* 457 U.S. at 867, citing *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Monteiro v. Tempe Union H.S. Dist.*, 158 F.3d 1022, 1027, n.5 (students' right to receive broad range of information to freely form own thoughts is necessary predicate

1

2       This right is an inherent corollary of the rights to free speech and press that
are explicitly guaranteed by the Constitution, in two senses.  First the right to
3   receive ideas follows ineluctably from the *sender's* First Amendment right to
send them: "The right of freedom of speech and press. . .embraces the right
to distribute literature, and necessarily protects the right to receive it." [citation
4   omitted.]  The dissemination of ideas can accomplish nothing if otherwise
willing addressees are not free to receive and consider them.  It would be a
5   barren marketplace of ideas that had only the sellers, and no buyers. [citation
omitted.] More importantly, the right to receive ideas is a necessary predicate
6   to the *recipient's* meaningful exercise of his own rights of speech, press, and
to political freedom.[158]

7   It is axiomatic that "[i]n our system, students may not be regarded as closed-circuit

8   recipients of only that which the State chooses to communicate. . . [S]chool officials

9   cannot suppress 'expressions of feeling' with which they do not wish to contend."[159]

10       The history and context of HB 2281 reveal that it was not motivated by

11   legitimate curricular concerns, but rather by invidious viewpoint discrimination.[160]

12   Superintendents Huppenthal and Horne and other politicians created, passed, and

13   implemented HB 2281 solely because they do not like the Mexican American

14   perspective presented by the curriculum authorized by TUSD.

15       In *Morse v. Frederick,* the Supreme Court rejected the claim that the First

16   Amendment allows the suppression of speech based on this type of viewpoint

17   discrimination.[161]  In that case, both the school district and the United States

18   unsuccessfully urged the broad argument "that the First Amendment permits public

19   school officials to censor any student speech that interferes with a school's

20   'educational mission.'"[162] Pursuant to that discredited theory, for example, a school

21   that defined its mission as solidarity with soldiers could have tried to ban the black

22   armbands worn in *Tinker*, or a school with an educational mission to promote world

23   _____

24   to meaningful exercise of his own rights of speech, press and political freedom.)

25      [158]  *Pico*, 457 U.S. at 867 (emphasis in original).

   [159]  *Pico*, 457 U.S. at 868, quoting *Tinker*, 393 U.S. at 511.
26
   [160]  Cf. *City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984)
27   ("[S]ome purported interests–such as a desire to suppress support for a minority party
or an unpopular cause, or to exclude the expression of certain points of view from the
28   marketplace of ideas...are...plainly illegitimate.").

   [161]  551 U.S. 393 (2007).
   [162]  551 U.S. at 423, Alito, J. concurring.

peace could have sought to ban buttons expressing support for the troops.[163] Or, in this case, lawmakers with an educational mission to treat and value pupils as individuals could seek to ban discussions of the legacy of oppression in the United States in the context of learning about Mexican Americans from the perspective of Mexican Americans.[164] Justice Alito further declared that "the 'educational mission' argument would give public school authorities a license to suppress speech on political and social views based on disagreement with the viewpoint expressed. The argument, therefore, strikes at the very heart of the First Amendment."[165]

HB 2281 ostensibly seeks to value students as individuals. In reality, it gives life to politicians' efforts to drive out a curriculum that teaches about Mexican Americans and is designed to lift up Latino students. HB 2281 does not represent a "curriculum."[166] Rather, it represents an illegitimate "educational mission" that is beyond the State's authority to set curriculum and impermissibly burdens teachers' and students' speech, speech which is otherwise properly within the district-approved MAS curriculum.

While "public education is committed to the control of state and local authorities," "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."[167] "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."[168] In light of the

---

[163] *Ibid.*

[164] See A.R.S. §15-111.

[165] 551 U.S. at 423.

[166] See text accompanying fn. 156.

[167] *Epperson*, 393 U.S. at 104, citing *Shelton v. Tucker*, 364 U.S. 479, 481 (1960).

[168] *Keyishian*, 385 U.S. at 603, citing *Sweezy v. State v. State of New Hampshire*, 354 U.S. 234, 250 (1957); see also, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975)("minors are entitled to a significant measure of First Amendment protection," citing *Tinker*, 393 U.S. 503, "and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them.")

plaintiffs' First Amendment rights, the Court is compelled to closely scrutinize the statute at issue and its application. HB 2281 must provide a high degree of specificity and clarity.[169]

TUSD adopted a legitimate curriculum in its creation of MAS and its students have a right to receive instruction that the Governing Board deems "to be of legitimate educational value."[170] As the Ninth Circuit recognized, "Certainly when a school board identifies information that it believes to be a useful part of a student's education, that student has the right to receive the information."[171] On the other hand, HB 2281 is an exceptional piece of legislation that goes beyond a legitimate exercise of power and does not create a "curriculum" in any sense of the word. Rather, HB 2281 is motivated by the goal of using invidious discrimination to deny TUSD's legitimate efforts to enhance students' academic achievement thorough the vehicle of learning about Mexican American history, literature, and culture form the perspective of Mexican Americans. Superintendent Huppenthal and the State's endorsement of this type of discriminatory viewpoint suppresses the plaintiffs' rights of free speech and must be invalidated.

This protected speech is unlike the government speech at issue in *Downs.* In that case, the Ninth Circuit determined that the message of school-sponsored bulletin boards was under the control of the school and was "government speech."[172] The school district dictated the message to be communicated on the boards.[173] The school was in control of materials on the boards and within its rights to remove items inconsistent with its message.[174]  Therefore, the teacher "had no *First Amendment* right to dictate or **contribute** to the content of that speech."[175]

---

[169] *Erznoznik*, 422 U.S. at 217-218.
[170] *Monteiro*, 158 F.3d at 1028.
[171] *Ibid.*
[172] *Downs*, 228 F.3d 1003.
[173] *Ibid.*
[174] *Ibid.*
[175] *Ibid.*, 228 F. 3d at 1009 (emphasis added).

1    But "government speech" in the form of a bulletin board is qualitatively
2  different from "government speech" in the form of a prescribed curriculum. The
3  curriculum dictates general content, but individual teachers are responsible for
4  communicating that content in unique and creative ways. School districts do not
5  provide teachers with scripts to communicate lessons. Every school day, thousands
6  of Arizona teachers engage in classroom speech to communicate the curriculum.
7  School principals do not, cannot, and should not desire to control every word a
8  teacher says in the classroom, in the way that the school in *Downs* desired and was
9  **able** to control the message conveyed by the bulletin boards. While a teacher has
10 no right to contribute to a school-sponsored bulletin board, a teacher possesses not
11 only a right, but also an obligation to contribute to the curriculum in a classroom.
12 Only if the district determines that the teacher has stepped outside of the prescribed
13 curriculum does that right cease. The plaintiffs here do not assert a First Amendment
14 right to dictate the curriculum adopted by TUSD, but rather to teach it.

15    Along with the broad discretion of the States and governing boards to manage
16 school affairs comes the limitation that such discretion "must be exercised in a
17 manner that comports with the transcendent imperatives of the First Amendment."[176]
18 Courts should not intervene in school affairs unless conflicts arise that "directly and
19 sharply implicate basic constitutional values."[177] That is the case here. HB 2281 is
20 not a curriculum. Rather, it was designed to shut down one program in one school
21 district. In finding that MAS is in violation of HB 2281, Superintendent Huppenthal
22 joins the Legislature in acting far beyond legitimate government discretion in
23 curricular matters.[178] To allow the government to regulate education in this awkward

24

25    [176] *Pico*, 457 U.S. at 864 (school board may not remove books from school
26 library on the basis of partisan or political disapproval); see also, *Meyer*, 262 U.S. 390
   (state may not forbid teaching foreign language in public and private schools);
27 *Epperson*, 393 U.S. 97 (state may not prohibit the teaching of evolution).
     [177] *Ibid.* 393 U.S. at 104.
28    [178] "Education is not criticized or challenged on legal grounds because it has a
   message but, rather, because the government has exceeded its authority-in effect, that

and aggressively viewpoint-discriminatory manner would insulate all purported curricular decisions, regardless of their invidious nature, from First Amendment protection or control. This is not the law under our Constitution and should not be the law. The issue before the Court is not whether the Constitution applies, but whether the Constitution has been violated.

Viewpoint discrimination is especially harmful where it distorts the nature of important institutions. In *Arkansas Educ. Television Comm. v. Forbes*, the Supreme Court recognized that "candidate debates are of exceptional significance in the electoral process."[179] Therefore, to allow a public television station to exclude a political candidate from a televised debate on the basis of viewpoint discrimination would present the "inevitability of skewing the electoral dialogue."[180] Likewise, in *LSC v. Velazquez*, the government violated the First Amendment by funding legal representation, but imposing viewpoint-based restrictions on the lawyers, prohibiting them from making certain arguments on behalf of their clients. The Court explained that such restrictions "distort[ ] the legal system by altering the traditional role of the attorneys."[181]

In this case, HB 2281 and Superintendent Huppenthal and Horne's discrimination against the viewpoint communicated by the MAS curriculum distorts the role of education. Rather than "safeguard the fundamental values of speech and inquiry and of belief,"[182] and "teach by example the shared values of a civilized social order,"[183] Superintendents Huppenthal and Horne give the students a remarkable lesson. They give them a first-hand lesson in government oppression.

This is not a case of a court determining the authority of a school or school

---

what the government is doing with its educational institutions is *not* educating." "The Many Faces of Government Speech," Randall P. Bezanson and William G. Buss, 86 *Iowa L. Rev.* 1377, 1421 (2001).

[179] 523 U.S. 666, 675 (1998).
[180] *Ibid.* 523 U.S. at 676.
[181] 531 U.S. 533, 534 (2001).
[182] *Epperson*, 393 U.S. at 104.
[183] *Fraser*, 478 U.S. at 683.

district to engage in its day-to-day operations. A principal has the authority to withhold publication of a student newspaper story that is potentially defamatory and an invasion of family privacy,[184] or to take down a teacher's materials on a bulletin board that do not comport with the school-sponsored message.[185] Likewise, a student may be disciplined for a sexually provocative speech at a mandatory school program,[186] or for displaying a banner at a school-sanctioned event that appears to promote illegal drug use.[187] Even as argued by the dissenting opinions, none of these cases present a scenario of unfettered government authority.

But the present case is much different. Here, the State and Superintendents Huppenthal and Horne seek to censor the very stories that American schoolchildren are taught about their nation and its principles, conflicts, wars, and treatment of others. No court should endorse such an absolute power over these types of lessons where the government censorship is racially discriminatory, vague, selectively designed, selectively enforced, and viewpoint-specific. Superintendent Huppenthal and Horne's Findings and HB 2281 embody invidious discrimination and have been applied to suppress the plaintiffs' First Amendment rights to free speech. This Court should strike them down.

## IX.  ELIMINATION OF MEXICAN AMERICAN STUDIES VIOLATES PLAINTIFFS' SUBSTANTIVE RIGHT TO DUE PROCESS

The Fourteenth Amendment provides, "No State shall. . .deprive any person of life, liberty, or property, without due process of law."  As a liberty interest, the law "affords constitutional protections to personal decisions relating to. . . education,"[188] although such decisions are not afforded heightened protection as a fundamental

---

[184] *Hazelwood*, 484 U.S. 260.

[185] *Downs*, 228 F.3d 1003.

[186] *Fraser*, 478 U.S. 675.

[187] *Morse*, 551 U.S. 393.

[188] *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992); *see also Meyer*, 262 U.S. at 399 (Liberty interest encompasses right of individual "to acquire useful knowledge.").

right.[189] Ethnic studies programs in general,[190] and TUSD's MAS program in particular,[191] have proven to be of particular benefit to enhance the academic achievement of Latino students.  On the other hand, elimination of courses designed to benefit a particular ethnic group has no effect on whether students are treated as individuals.  Thus, the goal of HB 2281 to eliminate the MAS program does not rationally further any legitimate state interest and HB 2281 unreasonably infringes upon the student and parent plaintiffs' liberty to choose this type of educational program that has been demonstrated to be of particular value to them as Latino students, and is offered by the school district.

Under the substantive due process analysis, Superintendent Huppenthal has the burden to prove that his action to terminate MAS is rationally related to a legitimate state interest that justifies intruding into the educational decisions of parents and their children.[192]  A.R.S. §15-111 declares the State's interest in treating students as individuals. But in reality, there is no legitimate state interest because HB 2281 is borne out of an invidious attempt to deny Mexican American identity and culture.  Much like the Colorado law prohibiting anti-discrimination laws protecting homosexuals which was struck down by the Supreme Court in *Romer*, HB 2281 is "inexplicable by anything but animus toward the class it affects."[193]

This case is similar to *Meyer v. Nebraska*, where the Supreme Court invalidated a state law prohibiting students younger than eighth grade from learning in a language other than English.[194]  Important to the Court's determination that parents have a right to control their children's education and that students have the

_____

[189]   *Meyer*, 262 U.S. at 399.
[190]   *See* "The Academic and Social Value of Ethnic Studies: A Research Reveiw" by Christine E. Sleeter, PhD., attached hereto as Exhibit 5.
[191]   Cambium Report, pp.49-50; Arce Decl.
[192]   *See Romer v. Evans*, 517 U.S. 620, 631 (1996) ("if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.")
[193]   *Ibid.*, 517 U.S. at 632.
[194]   262 U.S. 390.

1  right to acquire knowledge, was the regard for education and acquisition of
2  knowledge by the American people "as matters of supreme importance that should
3  be diligently promoted."[195] Specifically, the Court held that the state's desire "to foster
4  a homogenous people with American ideals" went beyond the State's legitimate
5  authority and conflicted with the right to conduct classes in a language other than
6  English.[196] Likewise, any attempt by the State of Arizona to shut down the MAS
7  program in the interest of fostering a homogenous people with an exclusive version
8  of American ideals is also an illegitimate interest.

9      Arizona's current political climate is hostile to Mexican Americans. The
10  Supreme Court has warned that "times can blind us to certain truths and later
11  generations can see that laws once thought necessary and proper in fact serve only
12  to oppress."[197] Should the State be successful in its efforts to eliminate MAS, the
13  stigma to Latino students,  as well as to Mexican Americans in general would be
14  inevitable, as was the stigma that attached to the Texas law criminalizing
15  homosexual conduct in *Lawrence v. Texas*.[198]  There is no legitimate state interest
16  that can justify this type of intrusion into students' lives and educational choices.

17      According to the Cambium Report, there is no indication that teachers in MAS
18  classes fail to treat students as individuals or in any way violate HB 2281.  To the
19  contrary, auditors observed that "teachers collectively are building nurturing
20  relationships with students," that "a culture of respect exits," and that "students from
21  many ethnicities are physically sitting in Mexican American Studies Department
22  classes and are learning that different perspectives are valuable, that Americans

23

24      [195]  *Ibid.*, 262 U.S. at 400.
25      [196]  *Ibid.*, 262 U.S. at 402.  The Supreme Court also criticized the Nebraska
26  Supreme Court's exemption of teaching Latin, Greek or Hebrew from the foreign
   language ban, much like HB 2281 specifically exempts the instruction of the Holocaust
27  and other incidences of genocide, while attempting to ban teaching about the
   oppression of Mexican Americans.  See A.R.S. §15-112(F).
28      [197]  *Lawrence v. Texas,* 539 U.S. 558, 579 (2003); *Raich v. Gonzalez*, 500 F.3d
   850, 865 (9th Cir. 2007).
       [198]  539 U.S. at 575.

come from may backgrounds, and that **being an American means that all people are accepted."**[199]

Elimination of the MAS program will not further the state's interest in treating students as individuals. To the contrary, by eliminating a program that teaches students that "being an American means that all people are accepted," the state will damage its own purported interest. HB 2281 is not rationally related to a legitimate state purpose and must be stuck down.

## X. PLAINTIFFS SATISFY THE REMAINING ELEMENTS REQUIRED FOR A PRELIMINARY INJUNCTION.

### A. Only An Injunction Can Prevent Irreparable Harm.

The Supreme Court has recognized that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.[200] In the Ninth Circuit "an alleged constitutional infringement will often alone constitute irreparable harm."[201] The plaintiffs, as educators and students residing in Arizona have alleged substantial ongoing violations of their Constitutional rights, which would continue to cause irreparable harm in the absence of an injunction.

HB 2281 and both Superintendents Huppenthal and Horne's Findings have all had substantial negative effects on the MAS program and on the plaintiffs. Politicians and the media have intensely scrutinized and denigrated the program. As a result of Superintendent Huppenthal's Finding, the Governing Board has found itself embroiled in an administrative appeal.

A recommendation from the ALJ is expected as early as November 19. However, the Superintendent of Public Instruction has full discretion to accept, reject or modify the recommendation.[202] Moreover, TUSD's claims are not coextensive with

---

[199] Cambium Report, p. 63 (emphasis added).
[200] *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *see also Thalheimer v. City of San Diego*, 2011 U.S. App. LEXIS 11590, 48 (9th Cir. 2011).
[201] *U.S. v. Arizona*, 641 F.3d 339, 2011 U.S. App. LEXIS 7413, 70-71 (9th Cir. 2011)(citation omitted).
[202] A.R.S. §41-1092.08(B)

the plaintiffs' claims for violations of their Constitutional rights. The plaintiffs have alleged substantial violations of their rights to Equal Protection, Freedom of Speech and Due Process. Regardless whether the ALJ finds for or against TUSD, Superintendent Huppenthal will impose the ten percent sanction, effectively forcing TUSD to terminate the program and putting an end to the plaintiffs' efforts to vindicate those rights in this Court. Further, Superintendent Horne designed the draconian penalty imposed by HB 2281 of withholding millions of dollars to create a situation in which it would be practically impossible for TUSD to pursue an appeal from the Superintendent's final agency decision.  TUSD is in an administrative forum where the Superintendent is the judge, jury and executioner and where litigation of the plaintiffs' constitutional claims against the validity of HB 2281 and of Superintendent Huppenthal's Finding cannot receive a full and adequate review.

Also, the livelihoods of the plaintiff teachers and director Sean Arce are at stake.  As the director of the MAS program, Mr. Arce will lose his employment if the program is eliminated.[203]  If the plaintiff teachers do not continue in their jobs as MAS teachers, it is likely that they will not have positions with TUSD.[204] This is an action for equitable relief and there is no opportunity for the teachers to recover lost wages. The Ninth Circuit has recognized irreparable harm where a teacher was to be removed from his teaching position and placed in an administrative position at an equal salary.[205] In *Chalk*, the HIV-positive teacher was specially trained to teach hearing-impaired students and the district wanted to remove him from the classroom due to fear of transmission of the virus. The court found that the emotional harm of removal due to his closeness with his students would cause irreparable harm despite the lack of monetary damage.[206]  Similarly, MAS teachers face the same emotional

---

[203]  Arce Declaration, ¶¶ 16-18.
[204]  Arizona public school teachers have no tenure or seniority rights in their employment. A.R.S. §15-502(H).  Due to budget cuts and staff reduction, laid off teachers face the likelihood of unemployment.
[205]  *Chalk*, 840 F. 2d at 710.
[206]  *Ibid.*

harm plus the loss of employment and income. They will be irreparably harmed more than the teacher in the *Chalk* case unless the Court grants the injunction.[207]

Time is in short supply. In *Thalheimer*, where the plaintiff sought to engage in political speech, the Ninth Circuit recognized that "timing is of the essence in politics" and that "a delay of even a day or two may be intolerable."[208] Delays in education are equally intolerable. Should the program be suspended due to Superintendent Huppenthal's Finding, the plaintiff students could also lose the opportunity to take MAS classes while litigation continues for months or years.[209]

An order from this Court enjoining the enforcement of the Huppenthal and Horne  Findings until the merits of the present action are resolved would preserve the status quo and prevent the irreparable damage to the plaintiffs' that a shut down of MAS would inevitably cause.

**B.    The Balance of Equities Tips in Favor of the Plaintiffs.**

In assessing whether the plaintiffs have carried this burden of what the Ninth Circuit refers to as "the balance of hardships," the district court must "balance the interests of all parties and weigh the damage to each."[210] In this case, all of the damage is to the plaintiffs. The students could lose the opportunity to benefit from a successful program and to gain a potentially transformative educational experience. Superintendent Huppenthal and HB 2281 have violated the plaintiff's rights to Equal Protection, Free Speech and Due Process. The MAS program has been targeted for elimination and the plaintiffs have been forced to operate under a

---

[207]   *See also Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008)("[T]he loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages."); *Stormans v. Selecky*, 586 F.3d at 1138; *Enyart v. Nat. Conf. of Bar Examiners*, 630 F.3d 1153, 1165 (9th Cir. 2011)(Irreparable harm where plaintiff would lose opportunity to pursue chosen profession.)

[208]   2011 U.S. App. LEXIS at 48.

[209]   Plaintiff Ms. Lopez is in tenth grade and will be eligible to take the classes in the fall of 2012.

[210]   *Storman's,* 586 F. 3d at 1138.

1   vague statute, not knowing what type of classroom speech and materials might
2   cause a catastrophic loss of district funding. The teachers and director are in danger
3   of losing their jobs and the students are in danger of losing the educational
4   opportunity that the district has offered to other students in the other Ethnic Studies
5   programs. In addition, Tucson's Latino community faces an unconstitutional
6   marginalization of its political voice. Moreover, they are all at risk of suffering the
7   indignity of having a marker of Mexican American educational advancement wiped
8   out for invidious reasons.

9       On the other hand, Superintendent Huppenthal would be unaffected and suffer
10  no harm by preservation of the status quo.  Under these circumstances, the balance
11  of hardships tilts sharply in the plaintiffs' favor.

12      **C.   An Injunction Is In the Public's Interest.**

13      "The public interest analysis for the issuance of a preliminary injunction
14  requires [the Court] to consider whether there exists some critical public interest that
15  would be injured by the grant of preliminary relief."[211] There are none. It is the
16  plaintiffs' constitutional harms that loom large here. It is not in the public's interest
17  to allow the state to violate the Constitution, "especially where there are no adequate
18  remedies available to compensate the . . .plaintiffs for the irreparable harm that
19  would be caused by the continuing violation."[212]

20      The public has a paramount interest in education. In determining whether to
21  issue an injunction, the Court should carefully consider the effect on those at-risk
22  students that the program is designed to help.  It would most certainly not be in the
23  public interest to deny them the opportunity to improve their academic performance
24  through a program that has been proven especially successful in reaching them
25  where other programs fail. It also would not be in the public interest to allow a band

26

27      [211] *Wild Rockies*, 632 F.3d at 1138 (citation omitted).
28      [212] *Cal. Pharmacists Assoc. v. Maxwell-Jolley*, 563 F.3d 847, 852-53 (9th Cir.
    2009); *see also U.S. v. Arizona*, 2011 U.S. App. LEXIS 7413, 71; *Enyart*, 630 F.3d at
    1167 (public clearly has interest in enforcement of anti-discrimination laws).

of politicians to exploit anti-Mexican American sentiment for political gain. And it certainly would not be in the public interest to allow one public official to exercise unchecked authority to drive out learning about a particular viewpoint from the perspective of Mexican Americans.

### D.    The Plaintiffs Have Satisfied the Serious Questions Test.

Since the Plaintiffs have met all four elements necessary to grant a preliminary injunction, the Court may balance the prongs of the test, "so that a stronger showing of one element may offset a lesser showing of likelihood of success on the merits."[213] "In other words, 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."[214]

Plaintiffs have proved the likelihood of success on the merits and there is little doubt that the hardship balance tips sharply in their favor. By preserving the serious questions test, the Ninth Circuit has endorsed "the longstanding discretion of a district judge to preserve the status quo with provisional relief until the merits could be sorted out in cases where the clear irreparable injury would otherwise result and at least 'serious questions' going to the merits are raised....[215] The Court should exercise its equitable powers and discretion to preserve the status quo and enjoin the application of A.R.S. §15-112.

## XI.    CONCLUSION

Among the many flaws contained in HB 2281 is the unmistakable message to our youth that the promise of the Constitution to protect them all equally is a myth; that the history, literature and culture of at least one group is not worthy of being taught in school. If the State of Arizona can take away the right of students to learn about the historical, literary and artistic contributions of Mexican Americans to the American experience, then the Constitution is a hollow document. The fact that the

---

[213]  *Wild Rockies*, 632 F.3d at 1131.
[214]  *Wild Rockies*, 632 F.3d at 1132.
[215]  *Wild Rockies,* 632 F.3d at 1134.

teachers "are educating the young for citizenship is a reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."[216] Whatever legitimate role the State may have in setting curriculum standards in Arizona, it must be "within the limits of the Bill of Rights."[217] This is the fundamental requirement that HB 2281 and its application fails to meet.

Plaintiffs do not seek the intervention of this Court to controvert or supersede the legitimate role of the local Governing Board to make curricular decisions. To the contrary, plaintiffs seek to preserve the role of the elected officials of TUSD to decide what curriculum is appropriate and necessary and beneficial for its student population.[218]

Whereas the plaintiffs respectfully request that the Court grant the relief requested in this motion for preliminary injunction.

Submitted this 14th day of November, 2011.

s/*Richard M. Martinez*, Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs

---

[216] *West Virginia St. Bd. of Ed. v. Barnette*, 139 U.S. 624, 637 (1943).
[217] *Pico*, 457 U.S. at 864.
[218] See *Hazelwood*, 484 U.S. at 273 ("education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not federal judges.")(citations omitted); see also, *Pico*, 457 U.S. at 864 ("At the same time, however, we have necessarily recognized that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment.")

**Certificate of Service**

I hereby certify that on November 14, 2011, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of the instant motion via the Notice of Electronic Filing to the CM/ECF registrants of record.

s/*Richard M. Martinez*, Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs

Exhibit 1

# IN THE OFFICE OF ADMINISTRATIVE HEARINGS

| | |
|---|---|
| IN THE MATTER OF THE HEARING OF AN APPEAL BY:<br><br>TUCSON UNIFIED SCHOOL DISTRICT NO. 1 | No. 11F-002-ADE<br><br>**ORDER SETTING DEADLINES FOR POST-HEARING SUBMISSIONS** |

The Office of Administrative Hearings received the parties' motions requesting that before the October 17, 2011 hearing date filing deadlines be set for the submission of closing memoranda and proposed findings of fact and conclusions of law.  While the parties agree that there should be a joint filing deadline, they disagree on the date when the post-hearing submissions should be filed.  Upon consideration of the filings made by the parties, the Administrative Law Judge has determined that the post-hearing filing deadlines shall be as follows:

**IT IS ORDERED** that on or before **November 11, 2011**, the parties are to file written closing memoranda and serve the opposing party in such a manner to ensure receipt by that date; the parties are requested to provide to the Administrative Law Judge copies of legal authorities, other than Arizona statutes and rules, that are cited in their legal memoranda; and

**IT IS FURTHER ORDERED** that on or before **November 18, 2011**, the parties are to file a hard copy proposed findings of fact and conclusions of law and also file the document electronically as a word document (not pdf). Subsequently, the Administrative Law Judge will issue an order advising the parties of the closing of the record.

Done this day: September 26, 2011.

 

_____
Lewis D. Kowal
Administrative Law Judge

 

| |
|---|
| Office of Administrative Hearings<br>1400 West Washington, Suite 101<br>Phoenix, Arizona 85007<br>(602) 542-9826 |

Copy mailed this _____ day of
_____, 2011 to:

John Huppenthal, Superintendent
Department of Education
c/o Stacey Morley
1535 W. Jefferson St.
Phoenix, AZ  85007

Bryan F. Murphy
Melissa G. Iyer
Burch & Cracchiolo, PA
702 East Osborn Road, Suite 200
Phoenix, AZ  85011

bmurphy@bcattorneys.com
miyer@bcattorneys.com


Heather K. Gaines
Lisa Anne Smith
Sesaly O. Stamps
Deconcini McDonald Yetwin & Lacy
2525 E. Broadway Blvd, Ste 200
Tucson, AZ  85716

hgaines@dmyl.com
lasmith@dmyl.com
sstamps@dmyl.com



By _____

Exhibit 2



RICHARD M. MARTINEZ
ATTORNEY AT LAW, PLLC

November 2, 2011

**Via E-Mail & First Class Mail**
Bryan Murphy, Esq.
BURCH & CRACCHIOLO, P.A.
702 East Osborn, Suite 200
Phoenix, Arizona 85011-6882

Re: *Acosta, et. al. v. Huppenthal*

Dear Mr. Murphy:

Yesterday I had the opportunity to speak with Kevin Ray from the Arizona Attorney General's office and learned that your firm would be withdrawing from further representation of Superintendent Huppenthal next week. The status of pending motions was also discussed, including a request for additional time to respond to plaintiffs motion for summary judgment. I advised Mr. Ray that his call coincided with a letter that I intended to send to you this week concerning the motion for preliminary injunction that I am in the process of finalizing. We agreed that I would respond to his request by this letter.

Due to the enforcement actions taken by Mr. Horne and then by Superintendent Huppenthal, the efforts to shut down the Mexican American Studies program have continued without pause or reflection on the role of the *Acosta* challenge. This is unfortunate, as it has caused the extraordinary expenditure of time and resources in the prosecution of the constitutional claims that are pending in federal district court. There has also been no consideration by your client of the unending severe adverse impacts that his enforcement actions have had on the educators and students in Mexican American Studies.

In light of the HB 2281 enforcement actions by Superintendent Huppenthal, the *Acosta* plaintiffs are prepared to forego the filing of a motion for a preliminary injunction only if the parties stipulate to the same and an order is immediately submitted for Judge Tashima's signature that places an immediate stay on all HB 2281 enforcement actions. The stay would need to remain in effect while the *Acosta* matter is pending. Otherwise, we need to move forward with the motion and have the summary judgment motion fully briefed without delay.

How we proceed is entirely up to Superintendent Huppenthal; there is no reason for him to force the *Acosta* plaintiffs to seek an injunction when he can voluntarily agree to one. Please advise immediately of Superintendent Huppenthal's decision, as the motion for preliminary injunction will be filed within a week. If there is no agreement, we are seeking your consent to our motion to exceed the page limitation and file a 50 page brief. In addition, we are seeking your agreement to an expedited briefing schedule, as we will not allow the enforcement actions to reach the final stage as promised by Superintendent Huppenthal.

Sincerely,

Richard M. Martinez
Counsel for the *Acosta* Plaintiffs

c: Melissa G. Iyer, via e-mail only
   Kevin Ray, via e-mail only

RMLaw@RichardMartinezLaw.com
307 S. Convent Avenue • Tucson, Arizona 85701 • Phone (520) 327-4797 • Fax (520) 320-9090

Exhibit 3

1  **RICHARD M. MARTINEZ, SBA No. 7763**
307 South Convent Avenue
2  Tucson, Arizona 85701
(520) 327-4797 phone
3  (520) 320-9090 fax
richard@richardmartinezlaw.com
4  **Counsel for Plaintiffs**

5  IN THE UNITED STATES DISTRICT COURT

6  FOR THE STATE OF ARIZONA

7  CURTIS ACOSTA, SEAN
ARCE, MAYA ARCE, MARIA
8  FEDERICO BRUMMER,
DOLORES  CARRION,            No. CV 10 - 623 TUC AWT
9  ALEXANDRO ESCAMILLA,
JOSE GONZALEZ,  NORMA
10 GONZALEZ, LORENZO          **DECLARATION OF**
LOPEZ, JR., KORINA ELIZA      **MARTIN SEAN ARCE**
11 LOPEZ, RENE F. MARTINEZ,
SARA "SALLY" RUSK,
12 and YOLANDA SOTELO,

13          Plaintiffs,

14 v.

15 JOHN HUPPENTHAL,
Superintendent of Public
16 Instruction, et. al.,

17          Defendants.

18

19     MARTIN SEAN ARCE declares:

20 1.     My name is Martin Sean Arce.

21 2.     I am over the age of eighteen years and am competent to testify; Unless

22 otherwise stated, my testimony is based on my personal knowledge.

23 3.     I submit this Declaration in support of the Plaintiffs' Motion for a

24 Preliminary Injunction.

25 4.     I am currently employed by Tucson Unified School District (TUSD).

26 5.     I am the director of the Mexican American Studies (MAS) program for the

27 TUSD, a position I have held since 2008-09 school year.

28 6.     I have worked in the MAS program at TUSD since 1999.

7.    The MAS program was created in TUSD in 1998 in response to the historic dismal performance of Mexican American students and the need to establish a comprehensive educational program that not only promoted but demonstrated that Latino students could experience true academic success in every aspect of their K-12 education; the curriculum developed included history, government, English, literature and art from Mexican American/Latino perspectives.

8.    All MAS classes have always been open to all students.

9.    All MAS high school classes receive core credits toward graduation.

10.    In the spring semester of 2011, MAS high school classes had 1,155 enrolled students in 43 course sections .

11.    As of today, MAS high school classes have 606 enrolled students in 24 course sections at six high school sites.

12.    The MAS high school English and History classes are year long, the Government class is a semester course; thus, 480 MAS students are currently in year long classes, the balance, 126, are in government classes which are now semester long and will be offered next semester.

13.    As of today, MAS middle school classes have 173 enrolled students in 10 course sections at five middle school sites, these classes are a semester in length; the same number of course sections are scheduled for next semester.

14.    As of today, MAS elementary school classes have 25 enrolled students in 1 course section at one elementary school site.

15.    As of today, MAS has a total of 804 enrolled students.

16.    If the HB 2281 10% sanction is imposed by Superintendent Huppenthal, TUSD will close down the MAS program due to the inability to sustain operations with a budget cut of that amount; this will result is the loss of all department funded positions which include 1 director, 6 teachers, 1 administrative assistant and 2 part-time college student workers. Five of the MAS department funded

1   teachers are plaintiffs in this case.

2   17.    If the HB 2281 10% sanction is imposed by Superintendent Huppenthal,

3   most, if not all of the teachers in the MAS program will have to find other

4   teaching positions in TUSD, which are scarce, and some, if not all, will likely

5   have to find other employment.

6   18.    If the HB 2281 10% sanction is imposed by Superintendent Huppenthal,

7   the MAS department will be eliminated, my position will be eliminated and I will

8   have to find other employment.

9   19.    As the director of MAS I have collected and analyzed comprehensive data

10  concerning MAS; my 2011 report, attached hereto as Exhibit A, reflects

11  important factors that any competent and unbiased educational decision maker

12  would accept as compelling evidence that would strongly favor a decision

13  contrary to Superintendent Huppenthal's; the data shows MAS's effectiveness in

14  student achievement and graduation; over a four-year period, the primarily at-

15  risk Latino students who participate in MAS consistently closed the achievement

16  gap with non-MAS students in standardized test scores in each of the four years

17  and in each of the three sections: reading, writing and mathematics.

18  20.    TUSD's Ethnic Studies programs, including MAS, were designed to

19  effectively target the persistent achievement gaps generally suffered by ethnic

20  and racial minority students; this focus has been a consistent core principle of

21  MAS.

22  21.    In MAS classes, issues of race and ethnicity and their role in history and

23  society are a central theme and vehicle by which the curriculum brings cultural

24  relevancy to its academic subjects.

25          I declare under penalty of perjury that the foregoing is true and correct.

26          Dated this 14th day of November, 2011.

27                                              _Martin Sean Arce_

28                                              MARTIN SEAN ARCE

Exhibit A

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

### INTRODUCTION

The following data analysis is designed to measure the academic impact of students who have taken Tucson Unified School District (TUSD) Mexican American Studies (MAS) classes on the Arizona Instrument to Measure Standards (AIMS) compared to the impact that "traditional" classes have on AIMS outcomes of students who did not take MAS classes. The data analyzed are taken from the data set *"AIMS Achievement Comparison for Students Taking One or More Mexican American Studies Classes – Initial Passing Rate Versus Cumulative Passing Rate by AIMS Subjects and Cohort Year"* (The numbers from this data spreadsheet were created by TUSD - Department of Accountability & Research that is labeled in the Appendix 1 of this paper as *"AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes Initial Passing Rate Versus Cumulative Passing Rate by AIMS Subject and Cohort Year* - January 6, 2011").

The classes that constitute MAS classes are: American Government/Social Justice Education Project 1, 2; American History/Mexican American Perspectives 1,2; Latino Literature 7, 8; and Latino Literature 5, 6. These MAS CORE classes fulfill the Arizona graduation requirement for the following "traditional" classes: American Government, American History, 12th grade English and 11th grade English.

### METHODOLOGY

The methodology for this data analysis cites AIMS data for the graduation cohorts of 2007, 2008, 2009, and 2010. Specifically, it indicates data on the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" on the AIMS Reading, Writing and Math test portions for "All Graduates Combined," "Graduates Who Did Not Take Mexican American Studies Classes," and "Graduates Who Took One or More Mexican American Studies Classes." The six indicators identified above are described and defined in the subsequent sections:

*All Graduates Combined –* all students within a given graduation cohort from the following TUSD High Schools: Catalina High Magnet School, Cholla High Magnet School, Palo Verde High Magnet School, Pueblo Magnet High School, Rincon High School, Sahuaro High School, Sabino High School, Santa Rita High School, Tucson High Magnet School, and University High School. It is important to note that "All Graduates Combined" includes students who did not take Mexican American Studies (MAS) classes or in addition to students who did take Mexican American Studies classes. Additionally, it is important to note that for the 2007 to 2010 academic years, MAS classes were not offered at Palo Verde High Magnet School, Sahuaro High School, Sabino High School, Santa Rita High School and University High School, all TUSD high schools that were included in this comparative analysis.

1

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

*Graduates Who Did Not Take Mexican American Studies Classes* – all students within a given graduation year cohort who did not take MAS classes (on TUSD A&R January 6, 2011 spreadsheet this data set is labeled and read under the subtitle as "Graduates Who Did Not Take Ethnic Studies Classes" – See Appendix 1) from the following TUSD High Schools: Catalina High Magnet School, Cholla High Magnet School, Palo Verde High Magnet School, Pueblo Magnet High School, Rincon High School, Sahuaro High School, Sabino High School, Santa Rita High School, Tucson High Magnet School, and University High School. Additionally, it is important to consider that for the 2007 to 2010 academic years, MAS classes were not offered at Palo Verde High Magnet School, Sahuaro High School, Sabino High School, Santa Rita High School and University High School, all TUSD high schools that were included in this comparative analysis.

*Graduates Who Took One or More Mexican American Studies Classes* – is defined as all students within a given graduation cohort year that took one or more MAS classes. The MAS classes include the following: American Government/Social Justice Education Project 1, 2; American History/Mexican American Perspectives 1, 2; Latino Literature 7, 8; and Latino Literature 5, 6. It is important to note that MAS classes during the 2007-2010 academic years were offered only at Catalina High School, Cholla High Magnet School, Pueblo Magnet High School, Rincon High School, and Tucson High Magnet School. The data analysis for "All Graduates Combined" and "Graduates Who Did Not Take Mexican American Studies Classes" include in its analysis, in addition to the high school sites where MAS classes were offered for the 2007 -2010 academic years, the following additional TUSD High Schools where no MAS classes were offered: Palo Verde High Magnet School, Sahuaro High School, Sabino High School, Santa Rita High School, and University High School.

*The Initial Passing Rate* – the percentage of students in a given graduation cohort year who passed the AIMS test for Reading, Writing, and Math when they took the AIMS test for the first time during the Spring semester of their 10th grade year.  For example, in Table 1 below, it illustrates in the "Initial Passing Rate" area of Reading for "All Graduates Combined" the 2010 graduation cohort's "Initial Passing Rate" was 78%, meaning that when these students took the test for the first time during the Spring of their 10th grade year, 78% of the students in this cohort passed the AIMS Reading test. Table 1 through Table 9 should be interpreted the same way in which the aforementioned example for Table 1 was read for AIMS Initial Passing Rates for Reading, Writing and Math for all three of the graduate cohort groups.

*Cumulative Passing Rate* – is the percentage of students in a given graduation cohort year who passed the AIMS test for Reading, Writing, and Math after a possible 5 total testing opportunities, which translates to their overall cumulative passing rates to include the initial passing rate and at least one additional, and possibly up to four

2

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

additional testing opportunities. The possible five AIMS testing opportunities that comprise the "Cumulative Passing Rate" for these students in Table 1 data were as follows: 1) Spring semester of their 10th grade year, 2) Fall semester of their 11th grade year, 3) Spring semester of their 11th grade year, 4) Fall semester of their 12th grade year, and 5) Spring semester of their 12th grade year. Table 1 illustrates that the "Cumulative Passing Rate" area of Reading for "All Graduates Combined" the 2010 graduation cohort "Cumulative Passing Rate" was 94%, meaning that the students in this graduation cohort passed the AIMS Reading test at a cumulative 94% when given at least one and possibly up to five testing opportunities. Table 2 through Table 9 should be interpreted the same way that the example for Table 1 was interpreted for AIMS "Cumulative Passing Rate" for Reading, Writing and Math.

**Improvement in Passing Rate** – the difference between "Cumulative Passing Rate" and the "Initial Passing Rate" of a given student graduation cohort year. For example, in Table 1 below, it illustrates that the "Improvement in Passing Rate" area of Reading for "All Graduates Combined" the 2010 graduation cohort "Improvement in Passing Rate" was 15%, equaling the difference of the 2010 student cohort's "Cumulative Passing Rate" and "Initial Passing Rate". Table 2 through Table 9 should be interpreted the same way that the example for Table 1 was interpreted for AIMS "Improvement in Passing Rate" for Reading, Writing and Math.

3

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

**DATA TABLES, GRAPHS, RESULTS, & NARRATIVE ANALYSIS**

**AIMS Reading Comparative Analysis**

Table 1 below illustrates the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "***All Graduates Combined***" on the AIMS Reading Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Reading Test in "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "***All Graduates Combined.***"

| Table 1. **AIMS READING Test -** Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of ***All Graduates Combined*** | | | | |
|---|---|---|---|---|
| | | READING | | |
| Graduation Cohort | Number Tested | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 3147 | 78% | 94% | 15% |
| 2009 | 3163 | 78% | 93% | 16% |
| 2008 | 3281 | 75% | 92% | 17% |
| 2007 | 3467 | 75% | 93% | 18% |
| | *4 Year Average* | *77%* | *93%* | *17%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rate Versus Cumulative Passing Rate by AIMS Subject and Cohort Year)

Table 2 below illustrates the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "***Graduates Who Did Not Take Mexican American Studies Classes***" on the AIMS Reading Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Reading Test in "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "***Graduates Who Did Not Take Mexican American Studies Classes.***"

4

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

| Table 2. **AIMS READING Test** - Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of *Graduates Who Did Not Take Mexican American Studies Classes* | | | | |
|---|---|---|---|---|
| Graduation Cohort | Number Tested | READING | | |
| | | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 2757 | 80% | 94% | 14% |
| 2009 | 2798 | 79% | 93% | 14% |
| 2008 | 2874 | 77% | 92% | 15% |
| 2007 | 3169 | 77% | 93% | 16% |
| *4 Year Average* | | *78%* | *93%* | *15%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rates Versus Cumulative Passing Rates by AIMS Subject and Cohort Year)

Table 3 below illustrates the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "*Graduates Who Took One or More Mexican American Studies Classes*" on the AIMS Reading Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Reading Test in "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "*Graduates Who Took One or More Mexican American Studies Classes.*"

| Table 3. **AIMS READING Test** - Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of *Graduates Who Took One or More Mexican American Studies Classes* | | | | |
|---|---|---|---|---|
| Graduation Cohort | Number Tested | READING | | |
| | | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 306 | 66% | 92% | 26% |
| 2009 | 268 | 65% | 92% | 27% |
| 2008 | 362 | 62% | 94% | 31% |
| 2007 | 252 | 56% | 90% | 34% |
| *4 Year Average* | | *62%* | *92%* | *30%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rates Versus Cumulative Passing Rates by AIMS Subject and Cohort Year)

Graph 1 below illustrates the four-year average, 2007-2010, of the "*Initial Passing Rate*" on the AIMS Reading Test for: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes."

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

Graph 1. **2007-2010 AIMS READING TEST - 4 YEAR AVERAGE - INITIAL PASSING RATE** of: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes"



**RESULTS for 2007 – 2010 AIMS READING TEST:  INITIAL PASSING RATE of: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes"**

     The four year average for the 2007 – 2010 academic years for the AIMS Reading "Initial Passing Rate" of the three cohort groups are as follows: "All Graduates Combined," 77%; "Graduates Who Did Not Take Mexican American Studies Classes," 78%; and "Graduates Who Took One or More Mexican American Studies Classes," 62%.

     It is important to note that for the AIMS Reading "Initial Passing Rate" of "Graduates Who Took One or More Mexican American Studies Classes," this group of students had not yet taken MAS classes during their initial opportunity to take the AIMS Test because the first opportunity to take the AIMS Test is during the Spring semester of students' 10th grade year. Mexican American Studies classes are not offered until the 11th grade year.

     Furthermore, "Graduates Who Took One or More Mexican American Studies Classes" on their AIMS Reading "Initial Passing Rate" passed at 15% less than the "All Graduates Combined" group and 16% lower than less than the "Graduates Who Did Not Take Mexican American Studies Classes" group. Also important to note is that the data on the "Initial Passing Rate" demonstrates that students coming in to MAS classes during their 11th grade year are the lowest performing group of students in the district within this comparative analysis.

6

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

Graph 2 below illustrates the four-year average, 2007-2010, of the "***Cumulative Passing Rate***" of the AIMS Reading Test for: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes."

Graph 2. **2007-2010 AIMS READING TEST - 4 YEAR AVERAGE - CUMULATIVE PASSING RATE** of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes



**RESULTS for 2007 – 2010 AIMS READING TEST:  CUMULATIVE PASSING RATE of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes**

The four year average, 2007 – 2010 academic years, for the AIMS Reading "Cumulative Passing Rate" of the three cohort groups are as follows: "All Graduates Combined, 93%; "Graduates Who Did Not Take Mexican American Studies Classes," 93%; and "Graduates Who Took One or More Mexican American Studies Classes," 92%.

The AIMS Reading "Cumulative Passing Rate" for "Graduates Taking One or More Mexican American Studies Classes" demonstrates a **"closing of the academic achievement gap"** which is substantial given that MAS students had an "Initial Passing Rate" significantly lower (-15% and -16%) than their comparative cohort groups.

Moreover, for the 2008 cohort year for "Cumulative Passing Rate" on AIMS Reading, "Graduates Who Took One or More Mexican American Studies Classes" not

7

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

only closed the achievement gap, but also had an outcome that resulted in a +2% inversion of the achievement gap in comparison to both groups.

Graph 3 below illustrates the four-year average, 2007-2010, of the "***Improvement in Passing Rate***" on the AIMS Reading Test for: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes."

Graph 3. **2007 – 2010 AIMS READING TEST - 4 YEAR AVERAGE– IMPROVEMENT IN PASSING RATE** of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes



**RESULTS of 2007 – 2010 AIMS READING TEST - IMPROVEMENT IN PASSING RATE of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes**

The four year average, 2007 – 2010 academic years, for **actual** "Improvement in Passing Rate" on the AIMS Reading Test of the three cohort groups are as follows: "All Graduates Combined," 17%; "Graduates Who Did Not Take Mexican American Studies Classes," 15%; and "Graduates Who Took One or More Mexican American Studies Classes," 30%.

While it should be noted that for the 2007-2010 AIMS Reading: "All Graduates Combined" had a ***possible improvement in passing rate of 23 percentage points*** (Initial

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

Passing Rate of 77%); "Graduates Who Did Not Take Mexican American Studies Classes" had a *possible improvement in passing rate of 22 percentage points* (Initial Passing Rate of 78%); and "Graduates Who Took One or More Mexican American Studies Classes" had a *possible improvement in passing rate of 38 percentage points* (Initial Passing Rate of 62%) – "Graduates Who Took One or More Mexican American Studies Classes" had a *rate of improvement* (Actual Rate of Improvement / Possible Improvement in Passing Rate) *that was 79%* compared to "All Graduates Combined" rate of improvement of 74% and "Graduates Who Did Not Take Mexican American Studies Classes" rate of improvement of 68%.

Table 4. **2007-2010  -  *AIMS Reading Rate of Improvement*** for: "All Groups Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes"

| Cohort | Initial Passing Rate | Possible Improvement in Passing Rate | Actual Improvement in Passing Rate | Rate of Improvement | Difference (+/-) MAS – Non MAS |
|---|---|---|---|---|---|
| All Graduates Combined (ACG) | 77% | 23% | 17% | 74% | (-) 5% |
| Graduates Who Did Not Take Mexican American Studies Classes (NonMAS) | 78% | 22% | 15% | 68% | (-) 11% |
| Graduates Who Took One or More Mexican American Studies Classes | 62% | 38% | 30% | **79%** | **(+)5% more than (ACG)** **(+)11% than more (NonMAS)** |

*Possible Improvement in Passing Rate* is determined by the following equation: (100% - Initial Passing Rate)
*Actual Improvement in Passing Rate* is calculated as follows: (Cumulative Passing Rate – Initial Passing Rate)
*Rate of Improvement* is calculated as follows: (Actual Improvement in Passing Rate /  Possible Improvement in Passing Rate)

**AIMS Writing Comparative Analysis**

Table 5 below illustrates the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "*All Graduates Combined*" on the AIMS Writing Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Writing Test in "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "*All Graduates Combined.*"

9

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

| Table 5. **AIMS WRITING Test** - Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of *All Graduates Combined* | | | | |
|---|---|---|---|---|
| | | WRITING | | |
| Graduation Cohort | Number Tested | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 3147 | 74% | 95% | 21% |
| 2009 | 3163 | 79% | 93% | 14% |
| 2008 | 3281 | 68% | 93% | 24% |
| 2007 | 3467 | 77% | 94% | 17% |
| | *4 Year Average* | *75%* | *94%* | *19%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rates Versus Cumulative Passing Rates by AIMS Subject and Cohort Year")

    Table 6 below illustrates the "Cumulative Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for ***Graduates Who Did Not Take Mexican American Studies Classes***" on the AIMS Writing Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Writing Test in "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for ***Graduates Who Did Not Take Mexican American Studies Classes.***"

| Table 6. **AIMS WRITING Test** - Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of *Graduates Who Did Not Take Mexican American Studies Classes* | | | | |
|---|---|---|---|---|
| | | WRITING | | |
| Graduation Cohort | Number Tested | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 2757 | 75% | 95% | 20% |
| 2009 | 2798 | 80% | 93% | 13% |
| 2008 | 2874 | 70% | 93% | 23% |
| 2007 | 3169 | 78% | 94% | 16% |
| | *4 Year Average* | *76%* | *94%* | *18%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rates Versus Cumulative Passing Rates by AIMS Subject and Cohort Year")

    Table 7 below illustrates the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for ***Graduates Who Did Take One or More Mexican American Studies Classes***" on the AIMS Writing Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Writing Test in "Initial Passing

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for *"Graduates Who Did Take One or More Mexican American Studies Classes"*

| Table 6. **AIMS WRITING Test -** Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of *Graduates Who Took One or More Mexican American Studies Classes* | | | | |
|---|---|---|---|---|
| | | WRITING | | |
| Graduation Cohort | Number Tested | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 306 | 65% | 93% | 28% |
| 2009 | 268 | 68% | 91% | 23% |
| 2008 | 362 | 57% | 94% | 38% |
| 2007 | 252 | 61% | 93% | 32% |
| | *4 Year Average* | *63%* | *93%* | *30%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rates Versus Cumulative Passing Rates by AIMS Subject and Cohort Year")

       Graph 4 below illustrates the four-year average, 2007-2010, of the *"Initial Passing Rate"* on the AIMS Writing Test for: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes."

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

Graph 4. **2007-2010 AIMS WRITING TEST - 4 YEAR AVERAGE - INITIAL PASSING RATE** of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes



## RESULTS for 2007 – 2010 AIMS WRITING TEST:  <u>INITIAL PASSING RATE</u> of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes

The four-year average for the 2007-2010 academic years for the AIMS Writing "Initial Passing Rate" of the three cohort groups are as follows: "All Graduates Combined," 75%; "Graduates Who Did Not Take Mexican American Studies Classes," 76%; and "Graduates Who Took One or More Mexican American Studies Classes," 63%.

It is important to note that for the AIMS Writing "Initial Passing Rate" of "Graduates Who Took One or More Mexican American Studies Classes," this group of students had not yet taken MAS classes during their initial opportunity to take the AIMS Test because the first opportunity to take the AIMS Test is during the Spring semester of students' 10th grade year. Mexican American Studies classes are not offered until the 11th grade year.

Furthermore, "Graduates Who Took One or More Mexican American Studies Classes" on their AIMS Writing "Initial Passing Rate" passed at 12% less than "All Graduates Combined" and 13% lower than less than "Graduates Who Did Not Take Mexican American Studies Classes." Also important to note is that the data on the "Initial Passing Rate" demonstrates that students coming in to MAS classes during their 11th grade year

12

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

are the lowest performing group of students in the district within this comparative analysis.

Graph 5 below illustrates the four-year average, 2007-2010, of the "***Cumulative Passing Rate***" on the AIMS Writing Test for: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes."

Graph 5. **2007-2010 AIMS WRITING TEST - 4 YEAR AVERAGE - CUMULATIVE PASSING RATE** of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes



2007 - 2010

**RESULTS for 2007 – 2010 AIMS WRITING TEST:  <u>CUMULATIVE PASSING RATE</u> of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes**

The four-year average for the 2007-2010 academic years for the AIMS Writing "Cumulative Passing Rate" of the three cohort groups are as follows: "All Graduates Combined," 94%; "Graduates Who Did Not Take Mexican American Studies Classes," 94%; and "Graduates Who Took One or More Mexican American Studies Classes," 93%.

The AIMS Writing "Cumulative Passing Rate" for "Graduates Taking One or More Mexican American Studies Classes" demonstrates a **"closing of the academic achievement gap"** which is substantial given that MAS students had an "Initial Passing

13

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

Rate" significantly lower (-12% and -13% respectively) than their comparative cohort groups.

Moreover, for the 2008 cohort year for "Cumulative Passing Rate" on AIMS Writing, "Graduates Who Took One or More Mexican American Studies Classes" not only closed the achievement gap, but also had an outcome that resulted in a +1% inversion of the achievement gap in comparison to both groups.

Graph 6 below illustrates the four-year average, 2007-2010, of the *"Improvement Passing Rate"* on the AIMS Writing Test for: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes."

Graph 6. **2007-2010 AIMS WRITING TEST - 4 YEAR AVERAGE – IMPROVEMENT IN PASSING RATE** of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes



**RESULTS of 2007 – 2010 AIMS WRITING TEST - IMPROVEMENT IN PASSING RATE of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes**

The four-year average for the 2007-2010 academic years for **actual** "Improvement in Passing Rate" on the AIMS Writing Test of the three cohort groups are as follows: "All Graduates Combined," 19%; "Graduates Who Did Not Take Mexican American Studies Classes," 18%; and "Graduates Who Took One or More Mexican American Studies Classes," 30%.

14

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

While it should be noted that for the 2007-2010 AIMS Writing: "All Graduates Combined" had a ***possible improvement in passing rate of 25 percentage points*** (Initial Passing Rate of 75%); "Graduates Who Did Not Take Mexican American Studies Classes" had a ***possible improvement in passing rate of 24 percentage points*** (Initial Passing Rate of 76%); and "Graduates Who Took One or More Mexican American Studies Classes" had a ***possible improvement in passing rate of 37 percentage points*** (Initial Passing Rate of 63%) – "Graduates Who Took One or More Mexican American Studies Classes" had a ***rate of improvement*** (Actual Rate of Improvement / Possible Improvement in Passing Rate) ***that was 81%*** compared to "All Graduates Combined" rate of improvement of 74% and "Graduates Who Did Not Take Mexican American Studies Classes" rate of improvement of 75%.

Table 7. **2007-2010 - *AIMS Writing Rate of Improvement*** for: "All Groups Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes"

| Cohort | Initial Passing Rate | Possible Improvement in Passing Rate | Actual Improvement in Passing Rate | Rate of Improvement | Difference (+/-) MAS – Non MAS |
|---|---|---|---|---|---|
| All Graduates Combined (ACG) | 75% | 23% | 19% | 74% | (-) 7% |
| Graduates Who Did Not Take Mexican American Studies Classes (NonMAS) | 76% | 24% | 18% | 75% | (-) 6% |
| Graduates Who Took One or More Mexican American Studies Classes | 63% | 37% | 30% | **81%** | **(+)7% more than (ACG) (+)6% than more (NonMAS)** |

*Possible Improvement in Passing Rate* is determined by the following equation: (100% - Initial Passing Rate)
*Actual Improvement in Passing Rate* is calculated as follows: (Cumulative Passing Rate – Initial Passing Rate)
*Rate of Improvement* is calculated as follows: (Actual Improvement in Passing Rate / Possible Improvement in Passing Rate)

**AIMS Math Comparative Analysis**

Table 8 below illustrates the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "***All Graduates Combined***" on the AIMS Math Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Math Test in "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for "***All Graduates Combined.***"

15

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

Table 8. **AIMS MATH Test** - Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of *All Graduates Combined*

| Graduation Cohort | Number Tested | MATH | | |
| --- | --- | --- | --- | --- |
| | | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 3147 | 75% | 90% | 15% |
| 2009 | 3163 | 71% | 89% | 18% |
| 2008 | 3281 | 70% | 89% | 19% |
| 2007 | 3467 | 69% | 88% | 19% |
| *4 Year Average* | | *71%* | *89%* | *18%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rates Versus Cumulative Passing Rates by AIMS Subject and Cohort Year)

Table 9 below illustrates the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for *Graduates Who Did Not Take Mexican American Studies Classes*" on the AIMS Math Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Math Test in "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for *Graduates Who Did Not Take Mexican American Studies Classes.*"

Table 9. **AIMS MATH Test** - Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of *Graduates Who Did Not Take Mexican American Studies Classes*

| Graduation Cohort | Number Tested | MATH | | |
| --- | --- | --- | --- | --- |
| | | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 2757 | 77% | 90% | 13% |
| 2009 | 2798 | 72% | 89% | 16% |
| 2008 | 2874 | 72% | 88% | 17% |
| 2007 | 3169 | 71% | 88% | 17% |
| *4 Year Average* | | *73%* | *89%* | *16%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rates Versus Cumulative Passing Rates by AIMS Subject and Cohort Year)

Table 10 below illustrates the "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for *Graduates Who Took One or More Mexican American Studies Classes*" on the AIMS Math Test for the 2007-2010 academic years in TUSD. Furthermore, the bottom column illustrates the four-year average of the 2007-2010 academic years for the AIMS Math Test in "Initial Passing Rate," "Cumulative Passing Rate," and "Improvement in Passing Rate" for *Graduates Who Took One or More Mexican American Studies Classes.*"

16

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

| Table 10. **AIMS MATH Test** - Initial Passing Rate, Cumulative Passing Rate, and Improvement in Passing Rate of *Graduates Who Took One or More Mexican American Studies Classes* | | | | |
|---|---|---|---|---|
| | | MATH | | |
| Graduation Cohort | Number Tested | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2010 | 306 | 61% | 86% | 25% |
| 2009 | 268 | 60% | 89% | 29% |
| 2008 | 362 | 57% | 90% | 33% |
| 2007 | 252 | 51% | 85% | 34% |
| *4 Year Average* | | *57%* | *88%* | *30%* |

\* Data Collected January 6, 2011 by TUSD Department of Accountability and Research (See Appendix "AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes – Initial Passing Rates Versus Cumulative Passing Rates by AIMS Subject and Cohort Year)

Graph 7 below illustrates the four-year average, 2007-2010, of the "*Initial Passing Rate*" on the AIMS Math Test for: "All Graduates Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes."

Graph 7. **2007-2010 AIMS MATH TEST - 4 YEAR AVERAGE - INITIAL PASSING RATE** of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes



17

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

**RESULTS for 2007 – 2010 AIMS MATH TEST:  <u>INITIAL PASSING RATE</u> of All Graduates
Combined, Graduates Who Did Not Take Mexican American Studies Classes, and
Graduates Who Took One or More Mexican American Studies Classes**

The four-year average of the 2007 – 2010 academic years for the AIMS Math
"Initial Passing Rate" of the three cohort groups are as follows: "All Graduates
Combined," 71%; "Graduates Who Did Not Take Mexican American Studies Classes,"
73%; and "Graduates Who Took One or More Mexican American Studies Classes,"
57%.

It is important to note that for the AIMS Math "Initial Passing Rate" of
"Graduates Who Took One or More Mexican American Studies Classes," this group of
students had not yet taken MAS classes during their first opportunity to take the AIMS
Test because the initial opportunity to take the AIMS Test is during the Spring semester
of students' 10th grade year. Mexican American Studies classes are not offered until the
11th grade year. Moreover, MAS do not offer courses in Math.

Furthermore, "Graduates Who Took One or More Mexican American Studies
Classes" on their AIMS Math "Initial Passing Rate" passed at 14% less than "All
Graduates Combined" and 16% lower than less than "Graduates Who Did Not Take
Mexican American Studies Classes." Also important to note is that the data on the
"Initial Passing Rate" demonstrates that students coming in to MAS classes during their
11th grade year are the lowest performing group of students in the district within this
comparative analysis.

Graph 8 below illustrates the four-year average, 2007-2010, of the "***Cumulative
Passing Rate***" on the AIMS Math Test for: "All Graduates Combined"; "Graduates Who
Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or
More Mexican American Studies Classes."

18

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

Graph 8. **2007-2010 AIMS MATH TEST - 4 YEAR AVERAGE - CUMULATIVE PASSING RATE** of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes



**RESULTS for 2007 – 2010 AIMS MATH TEST:** <u>CUMULATIVE PASSING RATE</u> **of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes**

The four-year average for the 2007-2010 academic years for the AIMS Math "Cumulative Passing Rate" of the three cohort groups are as follows: "All Graduates Combined," 89%; "Graduates Who Did Not Take Mexican American Studies Classes," 89%; and "Graduates Who Took One or More Mexican American Studies Classes," 88%.

The AIMS Math "Cumulative Passing Rate" for "Graduates Taking One or More Mexican American Studies Classes" demonstrates a **"closing of the academic achievement gap"** which is substantial given that MAS students had initial passing rates significantly lower (-12% and -13% respectively) than their comparative cohort groups.

Moreover, for the "Cumulative Passing Rate" for the 2008 cohort year on AIMS Math, "Graduates Who Took One or More Mexican American Studies Classes" not only closed the achievement gap, but also had an outcome that resulted in a +1% inversion of the achievement gap in comparison to both cohort groups. Additionally, MAS does not offer courses in Math.

Graph 9 below illustrates the four-year average, 2007-2010, of the **"*Improvement in Passing Rate*"** on the AIMS Math Test for: "All Graduates Combined";

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

"Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes."

Graph 9. **2007-2010 AIMS MATH TEST - 4 YEAR AVERAGE – IMPROVEMENT IN PASSING RATE** of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes



**RESULTS of 2007 – 2010 AIMS MATH TEST - IMPROVEMENT IN PASSING RATE of All Graduates Combined, Graduates Who Did Not Take Mexican American Studies Classes, and Graduates Who Took One or More Mexican American Studies Classes**

The four-year average for the 2007-2010 academic years for **actual** "Improvement in Passing Rate" in the AIMS Math Test of the three cohort groups are as follows: "All Graduates Combined," 18%; "Graduates Who Did Not Take Mexican American Studies Classes," 16%; and "Graduates Who Took One or More Mexican American Studies Classes," 30%.

While it should be noted that for the 2007-2010 AIMS Math: "All Graduates Combined" had a ***possible improvement in passing rate of 29 percentage points*** (Initial Passing Rate of 71%); "Graduates Who Did Not Take Mexican American Studies Classes" had a ***possible improvement in passing rate of 27 percentage points*** (Initial Passing Rate of 73%); and "Graduates Who Took One or More Mexican American Studies Classes" had a ***possible improvement in passing rate of 43 percentage points*** (Initial Passing Rate of 57%) – "Graduates Who Took One or More Mexican American Studies Classes" had a ***rate of improvement*** (Actual Rate of Improvement / Possible

20

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

Improvement in Passing Rate) *that was 70%* compared to "All Graduates Combined" rate of improvement of 62% and "Graduates Who Did Not Take Mexican American Studies Classes" rate of improvement of 59%.

Table 11. **2007-2010  -  *AIMS Math Rate of Improvement***  for: "All Groups Combined"; "Graduates Who Did Not Take Mexican American Studies Classes"; and "Graduates Who Took One or More Mexican American Studies Classes"

| Cohort | Initial Passing Rate | Possible Improvement in Passing Rate | Actual Improvement in Passing Rate | Rate of Improvement | Difference (+/-) MAS – Non MAS |
|---|---|---|---|---|---|
| All Graduates Combined (ACG) | 71% | 29% | 18% | 62% | (-) 8% |
| Graduates Who Did Not Take Mexican American Studies Classes (NonMAS) | 73% | 27% | 16% | 59% | (-) 11% |
| Graduates Who Took One or More Mexican American Studies Classes | 57% | 43% | 30% | **70%** | **(+)8% more than (ACG)** **(+)11% than more (NonMAS)** |

*Possible Improvement in Passing Rate* is determined by the following equation: (100% - Initial Passing Rate)
*Actual Improvement in Passing Rate* is calculated as follows: (Cumulative Passing Rate – Initial Passing Rate)
*Rate of Improvement* is calculated as follows: (Actual Improvement in Passing Rate / Possible Improvement in Passing Rate)

The "Improvement in Passing Rate" in AIMS Math for "Graduates Who Took One or More Mexican American Studies Classes" represents a growth that is substantially greater their two comparison cohort groups. Additionally, MAS does not offer courses in Math.

## IMPLICATIONS/CONSIDERATIONS

The data analysis within the *AIMS Achievement Comparison for Students Taking One or More Mexican American Studies Classes – Initial Passing Rate Versus Cumulative Passing Rate by AIMS Subjects and Cohort Year* clearly illustrates that MAS students at minimum *"close the academic achievement gap"* and make improvements in AIMS that exceed their peers over the four consecutive academic years of 2007 - 2010.

A consideration that these AIMS outcomes occur within a context wherein Latino students are the second lowest academically achieving student demographic in TUSD and the fact that Latino students comprise the majority of students in MAS classes make the AIMS outcomes and improvement rate compelling as to the educational efficacy of MAS classes.

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

Moreover, in light of the demographic trajectory in which Latino students are quickly approaching 70% of TUSD schools and in combination with the persistent achievement gap between Latino and White/Anglo students in TUSD, it is imperative that TUSD be responsive to address this achievement gap. In a highly effective and consistent manner, Mexican American Studies has clearly been able to ***"close the achievement gap"*** as evidenced in the TUSD Accountability & Research's – January 6, 2001 (Table 1 – Table 9; Graph 1 – Graph 9; Appendix 1) data set and the accompanying analysis within this paper.

Considering that these significant and favorable AIMS outcomes for MAS students transpire within the context of schools where MAS classes are offered that have a significantly higher percentage of students who qualify for "Free & Reduced Lunch," these AIMS outcomes and Improvement in Passing Rate demonstrate further evidence as to the efficacy of MAS classes (See Table 12 below). Furthermore, Latino students comprise the majority of students who qualify for "Free & Reduced Lunch" throughout TUSD schools and comprise the majority of students in MAS classes.

As a means to provide further insight into MAS class impact on AIMS outcomes, a school by school analysis (example: comparing MAS student AIMS outcomes to non-MAS student AIMS outcomes at the school sites where MAS classes are offered) would control for the stark contrasts in socio-economic level disparities between TUSD high schools where MAS classes are offered (low socio-economic levels) with that of TUSD high schools where MAS classes are not offered (substantially higher socio-economic levels). Specifically, an assessment of AIMS outcomes at high school sites where MAS courses were offered during the 2007-2010 academic years – Catalina, Cholla, Pueblo, Rincon, and Tucson High Schools where students qualified at 64% for Free & Reduced Lunch – compared to AIMS outcomes at high school sites where MAS classes were not offered – Palo Verde, Sahuaro, Sabino, Santa Rita and University High Schools where students qualified at 30% for Free & Reduced Lunch would provide additional valuable insight into the efficacy of MAS classes. (See Table 12 below)

| Table 12. Percentage of Students at TUSD High Schools Qualified for Free & Reduced Lunch for the 2010-2011 Academic Year | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Academic Year | Catalina Magnet High School | Cholla High Magnet School | Pueblo Magnet High School | Rincon High School | Tucson High Magnet School | Palo Verde High Magnet School | Sahuaro High School | Sabino High School | Santa Rita High School | University High School |
| 2010-2011 | 71.4% | 67.2% | 72.0% | 55.0% | 52.0% | 60.0% | 26.3% | 9.3% | 39.9% | 15.6% |

Furthermore, it is important to identify other educational programs in TUSD, both traditional and specialized, to analyze the impact they have on AIMS outcomes for Latino students and compare that to the impact that MAS classes have on AIMS

22

**Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years**

outcomes of Latino students. The critical question is *"What other programs in TUSD have a positive impact on the academic achievement of Latino students as do MAS classes?"* In view of the fact that Latino students are the second lowest performing group in TUSD combined with the demonstrated closing of the achievement gap by MAS students, such an analysis would illustrate the effectiveness that all educational programs have on TUSD's largest and second lowest achieving student population.

Lastly, a disaggregated look by ethnicity at the *AIMS Achievement Comparison for Students Taking One or More Mexican American Studies Classes – Initial Passing Rate Versus Cumulative Passing Rate by AIMS Subjects and Cohort Year* data set would illustrate the positive academic impact MAS classes have on Latino students who took MAS classes compared to Latino students who did not take MAS classes, the student group that constitutes the second lowest achieving student group in TUSD.

**CONCLUSION**

In a time where urban public school districts are searching for effective educational models, effective curricula, and effective pedagogical approaches to meet the needs of their most underserved and lowest achieving students, the TUSD Mexican American Studies Department has been highly effective and consistent in meeting the academic needs of Latinos, one of the district's most underserved and lowest achieving student groups.

Through maintaining the following MAS high school classes - American Government/Social Justice Education Project 1, 2; American History/Mexican American Perspectives 1, 2; Latino Literature 7, 8; and Latino Literature 5, 6 – in its current structure as CORE classes that fulfill the students' graduation requirements for American Government, American History, and 11th and 12th grade English, this structure will continue to create equitable educational opportunities for TUSD students. Additionally this current structure of class offerings will continue to afford students unique and innovative educational opportunities to replicate and even improve upon the irrefutable increase in AIMS "Cumulative Passing Rate" wherein **"the achievement gap is closed"** as well as AIMS "Improvement in Passing Rate" as clearly demonstrated in the above comprehensive analysis. *If MAS classes were either ineffective or just as effective as other "traditional" TUSD classes, one would expect these gaps to persist through cumulative passing rates. Instead, the data clearly illustrates the closing of the achievement gap, a substantial indicator of the efficacy of MAS classes. In order for MAS students to perform on par with non-MAS students ("Graduates Who Did Not Take Mexican American Studies Classes"), MAS students actually have "over performed" to achieve equity relative to academic achievement.*

23

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

*Any change in the current structure of MAS course offerings as CORE classes will certainly eliminate data driven and data proven equitable educational opportunities that have been provided to students in MAS classes that have resulted both in the increase in academic achievement as well as the closing of the achievement gap.* A change in structure of MAS course offerings will certainly have deleterious effects to include:

1) the elimination of student incentive to take MAS classes because students, particularly Latino students who have traditionally struggled to graduate and who are second to Native American students with highest dropout rate in TUSD (http://tusdstats.tusd.k12.az.us/paweb/aggD/graduation/DropOut.aspx), would not take the additional courses and "double up" for additional History and English classes.

2) sending the message to Latino students, parents and community that MAS courses, which highlight the historical and cultural contributions that Latinos (while simultaneously covering the traditional state standards) have made to the United States are not worthy of study as Social Studies and English classes sufficient to count as CORE credit.

3) a severe regression and setback on the tremendous gains that the Mexican American/Latino community and MAS has made to counter the pervasive Latino student population as being traditionally underserved and underperforming. Any such structural change in course offerings will certainly reset the Mexican American/Latino historical, cultural and lived experiences back to the margins and not at the center of curriculum and instruction, a practice that has traditionally failed Latino students in TUSD.

4) the removal of a highly specialized educational program, that are found in MAS courses as CORE classes, that has consistently met the academic needs of the second lowest performing and largest student population in TUSD.

24

**Comparative Passing Rates for**
**MAS Students & Non-MAS Students on AIMS Test**
**2007 to 2010 Academic Years**

Appendix 1

*"AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes*
*Initial Passing Rate Versus Cumulative Passing Rate by AIMS Subject and Cohort Year -*
January 6, 2011"

Comparative Passing Rates for
MAS Students & Non-MAS Students on AIMS Test
2007 to 2010 Academic Years

# Tucson Unified School District

## Department of Accountability and Research                     January 6, 2011

**AIMS Achievement Comparison for Students Taking One or More Ethnic Studies Classes**
**Initial Passing Rate Versus Cumulative Passing Rate by AIMS Subject and Cohort Year**

### All Graduates Combined

| Graduation Cohort | Number Tested | Math | | | Reading | | | Writing | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2007 | 3467 | 69% | 88% | 19% | 75% | 93% | 18% | 77% | 94% | 17% |
| 2008 | 3281 | 70% | 89% | 19% | 75% | 92% | 17% | 68% | 93% | 24% |
| 2009 | 3163 | 71% | 89% | 18% | 78% | 93% | 16% | 79% | 93% | 14% |
| 2010 | 3147 | 75% | 90% | 15% | 78% | 94% | 15% | 74% | 95% | 21% |

### Graduates Who Did Not Take Ethnic Studies Classes

| Graduation Cohort | Number Tested | Math | | | Reading | | | Writing | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2007 | 3169 | 71% | 88% | 17% | 77% | 93% | 16% | 78% | 94% | 16% |
| 2008 | 2874 | 72% | 88% | 17% | 77% | 92% | 15% | 70% | 93% | 23% |
| 2009 | 2798 | 72% | 89% | 16% | 79% | 93% | 14% | 80% | 93% | 13% |
| 2010 | 2757 | 77% | 90% | 13% | 80% | 94% | 14% | 75% | 95% | 20% |

### Graduates Who Took One or More Ethnic Studies Classes - All Classes Combined

| Graduation Cohort | Number Tested | Math | | | Reading | | | Writing | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2007 | 298 | 51% | 85% | 34% | 58% | 91% | 32% | 61% | 94% | 32% |
| 2008 | 407 | 57% | 91% | 34% | 63% | 94% | 31% | 58% | 95% | 37% |
| 2009 | 365 | 59% | 90% | 31% | 65% | 93% | 28% | 70% | 92% | 22% |
| 2010 | 390 | 63% | 87% | 24% | 67% | 93% | 26% | 67% | 95% | 28% |

### Graduates Who Took One or More Ethnic Studies Classes - Mexican American Studies Focus Only

| Graduation Cohort | Number Tested | Math | | | Reading | | | Writing | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate | Initial Passing Rate | Cumulative Passing Rate | Improvement in Passing Rate |
| 2007 | 252 | 51% | 85% | 34% | 56% | 90% | 34% | 61% | 93% | 32% |
| 2008 | 362 | 57% | 90% | 33% | 62% | 94% | 31% | 57% | 94% | 38% |
| 2009 | 268 | 60% | 89% | 29% | 65% | 92% | 27% | 68% | 91% | 23% |
| 2010 | 306 | 61% | 86% | 25% | 66% | 92% | 26% | 65% | 93% | 28% |

26

Exhibit 4



**U.S. Department of Justice**
*Civil Rights Division*

**U.S. Department of Education**
*Office for Civil Rights*



August 26, 2011

<u>Via Facsimile and United States Mail</u>

Mr. John Huppenthal
Superintendent of Public Instruction
Arizona Department of Education
1535 West Jefferson Street
Phoenix, Arizona  85007
602.542.5440

Kevin D. Ray
Section Chief Counsel
Education and Health Section
Arizona Office of the Attorney General
1275 West Washington Street
Phoenix, Arizona  85007-2926
602.364.0700

RE:    **<u>Arizona Department of Education</u>**
       **OCR Case Number 08-10-4038**
       **DJ 170-8-408**
       **DJ 169-8-84**

Dear Superintendent Huppenthal and Mr. Ray:

The Office for Civil Rights of the U.S. Department of Education (OCR) and the Civil Rights Division of the U.S. Department of Justice (DOJ) write to notify you of our determination with respect to the above-referenced matters regarding the Arizona Department of Education (ADE). On May 18, 2010, we received a statewide discrimination complaint against ADE, in which the complainant alleged that ADE discriminates against teachers of ADE's English Language Learner (ELL) program on the basis of national origin. The complainant specifically alleged that ADE enforces a policy, procedure, or practice that results in the removal of teachers from ELL classes based on a determination that their spoken English is accented or ungrammatical; the complainant further alleged that the policy may also have unlawfully discriminated against the ELL students who previously had been taught by the teachers who had been removed by the policy. We recognized that ADE denies these allegations. For the reasons set forth below, OCR and DOJ are closing the above-referenced matters effective the date of this letter.

Both OCR and DOJ are responsible for enforcing Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Title VI), and its implementing regulation, 34 C.F.R. part 100. Under Title VI and its regulation, recipients of federal financial assistance are prohibited from discriminating on the basis of race, color, or

Page 2

national origin. ADE is a recipient of financial assistance from the U.S. Department of Education and, therefore, is subject to Title VI and its implementing regulation. Additionally, Local Educational Agencies (LEAs) in Arizona that receive federal financial assistance are required to comply with Title VI, including LEAs subject to ADE's ELL monitoring procedures. Title VI also prohibits any recipient from intimidating or retaliating against an individual for the purpose of interfering with his or her rights under Title VI, or because he or she has filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing.

DOJ is further authorized to enforce Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII), with respect to state and local government employers, and the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701, *et seq.* (EEOA). Title VII prohibits an employer from discriminating against an employee on the basis of race, color, religion, sex, or national origin. Title VII also prohibits an employer from discriminating against an employee because he or she has opposed any practice made unlawful by Title VII, or because he or she has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing. Section 1703(d) of the EEOA, with limited exceptions, prohibits discrimination by a state or local educational agency on the basis of race, color, national origin, and sex in the employment, employment conditions, or assignments to schools of its faculty or staff.

On August 5, 2010, DOJ notified the State that its then-current application of Ariz. Rev. Stat. § 15-751(2)[1] might violate Title VII and the EEOA and that DOJ would be conducting an investigation. In a subsequent letter dated November 15, 2010, OCR and DOJ notified the State of their joint investigation of the complaint under the above-referenced statutes and requested information. DOJ and OCR were concerned that ADE's application of ARS § 15-751(2) might violate Title VI by discriminating against Hispanics and others who are not native-English speakers who work as or wish to work as public school teachers in Arizona, and that such discrimination could deny public school students in Arizona equal educational opportunities on the basis of national origin in violation of Title VI and the EEOA. *See* 20 U.S.C. §1703(d). In subsequent correspondence, the State provided responses to those requests. At the commencement of our investigation, ADE's on-site monitoring process included on-site visits to LEAs to monitor their ELL teachers' English fluency using subjective evaluations. Examples of concerns documented by ADE during their on-site classroom visits include: "the" pronounced "da," "another" pronounced "anuder," and "lives here" pronounced "leeves here." Based only on the brief classroom on-site visits, ADE required LEAs to create and implement corrective action plans to resolve ADE's concerns about teachers' accent for spoken English, even when LEAs did not have concerns about the teachers' English fluency and had already assessed the teachers' English fluency using objective measures.

When DOJ and OCR requested information regarding this monitoring process, ADE defended its actions based on the fluency requirement in Title III of the No Child Left Behind Act of 2001, 20 U.S.C. § 6801 *et seq.* (NCLB Title III). *See* Letter from Pollock to Martinez-Gonzalez at 1 (Mar. 16, 2011). Following clarification provided to ADE from the Department of Education's Offices of General Counsel and Elementary and Secondary Education regarding this requirement, DOJ and OCR received correspondence from ADE confirming its commitment to change its on-site teacher English fluency monitoring practices. ADE will now focus its inquiry on whether LEAs have certified that their teachers

---

[1] Ariz. Rev. Stat. § 15-751(2) provides that "'English language classroom' means a classroom in which English is the language of instruction used by the teaching personnel, and in which such teaching personnel possess a good knowledge of the English language."

Page 3

are fluent in English.  ADE has submitted a revised ELL monitoring guide that confirms to OCR and DOJ that ADE has made this change.

Based on ADE's decision to change its policy, OCR determined that insufficient facts exist to establish a Title VI violation and that its investigation of the complaint can be closed.  Similarly, based on this voluntary change in policy, DOJ determined that it can close its Title VII and EEOA investigations.

This letter sets forth DOJ's and OCR's determination in the above-referenced matters and, accordingly, is specific to the allegations set forth in the complaint.  This letter is not a formal statement of policy and should not be relied upon, cited, or construed as such.  Formal policy statements are approved by duly authorized DOJ or OCR officials and made available to the public.  The complainant may have the right to file a private suit in Federal court whether or not we found a violation.

Title VI regulations prohibit ADE from intimidating or harassing anyone who files a complaint with our offices or who takes part in an investigation.  Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  If we receive such a request, we will protect personal information to the extent provided by law.

We thank you and your staff for cooperating in the investigation and for taking steps to resolve the issues raised by the investigation.  If you have any questions, you may contact Toni Jackson at (202) 305-3194 or toni.jackson@usdoj.gov; Torey Cummings at (202) 305-4204 or torey.cummings@usdoj.gov; and Angela Martinez-Gonzalez at (303) 844-6083 or angela.martinez-gonzalez@ed.gov.

Sincerely,

Toni Michelle Jackson
Senior Trial Attorney
Employment Litigation Section
DOJ Civil Rights Division

Torey Cummings
Trial Attorney
Educational Opportunities Section
DOJ Civil Rights Division

Angela Martinez-Gonzalez
Supervisory General Attorney
OCR Denver Enforcement Office

cc:     Jordan Ellel
        Assistant Attorney General
        Arizona Office of the Attorney General

        Adela Santa Cruz
        Deputy Associate Superintendent
        Office of English Language Acquisition Services

        Complainant

Exhibit 5

# The Academic and Social Value of Ethnic Studies

## A Research Review

Christine E. Sleeter

National Education Association
Research Department
Ronald D. Henderson, Director





# The Academic and Social Value of Ethnic Studies

## A Research Review

Christine E. Sleeter

National Education Association
Research Department
Ronald D. Henderson, Director



*Great Public Schools for Every Student*

The National Education Association is the nation's largest professional employee organization, representing 3.2 million elementary and secondary teachers, higher education faculty, education support professionals, school administrators, retired educators, and students preparing to become teachers.

Reproduction: No part of this publication may be reproduced in any form without permission from NEA Research, except by NEA-affiliated associations and NEA members. Any reproduction of this material must contain the usual credit line and copyright notice. Address communications to Editor, NEA Research, 1201 16th Street, NW, Washington, DC 20036-3290.

Copyright © 2011 by the National Education Association
All Rights Reserved

What is the value of ethnic studies in schools and universities? Supporters say ethnic studies promotes respect and understanding among races, supports student success, and teaches critical thinking skills. Critics, however, increasingly question the relevance of ethnic studies education programs in the post-integration era.

As issues involving ethnic studies take center stage in education policy and practice, the National Education Association believes any discussion of the role of ethnic studies in education and in student achievement rightfully begins by asking:

- What do we know from prior research and practice about ethnic studies, especially as they relate to student achievement and narrowing achievement gaps?
- Are there ways to examine and talk about what we have learned that will enable us to apply those lessons to creating and establishing ethnic studies programs that support student and teacher learning?

The evolution of ethnic studies has sparked its share of controversy. NEA commissioned a review of the research on ethnic studies programs and curricula—specifically the ways in which such programs and curricula serve to improve student achievement and narrow achievement gaps—to inform the discourse on this issue. This paper provides a research base for discussing best practices for designing and implementing ethnic studies programs and curricula that meet those targets.

We hope this review is useful for revisiting ideas and generating new thoughts about the relationship between ethnic studies and student achievement. And we hope that our efforts in this regard will help ensure a great public school for every student.

*Dennis Van Roekel*

Dennis Van Roekel
President
National Education Association

# Table of Contents

**Executive Summary**........................................................ vii

**Review of Ethnic Studies Research**...................................... 1

Mainstream Curricula as Euro-American Studies............................ 1

Ethnic Studies and the Scope of this Review............................. 5

Impact of Ethnic Studies Designed Primarily
for Members of the Group under Study ................................... 8

Ethnic Studies Curricula for Diverse Student Groups
that include White Students ........................................... 16

Conclusion ........................................................... 20

**Bibliography**........................................................... 21

**About the Author**...................................................... 27

# Executive Summary

Ethnic studies includes units of study, courses, or programs that are centered on the knowledge and perspectives of an ethnic or racial group, reflecting narratives and points of view rooted in that group's lived experiences and intellectual scholarship. Ethnic studies arose as a counter to the traditional mainstream curriculum. Numerous content analyses of textbooks have found an ongoing marginalization of scholarship by and about African Americans, Latino/as, Native Americans, and Asian Americans. In acknowledgement of the dominance of Euro-American perspectives in mainstream curricula, such curricula can be viewed as 'Euro-American ethnic studies.' As students of color proceed through the school system, research finds that the overwhelming dominance of Euro-American perspectives leads many such students to disengage from academic learning. Ethnic studies curricula exist in part because students of color have demanded an education that is relevant, meaningful, and affirming of their identities. This review analyzes published studies and reviews of research that systematically document the impact of ethnic studies curricula, Pre-K through higher education, on students, academically as well as socially.

> Research finds that the overwhelming dominance of Euro-American perspectives leads many students to disengage from academic learning.

Ethnic studies curricula designed primarily for students who are members of the group under study are usually part of a broader effort to improve the quality of education afforded to those students, and are often used in conjunction with other dimensions such as culturally relevant pedagogy, teachers who are members of the group, and links to the community. Ethnic studies curricula are supported by research documenting a positive relationship between the racial/ethnic identity of students of color and academic achievement, as well as research on their impact. Three studies with middle school students documented high levels of student engagement when literature by authors within the students' ethnic background was used. Research on five literacy curricula (three involving African American secondary students and two involving Native American students) documented significant growth in students' literacy skills. Research on two math/science curricula (both involving Native American students) found a positive impact on student achievement and attitudes toward learning. Research on five curricula (three in social studies, one in literature, and one in 'life skills') found a positive impact on students' achievement and sense of agency. Only one reviewed study did not have the intended impact, largely because how ethnic culture was conceptualized in the curriculum conflicted with how students lived culture everyday.

Ethnic studies curricula designed for diverse student groups that include White students, while sometimes aiming to improve student achievement, usually focus more on influencing students' understanding of and attitudes about race and/or people who differ from themselves. Several studies, mostly with children, reveal features of curricula that make a difference. Simply infusing representation of racially and ethnically diverse people into curriculum only marginally affects students' attitudes because racial attitudes are acquired actively rather than passively. Curricula that teach directly about racism have a stronger positive impact than curricula that portray diverse groups but ignore racism. A large body of research in higher education that examines the impact of various diversity experiences, particularly course-taking and interracial interaction, reports quite consistently that such courses have a positive impact on 'democracy outcomes,' particularly when they include cross-group interaction and particularly on White students, since exposure to a systematic analysis of power and cross-racial interaction is newer to White students than to students of color. Research on the academic impact of ethnic studies curricula designed for diverse student groups, while not voluminous, shows that such curricula, when designed to help students grapple with multiple perspectives, produces higher levels of thinking.

> There is considerable research evidence that well-designed and well-taught ethnic studies curricula have positive academic and social outcomes for students.

In short, there is considerable research evidence that well-designed and well-taught ethnic studies curricula have positive academic and social outcomes for students. Curricula are designed and taught somewhat differently depending on the ethnic composition of the class or school and the subsequent experiences students bring, but both students of color and White students have been found to benefit from ethnic studies.

# Review of Ethnic Studies Research

Carlos entered my office to find out more about the graduate program in Education that I was directing in order to decide whether to apply to it.[1] I asked him to tell me about himself, which is how I usually began such conversations. He said that he had graduated from a local high school. While not a good student, the fact that he graduated mattered since most of his friends had dropped out. But he found school very boring, so he decided to enter the military rather than college. After completing a tour of duty, he returned to his hometown and got a minimum wage job. One day he ran into a friend from high school who was attending a local community college. The friend was taking Chicano studies courses, and encouraged Carlos to come check them out. At first Carlos had no interest in more school, but his friend was so enthusiastic that Carlos finally decided to go see what Chicano studies was all about. That hooked him on education. For the first time in his life, the curriculum was centered on his reality. Carlos completed two years of community college, taking as many Chicano studies courses as possible, then went on to complete a BA degree in Spanish. In the process, he became an avid reader about Mexican vaquero (cowboy) culture, and accumulated a mini-library at home on this subject. He wanted to continue his education in order to teach, which to my knowledge, he is still doing today.

The impact that Chicano studies had on Carlos is not unique. Informally, for many years I have witnessed similar impacts on students, especially, but not exclusively, students of color. This paper synthesizes research on the social and academic value of ethnic studies curricula and programs. Since ethnic studies can be understood as a counter to the traditional mainstream curriculum, the paper begins by framing the mainstream curriculum as 'Euro-American Studies.' Then, after briefly defining ethnic studies, it reviews research on the impact of ethnic studies curricula, first as designed specifically for students of color who are members of the group under study, and second as designed for diverse student groups that include White students. While there is some overlap between these kinds of curricula, there are also some differences.

## Mainstream Curricula as Euro-American Studies

Beginning in the late 1960s, educators and scholars of color pressed schools, school districts, and textbook companies to produce and offer curricula that reflected the diversity of the United States population. Through the 1970s and early 1980s, textbook publishers

---

[1] This account, which actually happened with a student whose name I changed here, represents several similar conversations I have had with students over the years.

addressed the most glaring omissions and stereotypes, but as national concern shifted toward establishing curriculum standards and systems of accountability, with a few exceptions, efforts to make texts and other curricula multicultural gradually subsided. Educators, particularly those who are White, often assume that publishers 'took care' of most forms of bias.

> As national concern shifted toward standards and accountablity, efforts to make curricula multicultural gradually subsided.

Systematic analyses, however, consistently find the opposite. While content related to African Americans, Latinos, and Native Americans has been added, deeper patterns and narratives that reflect Euro-American experiences and worldviews, and that have traditionally structured K–12 textbooks—particularly history and social studies texts—remain intact (Byrne 2001, Clawson 2002, Feiner and Morgan 1987, Foster 1999, Gordy and Pritchard 1995, Loewen 1995, Marquez 1994, O'Neil 1987, Powell and Garcia 1988, Reyhner 1986, Romanowski 1996, Sanchez 2007, Sleeter and Grant 1991). Whites continue to receive the most attention and appear in the widest variety of roles, dominating story lines and lists of accomplishments. African Americans, the next most represented racial group, appear in a more limited range of roles and usually receive only a sketchy account historically, being featured mainly in relationship to slavery. Asian Americans and Latinos appear mainly as figures on the landscape with virtually no history or contemporary ethnic experience. Native Americans appear mainly in the past, but also occasionally in contemporary stories in reading books. Immigration is represented as a distinct historical period that happened mainly in the Northeast, rather than as an ongoing phenomenon (Vecchio 2004). Texts say little to nothing about contemporary race relations, racism, or racial issues, usually sanitizing greatly what they mention (Hughes 2007).

In other words, racial and ethnic minorities are added consistently in a 'contributions' fashion to the predominantly Euro-American narrative of textbooks. Scholarship by and about African Americans, Latino/as, Native Americans, and Asian Americans continues not to be used to frame academic content. Even texts published within the last ten years, while having added content that previously was absent (such as depictions of racial violence directed against African Americans during slavery), continue to disconnect racism in the past from racism today, and to frame perpetrators of racism as a few bad individuals rather than a system of oppression, and challenges to racism as actions of heroic individuals rather than organized struggle (Alridge 2006, Brown and Brown 2010). Additional recognition of communities of color usually takes the form of Black History Month and Cinco de Mayo, rather than substantive curriculum revision (El-Haj 2006, Lewis 2001).

Although state curriculum frameworks have not received the attention that textbooks received, my analysis of the *History-Social Science Framework for California Public Schools* (California Department of Education 2001) reveals similar patterns (Sleeter 2002). Of the 96 Americans who were named for study in the *Framework*'s course descriptions, they were 77 percent White, 18 percent African American, 4 percent Native American, 1 percent Latino, and 0 percent Asian American. All of the Latino and all but one of the Native American names appeared at the elementary level. At the secondary level, 79 percent of the named people were White, mostly either U.S. presidents or famous artists and authors. I then analyzed the deeper narrative embedded in the *Framework*, finding it to fit comfortably within a story of European immigration and the progress of

those immigrants' descendents, a story that negates historical accounts and analytical frameworks of scholars of color (see King 1992).

As Hughes (2007) explains, the result of continuing to minimize attention to racism and White complicity

> is that students perceive racism as a tragedy of the past divorced from other historical issues…and the contemporary realities of power in American society. When textbook authors bury the history of American racism within a larger narrative of inevitable American progress, students perceive race relations as a linear trajectory of improvement rather than a messy continual struggle over power that encompasses both progress and, in the case of the decades after Reconstruction, significant steps backward in terms of racial justice.

Ethnic studies scholarship by and about racial minority groups presents a different narrative that is shaped partially by histories of oppression in the U.S. as well as by the intellectual and cultural resources and traditions of those communities. In an analysis of ethnic studies scholarship, I identified the following consistent themes that differentiate it from Euro-American mainstream school knowledge:

> *Ethnic studies scholarship by and about racial minority groups presents a different narrative.*

1) explicit identification of the point of view from which knowledge emanates, and the relationship between social location and perspective;

2) examination of U.S. colonialism historically, as well as how relations of colonialism continue to play out;

3) examination of the historical construction of race and institutional racism, how people navigate racism, and struggles for liberation;

4) probing meanings of collective or communal identities that people hold; and

5) studying one's community's creative and intellectual products, both historic and contemporary (Sleeter 2002).

Juxtaposing textbooks (as well as California's standards) against these themes reveals a wide chasm that students of color become aware of as they go through school.

Beginning as early as elementary school, students have been found to respond to curricula based partly on what they learn and experience in their homes and communities. Epstein (2001, 2009) reports interviews with Black and White children in grades 5, 8, and 11 regarding their perspectives about topics taught in social studies. While perspectives of White fifth graders tended to resonate with the mainstream school curriculum, perspectives of many Black fifth graders diverged. For example, although White fifth graders believed that the Bill of Rights gives rights to everyone, about half of the Black children pointed out that not everyone has rights. While Black children were beginning to articulate a sense of racial oppression, White children described the U.S. as being built on progress, democracy, and opportunity for all. What teachers taught added detail to what the children knew, but did not change their overall interpretive framework, which derived from their experiences outside school.

Middle school students of color, when asked, are able to articulate frustrations with Eurocentric curricula. Like the eighth graders interviewed by Epstein, 43 gifted Black middle school students interviewed by Ford and Harris (2000) all expressed a desire to learn more about Black people in school; most agreed that this would make school more interesting, and almost half agreed that they got tired of learning about White people all the time. Similarly, in a study of a professional-class, White middle school that had recruited a significant number of students of color (mainly African Americans), El-Haj (2006) found that the students felt marginalized and "angry that African American history was rarely discussed outside Black History Month and was almost always portrayed in terms of victimization." Students posited that teachers avoided in-depth discussions of race and racism out of fear that the Black students would react violently. A few teachers did try to create curricula that represented multiple social groups, but most of the students of color "framed their desire for a more representative curriculum in terms of learning about one's 'own' cultural history and literature" first, before going on to study other groups.

By the time they reach high school, students of color are not only aware of a Euro-American bias in curriculum, but they can describe it in some detail, and view it as contributing to their disengagement (Wiggan 2007). Epstein (2000, 2009) found African American students to bring a fairly sophisticated analysis of racism to their understanding of U.S. history. Although their perspectives varied, rather than discussing the U.S. in terms of individual rights, they interpreted its history in terms of systemic racism, from which African Americans continue to struggle for emancipation. Epstein points out that the academic perspectives offered in social studies frameworks did not address the perspectives of African American adolescents, and only partially addressed perspectives of White students, some of whom expressed interest in learning more about diverse peoples. As a result, Epstein (2009) concluded that African American students "learned to distrust the historical knowledge taught in schools and turned to family, community members, and Black oriented texts" for their education.

> Students of color are not only aware of a Euro-American bias in curriculum, they can describe it in some detail.

University students also notice and react to whose knowledge is represented in curriculum. Based on a survey of 544 university students, Mayhew, Grunwald, and Dey (2005) found that students—and especially students of color—judge the extent to which their university values diversity primarily based on willingness to integrate diverse racial and ethnic perspectives into curriculum. While students also saw extracurricular activities as important, whose perspectives are in the university curriculum was the most important factor they used to assess the campus's commitment to diverse students.

White adults generally do not recognize the extent to which traditional mainstream curricula marginalize perspectives of communities of color and teach students of color to distrust or not take school knowledge seriously. Epstein (2009) found that, while White teachers were willing to include knowledge about diverse groups, they did so intermittently and within a Eurocentric narrative. She found that White parents, like their children, "thought only of Europeans and white Americans as nation builders, portrayed Blacks as victims and one-time freedom fighters, and Native Americans as first survivors and later as victims of government policies. They never mentioned Whites (other than Southerners) as perpetrators or beneficiaries of racism and 80 percent believed that Blacks had achieved equal rights today." Lewis (2001) found several White

parents she interviewed to believe that talking about race would be divisive, even in the context of Black History Month, and to dismiss ethnic diversity with statements such as "We should all be Americans." Informal discussions I have had with White adults suggest that they base their evaluations of textbooks on comparisons with those they used when they were in school, rather than on comparisons with ethnic studies literature (which most White people have not studied).

In sum, it is important to recognize that ethnic studies grew from a desire to counterbalance both inaccuracies and the predominance of Euro-American perspectives that underlie mainstream curricula. Because of this bias, mainstream curricula contribute to the academic disengagement of students of color. Ethnic studies can reverse that disengagement, as the remainder of this paper shows.

## Ethnic Studies and the Scope of this Review

Ethnic studies arose as a counter to Euro-American studies curricula. Ethnic studies curricula and programs are often traced to their beginnings in 1968 at San Francisco State University, then to other campuses in California; from there, ethnic studies spread across the country. Ethnic studies has a much longer history, however, building on pioneering works such as the writings of Carter G. Woodson (1933) and W. E. B. DuBois (1903), freedom schools of the 1960s, Black independent schools and Afrocentric public schools (e.g., Durdin 2007, Lee 1992, Span 2002), tribal schools (e.g., Begay *et al.* 1995), and language immersion schools.

Before briefly describing what ethnic studies is, I will note what it is not. First, although commonly described as "divisive," un-American, and teaching racial separatism and even overthrow of the U.S. government, as the examples in this paper will show clearly, ethnic studies curricula very intentionally include historically marginalized communities and students in a multicultural American curriculum and narrative, often supporting and developing cross-group communication. Second, although commonly perceived as touchy-feely and non-academic—even as lowering academic standards, as examples will illustrate—ethnic studies curricula are academically based, usually designed to improve students' academic performance, and sometimes explicitly focus on university preparation. Third, although sometimes characterized as cheating students of color by substituting ethnic pride for knowledge and skills needed to succeed in the mainstream society, this paper will include research that shows how well-designed ethnic studies curricula do, in fact, prepare students to succeed while embracing their ethnic identity at the same time; indeed, these are linked, rather than competing, goals.

> Although commonly perceived as touchy-feely and non-academic, ethnic studies curricula are academically based.

It is highly significant that ethnic studies came about because students of color demanded, and have continued to demand, an education that is relevant and meaningful, that affirms their identities and selfhoods, and that works toward human liberation (Hu-DeHart 2004, Rangel 2007). Mainstream Euro-American studies deny all students—both White and of color—an education that takes seriously the realities of institutionalized racism that people of color live everyday, and knowledge that arises from within communities of color. Ethnic studies, by allowing for multiple voices to enter dialog constructing the narrative of this country, is critical to the development of a democracy that actually includes everyone.

Whether one is referring to Black studies, Chicano/a studies, American Indian Studies, or Asian American studies, ethnic studies have similar foci that center around "their objective of systematically examining and dismantling institutional racism" (Hu-DeHart 2004). For example, King (2005) explains that, given the "inherent liberatory potential of Black education, the ultimate object… is the universal problem of human freedom. That is, a goal of transformative education and research practice in Black education is the production of knowledge and understanding people need to rehumanize the world by dismantling hegemonic structures that impede such knowledge." Similarly, in a discussion of American Indian studies, Riding In and colleagues (2005) explain that the main objective is decolonization, empowerment, and sovereignty: "We have been cast as peoples who do not have the moral authority of non-Indians. And so we have to establish ourselves as humans with a moral situation equal to all others."

As ethnic studies matured, epistemologies have been developed around the most significant ways to understand and address the concerns of historically marginalized communities. For example, Macías explains that the issue is not curricular separatism, but rather reorganizing knowledge and research processes around questions that are central to the well-being of communities of color:

> We're not talking about Chicana/o history, Chicano sociology, Chicano education, Chicano political science, Chicano literature, etc. We are talking about different topical, thematic, problem, situational sets within the studies of Chicana/o studies communities, in the United States and throughout the Americas, that has to be driven by its own visions, its own view of itself in the future, and its own methodologies, including approaches to it to scholarship (Rangel 2007).

Duncan-Andrade and Morrell (2008) propose "pan-ethnic studies," which connects related fields of ethnic studies, critical pedagogy, postcolonial studies, critical race theory, multicultural education, and youth popular culture. Pan-ethnic studies begins "with the relationship between racialization in U.S. society and dehumanization of students of color." Duncan-Andrade and Morrell show how pan-ethnic studies can intersect with the K–12 curriculum across the disciplines. Significantly, their model includes students as producers rather than only consumers of knowledge: students learn to become public intellectuals engaging in research and collective agency to address problems in their own communities. Also, Duncan-Andrade and Morrell specifically prioritize the importance of cariño—relationships between teacher and students that are based on reciprocity and commitment to improving the welfare of the community students live in.

*Ethnic studies exists in one form or another from the Pre-K level onward.*

Although ethnic studies began and is most recognized at the higher education level, it exists in one form or another from the Pre-K level onward. At the elementary level, one can find Black culture-based schools (particularly private schools; see Lee 1992) and Indigenous-culture schools such as Navajo schools (e.g., Begay *et al.* 1995). There are also many teachers who have designed and taught developmentally appropriate ethnic studies curricula in their own classrooms, some such efforts having become programs at a school district level. At the secondary level, one can find ethnic studies classes (such as Filipino history or Chicano literature), although these are not

terribly common. In a survey of 8,051 entering freshmen in three large universities, Hurtado, Engberg, Ponjuan, and Landreman (2002) found that very few (only about 6% of the students) had taken a diversity class in high school. Only one school district—Tucson Unified Public Schools—has a full-fledged ethnic studies program.

For this review, I sought published studies and reviews of research that systematically document the impact of ethnic studies curricula, Pre-K through higher education, on students. I specifically focused on academic outcomes (such as test scores) as well as attitudinal outcomes. Currently in education, the 'gold standard' for program evaluation consists of experimental research using randomized assignment to control and experimental groups, with pre and post assessments that include standardized achievement tests. While some research on ethnic studies takes this form, much of it consists of small-scale qualitative studies that use outcome measures (such as descriptions of student engagement) that were meaningful to the context and time in which the study was conducted.

Ironically, what counts as program evaluation data shifted toward experimental research using test scores at the same time that education policy made it more difficult to develop and sustain K–12 ethnic studies curricula. The standards-based reform movement, although ostensibly designed to address the racial achievement gap, has pressed schools that serve students of color and students from high-poverty communities toward standardized, often scripted, test-prep curricula (Au 2007, Valli and Chambliss 2007), a shift that careful perusal of NAEP test scores from the 1970s onward, disaggregated by race, should cause us to question (National Center for Education Statistics 2008).

Much of the work in ethnic studies has been developmental in nature—researching subjugated and often forgotten knowledge, creating curriculum, developing pedagogies that link ethnic studies content with core academic concepts, preparing ethnic studies teachers, locating resources, navigating school district administrative and hiring policies, and so forth. And, because of their challenge to race relations, ethnic studies programs are always engaged in defending their existence. As Hu-DeHart (2004) explains:

> Ethnic studies programs are always engaged in defending their existence.

As long as ethnic studies and multicultural education in general remain within the confines of 'sensitivity training' and 'celebrating diversity,' it is safe and uncontested. But the minute ethnic studies and multicultural educators take seriously the edict that education's highest purpose is to liberate and empower (as opposed to socialize), then it becomes controversial and, frankly, threatening to the status quo.

In many cases, energy to develop high-quality programs and courses has simply taken precedence over efforts to systematically document their impact on students.

Nonetheless, I was able to locate a sizable body of research on the impact of ethnic studies on students. I have organized this review into two main sections: first, ethnic studies curricula as designed primarily for students of color who are members of the group under study and, second, ethnic studies curricula as designed for diverse student groups that include White students.

## Impact of Ethnic Studies Designed Primarily for Members of the Group under Study

Ethnic studies curricula include units of study, courses, or programs that are centered around the knowledge and perspectives of an ethnic or racial group, reflecting narratives and points of view rooted in lived experiences and intellectual scholarship of that group. Although usually open to students from all backgrounds, curriculum reviewed in this section is pitched primarily toward students who are members of the focal ethnic group, usually as part of a broader effort to improve the quality of education afforded to them. Although this review focuses primarily on the impact of curriculum, it is important to note that well-designed ethnic studies courses and programs include other related features, including interactive and culturally relevant pedagogy, teachers who are members of the ethnic group and well-versed in ethnic studies, and connections with the community.

Ethnic studies curricula are supported by a body of research documenting the relationship between racial/ethnic identity of students of color and academic achievement. Studies using different research methodologies, investigating students at middle school through university levels, in different regions of the U.S. consistently find a relationship between academic achievement, high level of awareness of race and racism, and positive identification with one's own racial group. For example, Altschul, Oyserman, and Bybee (2006) surveyed 98 African American and 41 Latino students in three low-income Detroit middle schools periodically over a two-year period. Although students' grades dropped as they moved from middle school to high school, grades of students with the highest racial-ethnic identity dropped the least. Chavous and colleagues (2003) surveyed 606 African American students from four predominantly Black high schools during twelfth grade, then again two years later. The students most likely to graduate and go on to college expressed high awareness of race and racism and high regard for being Black. Those least likely to stay in school expressed low awareness of race and racism, low personal regard for being Black, and a perception that other people do not value Blacks (see also Miller and MacIntosh 1999, Sanders 1997). Altschul, Oyserman, and Bybee (2008) surveyed 185 Latino/a eighth graders in three low-income middle schools where students ranged from being recent immigrants to second and third generation; most were of Mexican descent. Students with higher grades tended to have bicultural identities, identifying with their ethnic origin as well as focusing on overcoming obstacles within mainstream society. Students who identified little with their ethnic origin tended to achieve poorly, as did the relatively fewer students who identified exclusively with their culture of origin and not at all with the mainstream society (see Sellers, Chavous, and Cooke 1997 for similar findings with African American students). The researchers also found that, from the time of immigration through subsequent generations, Latino students identify progressively less with their ethnic community, often resulting in a downward spiral of achievement.

Carter (2008) and O'Connor (1997) each conducted in-depth interviews with small numbers of high-achieving African American adolescents, both researchers finding that students' critical consciousness of race and racism helped them develop an achievement ideology to navigate a racially hostile environment, and that a strong Black identity contributed to their sense of agency. O'Connor (1997) noted that the students'

> Students who identified little with their ethnic origin tended to achieve poorly.

familiarity with individual and collective struggle did not curtail their academic success, but rather contributed to their sense of agency and facilitated their academic motivation.

Ethnic studies teachers may not be aware of this research. What they are aware of, however, is the negative set of experiences that many students of color have in school, the relative absence of their ethnic group in the curriculum, and the lack of effort in many schools to help them develop an academic ethnic identity that connects school learning with their ethnic self, and helps them to see how education can serve as a tool for their own advancement as well as for serving their community. Students of color experience racism; ethnic studies does not introduce them to that concept. Rather, by taking racism and culture seriously, ethnic studies curricula attempt to give students the tools to navigate racially hostile systems—tools that many high-achieving students of color acquire in their communities.

> Ethnic studies curricula have been studied in relationship to three overlapping effects on students: academic engagement, academic achievement, and personal empowerment.

Ethnic studies curricula have been studied in relationship to three overlapping effects on students: academic engagement, academic achievement, and personal empowerment. Because these areas have been studied somewhat differently according to academic subject area, the discussion below is organized mainly by subject area, beginning with literacy.

Several studies have examined the relationship between using a culturally relevant literacy curriculum, student engagement, and, in some cases, student academic achievement.[2] Three qualitative studies with middle school students documented high levels of student engagement when literature by authors of the students' ethnic background is used. Brozo and Valerio (1996) described responses of eighth grade Mexican American students to high-quality literature by Mexican American authors, such as Rudolfo Anaya, as the teacher introduced works over the year. It was "immediately apparent" to the authors that students connected with the literature, as formerly passive students become highly engaged in reading. Bean, Valerio, Senior, and White (1999) documented the high level of engagement among racial and ethnically diverse classes of ninth graders as they read a young adult novel about a bi-racial adolescent's ethnic identity development. Some students developed a strong connection with the main character; others reported learning a good deal. The authors concluded that literature with which racial and ethnic minority students can identify engages them in the process of reading and writing. Copenhaver (2001) analyzed 12 African American elementary school children's responses to reading *Malcolm X: A Fire* in small groups. She found the children to bring a good deal more knowledge of the life of Malcolm X than their teachers were aware they had, and in groups composed of only African Americans they drew readily on their shared knowledge of African American media, civil rights leaders, and everyday racial issues to follow the plot, make connections, and interpret the story.

Studies have assessed the impact of five ethnic studies literacy curricula on students' achievement: three involving low-achieving African American secondary students in high-poverty schools and two involving Native American students.

In the Webster Groves Writing Project (Krater, Zeni, and Cason 1994) 14 middle and high school English teachers in school districts adjacent to St. Louis used action

---

[2] To keep this review manageable, although I recognize that language is central to literacy of students for whom English is not the primary language, I excluded research on native language immersion/bilingual education unless the project included ethnic culture in the curriculum.

research to improve writing achievement of their African American students; the project was then extended to all students (Black and White) performing below grade level. The project gradually developed several principles based on what was working, which included using various literary works by African American authors and a process approach to teaching writing in which some direct instruction was embedded. Over time the teachers realized that they needed to "acknowledge [students'] culture—not just by incorporating their cultural heroes into the curriculum, but by weaving the threads of their culture into the tapestry of our classroom" (Krater and Zeni 1995), which included recognizing how teachers' cultural biases got in the way. A significant realization was that dialect was a problem only when teachers focused on correcting grammar rather than on helping students communicate ideas; as students' ability to communicate ideas developed, students began to correct their own grammar. Over the years of the project's existence, participating students made greater gains in writing than non-participating students on the local writing assessment, then later on the state writing test (see Gay 2010).

In a qualitative study, Rickford (2001) studied the impact of culturally relevant texts (African American folk tales and contemporary narratives), coupled with emphasis on higher-order thinking, on 25 low-achieving African American middle school students' enjoyment and comprehension of literature. She found that the students became very engaged because they were able to identify with "deep structure" themes such as struggle, perseverance, and family tensions, as well as with surface structure features such as African American vernacular. In assessment of their comprehension, she found that the students excelled on the higher order comprehension questions, while they missed many of the lower order questions. Rickford concluded that familiarity with situations and people in stories increased students' motivation, and that even while missing many lower-order comprehension questions, students were able to analyze and interpret the stories well.

> Students became very engaged because they were able to identify with "deep structure" themes such as struggle, perseverance, and family tensions.

The Cultural Modeling Project (Lee 1995, 2001, 2006, 2007) has worked extensively to connect the language reasoning skills that African American English speakers develop with the English curriculum, extending and deepening findings of the more limited studies above. Lee (2006) explains that Cultural Modeling "is a framework for the design of curriculum and learning environments that links everyday knowledge with learning academic subject matter, with a particular focus on racial/ethnic minority groups, especially youth of African descent." The curriculum leverages the ability of speakers of African American English to interpret symbolism, a skill students use routinely in rap and Hip Hop but do not necessarily apply to analysis of literature in school. Cultural Modeling moves from analysis of specific language data sets students are familiar with and that draw on elements of Black cultural life, such as Black media or the Black church, to more general strategies of literary analysis and application to canonical literary works. Lee has conducted several studies to assess the impact of Cultural Modeling, using tests in which students write an analysis of a short story they have not seen before.

For example, in an experimental study in two low-achieving African American urban high schools, four English classes were taught using Cultural Modeling and two

were taught the traditional English curriculum. The experimental students' gain from pretest to posttest was over twice that of the control group students (Lee 1995). Lee's qualitative research in classrooms documents that students gradually learn to direct discussions interpreting and analyzing texts, through the Cultural Modeling process (Lee 2001, 2006), although traditional English achievement tests often do not capture this learning process (Lee 2007). She posits that African American life affords young people a wealth of cultural scripts and contexts that can be used in the classroom to develop literary analysis strategies students can then apply to unfamiliar texts, and that a curriculum that enables students to use their cultural frames of reference immediately engages them in much higher levels of cognition than is usually the case with a traditional curriculum (Lee 2006).

Two bilingual/bicultural indigenous literacy curricula have been examined in relationship to their impact on student achievement. The Rough Rock English-Navajo Language Arts Program (RRENLAP), originally funded by Title VII of the Bilingual Education Act, was designed to develop biliteracy skills of K–6 students, the majority of whom spoke Navajo as their primary language. Because a written Navajo literacy curriculum did not exist, the teachers needed to develop materials written in Navajo and relevant to the lives of the children. An example of a thematic unit the teachers created was Wind, "an ever-present force at Rough Rock" (McCarty 1993). McCarty (1993) reports that, after four years in the program, the students' achievement on locally developed measures of comprehending spoken English had increased from 51 percent to 91 percent, and their reading scores on standardized reading tests rose steadily after the second year, although students were still below national norms. Those who participated in the bilingual/bicultural program for 3–5 years made the greatest gains. Similarly, Lomawaima and McCarty (2006) explain that in Peach Springs, Arizona, teachers worked with parents, elders, and linguists to develop a writing system for the Hualapai language, then developed culturally relevant teaching units and materials across the academic subject areas in Hualapai. While, initially, non-Indian teachers objected to this curriculum, they relented when they saw children's positive responses, improved academic learning, ability to work in English, and 100 percent high school graduation rate.

> Indigenous students responded well to a curriculum designed around their culture and language.

In both of these related projects, indigenous students responded well to a curriculum designed around their culture and language. Even if, as in the case of the Navajo students, they were not yet performing at grade level on standardized tests in English, they were doing much better academically than they had been prior to the curriculum's development and implementation; they were also thriving psychologically. Lomawaima and McCarty suggest that these programs have not survived, not because they were not serving students well but, rather, because they require teachers who speak the indigenous languages, thereby posing a threat to non-indigenous teachers who did not speak the language, and because indigenous control over curriculum challenges federal power over the tribes.

I located studies of the impact of two ethnic studies math/science curricula on student learning,[3] both focusing on Native American students. Math in a Cultural Context (MCC) grew from collaboration between Alaska Yup'ik Native elders, teachers,

---

[3] While many articles discuss culturally relevant pedagogy broadly in math and science, only a few specifically examine the impact of curriculum on students.

and math educators to develop an elementary level curriculum that connects Yup'ik culture and knowledge with mathematics as outlined in the National Council of Teachers of Mathematics standards. Lipka, Hogan, and colleagues (2005) describe it as offering a "third space" that weaves together math content and local cultural knowledge. The curriculum has ten modules that link mathematics with community culture; for example, "Parkas and Patterns" focuses on geometry. The curriculum also supports traditional ways of communicating and learning, such as collaborative learning and cognitive apprenticeship. The modules and assessment materials, as well as papers reporting research on the project, can be found on the project's website (Math in a Cultural Context 2010).

For about two decades, Lipka and colleagues have been documenting the curriculum's development, use, and impact (e.g., Lipka 1991, Lipka, Hogan, *et al.* 2005, Lipka, Sharp, *et al.* 2005). Most of the publications describe in detail how teachers and students work with the curriculum (e.g., Lipka 1991, Lipka, Sharp, *et al.* 2005). Some also report experimental studies that use a pretest/posttest control group design, assessing students' learning based on the state's benchmarks or achievement tests. These studies find that students in classrooms using the MCC curriculum make more progress toward the state mathematics standards than students in classrooms not using it (Lipka and Adams 2004, Lipka, Sharp, *et al.* 2005). Not only does the curriculum help make mathematical concepts comprehensible for the Yup'ik children, studies also find it to improve Yup'ik teachers' practice by drawing on what is culturally familiar to them, thereby giving them confidence and authority over what they are teaching, as well as helping them to structure their math curriculum (Lipka, Hogan, *et al.* 2005).

Matthews and Smith (1994) reported an experimental study (pretest/posttest control group design) investigating impact of a much more modest project—using Native American science materials—on Native American students' attitudes toward science, attitudes towards Native people, and understanding of science concepts. The study investigated fourth through eighth graders in nine schools administered by the Bureau of Indian Affairs. The intervention, which lasted 10 weeks, involved use of biographies of Native Americans using science (such as a silversmith or a water quality technician) and other activities that related science to Native communities. The experimental group made greater gains in achievement than the control group, and expressed more positive attitudes toward science and toward Native Americans in the posttest. The findings suggest that the materials, limited in scope as they were, made a positive impact on students.

Research investigates the impact of five ethnic studies curricula (three in social studies, one in literature, and one in 'life skills') on students' achievement and empowerment, which in these studies refers to students' sense of agency and ability to take positive action on problems in their communities.

Tyson's (2002) case study examined the use of literature about social issues in an African American urban middle school social studies class of 20 students. Literature was linked with social studies to enable students to begin to think about how to participate in social life. The literature included five adolescent novels: three were African American, one was multiethnic, and one was set in Japan. All featured social justice concepts and characters acting on the world around them, such as working with neighbors to transform a vacant lot into a community garden or taking a stand on behalf of one's community. The researcher documented students' developing understanding of complexities of

social action, as well as their ability to use text to derive meaning; most of the students demonstrated growth in both areas over the semester.

Lewis, Sullivan, and Bybee (2006) reported an experimental study of a one-semester African American emancipatory curriculum for eighth graders in a predominantly Black inner-city public middle school. Students were randomly assigned to the experimental course or the control course (life skills). The experimental course focused on African and African American history and culture, African rituals and practices, building communalism, student leadership and activism, and school/community partnerships. It included considerable attention to racism, oppression, discrimination, White privilege, need for Black empowerment, and self-reliance. Youth in the experimental curriculum scored higher than those in the control group on communal orientation, school connectedness, motivation to achieve, overall social change involvement, and (contrary to the study hypothesis) individualism and competitiveness. The authors point out that by giving considerable sustained curricular space to African American heritage rather than bringing it out only at certain times (Black History Month, study of slavery in history), students could see that their own heritage has worth.

> By giving considerable sustained curricular space to African American heritage, students could see that their own heritage has worth.

Vasquez's (2005) case study examined the responses of 18 college students to a Chicano literature course, in which all of the selections were authored by Chicana/os and dealt with topics such as immigration, migrant labor, poverty, and Catholicism. Eleven of the 18 students were Latino/a. The Latino/a students all said that they identified with the texts, and that the texts filled in blanks in their understandings of their families' biographies. They reported developing a sense of community based on recognition of similar experiences and hardships. Realizing there is an abundance of Chicano literature prompted feelings of ethnic and personal affirmation, confidence, empowerment, and finally occupying the place of 'insider' in an academic institution. For one student, recognition that there is a strong Latino American culture strengthened his identification as American. The non-Latinos found shared human issues in the texts to identify with; they had to wrestle with recognition of differences while also seeing cross-group human similarities. They also had to deal with lacking the authority of shared experiences with the authors and characters and not being able to direct where discussions went. For the White students, not being insiders to the content was a new experience.

Halagao (2004, 2010) examined the impact of *Pinoy Teach* on Filipino American college students. *Pinoy Teach* is a curriculum she co-developed that focuses on Philippine and Filipino American history and culture using a problem-posing pedagogy that encourages students to think critically through multiple perspectives on history. She explains that *Pinoy Teach* offers a different perspective about history than students learned before, and some of it is uncomfortable; the pedagogical issue is not replacing one master narrative with another, but rather helping students grapple with and think their way through diverse and conflicting perspectives then consider what to do with their new knowledge. As part of the learning process, the college students mentor and teach what they are learning to younger students. Through a series of interviews, Halagao (2004) examined the curriculum's impact on six Filipino American college students at the end of the course. Like in Vasquez' study she found that, since none of them had learned about their own ethnic history in school, they described this curriculum as

"filling in the blanks." Students also described collisions between their prior knowledge of Philippine history, learned mainly from their parents, particularly around the experiences of Spanish then U.S. colonization. The students expressed interest in learning about their own history in relationship to that of other groups. Like in Vasquez' study, they moved from seeing other Filipinos through learned stereotypes to building shared sense of community, and they developed a sense of confidence and empowerment to stand up to oppression and to work for their own communities.

Several years later, Halagao (2010) reported a follow-up survey of 35 who had participated in the curriculum about 10 years earlier; 30 were Filipino American and five were Euro-American; all had completed college and were working in various professions. Students reported that what remained with them was a "deeper love and appreciation of ethnic history, culture, identity, and community." The curriculum, through its process of decolonization, had helped them to develop a sense of empowerment and self-efficacy that persisted, as well as a life commitment to diversity and multiculturalism. They also developed ongoing activism in their work as teachers, in other professions, and/or through civic engagement where they lived. The two Euro-American respondents had learned to work as allies; for example, one became an editor for a textbook publisher so she could influence textbook content in a positive way.

The Social Justice Education Project (SJEP), located in the Mexican American/Raza Studies Department in Tucson, Arizona, grew from collaboration between Chicano studies teachers and the University of Arizona (Cammarota 2007, Cammarota and Romero 2009, Romero, Arce, and Cammarota 2009). The four-semester high school social studies curriculum is based on a model of "critically conscious intellectualism" for strengthening teaching and learning of Chicano students in a school district where over 40 percent of its Chicano students leave school during the high school years (Cammarota and Romero 2009). The model has three components:

1) curriculum that is culturally and historically relevant to the students, focuses on social justice issues, is aligned with state standards but designed through Chicano intellectual knowledge, and is academically rigorous;

2) critical pedagogy in which students develop critical thinking and critical consciousness, creating rather than consuming knowledge; and

3) authentic caring in which teachers demonstrate deep respect for students as intellectual and full human beings.

The curriculum teaches about racial and economic issues, immersing students in university-level theoretical readings. It includes a community-based research project in which students gather data about manifestations of racism in their school and community and use social science theory to analyze why patterns in the data exist and how they can be challenged. During the first year of the project, 17 students who were on the verge of dropping out participated. Cammarota (2007) reports that 15 of the 17 had graduated at the time he was writing and 10 had enrolled in college; on a survey at the end of the project, students overwhelmingly reported that the project made them think more about their other classes, about their future, and about going on to college. Cammarota and Romero (2009) report that Chicano students in the SJEP outscored Anglo students in the same school on the state's exams: 34 out of 36 passed the reading exam, 35 out of

36 passed the writing exam, and 27 out of 35 passed the math exam, which was a considerably higher pass rate than the Anglo students attained. SJEP students' graduation rates (about 95%) exceeded those of Anglo students (about 84%) in the site(s) where the program was offered. Importantly, in interviews SJEP students consistently credit the program for their academic success.

I located one study of an ethnic studies curriculum project that did not achieve the intended outcomes. Ginwright (2004) documented an initiative to transform an urban high school that served mainly Black youth from low-income families, for the purpose of increasing students' academic performance and preparing them for higher education. To formulate a plan, school district leaders consulted with several prominent African American scholars whose work focused on Afrocentric curriculum and pedagogy, who subsequently persuaded them to base reform in "African precepts, axioms, philosophy" and to structure the curriculum around themes in African knowledge. As the reform was implemented, however, the Black students rejected it because it ignored their needs, which pragmatically began with the need for employment. Ginwright argues that what became an unsuccessful reform pitted two conceptions of Blackness against each other: that of middle class Black reformers who connected African and African American knowledge systems with origins in Egypt, and low-income urban Black youth whose central concerns revolved around needs such as housing, employment, and health care and whose identity was formed through urban youth cultural forms and local experiences with racism and poverty. This study shows how problems arise when culture, which is highly complex and dynamic, is operationalized in curriculum in a way that conflicts with culture students know and live daily.

In sum, all but one study investigating the impact of ethnic studies curricula designed for members of the group under study found a positive impact on students. Three studies documented high levels of student engagement when literature by authors of the students' ethnic background was used. Research on five literacy curricula documented significant growth in students' literacy skills. Research on two math/science curricula found a positive impact on student achievement and attitudes toward learning. Research on five additional curricula, mainly in social studies, found a positive impact on students' achievement and sense of agency. It is important to stress that these curriculum projects, on the whole, were well-designed, and taught by teachers who were prepared in ethnic studies and who, for the most part, were themselves members of students' ethnic group.

> All but one study investigating the impact of ethnic studies curricula designed for members of the group under study found a positive impact on students.

These various curricula share important features. Since all but one centered curriculum on students' cultural reality, students became classroom 'insiders' whose prior knowledge was valued and useful to academic learning. In that context, students' thinking and problem-solving abilities were evident; they became intellectually engaged. By reflecting the realities of students' lives, including racism and poverty, and providing students with tools to understand and act on those realities, curricula helped them develop a sense of constructive participation and hope about their lives. By being treated as intellectually capable, which many of these projects emphasized, students began to acquire an academic identity that links to, rather than conflicts with, their ethnic identity. Finally, by seeing the depth and richness of their own American ethnic history and

culture, some students who had questioned their identity began to affirm and claim an American identity.

## Ethnic Studies Curricula for Diverse Student Groups that include White Students

Research on ethnic studies curricula designed for diverse student groups that include White students is reviewed in this section. Most of the research has investigated impact on students' knowledge about and attitudes toward race and people who differ from themselves. This body of research is reviewed first, followed by the smaller body of research on the academic impact of such curriculum.

Several studies, mostly with children, reveal features of curricula that make the most difference. Simply infusing representation of racially and ethnically diverse people into curriculum, based on the assumption that students will develop positive attitudes by seeing diversity, makes only a marginal impact on students' attitudes. Bigler (1999) reviewed a large number of research studies on the impact of multicultural curricula and materials on children's attitudes about race. She found most of the research weak, consisting mainly of small-scale case studies that lacked processes for determining whether change had occurred and, if so, whether changes could be attributed to the curriculum. More significantly, she noted that racial attitudes are acquired actively rather than passively. Curricula that simply depict or label groups or group members (for example, pointing out a person's race, ethnicity, or gender) may draw students' attention to group markers and differences without engaging them in questioning their own thinking (Bigler, Brown, and Markell 2001). In addition, she noted that most curricula did not take account of children's age-specific cognitive development. She suggested that effective approaches would focus explicitly on stereotyping and bias, present strong counter-stereotypic models, and engage students in thinking about multiple features of individuals (such as race and occupation) within-group differences and cross-group similarities.

In subsequent experimental studies, Hughes, Bigler, and Levy (2007) and Hughes and Bigler (2007) documented the impact on African American and White elementary children of a few short lessons that include information about Black and White historical figures and (in the treatment condition) about racism. Both studies found that lessons teaching about racism and successful challenges to it improve racial attitudes among White children, allowing them to see how racism affects everybody and offering them a vision for addressing it. They posited that children's valuing of racial fairness accounts for much of the positive impact. Lessons about racism made less impact on the African American children (probably because it duplicated what they already knew), but the information about historical figures improved their regard for African Americans. A study at the higher education level complements these studies with children. In an experimental study, Carrell (1997) found that university students who completed an intercultural communication course that directly focused on cultural awareness and intercultural communication competence made significant gains in empathy, while students who completed an independent assignment about diversity that constituted a small portion of a control group course did not gain in empathy.

Aboud and Fenwick's (1999) studies offer further clues as to how curricula affect racial attitudes. They reported two studies building on previous research that found that

*Lessons teaching about racism and successful challenges to it improve racial attitudes among White children.*

a great majority of White parents do not talk with their children about race, and those that do usually do not do so at a developmentally appropriate level. Aboud and Fenwick investigated two curricular inventions designed to help elementary children talk about race. Both studies used a pretest/posttest design, one with a control group and the other without. Both studies documented the kind of talk that reduces prejudice, especially among high-prejudiced children: talk that directs attention toward individual qualities rather than group membership only, or talk that offers positive information about a group, and talk that directly addresses a listener's concerns rather than general talk that does not.

A sizable body of survey research in higher education supports and extends the research findings on curricula for children. Much of the higher education research examines development of democracy outcomes, which Gurin, Dey, Gurin, and Hurtado (2003) define as including "commitment to promoting racial understanding, perspective taking, sense of commonality in values with students from different racial/ethnic backgrounds, agreement that diversity and democracy can be congenial, involvement in political affairs and community service during college as well as commitment to civic affairs after college." This research examines the impact of various diversity experiences, with a focus on course-taking and interracial interaction. For the most part, the courses students took in these studies are required diversity courses on their campuses, lists of which include ethnic studies courses, women's studies courses, and courses that focus broadly on a range of forms of diversity.

The overwhelming and most consistent finding is that, in most studies, such courses have a positive impact on students' development of democracy outcomes (Astin 1993, Denson 2009, Gurin, Dey, Hurtado, and Gurin 2002, Lopez 2004). Engberg's (2004) review of 73 studies of the impact of a diversity course, a diversity workshop, a peer facilitated invention, or a service intervention found that 52 of the studies reported positive gains, 14 reported mixed gains, and only seven reported no change. Although most studies had methodological weaknesses (such as use of convenience samples and limitations stemming from wording of some of the survey questions), there was still a consistent pattern of finding a positive impact of diversity coursework on reducing students' biases.

> The overwhelming and most consistent finding is that such courses have a positive impact on students' development of democracy outcomes.

The impact of such courses is considerably stronger when they include cross-group interaction (Astin 1993, Bowman 2010b, Chang 2002, Denson 2009, Gurin, Dey, Hurtado, and Gurin 2002, Lopez 2004), or as Nagda, Kim, and Truelove (2004) put it, "enlightenment and encounter." Because of the importance of cross-group interaction (encounter), some research focuses specifically on its nature. Gurin and Nagda (2006) found that participation in structured intergroup dialogs,

fosters active thinking about causes of social behavior and knowledge of institutional and other structural features of society that produce and maintain group-based inequalities…increases perception of both commonalities and differences between and within groups and helps students to normalize conflict and build skills to work with conflicts, . . . [and it] enhances interest in political issues and develops a sense of citizenship through college and community activities.

In an experimental study, Antonio and colleagues (2004) found that small group discussions in which students vary by race or by opinion produce greater cognitive complexity than when participants are homogeneous. Similarly, in a survey of 8,051 entering freshmen in three large universities, looking at the impact of completing a high school multicultural education course on students' skills and attitudes for participation in a diverse democracy, Hurtado, Engberg, Ponjuan, and Landreman (2002) found that the impact was mediated by the extent to which students were engaged in active discussion of racial issues and interacting with peers whose perspectives are different from their own.

The higher education studies found that required diversity courses have a greater positive impact on White students than on students of color (Denson 2009, Engberg 2004, Bowman 2010a, Lopez 2004). This is probably because exposure to a systematic analysis of power is newer to White students than it is to students of color and, while most students of color have engaged in cross-racial interaction previously, a large proportion of White students have not. In addition, although the researchers do not note this, my experience is that introductory diversity courses are often pitched toward a White audience; students of color may appreciate White students being taught about racism, but they often do not find their own understanding stretched. Blackwell (2010), an African American woman who had been on the receiving end of such curricula, points out that students of color frequently feel marginalized in diversity curricula that focus on raising consciousness among White students by being positioned as cultural expert, teacher's aid, and witness of race and racism; she argues that "home spaces" where students of color can learn about race, ethnicity, and culture at a deeper level are also needed.

The studies also found that for many students—particularly White students—the first diversity course is emotionally challenging (Hogan and Mallot 2005). In a large survey study of students in 19 colleges and universities, Bowman (2010a) examined the impact of taking one or more diversity courses on students' well-being and on their comfort with and appreciation of differences. He found that many students who take a single diversity course experienced a reduced sense of well-being due to having to grapple with issues they have not been exposed to before. However, students who took more than one diversity course experienced significant gains, with gains being greatest for White male students from economically privileged backgrounds (who had the farthest to go). Completing a diversity course also appears to mitigate what is otherwise an escalation of intolerance in the university experience. In a pre-post survey study of students at the University of Michigan, Henderson-King and Kaleta (2000) found that, while the students (majority White) who completed a one-semester race and ethnicity course did not shift in their attitudes about various groups (such as African Americans and Latinos), students who did not complete such a course became less tolerant.

> For many students, particularly White students, the first diversity course is emotionally challenging.

Research on the academic impact of ethnic studies curricula designed for diverse student groups, while not voluminous, shows that such curricula, when designed to help students grapple with multiple perspectives, produce higher levels of thinking.

In the Multicultural Reading and Thinking Project (McRAT), which was developed in Arkansas for grades 4–6 (Arkansas Department of Education 1992), lessons that use multicultural content across the curriculum were designed to develop both higher order thinking and cultural awareness. By the end of the second year of the project,

which was being used in seven school districts, Quellmalz and Hoskyn (1988) found "substantial increases" in student achievement percentile rankings across social class and student achievement levels. They also reported qualitative data that showed an increase in students' writing ability and parent reports that children were reading more at home. In a subsequent experimental evaluation of the project (30% of the students were of color), students using the McRAT curriculum outperformed the control group in analysis, inference, comparison, and evaluation (Arkansas Department of Education 1992, see also Fashola and Slavin 1997). The multicultural curriculum, with its multiple perspectives, complemented teaching of higher order thinking.

At the higher education level, Bowman (2010b) reported a meta-analysis of 23 statistical studies of the relationship between college student participation in diversity experiences (courses, workshops, and/or interactions), and cognitive development (such as critical thinking, moral reasoning, problem-solving). He found that participation in diversity experiences is "significantly and positively related to cognitive development." While the magnitude was small, the effects were consistent across the studies. Diversity experiences that include interpersonal interaction related to racial diversity had the strongest positive impact because interaction across diverse perspectives forces students to think.

> Participation in diversity experiences is "significantly and positively related to cognitive development."

There is also indication that classes of diverse students find well-planned multicultural curricula to be interesting and engaging. Qualitative studies of two literature projects at the elementary level bear this out. The Multicultural Literacy Program (Diamond and Moore 1995 as cited by Gay 2010) entailed use of multiethnic literature with students in grades K–8 in Ypsilanti, Michigan, taught through a whole-language approach, learning centers, and cooperative learning. Qualitative data based on classroom observations and analysis of student work showed increased enjoyment of reading and writing, increased knowledge of various forms and structures of written language, expanded vocabulary and reading strategies, improved comprehension and reading fluency, and longer and clearer written stories. Grice and Vaughn (1992) reported an interview study of responses of nine Black and four White low-achieving third graders from a working class urban community to 20 "culturally conscious" books (set in inner city and some middle class Black neighborhoods, with Black protagonists and storyline that did not involve trying to gain White approval) and four "melting pot" books (middle class setting, no reference to racial identity) books. The children responded most positively to books with characters and situations they could identify with and that had a positive message.

To summarize, research on ethnic studies curricula designed for diverse student groups that include White students reports that just infusing representation of racially and ethnically diverse people into curriculum without doing anything else makes only a marginal impact on students' attitudes, in contrast with curricula that teach directly about racism. The large body of research in higher education that examines the impact of various diversity experiences—particularly course-taking and interracial interaction—on "democracy outcomes" reports quite consistently that such courses have a positive impact, particularly when they include cross-group interaction and particularly on White students. Research on the academic impact of ethnic studies curricula designed for diverse student groups, while not voluminous, shows that such curricula, when designed to help students grapple with multiple perspectives, produces higher levels of thinking.

## Conclusion

Considerable research evidence shows that well-designed and well-taught ethnic studies curricula have positive academic and social outcomes for students and that curricula are designed and taught somewhat differently depending on the ethnic composition of the students and the subsequent experiences they bring. These positive findings should not be interpreted, however, as meaning that schools can assign any teacher an ethnic studies curriculum to teach, or that students of color will automatically achieve more if ethnic content is added to the curriculum. As noted above, well-planned and well-taught ethnic studies includes related components.

Ethnic studies teachers must be able to relate well with their students, believe in students' academic abilities, and know ethnic studies content and perspectives well; often (but not always) they are members of the same ethnic background of most of their students. Pedagogical strategies need to engage students in active thinking. Culture, rather than being conceptualized as something static from the past, is viewed as complex and dynamic, and students' everyday lived culture and language is part of the ethnic studies curriculum. Finally, particularly at the Pre-K through 12 level, ethnic studies is not a separate subject but rather a reconceptualization of subject matter that takes into account state standards and assessments for which students will be held accountable.

> Both students of color and White students have been found to benefit academically as well as socially from ethnic studies

Both students of color and White students have been found to benefit academically as well as socially from ethnic studies. Indeed, rather than being non-academic, well-planned ethnic studies curricula are often very academically rigorous. Rather than being divisive, ethnic studies helps students to bridge differences that already exist in experiences and perspectives. In these ways, ethnic studies plays an important role in building a truly inclusive multicultural democracy and system of education.

# Bibliography

Aboud, F. E., and V. Fenwick. 1999. "Exploring and evaluating school-based interventions to reduce prejudice." *Journal of Social Issues* 55(4): 767–786.

Alridge, D. P. 2006. "The limits of master narratives in history textbooks." *Teachers College Record* 108(4): 662–686.

Altschul, I., D. Oyserman, and D. Bybee. 2006. "Racial-ethnic identity in mid-adolescence: Content and change as predictors of academic achievement." *Child Development* 77 (5): 1155–1169.

Altschul, I., D. Oyserman, and D. Bybee. 2008. "Racial-ethnic self-schemas and segmented assimilation: Identity and the academic achievement of Hispanic youth." *Social Psychology Quarterly* 71(3): 302–320.

Antonio, A. L., M. J. Chang, K. Hakuta, D. A. Kenny, S. Levin, and J. E. Milem. 2004. "Effects of racial diversity on complex thinking in college students." *Psychological Science* 15(8): 507–510.

Arkansas Department of Education. 1992. *Multicultural Reading and Thinking (McRAT): Proposal Submitted to the Effectiveness Panel of the National Diffusion Network.* Washington, DC: U.S. Department of Education.

Astin, A. W. 1993. "Diversity and multiculturalism on campus: How are students affected?" *Change* 25(2): 44–50.

Au, W. 2007. "High-stakes testing and curricular control: A qualitative metasynthesis." *Educational Researcher* 36(5): 258–267.

Bean, T. W., P. C. Valerio, H. M. Senior, and F. White. 1999. "Engagement in reading and writing about a multicultural novel." *Journal of Educational Research* 93(1): 32–37.

Begay, S., G. S. Dick, D. W. Estell, J. Estell, T. L. McCarty, and A. Sells. 1995. "Change from the inside out: A story of transformation in a Navajo community school." *Bilingual Research Journal* 19(1): 121–139.

Bigler, R. S. 1999. "The use of multicultural curricula and materials to counter racism in children." *Journal of Social Issues* 55(4): 687–705.

Bigler, R. S., C. S. Brown, and M. Markell. 2001. "When groups are not created equal: Effects of group status on the formation of intergroup attitudes in children." *Child Development* 72: 1151–1162.

Blackwell, D. M. 2010. "Sidelines and separate spaces: Making education anti-racist for students of color." *Race Ethnicity and Education* 13(4): 473–494.

Bowman, N. A. 2010a. "Disequilibrium and resolution: The non-linear effects of diversity courses on well-being and orientations towards diversity." *Review of Higher Education* 33(4): 543–568.

Bowman, N. A. 2010b. "College diversity experiences and cognitive development: A meta-analysis." *Review of Educational Research* 80(1): 4–33.

Brown, K. D., and A. L. Brown. 2010. "Silenced memories: An examination of the sociocultural knowledge on race and racial violence in official school curriculum." *Equity and Excellence in Education* 43(2): 139–154

Brozo, W. G., and P. C. Valerio. 1996. "A walk through Gracie's garden: Literacy and cultural explorations in a Mexican American junior high school." *Journal of Adolecent and Adult Literacy* 40(3): 164–170.

Byrne, M. M. 2001. "Uncovering racial bias in nursing fundamentals textbooks." *Nursing and Health Care Perspectives* 22(6): 299–303.

California Department of Education. 2001. *History-Social Science Framework for California Public Schools*. Sacramento: California Department of Education.

Cammarota, J. 2007. "A social justice approach to achievement: Guiding Latina/o students toward educational attainment with a challenging, socially relevant curriculum." *Equity and Excellence in Education* 40: 87–96.

Cammarota, J., and A. Romero. 2009. "The Social Justice Education Project: A critically compassionate intellectualism for Chicana/o students." In W. Ayers, T. Quinn, and D. Stovall, eds., *Handbook for Social Justice Education*. New York: Routledge.

Carrell, L. J. 1997. "Diversity in the communication curriculum: Impact on student empathy." *Communication Education* 46: 234–244.

Carter, D. 2008. "Achievement as resistance: Development of a critical race achievement ideology among Black achievers." *Harvard Educational Review* 78(3): 466–497.

Chang, M. J. 2002. "The impact of an undergraduate diversity course requirement on students' racial views and attitudes." *Journal of General Education* 51(1): 21–42.

Chavous, T., D. Hilkene, K. Schmeelk, C. H. Caldwell, L. Kohn-Wood, and M. A. Zimmerman. 2003. "Racial identity and academic attainment among African American adolescents." *Child Development* 74(4): 1076–1090.

Clawson, R. A. 2002. "Poor people, Black faces: The portrayal of poverty in economics textbooks." *Journal of Black Studies* 32(3): 352–61.

Copenhaver, J. 2001. "Listening to their voices connect literary and cultural understandings: Responses to small group read-alouds of *Malcolm X: A Fire*." *New Advocate* 14(4): 343–359.

Denson, N. 2009. "Do curricular and co-curricular activities influence racial bias? A meta-analysis." *Review of Educational Research* 79(2): 805–838.

Diamond, B. J., and M. A. Moore. 1995. *Multicultural Literacy: Mirroring the Reality of the Classroom*. New York: Longman.

DuBois, W. E. B. 1903. *The Souls of Black Folk*. Chicago: A. C. McClurg & Co.

Duncan-Andrade, J. M. R., and E. Morrell. 2008. *The Art of Critical Pedagogy*. New York: Peter Lang.

Durdin, T. R. 2007. "African centered schooling: Facilitating holistic excellence for Black children." *Negro Educational Review* 58(1–2): 23–34.

El-Haj, T. R. A. 2006. *Elusive Justice: Wrestling with Difference and Educational Equity in Everyday Practice*. New York: Routledge.

Engberg, M. E. 2004. "Improving intergroup relations in higher education: A critical examination of the influence of educational interventions on racial bias." *Review of Educational Research* 74(4): 473–524.

Epstein, T. 2000. "Adolescents' perspectives on racial diversity in U.S. history: Case studies from an urban classroom." *American Educational Research Journal* 37(1): 185–214.

Epstein, T. 2001. "Racial identity and young people's perspectives on social education." *Theory into Practice* 40(1): 42–47.

Epstein, T. 2009. *Interpreting National History*. New York: Routledge.

Fashola, O. S., and R. E. Slavin. 1997. "Promising programs for elementary and middle schools: Evidence of effectiveness and replicability." *Journal of Education for Students Placed at Risk* 2(3): 251–307.

Feiner, S. F., and B. A. Morgan. 1987. "Women and minorities in introductory economics textbooks: 1974–1984." *Journal of Economic Education* 18(4): 376–392.

Ford, D. Y., and J. J. Harris III. 2000. "A framework for infusing multicultural curriculum into gifted education." *Roeper Review* 23(1): 4–10.

Foster, S. J. 1999. "The struggle for American identity: Treatment of ethnic groups in United States history textbooks." *History of Education* 28(3): 251–78

Gay, G. 2010. *Culturally Responsive Teaching*, 2nd ed. New York: Teachers College Press.

Ginwright, S. 2004. *Black in School: Afrocentric Reform, Urban Youth, and the Promise of Hip-hop Culture*. New York: Teachers College Press.

Gordy, L. L., and A. M. Pritchard. 1995. "Redirecting our voyage: A content analysis of social studies textbooks." *Urban Education* 30(2): 195–218.

Grice, M. O., and C. Vaughn. 1992. "Third graders respond to literature for and about Afro-Americans." *Urban Review* 24(2): 149–164.

Gurin, P. Y., Dey, E. L., Gurin, G. and Hurtado, S. (2003). "How does racial/ethnic diversity promote education?" *Western Journal of Black Studies* 27 (1): 20–29.

Gurin, P. Y., E. L. Dey, S. Hurtado, and G. Y Gurin, G. 2002. "Diversity and higher education: Theory and impact on educational outcomes." *Harvard Educational Review* 72(3): 330–367.

Gurin, P. Y., and B. R. A. Nagda. 2006. "Getting to the what, how, and why of diversity on campus." *Educational Researcher* 35(1): 20–24.

Halagao, P. E. 2004. "Holding up the mirror: The complexity of seeing your ethnic self in history." *Theory and Research in Social Education* 32(4): 459–483.

Halagao P. E. 2010. "Liberating Filipino Americans through decolonizing curriculum." *Race Ethnicity and Education* 13(4): 495–512.

Henderson-King, D., and A. Kaleta. 2000. "Learning about social diversity: The undergraduate experience and social tolerance." *Journal of Higher Education* 71(2): 142–164.

Hogan, D. E., and M. Mallott. 2005. "Changing racial prejudice through diversity education." *Journal of College Student Development* 46(2): 115–125.

Hu-DeHart, E. 2004. "Ethnic studies in U.S. higher education: History, development, and goals." In J. A. Banks and C. A. M. Banks, eds., *Handbook of Research on Multicultural Education*, 2nd ed. San Francisco: Jossey Bass.

Hughes, R. L. 2007. "A hint of whiteness: History textbooks and social construction of race in the wake of the sixties." *Social Studies* Sept/Oct.: 201–207.

Hughes, J. M., and R. S. Bigler. 2007. "Addressing race and racism in the classroom." In G. Orfield and E. Frankenburg, eds., *Lessons in Integration: Realizing the Promise of Racial Diversity in America's Schools*. Charlottesville: University of Virginia Press.

Hughes, J. M., R. S. Bigler, and S. R. Levy. 2007. "Consequences of learning about historical racism among European American and African American children." *Child Development* 78: 1689–1705.

Hurtado, S., M. E. Engberg, L. Ponjuan, and L. Landreman. 2002. "Students' precollege preparation for participation in a diverse democracy." *Research in Higher Education* 43(2): 163–186.

King, J. E. 1992. "Diaspora literacy and consciousness in the struggle against miseducation in the Black community." *Journal of Negro Education* 61(3): 317–340.

King, J. E., ed. 2005. *Black Education: A Transformative Research and Action Agenda for the New Century*. Washington, DC: American Educational Research Association, and Mahwah, NJ: Lawrence Erlbaum.

Krater, J., J. Zeni, and N. D. Cason. 1994. *Mirror Images: Teaching Writing in Black and White*. Portsmouth, NH: Heinemann.

Krater, J., and J. Zeni. 1995. "Seeing students, seeing culture, seeing ourselves." *Voices from the Middle* 3(3): 32–38.

Lee, C. D. 1992. "Profile of an independent Black institution: African-centered education at work." *Journal of Negro Education* 61(2): 160–177.

Lee, C. D. 1995. "A culturally based cognitive apprenticeship: Teaching African American high school students skills in literary interpretation." *Reading Research Quarterly* 30(4): 608–630.

Lee, C. D. 2001. "Is October Brown Chinese? A cultural modeling activity system for underachieving students." *American Educational Research Journal* 38(1): 97–142.

Lee, C. D. 2006. "'Every good-bye ain't gone': Analyzing the cultural underpinnings of classroom talk." *International Journal of Qualitative Studies in Education* 19(3): 305–327.

Lee, C. D. 2007. *Culture, Literacy and Learning*. New York: Teachers College Press.

Lewis, A. E. 2001. "There is no 'race' in the schoolyard: Colorblind ideology in an (almost) all-White school." *American Educational Research Journal* 38(4): 781–811.

Lewis, K. M., C. M. Sullivan, and D. Bybee. 2006. "An experimental evaluation of a school-based emancipatory intervention to promote African American well-being and youth leadership." *Journal of Black Psychology* 32(1): 3–28.

Lipka, J. 1991. "Toward a culturally based pedagogy: A case study of one Yup'ik Eskimo teacher." *Anthropology and Education Quarterly* 22(3): 203–223.

Lipka, J., and B. Adams. 2004. "Culturally based mathematics education as a way to improve Alaska Native students' math performance: Appalachian Collaborative

Center for Learning, Assessment, and Instruction in Mathematics." Retrieved December 27, 2010, from http://www.uaf.edu/mcc/award-recognition-and-oth/.

Lipka, J., M. P. Hogan, J. P. Webster, E. Yanez, B. Adams, S. Clark, and D. Lacy. 2005. "Math in a Cultural Context: Two case studies of a successful culturally-based math project." *Anthropology and Education Quarterly* 36(4): 367–385.

Lipka, J., N. Sharp, B. Brenner, E. Yanez, and F. Sharp. 2005. "The relevance of culturally-based curriculum and instruction: The case of Nancy Sharp." *Journal of American Indian Education* 44(3): 31–54.

Loewen, J. W. 1995. *Lies My Teacher Told Me.* New York: The New Press.

Lomawaima, K. T., and T. L. McCarty. 2006. *To Remain an Indian: Lessons in Democracy from a Century of Native American Education.* New York: Teachers College Press.

Lopez, G. E. 2004. "Interethnic contact, curriculum, and attitudes in the first year of college." *Journal of Social Issues* 40(1): 75–94.

Marquez, S. A. 1994. "Distorting the image of 'Hispanic' women in sociology: Problematic strategies of presentation in the introductory text." *Teaching Sociology* 22(3): 231–36.

Matthews, C. E., and W. S. Smith. 1994. "Native American related materials in elementary science instruction." *Journal of Research in Science Teaching* 31(4): 363–380.

Mayhew, M. J., H. E. Grunwald, and E. L. Dey. 2005. "Curriculum matters: Creating a positive climate for diversity from the student perspective." *Research in Higher Education* 46(4): 389–412.

McCarty, T. L. 1993. "Language, literacy, and the image of the child in American Indian classrooms." *Language Arts* 70(3): 182–192.

Miller, D., and R. Macintosh. 1999. "Promoting resilience in urban African American adolescents: Racial socialization and identity as protective factors." *Social Work Research* 3: 159–169.

Nagda, B. A., C. W. Kim, and Y. Truelove. 2004. "Learning about difference, learning with others, learning to transgress." *Journal of Social Issues* 60(1): 195–214.

National Center for Education Statistics. 2008. "Average reading scores for White, Black, and Hispanic 9-year-olds higher in 2008 than in all previous assessments." In *The Nation's Report Card, Long-term Trend.* Retrieved November 20, 2010, from http://nationsreportcard.gov/ltt_2008/ltt0009.asp?subtab_id=Tab_2&tab_id=tab1#chart).

O'Connor, C. 1997. "Dispositions toward (collective) struggle and educational resilience in the inner city: A case analysis of six African American high school students." *American Educational Research Journal* 34(4): 593–629.

O'Neil, G. O. 1987. "The North American Indian in contemporary history and social studies textbooks." *Journal of American Indian Studies* 27: 22–28.

Powell, R. R., and J. Garcia. 1988. "What research says about stereotypes" *Science and Children* 25: 21–23.

Quellmalz, E. S., and J. Hoskyn. 1988. "Making a difference in Arkansas: The multicultural reading and thinking project." *Educational Leadership* 45(7): 52–55.

Rangel, J. 2007. "The educational legacy of *El Plan de Santa Barbara*: An interview with Reynaldo Macías." *Journal of Latinos and Education* 6(2): 191–199.

Reyhner, J. 1986. "Native Americans in basal reading textbooks: Are there enough?" *Journal of American Indian Education* 26: 14–21.

Riding J., E. Cook-Lynne, T. Holm, and J. Red Horse. 2005. "Reclaiming American Indian Studies." *Wicazo Sa Review* 20(1): 169–177.

Rickford, A. 2001. "The effect of cultural congruence and higher order questioning on the reading enjoyment and comprehension of ethnic minority students." *Journal of Education for Students Placed at Risk* 6(4): 357–387.

Romanowski, M. H. 1996. "Problems of bias in history textbooks." *Social Education* 60(3): 170–73.

Romero, A., S. Arce, and J. Cammarota. 2007. "A barrio pedagogy: Identity, intellectualism, activism, and academic achievement through the evolution of critically compassionate intellectualism." *Race Ethnicity and Education* 12(2): 217–233.

Sanchez, T. R. 2007. "The depiction of Native Americans in recent (1991–2004) secondary American history textbooks: How far have we come?" *Equity and Excellence in Education* 40: 311–320.

Sanders, M. G. 1997. "Overcoming obstacles: Academic achievement as a response to racism and discrimination." *Journal of Negro Education* 66(1): 83–93.

Sellers, R. M., T. M. Chavous, and D. Y. Cooke. 1998. "Racial ideology and racial centrality as predictors of African American college students' academic performance." *Journal of Black Psychology* 24(1): 8–27.

Sleeter, C. E. 2002. "State curriculum standards and student consciousness." *Social Justice* 29(4): 8–25.

Sleeter, C. E., and C. A. Grant. 1991. "Textbooks and race, class, gender and disability." In M. W. Apple and L. Christian-Smith, eds., *Politics of the Textbook.* New York: Routledge, Chapman and Hall.

Span, C. M. 2002. "Black Milwaukee's challenge to the cycle of urban miseducation: Milwaukee's African American immersion schools." *Urban Education* 37(5): 610–630.

Tyson, C. A. 2002. "'Get up off that thing:' African American middle school students respond to literature to develop a framework for understanding social action." *Theory and Research in Social Education* 30(1): 42–65.

University of Alaska Fairbanks. 2010. "Math in a Cultural Context." Retrieved March 30, 2011, from http://www.uaf.edu/mcc.

Valli, L., and M. Chambliss. 2007. "Creating classroom cultures: One teacher, two lessons, and a high-stakes test." *Anthropology and Education Quarterly* 38(1): 42–60.

Vasquez, J. M. 2005. "Ethnic identity and Chicano literature: How ethnicity affects reading and reading affects ethnic consciousness." *Ethnic and Racial Studies* 28(5): 903–924.

Vecchio, D. 2004. "Immigrant and ethnic history in the United States survey." *History Teacher* 37(4): 494–500.

Wiggan, G. 2007. "From opposition to engagement: Lessons from high achieving African American students." *Urban Review* 40(4): 317–349.

Woodson, C. G. 1933. *The Mis-education of the Negro.* Washington, DC: Associated Publishers.

# About the Author

**Christine E. Sleeter, PhD.** (University of Wisconsin–Madison 1982), is Professor Emerita in the College of Professional Studies at California State University–Monterey Bay, where she was a founding faculty member. She was formerly a high school learning disabilities teacher in Seattle. Currently a visiting professor at San Francisco State University, she was a faculty member at Ripon College in Wisconsin and at the University of Wisconsin–Parkside, and a visiting professor at Victoria University in New Zealand, San Jose State University, and the University of Washington–Seattle.

Currently serving as President of the National Association for Multicultural Education, Dr. Sleeter previously served as Vice President of Division K (Teaching and Teacher Education) of the American Educational Research Association. Her research focuses on anti-racist multicultural education and multicultural teacher education, and currently she is developing a new area, critical family history. With a team of researchers in Victoria University, New Zealand, she recently completed an evaluation study of a Maori professional development program for secondary schools.

Dr. Sleeter has published over 100 articles in edited books and journals such as *Journal of Teacher Education*, *Teacher Education Quarterly*, *Teaching and Teacher Education*, and *Curriculum Inquiry*. Her recent books include *Unstandardizing Curriculum* (Teachers College Press 2005), *Critical Multiculturalism: Theory and Praxis* (with Stephen May, Routledge 2010), and *Doing Multicultural Education for Achievement and Equity* (with Carl Grant, Routledge 2007). Her work has been translated into Spanish, Korean, French, and Portuguese. Her theorizing about disability was featured in a special issue of *Disability Studies Quarterly*. She has been invited to speak in most U.S. states as well as several countries.

Awards for Dr. Sleeter's work include the American Educational Research Association Social Justice in Education Award, the American Educational Research Association Division K Legacy Award, the California State University Monterey Bay President's Medal, the National Association for Multicultural Education Research Award, and the Central Washington University Distinguished Alumni Award.

For their helpful feedback and suggestions on a previous draft of this paper, I am very grateful to Julio Cammarota, Jeff Duncan-Andrade, Kevin Kumashiro, and Judith McQuaide.



*Great Public Schools for Every Student*

NEA Research
1201 16th Street, N.W.
Washington, D.C. 20036-3290
www.nea.org

13922  06/11  hls