THOMAS C. HORNE
Attorney General
Firm Bar No. 14000

Kevin D. Ray, No. 007485
Jinju Park Hurtado, No. 026023
Assistant Attorneys General
1275 West Washington Street
Phoenix, Arizona  85007-2926
Telephone: (602) 542-8328
Facsimile:  (602) 364-0700
Email: EducationHealth@azag.gov
*Attorneys for Defendants John Huppenthal,*
*Superintendent of Public Instruction, in his official capacity;*
*and the State Board of Education and its individual members,*
*named in their official capacity as nominal parties*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CURTIS ACOSTA, et al., | Case No. CV-10-623-TUC-AWT |
| Plaintiffs, | **RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| JOHN HUPPENTHAL, Superintendent of Public Instruction, in his Official Capacity, et al., | Honorable A. Wallace Tashima |
| Defendants. | |

Plaintiffs seek an order from this Court enjoining a state administrative enforcement proceeding (Doc. 113 at 1) between the Arizona Superintendent of Public of Education ("Superintendent") and the Tucson Unified School District ("TUSD") over whether the TUSD's Mexican American Studies ("MAS") program is in violation of State law.  Plaintiffs include eleven teachers from the MAS program at the TUSD and two students who are not eligible to enroll in the program at this time.  (Doc. 84.)  The Plaintiffs cannot assert the rights of TUSD, the real party-in-interest, in this case, and Plaintiffs' claimed personal rights

are too remote, contingent and speculative to support the requested injunction. [1]  Further, the Plaintiffs haven't met the threshold requirements for the issuance of an injunction.

The Plaintiffs filed this lawsuit on October 18, 2010, before the challenged legislation, Arizona House Bill 2281, codified at Arizona Revised Statutes ("A.R.S.") § 15-111 and -112 (hereinafter the "Act") went into effect on January 1, 2011.  (Doc. 1.)  The Act prohibits any public district school or charter school from including any courses or classes that (1) promote the overthrow of the United States government, (2) promote resentment toward a race or class of people, (3) are designed primarily for pupils of a particular ethnic group, or (4) advocate ethnic solidarity instead of the treatment of pupils as individuals in its course of study.  A.R.S. § 15-112.  Plaintiffs allege that the Act violates their personal First Amendment speech rights and Fourteenth Amendment equal protection and due process rights as teachers and future students.  (Doc. 84, 113.)  They request that this Court enjoin the Superintendent from concluding an administrative action to determine whether TUSD is in compliance with the Act.  (Doc. 113 at 1.)

As explained in the Memorandum of Points and Authorities, Plaintiffs fail to meet their burden to show that an injunction should issue because TUSD is the real party in interest.  TUSD is currently a party to a separate state administrative action with a right of appeal.  It is not a party to this lawsuit.  Until the administrative proceeding is concluded and an appeal of that final agency decision is resolved, there is no legal recognizable harm to be enjoined.  Even if the administrative process finds that TUSD is in violation of the Act, TUSD retains discretion to determine what actions it will take to bring the MAS program into compliance.  Unless and until all the speculative harm occurs, any injury alleged by Plaintiffs is too contingent and remote.  For the reasons given below, this Court should deny Plaintiffs' request for a preliminary injunction.

---

[1] The Superintendent addresses these issues in the Motion to Dismiss Plaintiffs' Third Amended Complaint, filed on September 19, 2011.  (Doc. 88.)

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    FACTUAL PROCEDURE AND BACKGROUND

As the Arizona Superintendent of Public Instruction ("Superintendent") has briefed before this Court, the Act is, on its face, a racially neutral statute that prohibits school districts and charter schools from providing courses or courses of study that violate provisions of the Act.  (Doc. 88.)  The statute provides that the Superintendent or the State Board of Education ("Board")[2] may notify a district if any of its programs have been deemed to be in violation of the statute. A.R.S. § 15-112(B).  If such a notice of violation is issued to any school district or charter school, the statute gives the district or school sixty days to bring the program into compliance.  *Id.*  If compliance is not achieved within sixty days, the statute empowers the Superintendent or the Board to "direct the department of education to withhold up to ten per cent of the monthly apportionment of state aid that would otherwise be due the school district or charter school."  *Id.*  Once the program has been brought into compliance (even if after the sixty-day window), all withheld monies are then "restored" to the school district or charter school.  *Id.*

After taking office on January 3, 2011, the Superintendent initiated an investigation into the MAS program at TUSD for possible non-compliance of the law, as declared by his predecessor in office.  (Doc. 113 at 14.)  The Superintendent found that TUSD's MAS program violated the Act and initiated enforcement of the Act.  (Doc. 113 at 14-15.)  TUSD appealed the Superintendent's decision to the State's office of administrative hearings.  (Doc. 113 at 15.)  TUSD and the Superintendent are parties to the ongoing state administrative proceeding.  The Administrative Law Judge ("ALJ") has not closed the record at this time.[3] Even after the close of the record, the ALJ has twenty days to consider the proposals and issue a written decision with an explanation of the reasons supporting the decision.

---

[2]  The Board is a nominal party in this case and has not participated in the enforcement proceedings.

[3]The docket for the administrative hearing, case number 11F-002-ADE, is available at https://portal.azoah.com/prolaw/ (last accessed December 7, 2011).

A.R.S. § 41-1092.08(A).  Upon issuance of the ALJ's findings of fact, conclusions of law, and recommendation, the Superintendent has thirty days to decide whether to accept, reject, or modify these findings.  A.R.S. § 41-1092.08(B).  The Superintendent must serve written copies of the final decision to TUSD.  *Id.*  Even after the Superintendent renders his decision, TUSD has the opportunity to file for a rehearing or for a judicial review in the state superior court within thirty days after service of the final administrative decision.  A.R.S. § 41-1092.09(A).  As of this date, none of these events have occurred.  Currently, the status quo of TUSD's MAS program is that: (1) the MAS program is still operating in the district's schools, (2) no administrator or teacher in the MAS program has lost his or her employment, (3) there is no final agency decision determining whether TUSD's MAS program is in violation of the Act, (4) the Superintendent has not withheld funding, and (5) TUSD has not indicated that the program would be terminated even if funding were withheld.  The Plaintiffs' claimed injuries are the result of pure speculation regarding future events that may never unfold.

## II.     LEGAL ARGUMENTS

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [P]laintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22, 129 S. Ct. 365, 376 (2008) (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865 (1997)).

### A.     Plaintiffs Fail to Show a Likelihood of Irreparable Injury

The alleged harm to Plaintiffs is the abolition of the MAS program that TUSD currently offers.  They assert that the student plaintiffs will be denied the opportunity to enroll in MAS courses and that the teacher plaintiffs may lose their teaching positions.

1  (Doc. 113 at 4.)  These claimed injuries are too contingent and remote to support the

2  requested injunction.[4]

3  　　　　The correct standard is not whether there is a remote possibility of injury contingent

4  on intervening future acts, but whether there is a current *likelihood* of irreparable injury.

5  *Stormans* 586 F.3d at 1138.  As the United States Supreme Court clearly stated in *Winter*, the

6  "'possibility' standard is too lenient."  555 U.S. 7, 22, 129 S. Ct. 365, 375 (2008).  Instead,

7  "plaintiffs seeking preliminary relief must demonstrate that irreparable injury is *likely* in the

8  absence of an injunction."  *Id.*  They fail to do so here.

9  　　　　TUSD and the Superintendent have not concluded the ongoing state administrative

10 proceeding.  Thus, the threatened injury is not likely unless all of the following occurs: (1)

11 the state administrative hearing process concludes; (2) TUSD is found to be in violation of

12 the Act; (3) the Superintendent gives notice of his intent to initiate a sanction against TUSD

13 for violations of the Act; (4) TUSD does not appeal an adverse final administrative decision;

14 (5) TUSD fails to obtain a stay of the administrative decision pending appeal; (6) the

15 Superintendent begins to withhold ten per cent of state aid to TUSD on a monthly basis; and

16 (7) TUSD decides to abolish or significantly modify the MAS program.  This is unlike the

17 situation in *Stormans* where the plaintiffs could show that the loss of their employment was

18 likely and imminent.  *Stormans*, 586 F.3d at 1121.  In *Stormans*, a group of pharmacists

19 brought suit against the Washington State Board of Pharmacy alleging that the rules

20 requiring them to dispense a contraceptive violated their personal religious views.  *Id.* at

21 1117.  The court found that the pharmacists had alleged actual and imminent injuries because

22 _____

23 [4] Moreover, according to the facts alleged by the Plaintiffs, they were aware of the
enforcement actions against TUSD as early as October 18, 2010.  (Doc. 1 at 11.)  However,

24 instead of seeking a preliminary injunction at that time, Plaintiffs amended their complaint
three times (Doc.20, 53, 84), filed two motions for summary judgment (Doc. 46, 97), and

25 waited until the Superintendent filed for a change of counsel on November 10, 2011 (Doc.
106) to file their Motion for Preliminary Injunction on November 16, 2011 (Doc. 113).

26 "Plaintiffs' long delay before seeking a preliminary injunction implies a lack of urgency and
irreparable harm."  *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377

27 (1985).

one pharmacist's employer had informed her that her religious beliefs would not be accommodated and another pharmacist was forced to leave her former job to work at another pharmacy further away from her house for less pay. *Id.* at 1121. In this case, while Plaintiffs claim that their loss of employment is inevitable, this scenario is too remote and contingent to support their request for a preliminary injunction.

Even if the MAS program is ultimately modified by TUSD to come into compliance with the new state law, the Plaintiffs are merely speculating that their personal interests will be affected. Any actions taken by TUSD to comply with the Act is within the discretion of TUSD. While it may have some impact on the teachers and students in the district, TUSD's decision is not actionable against the Superintendent. The Plaintiffs have no constitutional rights to object to the revision of any curriculum for the MAS program adopted by TUSD to conform to state law. Teachers have no constitutionally protected right to choose what to teach nor the method they may use to teach. *See Nampa Classical Acad. v. Goesling*, 714 F. Supp. 2d 1079, 1093 (D. Idaho 2010) *aff'd* 10-35542, 2011 WL 3562954 (9th Cir. 2011) (quoting *Downs v. L.A. Unified Sch. Dist.,* 228 F.3d 1003, 1009 (9th Cir.2000), *cert. denied,* 532 U.S. 994, 121 S. Ct. 1653 (2001)) (rejecting teachers' claims that the right of free speech extended over their choice of which books, sources, and supplementary materials to use and that the State's policy banning religious text violated the teachers' free speech rights). Likewise, students have no constitutionally protected right to pursue the course of study that they choose. *Id.*

In the alternative, Plaintiffs assert that they face irreparable harm from a loss of First Amendment freedoms. (Doc. 113 at 44.) A loss of First Amendment freedoms can constitute irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976). However, Plaintiffs fail to allege any facts that would give rise to an inference that their First Amendment freedoms have been or will be abridged. They have not given any concrete examples of a chill in their speech. They cannot point to any change in their pedagogy, their employment status, or the availability of MAS classes. A preliminary

injunction requires more than bare allegations that constitutional rights are being violated – it must be supported by evidence. *Stormans*, 586 F.3d at 1139. Plaintiffs must show that their First Amendment interests are either threatened or in fact being impaired. *Elrod*, 427 U.S. at 373, 96 S. Ct. at 2690. Plaintiffs' conclusory legal statements without supporting factual allegations show that no impairment of a constitutional right has occurred or will occur. Even if Plaintiffs did allege some facts to show that their expression has or will change, their claims must fail on the merits.

**B.      Plaintiffs Fail to Raise Serious Questions on the Merits of Their Claim.**

**1.      The Act Does Not Infringe Plaintiffs' Freedom of Expression.**

Plaintiffs allege that the Act attempts to infringe teachers' and students' rights to speak within an approved curriculum. (Doc. 113 at 34.) In doing so, they assert First Amendment protections to teach or to learn particular courses of study as they choose. Plaintiffs' curricular preferences are not constitutionally protected rights.

The First Amendment of the United States Constitution, declares that "Congress shall make no law [. . .] abridging the freedom of speech." Nevertheless, the right to speak is not without limits. The government has the ability to regulate speech depending on the nature of the speech and the forum of the speech. *Downs,* 228 F.3d at 1009. While teachers and students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate, *Tinker v. Des Moines Indep. Comty. Sch. Dist.*, 393 U.S. 503, 506, 89 S. Ct. 733, 736 (1969), school teachers and students have no First Amendment right to influence curriculum as they so choose. *Downs*, 228 F.3d at 1015-16. This is settled law in the Ninth Circuit.

The Act prohibits public district schools and charter schools from including four enumerated types of courses in their curricula. A.R.S. § 15-112(A). The choice of curricula and course of study is the focus of the Act. *Id.* It prohibits actions taken by school districts and charter schools, not teachers or students. *Id.* It imposes sanctions on a school district or charter school that fails to comply, after notice and an opportunity to cure. *Id.* The statute

does not prohibit teachers from using their discretion to communicate approved TUSD course curricula and materials to students. *Id.* It does not impose civil liabilities or criminal sanctions on a teacher's communication of materials to their students. *Id.* Public school teachers necessarily have wide discretion over the way the course material is communicated to students. *Ambach v. Norwick*, 441 U.S. 68, 78, 99 S. Ct. 1589, 1595 (1979). The Act does not address the teachers' discretion in communicating approved course material.

Plaintiffs also suggest that the Act infringes TUSD's authority to approve curricula. (Doc. 113 at 38.) Plaintiffs clearly do not have standing to raise this issue on behalf of TUSD. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992) (requiring a plaintiff to show an actual or imminent injury to a legally protected interest that is fairly traceable to the challenged action of the defendant that will be redressed by a ruling by the court); *see also Lopez v. Candaele*, 630 F.3d 775, 785-86 (9th Cir. 2010) *cert. denied*, 131 S. Ct. 2456 (2011) (applying this standard to overbreadth challenges to speech restrictions on behalf of parties not before the court). Moreover, this argument must fail because the State has the primary responsibility for educating its youth.[5] *See Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 179 Ariz. 233, 239, 877 P.2d 806, 812 (1994) (stating that, from the inception of its statehood, Arizona's public "schools were to be forever under the *exclusive* control of the state") (*citing* Act of June 20, 1910, ch. 310, § 20, 36 Stat. 557, 570); *see also* Ariz. Const. art. XI, § 1 (requiring the Legislature to "enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system"); A.R.S. § 15-341 (delegating a limited authority to school district governing boards to "prescribe and enforce policies and procedures for the governance of the schools, not inconsistent with law or rules prescribed by the state board of education"). Central

---

[5] While the right to make personal decisions relating to education may be said to be a fundamental right, the Ninth Circuit has explicitly rejected any fundamental due process right to direct *how* a public school teaches children. *Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1190 (9th Cir. 2006). As a result, the Plaintiffs' claim that the threatened elimination of the MAS program violates their substantive due process rights fails as a matter of law. (Doc. 113 at 41.)

among the powers and duties of the State in education is the authority to establish public

school curricula that accomplishes its educational objectives.  *See Bd. of Educ. v. Pico*, 457

U.S. 853, 864, 102 S. Ct. 2799, 2806 (1982); *Ambach*, at 76, 99 S. Ct. at 1594.

When the State determines the content of the education it provides, it is the State

speaking.  *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 833, 115 S.

Ct. 2510, 2518 (1995).  It has the discretion to engage in its own expressive activity of

prescribing its curriculum.  *Brown v. Li*, 308 F.3d 939, 949-50 (9th Cir. 2002).  "[U]nder the

Supreme Court's precedents, the curriculum of a public educational institution is one means

by which the institution itself expresses its policy, a policy with which others do not have a

constitutional right to interfere."  *Id.*  (citing  *Downs,* 228 F.3d at 1015-16).  And, as the

speaker, the State may regulate the content of what is or is not expressed by the teachers who

are enlisted to convey its message.  *Id.*  Assuming that the Plaintiffs have some First

Amendment protection over the manner of communication, this protection does not extend to

the right to choose the curricula.  *See Calif. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d

1141, 1148 (9th Cir. 2001) (assuming *arguendo* that instructional speech specifically

covered by the statute at issue received some First Amendment protections); *see also Downs*

228 F.3d at 1015-16 (stating that "school teachers have no First Amendment right to

influence curriculum as they so choose").

Similarly, the two individual student plaintiffs, who are not yet eligible to enroll in the

MAS program, have no constitutionally protected right to choose their own curricula.  As the

entity responsible for educating students, the State can, consistent with the First Amendment,

require students to comply with the terms of academic assignments.  *Li*, 308 F.3d at 949

(distinguishing the First Amendment protections over students' extracurricular speech from

core curricular speech and holding that a university may regulate students' curricular

speech).  The First Amendment also does not require the State to change its academic

requirements to suit a student's opinion or to approve a course of study that fails to meet a

legitimate academic standard.  *Id*.  The First Amendment is only implicated as to require

judicial intervention when the State prohibits student expression without a valid educational purpose. *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S. Ct. 562, 571 (1988). The Act does not prohibit extracurricular student expression. No student is prohibited from reading controversial books or texts outside of the established curricula. No student will be punished or reprimanded for expressing their ideas. As a result, there is no *reasonable* threat of a chilling effect of free exchange of ideas within the school community. *See Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S. Ct. 675, 683-84 (1967) (stating that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom" that have the effect of prohibiting teachers and students from free inquiry, study, and evaluation). The student Plaintiffs' claims of a constitutional violation must fail because the law does not infringe students' freedom to pursue knowledge and understanding independently of the State's core curricular requirements.

### 2. The Act Does Not Violate the Equal Protection Guarantees of the Fourteenth Amendment.

Plaintiffs allege that the actions taken by the Superintendent violates the Equal Protection Clause because they discriminate against Mexican Americans. (Doc. 113 at 6.) This claim has no basis.

Plaintiffs claim that the law is discriminatory on its face because it discriminates against Mexican-Americans. (Doc. 113 at 6.) This is clearly incorrect. As the Supreme Court has recognized, state action that addresses, in a neutral fashion, race-related matters does not violate the Equal Protection guarantees. *Crawford v. Board of Education of the City of Los Angeles,* 458 U.S. 527, 538, 102 S. Ct. 3211, 3218 (1982); *see also City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985) (internal citation omitted) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.") On its face, the statute does not single out Mexican-Americans. It makes no reference to a specific race or discreet or insular minority. If the law draws any classification

10

at all, the only classification it draws is between curricula that violate the statute and curricula that do not violate the statute.  *See* A.R.S. § 15-112(A) ("a *school district* or *charter school* in this state shall not include in its program of instruction any courses or classes" that violate the statute).  The law enforces this classification by allowing the Superintendent to impose sanctions on school districts or charter schools that fail to comply.  *See* A.R.S. § 15-112(B).  Nothing in the text of the law singles out Mexican-Americans for disparate treatment.

The Act is entitled to rational basis review because it makes no suspect classifications on its face.  *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 2101 (1993).  Because the law makes no impermissible classifications, Plaintiffs' claims that the State is biased towards Mexican-Americans or motivated by racist policy (Doc 113 at 7-8) "is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  *Beach Communications,* 508 U.S. at 315, 113 S. Ct. at 2102.  Its classification must be upheld against Plaintiffs' equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.  *Id.*  Plaintiffs bear a heavy burden to overcome the presumption of the statute's constitutionality.  *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 2643 (1993).  They fail to do so because they have not negated every conceivable basis that might support it.[6]  *Id.*  For this reason, Plaintiffs' facial challenge to the statute under the Fourteenth Amendment must fail.

---

[6]  While the Superintendent has no obligation to offer any proof or evidence of a legitimate application of the statute, the State's authority to set curricula is reasonably related to its established authority over the academic and ethical education of its youth.
*See* A.R.S. § 15-201(A)(12)-(13),(15).  Likewise, the Legislature has a legitimate interest in precluding curricula that promotes racism or favoritism toward a particular ethnic group and A.R.S. § 15-112 rationally furthers that interest.

1          Plaintiffs also claim that the law is being applied in a discriminatory fashion because

2    the Superintendent is applying it against Mexican-American students and educators.  (Doc.

3    113 at 7-22.)[7]  To succeed on this challenge, Plaintiffs must show that the law is applied in a

4    discriminatory manner or imposes different burdens on different classes of people.  *Lazy Y*

5    *Ranch Ltd. v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008).  They must "prove two essential

6    elements": (1) discriminatory effect and (2) invidious discriminatory intent or purpose.  *De*

7    *La Cruz v. Tormey*, 582 F.2d 45, 51 (9th Cir. 1978).  In this case, the effect is not

8    discriminatory.  While the MAS program is the first course of study targeted for

9    investigation and enforcement, it does not target Mexican-Americans for disparate treatment.

10         As the Supreme Court explained in *Engquist v. Oregon Department of Agriculture*,

11   "[t]here are some forms of state action, which by their nature involve discretionary

12   decisionmaking based on a vast array of subjective, individualized assessments."  553 U.S.

13   591, 603, 128 S. Ct. 2146, 2154 (2008).  This does not violate the rule that persons should be

14   treated alike under like circumstances.  *Id.*  The *Enquist* court supposed that if a traffic

15   officer stationed on a busy highway where people often drive above the speed limit stopped

16   one person and issued this single person a ticket, the officer may have created a class of

17   people that did not get speeding tickets and a "class of one" that did.  *Id.* at 603-604, 128 S.

18   Ct. at 2154.  But, if "it is in the nature of a particular government activity that not all

19   speeders could be stopped and ticketed," a complaint from the single person who received a

20   speeding ticket that he or she had been singled out did not invoke the fear of improper

21

---

22   [7] The Arizona Legislature provided a clear Declaration of Policy for the Act.  *See* A.R.S. §
     15-111 (stating, in relevant part, that "public school pupils should be taught to treat and
23   value each other as individuals and not be taught to resent or hate other races or classes of
24   people").  On its face, the Legislature drafted and adopted the statute to require schools to
     provide instruction in a non-discriminatory manner.  Nothing in its stated purpose can show
25   that the Legislature was motivated by any animus or discriminatory intent.  Plaintiffs instead
     rely on the Superintendent's administrative enforcement action against TUSD in an attempt
26   to demonstrate a discriminatory intent.  The enforcement of the Act against a single school
     district is insufficient to demonstrate that the Legislature was motivated by any invidious
27   intent to discriminate against Mexican-American students and teachers in enacting the law.

government classification at the heart of an equal protection claim.  *Id.* at 604, 128 S. Ct. at 2154.

Plaintiffs claim that the exclusivity of enforcement against TUSD's MAS program allows a finding of purposeful discrimination (Doc. 113 at 10),[8] but there is an array of subjective, individualized assessments involved in the Superintendent's discretionary decision to investigate and enforce the statute in this case.  First, the Superintendent does not have to, nor is it feasible to initiate an investigation into every public district or charter school's curricula simultaneously.  Second, the MAS program is the largest of its kind in the State, and has been the most controversial.  (Doc. 64-2, 88-1 at 10.)  Third, it is also the only program that the Superintendent is aware of that offers courses toward fulfillment of graduation requirements.  (Doc. 113 at 15.)  Finally, to the extent that the Superintendent "singled out" the MAS program, TUSD can raise this in the administrative appeal from the enforcement action.  Thus, Plaintiffs fail to demonstrate that the Superintendent's decision to investigate the MAS program indicated intent to discriminate against Mexican-Americans.  Treating seemingly similarly situated school districts differently in this context is "par for the course."  *Engquist* at 603, 128 S. Ct. at 2153.

This law is not motivated by an invidious discriminatory intent or purpose, and Plaintiffs have not provided actual evidence of such intent or purpose.  *City of Cuyahoga Falls v. Buckeye Comm. Hope Found.*, 538 U.S. 188, 194, 123 S. Ct. 1389, 1394 (2003) (requiring "proof of racially discriminatory intent or purpose" to show a violation of the Fourteenth Amendment's equal protections).  "[P]urposeful discrimination is the condition that offends the Constitution."  *Swann v. Charlotte-Mecklenburg Board of Educ.*, 402 U.S. 1, 16, 91 S. Ct. 1267, 1276 (1971).  In order to prove invidious discrimination, "'[a] purpose to discriminate must be present.'"  *Washington v. Davis*, 426 U.S. 229, 239, 96 S. Ct. 2040, 2047 (1976) (quoting *Atkins v. Texas*, 325 U.S. 398, 403, 65 S. Ct. 1276, 1279 (1945)).

---

[8] Plaintiffs cannot provide any authority to support their implied claim that the MAS program is entitled to Equal Protection rights under the constitution.

Contrary to Plaintiffs' claims that there are a series of official actions taken for invidious purposes (Doc. 113 at 11), such an intent to discriminate is not present here.

### 3.    The Act Does Not Impair Plaintiffs' Right to Engage in the Political Process.

Plaintiffs allege that the State is disenfranchising Mexican-American students by prohibiting courses of study that (1) promote the overthrow of the United States government, (2) promote resentment toward a race or class of people, (3) are designed primarily for pupils of a particular ethnic group, or (4) advocate ethnic solidarity instead of the treatment of pupils as individuals.  (Doc. 113 at 30); *see also* A.R.S. § 15-112.  The Act does not disenfranchise Mexican-American students.

This case is different from the situation in *Hunter v. Erickson*, 393 U.S. 385, 89 S. Ct. 557 (1969).  In *Hunter*, the Akron city council enacted a fair housing ordinance pursuant to its ordinary legislative process.  *Id* at 386, 89 S. Ct. at 558.  In response, the municipality's citizens amended the city charter to provide that any fair housing ordinance enacted by the city council had to be approved by a majority of voters at a regular or general election in order to be effective.  *Id.* at 387, 89 S. Ct. at 558.  The plaintiff challenged the initiative as a violation of the Equal Protection Clause.  *Id.* at 388, 89 S. Ct. at 559.  The United States Supreme Court found that the initiative violated the Equal Protection Clause because it made it "substantially more difficult" to secure enactment of fair housing ordinances.  *Id.* at 390, 89 S. Ct. at 560.  In so holding, the Court stated that the initiative placed special burdens on racial minorities within the governmental process.  *Id.* at 391, 89 S. Ct. at 560-61.  Unlike the *Hunter* case, the does not place special burdens on racial minorities who want to access the political process.  The Act simply addresses the limits of educational curricula adopted by school districts and charter schools in the State.

The Act does not "remov[e] the authority to address a racial problem -- and only a racial problem -- from the existing decisionmaking body, in such a way as to burden minority interests" like the challenged law in *Washington v. Seattle School Dist.*, 458 U.S.

457, 474, 102 S. Ct. 3187, 3197 (1982).  As the Court recognized in *Seattle*, the State's decision to usurp power "firmly committed to the local [school] board's discretion" for the single purpose of addressing the racial issue of integration and bussing in public schools differentiated between the treatment of problems involving racial matters and other non-racial matters.  *Id*. at 479-80, 102 S. Ct. at 3200.  The Court further acknowledged that this issue was a matter of local law.  *Id.* at 480, 102 S. Ct. at 3200.  Here, the authority to establish basic educational requirements is firmly committed to the State.  *See* A.R.S. § 15-203(A)(12) – (13) ("The state board shall prescribe a minimum course of study . . . [and] minimum competency requirements" for common schools and high schools); *see also* A.R.S. § 15-203(A)(20) ("The state board shall develop and maintain a handbook . . . that provides guidance for the teaching of moral, civic and ethical education" that promotes existing curriculum frameworks and instills character and ethical principles in school age pupils.); *see also* A.R.S. § 15-252(A)(4) (requiring the superintendent to distribute the courses of study prescribed by the Board).  The Act did not shift the political structure to the Board and the Superintendent solely for the purpose of burdening minority interests.  Thus, *Seattle* is not applicable precedent in this case.

Any time that a State chooses to address a policy issue, some persons or group may be disadvantaged, but this does not create a constitutional violation.  A claim that a state policy violates the federal constitution "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Beach Communications*, 508 U.S. at 313, 113 S. Ct. at 2101.  "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we think a political branch has acted."  *Id.* at 313-14, 113 S. Ct. at 2101.

15

4.      **The Act is Not Unconstitutionally Vague.**[9]

Finally, Plaintiffs allege that the Act is unconstitutionally vague on its face because it infringes their constitutional right to speech.  (Doc. 113 at 6; Doc. 97.)  Their claim must fail because "[f]acial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort."  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 118 S. Ct. 2168, 2175 (1998).  To prevail, the Plaintiffs must demonstrate a substantial risk that application of the provision will lead to the suppression of speech.  *Id.* They cannot do so here.

A statute can be impermissibly vague only if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or if it authorizes or even encourages arbitrary and discriminatory enforcement.  *Hill v. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480, 2498 (2000).  As the Supreme Court observed in *Grayned v. City of Rockford*, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language."  408 U.S. 104, 110, 92 S. Ct. 2294, 2300 (1972).  Thus, in testing a challenged statute for unconstitutional vagueness, a court employs "traditional tools of statutory construction to determine the statute's 'allowable meaning.'" *Calif. Teachers Ass'n*, 271 F.3d at 1147 (quoting *Grayned*, at 110, 92 S. Ct. at 2300).

The words of the statute do not apply to a teacher's classroom communications. A.R.S. § 15-112.  It does not prohibit students from speaking or exchanging ideas.  *Id.*  It merely restricts school districts and charter schools from offering certain types of courses or courses of study in its curricula.  *Id.*  As discussed above in Section II.B.1 on pages 7-9, the State may make such content-based restrictions on its own speech.  As the speaker, the State may decide what it will or will not communicate to school-age students.  The Act does not

---

[9] Plaintiffs rely on their arguments in the Motion for Summary Judgment filed on October 21, 2011 to make their claim.  (Doc. 97.)  The Superintendent adopts, by reference, particular arguments regarding vagueness contained in the Response to the Motion for Summary Judgment filed on June 27, 2011 (Doc. 57) and reserves the opportunity to respond more fully in its response to the Motion for Summary Judgment (Doc. 97) due on January 15, 2012 (Doc. 106).

suppress any constitutionally protected expression by the teachers or students.  As a result, this Court should uphold the statute unless there is no circumstance where this could be constitutional.

Even if the statute could be construed to apply to pedagogy or teachers' speech in the classroom pursuant to the curricula approved by a district or charter school, the statute is nevertheless not vague.  "The degree of vagueness that the Constitutional tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498, 102 S. Ct. 1186, 1193 (1982).  "The Court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99, 102 S. Ct. at 1193.  This is clearly not a criminal case.  In addition, the Act does not impose any civil penalties on Plaintiffs.  A.R.S. § 15-112.  The risk that any enforcement would affect any plaintiff is so remote and contingent at this time that Plaintiffs have no standing to complain of its vagueness.  (*See* Doc. 88.)  Even if Plaintiffs had the standing to raise this claim, the statute is nevertheless not vague.

To be constitutional, a statute must provide standards for its application that prevent arbitrary and discriminatory enforcement.  *Grayned*, 408 U.S. at 108-109, 92 S. Ct. at 2298.  Even a clearly worded statute may be susceptible to selective prosecution.  *Id.*  However, the Superintendent is entitled to a presumption of honesty and integrity in enforcing the Act.  *See Canatella v. California*, 404 F.3d 1106, 1112 (9th Cir. 2005) (according state adjudicators a presumption of honesty and integrity).  Plaintiffs request that this Court find that the Act is unconstitutional based on the possibility that the Superintendent will not enforce the Act with honesty and integrity.  Enforcement of a statute always requires the exercise of some degree of discretion and judgment.  *Grayned*, 408 U.S. at 114, 92 S. Ct. at 2302.  The exercise of discretion here is neither arbitrary nor discriminatory, for the reasons given above in section II.B.2 on pages 12-13 of this Response.

Finally, any ambiguity in the Act is susceptible to a narrowing interpretation by the Superintendent and the state courts.  The Act gives the Superintendent the statutory authority to exercise discretion and enforce the statute.  A.R.S. § 15-112.  Based on this allocation of authority, the Superintendent's interpretation of the statute should be accorded deference because ambiguous statutory terms can acquire concrete meaning through a process of case-by-case adjudication.  *See I.N.S. V. Aguirre-Aguirre,* 526 U.S. 415, 425, 119 S. Ct. 1439, 1445-46 (1999) (according *Chevron* deference to the Board of Immigration Appeals' adjudication of a case pursuant to an ambiguously worded statute).  As this Court is aware, an administrative proceeding is ongoing.  The ALJ has not made recommendations regarding the findings of fact or conclusions of law in the case.  The Superintendent has not made his final administrative decision.  This Court should not enjoin the law before the Superintendent and the state courts have the opportunity to adjudicate the matter.  "As a general rule, federal courts ought not to consider the Constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the state courts."  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 699-700 (9th Cir. 1997) (internal citations omitted).  It is solely within the province of the state courts to authoritatively construe state legislation.  *See United States v. Thirty-Seven Photographs,* 402 U.S. 363, 369, 91 S. Ct. 1400, 1405 (1971).  Until the State's courts have reviewed the statute and decided whether the statute, as applied to TUSD (to whom the statute applies) is warranted, an injunction of the Act is not appropriate.  If granted, "[i]t would frustrate the state's interest in administering its judicial system and put the federal court in the position of prematurely or unnecessarily deciding a question of federal constitutional law."  *Gilbertson v. Albright*, 381 F.3d 965, 980 (2004).

**C.**      **The Balance of Equities Favors the Superintendent's Enforcement of Validly Enacted State Policy.**

The Court must balance the competing claims of injury in this case and must consider the effect on each party of the granting or withholding of the requested relief.  *Winter*, 555 U.S. at 24, 129 S. Ct. at 376.  An injunction should only issue where the Court's intervention

is essential to protect rights against injuries that are otherwise irremediable and where there are no other legal remedies. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12, 102 S. Ct. 1798, 1803 (1982). As discussed above, there is no threat of an irremediable injury to the Plaintiffs. Even if Plaintiffs raise a colorable First Amendment claim that "raises the specter of irreparable injury, simply raising a serious First Amendment claim is not enough to tip the hardship scales." *Stormans,* 586 F.3d at 1138 (internal citations omitted). This case presents a matter of legislative policy that is a matter for the political process, not the courts. *See Baker v. Carr*, 369 U.S. 186, 210, 82 S. Ct. 691, 706 (1962) (suggesting that policy decisions would improperly interfere with a coordinate branch of government).

In this case, the Court must consider the significant burden the preliminary injunction would impose on the State's ability to determine the appropriateness of public school curricula, and the injunction's consequent adverse impact on the public interest in principles of comity. This case is not and should not be about the opinions and preferences of the Plaintiffs, nor the desirability or appropriateness of the MAS course offerings. *See Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1031-32 (9th Cir. 1998) (rejecting the notion that the courts are the proper forum for determining the appropriateness of certain books in the classroom and stating that "[s]uch judgments are ordinarily best left to school boards and educational officials charged with educating young people and determining which education materials are appropriate for which students, and under what circumstances."). As discussed above in II.B.1 on pages 8-9, the State has the central power and duty to establish public school curricula. *See also Pico*, 457 U.S. at 864, 102 S. Ct. at 2806. It is the State that is the "speaker" for purposes of First Amendment analysis in this case. *Rosenberger*, 515 U.S. at 833, 115 S. Ct. at 2518. It is the State whose expressive activity of prescribing its curriculum is threatened with an injunction. *Li*, 308 F.3d at 949-50. And, it is an activity with which Plaintiffs do not have a constitutional right to interfere. *Id.*

The federal courts have consistently stressed the need to affirm "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507, 89 S. Ct. at 737.  Federal courts should not ordinarily intervene in the resolution of conflicts which arise in the daily operation of school systems.  *Pico*, 457 U.S. at 864, 102 S. Ct. at 2806.

> **D.    The Public Interest Requires that the State Be Allowed to Interpret Its Own Laws.**

Finally, the Plaintiffs claim that there is no critical public interest to be impacted if the Court issues the injunction.  (Doc. 113 at 47.)  This claim demonstrates the Plaintiffs' lack of perspective and understanding of public policy and public interest.  The Court should give due weight to the serious consideration of the public interest in this case.  The statutes at issue were passed by the Arizona Legislature.  Chapter 15 section 111 declares the public policy of the law, that "[t]he legislature finds and declares that public school pupils should be taught to treat and value each other as individuals and not be taught to resent or hate other races or classes of people."  The opportunity for the State to decide its own domestic policy should be given due weight, and this Court should not exercise its equitable powers to disrupt the State's interpretation and application of the law based on Plaintiffs' allegations that remote and contingent possibilities for harm exist.  *See Stormans,* 586 F.3d at 1140 (stating that when responsible state officials pass laws that are the subject of a dispute, the courts should give serious consideration to the public interest in upholding the State's declaration of policy pursuant to a validly enacted statute).

As this circuit has made clear, "[t]he public interest may be declared in the form of a statute."  *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1126-27 (9th Cir. 2008) (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.4, at 207 (2d ed. 1995)).  The public consequence of the Court's decision here reaches beyond the parties and carries the possibility of disrupting the State's opportunity to declare the meaning and operation of its own laws.  *See Burford v.*

1   *Sun Oil Co.,* 319 U.S. 315, 318, 63 S. Ct. 1098, 87 L.Ed. 1424 (1943) ("[I]t is in the public

2   interest that federal courts of equity should exercise their discretionary power with proper

3   regard for the rightful independence of state governments in carrying out their domestic

4   policy." (internal quotation marks omitted)).  At this time, no Arizona court has had the

5   opportunity to interpret the meaning of the statute or consider the application of the statute to

6   the MAS program.  This Court should allow the state administrative process to conclude, and

7   provide an opportunity for this Act to be interpreted by a state court.

8   **III.    CONCLUSION**

9          Plaintiffs have not been harmed by the passage of the Act.  Plaintiffs cannot stand in

10  the shoes of TUSD, the real party-in-interest, and seek redress from the Act.  Nor have

11  Plaintiffs met their high burden in establishing the requisite elements for an injunction.  In

12  the interests of comity and of conserving judicial resources, this Court should decline to

13  issue an injunction that interferes with the state processes.

14         Dated this 7th day of December, 2011.

15                                          THOMAS C. HORNE
                                            Attorney General
16

17                                          /s/ Kevin D. Ray
                                            Kevin Ray, Esq.
18                                          Jinju Park Hurtado, Esq.
                                            Assistant Attorneys General
19                                          *Attorneys for Defendants John Huppenthal,*
                                            *Superintendent of Public Instruction, in his official*
20                                          *capacity; and the State Board of Education and its*
                                            *individual members, named in their official*
21                                          *capacity as nominal parties*

22

23

24

25

26

27

                                            21

1

## CERTIFICATE OF SERVICE

2

3        I certify that I electronically transmitted the attached document to the Clerk's Office
using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the
following, if CM/ECF registrants, and mailed a copy of same to any non-registrants, this
this 7th day of December, 2011 to:

4

5

6    Richard M. Martinez, Esq.
307 South Convent Avenue
7    Tucson, Arizona 85701
RMLaw@RichardMartinezLaw.com
8

9    By: /s/ Phil Londen
#2396669_v5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27