THOMAS C. HORNE
Attorney General
Firm Bar No. 14000
Kevin D. Ray, No. 007485
Jinju Park Hurtado, No. 026023
Assistant Attorneys General
1275 West Washington Street
Phoenix, Arizona   85007-2926
Telephone: (602) 542-8328
Facsimile:  (602) 364-0700
Email: EducationHealth@azag.gov

*Attorneys for Defendant John Huppenthal,*
*Superintendent of Public Instruction, in his official capacity;*
*and the State Board of Education and its individual members,*
*in their official capacity as nominal parties*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MAYA ARCE and KORINA ELIZA LOPEZ, | Case No. CV-10-623-TUC-AWT |
| Plaintiffs, | **RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND SUPERINTENDENT'S CROSS MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| JOHN HUPPENTHAL, Superintendent of Public Instruction and Executive Director of the Arizona State Board of Education, in his Official Capacity, the ARIZONA STATE BOARD OF EDUCATION, including all members in their Official Capacity; VICKI BALANTINE, JACOB MOORE, JOHN HAEGER, JAIME MOLERA, AMY HAMILTON, EILEEN KLEIN, GREGORY MILLER, JAMES HORTON, DIANNE ORTIZ-PARSONS, and THOMAS TYREE, | Honorable A. Wallace Tashima |
| Defendants. | |

## I.    SUMMARY OF THE ESSENTIAL ISSUES PRESENTED IN THIS CASE.

This case presents two essential questions.  First, can a state, that by constitution and statute is responsible for the standards to be taught in local school districts, constitutionally prohibit local school districts from adopting courses of study that essentially promote racism?  If the answer were no, a local school district could adopt a Ku Klux Klan curriculum that openly taught hatred of minority groups, and the state could not constitutionally do anything about it.  The answer to this question must be yes.  Second, assuming the answer to the first question is yes, is there substantial evidence in the record of administrative proceedings that support the conclusion that Tucson Unified School District's ("TUSD") Mexican American Studies ("MAS") Program was a course of study that essentially promoted racism?  We show in the next section that the answer to this question is also yes.

## II.    THERE IS SUBSTANTIAL EVIDENCE IN THE RECORD TO SHOW THAT TUSD'S MAS PROGRAM WAS A COURSE OF STUDY THAT PROMOTED RACISM IN VIOLATION OF STATE LAW.

Plaintiffs'[1] Motion for Summary Judgment ("Motion")[2] argues that Arizona Revised Statutes sections 15-111 and 112 (also known as "HB 2281" or the "Act") give the

---

[1]  Due to the District Court's January 10, 2012 Order, the number of named Plaintiffs has been reduced from thirteen to two.  The Plaintiffs' Motion, however, is replete with arguments relating to teachers as Plaintiffs.  (Doc. 97.)  For the purposes of this motion, the Superintendent assumes that student Plaintiff Arce has standing and is a proper Plaintiff, although the basis for finding standing for student Plaintiff Arce is unclear. The Order's standing analysis for student Plaintiff Lopez does not apply to student Plaintiff Arce, who is in eighth grade and is not eligible to register or take the junior and senior high school level MAS classes for several years.  (Doc. 84 at 2.)

[2]  Summary judgment is only appropriate when there are no issues of material facts, which, under the governing substantive law, affect the outcome of the case. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1031 (9th Cir. 2010).  When deciding a motion for summary judgment, the Court construes all facts in favor of the non-moving party, rather than the untested allegations of a plaintiff's complaint.  *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 958

Superintendent "unchecked power." (Doc. 97 at 20-21.)  This is incorrect.  The Superintendent's enforcement of the Act was subject to appeal to an independent Administrative Law Judge ("ALJ"), who conducted an extensive evidentiary hearing, and a right of appeal was provided to state courts.  (Doc. 132-1.)  After four days of extensive and detailed hearings, the independent ALJ concluded that:

> A.R.S. § 15-122 (F) permits the historical (objective) instruction of oppression[3] that may, as a natural but unintended consequence, result in racial resentment or ethnic solidarity.  However, teaching oppression objectively is quite different than actively presenting material in a biased, political, and emotionally charged manner, which is what occurred in MAS classes.  Teaching in such a manner promotes social and political activism against the white people, promotes racial resentment, and advocates ethnic solidarity, instead of treating pupils as individuals.  (*Id.* at 35.)

This finding is supported by 36 pages of detailed citations to the evidence.[4]  (*Id.*)

The Plaintiffs' Motion questions whether there has been any showing that the course was designed primarily pupils of a particular ethnic group.  Based on findings made by Tom Horne in his 2010 Notice of Violation ("Horne Notice"),[5] the public statements of the former Chair of the Ethnic Studies Department, stating that the MAS Program was "an attempt to connect with our indigenous sides, as well as our Mexican side," proves that it was.  (*See*

---

(9th Cir. 2004).  Accordingly, the Superintendent moves to strike all portions of the Plaintiffs' Statement of Material Facts (Doc. 98) that are unsupported by any evidence or that simply cite to the factual allegations of the Complaint (Doc. 68) as support for the alleged facts.

[3] This sentence refutes the many false examples in the Plaintiffs' Motion of things that could not be taught under this statute.

[4] Plaintiff has submitted the findings ("Findings") of the independent Administrative Law Judge ("ALJ") as part of this record (Doc. 137-1) and the Court can take judicial notice of these Findings pursuant rule 201 of the Rules of Evidence.

[5] While the Superintendent has previously argued that Superintendent Horne's Notice of Violation is superseded by Superintendent Huppenthal's Notice of Violation, the Plaintiffs continue to cite to both notices.  To ensure that the record is balanced with respect to references to Superintendent Horne's Notice, the Defendant has chosen to reference some of Superintendent Horne's factual findings that demonstrate the totality of the factual background, rather than the decontextualized allegations made by Plaintiffs.

Superintendent's Statement of Facts "SOF" ¶ 20(b).)  Plaintiffs' Motion also makes vague references to the Horne Notice's criticism of a text book holding up Jose Angel Guttierez as a role model (Doc. 97 at 31) while deliberately omitting Superintendent Horne's findings that Guttierez's solution to the existing problems was to call upon Chicanos to "kill the Gringo."  (Doc. 38-1 at 7.)

Plaintiffs' Motion claims that this course promotes an "exchange of ideas" (Doc. 97 at 14), "open minds" (*Id.* at 15), and a "robust exchange of ideas" (*Id.*).  If that were true, no one would object to the course, as the ALJ's Findings made clear.  (Doc. 132-1 at 35.)  But, as the ALJ found and substantiated, the MAS Program materials are presented in a biased, political, and "emotionally charged" one-sided manner.  (*Id.*)  Curricula such as "Conquest and Colonización," in which the students are taught "how half of Mexico was ripped off by trickery and violence [. . .] how Chicanos became a colonized people [and] were robbed of land and other resources" (SOF ¶ 20(d)) does not promote an "exchange of ideas," critical thinking skills, "open minds," or a "robust exchange of ideas."  Plaintiffs' Motion argues about the "chilling affects" on the exercise of First Amendment rights.  But complaints from teachers and former teachers at TUSD show that it is the MAS Program itself that is chilling First Amendment rights.  (SOF ¶ 20(e).)  School principals and the MAS teachers and administrator accuse critics of being racist.  (SOF ¶ 20(e).)  With a cadre of self-acknowledge 'progressive' political activists in the Ethnic-Studies department on the hunt, the race transgressors are multiplying.

## III.   Students Have No Protected First Amendment Right to Receive Information in the Former MAS Program.

On January 10, 2012, the TUSD suspended the MAS Program.  (SOF at Exhibit 1.)  Even assuming that Plaintiffs make any cognizable First Amendment claims regarding their right to receive information, Plaintiffs fail to show how a favorable decision from this Court on that issue would provide them with relief and result in TUSD, a non-party to this case, reinstating the former MAS program.  Plaintiffs' claims that they have a constitutional right

4

1   to receive information in the form of the former MAS Program lacks any merit.

2       **A.    Plaintiffs Fail to Show That They Have Any First Amendment Right to**
3              **Receive Information in the Former TUSD MAS Program That was Found**
4              **to be Operating Outside of a State-Established Course of Study or**
        **Curriculum.**

5           Citing *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* Plaintiffs
6   argue that students have a First Amendment right "to receive information and ideas."  457
7   U.S. 853, 102 S. Ct. 2799 (1982); (Doc. 97 at 12, 42-44).  While the Defendant
8   acknowledges that students have a limited First Amendment right to receive information, the
9   Plaintiffs have cited no case holding that a student's "right to receive information" bestows
10  upon them the power to control the contents of a course of study, curriculum, and pedagogy,
11  or to select specific curricular texts.  That is because there is no case that supports Plaintiffs'
12  theory; in fact, the opposite is true.

13          The right to receive ideas is an inherent corollary of the rights of free speech and press
14  that necessarily flows from the sender's constitutional right to disseminate ideas.  *Pico* at
15  867, 102 S. Ct. at 2808.  This right to receive ideas presupposes a willing speaker.  *Johnson*
16  *v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983) *citing Va. State Bd. of Pharmacy v. Va. Citizens*,
17  425 U.S. 748, 756, 96 S. Ct. 1817, 1822 (1976).  Thus, to establish an actual constitutional
18  injury from a restriction of the right to receive information, there must be a speaker who is
19
20  willing to convey the information.  *Id.*

21          Here, Plaintiffs have identified the wrong actor: when the speech at issue concerns a
22  course of study, curriculum and pedagogy, the state is the speaker, not the student.  "[W]hen
23  the state is the speaker it can decide the content of its message," and the Supreme Court "has
24  stated that the curriculum of public schools is a fully protected form of state speech."
25  *Griswold v. Driscoll*, 625 F. Supp. 2d 49, 54 (D. Mass. 2009) (citing *Rosenberger v. Rector*
26  *& Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)) (emphasis added).  Indeed, the Ninth
27  Circuit has rejected the argument that students have a constitutionally protected right to

5

pursue the course of study they choose.  *Downs v. Los Angeles Sch. Dist.*, 228 F.3d 1003, 1015 (9th Cir. 2000).  The *Downs* Court stated that if students were permitted to compel government speech by dictating the form and content of classroom curriculum and materials, they would be able to compel the state or the school district to embrace a student's viewpoint.  *Id.*  Clearly, the state's choice to include or exclude a particular text, or subject from study in its schools does not implicate a student's First Amendment rights.  *Seyfried v. Walton*, 668 F.2d 214, 216 (3d Cir. 1981).  Rather, "[t]he selection of course curriculum [is] a process which courts have traditionally left to the expertise of educators."  *Id.*  Thus, "a student has no First Amendment right to study a particular aspect or period of history in his or her senior history course."  *Id.*

Plaintiffs wish to extend the Court's holding in *Pico* to claim a right to control a course of study, textbooks, or curricula.  As the plurality decision in *Pico* itself recognized, a student's right to receive information was not a limitation on the State's power to control the curriculum and classroom, but the State's power to limit books available *in the library* – a place of voluntary, extra-curricular learning.  *Pico* at 861-62, 102 S. Ct. at 2805.  The *Pico* decision did not intrude into the classroom or into the compulsory classes taught there.  *Id*. at 862, 102 S. Ct. at 2805.  Numerous courts have examined the issue of a student's right to access information in the classroom following *Pico* and have concluded that the right to access information does not encompass the right to control textbooks, curricula, or the compulsory courses taught in public schools.  *See e.g. Griswold*, 616 F.3d at 54 (upholding the decision of the Massachusetts' State Board of Elementary and Secondary Education to remove specific books from the list of recommend curricular materials as a proper exercise of its curricular discretion); *Chiras v. Miller*, 432 F.3d 606, 619 (5th Cir. 2005) (holding that selecting and excluding a particular publication from a list of recommended textbooks for use in the classroom was not analogous to removing a book from a school library and did not

violate any articulable First Amendment right); *see also: Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184 (5th Cir. 1995) (school officials' decisions regarding public school library materials are properly viewed as decisions that do not involve the school curriculum and are therefore subject to certain constitutional limitations because public school library use is voluntary in nature).

Any reliance on the case of *Johnson v. Stuart*, 702 F.2d 193 (9th Cir. 1983), is also misplaced.  In *Johnson*, the court found that students had standing to allege a First Amendment right to receive information in a challenge to an Oregon textbook selection statute, but never reached or addressed the merits of the students' claims.  *Id.*  Additionally, the Act is readily distinguishable from the Oregon statute at issue, because the Act neither restricts TUSD's ability to select a textbook nor prohibits any specific textbook.  Rather, the Act simply prohibits school districts from adopting courses of study that promote racism, a laudable and constitutionally permitted policy.

Plaintiffs attempt to distinguish the weight of clear precedent by claiming that the students have a right to enroll in MAS courses because the TUSD Governing Board approved the courses.  (Doc. 97 at 41).  Plaintiffs seem to believe that the TUSD Governing Board's alleged approval of the MAS Program grants them a specially protected right to receive information.  Trying to support this claim, Plaintiffs represent that the MAS Program was in compliance with state standards for curricula and was approved by the TUSD Governing Board.  (Doc. 97 at 41.)  This is inaccurate.  As the independent ALJ recognized, "[i]t is undisputed that from January 1, 2011 through June 15, 2011, the MAS program did not have a comprehensive written curriculum and did not have textbooks or materials that had been approved by the District's governing board."  (Doc. 132-1 at 8, SOF at paragraph 13.)  In fact, the MAS teachers had nearly unfettered discretion as to which materials could be used in their classes to supplement textbooks, if textbooks were used, in violation of

TUSD policy.  (*Id.*)

Furthermore, any claim that the TUSD Governing Board approved of the MAS Program is contrary to the public testimony of the President of the Board and a Board Member in the state administrative hearings regarding the enforcement of the Act.  During the course of the administrative hearing, the President of the TUSD Governing Board, Dr. Mark Stegeman, testified that based on his observations at the high school MAS classes, the classes are primarily for Latinos, and he is concerned that MAS classes promote racial resentment and advocate ethnic solidarity instead of treating students as individuals.  (SOF ¶ 35.)  TUSD Governing Board President Stegeman also expressed his belief that the MAS program should be terminated and rebuilt.  (*Id.*)  Another TUSD Governing Board member, Charles Michael Hicks, testified that he believed that the MAS Program constitutes a form of "racial indoctrination," that the District is operating the MAS Program in violation of A.R.S. § 15-112, and that the program must come to an immediate end.  (*Id.*)  Given this testimony, Plaintiffs' claim of a special right to communicate within the "approved" curriculum (Doc. 97 at 43) pushes the boundaries of reason.

**B.    Plaintiffs' Free Expression Is Not Implicated By the Act.**

Plaintiffs also claim that their right to free expression is also being chilled by the Act. (Doc. 97 at 11, 40.)  The United States Supreme Court decision in *Hazelwood School District v. Kuhlmeier* forecloses this claim.  484 U.S. 260, 108 S. Ct. 562 (1988).  In *Hazelwood*, the Court held that, while students have some limited free speech rights in the classroom, they have no right to control the content of curriculum pursuant to their "right to receive information."  *Id.* at 266, 108 S. Ct. at 567.  A limitation on a student's curricular activities is reasonably related to legitimate pedagogical concerns and do not infringe their First Amendment protections.  *Id.* at 272-73, 108 S. Ct. at 571.  Accordingly, Plaintiffs have no First Amendment right to learn a course of study that the State rejects and that the students prefer to learn.

The United States Constitution also does not compel the State of Arizona to teach students or to fund classes or courses of study that: promote the overthrow of the government, promote resentment toward a race or class of people, are designed primarily for pupils of a particular ethnic group, or advocate ethic solidarity instead of the treatment of pupils as individuals.  Nevertheless, Plaintiffs' claimed constitutional right to receive information attempts to compel the State to do so.  The courses of study and the curricula of public schools are government speech.  Put another way, a State's right to select its curriculum and texts for courses that may be applied to graduation requirements is "by definition a legitimate pedagogical concern."  *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370 (4th Cir. 1998) (emphasis added).  When the government speaks, it may restrict the content of its speech and may do so without implicating a student's First Amendment rights.

## IV.   H.B. 2281 Does Not Infringe Upon Any Protected Speech; Thus Plaintiffs' Overbreadth Challenge Must Fail.

As the Supreme Court held in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, if a challenged law does not reach a substantial amount of constitutionally protected speech, "then the overbreadth challenge must fail."  455 U.S. 489, 494-95, 102 S. Ct. 1186, 1191 (1982).  Because Plaintiffs here have not, and cannot, demonstrate that H.B. 2281 reaches a substantial amount of protected speech, their overbreadth challenge should be rejected.

These Plaintiffs have not articulated a protected First Amendment right to enroll in the former MAS course or to control the selection of curriculum and texts used in any such course.  Moreover, even if they could assert such a right, Plaintiffs still could not allege that the statute reaches a "substantial" amount of their protected speech.  This is because § 15-112 does not apply to student speech at all.  Rather, the statute prohibits a school district

9

from implementing a program of instruction, which includes "any courses or classes" that violate the provisions of subsection A.  Because the plain language of the statute does not restrict student speech, either inside or outside of the classroom, it does not reach any constitutionally protected speech.  Similarly, § 15-111 is merely a statement of legislative purpose and, likewise, does not restrict or regulate any student speech.  Accordingly, Plaintiffs have not satisfied the first and most critical inquiry in the analysis needed to sustain their burden of demonstrating that H.B. 2281 is facially unconstitutional - the fact that the Act does not reach a substantial amount of protected speech.

## V.     The Act Is Not Void for Vagueness.

Once an overbreadth challenge has been considered and rejected, as it should be here, "[t]he court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications."  *Hoffman Estates*, 455 U.S. at 494-95, 102 S. Ct. at 1191.

### A.     To Succeed On Their Claim of Facial Vagueness, Plaintiffs Must Show That the Act Is Impermissibly Vague In All of Its Applications.

A statute is void for vagueness if it does one of two things: (1) "fails to give adequate notice to people of ordinary intelligence concerning the conduct it prescribes," or (2) "invites arbitrary and discriminatory enforcement."[6]  *Schwartzmiller v. Gardner*, 752 F.2d 1341,

---

[6] In response to the Plaintiffs' argument that the Superintendent enforced the Act arbitrarily and capriciously (Doc. 97 at 33-40), the Superintendent incorporates the analysis in his Response to the Motion for Preliminary Injunction (Doc. 124 at 12-14, 16-18) filed on December 8, 2011 regarding the enforcement-related issues raised by this prong of the analysis.  Despite Plaintiffs' claims that the Superintendent's enforcement against the MAS Program is arbitrary and capricious (Doc. 97 at 33), they fail to support this claim with any evidence.  The ALJ's Decision (Doc. 132-1) submitted by the Plaintiffs to support their Emergency Supplement to the Plaintiffs' Motion for Preliminary Injunction (Doc. 132) rebuts this claim with evidence and findings to the contrary.  The administrative record shows that the Department of Education received complaints from members of the Tucson community regarding the manner in which educational instruction was being conducted in the MAS Program.  (Doc. 132-1 at 5, SOF ¶ 25.)  The Department did not receive any

1345 (9th Cir. 1984).  A statute need not be perfectly clear to pass constitutional muster.
*Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001).  As the
Supreme Court observed in G*rayned v. City of Rockford* , "[c]ondemned to the use of words,
we can never expect mathematical certainty from our language."  408 U.S. 104, 110, 92 S.
Ct. 2294, 2300 (1972).  Thus, in testing a challenged statute for unconstitutional vagueness,
"[a] federal court's duty . . . is to employ traditional tools of statutory construction to
determine the statute's 'allowable meaning.'"  *Cal. Teachers* Ass'n, 271 F.3d at 1147
(quoting G*rayned*, 408 U.S. at 110, 92 S. Ct. at 2300).  In evaluating the "allowable
meaning" of the challenged law, the Court should "look to the words of the statute itself as
well as state court interpretations of the same or similar statutes."  *Id.*  Notably, "[t]he degree
of vagueness that the Constitution tolerates –  as well as the relative importance of fair notice
and fair enforcement – depends in part on the nature of the enactment."  *Hoffman Estates*,
455 U.S. at 498, 102 S.Ct. at 1193.  "The Court has . . . expressed greater tolerance of
enactments with civil rather than criminal penalties because the consequences of imprecision
are qualitatively less severe."  *Id.*

Based upon the standards of review articulated above, the Ninth Circuit "presume[s]
statutes are constitutional."  *Sea River Maritime Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662,
669 (9th Cir. 2002).  "Facial invalidation is, manifestly, strong medicine that has been
employed by the Court sparingly and only as a last resort."  *Nat'l Endowment for the Arts v.
Finley*, 524 U.S. 569, 580, 118 S. Ct. 2168, 2175 (1998).  To prevail, the Plaintiffs have the
burden of demonstrating a substantial risk that application of the provision will lead to the
suppression of constitutionally protected speech.  *Id.*  They cannot do so here.  Thus, this
court must construe the statutes challenged here to uphold their validity if possible.
*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 112 S. Ct. 1407 (1992).

---

similar complaints regarding any other ethnic studies in the District.  (*Id.*)  State law requires
the Department to consider and investigate complaints relating to public schools.  (*Id.*; *see
also*: A.R.S. § 15-231.01.)  For these reasons, the Superintendent did not act arbitrarily and
capriciously in investigating the alleged statutory violation of the MAS Program.

Plaintiffs' motion purports to analyze the statute, concluding that it is unconstitutionally vague.  But Plaintiffs do no such thing.  Instead, Plaintiffs recite a series of hypotheticals to the court implying that the statute might be broadly enforced to encompass those scenarios.  They do not, however, critically analyze the statute's text or explain how that text might reasonably be construed to apply as broadly as they fear.  Thus, Plaintiffs' hypotheticals do not exemplify the vagueness of the statute; they are red herrings.  Indeed, all of the hypotheticals Plaintiffs pose to the Court rely upon the same false premise: they presume that the statute restricts student speech.  It does not.  As previously demonstrated, A.R.S. section 15-112(A) only restricts a school district or charter school from implementing certain "program[s] of instruction."  A.R.S. § 15-112(A).  Student speech is not affected. Under these circumstances, the government's restrictions on the contents of its own speech is not void for vagueness.  Because the Act does not impose criminal penalties or potentially interfere with constitutionally protected rights, the standard of definitiveness is less stringent and must be measured within the scope of common understanding and specialized knowledge of public district and charter schools.  It is not vague as a matter of law.

### 1.    The phrase "promote the overthrow of the United States Government" is not unconstitutionally vague.

A.R.S. section 15-112(A)(1) prohibits a district or charter school from including within its "program of instruction" any courses or classes that "promote the overthrow of the United States government."  Plaintiffs first challenge the legislature's use of the phrase "promote the overthrow of the United States government" as unconstitutionally vague.  In so doing, Plaintiffs claim that "no teacher or school district can know whether such a classroom lesson criticizing the United States would constitute a course which "promotes the overthrow of the United States government" in violation of (A)(1).  Again, this provision of the statute does not prohibit students from speaking about anything.  And, upon review of the plain language, it is clear that none of the claimed vagueness actually exists.

The United States statute criminalizing treason contains the same language challenged

here and has been upheld as constitutional since 1951.  There is nothing vague about the

phrase "promote the overthrow of the United States government," a fact that has been

recognized by the United States Supreme Court for sixty years.  18 U.S.C. § 2385,

criminalizes the act of treason and provides the following:

> Whoever knowingly or willfully advocates,[7] abets, advises, or teaches the duty,
> necessity, desirability, or propriety of overthrowing or destroying the United
> States Government . . . shall be fined under this title or imprisoned not more
> than twenty years, or both.

In 1951, this statute was challenged on vagueness grounds and upheld as

constitutional by the United States Supreme Court.  In *Dennis v. United States*, the

Court stated, in no uncertain terms, that "[n]o one could conceive that it is not within

the power of Congress to prohibit acts intended to overthrow the Government by

force and violence."  341 U.S. 494, 501 (1951).

As noted above, "[t]he court has . . . expressed greater tolerance of enactments

with civil rather than criminal penalties because the consequences of imprecision are

qualitatively less severe."  *Hoffman*, 455 U.S. at 498-99, 102 S. Ct. at 1193.  The

language at issue has already survived a vagueness challenge and that ruling has

survived for sixty years.  It should go without saying then that the civil statute at issue

in this case, which incidentally imposes no individual civil penalty but merely a

reduction in state aid, is not unconstitutionally vague.  If that were not sufficient,

other cases support the holding in *Dennis* in considering vagueness challenges to laws

---

[7] As used in A.R.S. § 15-112, the word "promote" is similar in its common usage as the word "advocate" used in the federal treason statute.  To "promote" means "to further or encourage the progress or existence of" or "to urge the adoption of."  *See* Definition from Merriam Webster available at http://www.merriam-webster.com/dictionary/promote (last visited Jan. 16, 2012).  Thus, it is not surprising that courts called up to construe the word "promote" have concluded that the word has "a general meaning" and that "no serious argument can be presented by which it may be successfully contended" that the word "promote" is "either vague or ambiguous or [has] some obscure meaning."  *United States v. Smith*, 209 F. Supp. 907, 918 (D.C. Ill. 1962).

with a similar prohibition.  In *Cole v. Richardson*, 405 U.S. 676, 92 S. Ct. 1332 (1972), the Supreme Court upheld a state statute requiring public employees to take an oath swearing or affirming that they would "oppose the overthrow of the government of the United States."   The Court explained that "[a]lmost any word or phrase may be rendered vague and ambiguous by dissection with a semantic scalpel" but that the Court has "rejected such rigidly literal notions." *Id.* 683-84.   The Court, thus, rejected the argument that the phrase became void for vagueness merely because the term "oppose" could be literally construed to require the oath taker to "actively oppose" the overthrow of the government, but did not define what affirmative acts of opposition would satisfy the oath. *Id.* at 683.

The cases Plaintiffs rely upon are distinguishable and do not support their conclusion that A.R.S. § 15-112(A)(1) is void for vagueness.  The cases Plaintiffs rely upon, such as *Keyishian*, are distinguishable for the same reason explained in *Cole.  See Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 87 S. Ct. 675 (1967) (cited in Plaintiffs' Motion at 11-12.)    The Court in *Keyishian* was not concerned with the phrase "overthrow the United States government" so much as it was concerned at the breadth and vagueness of the subject statutes and oaths/certificates public employees were required to sign.

In *Keyishian*, a New York law called the "Feinberg law" was challenged as facially unconstitutional along with its implementing regulations by members of the faculty at the University of Buffalo.  The Feinberg law was enacted by the New York legislature to enforce and implement two earlier state statutes passed in 1917 and 1939 respectively.  The 1917 Act provided that a public school teacher could be dismissed for the "utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act." *Id.* at 593.  The 1939 law similarly disqualified a person from civil service and employment in the educational system if that person personally "advocate[d] the overthrow of government

14

by force, violence, or any unlawful means, or publishes material advocating such overthrow or organizes or joins any society or group of persons advocating such doctrine." *Id.* Pursuant to the Feinberg law, the State Board of Regents promulgated rules and regulations designed to ferret out persons ineligible for public employment pursuant to the 1917 and 1939 laws.  Included within those rules and regulations were definitions of "subversive persons" and "subversive organizations."  The regulations provided that membership in a "subversive organization" would be treated as prima facie evidence of disqualification for public employment. *Id.* at 594.  The Court ruled that the 1917 act was void for vagueness because it broadly prohibited any "utterances" or "acts" of a "seditious" or "treasonable" nature and did not define the terms "seditious" or "treasonable."  Thus, in "famously illustrating" the vagueness of the law by asking "Does the teacher who carries a copy of the Communist Manifesto on a public street thereby advocate criminal anarchy?" the Court was pointing out the broad application of the statute to all "utterances" and "acts" and the vague nature of the words "seditious" and "treasonable."

A.R.S. § 15-112 contains none of those terms.  Unlike the statutes and regulations at issue in *Keyishian*, the statute at issue here does not impose any civil or criminal penalty on any student enrolled in a public district or charter school.  For this reason alone, Plaintiffs' reliance on *Keyishian* is misplaced.[8]

### 2.    The phrase "promote resentment toward a race or class of people" is not unconstitutionally vague.

Similarly, Plaintiffs' contention that courses of study that "promote" resentment is

---

[8] Plaintiff also relies on *Baggett v. Bullitt*, 377 U.S. 360, 362, 84 S. Ct. 1316 (1964), another oath case similar to *Keyishian* involving a statute prohibiting "subversive persons" from being employed by the government.  *Baggett* is distinguishable for the same reasons as *Keyishian*.  Plaintiff also cites *Hunt v. City of Los Angeles*, 638 F.3d 703 (9th Cir. 2011), but *Hunt* involved a challenge to city ordinances regulating speech on the boardwalk in Venice Beach and so is entirely distinguishable as well.

unconstitutionally vague is unsupportable.  Just as the phrase "promote the overthrow of the United States government" is not unconstitutionally vague, the phrase under subsection (A)(2) prohibiting a program of instruction that "promotes resentment towards a race or class of people" is equally clear of any constitutionally infirmity.

The Supreme Court has rejected the claim that the word "promote" is unconstitutionally vague when used in a statute because it provides an explicit standard for those who apply them.  *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 170, 124 S. Ct. 619, 675, n.64 (2003) *overruled in part on other grounds*.  A.R.S. section 15-112(A)(2) prohibits a district from offering a "course or class" that "furthers" or "encourages" students to resent a race or class of people.[9]

Plaintiffs argue that the terms 'promote resentment', taken together, are too subjective for a 'teacher' to decide if the teacher's conduct violates the statute. (Doc. 97 at 13).  The Plaintiffs' reliance on *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004) is inapposite. In that case, abortion providers challenged the constitutionality of a health care regulatory scheme that applied to abortion clinics.  The Court examined a provision of that scheme that required abortion providers to inform patients that they had the right "[T]o be treated with 'consideration', 'respect', and 'full recognition' of the patient's 'dignity' and 'individuality'." *Id.*  The Court noted that, given the potential for harassment of abortion providers, the fact that the statute subjected doctors who violated the statute to criminal penalties made the Court's vagueness review "even more exacting." *Id.*  The Court went on to find that because of the heightened level of scrutiny, the fact that the meaning of the referenced terms were widely variable, and that the terms were not medical terms of art, the referenced terms were unconstitutionally vague. *Id.*  Plaintiffs simply claim, without any

---

[9] *See* Definition from Merriam Webster available at http://www.merriam-webster.com/dictionary/promote (last visited Jan. 16, 2012).

1   analysis, that like the terms in the *Tucson Woman's Clinic* case, the terms "promote

2   resentment" are equally subjective and subject to abuse. Plaintiffs fail to note that the Act

3   does not levy or threaten any criminal penalties, so that a higher level of scrutiny is this case

4   is unwarranted. Plaintiffs also fail to acknowledge that unlike the doctors subject to the

5   statutory scheme in *Tucson Woman's Clinic*, the Act does not apply to teachers or students.

6   The Plaintiffs' claim that *teachers* will be unable to identify proscribed conduct again misses

7   the point (Doc. 97 at 13); the Act does not prohibit any teacher or student conduct or speech,

8   and the Plaintiffs' entire argument from an alleged teachers' perspective, is no longer

9   relevant.

10      Plaintiffs' also support their contention that § 15-112(A)(2) is void for vagueness with

11  the ludicrous speculation that its language "prohibits a classroom discussion of jihad and the

12  attacks of September 11, 2001." (Doc. 97 at 15.) As noted, discussions of any kind are not

13  prohibited by A.R.S. § 15-112(A)(2). The court need go no further than the plain language

14  of the statute to reach this conclusion. Because the statute plainly does not prohibit

15  "discussions," plaintiffs' presumption that a course could be construed as "promoting

16  resentment" so long as a discussion of a subject "could . . . result in some students fostering a

17  bitterness" toward a race or class of people, also fails. By its plain language, the statute does

18  not prohibit "discussions" even if those discussions might result in "fostering bitterness."

19  Rather, the statute prohibits a course from "promoting" such resentment by encouraging it

20  through the official program of instruction it employs.[10]

---

[10] Notably, a state may have compelling interests in discouraging racial or ethnic resentment when it interferes with the function of an important public service. *See, e.g. McMullen v. Carson*, 568 F. Supp. 937, 945 (M.D. Fla. 1983) (dismissal of public employee for affiliation with Klu Klux Klan was narrowly tailored to compelling state interests). Certainly, public education is an important function that might be seriously disrupted by racial resentment, which may also lead to violence. Thus, even if this statute were subject to a heightened level of scrutiny, it would still pass constitutional muster.

17

### 3. The phrase "designed primarily for pupils of a particular ethnic group" is not vague.

Next, Plaintiffs challenge subsection (A)(3), which contains the prohibition against "courses or classes" that are "designed primarily for pupils of a particular ethnic group." This challenge is also unsuccessful.

Courts have already concluded that statutes containing the term "primarily" are not indecipherable to the point of being void. Courts have defined the term "primarily" as "meaning more than fifty percent." *In re Stewart*, 175 F.3d 796, 808 (10th Cir. 1999) (citing *Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996)) (recognizing the Department of Labor, as a "good rule of thumb," defines "primary duty" to mean the major part, or over fifty percent, of the employee's time). This is consistent with the term's ordinary meaning. The dictionary consistently defines "primarily" as "for the most part." *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988) (quoting Webster's Ninth New Collegiate Dictionary 934 (1984)). Thus, it is not a surprise that the Tenth Circuit has concluded that "the word 'primarily' is not an ambiguous or difficult word to understand." *In re Stewart*, 175 F.3d at 808.

Though not with any specific reference to an ambiguity in the text itself, Plaintiffs reiterate the argument that A.R.S. § 15-112(A)(3) creates "another subjective standard" and again pose a series of hypothetical applications of the statute to support their claim. For example, Plaintiffs ask whether the Act prohibits "a course attended primarily by pupils of a particular ethnic group." (Doc. 97 at 16.) Plaintiffs assume that such a course must be prohibited by the statute, but do so without any reference to the text.

The plain language of this provision does not prohibit a course or class attended by a majority of pupils of a particular ethnic group; nor does it prohibit classes "about" or even "primarily discussing" works by any particular ethnic group. There is a clear and

understandable demarcation between courses "designed primarily to study" a certain ethnic group, and courses "designed primarily for" students belonging to that group.  Indeed, throughout this case, Plaintiffs' counsel has touted TUSD's MAS courses as being specifically designed to meet the needs of the Latino students in the District.  (Doc. 98 ¶ 59.) Plaintiffs' counsel cannot now be heard to argue that courses "designed primarily for" students of a particular ethnic group are somehow unconstitutionally vague.  Accordingly, plaintiffs' rhetorical concerns as expressed in the motion do not emerge as the result of unclear statutory text.  Plaintiffs' unsupported conclusion that § 15-112(A)(3) is unconstitutionally vague should be rejected.

> **4.** **The phrase "advocate ethnic solidarity instead of the treatment of pupils as individuals" contained in A.R.S. § 15-112(A)(4) is not unconstitutionally vague.**

Plaintiffs also challenge the final subsection of A.R.S. § 15-112(A)(4), which prohibits classes or courses that "advocate ethnic solidarity instead of the treatment of pupils as individuals."  Again, plaintiffs do not directly assess the text of this provision.  In similar fashion to every other provision they have challenged, plaintiffs merely pose a series of teacher-based hypotheticals that clearly do not fall within the plain textual prohibition.  As with the other provisions challenged, plaintiffs' unsupported speculation does not support a conclusion that § 15-112(A)(4) is unconstitutionally vague.  This provision, like all the others, does not prohibit discussion of any topic or anything.  It simply prohibits a "course of study" and does not prevent "discussion" of nationalism, cultural or ethnic identity or solidarity, or recognized events dedicated to either like the examples suggested by the Plaintiffs: Black History Month or Hispanic Heritage Month. (Doc. 97 at 18).

Analyzing the plain language of the statute, the word "advocate" is an "ordinary everyday term with generally understood meaning" and is not vague. *Dunne v. United States*, 138 F.2d 137, 142 (8th Cir. 1943).  When used as a verb, as it is here, the word

"advocate" means "to plead in favor of."[11]  The term "solidarity" is defined as "unity (as of a group or class) that produces or is based on community of interests, objectives, and standards."  *Id.*  By contrast, "individual" when used as a noun (as it is here) is defined as "a particular being or thing as distinguished from a class, species, or collection."  *Id.*  So the statute clearly distinguishes "advocating ethnic solidarity" (*i.e.*, "pleading in favor of ethnic unity") from treating students as "individuals" (*i.e.*, treating students as beings which are distinguishable in their own right from any class or ethnic category to which they might also belong).   Thus, the statute's "allowable meaning" is sufficiently clear.

Nevertheless, Plaintiffs presume that the term "advocate" could reasonably be construed as a prohibition on any "presentation" about historical events or figures including the NAACP, the 1942 Zoot Suit riots, and Cesar Chavez.  (Doc. 97 at 18.)  But nothing in the plain definition of the word "advocate" supports an interpretation that would give rise to this "parade of horribles," where any discussion or "presentation" of historical figures or events would be prohibited.  Accordingly, Plaintiffs' vagueness challenge to this provision also fails**.**

### 5.     Subsections E and F limit the scope of subsection A and are not unconstitutionally vague.

A key factor in analyzing whether a law is unconstitutionally vague is to determine the breadth of the statute's proscription in light of the enumerated exceptions.  *Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997)).  Section 15-112(E) and (F) were included in the statute to clarify and narrow how broadly the statute can be applied.  Many of Plaintiffs' concerns and hypothetical applications are wholly undermined by the narrowing provisions of subsections (E) and (F).

For example, while Plaintiffs opine that subparts of subsection (A) might cause a

---

[11] *See* Merriam Webster On-Line Dictionary available at http://www.merriam-webster.com/dictionary/advocate?show=1&t=1308792449 (last visited Jan. 16, 2012).

teacher to "fear" speaking about controversial figures or events in history, these narrowing provisions were designed to alleviate any such concern.  Subsection (E) makes clear that no district can be penalized for implementing "courses or classes that include the history of any ethnic group and that are open to all students" or "courses or classes that include the discussion of controversial aspects of history."  This is consistent with the plain meaning of subsection (A) discussed above, which prohibits a district from implementing certain "program[s] of instruction," but which does not prohibit "discussion" of any topic.

Similarly, subsection (F) makes clear that the statute should be construed narrowly so that "instruction of the holocaust, any other instance of genocide, or the historical oppression of a particular group of people based on ethnicity, race, or class" is not prohibited by the restrictive language of subsection (A).  Thus, these subsections do indeed provide narrowing and clarification of the prohibitions outlined in subsection (A) and support the conclusion that the statute is not unconstitutionally vague.

### 6.   The Provisions of Subsections A, E, and F Are Severable And Should Be Severed If Some But Not All Provisions Are Declared Unconstitutional.

Plaintiffs argue that the ideas embodied in the provisions of section 15-112(A) are so interconnected that those provisions "cannot be coherently extricated from the general statutory scheme."  (Doc. 97 at 25.)  Consistent with their analysis of the specific provisions at issue, Plaintiffs' argument regarding severability is devoid of any textual support.

Severability is determined by "legislative intent."  The test is whether a statute's provisions are "so intimately connected as to raise the presumption that the legislature would not have enacted the one without the other."  *State v. Pandeli*, 215 Ariz. 514, 530, 161 P.3d 557, 573 (2007).  "Additionally, 'if part of an act is unconstitutional and by eliminating the unconstitutional portion the balance of the act is workable, only that part which is objectionable will be eliminated and the balance left intact.'"  *State v. Rios*, 225 Ariz. 292,

1   296, 237 P.3d 1052, 1056 (App. 2010). In light of this well-established standard, it is

2   obvious that the various subsections of 15-112 are severable from one another and are not so

3   "intimately connected" that a prohibition on a course that "promotes the overthrow of the

4   United States government" cannot stand independently from a separate section prohibiting a

5   course which "advocates ethnic solidarity."  For this reason, Plaintiffs' severability

6   arguments should be rejected.  If this Court upholds their constitutional challenge to some,

7   but not all of the provisions of subsection A, E, or F of § 15-112, then the unconstitutional

8   portions may be easily excised and the remainder left "intact."

9        **B.     Plaintiffs As-Applied Challenge Fails As a Matter of Law.**

10            **1.     Plaintiffs Do Not Have Standing to Make the As-Applied Challenge
                     to the Act Because the Act Does Not Apply to Plaintiffs.**

12        Plaintiffs allege that the Act is void for vagueness but fail to explain how the

13   Superintendent's application of the Act violates the individual students' free speech rights in

14   particular.  (Doc. 97 at 28.)  Plaintiffs also cannot raise an as-applied challenge to a law on

15   behalf of a third party, such as TUSD.

16        An as-applied First Amendment challenge contends that a given statute is

17   unconstitutional as-applied to a particular Plaintiff's specific speech activity.  *Legal Aid*

18   *Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010).  To prevail on their

19   as-applied void for vagueness challenge, Plaintiffs Arce and Lopez must show that the Act is

20   impermissibly vague as applied to them. *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 822 (9th

21   Cir. 2003) (stating that a void for vagueness as-applied challenge focuses on whether the

22   statute is impermissibly vague in the circumstances of the case).  As discussed previously,

23   the Plaintiffs' claim relies on the false premise that the Act restricts student speech.  It does

24   not.  Plaintiffs offer no facts or arguments to show any particular speech activity or any

25   application of the Act to their speech activity.

26

27

A.R.S. section 15-112(A) only restricts a "district or charter school" from implementing certain "program[s] of instruction."  A.R..S. § 15-112(A).[12]  Plaintiffs are students.  To state the obvious, they are not a district or a charter school.  Consequently, the statute does not restrict their speech in any way.  It does not prevent the discussion of any topic: it does not prevent the discussion of Cinco de Mayo or the Declaration of Independence.  It does not prevent the discussion of the American Indian Movement, the NAACP, or the 9/11 attacks on the World Trade Center or the Pentagon.  It does not prevent the discussion of anything.  Because the law does not implicate any speech activity by the Plaintiffs, the enforcement of the challenged law against a third party, TUSD, is not implicated in this case.  *Legal Aid*, 608 F.3d at 1097.  To properly, and narrowly, construe the plain language of § 15-112, the court must start from the plain terms of the statute and those terms simply do not impact student speech at all.

### 2.    A Party Whose Conduct Clearly Violates a Law Cannot Make an As-Applied Challenge to the Law.

Finally, even assuming that Plaintiffs articulate any as-applied claim based on the enforcement of this law,[13] the law is clearly not vague as applied to the MAS Program.  To raise a vagueness argument, the conduct must not be clearly prohibited by the law at issue.  *Hunt v. City of Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011).  As the administrative proceedings reflected, the MAS Program clearly violates the Act.

---

[12] Plaintiffs' motion emphasizes an attack on the constitutionality of A.R.S. § 15-112.  Nevertheless, plaintiffs' motion also occasionally refers to A.R.S. § 15-111 together with A.R.S. § 15-112 as being "unconstitutionally overbroad."  (Doc. 97 at 1, 9.)  A.R.S. § 15-111 does not impose any restraint on speech or conduct whatsoever and is merely a statement of legislative purpose prefatory to the enactment of A.R.S. § 15-112.  This is presumably why plaintiffs' vagueness analysis is limited to A.R.S. § 15-112.

[13] Plaintiffs fail to show that they have standing to raise any claims on behalf of TUSD.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

### a.   The MAS Program Was Primarily Designed for Students of a Particular Race.

By the Plaintiffs' own admissions, the MAS Program "was created to develop and provide for course offerings for students that focused on the history, culture, literature and art of Hispanics as a means of directly addressing and combating the consistent and persistent failure of Hispanic students."  (Doc. 98 ¶ 59.)

The public testimony of the program director and former plaintiff, Curtis Arce, introduced by the Plaintiffs (Doc. 132-1) clearly states that the MAS Program had been originally designed primarily for Mexican American students.  (Doc. 132-1 at 13, SOF ¶ 14.) Director Arce developed the program's pedagogy, in part.  (Doc. 132-1 at 15, SOF ¶ 14.) Director Arce was the co-author of a paper titled "Culture as a Resource: Critically Compassionate Intellectualism and its Struggle Against Racism, Facism, and Intellectual Apartheid in Arizona," which formed the educational philosophy underlying the MAS Program.  (*Id.*)  The philosophy espoused in the article included the utilization of "critical Latino race" theory and "critical pedagogy" as the foundation of the MAS classes.  (*Id.*) According to Director Arce's testimony at the administrative hearing, critical race theory utilizes a "racimized" (sic) lens to look at different social issues.  (*Id.*)  The ALJ found that article addresses what has, in fact, developed in the MAS program and noted that the parties did not dispute that anything changed in the MAS program's pedagogy from its inception through the effective date of A.R.S. § 15-112.  (*Id.*)

### b.   The MAS Program Promotes Resentment Against "Whites" and Advocates the Ethnic Solidarity of Latinos.

Based on the findings of fact and conclusions of law made by an independent ALJ, the Superintendent determined that the MAS Program violated the Act.  (Doc. 137-1.)  In coming to his recommendation that TUSD was in violation of the Act, the independent ALJ also reviewed exhibits that included: (1) a poem describing Mexican American people as a people "born from an act of rape" and "born to revolt"; (2) curriculum that stated that the

purpose of the lesson was to highlight "the connectedness and interconnectedness amongst Black and Brown people," excluding white people from the "bridges of solidarity" that the students were encouraged to build; (3) student assessments of courses that showed the focus of Latino Literature was the oppression of Mexican Americans by the White European race; (4) a teacher's exhortation to his students urging them to engage in political activism by reminding them that "we are still in the struggle"; and (5) a Caucasian student's report that the Hispanic students would not talk to her at all by virtue of her race.  (SOF ¶ 34.)

In making these findings, the independent ALJ concluded that the Superintendent proved by a preponderance of the evidence that TUSD violated the Act.  (Doc. 132-1 at 33.)

## VI.    CONCLUSION.

For the foregoing reasons, the Superintendent respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment.

## CROSS MOTION

The Superintendent incorporates by reference in this Cross-Motion his Statement of Facts in support of the Response to the Plaintiffs' Motion for Summary Judgment, and the facts and legal arguments set forth in the Response.  These facts and legal citations established that, as a matter of law, the Plaintiff's legal basis for their complaint is insufficient, and Superintendent respectfully requests that summary judgment be granted in favor of Defendant.

DATED this 17th day of January, 2012.

> THOMAS C. HORNE
> Attorney General
>
> /s/ Kevin D. Ray
> Kevin D. Ray
> Jinju Park Hurtado
> Assistant Attorneys General
> *Attorney for Defendant John Huppenthal,*
> *Superintendent of Public Instruction, in his*
> *Official Capacity; and the State Board of*
> *Education and its individual members, in their*
> *official capacity as nominal parties*

1

**CERTIFICATE OF SERVICE**

2

3        I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following, if CM/ECF registrants, and mailed a copy of same to any non-registrants, this this 17th day of January, 2012 to:

4

5

6    Richard M. Martinez, Esq.
    307 South Convent Avenue
    Tucson, Arizona 85701
7    RMLaw@RichardMartinezLaw.com

8

9    /s/ Phil Londen
    #2370731

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27