THOMAS C. HORNE
Attorney General
Firm Bar No. 14000

Kevin D. Ray, No. 007485
Jinju Park Hurtado, No. 026023
Assistant Attorneys General
1275 West Washington Street
Phoenix, Arizona   85007-2926
Telephone: (602) 542-8328
Facsimile:  (602) 364-0700
Email: EducationHealth@azag.gov
*Attorneys for Defendants John Huppenthal,*
*Superintendent of Public Instruction, in his official capacity;*
*and the State Board of Education and its individual members,*
*in their official capacity as nominal parties*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MAYA ARCE and KORINA ELIZA LOPEZ,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN HUPPENTHAL, Superintendent of Public Instruction and Executive Director of the Arizona State Board of Education, in his Official Capacity, the ARIZONA STATE BOARD OF EDUCATION, including all members in their Official Capacity; VICKI BALANTINE, JACOB MOORE, JOHN HAEGER, JAIME MOLERA, AMY HAMILTON, EILEEN KLEIN, GREGORY MILLER, JAMES HORTON, DIANNE ORTIZ-PARSONS, and THOMAS TYREE,<br><br>Defendants. | Case No. CV-10-623-TUC-AWT<br><br>**SUPERINTENDENT'S MOTION TO STRIKE PLAINTIFFS' STATEMENT OF FACTS; SUPERINTENDENT'S STATEMENT OF FACTS/CONTROVERTING FACTS IN SUPPORT OF THE SUPERINTENDENT'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Honorable A. Wallace Tashima |

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 7.2(m)(2), Defendant Superintendent John Huppenthal ("the Superintendent") hereby responds to Plaintiffs' Statement of Facts to Motion for Summary Judgment ("Statement of Facts"). (Doc. 98).  The Superintendent moves to strike the Plaintiffs' Statement of Facts because none of the factual allegations are supported by admissible evidence.  This Motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    THE SUPERINTENDENT'S MOTION TO STRIKE.

On October 21, 2011, the Plaintiffs filed a twenty page statement of facts that contains no evidentiary support and relies exclusively on factual allegations and conclusory legal statements contained in their Third Amended Complaint (hereinafter "TAC," Doc. 68).[1]  The Court should strike Plaintiffs' Statement of Facts for failure to comply with Fed. R. Civ. P. 56(c)(1)(a), which states that a party asserting that a fact cannot be disputed must support the assertion by citing to particular parts of materials in the record.  Fed. R. Civ. P. 56(c)(1)(a). Here, because the Superintendent has not even answered the complaint, it is uncertain which allegations are in dispute, much less which disputes might raise genuine issues of material fact.

Plaintiffs' Statement of Facts relies entirely on the allegations in their TAC.  While verified by eleven of the original parties to this lawsuit, all of the parties who verified the complaint have been dismissed from the lawsuit.  The two remaining Plaintiffs did not verify the complaint.  Thus, the complaint is insufficient to serve as an affidavit for purposes of summary judgment.  *See Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1022 (9th Cir. 2010) (stating that a verified complaint may serve as an affidavit for purposes of summary judgment if it is based on personal knowledge and sets forth requisite facts with specificity).  Here, the two student Plaintiffs remaining in the suit do not affirm any personal knowledge of any facts.  Thus, the information contained in the TAC is not admissible as

---

[1] The TAC is not verified by any of the remaining Plaintiffs in this case.

2

evidence to support a motion for summary judgment and should be struck. "In general, only admissible evidence may be considered by a trial court in granting summary judgment." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980). "An unverified complaint is legal memoranda" and does not "constitute evidence" within the meaning of Rule 56. *Presbyterian Church v. United States*, 752 F. Supp. 1505, 1509 (D. Ariz. 1990); *see also King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (References to a fact alleged in an unverified pleading is not "competent evidence" sufficient to support a motion for summary judgment); *Burden v. Int'l Longshoremen's Ass'n, Local No.1410*, 510 F. Supp. 2d 618, 628 (S.D. Ala. 2007) (same). Because Plaintiffs' Statement of Facts relies entirely on their inadmissible, unverified Third Amended Complaint, Defendant Superintendent moves to strike the Plaintiffs' Statement of Facts.

## CONTROVERTING STATEMENT OF FACTS

In the event the Court does not strike the Plaintiffs' Statement of Facts, Defendant Superintendent Huppenthal hereby controverts Plaintiffs' separate statement of facts as follows:

1.      The Superintendent moves to strike Paragraphs 1 and 2 as irrelevant due to the dismissal of this party pursuant to the Court's Order (Doc. 134) issued on January 10, 2012.

2.      The Superintendent objects to Plaintiffs' facts in Paragraph 3 as unsupported by any evidence or affidavit and therefore insufficient to support a motion for summary judgment. Furthermore, Plaintiffs' contention that the course offerings are currently available to junior and senior high school students by the Mexican American Studies ("MAS") Program is wrong. The Tucson Unified School District ("TUSD") Governing Board suspended the MAS program on January 10, 2012. (*See* Exhibit 1.) Whether the courses will be available for Plaintiff Arce when she becomes eligible to enroll is speculative at this time.

3.      The Superintendent moves to strike Paragraph 5-9 as irrelevant due to the dismissal of this party pursuant to the Court's Order (Doc. 134) issued on January 10, 2012.

3

4.      The Superintendent objects to Plaintiffs' statement of facts in Paragraph 10 as unsupported by any evidence or affidavit and therefore insufficient to support a motion for summary judgment.  Furthermore, Plaintiffs' contention that the course offerings are currently available to junior and senior high school students by the MAS Program is wrong. The TUSD Governing Board suspended the MAS program on January 10, 2012.  (Ex. 1.) Whether the courses will be available for Plaintiff Lopez when she becomes eligible to enroll is speculative at this time.

5.      The Superintendent moves to strike Paragraph 11-13 as irrelevant due to the dismissal of this party pursuant to the Court's Order (Doc. 134) issued on January 10, 2012.

6.      The Superintendent moves to strike Paragraph 14 and 15 as irrelevant due to the substitution of John Huppenthal for Thomas C. Horne pursuant to Federal Rule of Civil Procedure 17(d).

7.      The Superintendent admits Paragraph 16 insofar as it describes the Superintendent's authority to enforce A.R.S. § 15-112 pursuant to the statute.

8.      The Superintendent objects to the Paragraphs 17-20 as inaccurate statements of facts that are unsupported in the record.  The Superintendent concedes that the Cambium Report found no violation of the statute.  However, pursuant to the findings of the independent Administrative Law Judge ("ALJ"), the Cambium report was flawed because the curriculum audit did not include a comprehensive review of written curriculum, teachers' lesson plans or units utilized in the curriculum, textbooks, student assessments, and sample student work in conjunction with classroom observations.  (Doc. 132-1 at 8.)  The Cambium auditors reviewed less than 20% of the written curriculum units used in the courses.  (Doc. 132-1 at 11.)  Based on the small sample available for review, the Cambium auditors found that three out of the nine total curriculum units they did review "contain an overabundance of controversial commentary inclusive of political tones of personal activism and bias."  (Doc 70 at 5.)  In addition to the lack of written curricula, the Cambium auditors found that they were unable to determine what books were in use by the MAS teachers, but identified that

there were books that might be inappropriate for student use. (*Id.* at 5-12)   Further, the Cambium auditors observed very few classes of instruction, which was insufficient to confirm that written curriculum is being followed. (Doc. 132-1 at 10-11.) Based on the limited information available to the Cambium auditors and the data contained therein, the Superintendent decided to conduct an independent review of the MAS curricular materials before making a determination whether the District was operating its MAS program in compliance with A.R.S. § 15-112. (*Id.* at 6.)

9.      The allegation in Paragraph 21 that Superintendent Huppenthal's notice of violation "subjected the Tucson Unified School District to a sanction" that resulted in the withholding of any portion of the monthly state aid to TUSD is false. Further, no sanction is available against the Plaintiffs under the statute.

10.     The Superintendent moves to strike Paragraph 22-55 as irrelevant due to the dismissal of this party pursuant to the Court's Order (Doc. 134) issued on January 10, 2012.

11.     The Superintendent objects to Plaintiffs' statement of facts in Paragraph 56 and 57 as unsupported by any evidence or affidavit and therefore insufficient to support a motion for summary judgment. Furthermore, Plaintiffs' contention that the course offerings are currently available to junior and senior high school students by the MAS Program is wrong. The TUSD Governing Board suspended the MAS program on January 10, 2012. (Ex. 1.) Whether the courses will be available for Plaintiff Lopez when she becomes eligible to enroll is speculative at this time.

12.     The Superintendent objects to Plaintiffs' statement of facts in Paragraph 58-60 as unsupported by any evidence or affidavit and therefore insufficient to support a motion for summary judgment.

13.     The Superintendent objects to Plaintiffs' statement of facts in Paragraph 61 as patently false. To the contrary, "[i]t is undisputed that from January 1, 2011 through June 15, 2011, the MAS program did not have a comprehensive written curriculum and did not have textbooks or materials that had been approved by the District's governing board."

(Doc. 132-1 at 8.)  In fact, the MAS teachers had nearly unfettered discretion as to which materials could be used in their classes to supplement textbooks, if textbooks were used. (*Id.*)  MAS teachers also commonly wrote lesson plans on a chalkboard rather than employing a consistent practice for daily or cumulative lesson plan retention.  (Cambium Report, Doc 71 at 6.)  This is in violation of TUSD's district-wide policy requiring lesson plans and syllabuses to be in writing and approved.  (Doc. 132-1 at 9.)

14.     The Superintendent objects to Plaintiffs' characterization in paragraph 62 of the MAS Program as diverse and reflective of the specific school's population because it is unsupported by evidence.  Furthermore, to the extent that Plaintiffs attempt to use these statistics to argue that the MAS Program is not "designed primarily" for students of a particular race, the testimony of the program director and former Plaintiff, Curtis Arce, directly contradicts this allegation.  Director Arce testified that the MAS classes had been originally designed primarily for Mexican American students.  (Doc. 132-1 at 13.)  Director Arce developed the program's pedagogy, in part.  (Doc. 132-1 at 15.)  Director Arce was the co-author of a paper titled "Culture as a Resource: Critically Compassionate Intellectualism and its Struggle Against Racism, Facism, and Intellectual Apartheid in Arizona," which formed the educational philosophy underlying the MAS Program.  (*Id.* at 14.)  The philosophy espoused in the article included the utilization of "critical Latino race" theory and "critical pedagogy" as the foundation of the MAS classes.  (*Id.* at 15.)  According to Director Arce's testimony at the administrative hearing, critical race theory utilizes a "racimized" (sic) lens to look at different social issues.  (*Id.*)  The ALJ found that this article addresses what has in fact developed in the MAS program and noted that the parties did not dispute that anything changed in the MAS program's pedagogy from its inception through the effective date of A.R.S. § 15-112.  (*Id.*)

15.     The Superintendent admits the allegations contained in paragraph 63 to the extent that Hispanic students have comprised the most significant portion of the student population enrolling in the MAS Program courses offered at TUSD, but deny that enrollment reflects

"de facto segregation" or is related to charter schools.  Defendant objects to the inclusion of these additional facts as unsupported and inadmissible.

16.     The Superintendent objects to Paragraphs 64-65 of Plaintiffs' Statement of Facts as unsupported by admissible evidence.  They should be disregarded.

17.     The Superintendent admits the allegations contained in paragraph 66 to the extent that the textbook "Occupied America" is used in one or more courses offered as a part of the MAS Program at TUSD.  Defendant denies that this book is "a standard High School" level "course book." Defendant further objects to this additional fact as unsupported by any admissible evidence apart from the TAC.

18.     The Superintendent objects to Paragraph 67 of Plaintiffs' Statement of Facts as unsupported by admissible evidence which should be disregarded.

19.     The Superintendent objects to Paragraph 68-70 of Plaintiffs' Statement of Facts as conclusory legal opinions unsupported by admissible evidence which should be disregarded.

20.     The Superintendent objects to Paragraph 71 as unsupported by admissible evidence and should be disregarded.  To the extent Plaintiffs' claim for relief arises from the notice of violation issued by former Superintendent Horne ("Horne's Finding"), the Superintendent has previously maintained that such claims are moot.  However, because the Plaintiffs continue to cite to Superintendent Horne's Finding (Doc. 38-1), the Superintendent requests that the Court consider the totality of the factual findings of that document in their proper context, including the following facts:

     a.   MAS students are taught "Critical Race Theory" – a theory which, "[u]nlike traditional civil rights, which embraces incrementalism and step-by-step progress, critical race theory <u>questions the very foundation of the liberal order</u>, including equality theory, legal reasoning, <u>Enlightenment rationalism</u>, and neutral principles of constitutional law."  (*Id.*)  The materials for this class include "A Field Guide for Achieving Equity in School," which contains statements such as:

          "We often hear people referred to as being privileged, which usually is a comment pertaining to the individual's financial or economic

status…In Courageous Conversation, however, privilege takes on a different meaning: it refers to the amount of melanin in a person's skin, hair, and eyes.  (This is followed by a <u>table which promulgates</u> racial <u>stereotypes by detailing the differences between "white individualism" "colored group collectivism".</u>)  "<u>White people tend to dominate the conversation</u> by setting the tone for how everyone must talk and which words should be used.  All of <u>these "White ways" must be recognized</u>, internalized, and then silently acted on by people of color".  (This is an example, referring to the statute, of subsection 2, "promote resentment toward a race or class of people")…The aforementioned White cultural characteristics, such as individualism, blur into the consciousness of <u>Whiteness</u>, which becomes not only <u>a way of behaving</u> but also <u>a way of thinking</u>….<u>White people depend on the overwhelming presence of other White people</u> in positions of power and influence to maintain a system of racial advantage.  At the same time, many White educators believe that gains in school, as in their own lives, come from individual effort and accomplishment.

At page 200 of these materials, there is a table setting forth in detail the difference between "White Talk" and "Color Commentary".  These materials go on to state: "Anger, guilt, and shame are just a few of the emotions experienced by participants as they move toward <u>greater understanding of Whiteness</u>".  [If one were to substitute any other race for "Whiteness", it would be obvious how this promotes resentment toward a race or a people.]  The materials go on to state:  "<u>White Americans</u> often feel a unique sense of entitlement to Americanism, partly because <u>many never travel</u> beyond the borders of the United States."  (*Id.* at 9)

b.  Augustine Romero was the Chairman of the Ethnic Studies Department at TUSD for many years, and is still involved in the program.  In a debate against the undersigned on CNN, he was asked the following question and gave the following answer:

Q [by the reporter]: And, Mr. Romero, I want to begin with you.  <u>Why not just call the class Mexican studies or – like you would have – Mexican-American studies?  Why did you put the word la</u>

<u>raza in there</u>, which as you know, to many people connotes a political movement, as opposed to an educational course?

ROMERO: …<u>so that our students could recognize and connect to their indigenous side</u>, just like the word "dine" for the Navajo translates to 'the people,' like the word 'o'odham' for the Tohono O'odham translates to 'the people.'  The word 'yoeme' for the Yoeme people translates to 'the people.'

<u>It was an attempt to connect to our indigenous sides, as well as our Mexican side.</u>  (Emphasis added)

   c.   A text book holding up Jose Angel Guttierez as a role model deliberately omitted Guttierez's key point: the solution to the existing problems was to call upon Chicanos to "kill the Gringo." (*Id.* at 7.)

   d.   In a section of materials called "Conquest and Colonización", the students are taught "We will see how half of Mexico was ripped off by trickery and violence.  We will see how Chicanos became a colonized people.  In the process of being colonized, we were robbed of land and other resources." (*Id.* at 9.)

   e.   Teachers reported to the Department and the Superintendent that they were afraid to criticize the MAS Program without being labeled "racist."  John Ward, a former TUSD teacher who, despite his name, is Hispanic, and who objected to what Ethnic Studies specialists did in his History class, described how the TUSD administration intimidated him by removing him from his class, and calling him a "racist" even though he himself is Hispanic.  This tactic, he wrote "…is fundamentally anti-intellectual because it immediately stops debate by threatening to destroy the reputation of those who would provide counter arguments."  Unfortunately, he [John Ward] is not the only one to have been intimidated by the Raza studies department in this way.  A second teacher wrote that he heard a teacher tell his students that "the U of A is a racist organization because only 12% of students are Latino and they do not support the Latino students there.  I

heard him tell students that <u>they need to go to college so they can gain the power to take back the stolen land and give it back to Mexico</u>. He personally told me that he teaches his students that republicans hate Latinos and he has the legislation to prove it.  When I asked him about Mexican American Republicans who are against illegal immigration, he said this is an example of 'self-racism.'"  A third teacher wrote that he had been "attacked repeatedly" for questioning the substance and veracity of their American History and Social Justice Government classes and called racist by fellow Tucson High teachers, members of the Ethnic Studies department, and students enrolled in the departments' classes for asking the MAS Department to provide the primary source material for the perspective they preach.  A fourth teacher wrote: "I have had Hispanic students tell me that this is NOT the United States of America . . . it is "occupied Mexico". . . I have made simple comments as a substitute such as "please pick up the paper under your desk" only to receive an immediate response of "You don't like Mexicans?"  My response was to repeat my request of picking up the papers and calmly add that they must be REALLY confused . . . because I am also of Mexican descent."  Fifth, Hector Ayala was born in Mexico, and is an excellent English teacher at Cholla High School in TUSD.  He reports that the director of the MAS Program accused him of being the "white man's agent," and that when this director was a teacher, he taught a separatist political agenda, and his students told Hector that they were taught in Raza Studies to "not fall for the white man's traps." (Findings p.6)

21.    The Superintendent objects to Paragraphs 72-73 as opinions unsupported by admissible evidence that should be disregarded.  To the extent that the Plaintiffs allege that the Superintendent subjected the Plaintiffs to any sanction, this claim is patently false because no sanction is available against the Plaintiffs under the statute.

22.     The Superintendent objects to Paragraph 74 as unsupported by admissible evidence that should be disregarded.  The Superintendent also admits that Thomas C. Horne did support HB 2281.

23.     The Superintendent does not object to Paragraphs 75-79 to the extent that they reflect admissible public record/facts.

24.     The Superintendent objects to Paragraph 80-89 as unsupported by admissible evidence and should be disregarded.

25.     The Superintendent objects to Paragraph 90-92 as unsupported by admissible evidence and should be disregarded.  Rather than acting unlawfully, the Department of Education received complaints from members of the Tucson community regarding the manner in which educational instruction was being conducted in the MAS Program.  (Doc. 132-1 at 5.)  The Department did not receive any similar complaints regarding any other ethnic studies in the District.  (*Id.*) State law requires the Department to consider and investigate complaints relating to public schools. (*Id.*, *see also* A.R.S. § 15-231.01.)  The Superintendent did not act arbitrarily and capriciously in investigating the alleged statutory violation of the MAS Program.

26.     The Superintendent objects to Paragraph 93-94 as unsupported by admissible evidence and should be disregarded.

27.     The Superintendent admits to the allegation in Paragraph 95 that HB 2281 was enacted by the Legislature and signed into law by the Governor.  The Superintendent objects to the remaining opinions in the paragraph as unsupported by admissible evidence and should be disregarded.

28.     The Superintendent moves to strike Paragraph 96 as irrelevant due to the dismissal of this claim pursuant to the Court's Order (Doc. 134) issued on January 10, 2012.

29.     The Superintendent objects to Paragraph 97 as unsupported by admissible evidence and should be disregarded.  To the extent it references any acts taken by Thomas C. Horne,

defendant objects to the reference given that current Superintendent Huppenthal has been substituted as defendant in this case.

30.     The Superintendent objects to Paragraph 98 as unsupported by admissible evidence that should be disregarded.  The Superintendent further incorporates the controverting facts in Paragraph 8 of this Statement of Facts in response.

31.     The Superintendent admits the factual allegations in Paragraphs 99-101.

32.     The Superintendent objects to the allegations in Paragraph 102 as unsupported by admissible evidence and should be disregarded.  Whether students use the regular district-adopted text books or any additional texts is a matter of fact.  The Superintendent further incorporates the controverting facts in paragraph 13 of this Statement of Facts in response to the allegations of this claim.

## SUPERINTENDENT'S ADDITIONAL STATEMENT OF FACTS

33.     The Superintendent further alleges that the findings of fact and conclusions of law made by an independent Administrative Law Judge supports the finding that the MAS Program is in violation of the Act.

34.     In coming to his recommendation that TUSD was in violation of the Act, the independent ALJ reviewed exhibits that included: (1) a poem describing Mexican American people as a people "born from an act of rape" and "born to revolt" (*id.* at 20); (2) curriculum that stated that the purpose of the lesson was to highlight "the connectedness and interconnectedness amongst Black and Brown people," excluding white people from the "bridges of solidarity" that the students were encouraged to build (*id.* at 23); (3) student assessments of courses that showed the focus of Latino Literature was the oppression of Mexican Americans by the White European race (*id.* at 29); (4) a teacher's exhortation  to his students urging them to engage in political activism by reminding them that "we are still in the struggle" (*id.* at 31); and (5) a Caucasian student's report that the Hispanic students would not talk to her at all by virtue of her race (*id*. at 32).

1   35.     During the course of the administrative hearing, the President of the District Board,

2   Dr. Mark Stegeman, testified that based on his observations at the high school MAS classes,

3   the classes are primarily for Latinos, he is concerned that MAS classes promote racial

4   resentment, and advocate ethnic solidarity instead of treating students as individuals. (Doc.

5   132-1 at 19.)  District Board President Stegeman also expressed his belief that the MAS

6   program should be terminated and rebuilt.  (*Id.*)  Another District Board member, Charles

7   Michael Hicks, testified that he believed that the MAS program constitutes a form of "racial

8   indoctrination," and that the District is operating the MAS program in violation of A.R.S. §

9   15-112, and that the program must come to an immediate end. (*Id.*)

10          Dated this 17th day of January, 2012.

11                                      THOMAS C. HORNE
                                         Attorney General
12

13                                      /s/ Kevin D. Ray
                                         Kevin D. Ray, Esq.
14                                       Jinju Park Hurtado, Esq.
                                         Assistant Attorneys General
15                                       *Attorneys for Defendant John Huppenthal,*
16                                       *Superintendent of Public Instruction, in his*
                                         *Official Capacity; and the State Board of*
17                                       *Education and its individual members, in their*
18                                       *official capacity as nominal parties*

19

20

21

22

23

24

25

26

27

1

2

**CERTIFICATE OF SERVICE**

3

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following, if CM/ECF registrants, and mailed a copy of same to any non-registrants, this this 17th day of January, 2012 to:

4

5

6

Richard M. Martinez, Esq.
307 South Convent Avenue
Tucson, Arizona 85701
RMLaw@RichardMartinezLaw.com

7

8

9

By: /s/ Phil Londen

#2568012

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## <u>INDEX OF EXHIBITS</u>

1.     Tucson Unified School District Governing Board's January 10, 2012 Resolution
       Regarding Mexican-American Studies Program (available electronically at
       http://www.tusd1.org/contents/govboard/Documents/ResolutionMAS011012.pdf)

**The governing board of the Tucson Unified School District hereby resolves:**

The Mexican-American Studies (MAS) Department is and shall remain an organizational contributor to TUSD's commitment to greater academic and social equity for Hispanic Students.

All MAS courses and teaching activities, regardless of the budget line from which they are funded, shall be suspended immediately.

Students currently enrolled in MAS courses shall be transferred to new or existing sections of other courses, so that they do not lose the opportunity to earn credits and to satisfy requirements because of the suspension of the MAS courses.

The MAS department shall not hire, supervise, or evaluate classroom teachers.

The district shall revise its social studies core curriculum to increase its coverage of Mexican-American history and culture, including a balanced presentation of diverse viewpoints on controversial issues.   The end result shall be a single common social studies core sequence through which all high school students are exposed to diverse viewpoints.

The district shall study and bring to the board new measures designed to narrow the achievement gaps for traditionally underserved and economically disadvantaged students.

Staff will present a plan to the Board for implementation of this resolution by August 2012. Staff shall also update the board regularly on the progress of these initiatives and on steps taken to ensure compliance with Arizona statutes and district policy concerning curriculum.

Implementation of this resolution shall be consistent with guidance received from the federal court concerning the district's desegregation cases.