1  **RICHARD M. MARTINEZ, SBA No. 7763**
   307 South Convent Avenue
2  Tucson, Arizona 85701
   (520) 327-4797 phone
3  (520) 320-9090 fax
   richard@richardmartinezlaw.com
4  **Counsel for Plaintiffs and Plaintiffs-Intervenors**

5              IN THE UNITED STATES DISTRICT COURT

6                 FOR THE STATE OF ARIZONA

7  Curtis Acosta, et. al.,                    )
                                              )
8              Plaintiffs,                     )        No. CV 10 - 623 TUC AWT
                                              )
9  v.                                          )
                                              )
10 John Huppenthal,                            )
   Superintendent of Public                    )
11 Instruction, in his Official                )
   Capacity, et. al.,                          )
12                                             )
               Defendants.                     )
13 _____            )
                                              )
14 Margarita Elena Dominguez,                  )    **PLAINTIFFS' MOTION FOR SUMMARY**
   and Nicholas A. Dominguez,                  )    **JUDGMENT REPLY TO DEFENDANT**
15                                             )    **HUPPENTHAL'S RESPONSE AND**
               Plaintiffs-Intervenors,         )    **PLAINTIFFS' RESPONSE TO THE**
16                                             )    **DEFENDANT HUPPENTHAL'S CROSS**
   v.                                          )    **MOTION FOR SUMMARY JUDGMENT**
17                                             )
   John Huppenthal,                            )
18 Superintendent of Public                    )
   Instruction, in his Official                )
19 Capacity,                                   )
                                              )
20             Defendant.                       )
                                              )
21

22         Plaintiffs, through their undersigned counsel, hereby submit their response

23 in opposition to defendant Huppenthal's cross motion for summary judgment and

24 reply to the response submitted by him.

25         It remains evident that there are no contested issues of material fact

26 concerning the Fourteenth Amendment Due Process and First Amendment

27 overbreadth claims asserted in plaintiffs' dispositive motion.

28         The enforcement actions undertaken by Superintendent Huppenthal

have resulted in the termination of all MAS Classes in TUSD. Hundreds of students have been denied the opportunity to complete the MAS courses they enrolled in. This drastic and unprecedented action by the TUSD Governing Board on January 10, 2012 is the product of an enforcement action that has its roots dating back to at least 2007 when then Superintendent Tom Horne set his sights on elimination of TUSD's MAS program. Remarkable in this sustained effort to eliminate "La Raza" from continuing their courses is the complete absence of any definition, criteria or analysis that supports the adverse actions taken.[1] Neither Superintendent Horne or Superintendent Huppenthal, the Arizona Department of Education or the ALJ hearing process produced a single definition, criteria or analysis that establishes a causal nexus between the MAS classes and whatever it is that HB 2281 prohibits. In his Response, Superintendent Huppenthal claims that he desires to eliminate the MAS program because it promotes racism. This assertion reveals his true aim, which is to suppress the point of view that many Mexican Americans hold of U.S. society.

The study of history and culture from the viewpoint of those who have suffered discrimination *necessarily* has a different tone and viewpoint than does a sanitized view of our society. Superintendent Huppenthal's claims that he does not oppose the content taught by MAS, but only the manner in which is presented reveals his viewpoint discrimination. Superintendent Huppenthal has abused his authority in order to impose orthodoxy only on students in TUSD's MAS program. This travesty of state action represents the exercise of viewpoint discrimination at its most blatant and horrific form. TUSD's MAS has been demonized to the point of labeling this program that leads Latino students to success in high school,

---

[1] The evidence and legal analysis which provides the basis for granting plaintiffs motion is the same evidence and analysis resulting in the denial of defendant's cross motion for summary judgment.

1  college and in their communities a Latino manifestation of the KKK.[2] This
2  assertion not only reveals the depths to which Attorney General Horne and
3  Superintendent Huppenthal will go, but the genuinely racist nature of their attacks
4  upon TUSD's Latino students and teachers.

5       Cognizable constitutional harm has been inflicted upon the plaintiffs that
6  deprives them of a critical opportunity to develop their educational identity, see
7  them themselves as successful productive students with a post secondary future.
8  Their right to receive their history, culture and literature or to express the same
9  has been selectively denied for reasons, alleged violations of law, that remain
10  undefined, impermissibly vague and unconstitutionally imposed.

11       This response and reply is supported by a separate statement of facts, with
12  supporting declarations, transcripts and exhibits. Plaintiffs' facts, which number
13  182, provide a comprehensive record for making a determination as to the
14  constitutionality of HB 2281 and Supertiendent Huppenthal's enforcement thereof
15  against TUSD's MAS program.

16       In light of the absence of any material factual questions, as reflected in the
17  record submitted and addressed in the accompanying memorandum of points
18  and authorities, plaintiffs respectfully request that their motion be granted and
19  defendant's denied.

20       Respectfully submitted this 27th day of February, 2012.

21

22                   *s/Richard M. Martinez, Esq.*
                 RICHARD M. MARTINEZ, ESQ.
23                   Counsel for Plaintiffs

24

25

26

27  _____

28      [2] See Superintendent Huppenthal's brief at Ct. Doc. 150. p.2,

-3-

### Memorandum of Points and Authorities

I.    **PRELIMINARY STATEMENT**

    A.    **Issues Before the Court[3]**

At issue are the prohibitions of A.R.S. §15-112(A) against courses or classes that: (1) promote the overthrow of the United States government, (2) promote resentment toward a race or class of people, (3) are designed primarily for pupils of a particular ethnic group, and (4) advocate ethnic solidarity instead of the treatment of pupils as individuals, and their application by State Superintendents of Public Instruction Tom Horne and John Huppenthal. These express but incomprehensible prohibitions are all designed to allow for the subjective limitation of the material and ideas allowed in the public classrooms of Arizona.

The prohibitions in A.R.S § 15-112(A) and the exceptions of subsections 112(E) and (F) are impermissibly vague and restrict the First Amendment freedoms of students to learn because: 1.) they do not provide notice as to what speech or conduct constitutes a violation of subsection 112(A), 2.) they grant the State Superintendent of Public Instruction arbitrary and subjective powers of enforcement, and 3.) they chill the plaintiffs' rights to free speech.

Similarly, §§15-112(A)(1) through (4) prohibit a substantial amount of protected expression. Because the substantial amount of material that school districts and teachers will be prohibited from teaching is protected by the First Amendment, the State may regulate only with legitimate constitutional specificity; §§15-112(A)(1) through (4) fail to provide that specificity. All four subsections are

---

[3] Defendant's effort re-frame the issues before the court are a specious effort to create an issue which is not contested or presented. The denial of Due Process and chilling of First Amendment rights due to the complete absence of the notice required and impermissible adverse effects that result are at the core of what must be decided.

1   overbroad and are rightfully subject to invalidation by this Court.

2       Because the Declaration of policy contained in §15-111 cannot be

3   extricated from the enforcement provisions of §15-112, §15-111 is equally flawed

4   and requires invalidation.

5   **B.   Overview**

6       Now that Superintendent Huppenthal has used HB 2281 for its sole

7   intended purpose to eliminate Tucson Unified School District's (TUSD) Mexican

8   American Studies (MAS) program, and now that TUSD is using his final agency

9   decision to guide HB 2281's implementation, the statute's constitutional

10   infirmities, both on its face and in its application have come into full view.  The

11   undisputed facts have multiplied, not only since the plaintiffs' first moved for

12   summary judgment on a facial challenge in May, 2011, and more so since they

13   filed this Second Motion for Summary Judgment in October, 2011, but have

14   accrued at a rapid pace since this Court heard the Plaintiffs' Motion For

15   Preliminary Injunction in December, 2011.  All of these undisputed facts prove HB

16   2281's vagueness and overbreadth both on its face and as applied by

17   Superintendent Huppenthal.[4]

18       To achieve his campaign promise to "Stop La Raza," Superintendent

19   Huppenthal has distorted the nature and effect of the teaching and learning that

---

20

21       [4] A favorable decision on this motion will provide the plaintiffs with appropriate relief, despite the fact that TUSD is not a party to this action. TUSD is not required to be

22   a party for ruling on the constitutionality of HB 2281. Defendant's argument of such is without merit and ignores that the plaintiffs are now deprived of any MAS classes solely

23   due to the enforcement actions of Superintendent Huppenthal. Rather, voiding HB 2281 is a necessary precondition to the reinstatement of MAS classes by the TUSD

24   Governing Board, whether by order of Judge Bury in the desegregation action against TUSD or by the Governing Board's own volition. See *Romer v. Evans*, 517 U.S. 620

25   (1996).(Even though no municipality was obligated to pass an ordinance barring

26   discrimination on the basis of sexual preference, enjoining the voter-initiated

27   amendment to the Colorado Constitution prohibiting such ordinances was a necessary precondition to the ability of the plaintiffs to benefit from such anti-discrimination

28   ordinances in the future.)

takes place in the MAS program by utilizing vague, broad and subjective legal prohibitions to conclude that the MAS program violates HB 2281.[5] While HB 2281 purportedly bans all programs that are designed to benefit students from a particular ethnic group, it has been selectively applied to one school district and to a single program, to eliminate learning from a Mexican American point of view. Superintendent Huppenthal has deliberately ignored Arizona's 598 remaining public and charter school districts,[6] and left unchallenged, thus intact all other classes and courses including African American and Native American perspectives of U.S. history and literature.[7]

In pursuit of his singular goal of eliminating TUSD's MAS program, Superintendent Huppenthal has ignored the bounds of the Constitution. To accomplish this he has distorted the very foundation of the MAS classes,[8] and alleged that MAS classes "promote racism," and create in its students, resentment and hatred toward white people.[9] This assertion requires ignoring and rejecting the detailed classroom observations and conclusions of his hand-picked independent auditors while embracing an internal ADE review of written materials

---

[5]  Ex D, alleging violations of A.R.S. § 15-112(A)(2),(3) and (4).

[6]  This includes 224 public school districts and 374 charter holders.  See Arizona Department of Education web site, www.azed.gov/about-ade/overview.

[7]  PSOF 144.

[8]  The MAS program has several goals, including: promoting "the demonstration of respect, understanding, appreciation, inclusion and love at every level," providing culturally relevant curriculum that is centered within the Mexican American/Chicano experience and within the pursuit of social justice, working toward invoking a critical consciousness within each student and providing teacher education in the areas of Critical Pedagogy, Latino Critical Race Pedagogy and Authentic Caring. Ct. Doc. No. 84-1, citing to the MAS Department Vision and Goals.

[9]  *See* Ct. Doc. No. 150, p. 2; *see also* Ex. I, p.35, ¶10, where Superintendent Huppenthal states, "However, teaching oppression objectively is quite different than actively presenting material in a biased, political, and emotionally charged manner, which is what occurred in MAS classes.  Teaching in such a manner promotes social or political activism *against the white people*, promotes racial resentment, and advocates ethnic solidarity, instead of treating pupils as individuals."  (Emphasis added.)

1  absent any criteria, clear record as to whether the books had been used in

2  classrooms and, if so, when, how and in what context, and upon his own

3  conclusion that resentment and hate *must necessarily be the result* of learning

4  about racism from a critical perspective.[10]

5      Superintendent Huppenthal's actions impermissibly exceed the powers of

6  his office. Left unchecked, the MAS classes that have been terminated will not

7  return. The MAS books and teaching materials will remain boxed up and stored in

8  a remote warehouse, and MAS students will remain incarcerated in a classroom

9  with severe restrictions on the ideas that are allowed to be presented to them and

10  subjected to chilling classroom compliance monitoring by ADE officials and the

11  collection and examination of their class work.[11]  The students now turn to this

12  Court for relief from this tyranny.[12]

13  _____

14  [10]  Superintendent Huppenthal misunderstands the purpose of ethnic studies,
which is not to cause racial and ethnic minority students to resent white people, but to
15  provide all students with a broader understanding of the world through a diverse array of
histories and approaches to knowledge. *See* Ct. Doc. No. 110-5, p. vii, ("Ethnic studies
16  includes units of study, courses, or programs that are centered on the knowledge and
perspectives of an ethnic group, reflecting narratives and points of view rooted in that
17  group's lived experiences and intellectual scholarship.")
18  [11]  Ironically, ADE officials neither performed nor relied upon any classroom
observations to inform their conclusion that the MAS program violates HB 2281, but do
19  intend to rely on such visits to confirm compliance with Superintendent Huppenthal's
20  Decision.  Ex. CC, p.24:ll.23,24.
21  [12]  The tyranny of official suppression of ideas in Arizona now threatens to move
beyond the schools. On February 15, 2012, the Arizona Senate Government Reform
22  Committee passed SB 1202 which would revoke a teacher's certificate if a teacher
promotes "partisan doctrine" in school or "encourages, entices or otherwise
23  indoctrinates pupils to promote or adopt, or both, the teacher's partisan or political
viewpoints."  The latter prohibition *is not limited to the school setting* and presumably
24  would apply to a teacher at a political event where students are present.  An
administrator who did not "prevent or cease" such activity in the classroom would also
25  have his or her certificate revoked.  Where a school district superintendent or governing
board members "knowingly ignored" such conduct, the Superintendent of Public
26  Instruction has the authority to withhold ten percent of the district's funding, a scheme
27  which is identical to that of HB 2281. Bolstered by the legal success of HB 2281 in the
28  administrative forum and notwithstanding the blatant unconstitutionality of such a law,

C.   **Events Since Filing This Motion For Summary Judgment And Up To January 10, 2012.**

Since this motion was filed on October 21, 2011, the four days of administrative hearing of TUSD's appeal from Superintendent Huppenthal's Finding of violations before Administrative Law Judge (ALJ) Kowal concluded. ALJ Kowal issued his Decision finding that the MAS program violates A.R.S §15-112(A)(2), (3) and (4),[13] and Superintendent Huppenthal adopted the ALJ's Decision in its entirety, constituting the final agency decision,[14] and immediately imposed a multimillion dollar sanction on TUSD.

Hours after this Court issued its Order denying the plaintiffs' Motion For Preliminary Injunction on January 10, 2012, the plaintiffs' constitutional deprivations reached their intended apex, the elimination of the MAS program by the TUSD Governing Board.[15] That evening, Superintendent Huppenthal successfully imposed his will on TUSD, who chose to succumb, turn its back on 62% of their students and ignore a federal court order requiring that TUSD maintain the MAS program.[16]

---

Arizona legislators appear determined to impose their own sense of homogeneity on Arizona students.  Cf. *Meyer v. Nebraska,* 262 U.S. 390, 402 (1923) ("The desire of the legislature to foster a homogeneous people with American ideals prepared readily to understand current discussions of civic matters is easy to appreciate.")

   [13]  Ex. I.

   [14]  Ex. J.  The plaintiffs will hereinafter refer to this document as "the Kowal/Huppenthal Decision."

   [15]  In direct response to Superintendent Huppenthal's order finding the MAS program in violation of HB 2281 and imposing a penalty of ten percent of TUSD's state funding, the TUSD Governing Board passed a resolution ordering that all MAS courses and teaching activities shall be immediately suspended and that students currently enrolled in MAS courses shall be transferred to new or existing sections of other courses. Ex. L.

   [16]  The Post-Unitary Status Plan (PUSP) which mandates the MAS classes constitutes a required remedial measure for intentional acts of discrimination by TUSD towards its Latino students. On February 2, 2012, the Mendoza plaintiffs in the desegregation action against TUSD requested that the Special Master and the District Court "enforce the PUSP and reinstate Mexican American Studies courses and

### D.   Superintendent Huppenthal and TUSD's Enforcement Actions Since January 10, 2012.

With the elimination of MAS classes, Mr. Dominguez has lost the opportunity to complete the MAS classes he was attending commencing January 11, 2012. Further, the MAS classes that had been scheduled for the Fall 2012 semester, including those for which Ms. Lopez registered, have been eliminated and will not be reinstated.[17]

Compliance with the Huppenthal edict also required TUSD officials to immediately remove all books that had been used in MAS classes and provide Superintendent Huppenthal with proof of the removal.[18] TUSD has specifically banned in MAS classrooms seven books mentioned in the Kowal/Huppenthal Decision, including teachers' personal copies.[19] Also banned from MAS classrooms are all lessons, materials, and themes that MAS teachers had previously used.[20] MAS teachers have been instructed that they cannot encourage students to use an "MAS perspective," but have not been provided with an explanation of what that means.

---

teaching activities in accordance with the mandates of the Plan and direct [TUSD] to implement and regularly monitor in good faith all provisions of the Action Plan for Mexican American Studies as set forth in the PUSP. *Mendoza v. TUSD*, CV 74-204 TUC DCB, Mendoza Plaintiffs' Response to Notice to Court Concerning Suspension of Mexican American Studies Courses and Request for Special Master to Take Action, Ct. Doc. No. 1354.

[17] PSOF 144, 180, 181.

[18] Ex. M, p.2. Superintendent Huppenthal has ordered TUSD to produce evidence that TUSD has collected all MAS program materials from the classrooms by February 29, 2012.

[19] Ex. N. The seven books are: "Critical Race Theory," by Richard Delgado, "Pedagogy of the Oppressed," by Paolo Freire, "Rethinking Columbus: The Next 500 Years," edited by Bill Bigelow and Bob Peterson, "Occupied American: A History of Chicanos," by Rodolfo Acuna, "Chicano! The History of the Mexican American Civil Rights Movement," by F. Arturo Rosales, "Message to Aztlan," by Corky Gonzales, and "500 Years of Chicano History In Pictures, by Elizabeth Martinez.

[20] Ex. M,N.

Superintendent Huppenthal has ordered that MAS classrooms shall be monitored for compliance until the end of the school year.[21] Such monitoring has already begun and has specifically focused on the students' speech.[22] MAS teachers are also required to provide written student work to compliance monitors for inspection and approval.[23]  Teachers are subject to discipline for perceived violations, but have not been told specifically what constitutes a violation.[24]

All of this has understandably caused turmoil, sadness and anger on the part of the students.[25] Their classes that created a "culture of respect" and delivered the message that "Americans come from many backgrounds, and that being an American means that all people are accepted" have been eliminated with no hope of return.[26] They justifiably feel that the culture and perspectives of Mexican Americans have been singled out for censorship, while other ethnic groups escape such vilification.[27] This subjection to undeniable differential treatment will be ingrained within them as a tragic chapter of history that will be with them for the rest of their lives.

II.    **THE PLAINTIFFS PROPERLY RELY ON THEIR VERIFIED COMPLAINTS.**

Superintendent Huppenthal's Motion to Strike is without merit. This action was brought by Martin Sean Arce as next friend for his minor daughter Maya Arce and by Lorenzo Lopez, Jr. as next friend for his minor daughter Korina Eliza Lopez.  Both Mr. Arce and Mr. Lopez have personal knowledge of the facts alleged in the Third Amended Complaint (TAC) and have so attested through

---

[21] Ex. M.
[22] Ex. R.
[23] Ex. M,O.
[24] PSOF 121, 123,124, 127, 172, 173, 175.
[25] PSOF 161-65.
[26] Ct. Doc. No. 86, p.63.
[27] PSOF 163-65.

-10-

1   their verified signatures on the TAC.[28]  Although their individual claims have been

2   dismissed, they remain as next friends to bring this action and the TAC remains

3   verified by them.  Further, the plaintiff intervenors, Nicholas Dominguez and

4   Margarita Elena Dominguez have verified their Complaint in Intervention[29] and

5   have joined in the plaintiffs' Motion for Summary Judgment.  Both of these

6   verified complaints, based on the signers' personal knowledge and set forth with

7   specificity, are sufficient to serve as affidavits for purposes of summary

8   judgment.[30]

9   **III.   SUPERINTENDENT HUPPENTHAL OFFERS NO ADMISSIBLE**
    **EVIDENCE TO CONTROVERT ANY OF THE RELEVANT FACTS**
10  **CONTAINED IN THE PLAINTIFFS' STATEMENT OF FACTS.**

11          Superintendent Huppenthal offers no declarations, affidavits or other

12  admissible testimony to controvert the plaintiffs' Statement of Facts.  Rather,

13  aside from a few documents that are part of the record herein, he relies upon the

14  findings of fact and conclusions of law made by ALJ Kowal in the

15  Kowal/Huppenthal Decision[31] and the Findings made by Superintendents

16  Huppenthal and Horne.[32]  Although ALJ Kowal's findings and conclusions purport

17  to be based on the evidence presented at the hearing, they are not based on his

18  personal knowledge and do not constitute admissible evidence pursuant to

19  Federal Rules of Evidence, Rule 602.  For example, Superintendent Huppenthal

20  cites to the Kowal/Huppenthal Decision and paraphrases testimony given in the

21  administrative hearing, without quotation nor citation to the record.[33]  Neither the

22  Kowal/Huppenthal Decision nor Superintendent Huppenthal's Statement of

23  _____

24      [28]  Ct. Doc. No. 84, pp.24-25.

25      [29]  Ct. Doc. No. 134-1.
        [30]  *Moran v. Selig,* 447 F.3d 748, 760, n.16 (9th Cir 2006), citing *Lopez v. Smith,*
26  203 F.3d 1122, 1132, n.14 (9th Cir 2000) (en banc).

27      [31]  Ex. L.
        [32]  Ex. B,D.
28      [33]  See e.g. Ct. Doc. No. 142, p.13.

1  Facts/Controverting Facts contains admissible testimony of these witnesses.

2      Also, Superintendent Huppenthal offers portions of Superintendent Horne's

3  Finding for the truth of the matter asserted.[34]  For example, Superintendent

4  Huppenthal paraphrases the Horne Finding to assert that "[a] text book holding

5  up Jose Angel Gutierrez as a role model deliberately omitted Gutierrez's key

6  point: the solution to the existing problems was to call upon Chicanos to 'kill the

7  Gringo.'"[35] If Superintendent Huppenthal believes that instructional materials or

8  testimony are relevant to the issues presented by this motion, he must present

9  them with proper foundation.  Superintendent Huppenthal's Statement of Facts

10  that lack proper foundation should be stricken.

11  **IV.   THE STUDENTS HAVE FIRST AMENDMENT RIGHTS OF FREE EXPRESSION AND TO RECEIVE IDEAS AND INFORMATION.**

12      It is beyond dispute that in the educational setting, students retain First

13  Amendment rights to express themselves, subject only to educators' authority to:

14  1.) suppress vulgar, lewd, obscene and plainly offensive speech, 2). impose

15  limitations on school-sponsored speech that are reasonably related to legitimate

16  pedagogical purposes, and 3.) limit speech that materially disrupts classwork.[36]

17

18  _____

19  [34]  Superintendent Horne's Finding is dated December 30, 2010, the day before
20  HB 2281 went into effect. Ex. B, p.10. There is no evidence that any materials cited in
   his Finding were used after December 31, 2010, nor where, when and how they may
   have been used.
21  [35]  Ct. Doc. 142, p.9.  Contrary to Superintendent Huppenthal's statement, the
22  quoted text did not deliberately omit anything. Rather the Horne Finding quotes the
   following text, "Gutierrez attacked the gringo establishment angrily at a press
23  conference and called upon Chicanos to 'kill the gringo,' **which meant to end white
   control over Mexicans.**" Ct. Doc. 84-2, p.7, (emphasis added).  (The glaring omission
24  is Superintendent Huppenthal's failure to include the text book's interpretation of the
25  statement.) Since there is no evidence that this quote was ever presented to students,
   and if so, how and in what context, Superintendent Huppenthal has no basis for his
26  claim that this was used in the MAS program or that Mr. Gutierrez was held up as a
27  "role model."
   [36]  *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675 (1986); *Hazelwood Sch. Dist. v.*
28  *Kuhlmeier,* 484 U.S. 260 (1988); *Tinker v. Des Moines Indep. Comm. Sch.,* 393 U.S.

Despite the paramount authority granted to state and local officials to provide for public education, "it is [also] beyond dispute that schools and school boards must operate within the confines of the First Amendment."[37] Justice Blackmun cautions that, while the "unique environment" of schools substantially limits the extent to which First Amendment values restrict official decisions, that unique environment "also makes it particularly important that *some* limits be imposed."[38] Most importantly, the State may not operate schools in such a manner as to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion" or as "enclaves of totalitarianism"[39] in the guise of a "curricular" decision.

The students' right to receive speech was recognized by a plurality of the Supreme Court in *Pico*[40] and by the Ninth Circuit in *Johnson v. Stuart*,[41] and *Monteiro v. Tempe Union High School Dist.*[42] In the context of a school curriculum, this right rests on two First Amendment principles.[43] First, is that the right to receive information is an inherent corollary of the rights of free speech

---

503 (1969); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992),

[37] *Bd. of Ed. Island Trees v. Pico*, 457 U.S. 853, 876 (Blackmun, J., concurring); *see also West Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 637-38 (1943); *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1027 (9th Cir. 1998); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (state may not forbid teaching foreign language in public and private schools); *Epperson v. Arkansas*, 393 U.S. 97 (1968) (state may not prohibit the teaching of evolution); *cf. Citizens United v. Fed. Election Comm'n.*, 130 S.Ct. 876, 911 (2010) ("Where Congress finds that a problem exists, we must give that finding due deference; but Congress may not choose an unconstitutional remedy.")

[38] *Pico*, 457 U.S. at 879 (Blackmun, J., concurring) (emphasis in original).

[39] *West Va. Bd. of Ed.*, 319 U.S. at 642; *Tinker*, 393 U.S. at 510.

[40] 457 U.S. 853 (1982).

[41] 702 F.2d 193 (9th Cir. 1983)

[42] 158 F.3d at 1027, fn.5; *cf. Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002) (in the context of a doctor-patient relationship, "[i]t is *well established* that the right to hear–the right to receive information–is no less protected by the First Amendment than the right to speak.") (Kozinski, J., concurring) (emphasis added).

[43] *Monteiro*, 158 F.3d at 1027, fn.5.

-13-

and press.[44] Under this theory, there must be a speaker who is willing to convey the information.[45] Second, and "[m]ore importantly, the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom."[46] At issue is "the students' rights to receive a broad range of information so that they can freely form their own thoughts."[47] This second theory focuses on the students' own development and does not depend upon the reciprocal relationship between speaker and recipient.[48] The critical function of this right in the classroom setting is to guide the Nation's future by developing "leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'"[49]

A narrow view of the students' right to receive does not place an affirmative obligation on the state to provide students with information or ideas or allow students to demand a certain course of study and the plaintiffs here make no such claim. Rather, it prohibits the State from denying access to an idea "simply because state officials disapprove of that idea for partisan or political reasons."[50] The crucial distinction is "the State's decision to single out an idea for disapproval

---

[44] *Ibid.*

[45] *Stuart*, 702 F.2d at 195.  In *Stuart*, where the issue concerned students' right to prove that particular text books either were not submitted or were rejected in compliance with the statute, the books were found to be "willing speakers."

[46] *Pico*, 457 U.S. at 867, (emphasis in original).

[47] *Monteiro*, 158 F.3d at 1027, fn.5.

[48] Even if the plaintiffs' right to receive information and ideas depends on the existence of a willing speaker, the text books used in MAS classes are "willing speakers."  *See Stuart*, 702 F.2d at 195; Court Order re Motions: To Dismiss and For a Preliminary Injunction, Ct. Doc. No. 138, p.13.

[49] *Monteiro*, 158 F.3d at 1027, fn.5, citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

[50] *Pico*, 457 U.S. at 879 (Blackmun, J., concurring).

-14-

and then deny access to it."[51] The Constitution "does not permit the official suppression of *ideas*."[52] That is what has happened here: Superintendent Huppenthal is suppressing the ideas that flow from the study of literature, art, history and government from a Mexican American perspective.

The balance between a state's authority to prescribe curriculum and a student's right to receive ideas and information is a careful one. The state may determine what is suitable for study in public schools, the teaching methods to be employed and educational tools to be used.[53] These choices do not "run afoul of the First Amendment."[54] Moreover, "[t]hese decisions may properly reflect local community views and values as to educational content and methodology."[55]

But the right to prescribe curriculum is not totally unfettered.[56] When exercising its vast authority in the area of education, the State may not act in a manner that violates students' rights to Free Speech[57] and Equal Protection,[58] enforce vague laws in violation of their right to procedural Due Process,[59] or

---

[51]  *Ibid.*
[52]  *Pico,* 457 U.S. at 870-71, (emphasis in original).  This point was "cheerfully" conceded by the dissent.  457 U.S. at 907 (Rehnquist, J., dissenting).
[53]  *Pratt v. Indep. Sch. Dist. No. 831,* 670 F.2d 771, 775 (8th Cir. 1982) (citation omitted).
[54]  *Pico,* 457 U.S. at 879 (Blackmun, J., concurring).
[55]  *Pratt,* 670 F.2d at 775, citing *James v. Bd. of Ed. Of Central Dist. No. 1,* 461 F.2d 566, 573 (2nd Cir. 1972), cert. denied 409 U.S. 947 (1973).
[56]  *Pratt,* 670 F.2d at 776 (citations omitted); *Loewen v. Turnipseed,* 488 F.Supp. 1138 (N.D. Miss. 1980) (state's rejection of a textbook with the intent to perpetuate ideas of segregation and discrimination violate Equal Protection);  *see also* "The Many Faces of Government Speech," Randall P. Bezanson and William G. Buss, 86 *Iowa L. Rev.* 1377, 1421 (2001), ("Education is not criticized or challenged on legal grounds because it has a message but, rather, because the government has exceeded its authority-in effect, that what the government is doing with its educational institutions is *not* educating.")
[57]  *Pico,* 457 U.S. 853.
[58]  *Brown v. Bd. of Ed.,* 347 U.S. 483.
[59]  *Stephenson v. Davenport Comm. Sch. Dist.,* 110 F.3d 1303 (8th Cir. 1997).

1  violate the students' rights to substantive Due Process.[60] Even where the state

2  engages in state speech, a student may claim a violation of the right to receive

3  ideas where the decision "was motivated by 'narrowly partisan or political'

4  considerations."[61] Where decisions that are purportedly curricular in nature

5  threaten to restrict students' First Amendment rights, the State must demonstrate

6  that its action is reasonably related to a viewpoint neutral legitimate pedagogical

7  concern and that the legitimate concern is the true motive for the decision.[62]  The

8  official suppression  of ideas can never be a legitimate pedagogical concern.[63]

9  HB 2281 and Superintendent Huppenthal's enforcement have chilled student

10  speech and directly restricted their access to ideas in violation of the First

11

12  _____

13  [60]  *Meyer v. Nebraska,* 262 U.S. 390 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925).

14  [61]  In *Chiras v. Miller,* the student plaintiff failed to allege that the State's decision not to adopt a particular textbook "was motivated by 'narrowly partisan or political'

15  considerations," but the court indicated that such allegations could form a claim of First Amendment violation, despite characterizing the selection of textbooks as "state

16  speech."  432 F.3d 606, 620 (5th Cir. 2005).

17  [62]  *Hazelwood,* 484 U.S. 260; *Downs v. LAUSD,* 228 F.3d 1003, 1010 (9th Cir. 2000); *Pratt,* 670 F.2d at 779 (court rejected school board's proffered reason for

18  banning film); *McCarthy v. Fletcher,* 207 Cal. App.3d 130, 147 (Ct. App. 1989) (A legitimate pedagogical purpose motivating a school board's decision to exclude a book

19  cannot be satisfied merely by expressing some educational reason. "[T]he true motives

20  of the school board members must be examined to answer a First Amendment challenge."); *cf. Pico,* 457 U.S. at 871 (whether removal of books from school library

21  denied students' First Amendment rights depends upon the motivation of the officials'

22  actions.)  The Ninth Circuit in *Downs* distinguished the state speech at issue from the situation where students speak within the curriculum, as in *Hazelwood.*  228 F.3d at

23  1012.  Contrary to Superintendent Huppenthal's contention, *Hazelwood* does not

24  negate the students' right to Free Expression in the classroom.  Ct. Doc. No. 150, p.12. To the extent that the students are required to participate in classroom discussions and

25  express themselves in written work, the State cannot suppress that speech unless the limitation is reasonably related to a legitimate pedagogical concern.

26  [63]  *See Peck v. Baldwinsville Cent. Sch. Dist.,* 426 F.3d 617, 623 (2nd Cir. 2005), cert. denied, *Baldwinsville Cent. Sch. Dist. v. Peck,* 547 U.S. 1097 (2006) ("a manifestly

27  viewpoint discriminatory restriction on school-sponsored speech is, *prima facie*

28  unconstitutional, ***even if*** reasonably related to legitimate pedagogical interests.")

-16-

Amendment.[64]

## V.   HB 2281 IS OVERBROAD AND BURDENS STUDENTS' FIRST AMENDMENT RIGHTS.

Superintendent Huppenthal's efforts to use HB 2281 to cleanse the former MAS classrooms of the viewpoints he dislikes has had its intended chilling effect on students' speech. HB 2281 is so broadly written that it chills the speech of students not before the Court.[65] As a result, the Court should invalidate HB 2281 as overbroad because a substantial number of its applications are unconstitutional, judged in relation to HB 2281's negligible legitimate sweep.[66]

In determining whether a substantial amount of HB 2281's applications chill student speech, the Court "should evaluate the ambiguous as well as the

---

[64]   None of the cases relied upon by Superintendent Huppenthal address the situation where the state has singled out an idea for disapproval and then denied access to it. *Griswold v. Driscoll,* 625 F.Supp.2d 49 (D. Mass. 2009), involved the proper exercise of state authority to include reference to the Armenian genocide at the hands of the Turks in an *advisory* curriculum guide, but not citations to sources denying the existence of such a genocide. There was no mandatory curriculum, local school boards had discretion whether to adopt the guide and no teacher was "prohibited from teaching as he wishe[d]" about the issue. *Ibid.,* 625 F.Supp.2d at 60.  The plaintiffs agree with the cited statements in *Seyfried v. Walton,* 668 F.2d 214, 216 (3rd Cir. 1981), that students have no First Amendment right to study a particular aspect or period of history and that courts "traditionally" have left the process of curriculum selection to the expertise of educators. Yet, Judge Rosenn concurred separately to emphasize that school administrators' discretion "is not unfettered and that courts have a duty to vindicate the  complementary constitutional rights of students to hear more than one point of view." *Ibid.,* 668 F.2d at 217, (Rosenn, J., concurring). He also noted cases upholding the removal of books from a school library *"when the discussion of the subject matter covered by the books was also not proscribed."* *Ibid.,* 668 F.2d at 219. Contrary to Superintendent Huppenthal's contention, the Ninth Circuit in *Downs* did not reject "the argument that students have a constitutionally protected right to pursue the course of study they choose."  Ct. Doc. No. 151, p.9, citing 228 F.3d at 1015. *Downs* did not involve student speech, but teacher speech.
[65]   *See Forsyth v. Nationalist Movement,* 505 U.S. 123, 129 (1992)(citations omitted).
[66]   *See U.S. v. Stevens,* 130 S.Ct. 1577, 1587 (2010).

1   unambiguous scope of the [statute]."[67] Thus, the vagueness of HB 2281

2   necessarily affects its overbreadth because "ambiguous meanings cause citizens

3   to 'steer far wider of the unlawful zone'. . .than if the boundaries of the forbidden

4   areas were clearly marked."[68]

5          HB 2281 is fatally flawed because neither the statute, nor Superintendent

6   Huppenthal has provided any semblance of clarity with regard to what can and

7   cannot take place in the classroom.[69] Superintendent Huppenthal found students'

8   poems explaining their Mexican American self-identities to be prohibited, but

9   never explained why. Also unknown is why he found student essays criticizing the

10  effects of Arizona's policies on the students' lives and communities in violation of

11  HB 2281.[70]  Superintendent Huppenthal went so far as to find student artwork

12  which depicted the Arizona flag and replaced the center star with a swastika to be

13  illegal.[71]  Apparently, HB 2281 also bans classroom discussions about

14  oppression. Superintendent Huppenthal testified that, during his 2010 visit to an

15  MAS classroom, he was concerned by the students' classroom discussion of

16  oppression and believed that this "model in literature of oppression and always

17  being in the context of a white Caucasian power structure and an Hispanic – an

18  oppression of Hispanics" is a "direct violation of the statute."[72]

19          This is all core First Amendment student speech. By using students'

20

---

21          [67]  *Village of Hoffman Estates,* 455 U.S. 489, 494, fn.6 (1982).

22          [68]  *Ibid.*

23          [69]  *NAACP v. City of Richmond,* 743 F.2d 1346, 1358 (9th Cir. 1984) (overbroad
     statute provides "no core of easily identifiable and constitutionally proscribable conduct
     that the statute prohibits.")

24          [70]  Ex. V. Superintendent Huppenthal offered this student classwork into evidence

25   to prove a violation of the statute without identifying whether it was created after HB
     2281's effective date, which section of the statute it allegedly violates and how these

26   student works violate the statute.  ALJ Kowal also failed to make these findings.

27          [71]  Ex. W.  The plaintiffs will hereinafter refer to this as the "Arizona swastika
     flag."

28          [72]  Ex. CC, pp.39:l.17 to 42:5.

classroom discussions and course work in the administrative hearing in such a non-neutral manner, Superintendent Huppenthal has taken extraordinary action to suppress their viewpoints.

Emboldened by his success in suppressing students' viewpoints, he has now ordered compliance monitors to dissect student classroom speech and written works and pronounce whether the class is in compliance or not.[73] They are well aware of the pressure on their teachers, under threat of discipline, to present lessons in a manner that will not be judged out of compliance, but without knowing where is that line.[74] The students, too, must guess at what they are allowed to say in their classes and course work that will be scrutinized by compliance monitors.[75]

HB 2281 is overbroad for two reasons. First, "there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits."[76] And second, the unfettered discretion "raises the specter of administrative censorship."[77] These principles required the invalidation of a statute mandating application for a parade permit twenty days before the parade and giving the chief of police unlimited discretion to grant a waiver of the requirement. Such discretion provides officials with the power to discriminate and creates the possibility of "selective enforcement on the basis of the content of speech."[78] The court reasoned that these dangers are especially great in the context of a parade

---

[73]  PSOF 127, 128; Ex. R.
[74]  PSOF 124, 175.
[75]  PSOF 155-60.  Perhaps before Superintendent Huppenthal initiated enforcement action against MAS he could have argued in good faith that "§15-112 does not apply to student speech at all."  See Ct. Doc. No. 150, pp.13, 15-16, 20, 23, 26. However, in light of his specific and repeated targeting of student speech, his contention is not credible.
[76]  *NAACP v. City of Richmond*, 743 F.2d at 1358.
[77]  *Ibid.*
[78]  *Ibid.*, 743 F.2d at 1357, citing *Cox v. Louisiana*, 379 U.S. 536 (1965).

-19-

1  permit scheme, where waivers are often sought for politically controversial

2  causes, as demonstrated by the fact that the police chief refused to grant a

3  waiver to the NAACP, which had applied for the permit to protest the killing of a

4  man while in police custody.  HB 2281 similarly allows for selective enforcement

5  to stifle politically controversial speech. However, in this case, there exists more

6  than a "possibility" of selective enforcement. It has happened and is a certainty.

7      The  dangers of official censorship by means of an overbroad statute are

8  particularly acute in this case of classroom learning that so clearly demonstrates

9  why "[u]nfettered discretion to license speech cannot be left to administrative

10  bodies."[79] "It is precisely when 'political and social pressures' are most likely to

11  affect decision making that objective standards to govern discretion are most

12  essential."[80] This current oppressive, viewpoint discriminatory classroom

13  atmosphere, created and fostered by the overbreadth of HB 2281, is an affront to

14  the ideals of American public education.  HB 2281 chills a substantial amount of

15  student speech and must be struck down.

16  **VI.  HB 2281, UPON WHICH THE ACTIONS OF SUPERINTENDENT HUPPENTHAL AND TUSD ARE BASED, IS VOID FOR VAGUENESS,**

17  **BOTH ON ITS FACE AND IN ITS APPLICATION.**

18      HB 2281 is a statute that is unconstitutionally vague on its face and proven

19  to be unconstitutionally vague in its application. With its roots in the Due Process

20  clause of the Fourteenth Amendment, the vagueness doctrine rests upon the

21  notion of "fair notice or warning."[81] It also requires legislatures to set reasonably

22  clear guidelines for government officials to prevent "arbitrary and discriminatory

23  enforcement."[82] In this instance, the fundamental unfairness of the statute is fully

24  manifest in the lack of clear and determinate standards in the wording of the

25

26      [79]  *Ibid.*

27      [80]  *Ibid.*

      [81]  *Smith v. Goguen*, 415 U.S. 566, 572 (1974).

28      [82]  *Ibid.,* 415 U.S. at 573.

statute. The absence of clarity and the indeterminacy are compounded by and have directly led to the incoherent, confused and obscure manner in which both defendant Huppenthal and TUSD have applied and continue to apply the statute.[83]

### A.   HB 2281 Is Unconstitutionally Vague On Its Face.

HB 2281 is susceptible to a facial challenge for vagueness because it touches upon expressive conduct and access to learning by students that is protected by the First Amendment.[84]  Because HB 2281 reaches speech protected by the First Amendment, the Court must apply the vagueness test more stringently.[85] In this case, HB 2281 is facially void for vagueness even absent the heightened scrutiny that accompanies First Amendment rights.[86]

Touching upon constitutional rights and related interests in such a direct manner requires that HB 2281 must mark clear regulatory directives that are not susceptible of running afoul of constitutional limitations. The statute, however, does not. Rather, it is unconstitutionally vague on its face and should be invalidated for any one of the following three reasons: "(1) to avoid punishing

---

[83] ALJ Kowal refused to rule on TUSD's vagueness claim raised in its Notice of Administrative Appeal. Ex. H. Rather, he assumed the statute's constitutionality and concluded that "A.R.S. §15-112 has not been shown to have been declared unconstitutional by any court and the law must be given effect by this Tribunal." Ex. I, p.36, ¶19.  Despite refusing to rule on TUSD's vagueness claim, ALJ Kowal did make a Conclusion of Law that because MAS was the only ethnic studies program about which the ADE received complaints, "there was no credible evidence that showed that A.R.S. §15-112 is being enforced in an arbitrary or discriminatory manner." *Ibid.*,  p.36, ¶18.

[84] The Court's first task is to determine whether the statute reaches a substantial amount of protected conduct. *Village of Hoffman Estates,* 455 U.S. at 494.

[85] *Cal. Teachers Assoc. v. St. Bd. of Ed.*, 271 F.3d 1141, 1149 (9th Cir. 2001).

[86] The Supreme Court has considered claims that laws regulating economic and professional activity are vague, even where there is no criminal enforcement and no First Amendment rights affected. See *Village of Hoffman Estates,* 455 U.S. at 497-505; *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 48-49 (1966); *Barsky v. Bd. of Regents*, 347 U.S. 442, 443, 448 (1954); *Neblett v. Carpenter,* 305 U.S. 297, 302-03 (1938); *A.B. Small Co. v. Am. Sugar Refining Co.*, 267 U.S. 233, 239 (1925).

1    people for behavior that they could not have known was illegal; (2) to avoid

2    subjective enforcement of the laws based on 'arbitrary and discriminatory

3    enforcement' by government officers; and (3) to avoid any chilling effect on the

4    exercise of First Amendment freedoms,"[87] each of which demonstrate that HB

5    2281 is fundamentally flawed, leaving students and teachers alike, to cope with

6    its confusing and indeterminate prohibitions.[88]

7            **1.**      **HB 2281 Does Not Clearly Delineate The Speech Or Conduct That It Proscribes.**

8

9        The most glaring constitutional infirmity presented by HB 2281 is that it

10    does not provide a person of ordinary intelligence with fair notice of what speech,

11    conduct, expression, lessons, text books or classroom assignments constitute

     courses or classes are in violation of the statute.[89] Without specifying the

12    statutory proscriptions with clarity, HB 2281 violates the requirement of the Due

13    Process clause to preserve the right to "fair notice or warning."[90] HB 2281

14

15

16         [87]   *Foti v. Larsen,*146 F.3d 629, 638 (9th Cir. 1998), citing *Grayned v. City of Rockford*, 408 U.S. 104,108-09 (1998).

17       [88]   Although courts have expressed greater tolerance of vagueness in civil statutes than criminal because the consequences of a criminal statute are usually more

18    severe, *see Village of Hoffman Estates,* 455 U.S. at 498, the consequence here to the students is much more severe than a civil fine levied on a business. First this particular

19    penalty is equal to ten percent of TUSD's annual budget, or $15 million, and would affect more than 50,000 students and many thousands of employees. More importantly,

20    the real penalty here is the students' loss of their classes. This loss can never be recovered. Coming from the state official responsible for public education in Arizona, his

21    trivialization of the students' loss as "merely a reduction in state aid" is remarkable. Ct.

22    Doc. No. 150, p.17. Beyond the loss of their classes, they now find their First Amendment rights to expression and the right to receive information saddled by

23    classroom compliance monitoring and inspection of their written work. In light of these strong liberty interests, HB 2281 deserves the highest scrutiny for vagueness.

24       [89]   *See U.S. v. Williams,* 553 U.S. at 304 (citations omitted).

25       [90]   *Goguen*, 415 U.S. at 572 (citations omitted); *see also Connally v. General*

26    *Construction Co.,* 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires

27    the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due

28    process of law.") (citations omitted).

1   contains no definitions, no terms with settled legal meanings and no narrowing

2   context.[91]

3        Although the Court must construe a statute as it has been interpreted by

4   state courts, HB 2281 has not been addressed by any Arizona court.[92] Where

5   there is no prior judicial explanation or previous application for guidance, the

6   Court is left with "nothing more than the undefined language of the [statute]

7   itself."[93]

8        The weakness in Superintendent Huppenthal's Response/Cross Motion is

9   much like that of the Kowal/Huppenthal Decision, where he found TUSD in

10  violation of subsections 112(A)(2), (3) and (4) by pointing to the entire body of

11  evidence *en masse*, without defining what the statutory terms mean, without

12  specifying what evidence was found to violate each particular subsection, without

13  determining whether any of the excerpts from text books and other materials

14  were actually used in MAS classes after the statute's effective date and, most

15  importantly, without explaining how he believes the evidence violates the statute.

16  Here Superintendent Huppenthal provides a dictionary definition of the statute's

17  operative words and declares that the nature of what the statute prohibits in

18  courses or classes is clear.

19       He also relies upon the interpretation that he has consistently advanced to

20  this Court, that HB 2281 does not prohibit students and teachers from saying

21  anything "[b]ecause the statute plainly does not prohibit "discussions...."[94] But, as

22

23

---

24       [91] *Cf. Holder v. Humanitarian Law Project,* 130 S.Ct. 2705, 2728 (2010)

25  (Congress added clarity to the statute by providing narrowing definitions of terms and
    explaining when a violation of the statute occurs.)

26       [92] *Nunez v. City of San Diego*, 114 F.3d 935, 941 (9th Cir. 1997) and see Ex. 9,

27  pp.11-19.
         [93] *Stephenson,* 110 F.3d at 1309.

28       [94] Ct. Doc. No. 150, p.21.

-23-

demonstrated above,[95] while enforcing HB 2281, Superintendent Huppenthal has consistently pointed to what students say in the classroom and in their class work as evidence of statutory violations and has even characterized a class discussion of oppression to be a "direct violation of the statute."[96] Current compliance monitoring of MAS classes includes scrutiny of the students' words spoken in class and on paper.[97] Superintendent Huppenthal has never explained his contradictory positions taken in the federal and state actions.

HB 2281's application to classroom speech is clear from subsection 112(E)(4), which provides an exception for "[c]ourses or classes that include the *discussion* of controversial aspects of history."[98] It is abundantly clear that the statutory exception for the "discussion" of controversial aspects of history is necessary precisely because subsection 112(A) applies to class room discussions. Superintendent Huppenthal's assertion here that HB 2281 does not prohibit any student speech should not be credited.[99]

_____

[95] See Part V, *supra*.
[96] Ex. CC, pp.39:l.17 to 42:5.
[97] Ex. R.
[98] A.R.S. §15-112(E)(4) (emphasis added).
[99] Superintendent Huppenthal has gone so far as to use information about student work obtained in this action in an attempt to bolster his position in the ALJ hearing. In that hearing, Superintendent Huppenthal introduced student class work, including the Arizona swastika flag, which was in the form of a photo taken outside of a class room. When former plaintiff and teacher Sara Rusk recognized the poster as one she displayed outside of her classroom in the spring of 2011, she supplemented her Response to Superintendent Huppenthal's Motion to Dismiss before this Court with a Declaration identifying the art work and describing the chilling effect of its introduction into evidence in the ALJ hearing. Ct. Doc. No. 128-4. Superintendent Huppenthal, who had been unable to show that any of the student work introduced was created after the statute's effective date (and also unable to prove that any of the texts introduced were presented to students after the effective date) introduced Ms. Rusk's Declaration from this action in the ALJ hearing in order to link the Arizona swastika flag to the operative time period. As the only piece of evidence linked to the spring 2011 semester, it appears that Superintendent Huppenthal's entire case against the MAS program could rest on the Arizona swastika flag.

The unfairness of applying undefined prohibitions in classrooms is not that teachers and students are required to "conform [their] conduct to an imprecise but comprehensible normative standard, but rather that no standard of conduct is specified at all. Such a provision simply has no core. This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause"[100]

The Eighth Circuit explored this fairness aspect of a facial vagueness claim in the school setting and struck down a school district regulation that outlawed "gang related activities such as a display of 'colors,' symbols, signals, signs, etc.,"[101] In that case, an honor roll student with no history of disciplinary problems had a tatto of a small cross between her thumb and forefinger. She had never been accused of or perceived to be involved in any type of gang activity and there was no evidence that any students perceived her tattoo to be gang-related. Nevertheless, a counselor who saw the tattoo considered it to be a gang sign, as did a police officer who saw a drawing of it.[102]  Under threat of expulsion, the student acquiesced to the demand of the school district and had the tattoo removed. In her subsequent action pursuant to §1983, the court struck down the regulation as vague and pointed to the regulation's "failure to define the pivotal term."[103] HB 2281's pivotal terms are likewise undefined.

The regulation at issue in *Stephenson* was also flawed because there was no requirement that other students consider the symbol to be gang-related before disciplinary action is taken.[104] Thus, the student plaintiff underwent medical treatment, incurred expense, and suffered physical injury, "solely on the basis of

---

[100] *Goguen,* 415 U.S. at 578.
[101] *Stephenson*, 110 F.3d at 1305.
[102] *Ibid.*, 110 F.3d at 1305.
[103] *Ibid.*, 110 F.3d at 1310.
[104] *Ibid.*

the subjective opinions of school administrators and local police" who had no

evidence that she was involved in gang activity.[105] The same is true here where

Superintendent Huppenthal points to text book excerpts and concludes that they

promote resentment  without any evidence that such resentment in students

actually occurred or even was likely to occur. Furthermore, HB 2281 is so vague

that Superintendent Huppenthal need not identify which excerpts he believes

promote resentment, nor establish whether they were ever used in any

classroom, how they were used or precisely *how* the item allegedly causes

resentment or, in the case of student work, how he identifies the alleged resulting

resentment. To illustrate, HB 2281 is vague enough to allow Superintendent

Huppenthal to use the following excerpt from a student's poem to evidence an

unnamed violation of HB 2281 and to eliminate this student's classes:

> I am a strong beautiful motivated Chicana
> I wonder if our community will ever get better
> I hear violent (sic) all over the world
> I see people get beat up on t.v.
> I want our community to get better
> I am a strong beautiful motivated Chicana.[106]

Why did Superintendent Huppenthal believe that this student's poem required

that her classes end?  He has never explained this because HB 2281 did not

require him to do so. HB 2281 is unconstitutionally vague because it fails to

define any of its pivotal terms and requires no more than the presentation of

student work and a declaration of violation.[107]

---

[105] *Ibid.*, 110 F.3d at 1310-11.

[106] Ex. V.

[107] The cases relied upon by Superintendent Huppenthal are inapposite.  The fact that the Supreme Court in *McConnell v. FEC*, 540 U.S. 93, 170 (2003), found that "public communications" "that *promote* or attack a candidate for federal office" was sufficiently clear to avoid a vagueness challenge, has no relation to whether a court would find that a prohibition of classes or courses that *"promote resentment* toward a race or class of people" provides sufficient notice of precisely what is prohibited. In *Tucson Women's Clinic*, the Ninth Circuit struck down this type of subjective assessment in the context of an Arizona regulation requiring that abortion providers

2.   **HB 2281 Allows The Superintendent To Arbitrarily And Discriminatorily Enforce The Statute.**

The legislature's failure to define any of the terms used in HB 2281's prohibitions leads directly to the second reason that the statute is vague: Neither the prohibitions contained in subsection 112(A) nor the enforcement provisions of subsection 112(B) have any guidelines for the Superintendent of Public Instruction in order to prevent arbitrary and discriminatory enforcement.[108]  In fact, the absence of any ascertainable standard for inclusion or exclusion makes HB 2281 "particularly objectionable in view of the unfettered latitude" granted to the Superintendent.[109] This is "the most meaningful aspect of the vagueness doctrine."[110] Although Superintendent Huppenthal argues that his enforcement against the MAS program was not arbitrary or capricious,[111] he does not and cannot point to any sections of HB 2281 that provide constitutionally sufficient guidelines and standards for enforcement.

In a case raising constitutional concerns similar to the instant case, the Ninth Circuit upheld a facial challenge to an ordinance that was specifically crafted in response to the City of Menlo Park's desire to eliminate the long-standing picketing activities of two individuals in front of a Planned Parenthood clinic.[112] The picketers' facial challenge alleged that "any enforcement of the

---

treat patients with "consideration, respect, and full recognition of the patient's dignity and individuality." However, Superintendent Huppenthal's characterization of the statute at issue in that case as merely requiring doctors to *inform* patients that they have certain rights is incomplete. Rather, the vagueness found was in the requirement that doctors "*afford*" patients the right "to be treated with consideration, respect, and full recognition of the patient's dignity and individuality."

[108]  *Goguen*, 415 U.S. at 572-73.
[109]  *Ibid.*, 415 U.S. at 578.
[110]  *Goguen*, 415 U.S. at 574.
[111]  Ct. Doc. No. 150, p.14, n.4.
[112]  *Foti*, 146 F.3d at 634.

ordinance creates an unacceptable risk of the suppression of ideas."[113]  Menlo Park's ban was struck down because it failed to give police officers sufficient guidelines for enforcement, creating the danger that an officer might enforce the ordinance only against those displaying "messages the officer or the public dislikes."[114]  This was especially likely in view of the fact that Menlo Park "obviously adopted the ordinance to specifically target Foti and Larsens's activities."[115]  The facts of *Foti* bear strikingly resemblance to the facts here, where HB 2281 was specifically designed to target TUSD's MAS program.

The Constitution prohibits laws like HB 2281 that impose penalties under a standard so indefinite, that the State Superintendent is free to react to nothing more than his own personal preferences against learning about history, government,  literature or art from a Mexican American perspective.[116] HB 2281 is so standardless that it "encourages seriously discriminatory enforcement" in violation of the plaintiffs' right to Due Process thus mandating its invalidation.[117]

### 3.   Subsections (E) and (F) Do Not Narrow the Scope of Subsection (A).

In the Kowal/Huppenthal Decision, Superintendent Huppenthal explained his understanding of the operation of subsection 112(F)'s exception for the instruction of "the historical oppression of a particular group of people based on ethnicity."

> "A.R.S. §15-112(F) permits the historical (objective) instruction of oppression that may, as a natural but unintended consequence, result in racial resentment or ethnic solidarity.  However, teaching oppression objectively is quite different than actively presenting material in a biased, political, and emotionally charged manner, which is what occurred in MAS

---

[113] *Ibid.*, 146 F.3d at 635.

[114] *Ibid.*, 146 F.3d at 639.

[115] *Ibid.*

[116] See *Goguen*, 415 U.S. at 568-69, 578, (flag-misuse statute subjects individuals "to criminal liability under a standard so indefinite that police, court and jury were free to react to nothing more than their own preferences for treatment of the flag.")

[117] *Holder*, 130 S.Ct. at 2718.

classes.  Teaching in such a manner promotes social or political activism against the white people, promotes racial resentment, and advocates ethnic solidarity, instead of treating pupils as individuals."[118]

This represents Superintendent Huppenthal's attempt, for the first time, to insert entirely new language into the statute based on his interpretation of the word "historical." Prior to the Kowal/Huppenthal Decision, neither he, nor Superintendent Horne referred to any agency interpretations. He cites to no legislative history or other authority that might allow for such a generous addition to subsection (F).  The Court should give it no weight.

The exceptions at subsection (E)(4) for "the discussion of controversial aspects of history" and (F) for "the historical oppression" of a particular ethnic group are meaningless. With the volumes of documents presented in the administrative hearing, Superintendent Huppenthal did not find *one* instance where material was covered by the exceptions. The exceptions serve no narrowing function to save HB 2281 from vagueness.

**B.    The Statute Is Unconstitutionally Vague As Applied By Superintendent Huppenthal And By TUSD.**

The above bases for finding HB 2281 to be unconstitutionally vague on its face become magnified upon examination of the manner in which the statute has been enforced. Even if not unconstitutionally vague on its face, and it is, the statute has been applied by Superintendent Huppenthal and the TUSD administration with a level of vagueness and indeterminacy that tests credulity.[119]

---

[118] Ex. I, p.35, ¶10.  Superintendent Huppenthal here demonstrates the value of ethnic studies courses.  It should come as no surprise that a view of the historic oppression of Mexican Americans from the perspective of the people who lived it is less clinical and detached than one might expect to find in traditional text books.  To fault the MAS program for not presenting that unique perspective in a sufficiently sanitized form entirely misses the point of learning about that perspective in the first place.

[119] The Court has ruled against Superintendent Huppenthal's argument that the plaintiffs do not have standing to make their as-applied challenge.  Ct. Doc. No. 138. The students have lost their classes and are subject to compliance monitoring specifically aimed at them. HB 2281 has been applied to them. As for his tautological

1.   **Superintendent Huppenthal's Finding and Administrative Decision Do Not Clearly Delineate The Speech Or Conduct That Is Proscribed.**

The vagueness of HB 2281 is doubled in its application. Not only must the plaintiffs guess as to what constitutes a violation of HB 2281, they must also guess as to what Superintendent Huppenthal thinks constitutes a violation of HB 2281. Nowhere in his Finding or in the Kowal/Huppenthal Decision does Superintendent Huppenthal define what the statutory terms mean and how any cited conduct or speech violates them. In his Finding, Superintendent Huppenthal makes conclusory allegations about a few excerpted passages from texts to conclude that the MAS program violates A.R.S. §§15-112(A)(2), (3), and (4).[120] Similarly, in the Kowal/Huppenthal Decision, Superintendent Huppenthal cites to excerpts from text books, lessons developed by MAS teachers, and items of student work, but never identifies what specific statutory provisions he believes that they violate and how he believes that those items violated the statute.[121]

As a Finding of Fact, Superintendent Huppenthal merely states that "[t]estimonial evidence presented at the hearing, in conjunction with excerpts from texts, curriculum, assessments and student work, demonstrates that MAS classes cause students to develop a sense of racial resentment toward the 'white oppressor' or 'dominant' group."[122] As a Conclusion of Law, he found that, "[a]lthough the Department did not conduct observations of the MAS classes, the Department's witnesses credibly testified that *given the viewpoints expressed* in certain excerpts from materials used in the MAS program, some of which are cited in the above Findings of Fact, *there is no way to use the materials*

---

claim that HB 2281 is clear enough to determine that "the MAS program clearly violates the Act," Ct. Doc. No. 151, p.27, the plaintiffs disagree for the reasons cited herein.
[120]   Ex. D.
[121]   Ex. I, pp.13-33.
[122]   Ex. I, p.14, ¶76.

*without being in violation of the law."*[123] Further, he conclusorily states: "The examples of the MAS program cited in the above Findings of Fact, as well as the weight of the testimony presented, establish that the MAS program has classes or courses designed for Latinos as a group that promotes racial resentment against "Whites," and advocates ethnic solidarity of Latinos."[124]

One example cited in his Findings of Fact is the following excerpt from a student essay:

"All the laws that have been occurring here in Arizona such as SB1070 not only make us wonder what would of happened if the U.S. would of never bought the states from Mexico, but makes us realize that step by step they want to get rid of Mexicans like they did back then."[125]

Superintendent Huppenthal never identifies which subsection he believes this essay violates, and more importantly, *how* it violates the statute.

Another example is the Arizona swastika flag poster.  TUSD Governing Board President Mark Stegeman testified that the artwork "indicated racism to him."[126]  Superintendent Huppenthal believes this student work also violates the statute, but never specifies which subsection and how the work violates the subsection.

These examples illustrate the severity of the vagueness problem.  There is *nothing* in HB 2281, Superintendent Huppenthal's Finding or the Kowal/Huppenthal Decision that communicates to students and teachers what is acceptable in the classroom and what is not.  Now, in the presence of compliance monitors, they are left to guess and to speculate under the threat of discipline, on the part of the teachers, and the loss of millions of dollars in dedicated school

---

[123] Ex. I, p.34, ¶5 (emphasis added).
[124] Ex. I, p.34, ¶7.
[125] Ex. I, p.26, ¶147.
[126] Ex. I, p.28, ¶158.  It is not clear from the document whether Dr. Stegeman interpreted the racism to be on the part of the student or the State.

funding, which would harm the entire community.[127] As for the students, their words and expressions have already been used to eliminate their classes. Now they are expected to go forward under continuing State scrutiny without any greater degree of clarity as to what they can and cannot say in class.

The vagueness of the Kowal/Huppenthal Decision has led TUSD, upon advice of counsel, to remove from MAS classrooms every book mentioned in the Decision.[128] MAS teachers have not been told what they can and cannot teach, yet are threatened with discipline if they violate the Decision.[129] This lack of definiteness has led teachers to avoid teaching anything having to do with Mexican Americans, lending credence to the fear that this was the ultimate goal of HB 2281.[130] These effects of the statute's vagueness necessarily affects the students.

Superintendent Huppenthal's conclusory application of the statute does not provide fair notice of what conduct or speech runs afoul of HB 2281 and therefore violates the Due Process Clause of the Fourteenth Amendment.

**2.    Superintendent Huppenthal Arbitrarily and Discriminatorily Applied HB 2281 Against The MAS Program.**

Superintendent Huppenthal's attempt to cast his enforcement action as

---

[127]  The vagueness of the Kowal/Huppenthal Decision has led to similarly vague directions from TUSD to MAS teachers.  See Ex. O,P.  With regard to the MAS pedagogy, Superintendent Huppenthal quotes from the MAS website "...Working towards the invoking of a ***critical consciousness*** within each and every student ..., Providing and promoting teacher education that is centered within ***Critical Pedagogy, Latino Critical Race Pedagogy, and Authentic Caring***...." Ex. I, pp.13-14, ¶73 (emphasis added).  (He does not explain why or how he believes this violates the statute.)  Yet, when a teacher asked for clarification of what pedagogy could be used, his superior informed him that the pedagogy should promote "***critical thinking***... with student and teacher relationships that emerge from ***authentic caring***," apparently in contradiction to the Kowal/Huppenthal Decision. Ex. P, ¶6 (emphasis added).
[128]  PSOF 120, 122, 143, 176; Ex. N, EE.
[129]  Ibid.
[130]  PSOF 124, 142, 175.

-32-

"based on a vast array of subjective, individualized assessments" falls flat.[131] It is undisputed that HB 2281 was passed for the sole purpose of eliminating the MAS program and that Superintendent Horne believed that two other TUSD ethnic studies programs are in violation of subsection 112(A)(3)'s prohibition against courses designed primarily for pupils of a particular ethnic group.[132] Neither he nor Superintendent Huppenthal have taken any enforcement action against them, despite nearly identical evidence that they seek to improve the academic achievement of the students they target.[133] It is also undisputed that Superintendent Huppenthal has not investigated and **is not considering** investigating any other program.[134] These facts entirely negate Superintendent Huppenthal's attempt to characterize his wielding of his unrestricted enforcement authority as similar to that used by a police officer who must use discretion to decide which drivers to ticket.[135]

The arbitrary and discriminatory nature of Superintendent Huppenthal's enforcement against the MAS program is the most compelling evidence of HB

---

[131] Ct. Doc. No.124, p.12. (Superintendent Huppenthal incorporates by reference his response contained in his Response to Plaintiffs' Motion for Preliminary Injunction.)

[132] See Ct. Doc. No. 113, p.9, text accompanying n.40; Ex. 4, p.1.

[133] Ex. D, p.2. Superintendent Huppenthal finds the MAS program in violation of subsection 112(A)(3) because it strives for the prohibited goal of "an elevated state of Latino academic achievement." Ex. I, p.13, ¶72. Yet he does not enforce the statute against TUSD's African American Studies Dept., which is designed to "improve[] the academic achievement of African American students. See TUSD website, www.tusd.k12.az.us/contents/depart/aastudies/aboutus.asp

[134] Ex. CC, p.13.

[135] See Ct. Doc. No. 124, p.12. Superintendent Huppenthal's reference to the "class of one" theory of classification under the Equal Protection analysis is also inapposite. Subsection 112(A)(3) creates a facial classification, which has been used to discriminate against Mexican Americans. The fact that it has only been used once, does not negate the racial classification. *See Village of Arlington Hts. V. Metro. Housing Development Corp.,* 429 U.S. 252, 266, n.14 (1977) ("A single invidiously discriminatory governmental act... would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions.")

2281's vagueness. From the beginning, Superintendent Huppenthal pursued his own "personal predilections" in enforcing the statute only against the MAS program.[136]  In his hands, HB 2281 is "a convenient tool for [his] 'harsh and discriminatory enforcement... against particular groups deemed to merit [his] displeasure.'"[137]

The clearest proof of discriminatory enforcement is Superintendent Huppenthal's rejection of his own commissioned 120-page Cambium Audit, which found not only that the MAS program did not violate the statute, but that it provided a valuable curriculum with positive outcomes and increased achievement for its students.[138]  After receiving the positive audit report, Superintendent Huppenthal waited six weeks for his staff to review materials before issuing his contrary Finding.[139]  In the Kowal/Huppenthal Decision, Superintendent Huppenthal continued to rely solely on the conclusions of his deputies, based on a selective review of written materials and despite the fact that they never set foot in an MAS classroom, over the first-hand observations of neutral experts.[140]

Superintendent Huppenthal has gone to extraordinary lengths in his attempts to discredit the Cambium audit, including making allegations of interference with classroom observations on the part of the director of the MAS program that are directly contradicted by his own findings of fact and by the Cambium Audit. In a nationally broadcast interview on January 18, 2012, Superintendent Huppenthal made the following unsubstantiated accusation: "...[W]hat happened with the audit was revealing.  So, the founder of the Mexican

---

[136]  *Goguen,* 415 U.S. at 575 (statutory language of such a standardless sweep allows officials to "pursue their personal predilections.");
[137]  *Pappachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972)
[138]  Ct. Doc. No. 85, pp.49, 55.
[139]  Ex. D.
[140]  Ex. I.

Americans – the designer of the Mexican American Studies classes *was able to control when the auditors went into the classes and which classes they went into.*"[141] To the contrary, Superintendent Huppenthal's finding of fact regarding any involvement on the part of the MAS director was limited to telling "the MAS teachers that the auditors were going to make unannounced observations of their classes."[142] Most importantly, the Cambium Audit reported that "[t]he classroom observations and site visitation schedule was neither announced, nor released to TUSD personnel with the goal of obtaining the most reliable data and maintain the integrity of the audit."[143]

Superintendent Huppenthal used the unlimited authority granted to him by HB 2281 to find a violation *without explaining how the program violates the statute*, nor giving any guidance to TUSD as to how, short of complete elimination, the district may remedy any alleged violation.  Superintendent Huppenthal specifically justified these omissions by making the following conclusion of law:

> "...A.R.S. §15-112 *does not require* that the Superintendent of Administrative Law Judge address how the District must come into compliance with the law.  What is required and what has been addressed in this Decision is whether the District violates A.R.S. §15-112(A) (2), (3), or (4)."[144]

The result of this unconstitutionally vague grant of enforcement authority is evident in the drastic measures currently being taken by TUSD to demonstrate compliance. Since Superintendent Huppenthal decreed that "A.R.S. §15-112(A) only requires a finding of at least one class or course to be in violation of the law

---

[141] Ex. DD.

[142] Ex. I, p.10.  Superintendent Huppenthal made his contradictory allegation only twelve days after adopting the Kowal Administrative Decision.  Ex.J, DD.

[143] Ct. Doc. No. 85, p.16.

[144] Ex. I, p.35, ¶16 (emphasis added).  Superintendent Huppenthal has not told TUSD how to come into compliance because he cannot. The terms of the statute are undefined and he is unable to articulate how any administrator would determine whether the MAS program was in compliance.

for A.R.S. §15-112(B) to be applied," TUSD had no option but to eliminate each and every one of the elementary, middle and high school MAS classes.[145] Further, TUSD has required every book cited in Superintendent Huppenthal's Decision to be removed from former MAS classrooms.[146] Former MAS teachers have been told that they cannot instruct students to use MAS perspectives, without defining what are MAS perspectives, and cannot use any lessons or curricula developed for former MAS classes.[147] Superintendent Huppenthal and TUSD have sent compliance monitors into MAS classes.[148] Students have been informed that their work will be collected and examined.[149]

Superintendent Huppenthal has taken full advantage of the unlimited scope of his enforcement authority conferred upon him by HB 2281. The Court should find that his actions violate the plaintiffs' rights to Due Process

### c. Superintendent Huppenthal's Application of HB 2281 Chills Students' Protected Speech.

The final reason that Superintendent Huppenthal's application of HB 2281 is vague relates to the prior two. The statute is vague because its failure to define what is prohibited speech and the unfettered discretion given to the Superintendent inhibits students' exercise of their right to expressive speech in the classroom.[150] The combination of Superintendent Huppenthal's use of his vast authority in such a heavy-handed manner and his decision which offers no guidance to TUSD as to how to come into compliance has directly caused TUSD to go to extremes to avoid even the possibility that Superintendent Huppenthal will withhold school funding. This has led to unprecedented restrictions upon the

---

[145] Ex. I, p.34, ¶4 (emphasis added).
[146] PSOF 153; Ex. N.
[147] PSOF 120-26, 143-144, 172; Ex. O, P.
[148] PSOF 123, 127-28, 174; Ex. R.
[149] PSOF 123, 128, 155; Ex. S.
[150] *See Foti,* 146 F.3d at 638, citing *Grayned,* 408 U.S. at 108-09.

teachers and students in the former MAS classrooms. Under these oppressive circumstances, students reasonably conclude that their classroom speech and course work could negatively impact their teachers and their schools.

Superintendent Huppenthal's conduct in the administrative hearing and his actions in enforcing HB 2281 directly contradict his contention that HB 2281 merely prohibits certain classes and courses and does not prohibit student or teacher speech in any manner.[151] Superintendent Huppenthal has introduced student work into evidence to prove a violation of the statute.[152]  That fact alone demonstrates that HB 2281 reaches student speech.  Unannounced compliance monitoring of MAS classes has already begun. To provide evidence of compliance, TUSD and ADE will collect and examine student work.

Superintendent Huppenthal cannot consistently and repeatedly point to student and teacher speech and expressive conduct as violations of HB 2281 in the administrative forum and then argue to this Court that HB 2281 does not prohibit any type of speech in the classroom.  His actions have chilled student speech and limited their ability to learn from their teachers and texts, rendering his application of HB 2281 vague.

## CONCLUSION

This Court has provided Supertiendent Huppenthal wide latitude to demonstrate how he would exercise the powers granted him in HB 2281. Unfortunately for TUSD's Latino students and educators, that opportunity has proven disastrous. The obligation to provide clarity to HB 2281 was ignored and the unbridled discretion provided in the statue has been abused with no end in sight. Fundamental rights that reflect the core values and principles of our national identity and fabric have been ignored. Wholesale exploitation of one

---

[151] Ct. Doc. No. 150, pp.13, 21.
[152] Ex. I., pp. 26, ¶147; 27, ¶150; 28, ¶158; Ex. 29, 30.

group, Latinos, has occurred.

HB 2281 was contaminated in its conception by  biased office holders who fear and resent educated, articulate Latinos who seek full inclusion in the promise of our country. Contrary to embracing Latinos as an important and integral part of our society, they have been reduced to the status of enemies of the White segment of our population by misguided politicians.

Superintendent Huppenthal has proven unwilling to embrace the values of due process or recognize that Latinos also have rights under the First Amendment.[153] When such abuses occur, it is our Constitution and its enforcement by our courts that intervene to stop what would otherwise continue.

Whereas the plaintiffs respectfully request that the Court grant the relief requested in their motion for summary judgment and deny defendant's cross motion.

Respectfully submitted this 27th day of February, 2012.

s/*Richard M. Martinez*, Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs

**Certificate of Service**

I hereby certify that on February 27th, 2012, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of the instant motion via the Notice of Electronic Filing to the CM/ECF registrants of record.

s/*Richard M. Martinez*, Esq.

---

[153] See *Hazelwood*, 484 U.S. at 273 ("education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not federal judges.")(citations omitted); *see also Pico*, 457 U.S. at 864 ("At the same time, however, we have necessarily recognized that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment.")

-38-