**RICHARD M. MARTINEZ, SBA No. 7763**
307 South Convent Avenue
Tucson, Arizona 85701
(520) 327-4797 phone
(520) 320-9090 fax
richard@richardmartinezlaw.com
**Counsel for Plaintiffs and Plaintiffs-Intervenors**

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF ARIZONA

| | |
|---|---|
| Maya Arce, et. al., )<br><br>                    Plaintiffs, )<br><br> v. )<br><br> John Huppenthal,<br>Superintendent of Public<br>Instruction, in his Official<br>Capacity, et. al., )<br><br>                    Defendants. ) | No. CV 10 - 623 TUC AWT |
| Margarita Elena Dominguez,<br>and Nicholas A. Dominguez, )<br><br>                    Plaintiffs-Intervenors, )<br><br> v. )<br><br> John Huppenthal,<br>Superintendent of Public<br>Instruction, in his Official<br>Capacity, )<br><br>                    Defendant. ) | **PLAINTIFFS' SECOND MOTION<br>FOR PRELIMINARY INJUNCTION** |

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the plaintiffs

hereby request that this Court issue a preliminary injunction prohibiting Superintendent

Huppenthal from imposing any current or future penalty or other enforcement action

on the Tucson Unified School District No. 1 ("TUSD") for conducting classes within its

Mexican American Studies (MAS) program, including, but not limited to compliance

monitoring of MAS classrooms and student class work, and prohibiting the use of

textbooks, curricular materials, or instruction of MAS curriculum to students in MAS

classes.   Superintendent Huppenthal's enforcement actions have violated and continue to violate the plaintiffs' and all similarly situated TUSD students' constitutional rights, including those guaranteed by the First and Fourteenth Amendments.[1]

Following the final agency decision finding the MAS program in violation of HB 2281 and the imposition of an immediate multimillion dollar fine by Superintendent Huppenthal, the TUSD Governing Board terminated the MAS program, causing the immediate cessation of all MAS classroom instruction, the banishment of all MAS teaching materials, the prohibition of instructing students from an "MAS perspective," and the removal of text books from MAS classrooms. Over 600 hundred students, nearly all of them Latino, have been subjected to the unilateral cessation of classes that they had chosen and are now prohibited from receiving.

The three MAS classes that plaintiff Nicholas Dominguez, a senior, was taking have been eliminated. Plaintiff Korina Lopez, a current sophomore at Tucson High School, who enrolled for two MAS classes, English-Latino Literature and American History-Mexican American perspectives, for her junior year, has now been forced to choose other classes.

Superintendent Huppenthal's enforcement of HB 2281 violates the plaintiffs' rights pursuant to the First and Fourteenth amendments to the United States Constitution. His actions include: engaging in the official suppression of the Mexican American perspective on American society, history and culture because he disapproves of the perspective for partisan and political reasons, chilling the students' classroom speech, singling out and discriminating against Latino students who desire to take the MAS classes that are designed to enhance their academic success, imposing vague, overbroad and undefined statutory prohibitions against the MAS program in an arbitrary and discriminatory manner, and violating the plaintiffs' liberty

---

[1] Administrative Law Judge Kowal declined to rule on TUSD's constitutional vagueness argument, saying that, "A.R.S. §15-112 has not been shown to have been declared unconstitutional by any court and the law must be given effect by this Tribunal." Ct. Doc. No. 162-9, p.36, ¶19.

interests by eliminating the plaintiffs' opportunities to choose an educational program that was provided by TUSD without a rational basis for its elimination.

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, the plaintiffs move the Court for a preliminary injunction against the defendant Superintendent of Public Instruction John Huppenthal. The plaintiffs request that the Court order Superintendent Huppenthal to cease all enforcement activities of any kind against TUSD pursuant to A.R.S. §15-112 (also referred to herein as "HB 2281") and require Superintendent Huppenthal to order TUSD to cease enforcement of Superintendent Huppenthal's decision finding TUSD in violation of HB 2281 and to rescind all actions by TUSD resulting from the enforcement of HB 2281.  Superintendent Huppenthal's enforcement of HB 2281 has directly caused the decision by the TUSD Governing Board to terminate its MAS program and has also caused ongoing actions by TUSD officials to restrict instructional methods, access to text books, literature and other class materials, and to monitor student expression, all on the basis of the expressive content and ethnic-based distinctions.  The promise of the United States' Constitution of free expression, equal protection, liberty, due process and, moreover, fundamental fairness cannot allow such ongoing and further harm to stand.

DATED this 5th day of March 2012.


 s/Richard M. Martinez, Esq.
Richard M. Martinez, Esq.
Counsel for Plaintiffs and
Plaintiffs-Intervenors

1

**Memorandum of Points and Authorities**

2

**I.     NEED FOR A TEMPORARY RESTRAINING ORDER.**

3

      **A.     Superintendent Huppenthal Has Targeted Latino Students and Usurped the Political Process In Order To Suppress The Ideas Which Are At The Heart Of the MAS Program.**

4

5

     Superintendent John Huppenthal, successor to Superintendent Tom Horne, has

6

consummated his promise to the voters in the 2010 election to "stop La Raza" and to

7

prohibit the teaching of any viewpoint that allows MAS students to examine society

8

through a critical lens. He disapproves of the idea that discrimination suffered by

9

Mexican Americans plays a fundamental role in our national culture and history and

10

makes little effort to hide it.  A "smoking gun" is found in his final agency decision

11

where he states his conclusion that "***given the viewpoints expressed*** in certain

12

excerpts from materials used in the MAS program,... there is no way to use the

13

materials without being in violation of the law."[2]  Superintendent Huppenthal has thus

14

exercised the power granted him in HB 2281 with extreme prejudice to suppress the

15

exploration of Mexican American perspectives through the study of literature, history,

16

government and art.

17

     To accomplish his preconceived result, Superintendent Huppenthal has

18

distorted the nature and effect of the teaching and learning that takes place in the

19

MAS program by utilizing vague, broad and subjective legal prohibitions  to conclude

20

that the MAS program violates HB 2281.[3] While HB 2281 purportedly bans all

21

programs that are designed to benefit students from a particular ethnic group, it has

22

been selectively applied to one school district and to a single program, MAS.

23

Superintendent Huppenthal has deliberately ignored Arizona's 598 remaining public

24

and charter school districts, and left unchallenged, and thus intact, all other classes

25

_____

26

    [2] Ct. Doc. No.162-9, p.34, ¶5 (emphasis added).  The plaintiffs hereinafter refer to this document as "the Kowal/Huppenthal Decision."  Superintendent Huppenthal found these unnamed materials to constitute a violation despite the absence of any evidence that they were used in the classroom after the effective date of the statute and without any explanation as to how they violate the statute.

27

28

    [3] See Ct. Doc. No. 84, Ex.D, alleging violations of A.R.S. § 15-112(A)(2),(3) and (4).

-4-

and courses including those at University High School[4], and African American, Native American and women's perspectives of U.S. history and literature.[5]

HB 2281 has also resulted in a hijacking of the political process, whereby the locally elected TUSD Governing Board can no longer determine which classes and programs are best suited for the district's majority student population, Mexican American students.

In pursuit of his singular goal of eliminating TUSD's MAS program, Superintendent Huppenthal has ignored the bounds of the Constitution. To accomplish this he has distorted the very foundation of the MAS classes,[6] and alleged that MAS classes "promote racism," and create in its students, resentment and hatred toward white people.[7] This assertion requires ignoring and rejecting the detailed observations and conclusions of his hand-picked independent auditors while embracing an internal

---

[4] At University High School, TUSD's premiere site for the gifted, students are allowed without consequence to study literature and other materials from a critical perspective that MAS students are prohibited from using under the guise of the prohibited "MAS perspective." See Ct. Doc. No. 162-15. For example, UHS students learn about the gender critical approach to literature and study works including Martin Luther King Jr.'s "Letter From A Birmingham Jail," Henry David Thoreau's "Civil Disobedience," and Toni Morrison's "Beloved." See University High School web site, www.edweb.tusd.k12.az.us/uhs/academics/english.htm under the following individual teachers' AP English Language sections: Ms. Jennifer Glass, Mr. Chris Nelson and Ms. Kris Tully.

[5] Ct. Doc. Nos. 162-24 to 162-28.

[6] The MAS program has several goals, including: promoting "the demonstration of respect, understanding, appreciation, inclusion and love at every level," providing culturally relevant curriculum that is centered within the Mexican American/Chicano experience and within the pursuit of social justice, working toward invoking a critical consciousness within each student and providing teacher education in the areas of Critical Pedagogy, Latino Critical Race Pedagogy and Authentic Caring. Ct. Doc. No. 84-1, p.19, citing to the MAS Department Vision and Goals.

[7] See Superintendent Huppenthal's Response to Plaintiffs' Motion For Summary Judgment and Superintendent's Cross Motion For Summary Judgment, Ct. Doc. No. 150, p. 2, where Superintendent Huppenthal frames this case in the context of two questions: Can the State prohibit school districts from adopting "courses of study that promote racism?" If not then the district could adopt a curriculum "that openly taught hatred of minority groups...." Second, is there substantial evidence that "TUSD did adopt a course of study that **promoted racism**?" Superintendent Huppenthal concludes that the answer is yes. See also Ct. Doc. No. 162-9, p.35, ¶10, the Administrative Law Judge Decision, adopted by Superintendent Huppenthal, where he states, "However, teaching oppression objectively is quite different than actively presenting material in a biased, political, and emotionally charged manner, which is what occurred in MAS classes. Teaching in such a manner promotes social or political activism **against the White people**, promotes racial resentment, and advocates ethnic solidarity, instead of treating pupils as individuals." (Emphasis added.)

1   Arizona Department of Education (ADE) review of written materials which contains no

2   criteria for finding violations, nor any evidence in the record as to whether the books

3   had been used in classrooms and, if so, when, how and in what context, and upon his

4   own conclusion that resentment and hate ***must necessarily be the result*** of learning

5   about racism from a critical perspective.[8]

6       Superintendent Huppenthal's actions impermissibly exceed the powers of his

7   office. Left unchecked, the MAS classes that have been terminated will not return. The

8   MAS books and teaching materials will remain boxed up and stored in a remote

9   warehouse, and MAS students will remain incarcerated in a classroom with severe

10  restrictions on the ideas that are allowed to be presented to them, chilling classroom

11  compliance monitoring by ADE officials and the collection and examination of their

12  class work.[9]   The students now turn to this Court for relief from this orthodoxy.

13      **B.   Actions Leading to the Demise of Mexican American Studies Program in TUSD.**

14

15  HB 2281 was drafted and championed by Superintendent Horne for the

16  expressed purpose of ending the MAS program.[10]   On December 30, 2010, the day

17  before the effective date of HB 2281, Superintendent Horne issued his Finding that

18  the MAS program was in violation of the statute.[11] After taking office on January 2,

19      [8]   Superintendent Huppenthal misunderstands the purpose of ethnic studies, which is

20  not to cause racial and ethnic minority students to resent white people, but to provide all students with a broader understanding of the world through a diverse array of histories and

21  approaches to knowledge. *See* Ct. Doc. No. 110-5, p.vii, ("Ethnic studies includes units of study, courses, or programs that are centered on the knowledge and perspectives of an ethnic

22  group, reflecting narratives and points of view rooted in that group's lived experiences and intellectual scholarship.")  This is illustrated by the cartoon drawing of two children building

23  sand castles, one creating a European-style castle and another a pre-Colombian temple.  Ct. Doc. No. 162-21.  Superintendent Huppenthal introduced this as evidence of a violation,

24  presumably because he believes that it promotes resentment or advocates ethnic solidarity. (Since he does not explain how this item violates the statute, one must guess as to his legal

25  conclusion.)  But a more realistic view is that it illustrates the children's differing forms of expression in light of their different backgrounds and cultures without invoking negativity.

26      [9]   Ironically, ADE officials neither performed nor relied upon any classroom observations to inform their conclusion that the MAS program violates HB 2281, but do intend to rely on

27  such visits to confirm compliance with Superintendent Huppenthal's Decision.  Ct. Doc. No. 162-29, p.24:ll.23,24.

28      [10]   Ct. Doc. No. 84, Ex.B, p.1.
        [11]   Ibid.

1   2011, Superintendent Huppenthal initiated his own investigation as to whether MAS

2   classes violated the new statute due to the premature nature of the Horne Finding.[12]

3         To accomplish this, he commissioned Cambium Learning, Inc. to perform a

4   curriculum audit.[13] Cambium spent several months reviewing texts and materials,

5   conducting numerous classroom observations and interviews of teachers, students,

6   administrators, parents and community members. Cambium's audit report found, not

7   only that MAS classes **do not** violate HB 2281, but that MAS effectively promotes

8   student achievement and recommended the expansion of course offerings.[14] Instead

9   of releasing the Cambium Report in a timely manner, Superintendent Huppenthal

10   waited six weeks so he could prepare and release his own contradictory Finding that

11   TUSD's MAS program violates HB 2281.

12         TUSD administratively appealed the Finding[15] and, after four days of hearing,

13   Administrative Law Judge (ALJ) Kowal issued his Decision finding that the MAS

14   program violates A.R.S §15-112(A)(2), (3) and (4).[16]   Superintendent Huppenthal

15   adopted the ALJ's Decision in its entirety, constituting the final agency decision,[17] and

16   immediately imposed a multimillion dollar sanction on TUSD.

17        **C.**    **Events of January 10, 2012 and Thereafter.**

18         Hours after this Court issued its Order denying the plaintiffs' motion for

19   preliminary injunction on January 10, 2012, the plaintiffs' constitutional deprivations

20   reached their intended apex, the elimination of the MAS program by the TUSD

21   Governing Board.[18] That evening, Superintendent Huppenthal successfully imposed

22

23        [12] Ct. Doc. No. 84, Ex.D, p.1.
        [13] The specific scope of the curriculum audit requested by the ADE and awarded to

24   Cambium is identified in the "ADE Quote Request," Ct. Doc. No. 162-6.
        [14] See Ct. Doc. No. 86, pp. 66-67.

25        [15] Ct. Doc. No. 162-8.
        [16] Ct. Doc. No. 162-9.

26        [17] Ct. Doc. No. 162-9.  The plaintiffs will hereinafter refer to this document as "the
   Kowal/Huppenthal Decision."

27        [18] In direct response to Superintendent Huppenthal's Decision, the TUSD Governing
   Board passed a resolution ordering that all MAS courses and teaching activities shall be

28   immediately suspended and that students currently enrolled in MAS courses shall be
   transferred to new or existing sections of other courses.  Ct. Doc. No. 162-1

his will on TUSD, which chose to succumb, turning its back on the 62% of its students who are Latino and ignoring a federal court order that required TUSD to maintain the MAS program.[19] With the elimination of MAS classes as of January 11, 2012, Mr. Dominguez has lost the opportunity to complete the MAS classes that he was attending. Compliance with the Huppenthal edict also required that TUSD officials order the immediate removal of all text books that had been used in MAS classes and banish all lessons, materials, books and themes that MAS teachers had previously used.[20]   Compliance monitoring of MAS classes has begun and will continue throughout the semester.  Monitors have also begun collecting student work to inspect for compliance.[21]   All MAS classes that had been scheduled for the Fall 2012 semester, including those for which Ms.  Lopez registered, have been canceled and will not be reinstated.[22]

## D.   A Preliminary Injunction Is Immediately Required.

To be entitled to injunctive relief, plaintiffs must demonstrate (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief,[23] (3) that the balance of the equities tips in their favor,

---

[19] The Post-Unitary Status Plan (PUSP) mandates that MAS classes are a required remedial measure for intentional acts of discrimination by TUSD towards its Latino students. Ct. Doc. No. 98-2, pp.32-34. On February 2, 2012, the Mendoza plaintiffs in the desegregation action against TUSD requested that the Special Master and the District Court "enforce the [Post-Unitary Status Plan] and order TUSD to reinstate Mexican American Studies courses and teaching activities in accordance with the mandates of the Plan and direct [TUSD] to implement and regularly monitor in good faith all provisions of the Action Plan for Mexican American Studies as set forth in the PUSP. *Fisher/Mendoza v. TUSD*, 4:74-CV-00090-DCB, Mendoza Plaintiffs' Response to Notice to Court Concerning Suspension of Mexican American Studies Courses and Request for Special Master to Take Action, Ct. Doc. No. 1354. On February 29, 2012, Judge Bury denied the request, but stated that the plaintiffs are free to urge the issue again during the Court's review of the forthcoming Unitary Status Plan.  Ct. Doc. No. 1360.

[20]  Ct. Doc. Nos. 162-13, -14 and -17.

[21]  Ct. Doc. Nos. 162-13, -15, -18, and -20.

[22]  Ct. Doc. No. 162-4, ¶¶18, 19.

[23]   The injunction sought against Superintendent Huppenthal is appropriate relief, despite the fact that TUSD is not a party to this action.  Enjoining Superintendent Huppenthal's enforcement of HB 2281 is a **necessary precondition** to the reinstatement of MAS classes by the TUSD Governing Board, whether by order of Judge Bury or by the Governing Board's independent action.  In this respect, the injunction sought here is like the relief sought by the plaintiffs in *Romer v. Evans*, 517 U.S. 620 (1996).  Even though no municipality was obligated

and (4) that an injunction is in the public interest.[24]  The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" and  "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[25] The Ninth Circuit includes the "serious questions" test when applying the requirements of *Winter*. Thus, the Court must balance the elements of the preliminary injunction test "so that a stronger showing of one element may offset a weaker showing of another."[26] This insures that "[f]lexibility is the hallmark of equity jurisdiction."[27] Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[28] Here, the plaintiffs establish that clear showing on all four elements.

## II.  PLAINTIFFS' IRREPARABLE HARM REQUIRES IMMEDIATE RELIEF.

Superintendent Huppenthal's enforcement of HB 2281 and TUSD's actions that are a direct and foreseeable extension of that enforcement are inflicting ongoing irreparable harm upon the plaintiffs.[29] They are among the numerous TUSD students who are being denied the opportunity to benefit from a unique and important educational program.[30] This irreparable harm is compounded by the chilling effect of the severe restrictions imposed upon the MAS teachers who, under the threat of discipline, are being subjected to expansive but extremely vague restrictions on their teaching methods and overly restrictive regulation of the materials which they are

---

to pass an ordinance barring discrimination on the basis of sexual preference, enjoining the voter-initiated amendment to the Colorado Constitution prohibiting such ordinances was a necessary precondition to the ability of the plaintiffs to benefit from such anti-discrimination ordinances in the future.  *See Evans v. Romer,* 854 P.2d 1270 (Colo. 1993).

[24]  *Winter v. NRDC,* 129 S.Ct. at 365, 374, 376 (2008).
[25]  *Winter*, 129 S.Ct. at 376-77.
[26]  *Alliance for the Wild Rockies v. Cottrell* 632 F.3d 1127, 1131 (9th Cir. 2011).
[27]  *Ibid.*, *citing Winter*, 129 S.Ct. at 391 (Ginsberg, J., dissenting).
[28]  *Winter*, 129 S.Ct. at 376.
[29]   TUSD has stepped into Superintendent Huppenthal's shoes and now openly collaborates with him in the enforcement of HB 2281.
[30]  Ct. Doc. No. 85, pp.43-50.

1   allowed to utilize with their students.[31] Plaintiffs and their peers are thus reduced to

2   collateral damage, the ultimate fatalities of HB 2281. At the core of this instant matter

3   are the violations of the plaintiffs' fundamental constitutional rights, ***which alone***

4   ***constitutes irreparable harm.***[32]

5       **A.   Defendant Huppenthal's Enforcement Action Denies TUSD's Latino**
        **Students The Opportunity To Benefit From A Chosen Educational**
6       **Opportunity, An Adverse Action With Harmful Consequences That**
        **Are Irreparable To The Plaintiffs.**

7       Through his enforcement actions, Superintendent Huppenthal has denied to the

8   plaintiffs Nicholas Dominguez, Korina Lopez and Maya Arce the opportunity to

9   participate in or benefit from any MAS classes.  For Mr. Dominguez, the harm is

10  especially acute, as he is in the twelfth grade, will graduate in May 2012 and will never

11  again have the opportunity to participate in TUSD's MAS program.

12      The benefits of the MAS program are like no other TUSD program with a unique

13  focus on remedying discriminatory practices within TUSD.[33]  The MAS program has

14  proven to make a significant difference in the education of its students. This is

15  especially true for Latino, low socio-economic status students and for those who have

16  failed to pass the high-stakes standardized AIMS test as sophomores, which is

17  required for graduation.[34]  Students who took MAS courses graduated at a rate that

18  was five percent higher than their counterparts in 2005 and eleven percent higher in

19  2010.[35] The abandonment of the MAS program, in the absence of an equally effective

20  curriculum, condemns these students to a greater likelihood of failure and a reduced

21  likelihood that they will experience educational success, graduation and post

22

23

24      [31] Ct. Doc. Nos. 162–15, -16 and -17.  TUSD's "Guiding Principles" (Ct. Doc. No. 162-15) is as flawed as HB 2281; no standards or definitions are offered, leaving those directly impacted subject to prohibitions that lack any definition, are ambiguous, and impermissibly vague.

25      [32] *U.S. v. Arizona,* 641 F.3d 339, 366 (9th Cir. 2011), cert. granted *Arizona v. U.S.,* 132 S.Ct. 845 (2011), citing *Assoc. Gen. Contractors v. Coal. for Econ. Equity,* 950 F.2d 1401, 1412 (9th Cir. 1991).

26      [33] Ct. Doc. No. 110-3, ¶¶7, 19-21.

27      [34] Ct. Doc. No. 110-3, Ex.A.

28      [35] Ct. Doc. No. 85, pp.43, 47.

-10-

secondary education.

For Mr. Dominguez, who was enrolled in three MAS classes, the opportunity to reverse the damage slips away with every school day.  For Ms. Lopez, it is now certain that she will be unable to take the MAS literature and history classes for which she had registered for the upcoming fall semester. Because TUSD is prohibited from reconstituting its MAS classes in any form, Ms. Arce will lose the opportunity to ever take the classes.

The TUSD Governing Board resolution permanently ended the MAS classes and does not provide for the reinstatement of any type of MAS courses in the future.[36] As foreseen by the Court,[37] Superintendent Huppenthal's vague and overly broad decision with no direction or guidance regarding steps necessary for compliance, resulted in TUSD's abolishment of MAS classes, all to the irreparable detriment of the plaintiffs.[38]

> **B.    Superintendent Huppenthal Is Subjecting the MAS Teachers To Vague Restrictions On Their Teaching Methods Which Undermine Their Professional Performance, Threaten Their Livelihoods And Harm Their MAS Students.**

Superintendent Huppenthal's final agency decision has resulted in TUSD taking draconian steps to assure him that no vestige remains of the content or ideas used in classrooms by MAS teachers and students. This includes removal of seven books that Superintendent Huppenthal's identified as objectionable.[39] TUSD not only

---

[36] The resolution requires a revision of only its social studies core curriculum to provide some additional Mexican American and multicultural view points for a "single common social studies core sequence" Ct. Doc. No. 162-12.  This is ***not*** a resurrection of MAS classes and utilizes none of the successful pedagogy or curricula used by the MAS program.  Nor does the resolution provide for the revision of any type of MAS curriculum in any of the subject areas in any grade or the integration of the successful MAS curriculum into current courses. Furthermore, the resolution does not provide for the resurrection or revision of language arts or art curricula in response to the loss of MAS classes in those areas.  Under the current scheme, MAS classes have permanently ended in TUSD.

[37] Order re Motions: (1) To Dismiss; and (2) For a Preliminary Injunction, Ct. Doc. No. 138, p.16, fn.14.

[38] The TUSD Governing Board declined to appeal the Kowal/Huppenthal Decision to Superior Court.

[39] Ct. Doc. No. 162-14.

1   removed all copies of the seven books from MAS classrooms and any other books

2   previously used in MAS classes to the TUSD book repository but also prohibited MAS

3   teachers from having a personal copy at work or using them in their classroom

4   instruction.[40]  Mr. Dominguez witnessed TUSD officials boxing up and removing MAS

5   text books during one of his MAS classes.[41]  Finally TUSD also banned each and

6   every MAS lesson plan, Power Point presentation and text excerpt mentioned in the

7   Kowal/Huppenthal Decision, on the understanding that any item mentioned therein

8   means that item is in violation of HB 2281.[42]

9          Superintendent Huppenthal's enforcement of HB 2281 also prohibits teachers

10   from using "MAS perspectives,"[43] thereby chilling students' legitimate rights to freedom

11   of expression.  Mr. Dominguez has self-censored his work, in fear that his use of the

12   word "oppression" when writing about Dr. Martin Luther King, Jr. might cause trouble

13   for his teacher, should his work be selected for random compliance monitoring.[44]  By

14   banning anything having to do with MAS classes, it is impossible for any MAS student

15   to know what he or she can or cannot say, write or do in the classroom.

16   Superintendent Huppenthal's ban of the MAS classes, books, materials,   and

17   perspectives creates a constitutional conundrum for every affected student.

18          The MAS students are well aware of Superintendent Huppenthal's enforcement

19   of HB 2281.  It is no secret to the students that he introduced their class work and art

20

21          [40]  Ct. Doc. Nos. 162-1, ¶¶11, 12; 162-4, ¶14; 162-14.  The seven books are: "Critical
22   Race Theory," by Richard Delgado, "Pedagogy of the Oppressed," by Paolo Freire, "Rethinking
     Columbus: The Next 500 Years," edited by Bill Bigelow and Bob Peterson, "Occupied
23   American: A History of Chicanos," by Rodolfo Acuna, "Chicano! The History of the Mexican
     American Civil Rights Movement," by F. Arturo Rosales, "Message to Aztlan," by Corky
24   Gonzales, and "500 Years of Chicano History In Pictures, by Elizabeth Martinez.  Ct. Doc. No.
     162-14.  Superintendent Huppenthal has ordered TUSD to produce evidence that TUSD has
25   collected all MAS program materials from the classrooms by February 29, 2012.  Ct. Doc. No.
     162-12.
        [41]  Ct. Doc. No. 162-3, ¶8.
26      [42]  Ct. Doc. Nos. 162-15 and -17.
        [43]  Ct. Doc. Nos.  162-1, ¶¶11, 14; 162-4, ¶¶10, 11; 162-15.
27      [44]  Ct. Doc. Nos. 162-3, ¶¶13-15.  Based upon Superintendent Huppenthal's objections
     to students studying the concept of oppression, Mr. Dominguez' fear is well-founded.  See
28   Superintendent Huppenthal Deposition Transcript, Ct. Doc. No. 162-29, pp.41:l.11 to 42:5.

in the administrative hearing against TUSD as evidence of violations of HB 2281.[45] It is also well known that Superintendent Huppenthal has ordered compliance monitoring of the prohibited MAS classes to assure adherence to his Decision.[46] Superintendent Huppenthal has gone to the extreme of collecting students' work in order to assess compliance.[47] In response, Mr. Dominguez and his peers, fear that what they say or produce in the classroom could negatively impact their teachers.[48] Rather than being in a thriving classroom environment where a free and open exchange of ideas is welcomed, MAS students must now endure a climate of suspicion, and apprehension in their classrooms. This fear is understandable, predictable and reasonable; what any MAS student says, writes or artistically produces in class may have negative repercussions on their MAS teachers.[49]

These unprecedented restrictions placed upon the MAS teachers and classrooms,  contributes to the students' irreparable harm.  MAS teachers have repeatedly asked their supervisors for specific guidance as to what they can and cannot teach, but have received no answers.[50]  Much like TUSD being forced to eliminate the MAS program because Superintendent Huppenthal provided no guidance as to what constitutes a violation of HB 2281, teachers have no option but to eliminate the study of Mexican American and Latino topics and authors.[51]  Although MAS teachers have been told that they may teach and discuss the issue of race, they must use "literature content as the teaching focus relative to racism or oppression."[52] In other words, they are constrained from exploring, discussing or applying any

---

[45]  Ct. Doc. Nos. 162-3, ¶12; 162-21 to -23.
[46]  Ct. Doc. Nos. 162-1, ¶¶17, 18; 162-3, ¶¶9, 10; 162-4, ¶¶11-13; 162-13, pp.1-2;162-15; 162-16; 162-18 to -20.
[47]  For student work recently collected see Ct. Docs. Nos. 162-19.  See also Ct. Docs. Nos. 162-1, ¶¶13, 18; 162-3, ¶¶9, 10, 13; 162-15; 162-18, p.4.
[48]  Ct. Doc. No. 162-3, ¶¶10, 13-15, 20.
[49]  The compliance monitoring and lack of clear understanding as to what they can and cannot say in the classroom violates the students' First Amendment right to free expression. See pp. 37 to 48, *infra*.
[50]  Ct. Doc. Nos. 162-1, ¶¶11, 13-15, 17; 162-4, ¶¶10, 11, 13.
[51]  Ct. Doc. Nos. 162-1, ¶14; 162-4, ¶13.
[52]  Ct. Doc. No. 162-15.

themes of racial oppression in literature to situations in the real world. On the other hand, TUSD students who are not in MAS classes enjoy the full range of material, books, texts and freedom of expression, including those in the African American and Native American Studies classes.

As noted, Superintendent Huppenthal has directly caused classroom compliance monitoring, the examination of student work, the elimination of the plaintiffs' classes and the restriction of materials, topics and discussions in their MAS classrooms.  Further, the targeted restrictions on MAS teachers as to the texts, books, materials and discussions that may be utilized in the classroom also adversely impact students, causing irreparable harm.  These irreparable harms have chilled the students' right to express themselves in class and in their course work, impermissibly restricted their right to receive ideas and information, restricted their liberty interest in receiving an education and have targeted them  as Latino students to receive unequal treatment in violation of their constitutional rights.  Without an injunction from the Court, these harms to the plaintiffs will continue and remain irreparable.

**III.    LIKELIHOOD OF SUCCESS ON THE MERITS.**

The plaintiffs seek to invalidate HB 2281 and its application on several independent grounds. These include that: 1) HB 2281 is unconstitutionally void for vagueness, both on its face and in its application; 2) HB 2281 is unconstitutionally overbroad; 3) the application of HB 2281 suppresses the plaintiffs' freedom of expression and access to learning in violation of the First Amendment; 4) HB 2281 discriminates on the basis of race/ethnicity in violation of the Equal Protection Clause of the Fourteenth Amendment; and 5) HB 2281 infringes the liberty interests of students and teachers in the educational setting without even a rational basis, in violation of the Due Process Clause of the Fourteenth Amendment. Any one of these grounds may invalidate the statute or its application. In order to prevail on their motion for a preliminary injunction, a likelihood of success on the merits need be shown on

1   *only one* of these bases.[53] As demonstrated below, however, the plaintiffs are able

2   to show a likelihood of success on *all* of them.

3   **A.   HB 2281, Upon Which the Actions of Defendant Huppenthal and TUSD are Based, Is Void for Vagueness, Both on its Face and in its Application and Overbroad.**

5   The plaintiffs have demonstrated that HB 2281 and its application are vague

6   and overbroad. These arguments have been fully briefed in the second Motion for

7   Summary Judgment,[54]   Statement of Facts in Support of Motion for Summary

8   Judgement,[55] and the reply/response brief to Superintendent Huppenthal's Cross

9   Motion for Summary Judgment[56] and incorporate the same here by reference.

10   **B.   HB 2281 And The Enforcement Actions Of Superintendent Huppenthal And The TUSD Administration Violate Equal Protection Of The Law.**

12   The present effort to target for elimination one successful program ***explicitly***

13   because it is designed to enhance the academic achievement of Latino students is

14   one of the modern-day chapters in Arizona's long history of discrimination against

15   Mexican Americans.[57] Superintendent Huppenthal candidly admits that ***HB 2281 was***

16   ***designed for the sole purpose of shuttering TUSD's MAS program*** and that he

17   has not even considered conducting any other investigations under the law.[58]  Doubt

18   is cast upon Superintendent Huppenthal's conclusory allegation that he must eliminate

19

20   ───────────

[53] See *M.R. v. Dreyfus,* 663 F.3d 1100, 1115, n.2 (9th Cir. 2011) (Likelihood of success on one argument obviates the need to consider others.)

[54] Ct. Doc. No. 97.

[55] Ct. Doc. Nos. 98 and 162.

[56] Ct. Doc. No. 167.

[57] *See e.g. Gonzales v. Sheely,* 96 F.Supp. 1004 (D. Ariz. 1951) (segregation of Anglo and Latino students in public schools violates Equal Protection); *U.S. v. Arizona,* 703 F.Supp.2d 980 (D. Ariz. 2010), *aff'd. U.S. v. Arizona,* 641 F.3d 339 (9th Cir. 2011), *cert. granted, Arizona v. U.S., Arizona v. U.S.,* 2011 U.S. 8850 (2011), (striking down portion of Arizona law requiring an officer during any lawful stop to make a reasonable attempt to determine an individual's immigration status "where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States."); see also Aug. 26, 2011 letter from Office for Civil Rights and Civil Rights Division to Superintendent Huppenthal detailing concerns that subjective evaluations by the ADE of teacher's accents might discriminate against "Hispanics and others who are non native-English speakers." Ct. Doc. No. 110-4, p.2 and pp.22-23.

[58] Ct. Doc. No. 162-29, pp.11:11-20, 13:11-19.

1  the MAS program because it is teaching students to hate white people, by the
2  substantial amount of evidence to the contrary, including the laudatory 120-page
3  Cambium audit report provided by the professional educators commissioned by
4  Superintendent Huppenthal, who, unlike the ADE officials that he has relied on, spent
5  many hours in classroom observations and in interviews with students, teachers,
6  administrators, parents and community members.  In this case, Latino students have
7  been singled out and targeted in violation of their rights to Equal Protection of the
8  laws.

9          **1.**     **HB 2281 Discriminates Against Latino Students On Its Face.**

10          **a.**     **Subsection 112(A)(3) Constitutes A Facial Classification.**

11
12      The facial ethnic classification is created by the prohibition against courses or
13  classes "designed primarily for pupils of a particular ethnic group."[59]  While Arizona
14  law sanctions programs designed ***exclusively*** for girls[60] and any number of programs
15  designed for lower-income students pursuant to Title I,[61] HB 2281 outlaws a program
16  designed to enhance the academic success of Latino students.  In this case, the
17  creation, application and enforcement of subsection 15-112(A)(3)'s classification
18  amply demonstrates why the Supreme Court requires that racial and ethnic
19  classifications must be "strictly reserved for remedial settings" in order to avoid
20  promoting "notions of racial inferiority... lead[ing] to politics of racial hostility."[62]  The
21  classification can stand only if it passes strict scrutiny.[63]

22      [59]  A.R.S. §15-112(A)(3).
23      [60]  A.R.S. §15-184(D) allowed for the creation of Arizona's first publicly-funded charter
school designed exclusively to enhance the academic achievement of girls.  See school
24  website at http://glaaz.org (last accessed 12/12/11). Tucson High also has a class in Women's
Literature that satisfies the English requirement, although, like MAS classes, it is open to all
25  students.  Ct. Doc. No. 162-26, p.10.
    [61]  See 20 U.S.C. §7215(a)(23).
26      [62]  *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493 (1989); *see also Palmore v. Sidoti,*
466 U.S. 429, 432 (1984) ("Classifying persons according to their race is more likely to reflect
27  racial prejudice than legitimate public concern."); *Ho by Ho v. SFUSD,* 147 F.3d 854, 863 (9th
Cir. 1998) ("Misuse of race by government for over three centuries in America must make any
28  new governmental use of race stand suspect and in pressing need of justification.")
    [63]  *McLaughlin v. Florida,* 379 U.S. 184 (1964).

Subsection 15-112(A)(3)'s ethnic classification is not facially neutral despite the fact that the law does not explicitly single out Latino students.[64]  The Supreme Court rejected this type of mischaracterization in *Johnson v. California,* where California argued that its policy of segregating inmates by race was "neutral," in that it "neither benefits nor burdens one group or individual more than any other group or individual."[65]  To the contrary, "racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally."[66]

HB 2281 is a unique law.  It was drafted and passed specifically to apply against the MAS program and no other.  According to the Supreme Court, this absence of precedent is instructive: "discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision."[67]  Also, laws that target a particular group

> "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected. 'If the constitutional conception of equal protection of the laws means anything, it must at the very least mean that a bare desire to harm a politically unpopular group cannot constitute a ***legitimate*** governmental interest.'"[68]

In this case, subsection 112(A)(3)'s prohibition against a program designed primarily for students of a particular ethnic group is subject to strict scrutiny even though it does not specify Latino students.

//

//

//

//

---

[64]  *See Hunter v. Erickson*, 393 U.S. 385, 391 (1969) (Even though a "law on its face treats Negro and white, Jew and gentile in an identical manner, [where] the reality is that the law's impact falls on the minority," an ethnic classification is found.)

[65]  543 U.S. 499, 506 (2005).

[66]  *Ibid.*, citing *Shaw v. Reno*, 509 U.S. 630, 651 (1993).

[67]  *Romer v. Evans*, 517 U.S. 620, 633 (1996); *see also R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 181 (1980) ("If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect.") (Stevens, J., concurring).

[68]  *Romer,* 517 U.S. at 634, quoting *Dept. of Agric. v. Moreno,* 413 U.S. 528, 534 (1973*).*

-17-

1

2

3

        **b.**    **The Prohibition Against Classes Or Courses That Are Designed Primarily For Pupils Of A Particular Ethnic Group Is Not Narrowly Tailored To Further The State's Interest In Treating Pupils As Individuals And Not Teaching Them To Hate Other Races Or Classes Of People.**

4

5

6

       Superintendent Huppenthal cannot carry his burden to prove that subsection 112(A)(3)'s prohibition is narrowly tailored to further a compelling governmental interest.[69] HB 2281 states its purpose as teaching public school students to "treat and

7

8

9

value each other as individuals and not be taught to hate other races or classes of people."[70]     Yet, a prohibition on courses designed to enhance the academic achievement of Latinos is irrelevant as to whether students are treated as individuals

10

11

12

and is irrelevant as to whether students are taught to hate other races or classes of people.  Superintendent Huppenthal's assumption that the two concepts are mutually exclusive is pure speculation and unsupported by the record.

13

14

15

       Courses designed for pupils of a particular ethnic group are intended to remedy disparities in student achievement.[71]  In fact, the No Child Left Behind Act (NCLB) requires that states be held accountable for student achievement and report

16

17

18

disparities between ethnic and racial minority groups.[72]  In the case of MAS, issues of race and its role in history and society is the vehicle by which the curriculum brings cultural relevancy to its academic subjects.  But learning about and discussing race

19

20

21

and racism does not mean that students are not treated as individuals or that they are taught to hate.  Discussions and learning about race occur every day and those who participate do not *ipso facto* fail to treat others as individuals.

22

23

       Strict scrutiny is designed to "'smoke out' illegitimate uses of race by assuring

24

25

26

27

28

---

  [69]  *See Grutter v. Bollinger,* 539 U.S. 306, 326 (2003).
  [70]  A.R.S. §15-111.
  [71]  Ct. Doc. No. 162-2, ¶7.
  [72]  See e.g. Elementary and Secondary Education Act ("No Child Left Behind"), Title I, Sec. 1001(3) Statement of Purpose, (purpose to ensure that all children have a fair, equal and significant opportunity to obtain a high-quality education can be accomplished by "closing the achievement gap between high- and low-performing children, ***especially the achievement gaps between minority and nonminority students.***")

that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool."[73]   The test also enables an examination as to whether the means chosen "fit" the compelling goal so closely that there is "little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype."[74]   In this case, the failure of subsection 112(A)(3)'s classification to further the statute's purpose does not demonstrate a close fit and thereby casts suspicion on the legislature's motivation. "The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis."[75]   The statute prohibiting courses designed primarily for pupils of a particular ethnic group is not narrowly tailored to promote treating students as individuals and  be should be struck down.[76]

### 2.   Superintendent Huppenthal Discriminated Against Latinos In His Application Of HB 2281 .

Even absent subsection 112(A)(3)'s facial classification, a claim for violation of Equal Protection will lie here where Superintendent Huppenthal took enforcement action to shut down **only** the MAS program, despite his predecessor's opinion that two other TUSD Ethnic Studies programs also violate HB 2281.[77]   That is because the enforcement of a facially neutral statute violates the right to Equal Protection where

[73]   *Richmond,* 488 U.S. at 493.

[74]   *Ibid.*

[75]   *Ibid.,* 488 U.S. at 501, citing *Korematsu v. U.S.,* 323 U.S. 214, 235-40 (1944) (Murphy, J., dissenting).

[76]   Subsection 112(A)(3) could not even pass rational basis scrutiny.  In order to be credited, the stated rationale "must find some footing in the realities of the subject" addressed by HB 2281. *Heller v. Doe,* 509 U.S. 312, 321 (1993).  Conversely, it is not to be credited if the rationale "could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111 (1979).  Because HB 2281 does not further its stated interest of treating students as individuals, it could not have been a rational basis for the statute regardless whether it is a legitimate state interest.  *See Perry v. Brown,* 2012 U.S. App. LEXIS 2328, 84 (9th Cir. 2012) (because a constitutional amendment prohibiting marriage between persons of the same gender did not further any of the stated interests, they cannot have been rational bases for the measure, whether or not they are legitimate state interests.)

[77]   Ct. Doc. No. 84, Ex.B, p.1.  As a result, Ms. Lopez **cannot** take the MAS history and literature courses for which she had registered, but she **does** have the option of taking American History–African American Perspectives, American History-Native American Perspectives, African American Literature, Native American Literature, and Women's Literature.  Ct. Doc. Nos. 162-26, pp.9,10; 162-27; 162-28.

there is sufficient proof of discriminatory intent.[78]

### a. Superintendent Huppenthal Acted With the Intent to Discriminate Against Latino Students.

In this case, there is ample evidence from a variety of sources that Superintendent Huppenthal has acted with an "invidious discriminatory purpose" which is a motivating factor behind his enforcement action against the MAS program.[79] Relevant sources of evidence surrounding the action include: (1) "a clear pattern, unexplainable on grounds other than [ethnicity]", (2) the historical background of the decision, (3) departures from the normal procedural sequence, (4) substantive departures and (5) the legislative and administrative history.[80]  Evidence from all five sources compels the conclusion that Superintendent Huppenthal acted with the intent to discriminate against Latino students.

### I. Superintendent Huppenthal Has Applied HB 2281 Exclusively Against the MAS Program.

The clear pattern and singular pursuit against the primarily Latino students enrolled in the MAS program and the Mexican American perspective presented in the classes presents that rare case of a law administered "so exclusively against a particular class of persons as to warrant and require the conclusion, that. . .they are applied. . .with a mind so unequal and oppressive as to amount to a practical denial" of Equal Protection.[81]  Although the legislature and State Superintendents have exclusively targeted the MAS program with HB 2281, the prohibitions of the statute apply to every public and charter school K-12 classroom in Arizona.  There are numerous other classrooms where students are taught about racism and oppression. Yet Superintendent Huppenthal has not accused any other teachers or school districts

---

[78] *Village of Arlington Hts. v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265 (1977)
[79]  *Arlington Hts.,* 429 U.S. at 266, (Courts must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available".)  The nature of this "animus" is not necessarily "ill will" against Latino students, but disapproval which arises from prejudice or "longstanding, sincerely held private beliefs."  *Perry,* 2012 U.S. App. LEXIS 2328, 159-60.
[80]  *Arlington Hts.,* 429 U.S. at 266-67.
[81]   *Yick Wo v. Hopkins,* 118 U.S. 356, 372 (1886).

-20-

1   of conducting courses or classes that "promote resentment toward a race or class of

2   people."[82]

3       Superintendent Huppenthal has made no effort to eradicate learning about other

4   ethnic perspectives and has not even considered investigating any other program.[83]

5   Many Arizona high schools offer classes such as Advanced Placement European

6   History and classes that feature learning about British and European literature and art.

7   Nor has he applied subsection 112(A)(3)'s prohibition of courses designed primarily

8   for pupils of a particular ethnic group against TUSD's African American Studies

9   program, which is designed to "improve[] the academic achievement of African

10  American students."[84]   It is remarkable that Superintendent Huppenthal and TUSD

11  show no inclination to enforce HB 2281 against this program, which appears to violate

12  subsection 112(A)(3) in **exactly** the same way that the MAS program allegedly does.

13  It is abundantly clear that, Superintendent Huppenthal targets only Latino students

14  who choose to learn about Mexican American culture and heritage.[85]

15

---

16      [82]   Significantly, Superintendent Huppenthal has not initiated any investigation of or
    enforcement action against the Paolo Freire Freedom School, a charter school in Tucson
17  which is dedicated to social justice, using the teachings of Paolo Freire as a model.  Both
    Superintendents Huppenthal and Horne have condemned the MAS program for using Freire's
18  book "Pedagogy of the Oppressed," in designing the pedagogy used in the MAS program and
    have banned the book from MAS classrooms. Ct. Doc. Nos. 84, Ex.B, p.7; 162-14.  But they
19  have not taken any action against the publicly-funded charter school under the
    Superintendent's direct authority which is dedicated to the principles advocated by Freire. *See*
20  Ct. Doc. No. 84, Ex. B, p.7; web site of Paolo Freire Freedom School at
    www.paolofreireschool.org.
        [83]   Ct. Doc. No. 162-29, pp.11:17-20, 13:11-19.
21      [84]   See TUSD website, www.tusd.k12.az.us/contents/depart/aastudies/aboutus.asp
    This is in contrast to Superintendent Huppenthal's Finding that MAS violates the prohibition
22  because it was "formed specifically to enhance the academic success of Latino students."  Ct.
    Doc. No. 84, Ex.D, p.2.  The plaintiffs contend that HB 2281 is unconstitutional and do not
23  argue that subsection 112(A)(3) should be applied against the African American Studies
    program.  Rather, they point out that subsection 112(A)(3) has been selectively enforced
24  against the MAS program.
        [85]   The fact that, should Superintendent Huppenthal prevail, non-Latinos also would be
25  shut out of MAS classes, does not negate his discrimination against Latino students.  In *Griffin
    v. Co. Sch. Bd. of Prince Edward Co.*, 377 U.S. 218 (1964), the school board's decision to
26  close all of its schools, rather than to integrate them, discriminated against African American
    students, despite that fact that the schools were closed to white students, as well.  The closing
27  of the schools "[bore] more heavily on Negro children in Prince Edward County" and was done
    specifically with the intent to discriminate against them.  *Ibid.*, 377 U.S. at 230.  Whatever
28  nonracial grounds might support closing public schools, "the object must be a constitutional
    one, and grounds of race and opposition to desegregation do not qualify as constitutional."

1
2
3

Both State Superintendents campaigned specifically to ban the MAS program. On his attorney general election website, Tom Horne admits that he has singled out MAS with the following explanation:

4
5
6
7
8
9
10

> "In the Tucson Ethnic Studies programs they divided the kids by race. African American Studies for African Americans. Raza Studies for the Latino kids. "Raza" means race in Spanish. Indian Studies for the Native American kids. Asian Studies for the Asian kids. It just sounds like the Old South. And particularly in Raza Studies they taught the kids that the country is dominated by a white racist, imperialist power structure that is out to oppress them.... And these kids are being taught not to deal with civil disagreements in a civil way, but to deal with everybody by getting into people's faces and being rude and that means they are going to be unsuccessful adults. So it's a dysfunctional education and I fought hard to get the legislature to put a – to pass a law so that I can put a stop to it. And as the attorney general, I will give the legal aid to the Department of Education to be sure that we do put a stop to it."[86]

11
12
13
14
15
16

This is one of the "rare" cases where the starkness of the exclusivity of enforcement allows a finding of purposeful discrimination.[87]  Just as an ordinance which effectively prohibited the operation of laundries in buildings made from wood, where all laundries owned by Chinese operators were housed in wooden buildings, is unexplainable on grounds other than race,[88] so too is HB 2281, which was drafted specifically to eliminate the MAS program and applied exclusively against it.

17

      **ii.**    **The Historical Background of the Huppenthal and**

---

18
19

*Ibid.,* 377 U.S. at 231.  Likewise, Superintendent Huppenthal's desire to eliminate MAS out of a desire to deny Latino students the opportunity to improve their education through learning about Mexican Americans is unconstitutional.

20
21
22
23
24

  [86]  Tom Horne election website http://www.electtomhorne.com with link to video at http://www.youtube.com/user/TomHorneforAG#p/u/22/nA3HfVBRz0o titled "Tom Horne – Ended Ethnic Studies (Already performing Attorney General duties!)" at minutes 0:31 to 1:00 and 2:07 to 2:30.  In this video clip, Mr. Horne also presents compelling evidence of how the traditional perspective of U.S. history excludes the Mexican American perspective. In reference to Latino students in the MAS program, he states, "I'll tell you, these kids' parents and grandparents ***came to this country, most of them legally,*** because this is the land of opportunity." *Ibid.* at minute 1:07 to 1:13.  Mr. Horne fails to recognize that the ancestors of many of the students in the MAS program, like so many other Mexican Americans, have resided in what is now Arizona and the United States for centuries.

25
26
27
28

  [87]  *Ibid.,* citing *Yick Wo,* 118 U.S. 356; *Gomillion v. Lightfoot,* 364 U.S. 339 (1960).  The lack of a "consistent pattern of official race discrimination" is not a barrier to an Equal Protection claim. See *Arlington Hts.,* 429 U.S. at 266, fn. 14.   "A single invidiously discriminatory governmental act. . .would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions.  *Ibid.,* citing *City of Richmond v. United States,* 422 U.S. 358, 378 (1975) (annexation taken for the purpose of discriminating against African Americans has no legitimacy under the Constitution). Superintendent Huppenthal's actions taken exclusively against a program designed to advance the academic performance of Latino students and their desire to unravel the substantial gains made by those students is "unexplainable on grounds other than [race and ethnicity]." *Ibid.,* 429 U.S. at 266.

  [88]  *Yick Wo,* 118 U.S. 356.

-22-

**Horne Findings Reveals Their Intent To Discriminate Against Latinos.**

The historical background of Superintendents Huppenthal and Horne's enforcement actions against the MAS program is relevant because "it reveals a series of official actions taken for invidious purposes."[89]   For years, both Superintendents Huppenthal and Horne have specifically attacked and questioned the very idea of teaching Mexican American history, heritage, and culture, and ***explicitly condemned*** the goal of creating a curriculum designed to enhance the academic success of Latino students, who represent ninety percent (90%) of MAS students.[90]   In 2007, in his official capacity as Superintendent of Public Instruction, Superintendent Horne issued a call to citizens of Tucson to end the MAS program.[91]   In support, he accused MAS of advocating "a kind of destructive ethnic chauvinism" and pointed to the fact that "[t]he very name 'Raza' is translated as 'the race,'" to him, a negative connotation of the term.[92]   He complained that Tucson High School students participate in MEChA, a Chicano youth organization, as an extracurricular activity and disapprovingly noted that he observed a Tucson High School librarian wearing a shirt with the MEChA insignia.[93] Also in the letter, Superintendent Horne claimed that the Mexican American history textbooks "Occupied America" and "The Mexican American Heritage" are inappropriate for students in MAS classes.[94]

When the citizens of Tucson chose not to take up Superintendent Horne's call to eliminate MAS, he drafted the legislation that was eventually introduced and passed as HB 2281.[95]   Superintendent Huppenthal carried on with the theme in his 2010 campaign and manipulated anti-Mexican American sentiment in Arizona to his advantage by making the eradication of MAS central to his campaign platform.  In an obvious display of ethnic bias, Superintendent Huppenthal ran television and radio

---

[89]  *Arlington Hts.*, 429 U.S. at 267.
[90]  Ct. Doc. No. 84-1, p.6
[91]  Ct. Doc. No. 162-5.
[92]  *Ibid.*, p.2.
[93]  *Ibid.*, p.3.
[94]  *Ibid.*, pp.2-3
[95]  Ct. Doc. No. 84, Ex. B, p.1.

1    advertisements in which he pledged that he will "stop La Raza."[96]

2                        **iii.    Superintendent Horne's Departure From the
                                Normal Procedural Sequence Reveals His Intent
3                                to Discriminate Against Latinos.**

4            Superintendent Horne's departure from the "normal procedural sequence" is

5    also proof that the long-standing effort to eliminate the MAS program was motivated

6    by an improper purpose.[97]  On January 2, 2011, just hours before he left office to

7    become the Arizona Attorney General, Superintendent Horne made an unusual last-

8    minute rush to declare TUSD's MAS program in violation of HB 2281, despite the fact

9    that it had been in effect for only 3 days, during which time no classes had taken

10   place.[98]  In support, Superintendent Horne cited and relied upon facts that all occurred

11   well before, and in some cases years before the statute was in force.  Superintendent

12   Huppenthal consequently conceded that Superintendent Horne's irregularities

13   required him to "determine if, in fact, TUSD was in violation of the statue ***post***

14   ***January 1, 2011.***"[99]

15   //

16   //

17                        **iv.    Superintendent    Huppenthal's    Rejection    of
                                Factors Usually Considered Important By An
18                               Educational Decisionmaker Reveals His Intent To
                                Discriminate Against Latinos.**

19

20           [96] Superintendent Huppenthal gave the following explanation as to what he meant when
     he said in his campaign ad that he would "Stop La Raza" in an interview aired on January 18,
21   2012.
     "Q: But if you could just answer that question–
22   A: –be something that they were proud–
     Q:  –because it goes to a more overarching issue, running a campaign ad that said you will
23   stop La Raza.  What does that mean?
     A: Well, La Raza became symbolic for all of these classes and the problems with them, that
24   we would get this controversy under control and resolve it.  That's with that–that's what that
     claim means.  La Raza was shorthand for all of the controversy associated with these classes."
25   Ct. Doc. No. 162-30. Interview transcript found at
     www.democracynow.org/2012/1/18/debating_tucson_school_districts_book_ban      (last
26   accessed February 12, 2012).
             [97] *Arlington Hts.*, 429 U.S. at 267, (this method of proving discriminatory intent involves
27   scrutiny of the "specific sequence of events leading up to the challenged decision" to shed light
     on the decisionmaker's purpose.)
28           [98] Ct. Doc. No. 84, Ex. B, p.4; Ex. D, p.1
             [99] Ct. Doc. No. 84, Ex. D, p.1.  (In his Finding, Superintendent Huppenthal erroneously
     describes the Horne Finding as issued on January 1, 2011 and the effective date of the statute
     as January 1, 2011.)

                                            -24-

Superintendent Huppenthal's discriminatory intent is also revealed by his substantive departure of the normal sequence of events, where "the factors usually considered important by [a] decisionmaker strongly favor a decision contrary to the one reached."[100]   Here there are three factors that would counsel a rational Superintendent of Public Instruction against finding a violation: 1) the voluminous data and observations supporting the conclusions of the Cambium auditors that the MAS program does not violate HB 2281, provides a valuable curriculum and helps at-risk students to succeed; 2) the relative lack of evidence to support a finding of a violation; and 3) the applicability of the statutory exceptions for "courses or classes that include the history of any ethnic group" and "the instruction of. . .the historical oppression of a particular group of people based on ethnicity, race, or class."

Contrary to Superintendent Huppenthal's condemnation of the MAS program, the Cambium Audit concluded that

> "student achievement is due to the sense of pride that develops through their accomplishments with highly effective teachers.   Many research-based practices that promote enhanced critical thinking and high-order comprehension of difficult topics is in place and used on a daily basis. Regardless of program, teacher effectiveness achieves results. Effective practices in combination with the motivation to learn for a purpose relevant to the students create these results. Students learn to be proud, regardless of ethnicity, and are motivated to exceed and excel."[101]

Because these observations and the other generally positive conclusions of the Cambium Report would strongly counsel a conclusion contrary to the one reached by Superintendent Huppenthal, the unusual nature of his efforts to discredit the Cambium Audit raises suspicions.

In a nationally broadcast interview on January 18, 2012, Superintendent Huppenthal made an unsubstantiated accusation that the Director of the MAS program played a role in the auditors' classroom observations. He stated, "...[W]hat

---

[100]   *Arlington Hts.*, 429 U.S. at 267 (emphasis added).  For example, where re-zoning for a low-income housing development in a white neighborhood was denied, yet the city planning directors testified that there was no reason "from a zoning standpoint" why the parcel should not be re-zoned to match the surrounding zoning classification, the court found that the lack of rational decisionmaking proved invidious racial discrimination. *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970).

[101]   Ct. Doc. No. 85, pp.49-50.

happened with the audit was revealing.  So, the founder of the Mexican Americans – the designer of the Mexican American Studies classes was able to control when the auditors went into the classes and which classes they went into."[102]  However, his accusation directly contradicts his own administrative Decision where his only finding on the matter was that the MAS director told the MAS teachers that "the auditors were going to make unannounced observations of their classes."[103]  More weighty evidence of the candidness of the auditors' classroom observations is the Cambium Report's own statement that,

> "[t]he classroom observations and site visitation schedule was neither announced, nor released to TUSD personnel with the goal of obtaining the most reliable data and maintain the integrity of the audit."[104]

In another interview, Superintendent Huppenthal declared that the observations of the Cambium audit team were unreliable because they did not match the "information" as to what takes place in MAS classrooms that had been reported to him.[105]  Superintendent Huppenthal's failure to account for the possibility that the information reported to him could be biased and flawed and that what took place in the classrooms during the auditors' many hours of observation is what genuinely takes place in MAS classrooms is strong evidence of his intent to discriminate. He predetermined his narrative of what goes on in MAS classrooms.  When the auditors

---

[102] Ct. Doc. No. 162-30.
[103] Ct. Doc. No. 162-9, p.10.
[104] Ct. Doc. No. 85, p.16.
[105] On the Buckmaster Radio show broadcast on June 21, 2011, the following exchange took place between host Bill Buckmaster and Superintendent Huppenthal:

"BILL BUCKMASTER: But do you – what about the audit, stating on page 50, "During the curriculum audit period, no observable evidence was present to indicate that any classroom within TUSD is in direct violation of the law.  In most cases, quite the opposite is true." and – "quite the opposite is true," and I think this is what has people here in Tucson confused.  They read that sentence in the audit report but then what you're ruling is in, really, a contradictory – there's a disconnect between the two.

JOHN HUPPENTHAL: Absolutely.  And the thing that weighed heavily on our mind to set aside that observation of what they observed in the classroom, two things.  One, the – the Mexican American Studies knew that the audit would be taking place that week.  And the nature of an audit is you're supposed to define facts and you – we have – *we have a lot of information that what was going on in Mexican American Studies did not match what they observed in that week. So that was what led us to set aside those observations as not being reliable for that week."*

Ct. Doc. No. 98-4, transcript of recorded interview of The Buckmaster Show, June 21, 2011, p.5 (emphasis added).

saw something different, Superintendent Huppenthal rejected not only the Cambium Report's observations, but its conclusions, as well. The extraordinary lengths to which Superintendent Huppenthal has gone to discredit the positive and independent conclusions of the Cambium Audit suggest a pretext for a discriminatory motive.[106]

Equally damning of Superintendent Huppenthal's decision to ignore the voluminous data and conclusions of the Cambium Report is the dearth of evidence he musters to purportedly support his fundamentally flawed finding that MAS violates HB 2281.  The Kowal/Huppenthal Decision relies on a review of text books and some lesson plans, cherry-picking excerpts, without identifying if they were ever used in MAS classes after December 31, 2010, and if so, where, when and in what  context they were used.  Amazingly, Superintendent Huppenthal made his Finding, convinced ALJ Kowal that he carried his burden to prove a violation of the statute, adopted the ALJ's Decision, enforced the Decision against TUSD, imposed a multimillion dollar retroactive penalty, forced the TUSD Governing Board to eliminate the MAS program to the detriment and distress of MAS students, parents, educators, and members of the Tucson community, banned MAS text books from the classrooms, and is now subjecting MAS students and teachers to self-censorship and oppressive compliance monitoring, all without ***ever*** proving the crucial elements as to whether any of the materials he relied upon were used in class while HB 2281 has been in effect and if so, the context in which they were used.

Superintendent Huppenthal admits his failure to produce any evidence in the ALJ hearing by wrongly contending that the plaintiffs put the matter of whether the cited texts had ever been used in class at issue in their Reply to the Superintendent's Response to their second Motion for Summary Judgment.[107]  This admission that he

---

[106]  *See Brown v. Li*, 308 F.3d at 958 (Reinhardt, J., dissenting).
[107]  See Superintendent's Expedited Motion to Continue Oral Argument On Motion for Summary Judgment and Cross-Motion for Summary Judgment, Ct. Doc. No. 170, p.3.  To the extent that the Superintendent claims that he was unaware of the need for such evidence in opposing the plaintiffs' Motion for Summary Judgment, the plaintiffs have consistently argued such a failure of evidence since filing their Motion on October 18, 2011.  See Ct. Doc. No.91, pp.27, 29, 35 and 38.

1    lacks competent evidence to prove whether the cited excerpts were ever used in MAS

2    classes after the effective date of the statute shines a spotlight on the invidious nature

3    of his actions.  Nor does he offer any context in which the excerpts to which he takes

4    exception were utilized.  No rational Superintendent of Public Instruction could have

5    come down the long path that Superintendent Huppenthal has traveled in the face of

6    so little evidence of what really happens in MAS classrooms.  This alone warrants a

7    finding of discriminatory intent.

8            And finally, the exceptions contained in subsections 112(E) and (F) are critical

9    factors that would strongly favor a decision contrary to that of Superintendent

10   Huppenthal. Those subsections provide that HB 2281 does not prohibit or restrict

11   "[c]ourses or classes that include the history of any ethnic group,"[108] "the discussion

12   of  controversial aspects of history,"[109] or "the instruction of the holocaust, any other

13   instance of genocide, or the historical oppression of a particular group of people based

14   on ethnicity, race, or class."[110] And yet, Superintendent Huppenthal based his

15   allegations of violations on materials that fall well within the exceptions, and

16   proceeded as if the exceptions did not exist at all.

17           Like Superintendent Horne before him, Superintendent Huppenthal issued his

18   Finding without mentioning the exceptions.[111]   Not until the Kowal/Huppenthal

19   Decision did he address his refusal to apply only subsection 112(F), but his strained

20   interpretation of the exception is not supported by the language of the statute and

21   relies upon the wholesale importation of language not found in the statute.  In relevant

22   part, the Kowal/Huppenthal Decision states:

23           "10.  The Administrative Law Judge concludes that A.R.S. §15-112(F) permits
             the historical *(objective)* instruction of oppression that may, as a natural but
24           unintended consequence, result in racial resentment or ethnic solidarity.
             However, teaching oppression objectively is quite different than actively
25           presenting material in a biased, political and emotionally charged manner,
             which is what occurred in MAS classes.  Teaching in such a manner promotes
26           social or political activism against the white people, promotes racial resentment,

27   _____

28           [108]  A.R.S. §15-112(E)(3).
             [109]  A.R.S. §15-112(E)(4).
             [110]  A.R.S. §15-112(F).
             [111]  Ct. Doc. No. 84, Ex. D.

1  and advocates ethnic solidarity, instead of treating pupils as individuals."[112]

2  Neither subsection 112(F) nor any other portion of HB 2281 contains the word

3  "objective."  ALJ Kowal and Superintendent Huppenthal grafted an interpretation onto

4  subsection 112(F) without basis.  But Superintendent Huppenthal's rationale reveals

5  one of the essential truths underlying his application of HB 2281 to the MAS program:

6  He disapproves of students learning about the oppression suffered by Mexican

7  Americans from the perspective of Mexican Americans.

8  Obviously, the study of discrimination from the viewpoint of Mexican Americans

9  looks very different than from the perspective of White Americans or from the sanitized

10  versions presented in most high school text books, if they discuss discrimination

11  against Mexican Americans at all.   MAS presents the study of racism from the

12  perspective of the people who have lived it, and racism is ugly.  MAS presents a

13  critical view of racism, not to inflame prejudices or to convince Latino students that

14  they are victims.  Rather, the MAS program seeks to teach students how to think

15  critically about American history, government and literature and recognize the

16  conditions that give rise to and nurture racism, and reveal to them the power that each

17  one of them has to create a more inclusive and accepting community for all people.

18  This was the conclusion of the Cambium Report that Superintendent Huppenthal

19  rejected out of hand.[113]

20  The irregularities and oddities of Superintendent Huppenthal's actions support

21  an inference of discriminatory intent because they "do not have a firm basis in well

22  accepted and historically sound non-discriminatory social policy."[114]  For example,

23  gerrymandering school attendance zones, discriminatory school siting and other

24  discriminatory devices is proof of a school district's intent to discriminate by

25  maintaining segregated schools.[115]  Similarly, where a text book "rating committee"

26  was created to insure that only the views of those in authority in Mississippi would be

27

28
---

[112] Ct. Doc. No. 162-9, p.35 (emphasis added).
[113] Ct. Doc. No. 85, p.55
[114] *U.S. v. Texas Education Agency,* 564 F.2d 162, 168 (5th Cir. 1977*).*
[115] *Ibid.,* 564 F.2d at 166.

communicated to school children, the committee's rejection of a text book that was critical of Mississippi's treatment of African Americans supported an inference of discriminatory intent.[116]    Here, Superintendent Huppenthal's tortured efforts to conclude that the MAS program promotes resentment and advocates ethnic solidarity are not based in well-accepted and historically sound non-discriminatory social policy. Rather, they are part of an explicit effort to suppress the ideas that spring from a Mexican American perspective of society.   Superintendent Huppenthal's rejection of the findings by the Cambium Report, the lack of evidence in support of his Decision finding the MAS program in violation of HB 2281 and his refusal to apply any of the statute's exceptions all indicate that he did not act as would a rational decision maker and points to a discriminatory purpose.

### v.   The Administrative History of Superintendent Huppenthal's Actions Reveals His Intent To Discriminate Against Latinos.

The administrative history of Superintendent Huppenthal's enforcement action and other discriminatory actions also display his discriminatory intent.  In his Finding and in the Kowal/Huppenthal Decision, Superintendent Huppenthal fails to include any guidance as to what changes to the MAS program would be necessary to bring the program into compliance.[117]  Further, he describes in ethnic terms what he does not like about the classes.  He objects to students learning that Mexican Americans have suffered oppression.[118]   He explicitly targets Latino students by objecting to the program's goal of "increas[ing] academic achievement for Latino students."[119]  As a direct result of TUSD's mandate to comply with Superintendent Huppenthal's Decision, TUSD administrators have used the same explicit ethnic criteria.  They have

---

[116]  *Loewen v. Turnipseed*, 488 F.Supp. 1138, 1149 (N.D. Miss. 1980).
[117]  Ct. Doc. Nos. 84, Ex.D; 162-9. In fact, his lack of direction prompted TUSD, in its Notice of Appeal, to complain that the Finding's "lack of specificity makes it impossible for TUSD to identify and remedy any alleged violation." Ct. Doc. No. 162-8, p.4. But Superintendent Huppenthal countered that "A.R.S. §15-112 does not require that the Superintendent or the Administrative Law Judge address how the District must come into compliance with the law." Ct. Doc. No. 162-9, p.35, ¶16.  The law was designed to shut the program down, not bring it into compliance.
[118]  Ct. Doc. No. 84, Ex.D, p.2; 162-29, pp.38:23 to 42:5.
[119]  Ct. Doc. No. 84, Ex.D, p.2.

1  instructed former MAS teachers that "[a]ssignments cannot direct students to apply

2  MAS perspectives" or use any of the Mexican American history textbooks.[120]

3        Under Superintendent Huppenthal's leadership, the ADE has engaged in other

4  administrative actions that discriminate against Latino students and teachers.  Most

5  recently, the U.S. Department of Justice, Civil Rights Division (CRD) and the U.S.

6  Department of Education, Office of Civil Rights (OCR) concluded a joint investigation

7  of the ADE's policy of monitoring the fluency in English of teachers of English

8  language learners by using subjective evaluations.[121]  The ADE conducted these

9  subjective on-site fluency monitoring practices despite the fact that the school districts

10  had already assessed the teachers' English fluency using objective measures and had

11  **no concerns** about the teachers' fluency.  As a result of its subjective evaluations, the

12  ADE accused teachers who pronounce "the" as "da", "another" as "anuder," and "lives

13  here" as "leeves here" of lacking sufficient fluency in English.[122]  The CRD and OCR

14  were concerned that the ADE's subjective evaluations "discriminat[e] against

15  Hispanics. . .who work as or wish to work as public school teachers in Arizona, and

16  that **such discrimination could deny public school students in Arizona equal**

17  **educational opportunities on the basis of national origin in violation of Title VI**

18  **and the EEOA."**[123]

19        The inescapable implication of all this evidence of discriminatory intent is that

20  Superintendent Huppenthal believes that learning about Mexican Americans from the

21  perspective of Mexican Americans is harmful to Latino students.  "The Constitution

22  cannot control such prejudices but neither can it tolerate them."[124]

23              **2.    The Elimination Of MAS Is Not Narrowly Tailored To Further**
                      **The State's Interest In Treating Pupils As Individuals And Not**
24                    **Teaching Them To Hate Other Races Or Classes Of People.**

25

26        [120]  Ct. Doc. Nos. 162-1, ¶¶11, 12; 162-4, ¶14; 162-14; 162-15.
          [121]  Ct. Doc. No. 113-4.
27        [122]  *Ibid.*, p.2.
          [123]  *Ibid.*  The ADE initially defended its actions, but later "confirm[ed] its commitment
28  to change its on-site teacher English fluency monitoring practices" and limit its inquiry to
     whether school districts "have certified that their teachers are fluent in English."  *Ibid.,* pp.2-3.
          [124]  *Palmer v. Thompson,* 403 U.S. 217, 260-61 (1971) (White, J., dissenting).

1    The rationale for strict scrutiny is especially compelling in this case.

2   Huppenthal's application of HB 2281 fails strict scrutiny because the elimination of the

3   MAS program does nothing to further the purpose of the statute to treat students as

4   individuals and not to teach them to hate other races or classes of people."[125]

5    There is no credible, relevant evidence that MAS students are not treated as

6   individuals and are taught to hate other people.  Although the trial testimony of MAS

7   teachers and students will prove that the teachers treat their students as individuals

8   and that they did not teach them to hate anyone, the most compelling evidence for the

9   purposes of this motion is found in the Cambium Report.

> "No observable evidence exists that instruction within the Mexican
> American Studies Department promotes resentment towards a race or
> class of people.  The auditors observed the opposite, as students are
> taught to be accepting of multiple ethnicities of people. [Mexican
> American Studies Department] teachers are teaching Cesar Chavez
> alongside Martin Luther King, Jr. and Gandhi, all as peaceful protesters
> who sacrificed for people and ideas they believed in.  Additionally, all
> ethnicities are welcomed into the program and these very students of
> multiple backgrounds are being inspired and taught in the same manner
> as Mexican American students.  ***All evidence points to peace as the
> essence for program teachings.  Resentment does not exist in the
> context of these courses.***"[126]

16    The Cambium Report demonstrates that MAS classes actually **further** the

17   State's interest in treating pupils as individuals and not teaching them to hate

18   others.[127]  In this respect, Superintendents Huppenthal's mission to shut down MAS

---

[125]  A.R.S. §15-111.

[126]  Ct. Doc. No. 85, p.55 (emphasis added).

[127]  Superintendent Huppenthal's contrary view strains logic.  In deposition testimony, he gave the following explanation as to why he determined that the MAS classes did not treat students as individuals.

   "Q....What I'm curious about is how you reach a conclusion that the classes and courses that you looked at did not treat pupils as individuals.

   A.  Well, A(3) and A(4) are almost – in a sense, they are almost identical provisions that when you do what the course materials do, that you create this model that essentially you're not treating them as individuals, that some whites oppress whites, you know.  You have all kinds of injustices that happen in society.  You have whites that oppress whites.  You have whites that oppress Hispanics.  You have Hispanics that oppress whites.  There are a wide variety of injustices out there.  When you try to create a context in which – of Caucasians oppressing Hispanics, you're not – that to me by definition is not treating students as individuals.

   Q.  What does it mean to treat students as individuals?

   A.  It means to – it means to in a historical context like that to be very careful about your communications with students.  We all have an obligation to make a better society and injustices can occur in all stripes and manners.  So when you create – when you actively work

1   is a paradox.  The program he vilifies actually supports *the same* interests that HB
2   2281 claims to promote.

3        This contradiction reveals the insincerity of the purported governmental interest
4   of teaching pupils not to hate other races or classes of people as applied in the
5   context of the propriety of teaching students from the perspective of Mexican
6   Americans.  Moreover, it proves that the means chosen to pursue this interest not
7   does not fit "so closely that there is little or no possibility that the motive for the
8   classification was illegitimate [ethnic] prejudice or stereotype."[128]  To the contrary, it
9   does not fit at all.

10       The reason for this disconnect is clear.  Superintendent Huppenthal has drawn
11  the MAS students into his efforts to garner votes in Arizona's current racially-charged
12  atmosphere.  Strict scrutiny reveals that his conduct is motivated in fact by "simple
13  [ethnic] politics."[129]  Superintendent Huppenthal cannot prove that the elimination of
14  MAS is narrowly tailored to promote treating pupils as individuals and not teaching
15  them to hate others and his application of HB 2281 should be struck down as a
16  violation of the Equal Protection Clause.

17       **3.    HB 2281 Discriminates On A Race/Ethnic Basis Against The Plaintiffs' Right To Engage In The Political Process.**

18       The MAS program represents years of effort by Tucson's Mexican American
19  community to develop a program to remedy the inequitable education that TUSD has
20  provided to generations of Mexican American students as a result of discrimination.[130]
21  Most importantly, the MAS program was achieving its desired result of raising its
22  students' academic achievement in what appears to be an important step forward in
23  the community's effort to eliminate educational disparities between Latinos and other
24
25

26  to create a class consciousness around a racial identity, that to me is a direct violation of
27  treating students as individuals."

    Ct. Doc. No. 162-29, pp.83:13 to 84:15.
28          [128]  *Richmond,* 488 U.S. at 493.
            [129]  *Ibid.*
            [130]  Ct. Doc. No. 162-2, ¶7.

groups, thus, "leveling the educational playing field."[131]  The TUSD Governing Board not only endorsed the creation of the MAS program, it agreed to maintain the program as part of its desegregation efforts, currently overseen by Judge Bury.  HB 2281 impermissibly strips the program's advocates, including the plaintiffs, of the ability to implement such a program at the school district level.

The two Supreme Court cases on point, *Hunter* and *Seattle*, "yield a simple but central principle:" A state may not "allocate[] governmental power nonneutrally, by explicitly using the **racial** nature of a decision to determine the decisionmaking process."[132]  Thus, HB 2281 violates the Equal Protection Clause because it targets a program that focuses on a racial or ethnic issue, in this case the persistent achievement gap affecting Latino students, caused and perpetuated by years of discrimination against Latinos, and removes the school district's authority to address **only** this racial or ethnic issue to a more remote level of government in a manner that puts up obstacles to Latinos' efforts to remedy past discrimination.

This type of race-specific classification need not identify a particular race or ethnicity to violate the Equal Protection clause.[133] The plaintiff in *Hunter* sought to make a complaint pursuant to Akron's anti-discrimination housing ordinance.  But voters amended the city's charter to require approval of the majority of voters before the city council could implement any ordinance regulating real property "on the basis of race."[134]  The Supreme Court found that this language in the charter amendment constituted "an explicitly racial classification treating racial housing matters differently from other racial and housing matters."[135]  Likewise, by targeting courses or classes designed "primarily for pupils of a particular ethnic group," the statute is clear on its face that a racial or ethnic issue is involved and treats ethnic educational matters

---

[131] The continued success of programs such as MAS at the levels of primary and secondary education would have the beneficial effect of obviating the need for affirmative action in higher education.

[132] *Washington v. Seattle Sch. Dist.*, 458 U.S. 457, 469-70 (1982). *Hunter v. Erickson*, 393 U.S. 385 (1969).

[133] *Hunter,* 383 U.S. at 390.

[134] *Ibid.,* 383 U.S. at 387.

[135] *Ibid.,* 383 U.S. at 389.

differently from other ethnic or educational matters.

A program has this type of racial focus if it "inures primarily to the benefit of the minority, and is designed for that purpose."[136]  The *Hunter/Seattle* cases also require that the law must work a reallocation of political power or reordering of the decisionmaking process that places special burdens on a minority group's ability to achieve its goals through that process. [137]  By imposing special burdens, state action of this kind makes it "***more*** difficult for certain racial and religious minorities than for other members of the community to achieve legislation that is in their interest."[138]

In passing HB 2281, the Arizona Legislature restricted the TUSD Governing Board's authority to address the educational inequities affecting Latino and other racial and ethnic minority students by prohibiting the Governing Board from implementing programs that "are designed primarily for pupils of a particular ethnic group."[139]  This impermissible reallocation of decision making is much like that in *Seattle*, where the school district devised a magnet school program with busing to integrate the schools. After opponents failed to convince the school board to reverse the program, they successfully promoted a state-wide initiative that prohibited assigning students to schools other than to their closest neighborhood schools.  Under the new scheme, minority groups that wished to implement the busing plan would no longer be able to do so by convincing the local school board, but would be compelled to mount a state-wide campaign to overturn the initiative.   The Supreme Court found the unconstitutional vice of the initiative was that it "placed ***burdens*** on the implementation of educational policies designed to deal with race on the local level" by "treating educational matters involving racial criteria differently from other educational matters."[140]

HB 2281 is equally flawed.  The MAS program, like the busing program in

---

[136] *Seattle,* 458 U.S. at 472.
[137] *Ibid.,* 458 U.S. at 460.
[138] *Ibid.,* 458 U.S. at 470 (emphasis in original), quoting *Hunter*, 393 U.S. at 395.
[139] A.R.S. §15-112(A)(3).
[140] *Seattle*, 458 U.S. at 469, quoting *Hunter*, 383 U.S. at 719 (emphasis in original).

1    *Seattle*, at bottom inures primarily to the benefit of Latinos, and is designed for that

2    purpose.  When Superintendent Horne failed in his efforts to convince Tucson citizens

3    to lobby the Governing Board to shut down the program, he drafted and successfully

4    promoted the passage of HB 2281.  The statute removed the Governing Board's

5    authority to act affirmatively in an educational matter involving ethnic criteria, but left

6    intact the Board's authority to deal with all other types of educational matters.  Like

7    supporters of the Seattle integration plan, supporters of MAS now must not only

8    convince the TUSD Governing Board to implement the program, as supporters of any

9    ***other*** type of educational program must do.  Rather, HB 2281 puts an ***additional***

10   burden on those who seek programs to address the achievement gap generally

11   suffered by Latino and other minority students by "lodging decisionmaking authority

12   over the question at a new and remote level of government."[141]  They now must clear

13   a much higher hurdle and also convince the Arizona Legislature, a body well-known

14   for passing legislation hostile to Latinos, to overturn HB 2281.[142]

15        It makes no difference that the State has the power to set curricula.  The State

16   has delegated that power, along with most other educational functions, to the local

17

18

19

20        [141]  *Seattle*, 458 U.S. at 483.

21   [142]  The reasoning of the Ninth Circuit ruling in *Coalition for Economic Equity v. Wilson,* rejecting a constitutional challenge on the basis of the Equal Protection clause's political process theory, does not apply to the facts at issue here.  122 F.3d 692, 696 (9th Cir. 1997).

22   *Wilson* involved an amendment to the California constitution prohibiting public race and gender preferences.  The constitutional challenge was only to the prohibition of government affirmative

23   action programs.  *Ibid.,* 122 F.3d at 697-98.  The Ninth Circuit distinguished *Seattle* on the basis that the California prohibition on racial and gender preferences "prohibits all its

24   instruments from discriminating against or granting preferential treatment to anyone on the basis of race or gender" and that its law "addresses in a neutral-fashion race-related and

25   gender-related matters. *Ibid.,* 122 F.3d at 707. Critical to the court's decision was the fact that the amendment at issue did not present an obstruction to equal treatment, but rather to

26   preferential treatment that creates a situation where there are winners and losers.  *Ibid.,* 122 F.3d at 708.  On the other hand, like the laws at issue in *Hunter* and *Seattle,* HB 2281 grants

27   no preferences that benefit one group while disadvantaging another and does not address ethnic-related matters in a neutral fashion.  Rather, it singles them out for different treatment

28   and thus presents an obstruction to equal treatment.  *Cf. Valeria v. Davis,* 307 F.3d 1036, 1040-41 (9th Cir. 2002) (racially neutral anti-bilingual education statute did not obstruct minorities seeking protection against unequal treatment where there was no evidence that the bilingual education system was enacted to remedy identified patterns of racial discrimination.)

1    governing boards.[143]  Just as the Supreme Court confronted in *Seattle*, the issue here

2    is not whether the State has the "authority to intervene in the affairs of local school

3    boards; it is, rather, whether the State has exercised that authority in a manner

4    consistent with the *Equal Protection Clause*."[144]   "In a most direct sense, this

5    implicates the judiciary's special role in safeguarding the interests of those groups that

6    are 'relegated to such a position of political powerlessness as to command

7    extraordinary protection from the majoritarian political process.'"[145]  Here, the Arizona

8    Legislature has exercised its considerable power to usurp the political process by

9    impermissibly denying Latinos the ability to advocate at the local level for an

10    educational program that remedies past discrimination and benefits their community.

11    This Court should require that Arizona extend Equal Protection of the laws to all of its

12    citizens and strike down HB 2281.

### C.   The Actions of Superintendent Huppenthal And TUSD Based On HB 2281 Violate the Students' First Amendment Rights To Receive Information and To Express Themselves.

15    Superintendent Huppenthal and TUSD have censored students' access to ideas

16    and chilled their right to express themselves in a manner seldom seen in American

17    public school classrooms.  In sum, HB 2281 has been used as was intended: to deny

18    students access to history, literature, government and art from a Mexican American

19    perspective because state officials disapprove of that perspective for partisan or

20    political reasons.[146]  The issue before the Court is not whether the State has broad

21    authority to make curricular decisions.  It does.  Nor is the question whether students

22    have the right to dictate their own curriculum.  They do not.  Rather, the very narrow

---

[143]   *See* A.R.S. §15-341; *Savage v. Glendale H.S. Union Sch. Dist.,* 343 F.3d 1036, 1044-48 (9th Cir. 2003) (discussing the decentralized nature of Arizona public schools, placing primary responsibility with the local governing boards.)  Absent HB 2281's constitutional violation, the development of educational programs is a matter to be addressed by the TUSD Governing Board in the normal course of the political process.  *See Seattle.*, 458 U.S. at 474 (absent a constitutional violation, "the desirability and efficacy of school desegregation are matters to be resolved through the political process.")

[144]   458 U.S. at 476. Before adoption of the initiative at issue, Washington, like Arizona, firmly committed the power to determine what programs met a district's needs within the local board's discretion.

[145]   *Ibid.,* 458 U.S. at 486 (citation omitted).

[146]   *See Bd. of Ed. Island Trees v. Pico*, 457 U.S. 853, 878-79 (Blackmun, J., concurring).

1    question for the Court is whether state and local officials can, for partisan or political

2    reasons, eliminate from classrooms a view point with which they disagree.   They

3    cannot.

4         First Amendment values remain powerful in the educational arena.   Education

5    is and should always be "the most important function of state and local

6    governments."[147]   Public schools prepare individuals for participation as citizens and

7    preserve "the values on which our society rests."[148]   "Indeed, the Constitution

8    presupposes the existence of an informed citizenry prepared to participate in

9    governmental affairs, and these democratic principles obviously are constitutionally

10   incorporated into our structure of government."[149]

11        It is beyond dispute that in the educational setting, students retain First

12   Amendment rights to express themselves, subject only to educators' authority to: 1.)

13   suppress vulgar, lewd, obscene and plainly offensive speech, 2). impose limitations

14   on school-sponsored speech that are reasonably related to legitimate pedagogical

15   purposes, and 3.) limit speech that materially disrupts classwork.[150]   Despite the

16   paramount authority that state and local officials are given to achieve these goals, "it

17   is beyond dispute that schools and school boards must operate within the confines of

18   the First Amendment."[151]   Justice Blackmun cautions that, while the "unique

19   environment" of schools substantially limits the extent to which First Amendment

20   values restrict official decisions, that unique environment "also makes it particularly

21   important that *some* limits be imposed."[152]   Most importantly, the State may not

---

[147] *Brown v. Bd. of Ed.,* 347 U.S. 483, 493 (1954).

[148] *Ambach v. Norwick,* 441 U.S. 68, 76 (1979).

[149] *Pico,* 457 U.S. at 876 (Blackmun, J., concurring).

[150] *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260 (1988); *Tinker v. Des Moines Indep. Comm. Sch.,* 393 U.S. 503 (1969); *Chandler v. McMinnville Sch. Dist.,* 978 F.2d 524, 529 (9th Cir. 1992),

[151] *Pico,* 457 U.S. at 876 (Blackmun, J., concurring); *see also West Va. Bd. of Ed. v. Barnette,* 319 U.S. 624, 637-38 (1943); *Monteiro v. Tempe Union High School Dist.,* 158 F.3d 1022, 1027 (9th Cir. 1998); *Meyer v. Nebraska,* 262 U.S. 390 (1923) (state may not forbid teaching foreign language in public and private schools); *Epperson v. Arkansas,* 393 U.S. 97 (1968) (state may not prohibit the teaching of evolution); *cf. Citizens United v. Fed. Election Comm'n.,* 130 S.Ct. 876, 911 (2010) ("Where Congress finds that a problem exists, we must give that finding due deference; but Congress may not choose an unconstitutional remedy.")

[152] *Pico,* 457 U.S. at 879 (Blackmun, J., concurring) (emphasis in original).

operate schools in such a manner as to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion" or as "enclaves of totalitarianism"[153] That is what has happened here.

The students' right to receive speech was recognized by a plurality of the Supreme Court in *Pico*[154] and by the Ninth Circuit in *Johnson v. Stuart*,[155] and *Monteiro v. Tempe Union High School Dist.*[156]  In the context of a school curriculum, this right rests on two First Amendment principles.[157]  First, is that the right to receive information is an inherent corollary of the rights of free speech and press.[158]  Under this theory, there must be a speaker who is willing to convey the information.[159] Second, and "[m]ore importantly, the right to receive ideas is a necessary predicate to the **recipient's** meaningful exercise of his own rights of speech, press, and political freedom."[160]  At issue is "the students' rights to receive a broad range of information so that they can freely form their own thoughts."[161]  This second theory focuses on the students' own development and does not depend upon the reciprocal relationship between speaker and recipient.[162]  The critical function of this right in the classroom setting is to guide the Nation's future by developing "leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'"[163]

---

[153] *West Va. Bd. of Ed.,* 319 U.S. at 642; *Tinker,* 393 U.S. at 510.

[154] 457 U.S. 853 (1982).

[155] 702 F.2d 193 (9th Cir. 1983)

[156] 158 F.3d at 1027, fn.5; *cf. Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002) (in the context of a doctor-patient relationship, "[i]t is **well established** that the right to hear–the right to receive information–is no less protected by the First Amendment than the right to speak.") (Kozinski, J., concurring) (emphasis added).

[157] *Monteiro,* 158 F.3d at 1027, fn.5.

[158] *Ibid.*

[159] *Stuart*, 702 F.2d at 195.  In *Stuart*, where the issue concerned students' right to prove that particular text books either were not submitted or were rejected in compliance with the statute, the books were found to be "willing speakers."

[160] *Pico,* 457 U.S. at 867, (emphasis in original).

[161] *Monteiro*, 158 F.3d at 1027, fn.5.

[162] Even if the plaintiffs' right to receive information and ideas depends on the existence of a willing speaker, the text books used in MAS classes are "willing speakers."  *See Stuart,* 702 F.2d at 195; Court Order re Motions: To Dismiss and For a Preliminary Injunction, Ct. Doc. No. 138, p.13.

[163] *Monteiro,* 158 F.3d at 1027, fn.5, citing *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603 (1967).

A narrow view of the students' right to receive does not place an affirmative obligation on the state to provide students with information or ideas.  Rather, it prohibits the State from denying access to an idea "simply because state officials disapprove of that idea for partisan or political reasons."[164]  The crucial distinction is "the State's decision to single out an idea for disapproval and then deny access to it."[165]  The Constitution "does not permit the official suppression of ***ideas***."[166]

The balance between a state's authority to prescribe curriculum and a student's right to receive ideas and information is a careful one.  The state may determine what is suitable for study in public schools, the teaching methods to be employed and educational tools to be used.[167]  These choices ordinarily  do not implicate students' First Amendment rights.[168]  Moreover, "[t]hese decisions may properly reflect local community views and values as to educational content and methodology."[169]

But the right to prescribe curriculum is not totally unfettered.[170]  When exercising its vast authority in the area of education, the State may not act in a manner that violates students' rights to Free Speech[171] and Equal Protection,[172] enforce vague laws in violation of their right to procedural Due Process,[173] or violate the students' rights to substantive Due Process.[174]  Even where the state engages in its own speech, a student may claim a violation of the right to receive ideas where the decision "was

---

[164] *Pico,* 457 U.S. at 879 (Blackmun, J., concurring).

[165] *Ibid.*

[166] *Pico,* 457 U.S. at 870-71, (emphasis in original).  This point was "cheerfully" conceded by the dissent.  457 U.S. at 907 (Rehnquist, J., dissenting).

[167] *Pratt v. Indep. Sch. Dist. No. 831,* 670 F.2d 771, 775 (8th Cir. 1982) (citation omitted).

[168] *Pico,* 457 U.S. at 879 (Blackmun, J., concurring).

[169] *Pratt,* 670 F.2d at 775, citing *James v. Bd. of Ed. Of Central Dist. No. 1,* 461 F.2d 566, 573 (2nd Cir. 1972), cert. denied 409 U.S. 947 (1973).

[170] *Pratt,* 670 F.2d at 776 (citations omitted); *see also* "The Many Faces of Government Speech," Randall P. Bezanson and William G. Buss, 86 *Iowa L. Rev.* 1377, 1421 (2001), ("Education is not criticized or challenged on legal grounds because it has a message but, rather, because the government has exceeded its authority-in effect, that what the government is doing with its educational institutions is *not* educating.")

[171] *Pico,* 457 U.S. 853.

[172] *Brown v. Bd. of Ed.*, 347 U.S. 483.

[173] *Stephenson v. Davenport Comm. Sch. Dist.*, 110 F.3d 1303 (8th Cir. 1997).

[174] *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925).

1   motivated by 'narrowly partisan or political' considerations."[175]  "Whether a decision

2   to exclude content is 'narrowly partisan or political,' in turn, 'depends upon the

3   motivation behind [the school officials'] actions.'"[176]

4        Where decisions that are purportedly curricular in nature threaten to restrict

5   students' First Amendment rights, the State must demonstrate that its action is

6   reasonably related to a viewpoint neutral legitimate pedagogical concern and that the

7   legitimate concern is the true motive for the decision.[177]  The official suppression  of

8   ideas can never be a legitimate pedagogical concern.[178]  In this case, Superintendent

9   Huppenthal's desire to suppress the Mexican American viewpoint because he

10  disapproves of it is not a legitimate pedagogical concern and cannot pass First

11  Amendment muster.[179]

12       Superintendent Huppenthal's disapproval of the Mexican American viewpoint

13  examined in the MAS classes is transparent in his Finding, the Kowal/Huppenthal

14  Decision, and his deposition testimony given during the administrative proceeding.

15

16       [175]  *Chiras v. Miller*, 432 F.3d 606, 620 (5th Cir. 2005).
        [176]  *Ibid.*  In *Chiras,* the student plaintiff failed to allege that the State's decision not to
17  adopt a particular textbook "was motivated by 'narrowly partisan or political' considerations,"
    but the court indicated that such allegations could form a claim of First Amendment violation,
    despite characterizing the selection of textbooks as "state speech."
18       [177]  *Hazelwood,* 484 U.S. 260; *Downs,* 228 F.3d at 1010; *Pratt,* 670 F.2d at 779 (court
    rejected school board's proffered reason for banning film);  *McCarthy v. Fletcher,* 207 Cal.
19  App.3d 130, 147 (Ct. App. 1989) (A legitimate pedagogical purpose motivating a school
    board's decision to exclude a book cannot be satisfied merely by expressing some educational
20  reason.  "[T]he true motives of the school board members must be examined to answer a First
    Amendment challenge.")
21       [178] *See Peck v. Baldwinsville Cent. Sch. Dist.,* 426 F.3d 617, 623 (2nd Cir. 2005), *cert.
    denied, Baldwinsville Cent. Sch. Dist. v. Peck,* 547 U.S. 1097 (2006) ("a manifestly viewpoint
22  discriminatory restriction on school-sponsored speech is, *prima facie* unconstitutional, **even
    if** reasonably related to legitimate pedagogical interests.")
23       [179]  The notion that the official suppression of the Mexican American view point is
    beyond the State's validly exercised authority is consistent with other First Amendment values.
24  Foremost is the fact that because the First Amendment is premised on a mistrust of
    government, it "stands against attempts to disfavor certain subjects or viewpoints."  *Citizens
25  United,* 130 S.Ct. at 898 (citation omitted). The particular Mexican American view point of
    history, government and literature is a matter of public concern and "speech on matters of
26  public concern is at the heart of the First Amendment's protection."  *Snyder v. Phelps,* 131
    S.Ct. 1207, 1215 (2011).  Even though Free Speech rights may be limited in an area where
27  the State has the authority to proscribe speech, the State cannot proscribe in a selective
    manner that "creates the possibility that [it] is seeking to handicap the expression of ideas."
28  *R.A.V. v. City of St. Paul,* 505 U.S. 377, 394 (1992).  Finally, the fact that some, but not all, of
    the MAS students are minors does not mean that they are not entitled to "a significant measure
    of First Amendment protection."  *Brown v. Entertainment Merchants Assoc.,* 131 S.Ct. 2729,
    2735 (2011).

He specifically credits the testimony of his own witnesses "that ***given the viewpoints expressed*** from materials used in the MAS program,. . .there is no way to use the materials without being in violation of the law."[180]   According to Superintendent Huppenthal, the materials are illegal because of the ideas they contain.

He specifically identifies the offending ideas in his Findings of Fact.   For instance,

> "[s]tudents are also taught 'critical race theory.'  Students are taught that, with respect to the existence of inequalities, to look "beyond the magical and naive stage' and 'look at structural and systemic boundaries' to address social injustices."[181]

Superintendent Huppenthal also points to certain books and lesson units as presumably illegal, such as "Mexican Whiteboy," by Matt de la Pena and the units titled, "Our History – Indigenous Roots and the Mexican Revolution Novels," and "Critical Race Theater," where students "critically dissect and identify components of critical race theory through literary works."[182]

In his deposition, Superintendent Huppenthal testified that during his visit to an MAS classroom in 2010, he was "concerned they had a poster of Che Geuvara up on the wall," [t]hey portrayed Benjamin Franklin as a racist to the kids,"  and also concerned with a class discussion "in which they were talking about their – this concept of oppression, being oppressed and who the oppressor was."[183] Some of the most patent evidence that Superintendent Huppenthal has engaged in the official suppression of ideas is his following testimony:

> "Q: Is there something else about that kind of oppressor/oppressed discussion or characterization that concerns you now in your role as superintendent in looking at the statute?

---

[180]  Ct. Doc. No. 162-9, p.34, ¶5.

[181]  Ct. Doc. No. 162-9, p.27, ¶149.

[182]  Ct. Doc. No. 162-9, p.29, ¶¶161-163.  Superintendent Huppenthal does not explain why he considers this book and these units to be illegal.  The banned book "Mexican Whiteboy" is a novel  about a half-Mexican American and half-white teenager who struggles with his self-identity in the absence of his Mexican father.  This theme is similar to that of the memoir, "Dreams of My Father," by Barack Obama.  The relevant difference being that students in TUSD's African American Studies classes are allowed to read President Obama's book, while students in the MAS program are prohibited from reading about the same type of experience from the perspective of a Mexican American boy.

[183]  Ct. Doc. No. 162-29, pp.38:6-7,11-12, 25, and 39:1-3.

1
2
3
4
5
6

> A: Absolutely.  As we look through the materials we see over and over again this model of an historical event that takes place in the context of some social injustice and it's characterized in racial terms, and instead of being viewed in a historical balance kind of way it's being viewed in racial terms as – and used as a call for racial solidarity and to – we see that model in the literature of oppression and always being in the context of a white Caucasian power structure and an Hispanic – an oppression of Hispanics.  And we see that over and over again as we go through the classroom materials.
> Q: And so how does that fit into 15-112?
> A: Well, we think it is a direct violation of the statute and we also think it's very inappropriate in an educational setting for that kind of continual context."[184]

7   The clear message from Superintendent Huppenthal is that teaching about

8   race- and ethnic-based oppression violates A.R.S. §15-112(A) and that using texts

9   that teach about such oppression violates the statute.   Given Superintendent

10  Huppenthal's above-quoted testimony, it is seems that assigning students to read Dr.

11  Martin Luther King Jr.'s Letter From The Birmingham Jail would violate HB 2281

12  because of his following observations regarding oppression:

13
14
15
16

> I had hoped that the white moderate would see this need.  Perhaps I was too optimistic; perhaps I expected too much. I suppose I should have realized that few members of the oppressor race can understand or appreciate the deep groans and passionate yearnings of the oppressed race, and still fewer have the vision to see that injustice must be rooted out by strong, persistent, and determined action. I am thankful, however, that some of our white brothers in the South have grasped the meaning of this social revolution and committed themselves to it.  They are still all too small in quantity, but great in quality.[185]

17
18  HB 2281 also makes clear that it suppresses some ideas, but not others.  One

19  of the statute's exceptions provides that "[n]othing in this section shall be construed

20  to restrict or prohibit the instruction of the holocaust, any other instance of genocide,

21  or the historical oppression of a particular group of people based on ethnicity, race,

22  or class."[186]   The State of Arizona will allow teaching and learning about the

23  oppression of Jews and other racial and ethnic groups in the Holocaust, but it will not

24  allow teaching and learning about the oppression of Mexican Americans to be

25  conducted in classrooms in Tucson, the very place where the oppression occurred

26
27
28

---

[184] Ct. Doc. No. 162-29, pp.41:11 to 42:5.
[185] Found at http://www.standford.edu/group/King/frequentdocs/birmingham.html (last accessed February 12, 2012).
[186] A.R.S. §15-112(F).

-43-

1   and continues to occur.[187]

2       The restriction of the students' First Amendment rights begins, but does not

3   end, with Superintendent Huppenthal's effective ban on MAS classes.  As the Court

4   recognized, the "broad ambiguity" in Superintendent Huppenthal's Decision made any

5   efforts "short of total abolition of the program" a practical impossibility.[188]  For that

6   reason, TUSD has gone to extreme measures in order to convince Superintendent

7   Huppenthal that it is in compliance.

8       TUSD's attorneys have advised that MAS text books cannot be used in

9   classrooms at all.[189]  Superintendent Huppenthal has demanded that TUSD provide

10  him with proof that all MAS instructional materials have been removed from the

11  classrooms.[190]  Mr. Dominguez was in class when TUSD officials entered, boxed text

12  books and removed them from his classroom.[191]  TUSD administrators have prohibited

13  MAS teachers from using any of their MAS lesson plans.[192]  Consequently, teachers

14

15      [187]  At Cholla High School, student may enroll in "Literature of Holocaust and War,"
16  which appears to be a course that Superintendent Huppenthal would find to be in violation of
    the statute, had it been offered in the context of an MAS class.  The course catalog describes
    it as follows:

17

18      "This course is meant to explore the atrocities of war and holocaust on the psyche of
        individuals and societies.  While many think of holocaust as something as an
19      occurrence in the past, it is still prevalent in many countries around the world.  Now, war
        and the idea of holocaust are physically distanced from American life, but it is important
20      that we learn how its affects [sic] can reverberate through a culture. This course is a
        study of how people's prejudice can escalate into a hate that causes another group to
21      be systematically segregated and eventually killed when no one questions or rallies
        against acts that are inhumane and cruel.  Through different sources of media, non-
22      fiction literature, critical essays and research we will examine what kinds of ethical
        responsibility we, as individuals, can take to avoid the sensitive issues of holocaust and
        war."

23  Ct. Doc. No. 162-24, p.9.
        [188]  Court Order re Motions: To Dismiss and For a Preliminary Injunction, Ct. Doc. No.
24  138, p.16, fn.14.
        [189]  Ct. Doc. 162-31, p.6, where Governing Board President Mark Stegeman stated, "I
25  think our guidance from counsel on this particular point is that for now they shouldn't use those
    books at all.  Now that may not be the case forever, but I think an issue for us here is that we
26  want to convince the Department of Education we're in compliance with the law, and I think our
    counsel is recommending that to make that case, and based on our discussions with them, that
27  we shouldn't, for the time being, use those books at all." See also, Ct. Doc. Nos. 162-1, ¶¶12,
    16; 162-4, ¶14; 162-14; 162-17.
28      [190]  Ct. Doc. No. 162-13.
        [191]  Ct. Doc. No. 162-3.
        [192]  Ct. Doc. No. 162-15.

have been required to develop entirely new lesson plans in the middle of the semester, sanitized of any conceivably offending material. MAS teachers have also been instructed that class assignments cannot direct the students to apply "MAS perspectives" to their work.[193]   However, despite repeated requests, TUSD administrators have not provided them with specific instruction and definition regarding what they can and cannot teach in the classroom.[194]   Being under threat of discipline for violating the statute, but not knowing precisely what speech or conduct will be deemed in violation, teachers have had no choice but to eliminate topics and curriculum relating to Latinos and literature written by Latinos.[195]   This type of "ethnic cleansing" is a perversion of education. As a result of Superintendent Huppenthal's enforcement measures, the MAS teachers must teach with their hands tied behind their backs and the students are deprived of the educational opportunities that great teachers provide to their students.

MAS students now must tolerate the presence of compliance monitors in their classrooms.[196]   The monitors take note of and report the classroom discussions, including the student comments.[197]   Students are also aware that students' class work has been and will continue to be turned over to compliance monitors.[198]   As a result, Mr. Dominguez has self-censored his written work to eliminate the word "oppression," as he understands it to be part of the forbidden "MAS perspective" and he is concerned that his use of the word could cause problems for his teacher.[199]   He is disturbed by the compliance monitoring of his work and sad and angry at the loss of his "most challenging classes."[200]   He is also upset by the fact neither TUSD Superintendent Pedicone, nor any of the school administrators or governing board

---

[193] Ct. Doc. No. 162-15.
[194] Ct. Doc. Nos. 162-1, ¶¶11, 13-15, 17; 162-4, ¶¶10, 11, 13.
[195] Ibid.
[196] Ct. Doc. Nos. 162-1, ¶¶17, 18; 162-3, ¶¶9, 10; 162-4, ¶¶11-13; 162-13, pp.1-2;162-15; 162-16; 162-18 to -20.
[197] Ct. Doc. No. 162-18.
[198] Ct. Doc. 162-3, ¶¶10, 13, 14.
[199] Ibid., ¶¶16-18.
[200] Ibid., ¶17

1    members that he has questioned have been able to identify how any of his MAS

2    classes or teachers violated HB 2281.[201]

3          The official suppression of ideas is rare in American public schools and

4    precedents are few.  The Eighth Circuit found this type of constitutional violation where

5    a school board banned the showing of the film version of Shirley Jackson's short

6    story, "The Lottery" because board members perceived the ideas expressed to be a

7    "threat to the students' religious beliefs and family values."[202]  The main objections

8    were that the film's theme or purpose was "the breakdown of family values and

9    tradition," thus viewing the films may cause students to "begin to question their own

10   family loyalties," and that the film portrayed a "vengeful God" rather than a "loving

11   God."[203] While recognizing the breadth of the school board's authority to determine

12   curriculum in a manner that reflects local community views and values, the court held

13   that the board violated the students' right to receive information when it banned the

14   film because a majority of its members objected to the ideas expressed in it.[204]

15         Here Superintendent Huppenthal professes a similar concern, *i.e.* that the idea

16   of racial oppression examined in MAS classes causes students to resent white

17   people.[205]  Just like the school board in *Pratt*, Superintendent Huppenthal's actions to

18   eliminate the MAS program on the basis of ideology violates the students' First

19   Amendment rights.   His desire to restrict the students' access to the idea of

20   oppression against Latinos is not a viewpoint neutral, legitimate pedagogical concern

21   as required by *Hazelwood* and *Downs*.

22

23         [201]   Ibid.
24         [202]   *Pratt,* 670 F.2d at 776-77.
             [203]   Before acting, the school board created a "Challenge Committee" to evaluate the
25   film and the dispute.   *Ibid.*, 670 F.2d at 777.   The board disregarded the Challenge
     Committee's recommendation to keep the film for high school students, much like
26   Superintendent Huppenthal rejected Cambium's conclusion that MAS classes benefit students
     and do not violate the law.
27         [204]   Important to the court's holding was the finding that the board did not in fact act in
     response to a concern for the film's "undue emphasis on violence." *Ibid.*, 670 F.2d at 777.
28   Were the board in fact so motivated, the film's removal would have been a proper exercise of
     its authority.  *Cf. Bethel Sch. Dist v. Fraser,* 478 U.S. 675, 685 (1986) (school district may
     prohibit student speech that is "offensively lewd and indecent.").
             [205]   Ct. Doc. No. 162-9, p.35, ¶10.

-46-

1
2
3
4
5
6

Viewpoint discrimination is especially harmful here where it threatens to distort the nature of the educational institution.  For example, in *LSC v. Velazquez*, the government violated the First Amendment where it funded legal representation, but imposed viewpoint-based restrictions on the lawyers, prohibiting them from making certain arguments on behalf of their clients.  The Court explained that such restrictions "distort[ ] the legal system by altering the traditional role of the attorneys."[206]

7
8
9
10
11
12

In this case, HB 2281 and Superintendent Huppenthal's discrimination against the viewpoint of Mexican Americans communicated by the MAS curriculum distorts the role of education.  Rather than "safeguard the fundamental values of speech and inquiry and of belief,"[207] and "teach by example the shared values of a civilized social order,"[208] Superintendent Huppenthal gives the students a remarkable lesson.  He gives them a first-hand lesson in government oppression.

13
14
15
16
17
18
19
20

This is not a case of a court determining the authority of a school or school district to engage in its day-to-day operations.  A principal has the authority to withhold publication of a student newspaper story that is potentially defamatory and an invasion of family privacy,[209] or to take down a teacher's materials on a bulletin board that do not comport with the school-sponsored message.[210]  Likewise, a student may be disciplined for a sexually provocative speech at a mandatory school program,[211] or for displaying a banner at a school-sanctioned event that appears to promote illegal drug use.[212]  Yet, none of these cases present a scenario of absolute government authority.

21
22

But the instant case is much different.  Here, the State and Superintendent Huppenthal seek to censor the very stories that American schoolchildren are taught

23
24
25
26
27
28

[206]  531 U.S. 533, 534 (2001).  *See also Arkansas Educ. Television Comm. v. Forbes,* 523 U.S. 666, 675 (1998) ( to allow a public television station to exclude a political candidate from a televised debate on the basis of viewpoint discrimination would present the "inevitability of skewing the electoral dialogue."); *Conant*, 309 F.3d at 638 (Government prohibition against physician recommending the use of marijuana to a patient altered the traditional relationship between medical professionals and patients).
[207]  *Epperson*, 393 U.S. at 104.
[208]  *Fraser*, 478 U.S. at 683.
[209]  *Hazelwood*, 484 U.S. 260.
[210]  *Downs*, 228 F.3d 1003.
[211]  *Fraser*, 478 U.S. 675.
[212]  *Morse v. Frederick*, 551 U.S. 393 (2007).

about their nation and its principles, conflicts, wars, and treatment of others.  No court should endorse such absolute power over these types of lessons where the government censorship is racially discriminatory, vague, selectively designed, selectively enforced, and viewpoint-specific.  Superintendent Huppenthal's Findings, the Kowal/Huppenthal Decision and HB 2281 embody invidious discrimination and have been applied to suppress the plaintiffs' First Amendment rights to free speech. This Court should strike them down.

### D. The Actions of Superintendent Huppenthal and TUSD Infringe On the Liberty Interests of the Students and Parent.

The Fourteenth Amendment provides, "No State shall. . .deprive any person of life, liberty, or property, without due process of law."  As a liberty interest, the law "affords constitutional protections to personal decisions relating to. . . education,"[213] although such decisions are not afforded heightened protection as a fundamental right.[214]   Ethnic studies programs in general,[215] and TUSD's MAS program in particular,[216] have proven to be of particular benefit to enhance the academic achievement of Latino students.  On the other hand, elimination of courses designed to enhance the academic success of Latino students has no effect on whether students are treated as individuals.  Thus, the goal of HB 2281 to eliminate the MAS program does not rationally further any legitimate state interest and HB 2281 unreasonably infringes upon the student and parent plaintiffs' liberty to choose this type of educational program that has been demonstrated to be of particular value to them as Latino students, and is offered by the school district.

Under the substantive due process analysis, Superintendent  Huppenthal has the burden to prove that his action to terminate MAS is rationally related to a legitimate state interest that justifies intruding into the educational decisions of parents and their

---

[213] *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992); *see also Meyer*, 262 U.S. at 399 (Liberty interest encompasses right of individual "to acquire useful knowledge.").

[214] *Ibid.*, 262 U.S. at 399.

[215] *See* "The Academic and Social Value of Ethnic Studies: A Research Reveiw" by Christine E. Sleeter, PhD., Ct. Doc. No 110-5.

[216] Ct. Doc. 85, pp.49-50.

1   children.[217]   A.R.S. §15-111 declares the State's interest in treating students as

2   individuals.  But in reality, there is no legitimate state interest because HB 2281 is

3   borne out of an invidious attempt to deny Mexican American identity and culture.

4   Much  like  the  Colorado  law  prohibiting  anti-discrimination  laws  protecting

5   homosexuals which was struck down by the Supreme Court in *Romer*, HB 2281 is

6   "inexplicable by anything but animus toward the class it affects."[218]

7         This case is similar to *Meyer v. Nebraska*, where the Supreme Court invalidated

8   a state law prohibiting students younger than eighth grade from learning in a language

9   other than English.[219]  Important to the Court's determination that parents have a right

10   to control their children's education and that students have the right to acquire

11   knowledge, was the regard for education and acquisition of knowledge by the

12   American people "as matters of supreme importance that should be diligently

13   promoted."[220]   To that end, according to the Ninth Circuit, *Meyer* stands for the

14   principle that "the state cannot prevent parents from choosing a specific educational

15   program."[221] Yet, that is precisely what HB 2281 and Superintendent Huppenthal have

16   done.  They have prevented parents and students from choosing a program offered

17   by TUSD.   The Supreme Court also held that the state's desire "to foster a

18   homogenous people with American ideals" went beyond the State's legitimate

19   authority.[222]  Likewise, any attempt by the State of Arizona to shut down the MAS

20   program in the interest of fostering a homogenous people with an exclusive version

21   of American ideals is also an illegitimate interest.

22         Arizona's current political climate is hostile to Mexican Americans.  The

23

24         [217] *Lawrence v. Texas,* 539 U.S. 558 (2003); *see also Romer*, 517 U.S. at 631 ("if a law
     neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative
25   classification so long as it bears a rational relation to some legitimate end.")
          [218] *Ibid.*, 517 U.S. at 632.
26         [219]  262 U.S. 390.
          [220]  *Ibid.*, 262 U.S. at 400.
27         [221]  *Fields v. Palmdale Sch. Dist.,* 427 F.3d 1197, 1206 (9th Cir. 2005)
          [222]  *Meyer*, 262 U.S. at 402.  The Supreme Court also criticized the Nebraska Supreme
28   Court's exemption of teaching Latin, Greek or Hebrew from the foreign language ban, much
     like HB 2281 specifically exempts the instruction of the Holocaust and other incidences of
     genocide, while attempting to ban teaching about the oppression of Mexican Americans.  See
     A.R.S. §15-112(F).

1  Supreme Court has warned that "times can blind us to certain truths and later

2  generations can see that laws once thought necessary and proper in fact serve only

3  to oppress."[223]   Should the State be successful in its efforts to eliminate MAS, the

4  stigma to Latino students,   as well as to Mexican Americans in general would be

5  inevitable, as was the stigma that attached to the Texas law criminalizing homosexual

6  conduct in *Lawrence v. Texas.*[224]   There is no legitimate state interest that can justify

7  this type of intrusion into students' lives and educational choices.

8  According to the Cambium report, there was no indication that teachers in MAS

9  classes failed to treat students as individuals or in any way violated HB 2281.  To the

10  contrary, auditors observed that "teachers collectively are building nurturing

11  relationships with students," that "a culture of respect exits," and that "students from

12  many ethnicities are physically sitting in Mexican American Studies Department

13  classes and are learning that different perspectives are valuable, that Americans come

14  from may backgrounds, and that ***being an American means that all people are***

15  ***accepted.***"[225]

16  Elimination of the MAS program will not further the state's interest in treating

17  students as individuals.   To the contrary, by eliminating a program that teaches

18  students that "being an American means that all people are accepted," the state will

19  damage its own purported interest.  HB 2281 is not rationally related to a legitimate

20  state purpose and must be stuck down.

21  **III.    THE BALANCE OF EQUITIES TIPS IN FAVOR OF THE PLAINTIFFS.**

22  The hardships faced by the plaintiffs far outweigh any negligible hardship to the

23  State.   Mr. Dominguez has already lost the three MAS classes that he began this

24  semester and faces the prospect of forever losing the opportunity to complete them.

25  He has seen his text books packed up and taken away and his classroom fall under

26  a pall of trepidation.   He has also seen his teachers struggle with the vague

27

28

---

[223] *Lawrence,* 539 U.S. at 579; *Raich v. Gonzalez*, 500 F.3d 850, 865 (9th Cir. 2007).
[224] 539 U.S. at 575.
[225] Ct. Doc. No. 85, p.63 (emphasis added).

1    restrictions placed on their classroom speech. Most importantly, Mr. Dominguez faces

2    the disquieting fact that what he might say in class and in his class work could

3    negatively affect his teachers.

4        Ms. Lopez initially registered for Latino Literature and American History-Mexican

5    American Perspectives for the fall semester 2012. Those classes now have been

6    eliminated. All three students could lose the opportunity to benefit from a successful

7    program and to gain a potentially transformative educational experience that the

8    district continues to offer to other students in the other Ethnic Studies programs.

9        As a Latino parent of a MAS student, Ms. Dominguez has had her right to

10   choose an educational program for her child and her opportunity to participate in the

11   political process and to advocate for her child and for her community hijacked by the

12   State. Moreover, all of the plaintiffs are at risk of suffering the indignity of having a

13   marker of Mexican American cultural pride wiped out for invidious reasons. On the

14   other hand, Superintendent Huppenthal would be unaffected and suffer no harm by

15   enjoining him from any further enforcement action.

16       In assessing whether the plaintiffs have carried this burden of what the Ninth

17   Circuit refers to as "the balance of hardships," the district court must "balance the

18   interests of all parties and weigh the damage to each."[226] Under these circumstances,

19   the balance of hardships tilts sharply in the plaintiffs' favor.

20   **IV.    AN INJUNCTION IS IN THE PUBLIC'S INTEREST.**

21       The public interest prong requires the Court to consider "whether there exists

22   some critical public interest that would be injured by the grant of preliminary relief."[227]

23   There is not. Rather, the Constitutional harms loom large here. It is not in the public's

24   interest to allow the state to violate the Constitution, "especially where there are no

25   adequate remedies available to compensate the . . .plaintiffs for the irreparable harm

26

27

28

---

[226] *Storman's Inc. v. Selecky,* 586 F. 3d 1109, 1138 (9th Cir. 2009).
[227] *Cottrell*, 632 F.3d at 1138 (citation omitted).

-51-

1    that would be caused by the continuing violation."[228]

2         The public has a paramount interest in education.  In determining whether the

3    public interest favors the issuance of an injunction, the Court should carefully consider

4    the effect on those at-risk students that the program is designed to help.  It would most

5    certainly not be in the public interest to deny them the opportunity to improve their

6    academic performance through a program that has been proven especially successful

7    in reaching them where other programs fail.  It also would not be in the public interest

8    to allow a band of politicians to exploit anti-Mexican American sentiment for political

9    gain.  And it would certainly not be in the public interest to allow one public official to

10   exercise unchecked authority to ban books and drive out learning about a particular

11   viewpoint from the perspective of Mexican Americans.

12   **V.    THE PLAINTIFFS HAVE SATISFIED THE SERIOUS QUESTIONS TEST.**

13        Since the Plaintiffs have met all four elements necessary to grant a preliminary

14   injunction, the Court may balance the prongs of the test, "so that a stronger showing

15   of one element may offset a lesser showing of likelihood of success on the merits."[229]

16   "In other words, 'serious questions going to the merits' and a hardship balance that

17   tips sharply toward the plaintiff can support issuance of an injunction, assuming the

18   other two elements of the *Winter* test are also met."[230]

19        Plaintiffs have proved the likelihood of success on the merits and there is little

20   doubt that the hardship balance tips sharply in their favor.  By preserving the serious

21   questions test, the Ninth Circuit has endorsed "the longstanding discretion of a district

22   judge to preserve the status quo with provisional relief until the merits could be sorted

23   out in cases where the clear irreparable injury would otherwise result and at least

24   'serious questions' going to the merits are raised...."[231]  The Court should exercise its

25

26   ---

     [228] *Cal. Pharmacists Assoc. v. Maxwell-Jolley*, 563 F.3d 847, 852-53 (9th Cir. 2009); *U.S. v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), cert. granted *Arizona v. U.S.,* 132 S.Ct. 845
27   (2011) (not equitable or in the public's interest to allow the state to violate the requirements of federal law); *see also Enyart v. National Conf. of Bar Examiners*, 630 F.3d 1153 1167 (9th Cir.
28   2011) (public has interest in ensuring the eradication of discrimination).
     [229] *Cottrell*, 632 F.3d at 1131.
     [230] *Ibid.*, 632 F.3d at 1132.
     [231] *Ibid.,* 632 F.3d at 1134.

1    equitable powers and discretion to preserve the status quo and enjoin the application

2    of A.R.S. §15-112.

3                                    **CONCLUSION**

4            HB 2281 is a flawed law conceived in the bias, prejudice and malice of public

5    officials of the state of Arizona with the sole purpose to eliminate one educational

6    program in a single public school district. That the program was designed to remedy

7    historically poor educational achievement by the state's largest minority group was of

8    no concern. If anything, it emboldened the desire to impose strict limitations on a

9    group that was proving to be too unconventional, too educated, too successful in

10   educating students with a strong academic identity anxious to take their rightful place

11   in the promise of vibrant ever evolving democracy.

12           The sin of Mexican American Studies in TUSD was to develop Latino students

13   with a Latino identity, one that included graduating from high school, attending college

14   and respecting the rights of every person irrespective of color, race, ethnicity, gender,

15   sexual orientation, disability or social status. The program even had the audacity to

16   start a class with clapping and recite "Tu Eres Mi Otro Yo" a poem that instills the

17   fundamental value of the golden rule. The only revolution in an MAS class was

18   instilling the lust for reading, learning and challenging conventional wisdom through

19   critical thinking. The program dared to teach that the earth just might be round, and

20   not the flat one dimensional surface that is safe and comforting to the current

21   possessors of political power.

22           HB 2281 represents an abuse of political power, where the state government

23   overreached the limits of its legitimate power to govern. When such excesses occur,

24   it is the Constitution that intervenes and protects all equally from such abuses. In this

25   instance, it is the right of Latino students to have the opportunity to know their history,

26   literature and culture that has been eliminated, along with the opportunity to develop

27   a new academic identity premised on success. If the State of Arizona can take away

28   the right of students to learn about the historical, literary and artistic contributions of

     Mexican Americans to the American experience, then every group is at risk of such

unbridled governmental power. The fact that the teachers "are educating the young for citizenship is a reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."[232] Whatever legitimate role the State may have in setting curriculum standards in Arizona, it must be "within the limits of the Bill of Rights."[233] This is the fundamental requirement that HB 2281 and its application fails to meet.

Plaintiffs do not seek the intervention of this Court to controvert or supersede the legitimate role of the local Governing Board to make curricular decisions. To the contrary, plaintiffs seek to preserve the role of the elected officials of TUSD to decide what curriculum is appropriate and necessary and beneficial for its student population.[234]

Whereas the plaintiffs respectfully request that the Court grant the relief requested in this motion for preliminary injunction.

Respectfully submitted this 5th day of March, 2012.

s/*Richard M. Martinez,* Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs and
Plaintiffs- Intervenors

### Certificate of Service

I hereby certify that on March 5, 2012, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of the instant motion via the Notice of Electronic Filing to the CM/ECF registrants of record.

---

[232] *West Virginia*, 139 U.S. at 637.
[233] *Pico*, 457 U.S. at 864.
[234] See *Hazelwood*, 484 U.S. at 273 ("education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not federal judges.")(citations omitted); *see also Pico*, 457 U.S. at 864 ("At the same time, however, we have necessarily recognized that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment.")

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

s/*Richard M. Martinez,* Esq.
RICHARD M. MARTINEZ, ESQ.
Counsel for Plaintiffs and
Plaintiffs-Intervenors