| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF ARIZONA |

| | | |
|---|---|---|
| 3 | | |
| 4 | MAYA ARCE, et al.,            ) | CV 10-623-TUC-AWT |
| | Plaintiffs,     ) | |
| 5 | ) | |
| 6 | and                  ) | |
| 7 | NICHOLAS DOMINGUEZ, et al,   ) | March 19, 2012 |
| | )                  | Tucson, Arizona |
| 8 | Intervenors,    ) | |
| 9 | vs.                   ) | |
| 10 | JOHN HUPPENTHAL,        ) | |
| | Superintendent of Public    ) | |
| 11 | Instruction, in his Official  ) | |
| | Capacity, et al.,          ) | |
| 12 | )                  | |
| | Defendants.     ) | |

| | |
|---|---|
| 13 | |
| 14 | MOTION FOR SUMMARY JUDGMENT<br>CROSS-MOTION FOR SUMMARY JUDGMENT |
| 15 | BEFORE:  HONORABLE A. WALLACE TASHIMA<br>UNITED STATES CIRCUIT JUDGE |
| 16 | 405 W. CONGRESS<br>TUCSON, ARIZONA 85701 |
| 17 | |
| 18 | A P P E A R A N C E S |
| 19 | FOR THE PLAINTIFFS:  MR. RICHARD MARTINEZ, ATTORNEY AT |
| 20 | LAW. |
| 21 | FOR THE DEFENDANTS:  MR. THOMAS C. HORNE, ARIZONA<br>ATTORNEY GENERAL; KEVIN D. RAY and JINJU PARK HURTADO,<br>ASSISTANT ATTORNEYS GENERAL. |
| 22 | DIANNE DAVENPORT, RDR, CRR |
| 23 | 405 W. CONGRESS, SUITE 1500<br>TUCSON, ARIZONA 85701 |
| 24 | (520)205-4266 |
| 25 | Proceedings Prepared by Computerized Realtime Translation |

1          P R O C E E D I N G S

2          (Call to order of court, 9:55 a.m.)

3          THE CLERK:  Civil case 10-623, Acosta versus

4   Huppenthal, on for motion hearing.

5          MR. MARTINEZ:  Richard Martinez on behalf of the Arce

6   plaintiffs, Your Honor.

7          THE COURT:  Good morning.

8          MR. HORNE:  Good morning, Your Honor.  Tom Horne,

9   Arizona Attorney General.  I have with me Kevin Ray and Jinju

10   Hurtado from our office.  They are coming forward.

11          THE COURT:  Good morning to you, sir.

12          Okay.  These are, I guess, cross-motions for summary

13   judgment, right?

14          MR. MARTINEZ:  Yes, Your Honor.  Plaintiffs filed their

15   motion October the 18th of 2011.  There was a cross-motion filed in

16   January by the defendant.  That is --

17          THE COURT:  Since we have cross-motions, I'll hear

18   from the plaintiffs first.  Plaintiffs can, you know, argue in rebuttal on

19   its motion.  Then I'll give defendants the opportunity to argue in

20   rebuttal on the defendants' motion, all right?  So both sides will get

21   two shots.

22          Go ahead, Mr. Martinez.

23          MR. MARTINEZ:  Thank you, Your Honor.

24          At the outset, Your Honor, let me -- given the range of

25   issues here, let me ask the court if there's anything of -- specifically

1    that you would like addressed?

2          THE COURT:  Well, you know, there are a lot of parts to

3    these motions.

4          MR. MARTINEZ:  Yes, sir.

5          THE COURT:  To me the --

6          MR. MARTINEZ:  I didn't know if there was a

7    particular --

8          THE COURT:  I think the most viable grounds that the

9    plaintiffs assert, and I haven't reached, you know, reached a

10    determination on this yet, are overbreadth and vagueness.  I think

11    those are your best grounds, you know.

12          And you have to remember now, we're looking at this

13    only now -- only from the viewpoint of the students, right?

14          MR. MARTINEZ:  Yes, sir.

15          THE COURT:  So to me those are the most viable

16    grounds.  So, you know, you can take it from there.

17          MR. MARTINEZ:  Thank you, Your Honor.

18          As the court is aware, and as the court has already

19    indicated at least on a preliminary ruling, that the plaintiffs in this

20    case are all students and that these students have First Amendment

21    rights that have been recognized both in the Ninth Circuit and by the

22    supreme court.

23          For that line of authority, Your Honor, with respect to

24    their right to receive from a willing speaker, we have the authority

25    that comes from Johnson v. Stuart, from Monteiro and from Pico.

1        But we have also supplemented our citations to the

2  court, Your Honor, with the Virginia State Board of Pharmacy decision

3  by the supreme court which makes clear about the protection and that

4  it is not a reciprocal protection, but the First Amendment interest of

5  these students is not dependent on a speaker who has a First

6  Amendment right or First Amendment interest in this case.

7        As we look at the willing speaker here, Your Honor, and

8  try to identify who are they in the context of this particular case, we

9  find that willing speakers are books that have been removed at the

10  insistence of the State of Arizona.  We find that they are course

11  materials, curriculum, that they are all materials that were related to

12  Mexican American Studies that have been ordered to be removed by

13  edict of the superintendent of public instruction for the State of

14  Arizona.

15        We have speakers who -- even in the form of the

16  teachers, Your Honor, and recalling that -- and I would point to the

17  court's -- to the decision in Kleindienst, Your Honor, in Kleindienst v.

18  Mandel, where it was noted that even though there was no right -- and

19  in that particular case, Your Honor, in Kleindienst v. Mandel, you have

20  no right for the person who was an alien attempting to come to the

21  country on a temporary visa to give a speech, no First Amendment

22  interest on his part.  There is certainly the First Amendment interest

23  on the part of the speakers, the faculty, to have heard him and

24  engaged in debate with him.

25        In addition, Your Honor, in the decision in which you

1  participated, in <u>Cohen v. San Bernardino Valley College</u>, again there

2  was recognized there that there's an interest and how this interest

3  requires that there be -- that there be a specific kind of statute or

4  specific kind of prohibition so there's not essentially an ambush which

5  has occurred here.

6  Because of this First Amendment interest, Your Honor,

7  <u>California Teachers</u>, as you know, provides that there is heightened

8  scrutiny, that there is strict scrutiny required here.

9  Strict scrutiny and the constitutional interests of these

10  students, I think demanding heightened scrutiny or strict scrutiny

11  here, derives in two parts.

12  First, the First Amendment interest that we've made

13  reference to.  Also, Your Honor, the record is complete with respect to

14  the differential treatment, the lack of equal protection.

15  And in that sense we point the court to the record with

16  respect to the distinctions both at the discrete level and at the gross

17  level with respect to singling out a single program, Mexican American

18  Studies at TUSD.

19  Within TUSD there are other similar programs.  There's

20  the Native American program, there's the African American program,

21  and there's the Pan Asian Studies program.

22  We've also provided to the court the record that in fact

23  you have courses that are specific -- the exact same courses that were

24  going on in Mexican American Studies not only continue in this school

25  district with the approval of the state superintendent with respect to,

1     for example, the junior class American History from African American

2     perspectives, American History from Native American perspectives.

3     We also have classes in literature again from the African American and

4     the Native American perspective.

5            And we even offer, Your Honor, a course which we

6     believe was most telling and perhaps startling in revealing the kind of

7     differential treatment, the complete failure to look at this program in

8     other than from the viewpoint, the orthodoxy, the mandate here to

9     quash this program.

10           And in the program that's at Cholla High School, Your

11    Honor, which is called Literature of the Holocaust and War, and there

12    you point out, Judge, is that it talks specifically in that course syllabus

13    about what occurs in war and how do we get to a holocaust and how is

14    it that people become oppressed and how is it they become so

15    devalued that they can end up being slaughtered en masse.

16           And in the syllabus it also goes on to state, Your Honor,

17    that this course then studies the role of society and the individuals

18    within the society and their responsibilities with respect to such events

19    and to what is their responsibility to stopping such events.  That in

20    essence, Your Honor, was the Mexican American Studies.

21           And what we have is a superintendent who believes that

22    if you are outside of Mexican American Studies, the concept of

23    oppression is acceptable and can be taught.  If you are outside the

24    concept -- if you are outside of Mexican American Studies and you

25    teach from the perspective of African American Studies or Native

1   American Studies or Pan Asian Studies, again oppressive from a

2   historical perspective and a contemporary perspective is okay.  That

3   doesn't --

4              THE COURT:  Mr. Martinez, you're making a fine

5   argument, but you're really not addressing the issue of vagueness or

6   overbreadth --

7              MR. MARTINEZ:  I'll narrow into the vagueness, Your

8   Honor.

9              THE COURT:  -- are you?

10              MR. MARTINEZ:  I will narrow into the vagueness, Your

11   Honor.

12              With respect to the void for vagueness, Your Honor, as

13   you know, we've challenged it on both notions.  We've made a facial

14   challenge here and we have made an as-applied.  Let me go first to

15   the facial challenge.

16              The notion here is that we have to show one of three

17   things, Your Honor.  The notion is we have to show that this statute

18   fails to give a person of ordinary intelligence a reasonable opportunity

19   to know what is prohibited; essentially just the notion of fair notice.

20              The flip side of that is some of the decisions the courts

21   have talked about, Your Honor, and that's certainly what's in your

22   Cohen decision, is that a statute such as this cannot trap the innocent,

23   and that again is what occurs in this statute.

24              Secondly, you can make this showing by if it

25   impermissibly delegates policy matters on an ad hoc basis for

1    resolution on an ad hoc basis on a subjective basis with the attendant

2    dangers of arbitrary and discriminatory application.

3            Again, we believe the record here before the court is --

4    provides ample proof that that is in fact just in fact what has occurred

5    here.  That there has been ad hoc application of this statute.  It has

6    been subjective.  It has been arbitrary and certainly discriminatory.

7            Third, Your Honor, we can make this showing by

8    showing that this statute abuts upon sensitive areas of basic First

9    Amendment freedoms operating to inhibit the exercise of those

10   freedoms.

11           Again, no doubt that this statute, even though the state

12   denies that they are attempting -- that the statute reaches students,

13   that it reaches their books, that it reaches their curriculum, that it

14   reaches their writing, they have in fact relied upon these students,

15   these plaintiffs, to come to show what they purport to be a violation.

16           And with respect to subjective arbitrary

17   discriminatory enforcement, Judge, I would like to point to something

18   in this record that while the state attempts to distance itself from, it

19   can't.

20           When Mr. Huppenthal came into office at the beginning

21   of 2011, and as he comes into office, this statute had just come into

22   effect, HB 2281 which is A.R.S. 15-111 and 15-112.  He was faced

23   with the finding that Mr. Horne had issued because he had been the

24   superintendent.  And his -- Mr. Horne's finding predates the effective

25   date of the statute.

1          So Mr. Huppenthal said, well -- and, again, it's

2    uncontroverted -- I need to find out if there is other evidence.

3    Because all of the evidence that Mr. Horne made reference to predates

4    the statute being in effect.

5          So they hire Canbium.  They do this through their own

6    bid process.  They spend well over $100,00 on the Canbium report.

7    Canbium comes to Tucson, Arizona, audits the program.  They audit

8    the program in person.  They go into the classrooms.  They review the

9    texts.  They review the curriculums, the lesson plans.  They meet with

10   students.  They meet with parents.  They meet with teachers who

11   aren't party plaintiffs.  And they do an exhaustive study and issue a

12   lengthy report, which is again part of this record, Your Honor.

13          In Canbium where you have objective third parties, Your

14   Honor, who come in and who are professional educators, they

15   assessed the program and say three important things.

16          They say first of all there's no violation here of HB 2281.

17   The provisions of A.R.S. 15-112(A)(1) through (4), no violation, none.

18          Then they say, Your Honor, if anything, this is a program

19   that in fact does just the opposite of what the state purports.  The

20   state purports that this is a program that teaches hate, that it teaches

21   solidarity to the point of hating or having resentment against white

22   persons.  And what they said and what they found was just the

23   opposite, Your Honor.

24          You have a very credible and lengthy, lengthy report

25   which indicates that this is not only a program that they found great

1   value in but recommended its expansion, not that it be eliminated, not

2   that it be abolished, as has occurred here by threat of an imposition of

3   a $15 million sanction.

4         And so you have, Your Honor, in Canbium the one thing

5   they did say where there could be improvement was only in the issue

6   of essentially tightening up lesson plans and things of that nature, but

7   nothing about this statute.  Lesson plans or how thorough those lesson

8   plans are was not the issue in 112.  Never has been.

9         With respect to the provisions, Your Honor, on (A)(1)

10  through (4), we have in (A)(1) promote the overthrow of the United

11  States government.

12         This is -- we go back to Keyishian, Your Honor.  As you

13  know, essentially what -- while Mr. Huppenthal does not make an

14  (A)(1) finding, we still challenge that provision within the statute on a

15  facial basis because this utterance, this notion that there is a seditious

16  or treasonous words or acts that can be committed here is so

17  ambiguous that one would never know in this context.

18         In one of the -- which is true throughout the statute, but

19  in one of the things that we are confronted with, Your Honor, even

20  though there is a provision that says -- essentially it's a saving

21  provision, at least that's the way I would describe it, to say that

22  controversial aspects of history can be discussed and would not be a

23  violation, that in fact has not occurred here.

24         And what happens, Your Honor, is that every

25  controversial aspect of Latino history, of that which has happened to

1    Mexicans in this country or between the two nations of Mexico and the

2    United States, or if you look to a broader context of the United States

3    and the context of Latinos, so if you want to look to the Caribbean, if

4    you want to look to Central America, if you want to look to -- is

5    somehow off the table.  And it is not legitimate.

6            In fact Mr. Horne is very telling in his own writing when

7    he points out a very simple fact of history.  He attributes to the

8    Mexican American Studies program, the history program, that the

9    fact -- and when the Battle of the Alamo is discussed, from his

10   perspective, that what we have here is a class being taught that looks

11   at and teaches the viewpoint of the Mexicans with respect to what was

12   going on in Texas and that particular battle.  He finds that odd.

13           And it is so telling, Your Honor, that if you go through

14   any number of events that have happened for Mexican Americans and

15   for Mexicans, whether it be in the area of immigration, whether it go --

16   be in the area -- you know, I can just give a small few examples -- if

17   you were to teach the Zoot Suit riots that occur in Los Angles, Your

18   Honor, during the Second World War, if you were to talk about the

19   roundups that occur in Los Angeles, throughout the country in the

20   1930s in the depression, if you were to talk about the differences or

21   the assignments of Latinos that occurred in the military, any of those

22   things where you say there was a point in time that you had a

23   difference in treatment.

24           In fact, Your Honor, we have -- one of the starkest

25   differences that you have, Your Honor, is that in the finding that has

1   been adopted by the superintendent, so it becomes his final agency

2   decision, that finding by the ALJ specifically makes reference to and

3   finds offensive this book, <u>Mexican White Boy</u> by Matt De La Pena, Your

4   Honor.

5            <u>Mexican White Boy</u> is about a young man, Your Honor,

6   whose mother is white and his father is Mexican.  He's raised -- they

7   are not together.  He's raised by his mother and spends a summer,

8   Your Honor, with his father discovering that side of his identity.

9            What is this book equivalent of?  This one is banned,

10  Your Honor.  And it's the exact equivalent of our President's book

11  <u>Dreams of My Father</u>.  It's the same story, Your Honor.  It's the same

12  context.  And it is about that search which exists in our country, not

13  only for Latinos, but for millions of individuals.  Because, thank God,

14  we are past that stage where you have to be of the same race in order

15  to be married under state law.  That <u>Dreams of My Father</u> is

16  acceptable but <u>Mexican White Boy</u> isn't.

17           They go on, Your Honor, to accuse us with respect to

18  promoting resentment towards a race or class of people.  We suggest,

19  Your Honor, that this is the ambush language.  No one, no one can

20  know, no teacher knows, and they point to books, who knows what

21  they say that promotes resentment towards a race or class of people,

22  Your Honor.

23           And we believe that this provision is analogous to the

24  decision of the Ninth Circuit in the <u>United States v. Wunsch</u> where the

25  language there was about having an offensive personality.  If you

1    recall that case, Judge, it's the lawyer issue that you can't have an

2    offensive personality.  The court finding that that term is

3    unconstitutionally vague.

4              We are in the same situation here, Your Honor.  What is

5    it that we say?  And I would point out here, Your Honor, because I

6    think it's significant, there's no scienter requirement here.  So whether

7    I intend or not to promote resentment towards a race of people, if I

8    say something that elicits that in the hearer, then I can be found --

9              THE COURT:  But, Mr. Martinez, I think you're getting off

10   the point because, you know, I think you are starting to preach.

11             MR. MARTINEZ:  I'll move on, Your Honor.

12             THE COURT:  Wait a minute.  Let me finish.  We're not

13   talking about isolated casual remarks.  We're talking about having a

14   program or an instruction of courses.  So, you know, people make

15   comments like that all the time.  Sure.  Maybe they are not right, but,

16   you know, the point is we are talking about a program or a class of

17   instruction.  You are, I think -- you're getting off on a tangent.  And

18   the question again is now, you know, I asked you to address

19   vagueness, right, and overbreadth.

20             MR. MARTINEZ:  Yes.  I'll narrow there, Your Honor.

21             THE COURT:  All right.

22             MR. MARTINEZ:  With respect to vagueness, we would

23   contend, Your Honor, that this term is vague and the (A)(2) provision

24   is vague.  You don't know what resentment means.  And you don't

25   know what would promote resentment towards a race or class of

1   people.  That one just can't be on notice about that.

2          With respect to (A)(3), Your Honor, the provisions are

3   designed primarily for pupils of a particular ethnic group.  This is the

4   only provision within the statute that has what we would identify as

5   the scienter element to it.  But even then, Your Honor, I think it is

6   incredibly ambiguous as to what it means to design a class or a course

7   of study primarily for a group.

8          In this particular case, Your Honor, while the intent was

9   to design a program that would certainly address specifically the

10   achievement gap for Latinos, at no time were these classes limited to

11   Latino students or Mexican students, at no time was the topics limited

12   to Mexicans or to Latinos, and in fact they were always open and

13   enrollment was actually diverse.

14          Now, you have to understand, Your Honor, we are being

15   cited with, as part of the allegation that we violated, is the mere fact

16   that our schools are heavily segregated.  Pueblo High School, 90

17   percent Latino.  We have a district that is over 62 percent Latino.

18   And, as the court might appreciate, many of our schools are well over

19   60 percent Latino.  So where this program exists, you're going to have

20   very large Latino populations.  That you would find an inequal number

21   of students in the class would not be surprising.

22          With respect to the (A)(4) provision, advocates ethnic

23   solidarity instead of a treatment to pupils as individuals, again we

24   believe that that is an incredibly ambiguous term and that the Ninth

25   Circuit's decision in Tucson Woman's Clinic v. Eden, the Ninth Circuit

1    decision of 2004, speaks specifically to this, in that there the provision

2    was -- whether the respect and full recognition of the patient's dignity

3    and individuality was the language in question found to be vague and

4    to be unconstitutional, in that that term was a measure by which it

5    was being physicians would be subject to sanctions.

6            This statute remains, Your Honor, equally vague with

7    respect to its provisions with respect to the subpart B provisions where

8    you have the enforcement.

9            And what you have in the enforcement, Your Honor, I'll

10   just be very brief here, we know from the ALJ, the final agency

11   decision, is that the court -- the ALJ noted:  I can't -- you know, he's

12   very clear:  I can't tell you when or where this statute was violated.  I

13   can't tell you, you know, in what class it occurred, with what teacher,

14   what words were spoken, what materials were used, what book was

15   used, but certainly from the evidence I can glean that there must have

16   been a violation.

17           And interesting in that notion, Your Honor, they don't tell

18   us if it's in a history class, an English class, an art class, at a

19   specific -- you know, was it at Pueblo High School, Cholla High School,

20   Tucson High School?  Was it at Wakefield Junior High -- Middle School?

21   They don't identify any of that.

22           And yet by finding that ambiguous violation, Your Honor,

23   the edict from the superintendent in exercising the powers given to

24   him by this statute is you have a ten percent sanction.  Ten percent of

25   your funds are gone.  This case -- it's similar between 12 and 15

1    million dollars.

2              Faced with that loss of funds, Your Honor, the district

3    was compelled.  They faced extortion.  And in the face of that

4    extortion, they had to shut down the program.

5              In fact the ALJ also found that it wasn't the district's --

6    excuse me -- wasn't the superintendent's obligation to even tell the

7    district what they could do to remedy.

8              As you noted in one of your footnotes, Your Honor, in an

9    earlier ruling, you expected that in the lack of such clarity and the

10   ambiguity which existed here that you anticipated that the district's

11   only option would be to abolish the program which is exactly what

12   occurs on January the 10th of 2012.

13             With respect to overbreadth, Your Honor, we believe that

14   HB 2281's application is unconstitutional when it's judged in relation to

15   the statute's legitimate sweep and that it reaches as -- a substantial

16   amount of protected speech.  That it is in fact in -- contravenes that

17   which we learned from U.S. v. Stevens from the supreme court in that

18   this statute clearly inhibits speech.

19             It inhibits the speech of students.  It inhibits them

20   from -- it prohibits them with respect to their right to receive and it

21   also inhibits them as evidenced in the declaration that we provided to

22   you by Mr. Dominguez as a student about -- from his perspective to sit

23   in that classroom and not even know what it is you can say, you can

24   ask, you can write.

25             And it's clear, Your Honor, that that chilling of First

1   Amendment speech, that which has occurred here in Tucson, Arizona

2   at the insistence of state government, is that we have hundreds of

3   students who have been denied the opportunity to continue a chosen

4   curriculum.

5           There is, Your Honor, with respect to overbreadth, no

6   core of easily identifiable and constitutionally prescribable conduct that

7   the statute prohibits.  You just don't find the core, Your Honor.  You

8   can't point to in this statute this is what it means, this is what you can

9   do, this is what you cannot do.

10          What it provides, Your Honor, is unfettered discretion.  It

11  leaves -- which has occurred here -- not only the specter of

12  administrative censorship but the actual imposition of such censorship.

13  We don't have to speculate anymore, Your Honor, about what this

14  statute means, how it would be utilized and what it would result in.

15  We now know.

16          The case, Your Honor, is -- just to point to two that I

17  think are instructive with respect to overbreadth.  NAACP v. City of

18  Richmond I think is most helpful and instructive here, where it

19  essentially vested with the police chief the power to cut off any of

20  those who would be dissenters within the community.

21          In Ashcroft -- in the Ashcroft decision versus the Free

22  Speech Coalition, Your Honor, the 2002 decision from the supreme

23  court, again we find that there that statute in the context, and there

24  the court was addressing the issue of pornography, was again it

25  reached protected speech.  It was not narrowly defined.

1          The one thing we know, Your Honor, is that where First

2     Amendment interests are at stake, as they are here, that the state

3     must be specific, must be narrow, and they must -- in their statute

4     and their prohibitions and they must be clear.

5          They have failed in all regards with respect to that, Your

6     Honor, and we would urge that with respect to our facial challenge and

7     our as-applied challenge that we have presented this court not only

8     with the legal authority but the underlying factual basis for granting

9     plaintiffs this motion.

10          Thank you.

11          THE COURT:  All right.  Thank you, Mr. Martinez.

12          All right.  We'll hear from the superintendent.

13          MR. HORNE:  Thank you, Your Honor.

14          Before we get into the substance of the motion, I wanted

15     to point out that there is a motion pending to strike the plaintiffs'

16     statement of facts on the grounds that it was no more than a carbon

17     copy of its complaint.  There was no showing that those who verified

18     the complaint had personal knowledge of the facts set forth.

19          It's not the kind of good faith effort one expects in a

20     statement of facts where you have affidavits or a verified complaint

21     shows that someone has personal knowledge of what he's saying and

22     that that motion is pending.

23          THE COURT:  I'm glad you reminded me of that.  There's

24     that motion.  There's also a couple of -- I'll call them peripheral

25     motions by the plaintiff.  I'll rule on those before I rule on the

1  underlying motion.

2          MR. HORNE:  Thank you, Your Honor.

3          THE COURT:  Go ahead, Mr. Horne.

4          MR. HORNE:  Thank you, Your Honor.

5          Your Honor, we're dealing here with some very

6  fundamental values.  In the statute itself, section 15-111, the

7  legislature finds and declares that public school pupils should be

8  taught to treat and value each other as individuals and not be taught

9  to resent or hate other races or classes of people.

10          I would argue that the state has a legitimate interest in

11  that value.  That the courses in our schools do not teach racist values.

12  If what we were dealing with was a course designed by the Klu Klux

13  Klan, everybody would see it's obvious the state has that legitimate

14  interest.  I think in this case we have shown that this is a course that

15  promotes racist values that the legislature has a valid interest in

16  preventing.

17          In addition to that, the legislature has a valid interest in

18  preventing the balkanization of the teaching of American history and

19  of world history.  If two students can use the court to force a course on

20  the school system dealing with history from a Mexican American point

21  of view, then other students could force a course dealing with history

22  from a British point of view, Italian point of view, German point of

23  view, perhaps German point of view of World War II, and you end up

24  with balkanized history courses.

25          The legislature representing the people of the state says

1   that's not the way we want our history taught.  We want all students

2   brought together, taught together.  And in fact --

3                    THE COURT:  Mr. Horne, I appreciate your argument and

4   I think you are entirely correct.  I think the legislation has a legitimate

5   interest in doing all that.

6                    But of course what I have to deal with is the language of

7   the statute.  And you take, for instance -- and the question is then, in

8   First Amendment terms, is the statute legitimately designed to

9   accomplish that purpose?

10                   For instance, if you take the phrase "promote

11  resentment toward a race or class of people," it's quite a subjective

12  phrase and, you know, it's subject to all kinds of interpretation.

13                   I mean, for instance, wouldn't you say that the Occupy

14  movement promotes resentment against a class of people or the Tea

15  Party promotes resentment against a class of people?  And, you know,

16  so does that mean a school can't teach that because they -- about the

17  Tea Party or the Occupy movement because they promote resentment

18  against a class of people?  It's an awfully vague command from a

19  legislature, isn't it?

20                   MR. HORNE:  Your Honor, one of the big differences

21  between the plaintiffs and us in the written materials is that the

22  plaintiff agrees that in determining the meaning of a statute, you can

23  look to state court decisions.  We have argued that you can also look

24  to administrative decisions.  The plaintiff has denied that.

25                   And we cite the Village of Hoffman Estates for the

1    proposition that in determining the meaning of the statute, we can

2    look to administrative decisions.

3              In this case the independent administrative law judge

4    specifically said that it is permissible to teach historical examples of

5    oppression which may have the unintended but natural effect of

6    producing resentment.  But what you cannot do, which is what was

7    done in this case, is to teach a biased, politically -- political and

8    emotionally charged curriculum.  So that's the distinction that the

9    administrative law judge made.

10             It's perfectly permissible.  Indeed, it's encouraged.  And

11   in the statute itself, it says:  Nothing in this section shall be construed

12   to restrict or prohibit, cannot even restrict, among other things, the

13   historic oppression of a particular group of people based on ethnicity,

14   race or class.  The statute says that specifically.  And the standards

15   require it that the state promulgates.  We have standards.

16             But what the state contemplates is you'll have a class of

17   students from all different backgrounds and they'll be taught about

18   oppression of different people, they'll be taught about contributions of

19   different minority groups, and they will all learn it together.

20             As distinct from dividing kids by race and having each

21   race learn only about its own contributions and its own oppression and

22   then approach that in a biased, political and emotionally charged

23   manner so as to create resentment against other races by those

24   students.

25             And the hearing officer provided a lot of specific

1    information and testimony to show that that's true.  And we have

2    summarized that at pages 6 through page 17 of our reply.

3              Has Your Honor -- I don't know -- has Your Honor had a

4    chance to read that part?

5              So Your Honor knows the thrust of the course.  The fact

6    that the course is designed to be racimized, to use their own -- the

7    person who actually designed the course took the pedigogy of a

8    Marxist Paulo Freire who sees everything in terms of oppression and

9    class terms and racimizes it so that everything will be seen in terms of

10   oppression in racial terms and presents it in a way --

11             THE COURT:  Well, all right.  Mr. Horne --

12             MR. HORNE:  Yes.

13             THE COURT:  -- I think your summary of the ALJ's

14   findings I think is -- you know, it's a fair summary.  But to me, you

15   know, it's not -- first of all, it's not my job to -- you know, to review

16   the ALJ's report, although I look at it, as you say, it provides some

17   insight as to the meaning of the statute.

18             But, you know, the ALJ report itself is to me quite

19   vague, you know.  It says, well, the program -- the MAS program

20   violated the statute because it did this, it did this, it did this, but says

21   it's not my job to tell them what exactly is wrong or how to correct it.

22             It's quite to me unhelpful to the district that is the

23   subject of that report.  And then to further highlight the vagueness of

24   that, you know, it is the complete opposite of the Canbium report.  I'm

25   not saying it's wrong.  To me that just shows how subjective this

1  whole thing is.  You know, anybody could look at this and come to,

2  you know, lots of different kinds of conclusions.

3  And I think legitimately the superintendent is entitled to

4  rely on the ALJ's findings if it is supported by substantial evidence in

5  coming to his findings, the superintendent's findings, as to whether he

6  thinks the program comports with the statute or not as he understands

7  this, but still I think I have to look at, you know, the facial makeup of

8  the statute and says, well, it's possible for some other superintendent

9  to come to an entirely different conclusion based upon the same

10  evidence, isn't it?

11  MR. HORNE:  Your Honor, first of all, I would point out to

12  Your Honor that the administrative law judge's findings are subject to

13  appeal to court.  Tucson Unified School District decided not to appeal it

14  because they thought they couldn't win the appeal.

15  THE COURT:  I thought it was because they couldn't

16  afford the attorney's fees.

17  MR. HORNE:  They cited both reasons, Your Honor.

18  But I think if you ask a person of ordinary intelligence

19  what does it mean to create resentment against a group of people,

20  they would understand what that means.

21  And here we have the administrative law judge's

22  decision which is important because it very much narrows the term by

23  specifically pointing out, as the statute also says, it's perfectly okay to

24  teach about oppression even if that has the result of producing

25  oppression.  It's only if you teach it in a biased, politically and

1    emotionally charged way.

2            If the school district wants to know how do we avoid

3    violating that part of the statute, the answer is don't teach it in a

4    biased, politically and emotionally charged manner.  Teach it in a way

5    where you can have robust discussion.

6            I mentioned in our reply there's a grim irony in the

7    plaintiffs' lawyer talking about cases saying that we should have

8    robust discussion when the state itself encourages robust discussion.

9    And what pages 6 through 17 of our reply points out is that this course

10   is taught without robust discussion.

11           In fact we have affidavits from people that say that kids

12   were punished for giving a different point of view.  They were

13   discouraged from having a different point of view.  If other teachers

14   complained, they were intimidated.  They were called racists.  The

15   whole thrust of that course is a totally one-sided, propagandistic,

16   racist approach.

17           And the decision of this administrative law judge helps

18   narrow the idea, which I think intelligent people -- people of average

19   intelligence will understand, what does it mean to promote resentment

20   against another race.

21           Yeah, you ask people, they would say I know what that

22   means.  But the administrative law judge narrows it further and says

23   it's okay to teach things that would create that resentment, but you

24   can't do it in a biased, politically and emotionally charged manner, in a

25   one-sided manner, which suppresses discussions, which suppresses

1    different points of view, which has the result that kids become so

2    resentful that an Anglo girl who is in the course says the other kids

3    won't talk to her by the end of the course, or another Anglo kid says

4    they dissed me because I was white, or a mother says my child has to

5    leave the course because she doesn't want to be taught to hate her

6    Anglo father and love her Latino mother.

7              There's a lot of evidence, not only from the hearing, but

8    from the affidavits that we have submitted to the court as to the

9    approach that was taken.

10             And the administrative law judge limited the application

11   of the statute to that approach to say that the state can legitimately

12   stop you from promoting resentment toward other races and he

13   defined what that meant.

14             It doesn't mean just teaching things that could lead to

15   that resentment.  That is perfectly all right.  There is no suppression of

16   student speech in this statute.  Students can say whatever they want

17   to.  There is no prohibition against discussion.  We encourage

18   discussion.

19             Plaintiffs' counsel mentioned the Alamo.  I personally

20   think it's a perfectly good pedigogy to teach the American point of

21   view of the Alamo and the Mexican point of view of the Alamo and

22   discuss it.  That would be very good activity to have in the classroom.

23             But what we find in the curriculum is not that at all.  We

24   find chestbeating that takes only the Mexican point of view and crows

25   that the problem with Texans is that they never got over the fact that

1    they lost at the Alamo.  That's not a legitimate approach.

2              That's just one small example of a one-sided,

3    propagandistic, biased, politically -- political and emotionally charged

4    manner that produces resentment.

5              And we have documented in sworn affidavits, not relying

6    on just making a carbon copy of a complaint, but sworn affidavits

7    submitted to Your Honor that in fact the teachers taught material, the

8    curriculum contains material that promotes that resentment, and the

9    resentment did result and the kids testified to the effect on them.

10             And in a situation where 60 percent of the kids in a

11   school are Latino, if we are promoting resentment against other races,

12   they are the minority in that school.  So it becomes an oppressive

13   atmosphere for the African American kids, the Asian American kids,

14   the white kids, all of the kids that are parts of small minorities, where

15   60 percent of the kids in the school are being taught to be resentful for

16   them, to not be willing to speak to them, to diss them because they

17   are white, and so on, all the evidence that we have presented to the

18   court.

19             Now, Your Honor mentioned the Canbium report.  The

20   administrative law judge, who was an objective judge looking at this,

21   gave a lot of detail as to why he gave no credibility to the Canbium

22   report.

23             First of all, the district designated Mr. Arce to be the

24   liason with them.  He refused to meet with them and he stonewalled

25   them effectively.  They asked for curriculum and he said there's no

1   curriculum available.  The teachers write the curriculum on the board.

2   They asked for student work.  He said there's no student work

3   available.  It goes home.

4           Then when we came to the hearing and we used

5   subpoena and discovery, we got 10,000 pages of curriculum.

6           And so the administrative law judge had the benefit of

7   the curriculum that the Canbium people did not have.  He had the

8   benefit of the testimony that the Canbium people did not have.  And

9   this court has the benefit of more testimony that the Canbium people

10  did not have.

11          All that they did was to observe a few classes.  They

12  observed no elementary classes.  And we have cited to the court some

13  very shocking racist material given to small elementary children.  They

14  observed only one middle school class.  In high school they observed

15  five classes of Latino Literature.

16          One of them had a substitute who was running a film as

17  substitutes will often do.  One of them had a guest speaker on

18  availability of scholarships in colleges.  One of them had a writing

19  program that the Canbium people themselves said they felt was

20  designed to impress them.

21          So the administrative law judge looked behind to see

22  what had been made available to them.  And it turned out they had

23  been stonewalled by the district which also insisted for the few

24  observations they did make, insisted on telling the principals when

25  those observations were made so there would be no unannounced

1    observations.  The teachers would know that they were coming and

2    could put on a show for them.

3                    Your Honor, the -- one of the questions that I think is

4    relevant to the question of vagueness is the question of severability.

5    So if Your Honor were to find, for example, that the first section

6    dealing with overthrowing the government is too vague, the others

7    stand on their own because it's a question of "or".  It's not a question

8    of "and".  The four different criteria don't interact with each other.

9    Each one on its own is sufficient to invalidate the course.

10                   THE COURT:  There is some Arizona statutes that have

11   express severability provisions right in the statute.  So there it's clear.

12   In this case there isn't such a provision, is there?

13                   MR. HORNE:  There isn't, Your Honor.  But there is

14   case law that says it depends on the extent to which the parts of the

15   statute interact with each other.  So if you take out one, the others are

16   meaningless.

17                   Here, for example, if you find that the case was primarily

18   designed for students of a particular ethnic group, that's sufficient.  So

19   if you take out the part about overthrowing the government, that part

20   still remains and is sufficient to give -- to make the statute make

21   sense.

22                   With respect to primarily designed for students of a

23   particular ethnic group, we have proven to an absolute certainty that

24   this was clearly applied in this case because the person who designed

25   the course said that the course is designed to connect with our

1   indigenous side as well as our Mexican side.  Our indigenous side as

2   well as our Mexican side.

3   　　　　Well, if you're not part of that group, this course isn't for

4   you because it's not going to connect with your Mexican side or your

5   indigenous side because you don't have a Mexican side or indigenous

6   side.  So that -- it's clear beyond any doubt.

7   　　　　And the case law says that if -- that if it's clear there

8   was a violation, then the statute cannot be voided.  And here it's clear

9   certainly with respect to the course primarily being designed for

10  students of a particular ethnic group that -- it's crystal clear it was

11  clearly applied.

12  　　　　And in the case of <u>Village of Hoffman Estates</u>, the court

13  said there is no violation -- it was dealing with this void for vagueness

14  question.  There is no violation when the plaintiff has the ability to

15  clarify the meaning of the regulation by its own inquiry or by resort to

16  an administrative process.

17  　　　　And here they had every opportunity to inquire with the

18  Department of Education and they had an administrative process.  So

19  under the statute of <u>Village of Hoffman Estates</u>, the statute cannot be

20  voided for vagueness.

21  　　　　With respect to facial challenge, Your Honor, I want to

22  bring to the court's attention the very high bar that our U.S. Supreme

23  Court and our Ninth Circuit has risen for that kind of a challenge.

24  　　　　In <u>SeaRiver Maritime</u>, a U.S. Supreme Court case, the

25  court said facial invalidation is manifestly strong medicine that has

1   been employed by the courts sparingly and only as a last resort.

2          In the National Endowment case, the court said the

3   courts must construe statutes to uphold their validity if possible.

4          And in the Humanitarian Law Project case, the court said

5   plaintiff cannot show First Amendment rights affected -- excuse me,

6   Your Honor.  I think that was my other case.  Courts must construe

7   statutes to uphold their validity if possible.

8          So the case can be construed as consistent with what the

9   administrative law judge has said.

10          We have cited a case to the court that says that the

11   school district can get clarity either by inquiry or by an administrative

12   law decision.  And the administrative law decision here, even with

13   respect to the part of the statute that Your Honor has raised dealing

14   with oppression, has very much narrowed that definition in a way that

15   anybody can understand.

16          And then with respect to other provisions of the statute,

17   Your Honor, we feel those would be severable.

18          Two other cases I wanted to cite on this subject.

19          California Teachers Association said the statute need not

20   be perfectly clear.  And in the Rockford case, the U.S. Supreme Court

21   said because we are condemned to deal with words, we cannot expect

22   mathematical certainty.

23          And here we have a situation where I think people of

24   ordinary intelligence understand what the words mean, but certainly

25   we have an administrative law decision that narrows it considerably

1  from that and makes it clear to the district what they can do and what
2  they can't do.
3        They can teach history that covers oppression.  The
4  statute itself says that.  But they can't do it in a biased, politically and
5  emotionally charged manner or in a one-sided, propagandistic manner
6  that only gives one point of view that's designed to create resentment
7  toward other races.
8        On the not valid as applied challenge, the claim is made
9  that this was enforced in a discriminatory manner because it was
10  enforced against the Mexican American courses and not the other
11  courses.
12        The administrative law judge pointed out that evidence
13  was given, and evidence has been given directly to this court in the
14  form of an affidavit, that this is the only course as to which complaints
15  were made.  And under A.R.S. section 15-231.01, the state is
16  obligated to investigate complaints when they are made.
17        The administrative law judge also pointed out that there
18  was no evidence to show that there was discriminatory intent, that it
19  was done because somebody doesn't like Mexican Americans, which is
20  what plaintiff is claiming.  That the reason was this is the only course
21  for which complaints were made.
22        And in that sense this course was chosen, not because
23  of the race of the students in the course, but because of the racist
24  nature of the course as presented in the curriculum and in the
25  affidavits as to what people actually observed, what teachers observed

1    other teachers saying.  There was no such evidence as to the other

2    courses.

3              If there is a -- if there's some reasonable conceivable

4    explanation that can provide a rational basis for the reason one was

5    chosen and the other was not chosen, then there can be no claim for

6    vague as applied.

7              And in this case, the administrative law judge found

8    there was a perfectly good explanation.  We had complaints, numerous

9    complaints.  There were no complaints against the others.  No showing

10   that -- to borrow from the previous case that was argued that that was

11   pretextural.

12             And the U.S. Supreme Court in the Grayned case pointed

13   out that some discretion and judgment by those who apply the law has

14   to be recognized, that has to be used.

15             It is a reasonable exercise of judgment and discretion to

16   proceed against a course as to which you have a lot of complaints and

17   a lot of evidence and not to proceed against courses as to which you

18   have never gotten a single complaint as to which you would have no

19   evidence to present.

20             We have a big enough fight on this one where we have

21   an overwhelming amount of evidence of the racist way in which this

22   was delivered.  It would not be a good exercise of discretion or

23   judgment to proceed against courses for which you had no evidence.

24             Your Honor, the case that administrative decisions as

25   well as court decisions can be used to clarify the meaning of the

1    statute is <u>INS v. Aguirre-Aguirre</u>.  That case is cited in our reply.

2            The administrative decision in this case gave a clear and

3    reasonable interpretation of the statute.  Clear -- both clear and

4    reasonable.  He said it's okay to teach history of oppression even if it

5    does produce resentment as long as it's not done in a manner that is

6    biased, politically and emotionally challenged.  And under <u>INS v.</u>

7    <u>Aguirre-Aguirre</u>, that is a legitimate way to distinguish.

8            One other difference that we've had with the plaintiff is

9    the question of whether dictionary definitions can be used.  The

10   plaintiff has said you have to put the definitions in the statute itself.

11   We have said no, we think the words in the statute are clear.  But if

12   we look to the dictionary definitions, that makes it even more clear.

13           And the case on that is <u>U.S. v. Lettiere</u>, L-e-t-t-i-e-r-e,

14   in which the U.S. Supreme Court said that dictionary definitions can be

15   used to make the statute clear because words are given their ordinary

16   meaning and that's the rule of construction.

17           Your Honor, I haven't addressed the First Amendment

18   issue.  I don't know if Your Honor wants me to or not.

19           THE COURT:  I don't think it's necessary.  I appreciate

20   your argument, Mr. Horne.  Thank you.

21           What I'm going to do is I'm going to give each side five

22   minutes for rebuttal.  So you will get another chance.

23           Thank you.

24           MR. HORNE:  Thank you, Your Honor.

25           THE COURT:  All right.  Mr. Martinez, you've got five

1    minutes for rebuttal.  All right?

2              MR. MARTINEZ:  Yes, sir.

3              Your Honor, one of the fundamental flaws in what

4    Mr. Horne has presented to this court is the absence of any evidence

5    that substantiate any of the claims that he makes.  He has in his

6    motions and in his responses to the motion for summary judgment

7    failed to provide any competent evidence, certainly any that meets or

8    supports that what he alleges.

9              Moreover, Your Honor, he relies upon an administrative

10   law finding that is -- suffers from the same infirmities that the statute

11   does.

12             In the time since this statute was enacted, Your Honor,

13   and became effective on December the 31st of 2010, there has been

14   ample opportunity for the superintendent of public instruction,

15   whether it was Mr. Horne, Mr. Huppenthal, for the administrative law

16   judge, even for the attorney general in exercising his powers, to have

17   somehow provided us some interpretation what the statute means.

18             Nowhere, nowhere in the record do you find anything

19   that provides any kind of narrowing construction or clarity as to what

20   any of these provisions mean.

21             For example, you have reference to the administrative

22   law judge making a distinction between what is considered to be an

23   objective form of teaching the topic as opposed to one that he

24   characterizes as politicized.  The term that is used by Mr. Horne is

25   "racimized."  Whatever adjective they want to use.  You don't find that

1   in the statute.

2   And certainly this is a statute that undeniably was

3   promoted by Mr. Horne with the state legislature.  It was one that he

4   worked with them on to get passed.  And you would think that in

5   having that intimate a role, essentially to being the promoter of this

6   law, he would be able to define for the court what these provisions

7   mean.  He hasn't.

8   He's told you, Your Honor, that we all know what, for

9   example, promote resentment toward a race or class of people means.

10  I would suggest to you, Your Honor, that if we asked the people in this

11  courtroom today observing this what they thought that meant, that we

12  would have as many different opinions and definitions as we have

13  individuals in this courtroom.

14  And certainly, Your Honor, that is just compelling

15  evidence of the lack of notice and of the ambush that occurs here.

16  I think that in contrast, Your Honor, if we compare what

17  we have here to the finding you made in Cohen v. San Bernardino

18  Valley College, then the answer is clear.  This is a statute that fails in

19  every regard to provide the clarity and the specifics needed.

20  Moreover, I think that it is clear that the First

21  Amendment interests here are undeniable and that the heightened

22  scrutiny that is commensurate with that must be applied.  It is in that

23  context, Your Honor, that this statute fails in every regards to provide

24  fundamental due process, to provide notice.  It allows for arbitrary and

25  subjective enforcement.

1          And on a closing note, Your Honor, I would like to make

2     one reference to something that is cited as evidence by the ALJ.  It's

3     found at document 162-9.  It's page 29 -- I'm sorry.  It's page 30 in

4     the court record.  And it's paragraph -- identified as paragraph 165.

5          The ALJ writes --

6          THE COURT:  Just a minute.  165?

7          MR. MARTINEZ:  Paragraph 165.

8          THE COURT:  Go ahead.

9          MR. MARTINEZ:  The ALJ writes, Your Honor, "As an

10    example, one second semester final exam for a Latino Literature

11    course used in the spring of 2011 tests students with the following

12    essay prompt:

13          All year long we have read stories where the Mexican

14    Americans were discriminated against, taken advantage of, oppressed,

15    et cetera.  We are destined to repeat history if we don't do something

16    to change it.  Reflect on what we have read about this year and in an

17    essay write about what we can do as a group to change things" -- and

18    that's underlined by the ALJ -- "Write about what we can do as a group

19    to change things.  What will you do as an individual to change things?"

20    is the next sentence, Your Honor.  And then it goes on to say, "Select

21    one of the pieces we have read this year that best reflects the point

22    that you are trying to make in your essay."

23          Now, I have to, because we don't know this from this

24    ALJ, glean that what the ALJ is trying to say is that this must be a

25    violation of the 112(A) -- (A)(4) provision, advocate ethnic solidarity

1   instead of the treatment of pupils as individuals.  Because he

2   underlines here, "Write about what we do as a group to change

3   things."  Even though the next sentence says, "What will you do as an

4   individual to change things?"

5            Your Honor, they offered this as evidence.  The state has

6   relied on this kind of evidence to suggest that this program, this

7   curriculum, is not only legitimate and important but it actually fits

8   within the mainstream of American curriculum.

9            And this example reflects the viewpoint of the state that

10   no matter what comes out of Mexican American Studies, it's not

11   acceptable.  No matter what we teach or how we teach it, it's

12   unacceptable to Mr. Horne, Mr. Huppenthal or their ALJ.

13            And it is this statute, Your Honor, that is constitutionally

14   infirmed, that has subjected the plaintiffs here to substantial

15   constitutional harm, and it warrants the remedy which we have

16   requested.

17            Thank you.

18            THE COURT:  All right.  Thank you, Mr. Martinez.

19            Mr. Horne.

20            MR. HORNE:  Thank you, Your Honor.

21            Plaintiffs' counsel talks about competent evidence.  The

22   competent evidence is set forth at pages 6 through 17 of our reply.

23   That's really, I would say, the heart of my argument is for the court to

24   understand what really has been going on in this course.

25            And the clarification, among other things, can be given

1    by the decision of the administrative law judge as recognized in the

2    Aguirre-Aguirre case.

3            The term "racimized" is not my term.  The term

4    "racimized" is the term of the person who wrote the course, Mr. Arce.

5    What he said was he was taking the pedogogy of Paulo Freire, which is

6    a Marxist pedogogy which looks at everything in terms of oppression,

7    but it looks at everything in terms of oppression from a class

8    standpoint, and he then racimized it so that now everything in history

9    is looked at from an oppression in a racist -- in a race standpoint.

10           There are instances of oppression to be taught.  But to

11   treat all of history as nothing but race oppression is a gross distortion.

12           I think the legislature has a legitimate interest in seeing

13   to it that kids aren't subjected to that kind of course where every

14   single thing they are taught is over and over again hit over the head

15   with this idea you're oppressed, you're oppressed, you're oppressed all

16   year long in order to create resentment against the people who

17   allegedly have the oppression and the result is a girl who is caucasian

18   the other kids won't speak to her.

19           THE COURT:  Are you saying that so part of the way this

20   statute is interpreted is first you test the motivation of the curriculum

21   designer?  In other words, if the purpose is to promote resentment is

22   that what you look for?

23           MR. HORNE:  The motivation as shown in the materials.

24   You're not trying to read his mind.  You are looking at the materials

25   objectively, taking a reasonable look at the materials and see does this

1   show the purpose of the course is to promote resentment.  Is it

2   one-sided.  Is it propagandistic.  Is it pushing kids to engage in the

3   political activity that the teacher wants them to engage in, which is

4   what that essay question was about.

5               THE COURT:  So you think that's sort of the way the

6   statute is interpreted by the superintendent?

7               MR. HORNE:  No, by the independent hearing officer in

8   the administrative decision which the Aguirre-Aguirre case tells us,

9   which we can use to interpret it, is you look at the course as a whole.

10              A particular statement that might raise resentment is not

11  a violation, whether it's by a teacher or by a student.  The statute

12  doesn't go to student speech.  The statute doesn't even go to teacher

13  speech.

14              The statute goes to the overall thrust of the course as

15  shown by the curriculum and as shown by the testimony that we have

16  given the court at pages 6 to 17 of teachers who observed what is

17  going on in the course, Your Honor.

18              THE COURT:  All right.

19              MR. HORNE:  Your Honor, with respect to the Cohen

20  case, this was given to us last night.  If that's the case that might be

21  viewed as material to Your Honor, we would ask for time to give a

22  supplementary memorandum to the court.  So I guess I'm asking the

23  court if we should do that on the Cohen case.

24              THE COURT:  When you say "last night," you mean in

25  that thing that was electronically filed?

1          MR. HORNE:  Yes.

2          THE COURT:  Well, all right.  I'll make a note of that,

3  your request for supplemental briefing.

4          MR. HORNE:  Should we go ahead and do that or wait

5  for Your Honor?

6          THE COURT:  No, wait to see if it's going to -- you know,

7  if there's any need for it.

8          MR. HORNE:  Your Honor, one part -- in view of the fact

9  that we view the statute as severable, and if the court finds one part

10  of it vague, other parts can operate on their own and the statute still

11  makes sense, I wanted to mention the advocate ethnic solidarity part.

12          We have given the court -- we have cited cases to the

13  court that says you give words their ordinary meaning.  You can look

14  to the dictionary meaning.

15          "Advocate" is a generally understood term.  In the

16  Dunne case, it made it clear that to advocate is not to present

17  materials as plaintiffs' counsel has argued but to urge a point of view.

18          "Solidarity" is defined in the dictionary as unity.  An

19  individual is a particular person as distinguished from a class or

20  species or collection.

21          So the term in the statute means to plead or urge in

22  favor of ethnic unity rather than treating students as being

23  distinguished in their own right rather than based on their membership

24  in an ethnic group.

25          So that part of the statute I think is very clear and the

1    materials presented to this court at pages 6 through 17 of our reply

2    make it crystal clear to the court that the course is designed to do the

3    exact opposite of that.

4              The course is designed to make the kids think of

5    themselves and other people in racial terms, to treat other people not

6    what I believe is the basic value of our country and of the statute,

7    which is to treat people based on what they know, what they can do

8    and what is their character, rather than based on what race they

9    happened to have been born into.

10             But in this course, the propagandistic, repetitive

11   pounding away at the students is race, race, race.  You belong to a

12   race that was oppressed.  Those guys are the bad guys who oppressed

13   you.  You should resent them.  You should feel ethnic solidarity.  You

14   shouldn't treat people as individuals, but you should be superconscious

15   of people's race.

16             If it were a Klu Klux Klan course, everyone would agree

17   without any question the legislature had a legitimate interest in

18   prohibiting it.  We say pages 6 through 17 of our reply make it clear

19   that is the nature of this course.  It's just a matter of whose ox is

20   being gored.

21             And the legislature has a legitimate interest in saying

22   we're not going to balkanize kids, we're not going to teach history

23   from all different -- different courses for the German, the Italian, the

24   Irish, the Mexican point of view.  We're going to have one American

25   history course.

1              We're going to require that kids learn about the

2       contribution of different groups in that course, but we're going to do it

3       with all the kids together so that we broaden their horizons rather than

4       using the schools to narrow their horizons by dividing them by race

5       and giving the students a racial message that causes them to feel

6       resentment against others, to look to ethnic solidarity rather than

7       treating pupils as individuals.

8              These kids need to learn to treat each other and all kids

9       as individuals and not on the basis of their race.  I believe the

10      legislature had a legitimate interest in doing that and the

11      administrative law decision clarifies to the extent needed all four parts

12      of the definitions in the statute.

13             THE COURT:  Okay, Mr. Horne.

14             MR. HORNE:  Thank you, Your Honor.

15             THE COURT:  Thank you very much.

16             I thank both counsel.  This matter, cross-motion for

17      summary judgment, and I will call them the collateral motions, are all

18      taken into submission.

19             Thank you.

20             MR. MARTINEZ:  Thank you, Your Honor.

21             (The proceedings concluded at 11:00 a.m.)

22

23

24

25

1

2

3

4

5

6

7                        C E R T I F I C A T E

8

9

10

11          I, Dianne Davenport, certify that the foregoing is a correct

12   transcript from the record of proceedings in the above-entitled matter.

13

14

15

16

17   /s/  Dianne Davenport                    March 29, 2012

18

19

20

21

22

23

24

25