# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| CURTIS ACOSTA, et al., ) | No. CV 10-623-TUC-AWT |
| ) | |
| Plaintiffs, ) | **MEMORANDUM ORDER** |
| ) | |
| NICHOLAS DOMINGUEZ, et al., ) | |
| ) | |
| Intervenors - Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| JOHN HUPPENTHAL, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

This action was originally brought by several teachers and students at Tucson Unified School District No. 1 ("TUSD") against various state officials including the Arizona Superintendent of Public Instruction, John Huppenthal. Plaintiffs challenge the constitutionality of Arizona Revised Statute § 15-112, which limits school districts' ability to provide certain race-related curricula. Pending before the Court are cross-motions for summary judgment, Plaintiffs' second motion for a preliminary injunction, and several other related motions.

As discussed below, Plaintiffs' primary motion, with one exception, will be denied. The Court's rulings stem in large part from the considerable deference that federal courts owe to the State's authority to regulate public school education. The Court recognizes that, in certain instances, Defendants' actions may be seen as evincing a

misunderstanding of the purpose and value of ethnic studies courses. Equally problematic is evidence suggesting an insensitivity to the challenges faced by minority communities in the United States. Nevertheless, these concerns do not meet the high threshold needed to establish a constitutional violation, with one exception. Instead, they are issues that must be left to the State of Arizona and its citizens to address through the democratic process.

## I. BACKGROUND

**A.      The challenged statute and the administrative history**

Arizona Revised Statutes § 15-112 prohibits Arizona school districts and charter schools[1] from including in their programs of instruction any courses or classes that: (1) promote the overthrow of the United States government; (2) promote resentment toward a race or class of people; (3) are designed primarily for pupils of a particular ethnic group; or (4) advocate ethnic solidarity instead of the treatment of pupils as individuals. Ariz. Rev. Stat. § 15-112(A). The statute exempts, among other things, courses that include discussion of "controversial aspects of history" or that teach historical oppression of a particular ethnic group. *Id*. § 15-112(E), (F). The State Board of Education and the Superintendent of Public Instruction are charged with identifying violations of § 15-112. *Id*. § 15-112(B). Once a violation is established, the school district has sixty days to come into compliance with the statute and, if it fails to do so, the Board or Superintendent may direct the Arizona Department of Education to withhold ten percent of the monthly state aid otherwise due to the district. *Id*.

On December 30, 2010, then-Superintendent Tom Horne[2] issued a finding that TUSD was in violation of § 15-112(A) because of courses offered as part of TUSD's Mexican American Studies ("MAS") program. (Third Am. Compl., Doc. 84, Ex. B.) On

---

[1]      For simplicity, although the statute refers to both school districts and charter schools, henceforth the reference will be only to school districts.

[2]      Mr. Horne has since been elected Attorney General of the State of Arizona and, in that capacity, represents Defendants in this action.

June 15, 2011, Superintendent Horne's successor, John Huppenthal, issued a second finding that TUSD was in "clear violation" of §§ 15-112(A)(2), (3), and (4), based on his conclusion that the MAS program contained content promoting resentment towards white people, advocated Latino solidarity over the treatment of pupils as individuals, and was primarily designed for Latino pupils.  (Third Am. Compl., Doc. 84, Ex. D.)  He ordered TUSD to bring the MAS program into compliance with the statute within sixty days. *Id.* TUSD administratively appealed Huppenthal's finding on June 22, 2011.  (Pls.' Stmt. of Facts in Support of Opp. ("PSOFO"), Doc. 162, Ex. H.)  On December 27, 2011, an Administrative Law Judge ("ALJ") concluded that the MAS program violated §§ 15-112(A)(2), (3), and (4).  (PSOFO, Doc. 162, Ex. I.)  Superintendent Huppenthal then issued an order accepting the ALJ's "recommended decision."  (PSOF, Doc. 151, Ex. J.)

**B.      Procedural history of this action**

Plaintiffs filed this action during the pendency of the above-described administrative proceedings.  The operative complaint is the Third Amended Complaint ("TAC"), which was filed on behalf of ten MAS teachers, the Director of the MAS program, and two TUSD students who intend to take MAS classes in the future.  (Doc. 84.)[3]  Plaintiffs allege that Defendants' actions violate their rights to equal protection, free speech, freedom of association, and substantive due process.  Plaintiffs also assert that § 15-112 is void for vagueness facially and as applied.  On January 10, 2012, the Court dismissed as plaintiffs the teachers and the Director of the MAS program for lack of standing; dismissed the free association claim for failure to state a claim; and denied Plaintiffs' motion for preliminary injunction.  (Doc. 138.)  The Court later granted a motion to intervene as plaintiffs, filed by Nicholas Dominguez (a former MAS student) and his mother, Margarita Dominguez ("Plaintiffs-Intervenors").  (Doc. 153.)

---

[3]      The remaining Defendants, in addition to Superintendent Huppenthal, are the Arizona State Board of Education and its members, Jacob Moore, Jaime Molera, Amy Hamilton, Eileen Klein, Gregory Miller, James Horton, Dianne Ortiz-Parsons, and Thomas Tyree.

Plaintiffs also filed a motion for summary judgment contending that § 15-112 is: (1) unconstitutionally overbroad; (2) facially vague; and (3) vague as applied. (Doc. 97.) Plaintiffs then filed a "second" motion for a preliminary injunction, which relied on the same three claims raised in Plaintiffs' summary judgment motion, but which also relied on Plaintiffs' equal protection and substantive due process claims. (Doc. 179.) Defendants opposed both motions, and also filed a cross-motion for summary judgment that incorporated by reference its opposition to Plaintiffs' summary judgment motion. (Docs. 150, 199.) Defendants have also moved to dismiss Plaintiff-Intervenor Margarita Dominguez. (Doc. 159.)

## II. EVIDENTIARY MOTIONS

Before reaching the merits of the cross-motions for summary judgment, the Court will address three pending evidentiary motions.

**A.    Defendants' motion to strike**

Defendants move to strike Plaintiffs' Statement of Facts to the extent that the statement relies exclusively on the allegations of the TAC. (Defs.' Mem. at 8 n.3, Doc. 150.) "[A] verified complaint may serve as an affidavit for purposes of summary judgment if it is based on personal knowledge and if it sets forth the requisite facts with specificity." *Moran v. Selig*, 447 F.3d 748, 760 (9th Cir. 2006). Here, Defendants correctly point out that the TAC was not verified by either of the two Student-Plaintiffs, but only by the Teacher-Plaintiffs. However, two of the Teacher-Plaintiffs, Sean Arce and Lorenzo Lopez, are also alleged to be the natural parents and next friends of the two Student-Plaintiffs. (TAC, Doc. 68, ¶¶ 4, 11.) Defendants have not challenged the propriety of the Teacher-Plaintiffs' next-friend status; accordingly Plaintiffs properly rely on the verified complaint in their Statement of Facts. *See* Fed. R. Civ. Pro. 17(c)(2).

**B.    Plaintiffs' motion to strike**

Plaintiffs move to strike Defendants' Statement of Facts to the extent that it relies on the ALJ's findings and conclusions which, according to Plaintiffs, are not based on personal knowledge. (Doc. 165.) However, the Court has already taken judicial notice of

the ALJ's decision, (Doc. 138 at 3 n.4), which cured any potential defect in this regard. Moreover, Defendants' have submitted the Administrative Hearing Transcript in support of their Reply. (Doc. 194-1, Ex. A.) Plaintiffs also object to Defendants' reliance on Superintendent Horne's Findings of Violation. But Plaintiffs' themselves cite those very same findings in their own Statement of Facts; accordingly, any objection to Defendants' use of the same evidence is waived. *See Ohler v. United States*, 529 U.S. 753, 755-56 (2000). Plaintiffs' motion to strike will therefore be denied.[4]

## C.      Plaintiffs' motion for leave to supplement

Plaintiffs have also moved to supplement the record with the transcripts of two media interviews of Superintendent Huppenthal. (Doc. 186.) Defendants have not opposed this motion; accordingly, that motion is granted. *See* L.R. Civ. 7.2(I).

## III.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

As a threshold matter, although the parties' filings do not make it clear, it appears that Plaintiffs have not expressly moved for summary judgment on their equal protection and substantive due process claims. It does appear, however, that Defendants do so move, *i.e.*, for summary judgment on all of Plaintiffs' claims. *See* Defts.' Mem., Doc. 150 at 29 (urging court to conclude that "Plaintiffs' legal basis for their complaint is insufficient"). Notwithstanding that the record may not clearly reflect that the parties have expressly moved for summary judgment on the equal protection and substantive due process claims, the merits of these claims have been fully and fairly vetted in connection with Plaintiffs' second motion for preliminary injunction. The Court therefore invokes its "unquestionabl[e] . . . power to enter summary judgment sua sponte . . . ." *Norse v. City of Santa Cruz*, 629 F.3d 966, 971 (9th Cir. 2010) (en banc); *see also Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982) (holding that district courts may grant summary judgment *sua sponte* if the parties have had a "full and fair opportunity to

---

[4]      The parties also make numerous conclusory arguments about the admissibility of specific facets of the record. Those objections are denied.

ventilate the issues").

Summary judgment must be granted if the materials before the district court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

As stated above, although it is not entirely clear in their motions, the parties expressly move for summary judgment on only three claims in the TAC: Count Two (First Amendment – Free Speech); Count Four (Void for Vagueness – Facial); and Count Five (Void for Vagueness – As Applied). (Doc. 68.)[5] Because the only remaining Plaintiffs are students, these claims will turn on the scope of a student's free speech rights which, in this context, can take two forms. First, subject to various limitations, students have a direct First Amendment right to speak freely on school grounds. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). Second, subject again to limitations, students have an indirect First Amendment right "to receive a broad range of information so that they can freely form their own thoughts." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1998). As a threshold matter, the Court must determine if § 15-112 implicates either of these two rights.

**A.      § 15-112 does not implicate Plaintiffs' right to speak freely in the classroom.**

Arizona Revised Statute § 15-112 provides, in relevant part:

A.      A school district or charter school in this state shall not include in its program of instruction any courses or classes that include any of the following:

1.      Promote the overthrow of the United States government.

---

[5]      No argument is presented on Count One (Equal Protection) or Count Six (Substantive Due Process) in the summary judgment briefing; however, the validity of those claims is fully argued in the context of Plaintiffs' second motion for a preliminary injunction.

       2.      Promote resentment toward a race or class of people.

       3.      Are designed primarily for pupils of a particular ethnic group.

       4.      Advocate ethnic solidarity instead of the treatment of pupils as individuals.

   B.     If the state board of education or the superintendent of public instruction determines that a school district or charter school is in violation of subsection A, the state board of education or the superintendent of public instruction shall notify the school district or charter school that it is in violation of subsection A. If the state board of education or the superintendent of public instruction determines that the school district or charter school has failed to comply with subsection A within sixty days after a notice has been issued pursuant to this subsection, the state board of education or the superintendent of public instruction may direct the department of education to withhold up to ten per cent of the monthly apportionment of state aid that would otherwise be due the school district or charter school . . . .

      . . .

   E.     This section shall not be construed to restrict or prohibit:

       1.      Courses or classes for Native American pupils that are required to comply with federal law.

       2.      The grouping of pupils according to academic performance, including capability in the English language, that may result in a disparate impact by ethnicity.

       3.      Courses or classes that include the history of any ethnic group and that are open to all students, unless the course or class violates subsection A.

       4.      Courses or classes that include the discussion of controversial aspects of history.

   F.     Nothing in this section shall be construed to restrict or prohibit the instruction of the holocaust, any other instance of genocide, or the historical oppression of a particular group of people based on ethnicity, race, or class.

In construing its state statutes, Arizona courts look primarily to the language of the statute and interpret its terms according to their commonly accepted meanings, unless the legislature provides a specific definition, or unless the context of the statute indicates a specific meaning. *TDB Tucson Grp., LLC v. City of Tucson*, 263 P.3d 669, 672 (Ariz. Ct. App. 2011). When the language of the statute is clear and unambiguous, the court should

not look beyond that language and should assume that the legislature has said what it means.  *Id*.  The court should consider the statute as a whole and avoid interpretations that render statutory provisions meaningless, unnecessary, or duplicative.  *See Ariz. Dep't of Revenue v. Action Marine, Inc.*, 181 P.3d 188, 190 (Ariz. 2008) (en banc).

Read as a whole, the statute does not proscribe the rights of students to speak freely in the classroom.  Instead, numerous facets of § 15-112 indicate that it is directed to school curricula.  Thus, the statute expressly limits what a "school district or charter school" may do, and what a "program of instruction" may include.  The exceptions enumerated in § 15-112(E) and (F) are similarly directed at certain "courses or classes" and "instruction."  Nowhere does the statute expressly limit what a student may or may not say; moreover, the penalty provision is directed exclusively at school districts that are in violation of § 15-112(A).  Indeed, the target of the statute is concisely summarized by its title, "Prohibited Courses and Classes."[6]  *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008)  ("[S]tatutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute." (internal quotation marks omitted)).  In short, the statute does not impinge on students' right to speak freely in the classroom.  Even if the statute could somehow be read to restrict such speech, the Court must reject that interpretation.  *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (stating that if a proposed interpretation raises a "serious doubt" as to a statute's constitutionality, court must "ascertain whether a construction of the statute is fairly possible by which the question may be avoided").  Accordingly, the Court rejects Plaintiffs' First Amendment arguments to the extent that they assert an infringement of

---

[6]    Similarly, the "Declaration of Policy" codified at § 15-111, immediately prior to § 15-112, states that "public school pupils ***should be taught*** to treat and value each other as individuals and ***not be taught*** to resent or hate other races or classes of people." (Emphasis added.)  This preamble, with its focus on what can and cannot be taught in the schools, further underscores that the statute targets programs of instruction and curricula, rather than student speech in the classroom.

their right to speak freely on school grounds.[7]

**B.     § 15-112 implicates Plaintiffs' right to receive information.**

Although the statute does not directly restrict student speech, it unequivocally restricts the students' right to receive information because it limits the scope of curricular material.  Before addressing whether these restrictions are unconstitutional, the Court will define the scope of the students' right to receive information, which is vigorously disputed by the parties.

The starting point for understanding a student's right to receive information is *Island Trees Union Free School District v. Pico*, 457 U.S. 853 (1982).  In *Pico*, a plurality of the Supreme Court recognized that students share the same "right to receive information and ideas" as other citizens generally do.  *Id*. at 867-68.  This recognition relied, in part, on the principle that "'[s]tudents may not be regarded as closed-circuit recipients of only that which the State chooses to communicate . . . .'"  *Id*. at 868 (quoting *Tinker*, 393 U.S. at 511).  Applying these principles, the plurality held that a school district could not, consistent with the First Amendment, remove certain books from the school library simply because of a "disagreement with constitutionally protected ideas in those books, or upon a desire . . . to impose upon the students . . . a political orthodoxy . . . ."  *Id*. at 875.

Although *Pico* established that students have a right to receive information, its holding does not apply directly to Plaintiffs' suit.  The *Pico* plurality made clear that its analysis applied only to the unique environment of the school library, and it strongly suggested that the outcome, or at least the standards, would differ in a case involving curricular decisions.  The plurality thus noted that the school board "might well defend

---

[7]     Plaintiffs contend that the Superintendent's reliance on student work to demonstrate a violation shows that the statute restricts student speech. Viewed in the context of the plain meaning of the statute, however, the Superintendent's reliance on student work was simply a means of seeking to prove that the MAS program violated § 15-112(A). That student work was used to explain the nature of what was taught in the challenged courses does not mean that student work is proscribed by the statute.

[its] claim of absolute discretion in the matters of *curriculum* by reliance upon their duty to inculcate community values." *Id.* at 869.[8] This dicta from *Pico* does not entirely foreclose Plaintiffs' curriculum-based arguments, however, because the *Pico* plurality also noted that "[o]ur precedents have long recognized certain constitutional limits upon the power of the State to control even the curriculum and classroom." *Id.* at 861.

The constitutional limits on curricular discretion were clarified in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), in which the Supreme Court addressed a student speech claim arising from classroom-related activities. Specifically, the Court ruled that a student newspaper – published in connection with a journalism class – was "part of the school curriculum" rather than "personal expression that happens to occur on the school premises." *Id.* at 271. The Court then held that school officials could exercise editorial control over the newspaper "so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Although some factors distinguish *Hazelwood* from the present case, *i.e.*, the restrictions were imposed on a student newspaper rather than on curriculum more broadly, and the asserted right was direct speech rather than the right to receive information, *Hazelwood* can properly be read to establish that limitations on curriculum should be upheld so long as they are reasonably related to legitimate pedagogical concerns.

This conclusion is bolstered by Ninth Circuit precedent. In *Monteiro*, the Ninth Circuit recognized that a student's right to receive information is "also relevant in the context of a school curriculum." 158 F.3d at 1027 n.5 (citing *Pico*, 457 U.S. at 870-71). The plaintiff in that case, an African-American student, sued to remove from the school curriculum books that used racial slurs. *Id.* at 1024. The court observed that the case

_____

[8]    In a recent challenge to a curriculum restriction in Massachusetts, the First Circuit, speaking through Justice Souter, sitting by designation, held that "whatever special consideration is due to claims of library censorship, that issue need not be resolved here, for . . . this case would not fit within the [*Pico*] plurality's scheme of library protection." *Griswold v. Driscoll*, 616 F.3d 53, 57 (1st Cir. 2010).

presented a direct conflict between the First Amendment rights of high school students to receive information, and the rights of the same students (such as the plaintiff) to receive a public education that neither fosters nor acquiesces in a racially hostile environment. *Id.* The court concluded that "a student's First Amendment rights are infringed when books that have been determined by the school district to have legitimate educational value are removed from a mandatory reading list because of threats of damages, lawsuits, or other forms of retaliation." *Id.* Accordingly, *Monteiro* confirms that a student's right to receive information exists not only in the library, but in the classroom as well. Moreover, by holding that the fear of lawsuits cannot justify adjustments to curriculum, *Monteiro* teaches that curricular restrictions are at least subject to some degree of scrutiny. *See also Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983) (holding that students had standing to challenge curricular school book screening system).

At least three other circuits have identified limits on the State's discretion in setting curriculum. For example, the *Monteiro* court quoted with approval the Eighth Circuit's ruling in *Pratt v. Ind. School District No. 831*, 670 F.2d 771 (8th Cir. 1982), which held that a school board violated students' First Amendment right to receive information when it forbade the classroom use of a book based solely on its "ideological content." *Monteiro*, 158 F.3d at 1028-29. The Seventh Circuit articulated a more stringent test, but nevertheless held that "complaints filed by secondary school students to contest the education decisions of local authorities are sometimes cognizable but generally must cross a relatively high threshold before entering upon the field of a constitutional claim . . . ." *Zykan v. Warsaw Comty. Sch. Corp.*, 631 F.2d 1300, 1306 (7th Cir. 1980) (holding that school districts violate the right to receive information only if they "substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute"). Finally, the Eleventh Circuit applied the *Hazelwood* test, *i.e.*, whether the restriction was reasonably related to a legitimate pedagogical interest, to a student's challenge to the removal of certain books from the school curriculum. *See Virgil v. Sch. Bd. of Columbia*

- 11 -

*Cnty.*, 862 F.2d 1517 (11th Cir. 1989).  Like *Monteiro*, all of these cases support the proposition that curricular discretion has its limits.  Although *Monteiro* did not articulate what level of scrutiny applied, this Court agrees with the Eleventh Circuit's holding in *Virgil* that the *Hazelwood* test should apply to curricular decisions.  *See Hazelwood*, 484 U.S. at 271 (applying "legitimate pedagogical interest" test to expression that "may fairly be characterized as part of the school curriculum").

The Court is not persuaded, as Defendants urge, that this case is controlled by *Downs v. Los Angeles Unified School District*, 228 F.3d 1003, 1005 (9th Cir. 2000).  In that case, a public high school teacher challenged the school district's authority to forbid a teacher from posting anti-gay material on a bulletin board devoted to Gay and Lesbian Awareness Month.  The court held that *Hazelwood* did not apply because "all speech that occurred on the bulletin boards was the school board's and LAUSD's speech." *Id*. at 1012.  In other words, the speech at issue was government speech and so the school's "control of its own speech [was] not subject to the constraints of constitutional safeguards and forum analysis, but instead [was] measured by practical considerations applicable to any individual's choice of how to convey oneself:  among other things, content, timing, and purpose." *Id*. at 1013.

If applied unconditionally to Plaintiffs' case, *Downs* and the government speech doctrine might entirely foreclose Plaintiffs' claims.  *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").  A key distinction, however, is that the *Downs* suit was brought by a teacher who sought to "speak for the government," despite the fact that he, like any other teacher, had "no First Amendment right to influence curriculum . . . ." *Downs*, 228 F.3d at 1016-17.  In this case, the students do not actively seek to speak for the government, but instead seek to vindicate their passive right to be exposed to information and ideas.  To hold otherwise would be to disregard the weight of authority discussed above, including *Monteiro*, by improperly granting the State absolute discretion in devising its curriculum.

In summary, Plaintiffs' First Amendment claims are premised on two bases:  the right to speak freely in the classroom, and the right to receive information and ideas.  The first basis cannot sustain their claims because the statute does not limit what students can say in the classroom.  But the statute does implicate the second basis because Plaintiffs have an established right to receive information and ideas in the classroom.  Limitations on this right, however, are subject only to limited scrutiny, *i.e.*, whether the provisions are reasonably related to a legitimate pedagogical concern.  With these principles in mind, the Court turns to Plaintiffs' First Amendment claim.

**C.    Whether § 15-112 is facially overbroad**

The overbreadth doctrine protects against the chill of constitutionally protected speech that may arise from a threat of enforcement of an overbroad law.  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (en banc).  "In a facial challenge to a law's validity under the First Amendment, the law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Id.* (citing *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (internal quotation marks omitted)).

The first step in overbreadth analysis is determining the scope of the challenged statute.  *Stevens*, 130 S. Ct. at 1587.  The court should evaluate both the ambiguous and unambiguous scope of the enactment, because ambiguous meanings can cause citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden area were clearly marked.  *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 494 n.6 (1982).  Additionally, in evaluating a facial challenge, the court must consider the State's own authoritative constructions of the statute at issue, including its own implementation and interpretation of the statute.  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992); *see also Comite de Jornaleros*, 657 F.3d at 946.

The challenged statute's stated purposed is codified in the "Declaration of Policy" at § 15-111, which states: "The legislature finds and declares that public school pupils

- 13 -

should be taught to treat and value each other as individuals and not be taught to resent or hate other races or classes of people." Defendants appear to rely on this same asserted purpose in their briefing by describing § 15-112 as being geared toward prohibiting courses that "promote racism." Def.'s Mem. at 2-3. Plaintiffs do not dispute that reducing racism in schools is a legitimate pedagogical interest. *cf. Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (upholding law school admissions policy that promoted compelling interest in "cross-racial understanding" and the "break[ing] down [of] racial stereotypes"). Accordingly, the primary question in the Court's assessment of the statute will be whether its limitations are reasonably related to the goal of reducing racism at the schools. *Hazelwood*, 484 U.S. at 273. The Court may also identify other legitimate pedagogical interests even if Defendants have not expressly proffered them. *See FCC v. Beach Commc'ns., Inc.*, 508 U.S. 307, 315 (1993) (reviewing for any "conceivable basis" where rational basis review applied to equal protection claim).

1.    **§ 15-112(A)(1) – "Promote the overthrow of the United States government" / § 15-112(A)(2) – "Promote resentment toward a race or class of people."**

The Court will address these two provisions together because the viability of both turns primarily on the meaning of "promote." As noted above, Defendants have a legitimate interest in lessening racial or class animus in the schools. The school also has a legitimate interest in limiting curricula that tend to encourage the overthrow of the United States government. *See Dennis v. United States*, 341 U.S. 494, 501 (1951) ("No one could conceive that it is not within the power of Congress to prohibit acts intended to overthrow the Government by force and violence.").[9]

Plaintiffs do not seem to dispute that these are legitimate interests, but instead contend that the verb "promote" impermissibly broadens the statute to cover material that only incidentally causes the targeted sentiment. Thus, Plaintiffs contend that §15-

---

[9]    *See also Cole v. Richardson*, 405 U.S. 676, 683-84 (1972) (upholding mandatory state public employee oath to "oppose the overthrow of the . . . United States of America . . . by force, violence, or by any illegal or unconstitutional method").

112(A)(1) would prohibit, for example, a discussion of those portions of the Declaration of Independence that recognize the right to "throw off" tyrannical governments. Similarly, they contend that § 15-112(A)(2) would preclude the teaching of any historical account of racial oppression or ethnic violence – slavery in the United States, or the 9/11 attacks, for example – because such coursework may cause some students to resent the perpetrator's race.

As relevant here, "promote" is defined as "to contribute to the growth, enlargement, or prosperity of," and also as to "further" or "encourage." Webster's Third New Int'l Dictionary 1815 (2002). Under these and other definitions, "to promote" does not require intentional or purposeful conduct. Thus, for example, a school initiative designed to encourage student athletics could also incidentally "promote" better eating habits, even though the initiative did not expressly or actively encourage anything in the realm of nutrition. In this way, "to promote" is broader than "to advocate," which is defined as "to plead in favor of." *Id*. at 32. Thus, if read in isolation, use of the term "to promote" might have the effect of prohibiting courses that inadvertently cause students to harbor racial resentment or the desire to overthrow the government. But the Court is required to read the statute in context and as a whole, *Action Marine*, 181 P.3d at 190, and doing so reveals that "to promote" cannot be read so broadly.

As discussed in Part III.A., the statute does not restrict individual class discussions, but instead only targets the design and implementation of courses and curricula. Thus, the word "promote" takes on a more intentional and active meaning in this context. In this way, a given class *discussion* could incidentally promote resentment, but to say that a course designed to teach about the oppression of Mexican-Americans is automatically a class that "promotes resentment toward a race" would stretch the plain meaning of "promote" too far.[10] Moreover, even if the limited scope of this provision were not

---

[10]    The Supreme Court reached a similar conclusion in addressing a criminal statute that makes it unlawful "to knowingly or willfully advocate, . . . or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the

already clear, the exception for instruction of "historical oppression" of particular groups keeps the proscription from crossing the constitutional line. *See* § 15-112(F). Finally, and with regard to § 15-112(A)(1), it bears noting that the potentially passive "promote" is linked to the manifestly active "overthrow." Thus, to read this provision as proscribing incidental or passive furtherance of the overthrow of the government would amount to "verbal gymnastics" that defies ordinary English. *See Artuz v. Bennett*, 531 U.S. 4, 10 (2000).

This narrow reading of the statute is in keeping with the ALJ's interpretation of § 15-112. Specifically, the ALJ found that the statute "permitted the historical (objective) instruction of oppression that may, as a natural but unintended consequence, result in racial resentment or ethnic solidarity. However, teaching oppression objectively is quite different than actively presenting material in a biased, political, and emotionally charged manner . . . ." (PSOFO, Doc. 162, Ex. I at 35.) This Court owes at least some deference to the ALJ's sensible construction of the challenged statute. *Forsyth Cnty.*, 505 U.S. at 131; *see also Comite de Jornaleros*, 657 F.3d at 946. Lastly, to the extent these provisions could be read to prohibit the teaching of historical events or political theories that unintentionally encourage racism or the overthrow of the United States government, the Court rejects those readings because the provisions are "readily susceptible" to the more narrow, constitutional construction discussed above. *Stevens*, 130 S. Ct. at 1592; *see also City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984) ("[T]he mere fact that one can conceive of some impermissible applications of a statute is not

United States by force or violence . . . ." *Dennis*, 341 U.S. at 499. The Court rejected the contention that the statute "prohibits academic discussion of Marxism-Leninism" or that it "stifles ideas." *Id.* at 501. Instead, the Court ruled that the statute "is directed at advocacy, not discussion," noting that "it was not unlawful 'to conduct in an American college and university a course explaining the philosophical theories set forth in" certain assigned books. *Id.* at 502 (quoting relevant jury instruction with approval). Similarly, under § 15-112, a teacher could permissibly teach political theory find history related to revolution and coups d'etat, but the course could not itself affirmatively promote the overthrow of government.

sufficient to render it susceptible to an overbreadth challenge.").

In sum, neither § 15-112(A)(1) nor § 15-112(A)(2) is facially overbroad.  The Court cannot conclude that a "substantial number" of their applications would not be reasonably related to a legitimate pedagogical interest.

**2.    § 15-112(A)(3) – "Are designed primarily for pupils of a particular ethnic group."**

This provision is the most problematic because it is not apparent what interest it can serve that is not already covered by § 15-112(A)(2).  In other words, if a class "designed primarily for pupils of a particular ethnic group" also "promote[s] resentment towards a race," then it is already covered by (A)(2) which, as discussed above, tracks the overall legitimate purpose of the statute.  But if such a class *does not* promote resentment, then what legitimate purpose is served by forbidding such classes?  Defendants have not identified a unique interest specifically tied to this prohibition; instead, they fall back on their general argument that the statute as a whole precludes courses of study that "promote racism."  But, again, that interest is already covered by section (A)(2).  There is a similarly problematic overlap between (A)(3) and (A)(4), which forbids courses that advocate ethnic solidarity instead of treatment of pupils as individuals.  The Court is hard-pressed to conceive of a course that "advocates ethnic solidarity," but that is not also designed for a particular ethnic group.  It thus appears that (A)(3) forbids courses designed for a particular ethnic group, even if those courses do not promote resentment of another group, and even if they do not advocate ethnic solidarity, instead of individual treatment.  This additional prohibition, untethered as it is to the primary purpose of the statute, raises serious constitutional concerns.

Indeed, section (A)(3) threatens to chill the teaching of legitimate and objective ethnic studies courses.  The provision certainly is not an outright ban on ethnic studies courses because such courses are not solely for the benefit of members of the ethnicity being studied.  But the provision's broad and ambiguous wording could deter school districts from teaching ethnic studies.  Significantly, such trepidation would not be

unjustified given that Superintendent Horne found that three of the four Ethnic Studies courses at TUSD "could be found in violation" of § 15-112(A)(3).  (TAC, Doc. No. 84, Ex. B.)  That then-Superintendent Horne elected to enforce the statute only against the MAS program, and not the other two programs, only underscores the breadth and ambiguity of this provision.

In light of these ambiguities, the Court concludes that § 15-112(A)(3) is facially overbroad.  The provision does not promote any legitimate interest that is not already covered by § 15-112 (A)(2) and (A)(4), and also likely would chill the teaching of legitimate ethnic studies courses.  In sum, it does not further any legitimate pedagogical interest.

Although the statute does not include a severability clause, the Court concludes that subsection (A)(3) is severable from the balance of the statute.  *See Ruiz v. Hull*, 957 P.2d 984, 1002 (Ariz. 1998) (noting that a severability clause is relevant to, but not dispositive of the severability question).  Under Arizona law, "if part of an act is unconstitutional and by eliminating the unconstitutional portion the balance of the act is workable, only that part which is objectionable will be eliminated and the balance left intact." *State v. Pandeli*, 161 P.3d 557, 573 (Ariz. 2007) (en banc) (internal quotation marks omitted).  Here, there appears to be no reason to conclude that the other provisions of the statute could not be enforced without subsection (A)(3), nor is there any indication that the legislature would not have enacted the statute without subsection (A)(3).  *See id.* (noting that severability turns in part on whether the legislature would have enacted the statute without the unconstitutional provision).

### 3.   § 15-112(A)(4) – "Advocate ethnic solidarity instead of the treatment of pupils as individuals."

This provision survives the Court's deferential scrutiny.  On its face, the provision mirrors the Declaration of Policy's legitimate goals of treating students as individuals and of reducing race or class animosity.  The only potential infirmity in this provision is its limitation on "ethnic solidarity."  "Solidarity" is defined as "an entire union of interests

and responsibilities of a group" and as a "community of interests, objectives, or standards." Webster's Third New Int'l Dictionary 2169 (2002). Whether under that definition or any other, there is nothing inherently racist or divisive about "ethnic solidarity." Thus, if the statute simply proscribed courses that taught ethnic solidarity, without any reference to the treatment of students as individuals, it likely would not survive even the most deferential scrutiny. The provision, however, is more narrowly tailored than an outright ban on the teaching of ethnic solidarity. Instead, the statute prohibits the "advocacy" of ethnic solidarity "instead of the treatment of pupils as individuals." By phrasing this provision in the alternative, and by restricting only the direct "advocacy" of ethnic solidarity, the provision is at least reasonably related to legitimate pedagogical concerns. Accordingly, § 15-112(A)(4) is not unconstitutionally overbroad.

**D.    Whether § 15-112 is unconstitutionally vague**

"Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008)  A statute is facially void for vagueness if it:  (1) fails to provide a person of ordinary intelligence fair notice of what is prohibited; or (2) is so standardless that it authorizes or encourages seriously discriminatory enforcement. *Id*. Where, as here, the statute implicates speech, its vagueness exceeds constitutional limits if its deterrent effect on legitimate expression is both real and substantial, and if the statute is not readily subject to a narrowing construction by the state courts. *Cal. Teachers Ass'n*, 271 F.3d at 1151. Finally, a statute is vague as applied if it fails to put a particular litigant on notice that his conduct is prohibited. *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009).

Plaintiffs' facial vagueness challenge must fail for many of the same reasons

discussed in the context of overbreadth.[11]  The only phrases that are arguably vague are "to promote," "advocate ethnic solidarity," and "designed primarily for."  Read in context, and in light of the express purpose of the statute, however, these terms provide a person of ordinary intelligence fair notice of what is prohibited.  As discussed above, "to promote" requires some deliberate and affirmative effort on the part of school administrators to encourage either the overthrow of government or racial resentment.  And "ethnic solidarity" is sufficiently clear given its juxtaposition with the mandate to prioritize the "treatment of pupils as individuals."  Finally, although the term "primarily" is inherently imprecise, it is still a term of "common understanding."  *See Cal. Teachers Ass'n*, 271 F.3d at 1152 (holding that "overwhelmingly" and "nearly all" were not unduly vague even though such terms were not "readily translated into a mathematical percentage").  For these reasons, as well as those discussed in the overbreadth analysis, the Court cannot conclude that the statute is facially vague.

Plaintiffs also contend that the statute is vague as applied to the MAS program.  In support, Plaintiffs first argue that the Findings of former Superintendent Horne and Superintendent Huppenthal were unduly vague because they failed to give sufficient guidance to the TUSD on how to come into compliance with the statute.  The Court agrees that the two sets of Findings are sparse and, in some instances, conclusory.  The vagueness of the *findings*, however, does not bear on whether the *statute* is vague as applied.  An as-applied vagueness claim is viable when a particular application of an otherwise-permissible statute stretches the breadth of the statute further than could be reasonably anticipated.  *Kilbride*, 584 F.3d at 1257.  Thus, the specificity of Defendants' rulings cannot, by itself, show that the meaning of the statute was impermissibly stretched to apply to the MAS program.  In essence, Plaintiffs argue that Defendants' findings

---

[11]    Given that the statute does not implicate students' right to speak in the classroom, *i.e.*, it cannot be applied directly to student conduct – Plaintiffs may not have standing to assert a vagueness challenge.  The Court assumes, without deciding, that there is such standing.

failed to clarify an otherwise vague statute. But, as the Court has already ruled, the statute is not impermissibly vague on its face; thus, Defendants were under no obligation to clarify its meaning.

Moreover, even assuming that the dearth of detail in Defendants' rulings could support Plaintiffs' as-applied challenge, the detailed findings of the ALJ – which were "accepted as written without modification" by Superintendent Huppenthal – provided sufficient notice. (PSOFO, Doc. 162, Ex. J.) Specifically, the ALJ issued a 36-page Decision that analyzed textbooks, curricular materials, and student work. (PSOFO, Doc. 162, Ex. I.) The Decision also considered the testimony of state education officials, TUSD officials, teachers, parents, and education experts. After a fairly specific analysis of the evidence, the ALJ concluded that the evidence "establish[ed] that the MAS program has classes or courses designed for Latinos as a group, that promotes racial resentment against 'Whites,' and advocates ethnic solidarity of Latinos." *Id*. at 34. The ALJ also noted that the statute permits "the historical (objective) instruction of oppression that may, as a natural but unintended consequence, result in racial resentment or ethnic solidarity." *Id*. at 35. The Court need not decide whether the ALJ's ruling was a correct interpretation of the state-law question that he faced – this action is not an appeal of the ALJ's ruling – but the Court does conclude that the ALJ's Decision was sufficiently detailed to provide notice of how the MAS program was deemed to violate § 15-112. In short, the lack of detail in the two sets of Findings does not render the statute vague as applied to the MAS program.[12]

In their as-applied vagueness challenge, Plaintiffs also argue that the MAS

---

[12]    Plaintiffs also argue that the Superintendent's role as final decisionmaker further demonstrates that the enforcement procedures allowed Huppenthal to apply the statute in an arbitrary and discriminatory manner. Even assuming that the enforcement protocol is relevant to the as-applied vagueness challenge, Plaintiffs' disregard the fact that an adverse administrative ruling is subject to review by the state courts. *See* Ariz. Rev. Stat. §§ 15-112(D); 41-1092.08(H). The right to judicial review is inconsistent with Plaintiffs' claims that the Superintendent's discretion is unfettered.

program was improperly singled out for enforcement. This is a selective enforcement argument of § 15-112 and is based on the contention that the statute is so standardless that it authorizes or encourages seriously discriminatory enforcement. This argument is a subset of the equal protection argument that Plaintiffs assert in support of their preliminary injunction motion. As discussed below in Part IV.A., this argument must fail; thus, it cannot support Plaintiffs' as applied vagueness challenge.

In conclusion, there are no genuine issues of material fact with respect to Plaintiffs' First Amendment and vagueness claims. Accordingly, summary judgment will be granted to Defendants on these claims, except as to subsection (A)(3) on which summary judgment will be granted to Plaintiffs.

**E.      Equal Protection[13][14]**

**1.      Facial challenge**

Plaintiffs first contend that § 15-112(A)(3) – which prohibits classes designed primarily for students of a particular ethnic group – is facially discriminatory "even

---

[13]      As stated above, the Court reaches these claims – the equal protection and substantive due process claims – on summary judgment because the parties have had the opportunity to and, in fact, these claims have been fully ventilated in the parties' extensive briefing on Plaintiffs' second motion for preliminary injunction.

[14]      Defendants raise a threshold issue in their motion to dismiss Plaintiff-Intervenor Margarita Dominguez. The Complaint-in-Intervention asserts claims on her own behalf and as a "next friend" of her son, Plaintiff-Intervenor Nicholas Dominguez. (Doc. 159.) In response to the motion to dismiss, Ms. Dominguez has clarified that she does not seek to raise any claims on behalf of her son, nor does she raise any First Amendment claims. (Doc. 199.) Accordingly, Ms. Dominguez's suit rests only on substantive due process and equal protection grounds. Defendants' motion to dismiss will be denied. Ms. Dominguez has standing to challenge the curricular decisions made on her son's behalf, which she may assert under the Due Process Clause. *See Johnson*, 702 F.2d at 197; *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923). She also has standing to pursue her political process equal protection claims. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007) (holding that parents of school children had standing to challenge race-based school assignments). The Court also notes that, although it appears that Plaintiff-Intervenor Nicholas Dominguez is no longer a student in the TUSD, Defendants have not moved to dismiss the claims of either Plaintiff-Intervenor on mootness grounds.

though it does not explicitly single out Latino students." Pls.' Inj. Mem. at 17.  As an initial matter, Plaintiffs reliance on cases that address statutes with explicit classifications of protected groups are inapposite because, as Plaintiffs concede, the challenged statute does not include express classifications.  Thus, the only potentially applicable case that Plaintiffs rely on is *Hunter v. Erickson*, 393 U.S. 385 (1969).

In *Hunter*, the Supreme Court considered a city charter amendment (codified as § 137 of the charter) that prevented the city council from implementing any ordinance dealing with racial, religious, or ancestral discrimination without first obtaining the approval of the majority of voters of the city.  *Id*. at 386.  The Court recognized that § 137 did not make express classifications on the basis of race or religion, but nevertheless held that § 137 "disadvantages those who would benefit from laws barring racial, religious, or ancestral discriminations as against those who would bar other discriminations . . . ." *Id*. at 391.  Thus, the law "place[d] special burdens on racial minorities" because "[t]he majority needs no protection against discrimination, and if it did, a referendum might be bothersome but no more than that." *Id*.  The Court then applied "the most rigid scrutiny" because § 137 amounted to a racial classification, and ultimately struck down the statute. *Id*. at 393.  The Court later followed *Hunter* in *Washington v. Seattle School District*, which struck down an initiative that placed political burdens on the efforts of minority groups to desegregate schools.  458 U.S. 457, 474 (1982).

*Hunter* and *Seattle*, which are known as the "political structure equal protection cases," *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 704 (9th Cir. 1997), are not applicable here.  As the Ninth Circuit has recognized, *Hunter* "dealt with **political obstructions** placed in the way of minorities seeking to remedy identified patterns of racial discrimination." *Valeria v. Davis*, 307 F.3d 1036, 1040 (9th Cir. 2002) (emphasis added).  It is true that the MAS program is a component of the Post-Unitary Status Plan, which was implemented in connection with a long-running school desegregation lawsuit.

*See Fisher v. Lohr*, No. 4:74-cv-0009-DCB (D. Ariz. Feb. 29, 2012).[15]  In that sense, § 15-112 could be construed as an "obstruction" of an effort to remedy past racial discrimination.  But *Hunter* and *Seattle* are distinguishable because § 15-112 does not structurally impede the ability of minorities to use the political process to remedy racial discrimination.  The amendment in *Hunter* made it "substantially more difficult" for minorities to secure passage of fair housing laws.  393 U.S. at 390.  Section 15-112, in contrast, is simply a limit on certain coursework that was adopted in connection with efforts to remedy past discrimination; it does not "remov[e] the authority to address a racial problem – and only a racial problem – from the existing decisionmaking body, in such a way as to burden minority interests."  *Seattle Sch. Dist.*, 458 U.S. at 474.  Thus, on its face, § 15-112 is a permissible "state action that addresses, in neutral fashion, race-related matters."  *Crawford v. Bd. of Educ.*, 458 U.S. 527, 538 (1982).

### 2.    Discriminatory intent

Although § 15-112 is not facially discriminatory (either explicitly or under the *Hunter* analysis), it would still be unconstitutional if it was motivated by a discriminatory purpose.  *Washington v. Davis*, 426 U.S. 229 (1976).  In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Supreme Court identified the following non-exhaustive "subjects of proper inquiry" for discerning discriminatory intent:  (1) whether the historical background of the decision "reveals a

---

[15]    Since 1978, the TUSD has operated subject to a federally enforced desegregation decree.  *See Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1134 (9th Cir. 2011).  As part of that decree, the TUSD has been operating under the Post Unitary Status Plan ("PUSP"), which was adopted by the TUSD on July 30, 2009, and which called for the implementation of MAS courses.  *See Fisher v. Lohr*, No. 4:74-cv-0009-DCB (D. Ariz. Feb. 29, 2012) (Doc. 1360).  Although the district court approved the PUSP and declared that the TUSD had achieved unitary status, that ruling was reversed on appeal.  *Fisher*, 652 F.3d at 1143-44.  The PUSP remains in place as an interim measure while the parties work with a special master to develop a "Unitary Status Plan" that will supersede the PUSP.  *Fisher*, No. 4:74-cv-0009-DCB (D. Ariz. Feb. 29, 2012) (Doc. 1360).  The district court recently adopted, in part, a Unitary Status Plan, subject to revision of disputed portions.  *Id*. (Doc. 1436).

series of official actions taken for invidious purposes"; (2) whether the sequence of events leading up to the challenged decision reveals discriminatory intent; (3) whether there were departures from the normal procedural sequence; (4) whether the factors usually considered important by the decisionmaker "strongly favor" a decision contrary to the one reached; and (5) the legislative or administrative history. *Id.* at 265-68.

There are several aspects of the challenged actions that are concerning, or that at least "spark suspicion." *Id.* at 269. These red flags begin with the actions of former Superintendent Horne. Horne sought to "eliminate" the MAS program as early as 2007, when he wrote an "Open Letter to the Citizens of Tucson" explaining his disagreement with the MAS teachings. (PSOFO, Doc. 162, Ex. E.) When Horne's informal effort failed, he became the driving force behind the enactment of § 15-112. He spoke at the relevant Arizona legislative committee hearing and stated unequivocally that his support for the bill arose from his concerns about the MAS program.[16]

Defendants do not dispute that § 15-112 was passed in response to complaints about the MAS program. Indeed, the testimony before the Senate Committee confirms that this was the case. *See supra* note 16. By itself, however, this facet of the legislative history does not reveal a discriminatory intent. Countless laws are passed in response to a single manifestation of a perceived problem, but that does not necessarily show that the motivating instance was unfairly – let alone unconstitutionally – targeted.

Superintendent Horne issued his Finding of Violation on his last day in office, December 30, 2010. His Finding went into effect January 1, 2011, the same day that § 15-112 went into effect. (TAC, Doc. No. 84, Ex. B.) The timing of the Finding underscores Horne's determination to do away with the MAS program, and it also means that Horne necessarily applied the statute retroactively, without any effort to show that the problematic materials were in use at the time of the Finding. Indeed, Horne's successor,

---

[16]    The hearing was held on April 7, 2010, before the Senate Committee on Education. The video and audio recording is available at http://azleg.granicus.com/ MediaPlayer.php?view_id=13&clip_id=7405.

Superintendent Huppenthal, seemed to recognize this defect, and thus issued his own Finding that purported to address contemporaneous violations. (PSOFO, Doc. No. 162, Ex. I.)

Also of concern is the fact that the Horne finding recognized that, in addition to MAS, two other TUSD ethnic studies programs "could be found in violation" of § 15-112. (Doc. No. 84, Ex. B.) Nevertheless, the Finding only targeted the MAS program because, according to the Finding, it was the only program about which Horne had received complaints. *Id.* To date, no other programs have been investigated or found to be in violation of § 15-112. Moreover, Horne's Finding seemed to circumvent the 60-day safe harbor period during which a school district has an opportunity to comply with the statute. The Finding stated that, because the violations were "deeply rooted in the program," "only the elimination of the program will constitute compliance." *Id.* at 2. This single-minded focus on terminating the MAS program, along with Horne's decision not to issue findings against other ethnic studies programs, is at least suggestive of discriminatory intent.

As previously noted, Superintendent Huppenthal undertook his own investigation, and Plaintiffs' contend that his decision to disregard a third-party audit evinces discriminatory intent. Prior to issuing his Findings, Superintendent Huppenthal commissioned Cambium Learning, Inc.,[17] to perform a curriculum audit of the MAS program. After a two-month investigation, Cambium concluded that "no observable evidence was present to suggest that any classroom within [TUSD] is in direct violation of the law A.R.S. § 15-112(A)." (TAC, Doc. 85, Ex. C. at 55.) Nevertheless, both the Huppenthal Finding and the subsequent ALJ ruling disagreed with Cambium's conclusion, noting several limitations of the audit that Cambium itself had identified. Thus, for example, the Report stated that "[i]t is imperative to note the curriculum audit

---

[17]   Cambium subcontracted the audit to the National Academic Educational Partners. (PSOFO, Doc. 162, Ex. I.)

period included a limited number of classroom observations in comparison to the number of sections offered." *Id*. at 63.  Specifically, Cambium was only able to observe 39.5% of all high school MAS courses offered. *Id*.  The Report also emphasized that auditors were only able to observe an average of 29.6 minutes per class period, and further recognized "the lack of comprehensive information provided by" the MAS department. *Id*.; *see also id*. at 65 ("[A]s part of a curriculum audit, it is common practice to review student work samples; yet, [MAS] student works are not retained, rather sent home instead.").

The Court need not determine whether the Cambium Report was right or wrong, nor whether the deficiencies outlined above were fatal to the Report's conclusions.  At the very least, however, the deficiencies provided a reasonable basis for Huppenthal's decision to disregard the Cambium Report's conclusion.  Plaintiffs have not presented any evidence explaining why these deficiencies were an inadequate basis for Huppenthal's disagreement with the Cambium Report's conclusions.  Thus, Huppenthal's disagreement with the Report cannot support Plaintiffs' claim that the statute was selectively enforced against the MAS program.  Moreover, the Huppenthal Finding does not include the same kinds of problematic assumptions and implicit biases that appear in Horne's informal letter.

Considering the record as a whole, and even drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have not shown that Defendants acted with discriminatory intent.  Although some aspects of the record may be viewed to spark suspicion that the Latino population has been improperly targeted, on the whole, the evidence indicates that Defendants targeted the MAS program, not Latino students, teachers, or community members who supported or participated in the program.  Moreover, Plaintiffs spend a good deal of time attacking the substance of Defendants' (and the ALJ's) findings that MAS violated § 15-112.  But this Court is not charged with reviewing those questions of state law.  Although the analysis used by Defendants may be subject to criticism for inaccuracy and on other grounds, the Court cannot conclude, on this record, that Defendants' actions were motivated by a discriminatory intent.  While there may be

grounds to question the wisdom of § 15-112 as a policy matter, "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we think a political branch has acted." *Beach Commc'ns.*, 508 U.S. at 313-14.  In sum, although Plaintiffs' have presented some viable support for their equal protection claim, in the end, that showing is insufficient to establish the *prima facie* elements of an equal protection claim.

**F.      Substantive Due Process**

Plaintiffs claim a right under the Fourteenth Amendment's Due Process Clause, to make decisions relating to education.  For Plaintiff-Intervenor Margarita Dominguez – who is the parent of Plaintiff-Intervenor Nicholas Dominguez – this claim relies on "the right of parents to make decisions concerning the care, custody, and control of their children." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2006).  This right does not, however, "vest parents with the authority to interfere with a public school's decision as to how it will provide information to its students or what information it will provide, in its classroom or otherwise." *Id*. at 1206.  Thus, § 15-112 and the suspension of the MAS program do not infringe any of Ms. Dominguez's fundamental constitutional rights, and her claim must fail so long as Defendants' actions survive rational basis review. *See Vacco v. Quill*, 521 U.S. 793 (1997).  As discussed in the Court's analysis of the First Amendment and equal protection claims, the statute is reasonably related to a legitimate pedagogical concern, and the application of § 15-112 to the MAS program does not reveal a discriminatory intent.  Accordingly, Plaintiffs have failed to make a *prima facie* showing of the necessary elements to support their substantive due process

claim,[18] and their substantive due process claims must fail.[19]

## IV. REMEDY

With respect to the constitutional violation that has been established, the question remains of the proper remedy to be invoked, *i.e.*, whether the issuance of a permanent injunction is appropriate.   The bulk of Plaintiff's attack on the statute has been rejected and only one subsection of the statute has been found not to serve a legitimate pedagogical purpose.   The Court is also mindful that proceedings in *Fisher v. Lohr* are still ongoing.   In light of all these circumstances, the Court concludes that the public interest does not require the issuance of a permanent injunction.   *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987) ("'[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.'" (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982))); *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 493 (2001) ("[W]hen a court of equity exercises its discretion, it may not consider the advantages and disadvantages of nonenforcement of the statute, but only the advantages and disadvantages of employing the extraordinary remedy of injunction over other available methods of enforcement." (citations and internal quotation marks omitted)).

---

[18]    Plaintiffs contend that this claim is also asserted on behalf of the student Plaintiffs, and they concede that restrictions on those rights are subject only to rational basis review.  Accordingly, the analysis is the same for both the parent-plaintiff and the student plaintiffs.

[19]    In their Supplemental Filing of Exhibits, the Plaintiffs submit (1) filings from the *Fisher* litigation showing that the State of Arizona has objected to portions of the proposed Unitary Status Plan that, in its view, are in violation of § 15-112; and (2) a recent study of the MAS program's effects on student achievement.  (Doc. 222).  Even assuming the Court could properly consider these exhibits, they would not alter the outcome.  The State's filings in *Fisher* show only that it continues to seek enforcement of § 15-112, and do not show discriminatory intent.  And the new report – while it may demonstrate the benefits of MAS – does not change the fact that the statute is reasonably related to legitimate concerns.  Nor does it show that the Defendants acted with discriminatory intent given that, as described above, there is sufficient evidence that they acted for non-discriminatory purposes.

In the circumstances of this case, the Court concludes in the exercise of its discretion that a declaratory judgment that § 15-112(A)(3) is unconstitutional, accompanied by the retention of jurisdiction over any future remedial proceedings, if such become necessary, suffices as a remedy.

## V.  CONCLUSION & ORDER

For the foregoing reasons, **IT IS ORDERED:**

1.     Plaintiffs' motion to strike (Doc. 165) and Defendants' motion to strike (Doc. 150 at 8 n.3) are **DENIED.**

2.     Plaintiffs' motion to supplement (Doc. 186) is **GRANTED.**

3.     Plaintiffs' motion for summary judgment (Doc. 97) is **GRANTED in part and DENIED in part**.  The motion is granted with respect to Plaintiffs' claim that § 15-112(A)(3) is unconstitutional and is denied with respect to all remaining claims.

4.     Defendants' cross-motion for summary judgment (Doc. 151) is **GRANTED in part and DENIED in part.**  The motion is granted with respect to all of Plaintiffs' First Amendment claims, except with respect to the claim that § 15-112(A)(3) is unconstitutional, as to which it is denied.

5.     The court *sua sponte* **GRANTS** summary judgment to Defendants on Plaintiffs' equal protection and substantive due process claims.

6.     Plaintiffs' second motion for a preliminary injunction (Doc. 179) is **DENIED** as moot.

7.     Defendants' motion to dismiss Plaintiff-Intervenor Margarita Dominguez (Doc. 159) is **DENIED.**

8.     All other pending motions, including Plaintiffs' motion to expedite the briefing schedule (Doc. 107), Defendants' motion for extension of time (Doc. 115), and various motions related to a status conference are **DENIED** as moot.

//

//

//

9.      Final Judgment shall be entered consistent with this Memorandum Order. Each party shall bear his or her own costs.


      **DATED** this 8th day of March, 2013.



_____
A. Wallace Tashima
United States Circuit Judge
Sitting by Designation