1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3

4   CURTIS ACOSTA, ET AL.,        )
                                  )
5                  Plaintiffs,    )
                                  )
6   vs.                           )   CV-10-623-TUC-AWT
                                  )
7   JOHN HUPPENTHAL, ET AL.,      )
                                  )
8                  Defendants.    )   Tucson, Arizona
    _____)   December 21, 2011

9

10

                  TRANSCRIPT OF MOTIONS HEARING
11         BEFORE THE HONORABLE A. WALLACE TASHIMA
                  UNITED STATES DISTRICT JUDGE
12

13  APPEARANCES:

14  On Behalf of the Plaintiffs:   Mr. Richard M. Martinez
                                   300 South Convent Avenue
15                                 Tucson, AZ  85701

16  On Behalf of the Defendants:   Mr. Kevin D. Ray
                                   Office of the Attorney General
17                                 1275 West Washington Street
                                   Phoenix, AZ  85007
18

19

20

21

22  Court Reporter:                Aaron H. LaDuke
                                   Official Court Reporter
23                                 U.S. District Court
                                   405 W. Congress St.
24                                 Tucson, AZ  85701

25

1          P R O C E E D I N G S

2          THE COURT:  In Acosta, we have two matters set for

3     hearing today.  One is the defendants' motion to dismiss, and

4     the second is the plaintiffs' motion for a preliminary

5     injunction to prevent the statute from going into effect

6     pending resolution of this case.  Obviously, if defendants

7     prevail on the motion to dismiss, that does away with the

8     motion for preliminary injunction, so I'm going to take that

9     motion first.

10         My main concern on that motion, as far as the plaintiffs'

11    case is concerned, is I think they have an uphill road on

12    standing.  So I think plaintiffs ought to at least spend a

13    good deal of their argument on the standing question, all

14    right?

15         So I'll hear from the -- let's see.  On the motion to

16    dismiss, it's the defendants' motion, so I'll hear from the

17    defense first, then the plaintiff, and give the moving party a

18    chance to respond, all right?

19         Let's proceed.

20              THE CLERK:  Call the case?

21              THE COURT:  Yes.  Okay.

22              THE CLERK:  CV-10-00623, Acosta versus Horne, on for

23    a motion hearing.

24         Counsel, please state your appearance.

25              MR. MARTINEZ:  Richard Martinez, Your Honor, on

1 behalf of the Acosta plaintiffs, who are all in the courtroom

2 today.  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. RAY:  Good afternoon, Your Honor.  Assistant

5 Attorney General Kevin Ray, appearing on behalf of the

6 Superintendent of Public Instruction John Huppenthal.

7      Just for the record, Judge, I just want to remind the

8 Court that I also represent or the Attorney General's Office

9 also represents the State Board, but they have been granted

10 nominal party status at this point.

11          THE COURT:  All right.  Let me just say the

12 clerk announced the case as Acosta versus Horne, but of course

13 Huppenthal has since been substituted as the lead plaintiff.

14      Go ahead, Mr. Ray.

15          MR. RAY:  That is correct.  Thank you, Judge.

16      Judge, the plaintiffs have the burden today to establish

17 standing.  Our papers are very clear on this point.  The

18 plaintiffs lack standing to bring this action.  The plaintiffs

19 are 11 employees employed by the Tucson Unified School

20 District in the Mexican American Studies Department and two

21 student plaintiffs who are not yet eligible to enroll in any

22 of those classes.  The law at issue --

23          THE COURT:  Apparently, one is on the cusp of

24 eligibility, right?

25          MR. RAY:  Well, based on the most recent filing,

1    it appears that one of the student plaintiffs has enrolled in

2    classes that will start in either August or September of 2012.

3    That's when they would become eligible.

4         The law at issue --

5              THE COURT:  It's not when they become eligible.

6    That's when the class --

7              MR. RAY:  Would begin.

8              THE COURT:  -- is supposed to start, yeah.  So are

9    you still contesting her eligibility?

10             MR. RAY:  Yes.

11             THE COURT:  On what basis?

12             MR. RAY:  Well, Judge, the cases are clear.  Standing

13   is appropriate at the time the complaint is filed.  The

14   complaint was filed in 2010.  She will not have standing

15   until, A, she is registered and enrolled and, B, the classes

16   begin, and I believe that's in August or September of 2012.

17             THE COURT:  All right.

18             MR. RAY:  Secondly, this law at issue, and it's

19   really -- the plaintiffs refer to it as House Bill 2281.  What

20   it really is is A.R.S. 15-111 and 112.  It does not apply.  It

21   does not reference individuals, teachers, or students.  It

22   doesn't prohibit individual conduct.  It doesn't restrict

23   individual teacher or student speech, and there's no authority

24   under that statute for the superintendent to discipline or

25   terminate students or teachers in this matter.

1        This lawsuit is really a challenge by these plaintiffs

2  who are alleging individual constitutional right deprivation

3  based on the impact of this law.  The law applies only to

4  school districts and charter schools.  Tucson --

5             THE COURT:  Well, that alone doesn't deprive them of

6  standing.  In other words, take, for instance, the *Seattle*

7  *School District* case.  That didn't apply to the students or

8  the parents, right?  It applied to the school district, but

9  still the parents had standing.

10             MR. RAY:  Yes.  That was --

11             THE COURT:  What's the difference?

12             MR. RAY:  Well, there's a significant difference.  I

13  think the *Washington versus Seattle* case, that was the

14  busing -- I believe the segregation, the busing segregation

15  case.

16             THE COURT:  No.  I'm talking about the more recent

17  parents concerned case.

18             MR. RAY:  Oh, the *Parents Involved* case?

19             THE COURT:  Yes.  I mean, the parents were recognized

20  to have standing there, and the state law applied only to

21  school districts.

22             MR. RAY:  Yes, that's correct.  What the court

23  focused on there, Judge, is different than what's going on in

24  this case.

25        First of all, let's back up.  Teachers have no standing,

and I think that's well-settled in the Ninth Circuit.  The
*Johnson* case is clear on that.  The cases you are talking
about, Judge, are I believe the *Gratz* and the *Parents Involved*
case -- and if you'll permit me just a moment.

        The injury in both of those cases, Judge, was based on
racial admission policies that were applied to students in
both *Gratz* and the *Parents Involved* case, and what the court
said was the fact where plaintiffs were being forced to
compete in a system that disfavored them because of a specific
racial classification built into the policy, that caused the
injury.

    We don't have that here.  The statute itself is neutral
on its face.  There is no race-based classification.  That is
the primary distinction.

        THE COURT:  Can they make an as-applied challenge?

        MR. RAY:  Certainly, certainly they can make -- they
have alleged an as-applied challenge.

        THE COURT:  Well, do they have standing for an
as-applied challenge?

        MR. RAY:  No, no, we would say they don't have --
they haven't met their burden on that, either.  There has to
be an injury.  There has to be a particularized injury.  That
isn't demonstrated here by either of these two student
plaintiffs.  Secondly, there has to be a causal connection,
and again --

```
 1            THE COURT:  You don't think that the deprivation of
 2   the opportunity to study Mexican American Studies is an
 3   injury.  Is that what you are saying?  It's not a legal
 4   injury?
 5            MR. RAY:  I'm saying --
 6            THE COURT:  Isn't that what they are complaining
 7   about?
 8            MR. RAY:  Yes.  And the Supreme Court and the Ninth
 9   Circuit is very clear.  Students do not have a protected
10   constitutional right to study subjects that they want to learn
11   or that can dictate curriculum or course of study to the
12   state.  It's very clear.  So they don't have that
13   constitutional right.
14            THE COURT:  Well, as far as standing goes, I don't
15   think their attack is that broad.  Their attack is that
16   certainly the state and the district can control the
17   curriculum, but they can't do it in a race-based way, based on
18   race.
19            MR. RAY:  That is correct.
20            THE COURT:  In other words, saying any curriculum is
21   okay, but you can't say anything about Mexicans.  How is that?
22   Would that be okay because it's a curriculum matter?
23            MR. RAY:  No.  That's not what the law -- the law --
24            THE COURT:  I'm not saying -- I'm just talking about
25   standing.
```

1             MR. RAY:  Okay.

2             THE COURT:  Wouldn't they have standing to challenge

3    a law like that?

4             MR. RAY:  I'm sorry.  Would you repeat your

5    hypothetical.

6             THE COURT:  In other words, suppose the law says,

7    well, a school district can teach anything it wants in the

8    curriculum as long as it doesn't concern Mexicans or Mexican

9    heritage.  Would that be okay?

10             MR. RAY:  No, certainly.

11             THE COURT:  Well, would they have standing to

12    challenge that?

13             MR. RAY:  That would be a race-based classification.

14             THE COURT:  Well, how far removed is this challenge

15    from that?

16             MR. RAY:  This is a significant removal.

17             THE COURT:  I mean from the plaintiffs' point of

18    view.

19             MR. RAY:  Well, the plaintiffs go through a great

20    deal of exaggeration in their pleadings.  From their point of

21    view, I think, every action by the superintendent and the

22    legislature is designed to be anti-Hispanic, anti-Mexican

23    American, and I think that's just simply an exaggeration and

24    an unreasonable conclusion.

25             THE COURT:  But that's something that remains to be

1    proven or not proven, right?

2            MR. RAY:  That goes to the merits, absolutely.

3            THE COURT:  That's right.

4            MR. RAY:  What we are talking about --

5            THE COURT:  It doesn't go to standing.

6            MR. RAY:  What we are talking about today is

7    standing.  And the school district itself would certainly have

8    standing here.  They are in fact litigating this issue in

9    state court proceedings.

10            THE COURT:  By the way, what's the status of that

11    state court proceeding?

12            MR. RAY:  The administrative law judge has indicated

13    that he will file a recommended decision on or before January

14    5th; and from that point on, the superintendent will have 30

15    days to accept it, reject it, or modify it; and at that

16    conclusion of that process, there will be a final agency

17    decision.  Then that is subject to appeal through the Judicial

18    Review Act.

19            THE COURT:  So it's not in the state court yet,

20    right?  It's still at the administrative stage.

21            MR. RAY:  It's in the state administrative

22    proceedings, and the Supreme Court has held that that meets

23    the state judicial proceeding standards under abstention

24    doctrines, Judge.  So I would say, yes, it's in the state

25    court.  It's in an administrative proceeding at this point.

```
1              THE COURT:  Wait a minute now.  So 30 days from what,
2    January?
3              MR. RAY:  January 5th.
4              THE COURT:  30 days from January 5 is the time for
5    the superintendent to make his --
6              MR. RAY:  Deadline, that's correct.
7              THE COURT:  I'll call it the final decision.
8              MR. RAY:  Yes, to accept, reject, or modify.
9              THE COURT:  And then after that?
10             MR. RAY:  There is a --
11             THE COURT:  How many days to --
12             MR. RAY:  35 days to appeal.
13             THE COURT:  To go to state court.
14             MR. RAY:  Yes, under Title 12, Section 901, et seq.
15             THE COURT:  Okay.  That takes you to your -- you make
16   an abstention challenge too, right?
17             MR. RAY:  Yes, sir.  If you believe any of these
18   plaintiffs have standing, then we would ask the Court to
19   consider an abstention until the state proceedings are
20   completed.  That would allow the state court to interpret
21   state law and avoid the possibility of inconsistent federal
22   and state court rulings.
23        But before I get there, Judge, what I would like to also
24   talk about with regard to the standing issue, they
25   have alleged two things:  One, they are going to be terminated
```

1    from their employment.  That simply is not true.  It's not

2    true today.  The program is currently operating despite the

3    finding, despite the proceedings.  The plaintiffs, plaintiff

4    teachers and director are still employed.  The classes are

5    still operating.  What they are doing is speculating as to the

6    future impact of an adverse decision.  Even if a decision was

7    adverse, even if it gets appealed and is adverse, there is no

8    requirement that the program be terminated.

9        So for them to prove appropriate standing, they have to

10   demonstrate an injury of fact, and here it's just too

11   speculative and too contingent.  It depends on future actions

12   of a nonparty here, Tucson Unified School District.  They can,

13   in the face of an adverse decision, decide to maintain the

14   program.  There is no injury then.

15       The other argument they make is that there is a chill on

16   their First Amendment rights.  We know from the Supreme Court

17   case of *Hazelwood* that First Amendment rights in a school

18   environment are very limited.  We also know that the Ninth

19   Circuit and the Supreme Court have not definitively determined

20   whether instructional speech for teachers is, frankly, a

21   protected constitutional right and, if it is, what the

22   parameters of that are.

23       So from a subjective chill -- from a chilling of the

24   First Amendment speech argument, they can't get there, either.

25   What they are complaining of does not rise to a protected

1    constitutional interest.

2         And the *Hazelwood* case also is very instructive on the

3    state's interest when -- and in that case there's language

4    that says when a school or when a state has courses that are

5    core-curriculum courses, courses that are for grades and not

6    simply volunteer cases, the state has a heightened interest in

7    ensuring that the content is appropriate for the education

8    policy of the state.  That's what's going on here.  It is --

9    the state has the right to control content in schools.  That's

10   what their -- it's the state's government speech right, and

11   they cannot attack that.  There are numerous cases on that

12   point.

13        THE COURT:  So you have passed beyond your standing

14   argument now.  Now you are arguing the merits of whether they

15   have, they meaning the teachers, have a First Amendment right.

16   Isn't that what you are arguing now?

17        MR. RAY:  No, Judge.  It may spill into the merits

18   argument, but standing requires an injury.  In fact, they

19   have alleged two injuries, one, this chill in the classroom

20   and, two, the employment status.  So I have just addressed

21   those from a standing standpoint, that they can't meet that

22   key component for standing.

23        I can jump back into the abstention issue if the Court --

24   if the Court believes there is standing for any of these

25   plaintiffs -- and we would strongly argue there is no

1 standing -- we would ask the Court to abstain from further

2 proceedings in this matter until the conclusion of the state

3 court proceedings.  There are numerous Supreme Court and

4 federal Ninth Circuit court decisions that favor that,

5 particularly when a court is sitting in equity as this Court

6 is, that the Court should allow state courts to interpret

7 state law in a manner to determine whether or not there are

8 actual disputes.

9 　　　　　THE COURT:  In your papers, you first argued for what

10 we would call a *Burford* abstention, and then in your reply you

11 seem to have shifted to a *Younger* abstention.  Which are you

12 arguing now?

13 　　　　　MR. RAY:  Judge, I think we would be fine under

14 either standard.

15 　　　　　THE COURT:  I don't think you can meet either.

16 *Burford* requires that the state proceedings be challenged to

17 some specialized court, and that's not true under Arizona

18 statutes.  You can go to any court you want just about, right?

19 　　　　　MR. RAY:  Well, no.  Well, you are required to go to

20 the administrative proceeding route.  I mean, it's not any

21 court.  It's an administrative proceeding.

22 　　　　　THE COURT:  And then to a specialized court.

23 　　　　　MR. RAY:  Well, and then to the --

24 　　　　　THE COURT:  In *Burford* they were all concentrated in

25 a single county, right?

1          MR. RAY:  Yes, that is true.

2          THE COURT:  Isn't that true here?

3          MR. RAY:  That is the distinction.  Yes, that is

4   true.

5          THE COURT:  So you don't meet the *Burford*

6   requirement.

7          MR. RAY:  Well, to the extent it requires that level

8   of specialized court, that's correct.  The judicial review

9   bench in the superior court in Arizona, there are assigned

10  specific judges.  It is not a random draw.  They specialize in

11  judicial review.

12         THE COURT:  I know that, but you could have it here;

13  you could have it in Maricopa County; you could have it

14  anywhere, right?

15         MR. RAY:  You would go where the venue is, yes, yes.

16  In particular, Maricopa County has that level of

17  specialization at the judicial review level.  I don't know

18  about the other counties.

19         THE COURT:  I know that, but you don't have to go to

20  Maricopa County.  In fact, this case will probably undoubtedly

21  be filed in this county, right?

22         MR. RAY:  I don't know.  I don't know where it's

23  going to be filed.

24         THE COURT:  That's exactly it.  We don't know because

25  there's no designated court.  It could be any court.  So I

1  don't think you meet the *Burford* requirement.

2       MR. RAY:  Okay.  I think we meet the *Younger*

3  requirement.  We have a state interest, state judicial

4  proceedings underway, and upon the review of those

5  proceedings, the questions, the federal questions,

6  particularly in the area of vagueness and the

7  constitutionality statute, can be addressed there.

8       THE COURT:  Assuming you haven't waived the *Younger*

9  argument, one of the requirements, I think, is that the

10 plaintiffs in this case have the opportunity to pursue their

11 remedies in the state proceedings, but these plaintiffs can't

12 because they are not parties to the state proceedings.  Isn't

13 that a requirement of *Younger*?

14      MR. RAY:  Yes, I believe that is.

15      THE COURT:  Well, this case doesn't meet it, does it?

16      MR. RAY:  No.  Well, if in fact they have to be able

17 to bring that proceeding, they did not join, they did not move

18 to intervene in that administrative proceeding.

19      THE COURT:  So *Younger* doesn't apply.

20      MR. RAY:  Well, I'm not sure I would concede it

21 doesn't apply.  I think it is something that the Court can

22 consider.

23      THE COURT:  All right.

24      MR. RAY:  Judge, I would reserve the rest of my time

25 for rebuttal on the motion to dismiss, and then I'll join you

1    on the preliminary injunction.

2         THE COURT:  Good.  We'll hear from the plaintiffs

3    then on the motion to dismiss.  Thank you.

4         MR. RAY:  Thank you.

5         MR. MARTINEZ:  Thank you, Your Honor.

6        The position of the government in this case with respect

7    to standing, Your Honor, is quite honestly one that is at an

8    extreme level.  Essentially, they ignore the precedence of the

9    Ninth Circuit and would have the Court apply a test where

10   essentially we have to, as plaintiffs in this case, put a

11   corpse in front of you.  That corpse would be the termination,

12   the corpse of Mexican American Studies, meaning the

13   termination and the harm already inflicted upon each of the

14   plaintiffs.

15       Just to review briefly, Your Honor, in this case the

16   plaintiffs represent the director of Mexican American studies,

17   Mr. Arce, ten of the teachers, two students, and two of the

18   teachers are also the parents of the students.  That's Korina

19   and -- excuse me, Korina and also in the case of Sean Arce,

20   his daughter.

21       Standing, Your Honor, requires us first of all accepting

22   as true all material facts in the complaint and construed in a

23   manner that's most favorable to the plaintiffs.  And in

24   addition to that, there's a general presumption that the

25   facts, general facts embrace the specific facts that are

1    necessary to make our showing.  That's in *Lujan*.

2        We show, Your Honor, that there has been actual and

3    imminent harm here.  Actual harm, we know, comes --

4        THE COURT:  I think you are better off dividing, as I

5    think the requirements are different, you know, dividing your

6    argument as between the teachers and the pupils, because I

7    think their standing analysis is not the same.

8        MR. MARTINEZ:  Yes, sir.  I would be happy to.

9        THE COURT:  So which one do you want to address

10   first?

11       MR. MARTINEZ:  I would be happy to start with the

12   students, Your Honor.

13       THE COURT:  All right.

14       MR. MARTINEZ:  In our case, Your Honor, in the case

15   of Korina Lopez -- and we have supplemented the record.  She

16   has in fact registered.  That opportunity was just provided to

17   her, and we have supplemented.  She is now registered for the

18   Mexican American Studies courses next year.  In addition to

19   that, Your Honor, only one year behind her is Ms. Arce, that

20   she then will be eligible for that, and we believe that that

21   certainly goes to the *Seattle* case with respect to her

22   expectancy in being enrolled.  We have every reason in these

23   cases as we --

24       THE COURT:  What is the -- what is her -- is her

25   cause of action the same as the students in the *Seattle* case?

1  No, it's not the same, is it?

2        MR. MARTINEZ:  It is similar, but it is distinct,

3  Your Honor.  In the *Seattle* case, that was a case that I

4  believe was limited in its application, and here we have much

5  broader constitutional arguments.  Certainly these students

6  raised the issue under the First Amendment, and they raised

7  their rights under the First Amendment, both under *Tinker* and

8  under *Hazelwood*, and also the recognition under *Hazelwood* and

9  *Monteiro* that they have the right to receive and to

10  participate in this curriculum.

11        We also know from precedent in the Ninth Circuit, Your

12  Honor, that the parents have a right to choose a curriculum

13  that has been adopted and made available to them.  That is a

14  choice that the state in the case, in this instance that of

15  Mr. Horne as the superintendent of public instruction and then

16  followed up by Mr. Huppenthal, has been taken away from them

17  or that he would have them taken away.

18        The notion, Your Honor, that for either the students or

19  for the teachers, that this program survives the 10-percent

20  sanction -- and that's why I put up the poster that I did or

21  the board that I did, Your Honor, is that the government in

22  this case has asked the administrative law judge to issue an

23  order that says, "Based on the foregoing evidence and

24  authorities, the Department of Education shall withhold 10

25  percent of the Tucson Unified School District's monthly

allocation of state aid beginning on the effective date of the
order entered in this matter until the district brings all
courses offered as a part of its MAS program into compliance
with A.R.S. 15-112 A."

They have essentially delegated the superintendent's
decision-making in the 30 days and merged it with what they
have asked the ALJ to do.  They have asked him -- that is
their own finding, and we have submitted this as a
supplemental pleading, Your Honor.  They have asked the ALJ,
by January the 5th, if not sooner, to impose the 10-percent
sanction.  The 10-percent sanction, again uncontested, Your
Honor, is the 1 to $3 million withholding of state funds.
Tucson Unified School District cannot be reasonably expected
to maintain a program for which they are suffering that
penalty and which they will never recover.  The statute makes
clear that they --

THE COURT:  No, but we don't know yet what would be
required --

MR. MARTINEZ:  Actually, we do, Your Honor.

THE COURT:  -- as the proposed order says, to bring
the program into compliance.

MR. MARTINEZ:  We do, Your Honor.

THE COURT:  No, we don't.

MR. MARTINEZ:  We do, because we have submitted to
you the deposition transcript of Mr. Huppenthal.  He was asked

1   specifically, Your Honor, what it would take for Tucson

2   Unified School District to come into compliance.  His answer

3   to that question under oath, Your Honor, goes far beyond

4   anything that is in 15-112 or any other statute found in the

5   Arizona law.  His answer was, one, you would have to eliminate

6   the program; you would have to come up with an entirely new

7   program, curriculum; you would have to take it out to the

8   public for extensive public hearings; and then once you had

9   that approval of the public, you would have to be able to

10  then allow the public to come in and visit those classrooms.

11  Nowhere in the statute does it mandate such scrutiny, nowhere

12  in the statute does it mandate that kind of remedial measure,

13  and nowhere in the statutes of Arizona will you find any other

14  curriculum that is subject to that.

15          THE COURT:  So you think I should assume, for

16  purposes of the decision to be made in this case, that the

17  superintendent is going to, in his remedial order, do exactly

18  what he says he is going to do in his deposition; is that

19  right?

20          MR. MARTINEZ:  Not only that, Your Honor, is that we

21  have a record that dates back to June the 15th of 2007; and

22  from June the 15th of 2007, which is the Warren open letter to

23  the Tucson community, to this date, we have never heard a

24  contrary statement from either Mr. Horne or Mr. Huppenthal

25  other than they want the Mexican American Studies program shut

 1   down.  In fact, from Mr. Huppenthal, who has never contested

 2   this, he campaigned as superintendent for public instruction

 3   on the banner of "Stop La Raza."  This is a superintendent who

 4   holds public office playing race politics in our state

 5   specific to this program.  He admits in that same deposition,

 6   Your Honor, that this law was passed specifically and targeted

 7   at only one program in the entire state, Mexican American

 8   Studies.

 9          THE COURT:  Now how does all this relate to the

10   plaintiffs' standing?

11          MR. MARTINEZ:  Excuse me, Your Honor?  I'm sorry.

12          THE COURT:  I said how does this all this relate to

13   the plaintiffs' standing?  That's what we are talking about.

14          MR. MARTINEZ:  Yes.  It relates to the plaintiffs'

15   standing, Your Honor, in that the students certainly have the

16   right, as we know, to receive this curriculum.  And if you go

17   to *Stewart versus Johnson* -- and there was mention of *Stewart*

18   *versus Johnson* -- in fact, in that decision, Your Honor, it

19   was specifically found that the students had standing.  And if

20   you remember the facts of *Stewart versus Johnson*, that had to

21   do with the state -- essentially what textbooks would be

22   approved.  And in that particular case, the state had told the

23   publishers of those textbooks that -- they gave them a list to

24   say, "Don't even send us these books for consideration."

25          The students were not in a position to know even what

1   books were being considered or had been banned because they

2   didn't have that level of information, and yet the court there

3   said that there was a substantial likelihood that the relief

4   requested would provide for their redress and that the causal

5   relationship between that which was prohibited and their right

6   to receive that information was probable enough.

7        So *Johnson versus Stewart*, Your Honor, certainly stands

8   for the proposition that the students have standing.  What

9   *Stewart*, *Johnson versus Stewart* does not address, Your Honor,

10  is the question of -- they didn't address the proposition in

11  *Carey versus Population Services*, *Planned Parenthood of Idaho*

12  *versus Wasden*, or *Leonard versus Clark* that when one plaintiff

13  has standing, the court need not consider the standing of

14  others.

15       So here our position would be, Your Honor, that if you

16  find standing as to the students, then you have found standing

17  as to all plaintiffs, and that is again something that the

18  government, the state here, has not contested.

19       There certainly, Your Honor, is no question with respect

20  to redressability here.  If in fact this statute is found to

21  be unconstitutional, then that finding in and of itself will

22  stop the enforcement of 2281, the loss of the 10 percent.

23  That means that in fact that harm which the plaintiffs allege

24  will occur and has in fact occurred with respect to the

25  already existing constitutional harms, that that in fact will

 1   cure it, that there's a reasonable likelihood of that.  It is

 2   probable enough that the injury would be avoided and redressed

 3   by a decision in favor of the plaintiffs.  We certainly meet

 4   that standard.

 5        There's certainly no doubt, Your Honor, that the injury

 6   for which we complain here, these plaintiffs complain, is

 7   traceable to the actions of the defendant.  The Mexican

 8   American Studies, whether you look at it from the perspective

 9   of the students, that of Mr. Arce as the director, or that of

10   the teachers, is traceable to the enforcement of 2281.  And we

11   know from such decisions, Your Honor, such as in *Chalk*, that

12   if in fact there is a harm to reputation, we know that if

13   there is any impairment of the professional, the profession

14   involved, that those are all injuries that occur to the

15   plaintiffs.

16        And what you have here, Your Honor, let's take them one

17   at a time.  For the students, the imposition of the sanction

18   means the end of MAS studies.  These plaintiffs are never in

19   those classes.  They never have the right to hear or discuss

20   this information.

21        THE COURT:  It's at least a possibility --

22   let's assume the superintendent issues an order something like

23   the order that's proposed, all right?

24        MR. MARTINEZ:  Yes.  That's what they have asked for.

25        THE COURT:  And that he goes through with his --

1          MR. MARTINEZ:  The withholding of the 10 percent?

2          THE COURT:  With what he said earlier at the

3    deposition about, well, there's only one way cure it is to

4    eliminate it and start over with all these conditions.

5          MR. MARTINEZ:  Yes, sir.

6          THE COURT:  Now isn't it possible that the school

7    district might accept that, start over and institute another

8    MAS program?

9          MR. MARTINEZ:  Your Honor, to have --

10         THE COURT:  And then if it does, is there any

11   constitutional injury to the students?

12         MR. MARTINEZ:  Yes, sir, there is.

13         THE COURT:  All right.

14         MR. MARTINEZ:  And that constitutional injury is that

15   no matter what -- and the courts under the First Amendment

16   have clearly announced, and certainly I think equal protection

17   stands for the same proposition, is that the deprivation, even

18   for a short period of time or for any extended period of time,

19   is a constitutional harm and that the deprivation, the loss of

20   this program for any period of time, constitutes sufficient

21   harm here.

22       Second, Your Honor, during that period of time --

23         THE COURT:  We don't know that it's going to be a

24   deprivation, do we?

25         MR. MARTINEZ:  Certainly we know it's a deprivation

1  because, Your Honor, the expectation that by August this

2  program would be in place, that's just not reasonable.

3      And you have to understand, Your Honor, this is a statute

4  that when you look at it, who knows what it means, Your Honor?

5  And I'll address those more in substance with respect to the

6  complete analysis under each of the theories that are

7  applicable here, but remember we raised equal protection

8  analysis here because there's a racial classification here.

9  It's expressed in the statute, and it certainly has been

10 applied that way by Mr. Huppenthal.

11      THE COURT:  Wait a minute.  How is a racial

12 classification expressed in the statute?

13      MR. MARTINEZ:  Because it talks about, Your Honor,

14 with respect to you can't promote, for example, ethnic

15 solidarity.  Ethnic solidarity, Your Honor, is akin to saying

16 you can't be -- that's race-specific.  It is also

17 race-specific when it says that if you promote ethnic

18 solidarity over that of an individual, that is a race-specific

19 provision.

20      Thirdly, there's an exception within the statute, Your

21 Honor, that says that the teaching of the Holocaust is

22 permitted.  That is clearly a race-specific exception in that,

23 whether you look at it as race/religion or you look at it as

24 ethnicity/religion, they have specifically excluded from this

25 the history of what those of the Jewish faith had to suffer

1   and other groups had to suffer during World War II under the

2   hands of the Nazis.

3       So they have made race-conscious decisions in this

4   statute on its face.  Certainly in the finding issued by

5   Mr. Huppenthal, he makes the finding under 112 A3, Your Honor,

6   specifically that he finds a violation because he says this

7   class, Mexican American Studies, was designed specifically for

8   Mexican American students, and he makes that assumption both

9   from what he sees on the website and from the percentages,

10  that there's 90-plus percent of Mexican American students in

11  these classes.

12      So he says essentially, the standard he is applying,

13  there are too many Mexicans in these classes.  Therefore, if

14  you have a topic of Mexican American Studies and you have all

15  these Mexicans in the room, that's the violation.  That's a

16  racial classification, Your Honor, and that is subject, as you

17  know, to strict scrutiny.  We believe that under a strict

18  scrutiny analysis that it's a test that the state cannot

19  clearly meet in this particular instance.

20      We also know, Your Honor, that with respect to the equal

21  protection analysis with respect to political process that

22  here we have a statute that specifically burdens Latinos.

23  Mexican American Studies, Your Honor, came about after years

24  and years of dismal failure, which is not unique to Tucson or

25  the Tucson Unified School District, but it is something which

1    has a national problem that even No Child Left Behind attempts

2    to address.

3            THE COURT:  Well, I think you are getting way beyond

4    standing now.  I mean, you are obviously getting into the

5    merits here.

6            MR. MARTINEZ:  Let me back from that, Your Honor.

7        But certainly, Your Honor, this is a statute which we

8    believe is burdenous and that these plaintiffs are in a

9    position to raise because it puts them at a disadvantage that

10   no other group is placed at with respect to maintaining a

11   program, because their level then of redress or of advocacy

12   has to be at the state level as opposed to Arizona, which is

13   at the local level.

14       One of the things that has been presented, Your Honor, in

15   this case is the notion that the government offers that we

16   have a centralized form of curriculum making.  That's, in

17   fact, a completely inaccurate statement.  The government just

18   has not been candid with this Court.  What we have is a

19   totally decentralized system of curriculum.  That has been

20   delegated to school boards throughout this state.  They make

21   curriculum decisions.  The only thing that the state retains

22   is some broad powers with respect to minimum requirements.

23       With respect to the due process, Your Honor, we certainly

24   have the facial challenge under the vagueness standard and

25   certainly the as-applied standard here, and we have given

1   substantial showing of why these plaintiffs stand in a

2   position to raise those claims as to vagueness.

3        Who knows -- and again, when we deal with the motion for

4   preliminary injunction, I will go to the merits, Your Honor.

5   Who is to know, in the words of John Huppenthal, as he

6   testified, for example, when he says any communication, any

7   statement by a teacher that goes to promoting ethnic

8   solidarity is mutually exclusive with treating a pupil as an

9   individual?  He is saying that that is a per se violation of

10  the statute.  Certainly no teacher in Mexican American

11  Studies, Your Honor, is in a position to know what they say

12  with respect to -- is advocating of ethnic solidarity.

13            THE COURT:  Mr. Martinez, I want you to address one

14  more --

15            MR. MARTINEZ:  Yes, sir.

16            THE COURT:  -- one more issue on the motion to

17  dismiss before I give Mr. Ray a chance to respond just on this

18  motion, and that's this problem I have:  One, let's assume

19  that at least one of the students -- I think that would be

20  Ms. Lopez -- has standing because she's recently enrolled --

21            MR. MARTINEZ:  Yes, sir.

22            THE COURT:  -- in an MAS class that's supposed to

23  start, I guess, in September, all right?

24            MR. MARTINEZ:  Yes, sir.

25            THE COURT:  The problem is then, if she has standing,

1   you have to turn to defendants' next argument that she doesn't

2   state a First Amendment claim because she has no right, you

3   know, the way you put it I think is to receive material,

4   unless one of two -- it seems to me, one of two circumstances

5   pertains.  The first is that the teachers have some kind of

6   right to teach certain material, and I don't think Ninth

7   Circuit case law gives the teachers the right to control the

8   curriculum.

9        In other words, I think when teachers speak as teachers,

10  they are speaking as government employees, and their speech is

11  controlled by the *Pickering* test and the *Garcetti* test.  And I

12  don't think -- you know, when they are speaking in class, they

13  are speaking as government employees, so in effect they have

14  no First Amendment right.  So if they have no right to speak,

15  the students can't have a right to receive what they might

16  say.

17       Second is, is there some independent right of the

18  students to in effect control the curriculum?  I mean, that's

19  almost I think what you are arguing, that they have a right to

20  demand that certain courses be taught, and I don't know that

21  the case law really supports that.

22       I mean, the easiest cases -- we know all the time courses

23  are eliminated from the curriculum in all kinds of schools, in

24  all kinds of circumstances, especially these days because of

25  the budgetary constraints.  This kind of course and that kind

1   of course is chopped off.  You know, teachers are laid off.  I

2   don't think the student can say, "Well, you know, I have a

3   right for that course to be taught because I have a right to

4   receive that information."  I mean, isn't that your argument?

5              MR. MARTINEZ:  No, Your Honor, that in fact is not

6   our argument, but let me address that in a couple of different

7   ways.

8        First of all, while we may live in an environment where

9   school districts across this state have had to make

10  modifications to their course offerings, and we don't dispute

11  their right to make those modifications to course offerings,

12  they still have to do it in a lawful, constitutional manner,

13  Your Honor.  They cannot certainly exercise governmental

14  authority outside, in a manner that violates the Constitution.

15  Certainly *R.A.V.* stands for that proposition.  And you can't

16  exercise that decision in a manner that imposes a viewpoint

17  discriminatory purpose, and that again is what is occurring

18  here.

19       With respect to the rights of teachers, Your Honor, that

20  you raise, the points you just articulated are a little bit

21  different than that which you articulated in your dissent in

22  the *California Teachers Association* case.  There, you wrote,

23  Your Honor, that you believed that teachers had a First

24  Amendment right that was akin to that under the *Hazelwood* test

25  and that it would be applied in the same manner that *Hazelwood*

1  had been applied to students.

2      So if we take it under *Hazelwood*, Your Honor, the

3  elimination of this program and how it impairs speech of the

4  teachers is that this is a lawfully adopted curriculum, and

5  they have a right to speak within that curriculum.  This is

6  something that the state has taken away from them.  So they

7  are not talking about speech outside of the curriculum.  We

8  are not talking about the bulletin board.  We are not talking

9  about some topic outside of the curriculum.  We are not

10  talking about the math teacher who wants to talk about his

11  religious beliefs.  We are talking about Mexican American

12  teachers and students who have the right to hear this, one, to

13  speak with respect to this curriculum, which the

14  superintendent wishes to take away from them, and the

15  reciprocal relationship, Your Honor.

16      The courts within the Ninth Circuit have also not been

17  clear about this, but certainly the courts have distinguished,

18  Your Honor, whether it's in *Monteiro* or in *Johnson versus*

19  *Stewart*, and there was clearly in *Johnson versus Stewart* a

20  distinction made between the rights of the students as opposed

21  to those of the teachers.  So I don't believe that they're

22  reciprocal or related in a manner that one is dependent on the

23  other, that there is not a dependency factor there.  I think

24  that they are analyzed and looked at separately.

25          THE COURT:  Do you think your best case is *Johnson*

1    *versus Stewart*?

2           MR. MARTINEZ:  I think it is one of them, Your Honor.

3    I think the other that the Court should look at that I think

4    is entirely applicable here, Your Honor, is *Stormans versus*

5    *Selecky*.  And the reason I would like to point the Court to

6    *Stormans versus Selecky*, Your Honor, is because there, if you

7    will recall, that is a situation where the pharmacists who

8    were employees of a pharmacy, it's the pharmacy that is

9    subject to the mandate from the state to dispense Plan B.  In

10   fact, when that first came up, Your Honor, you were on that

11   panel and wrote the dissent in that case.

12      When *Stormans* comes back up for this decision that's

13   reported that we are speaking to, the court recognized that

14   where you have a determinative or coercive effect on the third

15   party, here the pharmacists, that they had standing.  And I

16   understand, Your Honor, that that was under the First

17   Amendment and it was under the Establishment Clause that they

18   were raising the religious freedom issue, but that wasn't what

19   it turned on with respect to the harm.  What it recognized,

20   Your Honor, and *Stormans* isn't unique, is that the government

21   can impose such a coercive effect -- that's what that 10

22   percent is, Your Honor -- that in fact the harm flows not only

23   to these students, Your Honor, but it flows to these teachers,

24   and it certainly flows to Mr. Arce.  And there's no reason,

25   Your Honor, to believe that Mr. Arce would continue in his

1  position, and we need not show that he will be terminated or

2  that the teachers will be reassigned or lose employment.  We

3  only have to show that there's a reasonable likelihood, and

4  logic takes us there, Your Honor.

5      If you are suffering a 1 to $3 million-a-month loss in

6  state revenues, this district, like any other district, Your

7  Honor, is in no position to suffer that harm, and there's

8  no -- and understand something else about what happens here

9  with respect to coercive effect, Your Honor.  They are asking

10  for the immediate imposition of the 10 percent.  In their own

11  pleadings, they admit that TUSD would have to -- would

12  immediately suffer the 10-percent loss, then have to go and

13  try and get a stay on the 10 percent while they

14  were appealing.

15      The appeal standard in this case, Your Honor, should they

16  choose to approve it, under state law, is to show an abuse of

17  discretion standard.  State law in this particular

18  jurisdiction is very extensive, that if there is any

19  reasonable basis in the record to sustain the finding, it

20  shall be sustained and that the trial court is in no position

21  to substitute its judgment, whether it likes the outcome or

22  not, for that of the decision maker, the administrative

23  decision maker.

24      So what we have, Your Honor, is that the way A.R.S.

25  15-112 was written, it puts all of the power in one person,

1   Mr. Huppenthal as superintendent of public instruction, and

2   it allows him to terminate this program at his will.

3          THE COURT:  All right.

4          MR. MARTINEZ:  Thank you.  I'm sorry.

5          THE COURT:  That's fine.  Thank you.

6     Let me give Mr. Ray an opportunity for, I'll say, brief

7   rebuttal on the motion to dismiss, all right?  And then we'll

8   move to the motion for preliminary injunction.

9     Go ahead.

10        MR. RAY:  Thank you, Judge.

11     Frankly, Mr. Martinez is wrong on many accounts here.

12  This decision by the administrative law judge is simply a

13  recommended decision by statute.  The final agency decision is

14  that of Mr. Huppenthal.  I have already gone through the

15  process with you.  The standard of review is not as

16  Mr. Martinez has explained.  You can find that in A.R.S.

17  12-910.  It's a substantial evidence standard.

18       THE COURT:  Well, what about the fact that at the

19  very least, as Mr. Martinez said, the superintendent has, say,

20  committed himself already to a position, an outcome of that

21  case in his deposition?

22       MR. RAY:  Your Honor, that's another factor I want to

23  address.  Mr. Martinez has populated the record of this Court

24  with numerous documents from the administrative proceeding.

25  There is a different -- the issue there is whether the

1  curriculum that's been adopted and is being taught is in

2  violation of the statute.  That is the purpose of that

3  proceeding.  Mr. Huppenthal's deposition in there may very

4  well have some overlap, but it may very well not have overlap.

5  That deposition in this case has not occurred yet.

6      Frankly, there's been no motion for this Court to

7  consider the entire administrative record and brought in to be

8  the evidence in this case, and it shouldn't.  This case is

9  different than the administrative case, and we would object to

10 those submissions by Mr. Martinez on that basis as well.

11     I think the Court's absolutely correct:  The teachers

12 standard is clear.  *Johnson* is clear on that.  These 11

13 teachers and the director do not have standing here.

14     Mr. Martinez's two big cases, *Johnson versus Stewart*,

15 that was -- *Johnson versus Stewart* was a viewpoint

16 discrimination case.  It was an outright ban on all criticism

17 of the government.  That was a viewpoint discrimination case.

18 That is a heightened level of scrutiny.  That's the

19 significant difference here.

20     Secondly, what was being banned there is not banned under

21 our statute here.  They tell you it is, but it isn't.  If you

22 look closely at the statute, 15-112 F is the -- there are

23 broad exceptions, and teaching oppression and genocide of

24 particular groups, those are allowed under the law.

25     *Stormans*, his other significant case, the real difference

1  there is they have to demonstrate the likelihood of their

2  employment being terminated.  Again, I have gone through the

3  number of steps that have to occur.  That's speculation.  In

4  *Stormans*, those employers had already advised the pharmacists

5  at issue that they were being terminated or would not be

6  accommodated for their religious beliefs.  That was already in

7  the record.  That's not the case here.

8       *Hazelwood*, the Supreme Court in the case in *Hazelwood*

9  makes it very clear that the state and the school have content

10 control over the education experience through the curriculum,

11 through the text, through the materials, and through the

12 instructional provisions.  When you asked is there a problem

13 if TUSD changes the program, rewrites the program,

14 significantly changes it, does that violate their rights, no.

15 Whether you are a teacher or a student, you have no protected

16 constitutional right to govern the course of study, the

17 curriculum or the classes, or the way they are taught.  That

18 is clear in the Ninth Circuit and in the Supreme Court.

19      The state would contest standing, and standing for one

20 means the case can go forward.  It does not mean that all of

21 the plaintiffs who cannot prove standing participate.  That's

22 just, that's not true.

23          THE COURT:  If the case goes forward, at least with

24 respect to the one student who is already registered, right,

25 in the MAS classes, then we get to the other part of your

1   motion to dismiss.

2          MR. RAY:  Yes, Judge.  I will --

3          THE COURT:  Which is whether or not she has a -- I

4   think the strongest claim is the First Amendment claim, right,

5   whether she has a First Amendment right as a matter of law?

6          MR. RAY:  Correct.

7       And on my last point, there is no constitutional

8   protected right for these teachers.  I think the Court has

9   fleshed that out and is aware of that.  I would argue that

10  there is no independent, constitutionally protected right for,

11  if it's student Lopez, because --

12         THE COURT:  There are some cases that say a student

13  has a right, aren't there?

14         MR. RAY:  Well, there are cases that say there are

15  First Amendment rights in a school environment.  They are

16  limited.  They are much different from a student outside in a

17  public environment.  That's very clear.  *Hazelwood* makes it

18  very clear the school and the state have significant

19  restriction on content ability.

20      But the point is that for her to have a protected

21  constitutional right, she would have to be able to say, "I

22  have a constitutional right for this program to be taught in

23  the way it's being taught today forever and ever," and that

24  right does not exist.  "I have a right to be taught by

25  particular teachers in a particular manner of this class, in

```
 1   this particular course of study," and the Supreme Court and
 2   Ninth Circuit case law is absolutely clear:  Students don't
 3   have that kind of right; and unless they do, they don't have
 4   an independent right that they can proceed in this lawsuit,
 5   Judge.  Thank you.
 6           THE COURT:  All right.  Thank you.
 7       All right.  I'm going to take the motion to dismiss under
 8   submission, but proceeding under the assumption, right,
 9   that -- and at this point it's only an assumption -- that
10   there is at least one plaintiff has standing to proceed
11   further, then I think we have to reach the motion for
12   preliminary injunction.
13       I'll make my decision on both of these motions as
14   expeditiously as I can because I think, although in a sense we
15   have to wait for the state proceedings, in a sense there are
16   time constraints on what's going on in this case.
17       So I'm going to hear argument now on the motion for the
18   preliminary injunction.  It's plaintiffs' motion, so plaintiff
19   can open and close, you know, Mr. Martinez, whatever you think
20   you have to add to what's already been argued, all right?  So
21   now your motion for preliminary injunction.
22           MR. MARTINEZ:  Your Honor, yes.  And let me put part
23   of my argument in the context of Ms. Lopez, Korina Lopez.  And
24   understand that in considering both motions, Your Honor,
25   Ms. Lopez has much more than just a First Amendment claim.
```

1   She certainly raises a claim with respect to the equal

2   protection, racial classification.  She's a Latina student who

3   would be denied a class that has already been found as to be a

4   violation of the statute because there are too many Latinos in

5   it, and it was designed for Latinos.  So she certainly has the

6   equal protection claims.

7        She certainly raises the equal protection claims with

8   respect to political process, and she certainly raises the

9   political -- I mean the claims with respect to the void for

10  vagueness standard, certainly as applied and certainly from

11  the perspective of the facial challenge.

12       I address those, Your Honor, because certainly that goes

13  to the prong on likelihood of success on the merits.  And as

14  you look at each of these, Your Honor, and I'm going to spend

15  my time more with respect to likelihood of success on the

16  merits and irreparable harm, but let me raise one point here.

17  In the record that is before the Court, not only has there

18  been no objection made to it other than what was just made

19  formally, there have been no facts offered by the defendant in

20  this case.  All of the facts that have been submitted on the

21  record in this case by the plaintiff, Your Honor, have come

22  from the plaintiff, number one; number two, none of them have

23  been disputed; and, number three, none of them have been

24  contested.

25       So essentially you have a very rich and deep record with

1   respect to what has occurred here, and it goes to the issues

2   of success on the merits and irreparable harm that the state

3   has at no point in time raised any evidence; and, to the

4   extent that there is burden-shifting under these various

5   analyses, they have offered no evidence to meet their burdens

6   with respect to any of these.

7       I would like to start, Your Honor, and go quickly through

8   this, on part of what's going on here, because what we have in

9   this particular case, Your Honor, is not only viewpoint

10  discrimination or content-based distinctions being made

11  because we have a state superintendent who takes exception to

12  this curriculum; we have a state superintendent who seeks to

13  ban Mexican American Studies and offers as evidence of such

14  that, for example, this was put into the record as evidence of

15  a violation of the statute.  As you can see --

16          THE COURT:  When you say the record, you mean at the

17  administrative hearing?

18          MR. MARTINEZ:  Yes, sir, and it's a public record and

19  it's properly within this record.

20      The state would have us believe that this violates the

21  statute either by promoting, I think, solidarity or by

22  promoting resentment because we have a cartoon where one

23  child, who is presumably Latino, their sand castle is an Aztec

24  monument or pyramid, and we have the non-Latino student

25  building the castle that may be more traditionally attributed

1   to a western European castle.  They would have us believe,

2   Your Honor, that this is evidence of violation of the statute.

3   That's the kind of subjective enforcement, the viewpoint

4   discrimination, and the content-based discrimination that is

5   occurring here.

6        We also have, Your Honor --

7        THE COURT:  See, the problem is your argument

8   precedes the administrative determination, so, you know, you

9   are asking me to assume what the superintendent is going to

10  find and order, right?  Isn't that what you are doing?

11       MR. MARTINEZ:  Well, Your Honor --

12       THE COURT:  Because he hasn't made a decision yet.

13       MR. MARTINEZ:  But the standard that is applicable

14  here, Your Honor, with respect to suffering irreparable harm

15  is that the question that you ask is do you have to wait until

16  the ALJ decision comes out on or before the 9th, and do we

17  then have to wait for us to show irreparable harm with respect

18  to that prong until Mr. Huppenthal has issued his final edict.

19       I would again suggest to you that the answer to that is

20  no, that you already know what that decision is, not only by

21  the structure of the statute, Your Honor, and not only by the

22  manner and discriminatory manner in which it has been applied

23  here and enforced here, but also from the very actions of

24  Mr. Horne and then continued from Mr. Huppenthal.

25       Let me bring you back to perhaps one of the most

significant facts in this case, Your Honor.  Mr. Huppenthal,
on coming to office, already had in place the Horne finding.
The Horne finding is issued -- and this goes to a showing of
acting outside of the regular course of business in a
governmental matter.  He issues a finding before the statute
even becomes in effect.  He issues it based on conduct which
predates the statute.

We then had Mr. Huppenthal saying, "Well, I'm going to
order an independent auditor to come in and do our own study."
That's the Cambium audit.  They come and they spend weeks in
Tucson looking specifically at the Mexican American Studies
program -- these are all professionals, Your Honor -- at
substantial expense to the state, over $110,000 spent.
They issue a finding, Your Honor, that is glowing, essentially
what I'd term as it gives the program a clean bill of health.

It says specifically, Your Honor, in that study, which is
approximately 120 pages in length, that they found absolutely
no evidence of a violation of A.R.S. 15-112, none.  They did
not find a violation, Your Honor.  And yet despite on-site
audits, having extensive meetings and audit activity and
issuing a very lengthy and credible report, the superintendent
rejects it, again an extraordinary move; he keeps it,
essentially sequesters that report for a period of six weeks;
and then in June of this year issues a three-page finding.  In
that three-page finding, Your Honor, he says that TUSD was in

1   violation of A.R.S. 15-112 A2, 3, and 4.  In that finding and

2   in his deposition, Your Honor, he repeatedly says -- and we

3   point out to the Court in that record -- that at least five

4   separate times he says making that finding for him wasn't even

5   close.

6        So what do you have here, Your Honor?  The one objective

7   person, the one objective entity to look at this program is

8   Cambium, hired by the state -- it's their own expert -- comes

9   in and does exactly that which they were contracted to do, and

10  they come back and say not only do we not find a violation

11  here, we find in the Mexican American Studies curriculum that

12  they in fact teach that which allegedly the statute promotes,

13  that it teaches respect for each other, that it teaches that

14  this is a very inclusive environment as opposed to an

15  exclusive environment, that it doesn't teach resentment; it

16  teaches the opposite of that.

17       This is a curriculum, Your Honor, that embraces the

18  diversity of this country and then uses it as a tool to

19  promote a very unified and integrated society.  But if you

20  look to the state and what they are looking at, and

21  Mr. Huppenthal, not only do we know that they would shut down

22  this because he finds this curriculum objectionable to his own

23  political likings, we know that they have taken this record in

24  this proceeding, Your Honor, and injected it into the

25  proceedings at the state level.  They took the declaration of

Ms. Rusk that was submitted in this case, where she talks
specifically about one of her students having produced this
piece of art, and say that's evidence of promoting resentment.

     Your Honor, we know that that one -- this goes, Your
Honor, certainly to student speech or student expression.
This certainly goes to *Tinker*, Your Honor, and this certainly
goes to *Hazelwood*.  And we also know, Your Honor, from
Mr. Huppenthal's own words, is that he says that whatever a
teacher says in a classroom in the Mexican American Studies,
they need to be very careful of what they say to students.

     We also know, Your Honor, that they take exception and
chastise even a student writing what is called an *I Am* poem.
And while I have prepared different ones, Your Honor, in this
one we clearly have a student, again in Ms. Rusk's class,
saying, writing, "I am" -- in this case that was her name.
But she starts off with the proposition of, "I am Latina.  I
wonder when discrimination will end.  I hear boycotts.  I see
racism almost everywhere.  I want harmony.  I am someone that
cares.  I pretend everything is okay.  I feel like I'm not
trying hard enough.  I touch many people's hearts.  I worry
this won't ever change.  I cry when it feels like there's no
hope.  I am not giving up.  I understand people's rights.  I
say yes to equality.  I dream of a peaceful world.  I try to
change society.  I hope one day I will make a difference.  I
am a proud Chicana."  That, Your Honor, is what Mr. Huppenthal

1  offered as a violation of this law.

2      And let me ask the Court, in consideration of *R.A.V.*, to

3  think about some other contexts here.  Could they, Your

4  Honor -- if this poem said, "I am Apache," could they have

5  this statute and could they impose it, this limitation?  Could

6  they, Your Honor, in your considerations of this, foreclose

7  any such expression by a student if they said, "I am a woman

8  and I see discrimination and unequal treatment of women.  I

9  see harassment.  I see unequal wages.  I see in the history of

10  this country the loss of even the right to vote that was

11  withheld for a century before it was provided."  Can you not

12  teach that?

13          THE COURT:  The problem with your approach I'm

14  having, Mr. Martinez, is that -- I'm repeating myself, but you

15  are prejudging the superintendent's decision.  I don't know

16  what he is going to decide.  You are telling me like he's

17  already decided this just because this is in the record and

18  somebody, you know, characterized it the way you are

19  characterizing it now.  Maybe he is going to adopt that and

20  maybe he is not, but I have no idea and no basis to say, yes,

21  he is or, no, he isn't.  Isn't it better for me to wait until

22  he actually issues his decision --

23          MR. MARTINEZ:  Your Honor --

24          THE COURT:  -- instead of speculating on, yes, he is

25  going to agree with this, the view that you are expressing

1  now?

2          MR. MARTINEZ:  Well, in our third amended complaint,

3  Your Honor, at Exhibit D, you will find Superintendent of

4  Public Instruction John Huppenthal's finding.  In that

5  finding, Your Honor, he makes specific findings that there is

6  a violation of 15-112 A2, that there is a violation of 15-112

7  A3, and 15-112 A4.

8      If we just focus for a moment on the A3 violation, he

9  writes as his finding of the violation of this statute, Your

10 Honor, that in fact the violation exists because "The

11 department's website clearly indicates the program is

12 primarily designed for peoples of a particular ethnic race,

13 coupled with the fact that an extraordinary percentage of

14 students enrolled in program classes are Hispanic, over 90

15 percent, compared to the student population as a whole,

16 constitutes a violation of 15-112 A3," and then goes, "These

17 are examples of a portion that supports this finding."

18          THE COURT:  I appreciate that, Mr. Martinez, but the

19 whole purpose of the administrative hearing, right, is to

20 review that and to take a second look at it.  Isn't that the

21 whole purpose of the administrative hearing?

22          MR. MARTINEZ:  I agree that that was certainly the

23 right that's limited to Tucson Unified School District, to

24 have an administrative proceeding in which this finding -- the

25 burden of proof is on the superintendent to show by a

1  preponderance of evidence that he has the evidence to support

2  this finding and that he then gets a report or recommendation

3  from the ALJ that is consistent with this finding.  But

4  remember in this statute, Your Honor, that that decision of

5  the administrative law judge is not binding on Mr. Huppenthal.

6  Mr. Huppenthal retains under this statute the authority under

7  subsection B to issue his own finding.

8          THE COURT:  All right.  Let's get beyond the

9  administrative hearing, what's going to happen, you know, at

10  the end of that, whether the state court judge might overturn

11  it.  What else do you have to argue?

12          MR. MARTINEZ:  Well --

13          THE COURT:  Anything else, or can we give Mr. Ray a

14  turn now?

15          MR. MARTINEZ:  Your Honor, the only things that I

16  would point to very briefly, Your Honor, is that we have given

17  the Court a substantial record and analysis under equal

18  protection, under due process, under both theories, under

19  First Amendment, both traditional and overbreadth, Your Honor.

20  With respect to overbreadth, if you -- as you know, even if

21  you just focus on Ms. Lopez, with respect to her First

22  Amendment interests here, that then gives her standing to

23  raise the overbreadth claim for the parties that are not

24  before the Court.  She meets that prong.  And you certainly

25  have, Your Honor, our substantial analysis under the

1   substantive due process claims.

2        Under each of these analyses, Your Honor, we believe that

3   we have established for the Court, at a minimum, that there

4   are constitutional harms which occurred to the plaintiffs.

5   Those constitutional harms alone are sufficient to establish

6   irreparable harm, that the balance of equities, the public

7   interest all tilt heavily in favor of the plaintiffs.

8        Well, I think the Court correctly points, Your Honor,

9   that you have two ways to go here:  You can wait until you

10  have a final decision from Mr. Huppenthal and then issue your

11  finding essentially stopping him at that point, or you can

12  treat this record as sufficient, that it is likely and very

13  probable that that finding is forthcoming, there's no reason

14  to believe that it's not forthcoming, and that it will be

15  against Tucson Unified School District.

16       The only distinction between the two, Your Honor, is what

17  is the purpose of Rule 65 in this context, and that is to

18  preserve the status quo.  What puts you in the best position

19  to preserve the status quo?  I would suggest to the Court that

20  ruling sooner than later puts the plaintiffs -- or the Court

21  in the best position to preserve the interest, to preserve the

22  status quo for the plaintiffs.

23       Should this Court choose to delay absent ruling or

24  issuing an order essentially on the same day that we have an

25  order coming out from Mr. Huppenthal, using that as the final

decision, then absent that, that harm which is irreparable and those constitutional harms that we say already are occurring will occur to the point of where then we run the risk of TUSD on their own, because of the corrosive elements of that finding and the effects of the loss of the 10 percent, votes to eliminate the program, because that's the quickest remedy here, Judge.

And remember one thing about that decision: Mr. Horne himself, in his findings, says, "Not only do I believe Mexican American Studies violates the statute, but I believe there's probably two other programs in TUSD that violate.  I'm going to ignore those programs, whether it's African American Studies or whether it's Native American Studies.  I'm only going after Mexican American Studies."

And in the context of Mr. Huppenthal, his sole and exclusive focus throughout the state of Arizona, his testimony is that "We have never looked at another district.  We have never considered another program."  The statute was only passed for one purpose, to stop and eliminate TUSD's Mexican American Studies program.

That is the *R.A.V.* extreme act.  It's an abuse of governmental power, it's illegitimate, it's unconstitutional, and it's the kind of act the government, although they are rare -- and this is a very rare circumstance -- where the powers of this Court are needed to preserve the status quo.

1    Thank you, Your Honor.

2            THE COURT:  All right.  Thank you, Mr. Martinez.

3        All right.  Mr. Ray.

4            MR. RAY:  Thank you, Judge.  I do intend to be brief.

5        Let me correct the record again.  In the motion to -- or

6    the reply to the motion to dismiss the superintendent's prior

7    counsel, on page 3, move to strike all of these efforts by

8    Mr. Martinez to bring in evidence that's incomplete and

9    mischaracterized out of another proceeding into this

10   proceeding, so I want to correct the record on that.

11       Secondly, with regard to the vagueness challenge and the

12   overbreadth issue he just raised on behalf of the plaintiff

13   student Lopez, the *Village of Hoffman Estates* case holds that

14   unless a law reaches a substantial amount of protective

15   constitutional speech or conduct, a facial overbreadth

16   challenge must fail.  I don't think there's any way to stretch

17   their claim here by this student into a substantial amount of

18   protected speech at issue here.  So under the *Village of*

19   *Hoffman Estates* case out of the Ninth Circuit, I think it's

20   clear they don't have a claim on that.

21       And I just want to focus on two of the four requirements

22   for the plaintiffs to prove in order to get the extraordinary

23   remedy of a preliminary injunction.  What they are asking this

24   Court to do is to intervene and enjoin an incomplete, separate

25   state process between the -- which was created under this new

law.  They want you to prejudge the end result, which is not
final.  I mean, it's ridiculous.  That process needs to go
forward.  The state courts have to have an opportunity to
interpret this law.

Let me just focus on the final two points, irreparable
injury and they haven't raised serious questions on the
merits, and I really just want to limit my comments to the
student.  The recent case of *Nampa*, *Nampa Classical Academy*, a
recent Ninth Circuit case that we cited, and the *Downs* case,
both Ninth Circuit cases, make it clear that students have no
protected constitutional rights to any particular course of
study, any particular class, any particular textbooks,
materials used in the class; and because of that, what
Mr. Martinez is arguing is you have to enjoin the state
proceeding that's not yet complete so that plaintiff student
Lopez has a right nine months from now to participate in a
course of study that may never change, that -- because
otherwise it would violate her rights.

That's absolutely not true under all Supreme Court and
Ninth Circuit doctrine.  There is no recognized right for a
student to be able to determine what they learn, who teaches
it, what courses are offered, what classes are offered in a
course of study.  That is strictly state speech.

And that same analysis applies to the serious questions
on the merits.  They would have to demonstrate that she has

1   that constitutionally protected right in order for this Court

2   to issue an injunction down the road, and it's just not there.

3        Thank you, Judge.  Unless you have some questions, I'm

4   finished.

5             THE COURT:  No.

6             MR. RAY:  Thank you.

7             THE COURT:  You need rebuttal, Mr. Martinez?

8             MR. MARTINEZ:  Yes, Your Honor, just a couple points.

9        The two cases that counsel points to are limited to the

10  First Amendment.  The claims raised here go beyond, well

11  beyond the First Amendment, Your Honor.  Certainly the 112 A3,

12  discriminating against Latino students, is specifically

13  race-specific.  That's equal protection.  That's classic equal

14  protection analysis, and it certainly also goes to showing the

15  same with respect to equal protection and political process.

16  She also has, as I have noted, Your Honor, the vagueness

17  claims.

18       The other thing I want the record to be very clear on,

19  Your Honor, with respect to the response filed by the

20  government in response to the motion for preliminary

21  injunction, they did not even address, Your Honor, the void

22  for vagueness as applied theory.  You won't find it.  That

23  theory that we applied -- because when they responded to void

24  for vagueness, essentially they just incorporated their

25  reference, their response to the first motion for summary

1   judgment on void for vagueness.  That first motion for summary

2   judgment, Your Honor, was limited to a facial challenge.

3   Subsequent to that, we have filed a second motion for summary

4   judgment to which the government is required to file a

5   response, I believe on January the 15th or 16th, and that

6   raises both the void for vagueness facial challenge and

7   as-applied, and so they have not even responded to that.  As I

8   said, there is no other record, no other evidence submitted by

9   them.

10      In addition to that, Your Honor, the notion that TUSD

11  can appeal this is simply begging the question about is a

12  school district going to suffer a multimillion-dollar loss on

13  a monthly basis to preserve a program when the remedy for them

14  is very simple; you just don't have the program.  And, Your

15  Honor, that's no different from the bar student who can't get

16  the assistance needed to take the bar exam because you know

17  that absent that, the likelihood is substantially increased

18  that they are not going to pass that bar exam and that that

19  has some stigma on them.

20      This case, Your Honor, this 10 percent, the way this

21  statute was designed was to coerce, to force a specific

22  result.  That's the elimination of Mexican American Studies.

23  Mr. Horne has never hidden that as his intent.  Mr. Huppenthal

24  has never denied that his -- one of his goals as the

25  superintendent of public instruction was to stop La Raza, and

1    what he meant by that was to end this program, and he has

2    fulfilled that political promise, Your Honor.  There's no

3    reason to believe that he won't do that.  Thank you.

4            THE COURT:  All right.  Thank you.

5        Okay.  I'm going to -- I'm taking, as I said earlier,

6    both motions under submission.  One is defendants' motion to

7    dismiss, and two is the plaintiffs' motion for preliminary

8    injunction.

9        After we get beyond that, if necessary, as Mr. Martinez

10   mentioned, there are pending motions for summary judgment

11   still in the briefing process, but we'll see what happens.

12   And as I say, I'll get my decision out as expeditiously as

13   possible, all right?

14       So I thank counsel for their argument.  These matters are

15   now submitted.  I think because we have so many people in the

16   courtroom, the court reporter has been at it for an hour and a

17   half, so we'll take a recess now.  So you can take down your

18   exhibits and so forth, and we'll resume with the calendar,

19   well, let's say in about 20 minutes, all right?  So stand in

20   recess at this time.

21           MR. RAY:  Thank you, Judge.

22           THE COURT:  Thank you.

23       (Court recessed at 3:35 p.m.)

24

25               C E R T I F I C A T E

1          I, Aaron H. LaDuke, do hereby certify that I

2    reported the foregoing proceedings to the best of my skill

3    and ability, and that the same was transcribed by me via

4    computer-aided transcription, and that the foregoing pages

5    of typewritten matter are a true, correct and complete

6    transcript of all the proceedings had, as set forth in the

7    title page hereto.

8          Dated this 26th day of April, 2013.

9

10

11                          _____s/Aaron H. LaDuke_____
                              Aaron H. LaDuke, RMR, CRR
12                            Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25