1

2

3

4

5

6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF ARIZONA**

8

9

10

11

12

NOAH GONZÁLEZ; JESUS )
GONZÁLEZ, his father and next friend, )
MANUEL BARCELO; and JULIAN )
BARCELO, his father and next friend, )

No. CV 10-623 TUC AWT

**MEMORANDUM OF DECISION**

13

Plaintiffs, )

14

vs. )

15

)

16

17

18

DIANE DOUGLAS, Superintendent of )
Public Instruction, in her Official )
Capacity, et al., )

19

Defendants. )

20

21

22

23

24

25

26

27

28

This is an action brought by students and their parents against the Superintendent of Public Instruction for the State of Arizona and members of the Arizona State Board of Education. The complaint alleges that plaintiffs' First and Fourteenth Amendment rights were violated by the enactment and enforcement of Arizona Revised Statutes ("A.R.S.") §§ 15-111 and 15-112 to eliminate Tucson Unified School District's Mexican-American Studies program. The matter was tried to the Court sitting without a jury. This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law

pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.   FINDINGS OF FACT

In 1974, Latino and Black students brought a school desegregation class action in federal district court against Tucson Unified School District ("TUSD").  Following trial, the district court ruled that TUSD had acted with segregative intent and failed to rectify the detrimental effects of those actions.  *See Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1341 (9th Cir. 1980); *Fisher v. United States*, 549 F. Supp. 2d 1132, 1135 n.5 (D. Ariz. 2008) (describing the district court's findings).  The court entered a consent decree requiring TUSD "to remedy existing effects of past discriminatory acts or policies."  *See Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1137 (9th Cir. 2011).  TUSD continues to operate under that desegregation decree.[1]

To further the remedial objectives of the decree, in 1998, TUSD implemented a Mexican-American Studies ("MAS") program.  *Fisher*, 549 F. Supp. 2d at 1161 & n.31; Trial Tr. 70:9-12 June 29, 2017; Ex. E-B at 12.  The program included art, government, history, and literature courses at the kindergarten through 12th grade levels, with each course focusing on historic and contemporary Mexican-American contributions.  The concept of the program was to engage Mexican-American students by helping them see "themselves or their family or their community" in their studies, and its purpose was to close the historic gap in academic achievement between Mexican-American and white students in Tucson.[2]  Trial Tr. 42:23-43:15, 45:1-20 June 26, 2017; Trial Tr. 51:2-5 June

---

[1]      In 2011, the district court terminated its jurisdiction over the decree upon finding that TUSD had achieved unitary status.  *Fisher*, 652 F.3d at 1140.  The Ninth Circuit reversed on the ground that TUSD had neither eliminated the vestiges of past discrimination to the extent practicable, nor complied in good faith with the desegregation decree.  *Id.* at 1141-43.

[2]      The achievement gap is measured by graduation rates, standardized test
(continued...)

29, 2017.  At the high school level, the MAS courses were research-based, designed as college preparatory courses, and "used texts that are regarded as canonical in the fields of Ethnic studies and Mexican American Studies."  Trial Tr. 53:24-54:2, 55:13-4, 59:15-22, 66:20-22 June 26, 2017; Ex. 93 at 49; Ex. E-B at 13.

In the 2010-2011 school year, TUSD had 53,000 students, sixty percent of whom were Latino.  Trial Tr. 159:19-24 June 27, 2017.  Twenty-one MAS classes were offered that year at eight high schools and middle schools.  Ex. 558A; Ex. 558D.  A total of 1,300 students enrolled in the classes.  Trial Tr. 160:1-5 June 27, 2017.  Participation was on a voluntary basis and open to any student.  Trial Tr. 30:24-31:5 July 18, 2017. Approximately ninety percent of students who chose to enroll were Latino.  Trial Tr. 50:8-11 June 26, 2017; Trial Tr. 160:1-5 June 27, 2017; Ex. E-A at 15.

In practice, the MAS program furthered its objective of improving the academic achievement of enrolled students.  TUSD tracked certain measures of MAS student success, such as graduation rates, state standardized test passage rates, discipline rates, and attendance rates.  It found that students in the program "surpass[ed] and outperform[ed] similarly situated peers."  Ex. 93 at 43; Trial Tr. 60:14-62:12 June 26, 2017.  Plaintiffs' expert Dr. Nolan Cabrera, a professor of higher education at the University of Arizona, confirmed that "there is an empirically demonstrated, significant, and positive relationship between taking MAS classes and increased academic achievement–measured by increased high school graduation rates and increased AIMS tests passing rates–for all students who took the courses, but in particular for Mexican

---

[2](...continued)
passage rates, grade point average, and discipline rates.  Trial Tr. 42:23-43:15, 45:1-20 June 26, 2017.

1   American students in TUSD."[3]  Ex. E-A at 7.  He further found that "[t]his positive

2   relationship increased as Mexican American students took more MAS classes."  *Id.*

3   These results are especially impressive given that the students electing to take MAS

4   classes had "extremely low academic performance prior to taking the courses."  *Id.* at 13

5   n.13.

6        The MAS program drew negative attention of officials within the Arizona

7   Department of Education ("ADE") in 2006.  In the spring of that year, Dolores Huerta, a

8   Latina labor leader and civil rights activist, gave a speech at Tucson High School in

9   which she stated that "Republicans hate Latinos."  Trial Tr. 78:7-8 June 26, 2017; Trial

10  Tr. 11:6-25 July 18, 2017.  Calling Huerta's statement "hate speech," then-Superintendent

11

12  _____

13        [3]        The Court accepts Dr. Cabrera's analysis.  Dr. Cabrera's research was
    published in the American Educational Research Association Journal, a peer-reviewed
14  journal that, defendants concede, is well-respected in the field of education research.  Ex.
    E-A at 5; Ex. D to Ex. E-A; Trial Tr. 53:18-25 July 20, 2017.  The criticisms of Dr.
15  Cabrera's testimony offered by defendants' rebuttal expert Dr. Thomas Haladyna do not
    persuade the Court that Dr. Cabrera's research was unsound.  For example, Dr. Haladyna
16  criticizes Dr. Cabrera's decision to measure passage rates on standardized tests, rather
    than improvements in standardized test scores.  Ex. E-D ¶ 10.  Dr. Haladyna admits,
17  however, that "from an educational policy standpoint" it would "be important to know if
    an educational program helped increase passing on standardized . . . tests after failure on
18  those tests."  Trial Tr. 46:6-8 July 20, 2017.  Dr. Haladyna also faults Dr. Cabrera for
    failing to obtain a random sample because MAS students were self-selected.  *Id.* at 52:6-
19  16.  The result, according to Dr. Haladyna, is that some common feature of this self-
    selected group, other than the fact that they all took MAS courses, could explain the
20  improvements.  But Dr. Haladyna offers no plausible hypothesis of what that common
    feature might be.  Moreover, defendants offered no evidence to contradict Dr. Cabrera's
21  findings, *i.e.*, showing that the MAS program had no positive effect on student
    performance.  Dr. Haladyna did not conduct his own statistical analysis of the MAS
22  program data.  *Id.* at 42:2-3.  And although Superintendent Tom Horne in 2009 asked a
    staffer to conduct an analysis of the effect of the MAS program on student achievement,
23  Ex. 29, this report was not admitted into evidence for its truth.  *See* Dkt. No. 422 at 4.

24

25

26

27

28

of Public Instruction Tom Horne had his Deputy Superintendent Margaret Garcia Dugan give a rebuttal speech at Tucson High School.  Trial Tr. 12:6-22, 13:8-15 July 18, 2017. He wanted Dugan to provide the students with another perspective and explain "why she is proud to be a Latina and why she is proud to be a Republican."  *Id.*  Dugan declined to host a question-and-answer session after the speech.  *Id.* at 19:17-19.  A group of students attending Dugan's speech protested by taping their mouths, turning their backs, raising their fists, and walking out of the auditorium.  *Id.* at 18:7-16, 23:23-24:5.

Horne, who was in attendance, found the protest "rude."[4]  *Id.* at 18:21-19:6, 20:5-8, 23:12-13, 25:1-2.  He concluded that it was organized, and the "rudeness" taught, by teachers in the MAS program.  *Id.*  The basis for those conclusions was that he had "[n]ever seen this behavior [in another school] before or afterwards," had no "reason to think that the parents of these students were any different than the parents of the other students around the state," and had "evidence from other teachers" that MAS teachers were teaching students to "get[] in people's faces."  *Id.* at 19:1-3, 20:23-21:6, 25:10.

That same day at Tucson High School, Horne saw a librarian wearing a t-shirt bearing the acronym "M.E.Ch.A."  *Id.* at 25:21-24.  M.E.Ch.A. stands for "Movimiento Estudiantil Chicano de Aztlán" and is a student "community organizing club" with chapters in high schools and colleges across the United States.  Trial Tr. 143:1-3 June 26, 2017; Trial Tr. 39:10-15, 40:17-18 June 29, 2017.  Horne did not speak to the librarian about M.E.Ch.A. or her reasons for wearing the shirt.  Trial Tr. 26:12-27:3 July 18, 2017. After attending the event, however, Horne visited the University of Arizona M.E.Ch.A. website where he read "El Plan Spiritual Aztlán," a document dating to M.E.Ch.A.'s founding in 1969.  *Id.* at 127:18-130:14; Ex. 606.  From that document, Horne concluded

---

[4]     At trial, Horne described the "raised fist" as similar to "what you see from totalitarian movements."  Trial Tr. 165:19-20 July 18, 2017; *id.* at 181:6-8 ("[P]eople put their fists in the air" in "the 1930s in Germany.").

1  that M.E.Ch.A. is "extremely anti-American" because it promotes "essentially revolution

2  against the American government, that the borders were artificial, [and] that the bronze

3  continent was for the bronze people."  Trial Tr. 28:3-8 July 18, 2017.

4      On June 11, 2007, Horne wrote an "Open Letter to the Citizens of Tucson," in

5  which he set out his grievances with the MAS program and recommended that it be

6  eliminated.  Ex. 22.  In the letter, he stated that the ultimate "decision of whether or not to

7  eliminate this program will rest with the citizens of Tucson through their elected school

8  board."  *Id.* at 1.

9      First, the letter recounted the protest at the Dugan speech, stating that "a small

10  group of La Raza Studies students treated her rudely" and that "the students did not learn

11  this rudeness at home, but from their Raza teachers."  *Id.* at 1-2.  It also relayed Horne's

12  observation of the librarian wearing the M.E.Ch.A. t-shirt.  *Id.* at 3.  Horne asserted that

13  students in the MAS program were "creating a hostile atmosphere in the school for the

14  other students, who were not born into their 'race'" by "teach[ing] a kind of destructive

15  ethnic chauvinism."  *Id.* at 2.  He also stated that "'Raza,'" which used to be part of the

16  name for the MAS program, Trial Tr. 71:3-6 June 29, 2017, "is translated as 'the race.'"[5]

17  *Id.* at 2.

18      Second, the letter addressed two textbooks used in the MAS program, *Occupied*

19  *America* and *The Mexican American Heritage*, and gave brief quotations from each text

20  to support Horne's position that the MAS program should be eliminated.  *Id.* at 2.  For

21

22      [5]      When asked at trial about the meaning of "La Raza," Horne testified that

23  Spanish dictionaries "all say 'La Raza' means the race" and "[w]hen they say it doesn't

24  mean 'the race,' it means 'the people,' they're being deceptive."  Trial Tr. 131:15-19 July

25  18, 2017.  The American Heritage dictionary defines "La Raza" to mean "Mexicans or

26  Mexican Americans considered as a group, sometimes extending to all Spanish-speaking

27  people of the Americas."  *See* American Heritage Dictionary of the English Language,

   available at http://ahdictionary.com/word/search.html?q=la+ra

   za&submit.x=0&submit.y=0 (last visited August 15, 2017).

28

instance, *Occupied America* contains the statement that "Texans had never come to grips with the fact that Mexicans had won at the Alamo." *Id.* In the letter, Horne said that he found this statement "strange" because it took "the Mexican side of the battle at the Alamo." *Id.*[6] The letter also quoted the following sentence from *The Mexican American Heritage*: "Apparently the U.S. is having as little success in keeping the Mexicans out of Aztlan as Mexico had when they tried to keep the North Americans out of Texas in 1830." *Id.* at 3. Horne interpreted that statement as "gloating over the difficulty we are having in controlling the border." *Id.* at 3.

Finally, the letter contained two reports from teachers. It stated that Hector Ayala, an "English teacher at Cholla High School in TUSD," said that the MAS program director "accused [Ayala] of being a white man's agent,'" and that MAS teachers "taught a separatist political agenda" that admonished students "'not to fall for the white man's traps.'" Ex. 22 at 2. The letter also relied on an article from the *Arizona Republic* containing a report of former TUSD teacher John Ward, who had retired in 2002. *Id.* at 3; Trial Tr. 35:3-4 July 18, 2017. The letter stated that Ward "despite his name, is Hispanic." Ex. 22 at 3. According to the letter, Ward reported that MAS teachers "are vehemently anti-Western culture," are "vehemently opposed to the United States and its power," and "tell[] students they are victims and that they should be angry and rise up." *Id.* at 4.

At no time before or after drafting his Open Letter did Horne attend a MAS class to observe what was being taught there. Trial Tr. 9:18-19, 9:24-25 July 18, 2017; *id.* at 176:6-7. His reason for not doing so was that he "didn't want to have [MAS teachers] go and put on a show for [him] and make it seem innocuous" because if then asked "what

---

[6]     At trial, Horne further described the textbook's statement as "celebrat[ing] the fact that the Mexicans won and murdered the people that were in the fort. In Mexican public schools, I would expect it. . . ." Trial Tr. 36:9-12 July 18, 2017.

[he] saw," Horne "would have to say it was innocuous." *Id.* at 9:20-23.  As a result, Horne at no point had "personal knowledge of anything" that was being taught in MAS classrooms other than "what [he] read in [MAS] materials." *Id.* at 174:3-4.

TUSD did not accept Horne's recommendation to terminate the MAS program. Trial Tr. 83:6-16 June 26, 2017.  Horne then began lobbying for statewide legislation that would ban the program.  Trial Tr. 44:17-19 July 18, 2017.  In 2008, Arizona Senator Russell Pearce responded to Horne's call and introduced Senate Bill 1108, which would have prohibited any courses "that promote, assert as truth or feature as an exclusive focus any political, religious, ideological, or cultural beliefs or values that denigrate, disparage or overtly encourage dissent from the values of American democracy and western civilization, including democracy, capitalism, pluralism, and religious tolerance." *Id.* at 46:4-8; Ex. 26.  It also sought to ban organizations from "operat[ing] on the campus of [a] school, university, or community college if the organization is based in whole or in part on race-based criteria." Trial Tr. 47:2-6 July 18, 2017.  Senator Pearce introduced this bill because he believed that the MAS program was "very anti-American hateful hate speech."[7]  Ex. 144 at 29:37.  S.B. 1108 did not pass.

The following year, Horne drafted his own bill to address the MAS program, which Senator Jonathan Paton introduced as Senate Bill 1069.  Trial Tr. 47:15-18 July 18, 2017; Ex. 27.  It sought to prohibit courses that either "are designed primarily for pupils of a particular ethnic group" or "advocate ethnic solidarity instead of the treatment of pupils as individuals." Ex. 27.  Horne testified that he drafted the bill to give enforcement authority to the Superintendent because he held that office at the time.  Trial Tr. 53:18-24

---

[7]     At a legislative hearing on S.B. 1108, Representative John Kavanagh, who ultimately voted for the bill that would become A.R.S. §§ 15-111 and 15-112 (hereinafter together, "A.R.S. § 15-112"), stated that he opposed the MAS program because "[i]f you want a different culture then fine, go back to that culture.  But this is America." Ex. 144 at 29:29.

July 18, 2017.[8]

S.B. 1069 did not pass, *id.* at 54:2-3, but Horne persisted.  In the winter of 2010, he drafted a third bill, House Bill 2281.  Ex. 509.  Similar to S.B. 1069, it sought to prohibit courses that "are designed primarily for pupils of a particular ethnic group" or "advocate ethnic solidarity instead of the treatment of pupils as individuals." *Id.*  It also gave enforcement authority to the Superintendent. *Id.*

Horne was "very involved" in the process of getting H.B. 2281 passed.  Trial Tr. 59:23-60:8 July 18, 2017.  He asked Representative Steve Montenegro, "a Central American immigrant," to introduce H.B. 2281 because "the fact that he was a Hispanic was a plus in trying to get the bill passed." *Id.* at 54:14-19.  Representative Montenegro supported the bill because MAS classes teach that "the white man's evil and this was our land and it's time for us to take it back," Ex. 51 at 122:17-18, and because "it's wrong to be creating this kind of racial warfare," Ex. 35 at 81:3-4.  Horne provided Representative Montenegro with "evidence and proof" on the MAS issue, Ex. 35 at 76:21-24, and worked closely with Representative Montenegro to promote and manage the bill.  For example, when H.B. 2281 was in committee, Representative Richard Crandall substituted Horne's original two provisions for two different provisions, prohibiting courses that "promote the overthrow of the United States government" or "promote resentment toward a race or class of people." *Id.* at 61:1-10; Ex. 512.[9]  At Horne's request Representative

---

[8]    Also in 2009, Horne directed a member of his staff at the ADE to analyze the impact of participation in the MAS program on ability to pass state standardized tests. Trial Tr. 109:23-110:4, 131:5-7 July 17, 2017; Ex. 29.  The analysis "found no significant effect of the courses on student performance on the . . . tests." Ex. 29.  As noted, the Court has not considered this analysis for its truth. *See supra* note 3.

[9]    Representative Crandall's amendment also gave enforcement authority to the State Board of Education, rather than the Superintendent of Public Instruction.  Trial Tr. 61:13-16 July 18, 2017.

Montenegro proposedan amendment to Representative Crandall's version that restored Horne's two favored provisions.  Trial Tr. 64:9-11 July 18, 2017; Ex. 513.

Horne also spoke twice before the Arizona legislature, once before the House Education Committee and once before the Senate Education Accountability and Reform Committee.  Then-Senator John Huppenthal was chairman of the Senate Education Accountability and Reform Committee at that time.  Trial Tr. 152:1-3 June 26, 2017.  In his remarks, Horne promoted his position that the MAS program teaches "ethnic chauvinism."[10]  Ex. 511 at 1:39:50; Ex. 516 at 2:49:15.  He recounted the Huerta and Dugan speeches, asserted his beliefs that the student protesters were members of "the Raza program" and were taught to be "rude" by "Raza studies" teachers who were "radical," referenced the librarian's M.E.Ch.A. t-shirt, and quoted selections from "El Plan Spiritual de Aztlán."  Ex. 511; Ex. 516; Trial Tr. 69:25-72:7 July 18, 2017.  Horne mentioned John Ward's complaints and described some of the textbooks, including *Pedagogy of the Oppressed* by Paulo Freire, who Horne said was a "well-known Brazilian communist."  Ex. 511; Trial Tr. 69:25-72:7 July 18, 2017.  Horne also said that he had heard from a teacher that a group of students complained that a MAS teacher "dissed them for being white."[11]  Ex. 516 at 2:58:22.  In addition, Horne asserted that having "Raza studies for the Raza kids, Native American studies for the Native American kids, [and] oriental studies for the oriental kids" was "just like the Old South."  Ex. 516 at 2:55:24; Ex. 511 at 1:32:22.

Responding to Horne's statements before the House committee, one member

[10]     Others involved in the legislative process confirmed that the target of H.B. 2281 was the MAS program, and not any other ethnic studies program.  Trial Tr. 26:11-24 June 28, 2017; Trial Tr. 147:18-23 July 17, 2017.

[11]     At trial, Horne also testified that he was concerned that "white kids who took the [MAS] course[s] . . . had to sit there while they were told not to fall for the white man's traps."  Trial Tr. 77:25-78:4 July 18, 2017.

informed Horne of a charter school in Tucson called the Paulo Freire Freedom School, named for the author of *Pedagogy of the Oppressed*. Ex. 511 at 1:38:10; *Id.* at 73:6-10; Ex. 35. The House member told Horne that the school was "devoted totally" to Paulo Freire's "curriculum and theories." Ex. 511 at 1:38:26; Trial Tr. 73:11-13 July 18, 2017. At the time, the Paulo Freire school had a majority-white student population. Ex. 230. At trial, Horne testified that he never contacted the Paulo Freire charter school or tried to determine what was being taught there. Trial Tr. 74:3-13 July 18, 2017.

H.B. 2281 passed the House and was taken up by the Senate. Senator Huppenthal became a proponent of the bill,[12] Trial Tr. 155:19-21 June 26, 2017, and was "very deeply involved in [the effort to] amend[] and pass[]" it, *id.* at 189:5-7. Huppenthal objected to the MAS program because he believed that the program was "plant[ing] evil ideas in kids' minds." Ex. 144 at 33:20. Addressing a MAS administrator at one of the legislative hearings, Huppenthal stated the following:

> The textbook that you use, *Pedagogy of the Oppressed*, my understanding is that if you go and look at the citations, you see Marx, Lenin, Mao, Che Guevara, Fidel Castro. And so our suspicion is inside these classes, these students are being indoctrinated by people who are in power to have a certain mindset of us versus them. . . . That's our suspicion. We really think we know what's going on behind those doors. People in power are doing something distasteful.

*Id.* at 32:19. At trial, Huppenthal further explained that an "oppressed/oppressor framework is very toxic" for students because "[i]t gets them thinking in unhealthy ways about that . . . 'oppressor' group"; students should not "be thinking . . . that somebody is holding [them] back and be wasting time on negative thoughts." Trial Tr. 122:15-16, 123:2-18 June 27, 2017.

Huppenthal successfully sought to amend H.B. 2281 in two ways, both having to do with enforcement. First, he delayed the effective date until January 1, 2011. Trial Tr.

---

[12] Huppenthal testified that he initially refused to sponsor the bill because he favors "local control of education." Trial Tr. 155:11-14 June 26, 2017.

175:9-15 June 26, 2017.  Huppenthal said that his intent was to "move[]" the effective date to "after the election" to "take the politics out of any decision that was made regarding the class."  Trial Tr. 136:7-24 June 27, 2017; Trial Tr. 175:16-19 June 26, 2017.  Huppenthal did not tell Horne about the amendment "because he was concerned that . . . Horne [would] influence members of the Senate to oppose the amendment."  Trial Tr. 151:15-17 July 17, 2017.  Second, he restored enforcement authority to the office of the Superintendent.  Trial Tr. 171:24-172:3, 173:24-174:8 June 26, 2017.

"[A]t the [same] time that all of this was taking place," Huppenthal was running for that office, which he ultimately won.  *Id.* at 176:3-12, 177:25-178:2.  He "campaigned on a platform to stop La Raza," an issue that "was an important part of [his] campaign."[13] *Id.* at 176:13-18.  According to Huppenthal, "concerns" about the MAS program had "spread across the state like wildfire," and he saw them "everywhere" as he campaigned.  Trial Tr. 133:1-3 June 27, 2017.  During his primary campaign, Huppenthal spent approximately $40,000 on radio commercials in which he used the phrase "Stop La Raza."  Trial Tr. 73:2-4, 98:23-99:4, 100:5-6 June 28, 2017.  Huppenthal testified that the word "Raza" became "shorthand for . . . communicating with Republican primary voters," specifically, "shorthand for stop the slandering of the founding fathers, stop the unbalanced examination of the founding fathers, [and] stop indoctrination of students into a Marxist oppressed/oppressor framework."  Trial Tr. 176:20-177:2 June 26, 2017.

At the same time, Horne was also running for office – the office of Arizona Attorney General – and, like Huppenthal, based his campaign, in part, on his efforts to "stop La Raza."  Trial Tr. 121:2-3 July 18, 2017.  He gave a campaign speech that referred to his "crusade" to "destroy[] the entire" MAS program.  *Id.* at 113:10-25, 118:20-119:16.  He also posted a video to his campaign website in which he stated: "I

---

[13]     Like Horne, Huppenthal testified that "La Raza" means "the race" in Spanish.  Trial Tr. 176:19-20 June 26, 2017.

1    fought hard to get the legislature to pass a law so that I could put a stop to the Raza

2    Studies program.  And as the Attorney General, I will give legal aid to the Department of

3    Education to be sure that we do put a stop to it."  Trial Tr. 112:22-113:12 July 18, 2017.

4         In the spring of 2010, then-Senator Huppenthal visited a Latino literature MAS

5    class at Tucson High School.[14]  Trial Tr. 84:6-10 June 26, 2017.  The ACT test was being

6    administered that day, so regular class periods were shortened to twenty minutes.  *Id.* at

7    84:13-21.  Rather than attempt to cover new content during the twenty-minute period, the

8    teacher hosted "a dialogue" with Huppenthal so that "he could hear directly from the

9    students" about what was being taught in the class.  *Id.* at 85:16-20.

10        At trial, Huppenthal identified two aspects of that experience that concerned him:

11   there was a "poster of Che Guevara up on the wall" and one of the administrators of the

12   MAS program "described Benjamin Franklin as a racist."  *Id.* at 164:19-167:5; Trial Tr.

13   130:12-17 June 27, 2017.  Huppenthal viewed those facts "as a threat to the cultural

14   conditions that [he] subscribed to" and concluded that the MAS classrooms did not

15   "value[] . . . freedom and success."  Trial Tr. 164:19-166:20 June 26, 2017.  However,

16   Huppenthal also came away with "a very positive impression" of the teacher of the class,

17   *id.* at 169:2-3, and felt that his dialogue with the students had been "respectful," Trial Tr.

18   120:17-19 June 27, 2017.

19        On May 11, 2010, the Arizona Senate passed H.B. 2281, which is now codified as

20   A.R.S. § 15-112.  The statute prohibits a school district or charter school from including

21   in its program of instruction any courses that: (1) "Promote the overthrow of the United

22   States government," (2) "Promote resentment toward a race or class of people," (3) "Are

23

24

25

26   _____

27       [14]    This was the only MAS class that Huppenthal ever visited.  Trial Tr.
     164:15-16, 171:21-23 June 26, 2017.

28                                          13

1    designed primarily for pupils of a particular ethnic group,"[15] or (4) "Advocate ethnic

2    solidarity instead of the treatment of pupils as individuals." *See* A.R.S. § 15-112(A).  If

3    the State Board of Education or the Superintendent of Public Instruction determines that a

4    school district is in violation of the statute, the district has sixty days to achieve

5    compliance.  If the district fails to comply, the Superintendent or State Board may direct

6    ADE to withhold ten percent of the district's funding.  *See* A.R.S. § 15-112(B).  Given

7    Huppenthal's amendment, the statute did not go into effect until January 1, 2011, the day

8    after Horne's final day as Superintendent.

9        A few months later, then-Senator Huppenthal began posting comments on political

10   blogs using two pseudonyms.  On December 14, 2010, he posted the comment, "No

11   Spanish radio stations, no Spanish billboards, no Spanish TV stations, no Spanish

12   newspapers.  This is America, speak English."  Trial Tr. 95:18-23 June 27, 2017.  The

13   next day, he posted the comment, "The rejection of American values and embracement of

14   the values of Mexico in La Raza classrooms is the rejection of success and embracement

15   of failure."  *Id.* at 96:2-7.  The next day, Huppenthal again posted, this time stating, "I

16   don't mind them selling Mexican food as long as the menus are mostly in English."  *Id.* at

17   97:19-20.

18       In a document dated December 30, 2010, Horne's final weekday in office as

19   Superintendent, he found that the MAS program was "in violation of A.R.S. § 15-112"

20   and gave TUSD "60 days to eliminate the Mexican American Studies courses" or else be

21   "subject . . . to having 10 percent of its budget withheld."  Ex. 525 at 10.  Horne had the

22   Superintendent's office issue the finding two days later, recognizing that "the statute

23   wasn't effective until January 1."  Trial Tr. 80:18-20 July 18, 2017; *see also* Trial Tr.

24   _____

25       [15]    In 2013, this Court invalidated the third provision as unconstitutional under

26   the First Amendment.  *Acosta v. Huppenthal*, 2013 WL 871892, at *10 (D. Ariz. 2013)
     That ruling was affirmed by the Ninth Circuit.  *See Arce v. Douglas*, 793 F.3d 968, 986

27   (9th Cir. 2015).

28                                             14

189:11-17 June 26, 2017.

The stated basis for Horne's finding was much of the same conduct that had occurred over three years prior described in Horne's Open Letter: the protest at the Dugan speech, the John Ward and Hector Ayala reports, and use of textbooks containing certain quotes.[16] Ex. 525; Trial Tr. 81:20-82:4 July 18, 2017.  In addition, the finding relied on reports by three unnamed teachers, one who heard a MAS teacher "tell his students that the [University of Arizona] is a racist organization because only 12% of students are Latino," another who had "been called racist by fellow Tucson High teachers, members of the Ethnic Studies department, and students enrolled in the departments' classes," and a third who had "been accused by Hispanic students of 'not liking Mexicans.'" Ex. 525 at 5-6.  The finding also quoted several other texts, including *The Lost Land: the Chicano Image of the Southwest* by John R. Chávez,[17] *Critical Race Theory* by Richard Delgado and Jean Stefancic, and *Courageous Conversations About Race: a Field Guide for Achieving Equity in Schools* by Glenn Singleton.  *Id.* at 8-9.

Horne further noted in his finding that the other three ethnic studies programs offered in TUSD–the Asian-American, African-American, and Native American programs–"could be found in violation under criterion three" of A.R.S. § 15-112, prohibiting "courses designed primarily for pupils of a particular ethnic group." Ex. 525 at 2.  Yet Horne never investigated those programs or enforced the statute against them because he received no complaints about them.  Trial Tr. 48:9-10 July 18, 2017.  When

---

[16]     At trial, Horne testified that, although much of his information was years-old, he had "no indication" that the MAS program had changed in the interim, and he would have been aware of any change because he "read transcripts of conferences that were held." Trial Tr. 155:2-5 July 18, 2017.  No other witness testified about conferences.

[17]     Horne inaccurately referred to this book as "AZTLAN The Lost Land, 'The Chicano Homeland' by John R. Chavéz."

asked at trial why he did not enforce the statute to eliminate specifically the Asian-American studies program, Horne added that he "was told that it was academically an excellent program." *Id.* at 91:3-7.

Huppenthal left the Arizona Senate and succeeded Horne as the Superintendent of Public Instruction. He was sworn into office on Monday, January 3, 2011. Trial Tr. 178:3-14 June 26, 2017. Early the next morning, he issued a press release stating that he "support[ed] former Superintendent Tom Horne's decision that a violation of one or more provisions of A.R.S. § 15-112 . . . has occurred by the Tucson Unified School District." Ex. 60 at 3. Also on January 4, Huppenthal posted a blog comment stating that, "La Raza means 'The Race.' It doesn't mean the Mexican race, unless you use it as a shorthand for that. But it's also shorthand for classroom studies that depict America's founding fathers as racists, poisoning students' attitudes towards America." Trial Tr. 98:5-12 June 27, 2017.

Despite expressing support for Horne's finding, Huppenthal chose not to enforce it immediately.[18] He instead hired an independent auditor, Cambium Learning, Inc. ("Cambium"), to conduct an investigation of the MAS program. Trial Tr. 193:7-10 June 26, 2017. Cambium "was a national consulting company that had a deep well of experts in curriculum review [and] in instructional practices" who "did a tremendous amount of professional development along with consulting at the state and local levels across the country." Trial Tr. 27: 6-10 June 30, 2017.

Huppenthal appointed four of his staff members, Elliott Hibbs, Kathy Hrabluk,

---

[18]    On February 24, 2011, Huppenthal extended the deadline for TUSD to come into compliance by forty-five days, giving the district "the whole semester to heal themselves." Trial Tr. 153:10-22 June 27, 2017; Ex. 527.

Stacey Morley, and John Stollar,[19] to oversee the Cambium investigation.  Trial Tr. 156:8-10 July 17, 2017; Trial Tr. 196:2-6 June 26, 2017; Trial Tr. 43:1-24 June 27, 2017; Trial Tr. 22:12-16, 41:19-23 June 30, 2017; Ex. 67.  None of these individuals questioned Cambium's ability to conduct the audit competently.  Trial Tr. 194:6-8 June 26, 2017.  Nor did they criticize Cambium's proposed audit plan, Trial Tr. 98:20-25 June 30, 2017, other than to voice concern that MAS teachers would be aware of which week the auditors would be doing classroom visits, *id.* at 35:23-37:4, 38:5-8, 87:23-88:8.  But Hrabluk, the staffer who was directly overseeing the audit, concluded that "because of the limited time frame . . . it had to be that way."[20]  Trial Tr. 32:25-33:1 July 17, 2017.  Huppenthal did raise with his staff the issue of whether Cambium was "conservative enough or too liberal in their thinking."  Ex. 63; Ex. 67.  Publicly, however, Huppenthal's office expressed "full confidence in the . . . audit team and their ability to remain impartial and unbiased as they continue their review of TUSD's Mexican-American Studies program."  Ex. 67.

The audit entailed classroom visits,[21] review of MAS course materials (*i.e.*, texts used in the classes), review of MAS curricular materials (*e.g.*, lesson plans), focus group interviews, and a survey.  Ex. 93 at 12-13.  On the advice of his attorney, the director of

---

[19]     Elliott Hibbs was Deputy Superintendent of Operations at ADE, John Stollar was Deputy Superintendent of Education, Kathy Hrabluk was Associate Superintendent, and Stacey Morley was Director of Policy Development and Government Affairs.

[20]     Time was limited because Huppenthal wanted the audit completed "before the end of the school year."  Trial Tr. 78:19-20 June 30, 2017.  The auditors had "six or seven weeks . . . from the time they began to the time they issued their report."  *Id.* at 86:2-5.

[21]     The auditors visited "17 out of the 43" high school MAS courses, or "39.5% of all high school MAS[] courses."  Ex. 93 at 63.  The auditors observed each class for an "average [of] 29.6 minutes."  *Id.*

the MAS program did not provide any information to the auditors or otherwise participate.  Trial Tr. 179:1-6 June 27, 2017; Trial Tr. 20:8-23 June 29, 2017; Trial Tr. 90:6-8 June 30, 2017.

Hrabluk testified that she developed concerns during the course of the audit.  Trial Tr. 40:5-9 June 30, 2017.  Specifically, she came to understand that only "limited curriculum materials [were] being presented to the auditors," "limited lesson plans [were] available," "there was zero student work for them to actually look at," and "time was tight."  *Id.* at 40:11-17.  However, ADE continued to publicly express support for the audit.  On March 24, ADE stated in a press release that it was "pleased with the audit team in place and the work accomplished to date," and had "full confidence in the current audit team and their ability to remain impartial and unbiased as they continue their review of TUSD's Mexican-American Studies program."  *Id.* at 83:2-7.

On May 2, 2011, Cambium gave a draft report to ADE, which concluded that the MAS program did not violate A.R.S. § 15-112.  Trial Tr. 84:15-18 June 30, 2017.  Cambium sent its final report to Huppenthal's staff on May 15, 2011.  Trial Tr. 6:12-14 July 17, 2017.  That version likewise maintained that there had been no violation.[22]  Ex. 93.

The report made three main findings.  *Id.* at 18-63.  (1) The auditors found "no observable evidence was present to indicate that any classroom within Tucson Unified School District is in direct violation of the law, A.R.S. § 15-112(A)."  *Id.* at 50-63.  They

---

[22]     At trial, Horne testified that he viewed Huppenthal's decision to hire Cambium as "a big mistake" because "[t]he classes pretended to be harmless" and  "were putting on a show for [the auditors]."  Trial Tr. 87:2-11 July 18, 2017; *see also id.* 96:18-21 ("These teachers were so ideological that they would tell you whatever you wanted to hear as far as reforming the curriculum and then behind closed doors they would do whatever they wanted to do.").  Huppenthal similarly testified that "the core of the issue [with] . . . the audit [was] that people don't misbehave when they're being observed."  Trial Tr. 211:16-18 June 26, 2017.

rejected the proposition that the MAS courses violated any of the four sub-parts of the statute and substantiated those conclusions with evidence gathered in the audit. *Id.* 920 The auditors found that TUSD's MAS "programs are designed with the intention to improve student achievement." *Id.* at 18-43. That conclusion was "based on the audit team's findings of valuable unit and lesson plans, engaging instructional practices, and collective inquiry strategies through values of diversity and intercultural proficiency." *Id.* Cambium noted, however, that "the curriculum auditors did not observe flawless curriculum execution." *Id.* at 18-43 ("The auditors did not find a well-defined, solitary document that provided the integrated, comprehensive guidance needed to direct, monitor, and assess effective curriculum implementation."). (3) The auditors found that "student achievement has occurred [in the MAS program]" and that MAS "is closing the achievement gap." *Id.* at 43-50. Cambium "based [that conclusion] on the re-analysis and findings of TUSD's Department of Accountability and Research," and specifically cited standardized test passage rates and higher graduation rates for MAS students. *Id.* The auditors attributed this result to "teacher effectiveness" and students' "motivation to learn." *Id.* at 49.

As noted, Cambium did identify problems with some of the MAS curriculum materials. *Id.* at 34. Specifically, some of the "MAS[] curriculum units analyzed by the auditors contain an overabundance of controversial commentary inclusive of political tones of personal activism and bias." *Id.* The auditors could not, however, "determine[] if these units [we]re currently being taught" because "their use was not observed during the audit window." *Id.* at 35.

Cambium further noted that some of the course texts provided to the auditors were "questionable for appropriate student use," but again could not determine that they were "currently in use." *Id.* at 37. From what they had seen "in use" during the audit and "sitting on the shelves" in the classrooms, "the auditors saw no evidence of previous questionable MAS[] materials." *Id.* at 38. The auditors also specifically addressed

19

several texts, including *Occupied America* by Rodolpho Acuña, *Message to Aztlán* by Rodolfo Gonzales, *The Mexican American Heritage (2nd Ed.)* by Carlos Jiménez, and *500 Años del Pueblo Chicano / 500 Years of Chicano History in Pictures* by Elizabeth Martinez.  As to some texts, Cambium noted that "individuals and organizations" had taken "[q]uotes . . . out of context," while they concluded that other texts "should have gone through a District approval process" before being used, if they were used.  *Id.* at 39-40.

The record contains conflicting evidence as to Huppenthal's and his staff's reactions upon receiving the Cambium report.  Hrabluk testified that Huppenthal, Stollar, Hibbs, and herself "unanimous[ly]" concluded that "we did not have enough information" to determine whether the MAS classes violated A.R.S. § 15-112, and therefore decided to "do a more intense review of the materials."  Trial Tr. 47:13-48:8 June 30, 2017.  ADE subsequently conducted its own review.  Nevertheless, the weight of the evidence suggests that ADE concluded there was a violation *before* that investigation.  Elliott Hibbs testified that, as of May 9, 2011, the team had already "reached a conclusion that there was a violation of the statute."  Trial Tr. 136:23-137:11 July 20, 2017.  Contemporaneous documentary evidence supports that testimony.  On May 9, Hibbs sent an e-mail to Hrabluk asserting that Cambium had "missed the boat" on the MAS program.  Ex. 84.  On May 12, Stollar sent an e-mail to Hibbs, Hrabluk, and others asking them to "add . . . specific citations" to support the "[c]onclusion" that "[t]he existing TUSD's MASD progam of study must be terminated suspended [*sic*] immediately."  Ex. 86.  Accordingly, the Court finds that the conclusion that the MAS program was in violation of § 15-112 was reached upon receipt of the draft report, before any independent ADE investigation was conducted.

To marshal support for this conclusion, Huppenthal and his staff undertook their own review of the MAS program.  Trial Tr. 157:20-22 July 17, 2017.  Huppenthal, Hrabluk, and Morley all testified that "materials," meaning textbooks, were the subject of

this investigation and the basis for Huppenthal's subsequent finding.  Trial Tr. 42:4-7 June 27, 2017; Trial Tr. 46:2-6 June 30, 2017; Trial Tr. 160:14-19 July 17, 2017.  In fact, the evidence shows that the materials were the *sole* basis.  No ADE staffer audited a MAS class or spoke to a MAS teacher.  Trial Tr. 43:18-19 June 27, 2017; Trial Tr. 34:8-10, 159:10-11 July 17, 2017.  Hrabluk testified that "we reached the conclusion that, *based on the material* that the district and the Mexican-American Studies program had submitted, that the program was in violation of the legislation," Trial Tr. 61:18-23 June 30, 2017 (emphasis added), *id.* at 46:2-6, and that ADE's own investigation was based only on "materials," *id.* at 48:2-8.  Huppenthal's finding itself stated that it was "based on the limited curriculum and materials reviewed at TUSD and additional materials gathered independently of the conducted classroom observations." Ex. 90 at 65690.  Attached to the finding was a chart that named particular texts and identified for each a corresponding "[r]elevant passage" that purported to show the violation.  Ex. 557.

At trial, Hrabluk explained how, in ADE's view, the course materials and lack of curricular materials supported the finding.

> [W]e [co]ncluded that there in fact was no full curriculum for the Mexican-American Studies program classes; that the textbooks and the resource materials that the department had submitted for review were just standalones, they were lists of textbooks and we had many of them submitted to us, but we had no idea how they were used, what other materials were used to balance an outlook, and so we had to take them at face value, and so we did.

Trial Tr. 48:11-18 June 30, 2017.  Phrased another way, ADE "had no idea" how the materials were used "because there was no written plan.  So when we looked at the materials, we looked at them really from a literal standpoint."  Trial Tr. 14:15-23 July 17, 2017.  In Huppenthal's words, regarding course materials, "you had some really egregious examples [of objectionable materials] in there that just had to be dealt with," although he admitted that "a significant portion of the materials . . . were acceptable." Trial Tr. 45:8-16 June 27, 2017.  And regarding the "minimal curriculum framework,

right away" he knew he was "looking at chaos" and "likely inappropriate behavior, a lack of organization within the classroom." *Id.* at 161:19-23.

On June 15, 2011, Huppenthal issued a three-page finding that the MAS program violated A.R.S. § 15-112. Ex. 90 at 65690-92. In support of his finding, Huppenthal stated that "[d]uring classroom observations, no established curriculum was observed by the auditors" and that the "materials submitted to ADE contained content promoting resentment towards a race or class of people." *Id.* at 65690. The finding also stated that the MAS program violated A.R.S. § 15-341, which requires school district governing boards to approve curricula, and §§ 15-721 and 15-722, which require school district governing boards to approve courses of study and textbooks. *Id.* at 65691.

The finding did not mention the Cambium audit's contrary conclusion that the program did not violate A.R.S. § 15-112, or give reasons for disregarding that conclusion. Ex. 90. However, Huppenthal gave a speech in which he stated the "basis for [his] rejection of the Cambium report." Trial Tr. 67:24-25 June 27, 2017; Ex. 92 at 1-2. "First, two-thirds of the final audit report was beyond the scope of the legal determination. . . ." Ex. 92 at 1. "Second, the Tucson Unified School District Administration knew which week the on-sight classroom reviews and interviews would be taking place. In addition, only 37% of the Mexican American Studies Program classrooms were observed. Most classrooms were visited just once and for only 30 minutes." *Id.* "Finally, while invited to participate in the curriculum audit process, key leadership in the Mexican American Studies Department refused to cooperate–including the Director of the Department." *Id.* at 2.

A few months later, in October 2011, Huppenthal posted a blog comment that "The Mexican-American Studies classes use the exact same technique that Hitler used in his rise to power. In Hitler's case it was the Sudetenland. In the Mexican-American Studies case, it's Aztlán." Trial Tr. 98:13-22 June 27, 2017.

TUSD appealed Huppenthal's determination to an Administrative Law Judge

1  ("ALJ") within the Arizona Office of Administrative Hearings.  Trial Tr. 180:2-14 June

2  27, 2017.  The ALJ upheld Huppenthal's finding.  *Id.* at 181:7-10.  On January 6, 2012,

3  Huppenthal issued an order "accept[ing]" that decision and directing ADE "to withhold

4  ten percent of the monthly apportionment of state aid that would otherwise be due to

5  [TUSD] effective from August 15, 2011 through the present, and until such time as this

6  violation of A.R.S. § 15-112 is corrected."  Ex. 108 at 1-2.  Later that month, TUSD

7  voted to terminate the MAS program.  Trial Tr. 84:12-14 June 27, 2017; Trial Tr. 91:5-9

8  June 26, 2017.  ADE never actually withheld funding from TUSD.  Trial Tr. 186:14-15

9  June 27, 2017.

10      On January 14, 2012, Huppenthal posted another blog comment, this time stating

11  that, "No book whatsoever has been banned.  Just that MAS skinheads can't run

12  classrooms."  Trial Tr. 99:1-3 June 27, 2017.  The next day, he wrote another post:

13  "*Pedagogy of the Oppressed* and *Occupied America* are hateful books and are being

14  taught as belief systems in Mexican-American Studies.  The books aren't the problem.

15  The infected teachers are the problem."  *Id.* at 99:5-8.  One week later, Huppenthal wrote,

16  "They're having an orgasm over the claim that their book was banned.  Now maybe a

17  student will read it."  *Id.* at 100:23-24.  He explained at trial that there is "nothing more

18  tha[t] liberals love than to have a conservative ban a book, so that's why I was adamant

19  that I didn't want to participate in any book being banned. . . .  [I]t's just simply not the

20  books, it's how they're . . . handled within the classroom."  *Id.* at 101:2-7.  Huppenthal

21  continued to post comments on the issue into the spring.  On March 8, he commented that

22  "MAS = KKK in a different color."  *Id.* at 101:17-18.

23      In an interview that he gave at the time, Huppenthal used a "military analogy" to

24  describe his "battle" against the MAS program.  Ex. 104 at 8:5, 9:13, 9:13-15 ("This is

25  the eternal battle of all time, the forces of collectivism against the forces of individual

26  liberty . . . .").  He said "you can very quickly, as a conservative, end up with a lot of

27  forces against you and you can be defeated in your mission."  *Id.* at 7:22-24.  "And so

28                                    23

1   when we encountered this situation, we did what Hannibal did to the Romans, and when

2   Hannibal encountered the Romans he stretched them out. . .  So we elaborately built our

3   case," "stretched the[m] out for a whole year" during which TUSD "lost an enormous

4   number of their Mexican-American Stud[ies] students" and had "to continue to defend

5   themselves in the press."  *Id.* at 8:12-22.  Finally, Huppenthal delivered the "knockout

6   punch."  *Id.* at 8:23.  At trial, Huppenthal again described his "war with MAS" as

7   "eternal.  It goes back to the plains of the Serengeti[,] . . . when we were evolving as a

8   human race, the battle between the forces of collectivism and individualism.  It defines us

9   as a human race."  Trial Tr. 87:1-6 June 27, 2017.

10      Like Horne, Huppenthal was aware of the Paulo Freire charter schools, Trial Tr.

11   161:20-162:16 June 26, 2017, and the other three ethnic studies programs in TUSD, but

12   never investigated or audited those programs, *id.* at 162:13-162:16, 186:15-187:20.

13      One aspect of defendants' theory at trial was that they "had no intention to

14   terminate the MAS program," but instead wanted TUSD to bring the program into

15   compliance.  *See, e.g.*, Trial Tr. 52:2-17 June 27, 2017; *id.* at 85:16 (Huppenthal testifying

16   that he gave the MAS program "every chance to heal themselves").  The Court agrees

17   with the Ninth Circuit that "[t]his characterization . . . is artificial."  *See* 793 F.3d at 983

18   n.8.  Horne repeatedly testified that his objective was to "eliminate[]" the MAS program.

19   *See, e.g.*, Trial Tr. 30:7-10 July 18, 2017; Trial Tr. 155:12-20 July 18, 2017 (testifying

20   that the program could not "come into compliance" because "it was beyond reform").

21   When Huppenthal enforced the statute against the MAS program, he imposed the

22   maximum penalty of ten percent of TUSD' entire state funding without even considering

23   whether a lesser amount should be withheld.  Trial Tr. 104:19-105:5 July 17, 2017.  As

24   even Huppenthal acknowledged, TUSD was at that point left with "no choice but to

25   terminate" the program, given that a "[t]en percent reduction is, essentially, all of your

26   liquidity as a school district."  Ex. 210 at 110:7-8, 10-16; *see also* Ex. 104 at 9:4

27   (Huppenthal stating that "they have [to] shut that program down").

28

1    In 2014, TUSD began developing a new ethnic studies program pursuant to the

2    requirement under the *Fisher* desegregation decree that TUSD take "decisive and

3    measured steps towards attaining unitary status."  *See* Dkt. No. 1375 at 3 (Case No. 74-

4    090-DCB).  On January 2, 2015, during Huppenthal's final week as Superintendent, Trial

5    Tr. 88:21-23 June 27, 2017, he issued a notice of non-compliance to TUSD finding the

6    new program in violation of A.R.S. § 15-112.  Ex. 118.  Then-Attorney General Horne,

7    on behalf of the State of Arizona, attempted to intervene in *Fisher* to object to the new

8    courses, which he believed "prompt[ed] the return of the discredited Mexican-American

9    Studies program."  Trial Tr. 118:14-19 July 18, 2017.  The district court denied Arizona's

10   motion, and the Ninth Circuit affirmed that ruling.  *Fisher v. Arizona*, 594 F. App'x 917

11   (9th Cir. 2014).

12   Horne and Huppenthal both testified that in taking action against the MAS

13   program, they did not intend to express any animus toward Mexican Americans.  Trial Tr.

14   171:16-25 July 18, 2017; Trial Tr. 189:15-23 June 27, 2017.  Horne asserted that he

15   considers "racial animus . . . to be the biggest evil in human history," and that his

16   opposition to the MAS program arose out of his "philosophy" that "race has no proper

17   role in American law or life."  Trial Tr. 40:24-25, 171:19-25 July 18, 2017.  Huppenthal

18   asserted that he is "the reverse of biased.  If [he] could help these kids, [he] would lay

19   down in the mud and let them walk over [his] back."  Trial Tr. 189:25-190:2 June 27,

20   2017.  Horne and Huppenthal also testified that their political beliefs had nothing to do

21   with their efforts to pass and enforce A.R.S. § 15-112 against the MAS program.  Trial

22   Tr. 171:16-25 July 18, 2017; Trial Tr. 190:3-5 June 27, 2017.

23   **II.   CONCLUSIONS OF LAW**

24       **A.   Fourteenth Amendment**

25   In *Arce v. Douglas*, the Ninth Circuit affirmed this Court's ruling that A.R.S. § 15-

26   112 is not discriminatory on its face.  793 F.3d at 977.  However, "the statute and/or its

27   subsequent enforcement against the MAS program would still be unconstitutional if its

28                                        25

enactment or the manner in which it was enforced were motivated by a discriminatory purpose." *Id.* (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("*Arlington Heights*")).  To establish a Fourteenth Amendment violation under *Arlington Heights*, a plaintiff need not prove that the discriminatory purpose was the "sole[]" purpose of the challenged action, only that it was a "motivating factor."  429 U.S. at 266.  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Id.*  Circumstantial evidence of discriminatory purpose includes: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the defendant's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history.  *Id.* at 266–68.

### 1.    Enactment

Huppenthal's blog comments provide the most important and direct evidence that racial animus infected the decision to enact A.R.S. § 15-112.  Huppenthal not only voted for the bill, but was a key player in the effort to get it passed.  Several of his blog comments convey animus toward Mexican Americans generally.  Trial Tr. 95:18-23 June 27, 2017 ("No Spanish radio stations, no Spanish billboards, no Spanish TV stations, no Spanish newspapers.  This is America, speak English."); *id.* at 97:19-20 ("I don't mind them selling Mexican food as long as the menus are mostly in English.").  Other comments specifically referenced and disparaged the MAS program and teachers in racial terms.  Trial Tr. 101:17-18 June 27, 2017 ("MAS = KKK in a different color"); *id.* at 96:2-7. ("The rejection of American values and embracement of the values of Mexico in La Raza classrooms is the rejection of success and embracement of failure."); *id.* at 98:13-22 ("The Mexican-American Studies classes use the exact same technique that Hitler used in his rise to power.  In Hitler's case it was the Sudetenland.  In the Mexican-

26

American Studies case, it's Aztlán."); *id.* at 99:5-8 ("The infected [MAS] teachers are the problem."). Because these comments were made soon after the legislature debated and voted on the bill, they are highly probative of Huppenthal's state-of-mind during the relevant period.

Defendants made no attempt to argue that these comments do not convey racial animus.[23] Rather, they argued that Huppenthal's public statements, which were facially neutral as to race, are more probative of his true intent. Trial Tr. 81:15-21 July 21, 2017 (defense counsel arguing in closing that "those private comments don't reflect the public reasons for taking action against TUSD's MAS program," as they were not "reflected in the directives he issued regarding the program"). The Court is unpersuaded. The blog comments are more revealing of Huppenthal's state-of-mind than his public statements because the guise of anonymity provided Huppenthal with a seeming safe-harbor to speak plainly. Huppenthal's use of pseudonyms also shows consciousness of guilt. Had Huppenthal, a public official speaking in a public forum on a public issue, felt that his inflammatory statements were appropriate, he would not have hidden his identity.

The Court next evaluates the circumstantial evidence under the five *Arlington Heights* factors. The first factor is whether enactment of the statute had a disparate impact on Latinos. Where "the challenged governmental policy is 'facially neutral,' proof of disproportionate impact on an identifiable group, such as evidence of 'gross statistical disparities,' can satisfy the intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy." *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) (citing *Arlington Heights*, 429 U.S. at 264-66).

As the *Arce* court noted, defendants do not contest that the decision to terminate

---

[23]   Even Horne described these statements as "shock[ing]" and hate speech. Trial Tr. at 15:2-18 July 18, 2017.

1   the MAS program "bear[s] more heavily on racial minorities." *See Arlington Heights*,

2   429 U.S. at 269; *Arce*, 793 F.3d at 978.  At the time the program was terminated,

3   approximately ninety percent of the students enrolled in MAS courses were Latino.

4   Moreover, Dr. Cabrera's report showed that the MAS program was "particular[ly]"

5   beneficial to the Latino students who were enrolled.  Accordingly, there can be no

6   question that the enactment of A.R.S. § 15-112, which targeted the MAS program, had a

7   disproportionate impact on Latino students.

8        The next factor is the historical background of discrimination.  The evidence

9   bearing on this factor also supports an intent to discriminate.  Arizona schools engaged in

10  widespread racial segregation during the twentieth century, leading to multiple

11  meritorious desegregation suits.  Ex. E-B at 12.  A federal desegregation order remains in

12  effect today, requiring TUSD to eliminate the district's historical "segregative intent"

13  with respect to Mexican-American students.  *See Fisher*, 652 F.3d at 1137.  The MAS

14  program was implemented as part of the ongoing effort to remedy the harmful effects of

15  that historical segregation.

16       The next two factors are the sequence of events and whether those events included

17  departures from normal procedures or substantive conclusions.  The Court finds

18  enactment of A.R.S. § 15-112 was irregular in two ways.  First, the statute was enacted to

19  target a single educational program in use in a single school district in Arizona.  This is

20  probative of discriminatory intent, as defendants' own evidence showed that it is unusual

21  to address a perceived problem with one school program on a statewide, rather than a

22  local, basis.  *See United States v. Windsor*, 133 S Ct. 2675, 2693 (2013) (noting that the

23  enactment of a federal law regulating marriage was an "unusual deviation" from the

24  general practice of regulating marriage at the state level).  Horne's Open Letter presumed

25  that any issue would be resolved by the local school board.  Ex. 22 at 1 (stating that the

26  ultimate "decision of whether or not to eliminate this program will rest with the citizens

27  of Tucson through their elected school board").  Huppenthal testified that he initially

28

1  opposed H.B. 2281 because the issue should be resolved locally.

2      Second, several defense witnesses testified that existing statutes could have been

3  used to address the purported issues with the MAS program.  Specifically, A.R.S.

4  §§ 15-721 and -722 could have been used to ensure that all MAS textbooks were properly

5  approved, and A.R.S. § 15-341 could have been used to ensure that the MAS program

6  was not using "materials of a sectarian, partisan or denominational character."  Trial Tr.

7  50:12-18 June 27, 2017; Trial Tr. 28:19-25, 29:16-19, 161:9-162:10 July 17, 2017.

8      The last factor is the legislative history.  In *Arce*, the Ninth Circuit noted that it

9  contains "a few snippets of overtly discriminatory expression."  793 F.3d at 978.  The

10  court pointed to Representative Montenegro's statement that MAS was creating "racial

11  warfare."  The court of appeals also noted Horne's testimony before the House and

12  Senate "recounting the incident from 2007 where students walked out of the speech given

13  by his deputy," where he "stated that the MAS program 'promoted' the group MeCHA,

14  which he characterized as a group 'that among other things says that North America is a

15  land for the bronze peoples,'" and where he "added that he saw a TUSD high school

16  librarian who was 'wearing a MeCHA t-shirt.'"  *Id.* at 978–79 (internal quotation marks

17  omitted).

18      The Court relies on these statements, as well as several additional, similar

19  statements from these individuals and other legislators who voted for the bill.  Horne

20  made several statements from which the Court infers that racial animus underlay his

21  efforts to pass H.B. 2281.  These include his statement that the MAS program teaches

22  "ethnic chauvinism," his description of a third-hand report from a teacher who told him

23  that a group of students complained that a MAS teacher "dissed them for being white,"

24  and his assertion that having "Raza studies for the Raza kids, Native American studies for

25  the Native American kids, [and] oriental studies for the oriental kids" is "just like the Old

26  South."  Also revealing of discriminatory purpose is Representative Kavanagh's

27  statement that he opposed the MAS program because "[i]f you want a different culture

28

then fine, go back to that culture.  But this is America."

Finally, as to this factor, the Court finds that during the legislative proceedings and other public discussion of H.B. 2281, Horne, Huppenthal, and other officials used code words to refer to Mexican Americans in a derogatory way.  "[T]he use of 'code words' may demonstrate discriminatory intent."  *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 505 (9th Cir. 2016); *see also Underwood v. Hunter*, 730 F.2d 614, 621 (11th Cir. 1984) (relying in part on conclusion that "the phrase the 'corrupt and the ignorant' referred specifically to blacks and lower-class whites" to discern racial animus in passage of facially neutral legislation).  Code words are words that "send a clear message and carry the distinct tone of racial motivations and implications" by "conveying the message that members of a particular race are disfavored."  *Ave. 6E*, 818 F.3d at 506 (quoting *McGinest v. GTE Serv. Corp*, 360 F.3d 1103, 1117 (9th Cir. 2004)).  "Whether a code word evidences racial animus may depend upon factors including local custom and historical usage."  *Id.*  Where a "code word[] consist[s] of stereotypes of Hispanics that would be well-understood in [the relevant community]," an inference of racial animus may be drawn.  *Id.*

Certain frequently invoked terms and concepts, including "Raza," "un-American," "radical," "communist," "Aztlán," and "M.E.Ch.a," operated as derogatory code words for Mexican Americans in the MAS debate.  These terms functioned as code words by standing for a racial group, *see, e.g.*, Ex. 516 at 2:55:24 (Horne using "Raza" to mean Mexican American in referring to "Raza studies for the Raza kids"), and by drawing on negative mischaracterizations that had little to no basis in fact.  These particular words were effective codewords with Arizona voters because they drew on "[p]eople['s] . . . concern[s] about illegal immigration" and the 'Mexicanization' of Arizona that were prominent during "the 2006 to 2011 time frame."  *See* Trial Tr. 149:7-12, 152:5 July 18, 2017.  In Huppenthal's own words, the term "Raza" became "shorthand for . . . communicating with Republican primary voters" in the Tucson community.  Trial Tr.

176:20-177:2 June 26, 2017.  These concepts of foreignness and political radicalism were not only used to promote A.R.S. § 15-112, they in fact are reflected in the statute, which forbids courses that "[p]romote the overthrow of the United States government."  That there is no basis for linking this concept to MAS is undisputed, as Horne did not believe that the MAS program was promoting overthrow of the United States government.  Trial Tr. 61:20-21 July 18, 2017 (Horne testifying that he "had no evidence that anyone promoted the overthrow of the United States Government").  Thus, the provision served no function other than to reinforce a link between the MAS program and a negative stereotype.

Although the Court has reached this conclusion regarding code words independently, the testimony of plaintiffs' expert Dr. Stephen Pitti corroborates it.[24]  Dr. Pitti explained that, due to "changing social norms," politicians may "resort to racially coded speech that stands in for racial and racist ideology that was previously stated explicitly."  Ex. E-B at 10.  His historical analysis showed that "Arizona, in the last decade of the twentieth century and the first part of the twenty-first century, has experienced increasing political tension associated with rapidly changing demographics," specifically, an increase in the state's Latino and Mexican-born immigrant populations. *Id.* at 13.  A "strong correlation between 'Mexicans' and the total foreign-born population in Arizona contributed to a tendency among policymakers, the media, and members of the public to assume that the majority of persons of Latino descent were non-citizens," and "contributed to anxieties expressed in public discourse . . . about the 'Mexicanization' of the state." *Id.*  Fears of Mexicanization spawned the use of codewords like "Aztlán, Reconquista, La Raza, MEChA, illegal immigrants," "un-American," "radical," and

---

[24]     Dr. Pitti is a Professor of History and American Studies at Yale University whose "primary field of research and teaching centers on the experiences of Mexicans and Mexican Americans in the U.S. Southwest."  Ex. E-B at 2.

1   "collectivism" to refer to the MAS program.  Ex. E-B at 16.  Use of these "code words
2   was done in conjunction with mischaracterizations of" that program, as well as of "MAS
3   educators and students."  *Id.* at 21.

4          **2.     Enforcement**

5          Huppenthal's blog comments provide the strongest evidence that racial animus
6   motivated the enforcement of A.R.S. § 15-112 against the MAS program, for the same
7   reasons given above.  The blog comments are more probative of the reasons behind
8   *enforcement* of the statute because Huppenthal was Superintendent at the time, the
9   ultimate decisionmaker in that effort.  While enforcing A.R.S. § 15-112 against the MAS
10  program, Huppenthal continued to make comments  that disparaged Mexican Americans
11  as a group, and linked that view to his fight against the MAS program.

12         Providing further direct evidence of animus is the fact that Mexican Americans
13  were "specifically targeted for enforcement."  *See Pac. Shores*, 730 F.3d at 1162.  Horne
14  and Huppenthal were aware of other ethnic studies programs and had evidence that those
15  programs violated the statute.  *See, e.g.*, Trial Tr. 89:6-91:7 July 18, 2017; Ex. 57
16  (TUSD's African American studies website stating that the program is designed "to
17  improve the academic achievement of African American students" and "works primarily
18  with African American students"); Ex. 525 at 2.  They were also both aware of the Paolo
19  Freire school.  Yet, the MAS program was the only program against which the statute was
20  ever enforced; in fact, the only program that was ever investigated for a possible violation
21  of § 15-112 by the ADE.

22         Next, the Court considers the circumstantial evidence that enforcement was
23  motivated by discriminatory animus.  As to disparate impact, again, defendants do not
24  dispute that Mexican-American students bore the brunt of the enforcement decision.  This
25  fact is even clearer in the enforcement context, as the statute has only ever been enforced
26  against the MAS program.  The Court has also already addressed the second factor, the
27  historical background of the decision, in the context of enactment of the statute.  For the

28

1   same reasons, this factor weighs in favor of finding that defendants intended to

2   discriminate against Mexican Americans.

3       The Court next considers the sequence of events that comprised Horne's and

4   Huppenthal's efforts to enforce the statute, and whether those events entailed procedural

5   or substantive irregularities.  The enforcement effort was rife with irregularities.  From

6   the outset, Horne's investigation into the MAS program drew tenuous conclusions that

7   were based on admittedly thin and one-sided evidence.  *See Pac. Shores*, 730 F.3d at

8   1164 (relying on one-sided information in a fact-gathering proceeding is a "procedural

9   irregularit[y]" that evinces discriminatory intent).  For instance, Horne candidly stated

10  that he refused to visit a MAS classroom as part of his investigation because he "didn't

11  want to have [MAS teachers] go and put on a show for [him] and make it seem

12  innocuous" because if then asked "what [he] saw," he "would have to say it was

13  innocuous."  Trial Tr. 9:20-23 July 18, 2017.  What information Horne did have about the

14  program was extremely limited.  Horne witnessed the protest at the Dugan speech, but he

15  had no legitimate basis for concluding, as he did, that such protest was organized by

16  radical MAS teachers who taught rudeness.  Horne also relied on having seen a librarian

17  wearing a M.e.CH.A. t-shirt and on cherry-picked quotations from textbooks, his

18  interpretations of which border on the illogical.  And finally, Horne had reports from

19  teachers, at least one of which was second-hand and made by a teacher who had not

20  taught since 2002, and never taught in the MAS program.

21      The irregularities continued.  Horne found the MAS program violated A.R.S. § 15-

22  112 on December 30, 2010, before the statute was in effect.  To apply a statute that is not

23  effective is unlawful and shows discriminatory intent.  *See Pac. Shores*, 730 F.3d at 1164

24  (efforts to enforce a zoning code provision "prior to [its] enactment" was a "procedural

25  irregularit[y]" evincing discriminatory intent).  Horne's finding was based only on

26  conduct occurring before the statute was passed, thus applying the statute retroactively to

27  conduct that was lawful when it occurred.

28

1    When Huppenthal took office, he immediately expressed support for this improper

2 finding.  As the drafter of the amendment that delayed the effective date of the statute,

3 Huppenthal knew that Horne's finding was premature.  Yet, Huppenthal embraced

4 Horne's finding in one of his first acts as Superintendent on his first full day in office.

5    Although Huppenthal then hired independent auditors, he rejected their findings

6 when they did not conform to his preconceptions about the MAS program.  *See Ave. 6E*,

7 818 F.3d at 507 (disregarding the "advice of [the government's] own experts can provide

8 evidence of discriminatory intent").  Further, none of Huppenthal's three stated reasons

9 for rejecting the audit are credible.  *Cf. Island Trees Union Free Sch. Dist. No. 26 v. Pico*,

10 457 U.S. 853, 873 (1982) (school board's decision to reject an independent "Committee's

11 recommendations . . . without any statement of reasons for doing so" was evidence that

12 the board acted with improper intent) (plurality opinion).  His first criticism, that "two-

13 thirds of the final audit report was beyond the scope of the legal determination," Ex. 92 at

14 1, is not a reason for rejecting the audit because Huppenthal admitted at trial that "those

15 two-thirds of the audit were requested by the Arizona Department of Education," Trial Tr.

16 71:18-20 June 27, 2017.  His second criticism, that TUSD "knew which week the on-

17 sight classroom reviews and interviews would be taking place," "only 37% of the

18 Mexican American Studies Program classrooms were observed," and "[m]ost classrooms

19 were visited just once and for only 30 minutes," Ex. 92 at 1, is not credible because

20 Huppenthal did not have his own staff visit *any* classrooms during the course of their own

21 investigation, Trial Tr. 77:17-18 June 27, 2017.  Moreover, Huppenthal admitted that

22 37% "would be a fairly large sample size" of MAS classes.  Ex. 210 at 85:14-15.  Lastly,

23 his criticism that "key leadership in the Mexican American Studies Department refused to

24 cooperate–including the Director of the Department," Ex. 92 at 2, standing alone, would

25 provide an exceedingly weak basis for rejecting the auditors' findings, especially given

26 that those findings were substantiated with evidence from other firsthand sources.  Ex. 93

27 at 12-13 (describing auditors' efforts "to locate and use . . . primary sources of

28

34

information along with qualitative and quantitative data").  Accordingly, the Court is persuaded that Huppenthal's rejection of the Cambium Report "was based on a predetermined intent to find the MAS program in violation of § 15-112." *See Arce*, 793 F.3d at 980-81.

Next, Huppenthal and his staff undertook their own investigation.  This presented another irregularity, as they had already concluded that a violation occurred upon receiving the Cambium report.

At the conclusion of their investigation, Huppenthal issued his finding that the MAS program was in violation.  This finding was based solely on the lack of curricular materials and the content of the textbooks.  The Court finds that this basis for the finding does not support it, and thus concludes that the basis is pretextual.  Shortcomings in curriculum do not violate A.R.S. § 15-112.  Trial Tr. 86:19-20 June 28, 2017; Trial Tr. 80:21-22 June 30, 2017.

Although at trial Hrabluk claimed that curricular deficiencies indirectly support a finding of violation, even this assertion collapses under scrutiny.  She and the other ADE witnesses admitted that they saw no defined curriculum and made no classroom visits.  They further admitted that without a defined curriculum or classroom visits–in other words, looking solely at course materials–it would not be possible to know what was being taught.[25]  *See, e.g.*, Trial Tr. 105:16-20 June 28, 2017 ((Huppenthal) Q: "In the absence of a curriculum, it can be very difficult to discern how materials . . . are being used, right?"  A.  "Yes."); Trial Tr. 163:8-10 June 27, 2017 ((Huppenthal) Q. "If you look

---

[25]     Huppenthal repeatedly testified that whether use of a book is objectionable depends on "what's going on in the classroom."  Trial Tr. 64:17-19 June 27, 2017; *id.* at 50:2-4 ("[J]ust about any [text] should be allowed to be in a school, . . . it's how you use it that is the key."); *id.* at 101:6-7 ([I]t's just simply not the books, it's how they're . . . handled within the classroom.").  Hrabluk agreed that when "controversial material is part of a group of resources for a program, what does become critical then is how those resources are being presented to students."  Trial Tr. 37:8-10 July 17, 2017.

35

at the materials, can you tell what's being taught or when?"  A. "No."); Trial Tr. 78:10-12 July 17, 2017 (Hrabluk testifying that "I don't know how you figure out what teachers are teaching and what students are learning if you cannot review a full and complete plan and a curriculum map."); Trial Tr. 19:16-20 June 30, 2017 ((Hrabluk) Q.  "If you have a series of curriculum units that don't appear to be connected to each other, can you tell what's being taught?"  A. "You could not tell what was being taught across the length of the time of instruction.").  Without knowing what was being taught, *no affirmative conclusion* could be drawn that MAS teachers were teaching radicalism, racial resentment, or other objectionable philosophies.  Thus, by their own admissions, Huppenthal and his staff's findings had no logical basis.[26]

Worse, in drawing an affirmative conclusion from materials where none could reasonably be drawn, ADE officials necessarily relied on an unsupported assumption that MAS teachers were presenting materials with the intent to indoctrinate students, rather than in a balanced way that would generally be expected of competent teachers.  As Hrabluk testified, she and the other ADE staff took the materials "at face value."  *See, e.g.*, Trial Tr. 14:24-15:5 July 17, 2017.  By this, she meant that she assumed that the material, no matter the type of source or the context, was "taught as truth."  Trial Tr. 103:23-104:4 July 17, 2017.  To give an illustration, a 1965 Che Guevara speech was

---

[26]   At times, Hrabluk and others insinuated that their finding rested in part on the fact that *all* of the MAS texts reviewed by ADE were biased and provided a single view point, and there were no materials to provide a balanced perspective.  Trial Tr. 51:20-25 July 17, 2017.  To the contrary, Huppenthal himself conceded that there were only "some really egregious examples [of objectionable materials] in there," and that "a significant portion of the materials . . . were acceptable."  Trial Tr. 45:8-16 June 27, 2017.  The Cambium auditors reported that *The American Vision*, the Arizona-approved United States history text, was seen in use in all of the high school history courses visited during the audit.  Trial Tr. 39:4-12 July 17, 2017; Ex. 231.  Hrabluk had no reason to doubt that *The American Vision* was in use, Trial Tr. 39:24-40:1 July 17, 2017, and conceded that *The American Vision* would have provided "balance and context," *id.* at 53:6-10, 94:2-5.

taught in the Latino literature course at one time.  Trial Tr. 114:17-115:1 June 26, 2017.

Huppenthal's staff would have assumed that the speech was taught, not as part of a lesson

in effective rhetoric or to help students understand Guevara's role in history, but to

indoctrinate students in Guevara's socialist political philosophy.  *See* Trial Tr. 104:5-18

July 17, 2017.  Such a baseless assumption was itself an act of negative stereotyping.

        The Court's conclusion that enforcement was founded on a discriminatory

assumption about MAS teaching is bolstered by Horne's and Huppenthal's own

statements.  Both individuals conveyed an unfounded, yet uniform, distrust of MAS

teachers' and students' accounts of what was taking place in MAS classrooms.  Ex. 144 at

32:19 (Huppenthal stating that his "suspicion is inside these classes, these students are

being indoctrinated by people who are in power to have a certain mindset of us versus

them. . .  That's our suspicion.  We really think we know what's going on behind those

doors.  People in power are doing something distasteful."); Trial Tr. 9:20-23 July 18,

2017 (Horne testifying that he did not visit a MAS class because he believed that MAS

teachers would "go and put on a show for [him] and make it seem innocuous," which

would require him, if then asked "what [he] saw," "to say it was innocuous."  Trial Tr.

131:15-19 July 18, 2017 (Horne testifying that "[w]hen they say [raza] doesn't mean 'the

race,' it means 'the people,' they're being deceptive"); Trial Tr. 95:13-20 July 18, 2017

(Horne dismissing a student's positive testimony about the MAS program because she

was being questioned by a legislator who was "very liberal" and "worded the question to

indicate what answer he was looking for"); Trial Tr. 87:2-11 July 18, 2017 (Horne

testifying that he viewed Huppenthal's decision to hire Cambium as "a big mistake"

because "[t]he classes pretended to be harmless" and "were putting on a show for [the

auditors]"); Trial Tr. 96:18-21 July 18, 2017 (Horne testifying that "[t]hese teachers were

so ideological that they would tell you whatever you wanted to hear as far as reforming

the curriculum and then behind closed doors they would do whatever they wanted to

do.").  Their position is unjustifiable because all of the available firsthand evidence–the

experiences of the Cambium auditors, the MAS teachers, the MAS students, and even Huppenthal himself–belied the notion that anything untoward was happening in MAS classrooms.

Finally, given that the MAS program was an academically successful program, the decision by each of these two Superintendents of Public Instruction to eliminate it was a departure from the substantive outcome that one would expect.  One would expect that officials responsible for public education in Arizona would continue, not terminate, an academically successful program.  Horne himself admitted that he did not enforce the statute against the Asian-American studies program in Tucson because he "was told that it was academically an excellent program."  Trial Tr. 91:3-7 July 18, 2017.  Although Horne and Huppenthal were told that the MAS program was academically excellent, they refused to believe it.

To summarize, the sequence of events included no attempt to conduct a good faith, objective evaluation of the MAS program's teachings and efficacy, other than the Cambium audit, which was rejected out of hand.  Instead, in enacting the statute, the legislature, Horne, and Huppenthal relied on and presented biased accounts of the MAS program that were based on limited evidence and laced with terms fairly understood to refer negatively to perceived traits of Mexican Americans.  In enforcing the statute against the MAS program, the ADE, under Huppenthal's direction, took cherry-picked passages from texts at face value, *i.e.*, they assumed, without evidence, that MAS teachers were promoting politically radical positions, rather than teaching their students about history and literature in a factually accurate and balanced manner.

### 3.  Conclusion regarding the Fourteenth Amendment claim

Considering the evidence, the Court is convinced that A.R.S. § 15-112 was enacted and enforced with a discriminatory purpose.  Huppenthal's anonymous blog comments are the most important evidence, as they plainly show that he harbored animus.  The circumstantial evidence corroborates that direct evidence, and confirms that other actors

38

1  held the same views.  Given this wealth of evidence, the Court finds Horne and
2  Huppenthal did not testify credibly regarding their own motivations.  The passage and
3  enforcement of the law against the MAS program were motivated by
4  anti-Mexican-American attitudes.

5      **B.      First Amendment**

6      Students have a First Amendment right to receive information and ideas, *see Pico*,
7  457 U.S. at 866-67 (1982) (plurality opinion), a right that applies in the context of school
8  curriculum design, *see Arce*, 793 F.3d at 983.  The right is infringed if the state
9  "remove[s] materials otherwise available in a local classroom unless [that] action[] [is]
10  reasonably related to legitimate pedagogical concerns." *Id.*

11      A plaintiff may establish a First Amendment violation by proving that the reasons
12  offered by the state, though pedagogically legitimate on their face, in fact serve to mask
13  other illicit motivations.  *See Pico*, 457 U.S. 853 (1982).  In *Pico*, a four-member plurality
14  of the Supreme Court recognized that school boards' "discretion to determine the content
15  of their school libraries[,] . . . may not be exercised in a narrowly partisan or political
16  manner." *Id.* at 870.  *Pico* explained that it therefore had to consider "the motivation
17  behind [the board's] actions" to determine whether students had been "denied . . . their
18  First Amendment rights."  *Id.* at 871.  Impermissible motivations would include "racial
19  animus," as well as if the board "*intended* by their removal decision to deny [students]
20  access to ideas with which [the members of the board] disagreed." *Id.* at 871, 872 ("[W]e
21  hold that local school boards may not remove books from school library shelves simply
22  because they dislike the ideas contained in those books and seek by their removal to
23  'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of
24  opinion.'" (quoting *W. Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943))).

25      Although he dissented from the judgment in *Pico*, Justice Rehnquist "cheerfully
26  concede[d]" that "discretion may not be exercised in a narrowly partisan or political
27  manner." *Id.* at 907 (internal quotation marks omitted).  He also agreed with the plurality

28

39

1    that impermissible motivations for removing library books include "racial animus."  *Id.*

2    Consequently, five members of the Supreme Court subscribed to the view that the First

3    Amendment forbids school officials from removing materials from school libraries to

4    further narrowly partisan, political, or racist ends.

5         *Pico* concerned library materials rather than curricular materials, but the Ninth

6    Circuit in *Monteiro v. Tempe Union High School District* relied on *Pico* in extending the

7    First Amendment to "the context of a school curriculum."  158 F.3d 1022, 1027 n.5 (9th

8    Cir. 1998) (citing *Pico*, 457 U.S. at 870-71).  Moreover, the Second, Sixth, Eighth, and

9    Tenth Circuits have all recognized a pretext-based First Amendment claim in the school

10   curriculum context.  *See Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617,

11   631 (2d Cir. 2005); *Settle v. Dickson Cty. Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995);

12   *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 773 (8th Cir. 1982);

13   *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292-93 (10th Cir. 2004).

14        The stated policy of A.R.S. § 15-112 is to reduce racism in schools, *see* A.R.S.

15   § 15-111, which is a legitimate pedagogical objective.  The theory of plaintiffs' First

16   Amendment claim is that reducing racism is only a pretextual objective, and that the

17   statute was in fact enacted and enforced for narrowly political, partisan, and racist

18   reasons.

19        The Court concludes that plaintiffs have proven their First Amendment claim

20   because both enactment and enforcement were motivated by racial animus.  The same

21   evidence supporting the conclusion that defendants violated plaintiffs' Fourteenth

22   Amendment rights also supports the conclusion that defendants enacted and enforced

23   A.R.S. § 15-112 for illicit reasons, rather than out of pedagogical concern.

24        Additional evidence shows that defendants were pursuing these discriminatory

25   ends in order to make political gains.  Horne and Huppenthal repeatedly pointed to their

26   efforts against the MAS program in their respective 2011 political campaigns, including

27   in speeches and radio advertisements.  The issue was a political boon to the candidates

28                                            40

1  because "concerns" about the MAS program had "spread across the state like wildfire."

2  Huppenthal delayed the effective date of A.R.S. § 15-112 until the day that he was to take

3  over as Superintendent.  The most plausible explanation for this action was that

4  Huppenthal wanted to take political credit for putting an end to the MAS program.[27]

5  Horne issued a finding of violation anyway, before the effective date, because he wanted

6  to take the credit for himself.

7      Huppenthal also expressly framed the dispute regarding the MAS program in

8  political terms.  In "battl[ing]" MAS, he saw himself "as a conservative . . . with a lot of

9  forces against [him]" that "sought to defeat[]" him "in [his] mission."  He also wanted to

10  ensure that Cambium was "conservative enough" and not "too liberal in their thinking."

11  At trial he explained that "that there is "nothing more tha[t] liberals love than to have a

12  conservative ban a book, so that's why I was adamant that I didn't want to participate in

13  any book being banned."

14      Viewing the issue from another perspective, plaintiffs have proven their First

15  Amendment claim by proving that no legitimate pedagogical objective motivated the

16  enactment and enforcement of A.R.S. § 15-112 against the MAS program.  First,

17  defendants had no legitimate basis for believing that the MAS program was promoting

18  racism such that eliminating it would reduce racism.  As explained in the analysis of the

19  Fourteenth Amendment claim, Horne's investigation was one-sided and yielded little

20  evidence.  Huppenthal's investigation was outcome-driven and rejected the findings of an

21  independent and well-regarded professional curriculum consultant without credible

22  explanation.  Second, as explained above, defendants' emphasis on curriculum was

23  pretextual because it did not support a finding that A.R.S. § 15-112 had been violated.

24

25      [27]    Huppenthal's explanation, that he wanted to "take the politics out of any

26  decision that was made regarding the class," is not credible, given that the decision was
political and Huppenthal made it so.  Trial Tr. 136 g:.7-24 June 27, 2017; Trial Tr.

27  175:16-19 June 26, 2017.

28

1  Finally, Huppenthal's comments describing his "eternal" "war" against the MAS

2  program, Ex. 104, expose his lack of interest in the welfare of TUSD students, who would

3  be the focus of legitimate pedagogical concern if one existed.  Those comments reveal

4  instead a fixation on winning a political battle against a school district.  Having thus ruled

5  out any pedagogical motivation, the Court is convinced that decisions regarding the MAS

6  program were motivated by a desire to advance a political agenda by capitalizing on race-

7  based fears.

8  **III.     ORDER**

9          For the reasons set forth above,

10         **IT IS HEREBY ORDERED:**

11         1.      Judgment as to liability shall be entered in favor of plaintiffs on their First

12 and Fourteenth Amendment claims.

13         2.      The Court shall determine the appropriate remedy for Defendants above

14 constitutional violations on the following schedule:

15             (A) The parties shall file concurrent Remedy Briefs within 20 days of the

16 date of this Memorandum of Decision.

17             (B) The parties may, but are not required to, file Reply Briefs.  If such

18 briefs are filed, they shall be filed within 14 days after service of the opposing party's

19 initial Remedy Brief.

20             (C) The court shall thereafter set the remedy phase for oral argument after

21 consultation with counsel.

22         DATED this 22nd day of August, 2017.

23

24

25

26                                        A. Wallace Tashima

27                                        United States Circuit Judge
                                         Sitting by Designation
28